# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TDM America, LLC,<br>Plaintiff,<br>v.<br>The United States of America<br>Defendant,<br>and<br>Donjon Marine Company, Inc.<br>Interested Party. | Civil Action No. 06-472-C<br>Judge Thomas C. Wheeler |

## TDM'S MEMORANDUM OF LAW IN OPPOSITION TO THE US' MOTION TO QUASH THE SUBPOENA OF ALAN P. KLEIN AND FOR A PROTECTIVE ORDER AND IN SUPPORT OF TDM'S CROSS-MOTION FOR SANCTIONS AND/OR TO COMPEL PURSUANT TO RCFC 37

## TABLE OF CONTENTS

**Page No.**

I. PRELIMINARY STATEMENT ....................2
A. US' Failure to Comply with RCFC 26, 30, 33, and 34 ....................2
B. Relief Sought By TDM ....................4
II. BACKGROUND AND FACTS RELEVANT TO THE MOTION ....................5
A. Administrative Claim ....................5
B . Pleadings, Discovery and Initial Disclosures ....................6
C. The US' Deficient Interrogatory Responses ....................6
D. The US' Deficient Responses to Document Demands Under RCFC 34 ....................9
E. TDM's Good Faith Efforts at Resolution ....................10
F. The US Thwarts TDM's Inspection and February 6, 2007 Court Rulings ....................10
G. The March 6, 2007 Conference and the US' Failure to Comply ....................12
H. The US' Amended Interrogatory Responses Are Insufficient ....................13
I. The US' Answer to the Second Set of Interrogatories is Insufficient ....................14
J. Deposition Notices and RCFC 34 Requests Included Are Ignored by the US ....................15
K. The Klein Deposition Notice ....................16
III. ARGUMENT IN OPPOSITION TO THE US' COMBINED OTION TO QUASH THE DEPOSITION OF ALAN P. KLEIN AND FOR A PROTECTIVE ORDER ....................17
A. The Attorney-Client Privilege Does Not Apply To The Information TDM Seeks ....................17
B . The Work-Product Doctrine Does Not Apply To the Information TDM Seeks ....................21
IV. TDM'S CROSS-MOTION FOR SANCTIONS AND/OR TO COMPEL PURSUANT TO RCFC 37 ....................22
V. CONCLUSION ....................25

# TABLE OF AUTHORITIES

**Page No.**

## Cases

*AAB Joint Venture* v. *The United States*,
75 Fed.Cl. 432, (Fed. Cl. 2007) ........................................................................22

*AAB Joint Venture v. The United States*,
75 Fed.Cl. 448 (Fed.Cl. 2007) ........................................................................18, 19, 25

*AAIPHARMA Inc., v. Kremers Urban Development Co.*,
2006 WL 3096026 (S.D.N.Y. Oct. 31, 2006)........................................................24

*Blue Lake Forest Products Inc. v. The United States*,
2007 WL 968142 (Fed.Cl. March 29, 2007) ........................................................21

*Boston Edison Company v. United States*,
2007 WL 610885 (Fed. Cl. February 26, 2007) ......................................................20

Kaiser v. Mutual Life Ins. Co.,
161 F.R.D. 378 (S.D.Ind. 1994) ........................................................................17

King-Fisher Company v. The United States, 58 Fed.Cl. 570 (Fed.Cl. 2003) ..................18

*Pacific Gas and Elec. Co. v. U.S.*
69 Fed.Cl. 784 (Fed.Cl. 2006) ........................................................................22

*Properties International Ltd. v. Turner*,
706 F.2d 308 (11th Cir. 1983) ........................................................................24

*Shelton v. American Motors Corporation*,
805 F.2d 1323, 55 USLW 2331 (8th Cir. 1986)..............................................19, 20, 21

*Variable-Parameter Fixture Development Corp., v. Morpheus Lights, Inc.*
1994 WL 419830 (S.D.N.Y. Aug. 10, 1994)........................................................24

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TDM America, LLC,<br><br>Plaintiff,<br><br>v.<br><br>The United States of America<br><br>Defendant,<br>and<br><br>Donjon Marine Company, Inc.<br><br>Interested Party. | Civil Action No. 06-472-C<br>Judge Thomas C. Wheeler |

## TDM'S MEMORANDUM OF LAW IN OPPOSITION TO THE US' MOTION TO QUASH THE SUBPOENA OF ALAN P. KLEIN AND FOR A PROTECTIVE ORDER AND IN SUPPORT OF TDM'S CROSS-MOTION FOR SANCTIONS AND/OR TO COMPEL PURSUANT TO RCFC 37

Plaintiff TDM America, LLC ("TDM" or "plaintiff") respectfully submits this memorandum (i) in opposition to the combined motion by defendant United States of America ("US" or "defendant") to quash the subpoena of Alan P. Klein ("Klein") and for a protective order and (ii) in support of TDM's cross-motion for an order pursuant to Rule 37(a)(2)-(4), (b)(2) and (c)(1) of the Rules of the United States Court of Federal Claims ("RCFC") against defendant US. The basis for the cross-motion is the US' failure to (i) provide adequate, sufficient and verified responses to interrogatories propounded by TDM in accordance with RCFC 33; (ii) properly respond to document requests propounded in accordance with RCFC 34; (iii) comply with orders of this Court to produce and/or allow inspection of documents and properly respond to and verify interrogatories; and (iv) produce witnesses for duly noticed depositions.

More than six (6) months have elapsed since TDM first sought discovery from the US. Yet, the US still refuses to provide the most critical information in this patent infringement action, namely, the description(s) of the methods used to treat dredged materials, which is the essence of the claims of the patents-in-suit.

# I. PRELIMINARY STATEMENT

## A. US' Failure to Comply with RCFC 26, 30, 33, and 34

TDM commenced this action on June 21, 2006 against the US for infringement of US patent nos. 6,293,731 (the "'731 patent") and 5,542,614 (the "'614 patent") and, in a first amended complaint, included US patent nos. 5,794,862 (the "'862 patent") and 5,007,590 (the "'590 patent"). The patents-in-suit relate to, *inter alia*, the methods used for processing and/or treating dredged materials to form a structural fill.[1] Indeed, the method for treating dredged material is the key issue in this case, yet, to date, some six months after discovery began, after initial disclosures were to be exchanged and after TDM served document demands and interrogatories, the US still has not produced documents, photographs, and/or permits detailing the methods for treating dredged materials, nor has it produced the information regarding the quantities and invoicing thereof.

Although the US produced thousands of pages of documents (mostly within the last two weeks), the quantity of the documents should not obscure the fact that the key

---

1 The terms "treat," "treatment," "treating," "process" and "processing," as used herein, include treatment, processing, dewatering, stabilization, retention, handling, curing, reuse, remediation, fixation, solidification and/or disposal (in the past or present). All documents directed to methods used for processing or treating dredged materials are referred to throughout this memorandum as "process documents" to avoid repetition of the extended enumeration of document types each time reference is made to them. Appendix A, annexed hereto, provides a detailed listing of categories of process type documents which *must* exist.

process documents have not been produced or identified. Specifically, US contracts with contractors for dredging activities explicitly require that copies of detailed descriptions of the technological processing and treatment be submitted to the US usually within 35 or 70 days of the contract award. (See the accompanying April 20, 2007 Declaration of Michael A. Adler ("Adler Dec.") at Exs. 1, 2, and 3, respectively, which are excerpts from US contracts).[2] This information should be readily available to the US because ten (10) copies must be submitted. (*Id.*).

Further, even if there are a few select process documents among the thousands that have been produced, the US has not identified them in its responses to TDM's interrogatories or document requests. Ironically, the most detailed description of the treatment of dredged materials provided from the US was not contained in an interrogatory response or a document during discovery in this litigation, but in a May 16, 2006 letter from Klein to counsel for TDM and its affiliate one month before this action commenced (the "Klein Letter"). (Ex. 4). And that description was far from detailed. The Klein Letter denied TDM's administrative claim for patent infringement against the US and generally described the treatment of the dredged materials utilized by or on behalf of the US. Having failed to obtain documents or descriptions of these processes, and volumes, amounts and costs thereof, through initial disclosures, interrogatories, documents demands, deposition notices and court orders, TDM noticed the deposition of Klein and sought documents related to the Klein Letter.

Given the US' pattern of withholding relevant information and documents, it is not surprising that it now seeks to prevent TDM from deposing Klein about the factual

---

2 Exhibits referenced herein refer to the corresponding exhibits annexed to the Adler Dec.

statements he made regarding treatment of dredged materials in the Klein Letter. More egregious, however, is the US' attempt to cloak all underlying facts regarding the treatment of dredged materials under the guise of privilege merely because Klein reviewed documents containing the facts or interviewed witnesses who knew the facts. The US cannot hide behind the attorney-client privilege to prevent TDM from discovering the facts central to its claims. Therefore, the US' combined motion to quash the deposition of Klein (the "Klein deposition") and for a protective order should be denied in its entirety.

### B. Relief Sought By TDM

TDM moves for sanctions because the US failed utterly, and on numerous occasions, to comply with discovery requests in accordance with RCFC 26(c), 30, 33 and 34, and to obey court orders to produce documents, respond to interrogatories and allow inspections. The US refuses to answer critical interrogatories seeking process descriptions and volumes and quantities of treated dredged material and the disposal and costs thereof. The US refuses to produce and identify documents that contain information on the process for treating dredged material, volumes of treated dredged material, and the costs and disposal thereof, despite the fact that the US' contracts expressly provide that the US must have such information and the documents. (Exs. 1-3, 23, appendix A). US' budgetary requirements certainly include volumes and dollar amounts for treatment and disposal of dredged material.

Therefore, TDM is entitled to a ruling that (i) establishes the US' process for treating dredged materials is in accordance with the claims asserted by TDM; (ii) refuses

to allow the US to oppose TDM's claims of infringement, support its defenses and prohibits it from introducing designated matters in evidence; (iii) strikes the US' defenses in this matter or renders a judgment by default against the US; (iv) holds the US in contempt for failing to obey the orders of this Court, to respond to discovery demands in accordance with RCFC 33 and 34 and to produce witnesses for duly noticed depositions; and (v) awards TDM reasonable expenses incurred in making this motion, including attorneys' fees.

In the alternative, TDM seeks an order compelling the US to produce by a date certain (i) complete and verified responses to interrogatories in accordance with RCFC 33; (ii) responses, production and identification of all requested documents, especially process documents;[3] (iii) Klein for a deposition with the documents and complete responses to the requests accompanying the notice of his deposition; and (iv) other deponents in accordance with notices previously served on the US pursuant to RCFC 30(b)(1) and 30(b)(6), with complete responses to accompanying document requests. This Court should also award TDM's reasonable expenses incurred in making this motion, including attorneys' fees.

## II. BACKGROUND AND FACTS RELEVANT TO THE MOTION

### A. Administrative Claim

Prior to commencement of this action, TDM, through its affiliate, UTEX Environmental Services, LLC, brought an administrative claim against the US, *inter alia*,

---

[3] These process documents are believed to be included in contractually required submissions of detailed descriptions, precise invoicing and amounts, photographs and processing steps, permits and logs of the treatment of dredged materials pursuant to the US' contracts for dredging activities and treatment of dredged materials. (Exs. 1-3, 30-32, appendix A hereto).

for patent infringement of the '614 and '731 patents. TDM commenced the administrative claim after failed settlement efforts with the US and upon the direction of Klein. The Klein Letter, in general terms, reported the results of the US' investigation, *inter alia*, regarding the '614 and '731 patents to TDM. (Ex. 4). The Klein Letter generally described, among other things, the US' processing of dredged materials. (Ex. 4). Despite the fact that the Klein Letter is a glaring admission that the US has within its possession documents and information describing the processes and treatment of dredged material, the US failed to provide any such documents in response to TDM's discovery requests and refused to provide any description thereof in response to TDM's interrogatories.

**B. <u>Pleadings, Discovery and Initial Disclosures</u>**

On November 6, 2006, TDM served a first set of interrogatories to the US pursuant to RCFC 33 and a first request for production of documents and things to the US pursuant to RCFC 34. (Exs. 5 and 6). On November 22, 2006, the US and TDM served initial disclosures pursuant to RCFC 26. (Ex. 7). After TDM granted extensions, the US responded to TDM's first set of interrogatories on December 15, 2006 and to TDM's first set of requests for production of documents and things on December 22, 2006. (Exs. 8 and 9, respectively).

**C. <u>The US' Deficient Interrogatory Responses</u>**

The US' responses to TDM's first set of interrogatories are unverified, incomplete and improper. (Ex. 8). For example, interrogatory no. 2 requests:

> [S]eparately, for each claim of the patents-in-suit, state with particularity the factual basis for the US' contention that it had not infringed any claims of the patents-in-suit.

(Ex. 8). The response is a conclusory rendition of claim elements wherein the US responds that it does not infringe the patents-in-suit because its dredging processes do not include some of the limitations in the claims. (Ex. 8, p. 7). In other words, the US argues that it does not infringe the claims of the '614 and '731 patents because it does not infringe; however no description is provided. (Ex. 8, p. 7). The US then concludes in its response that:

> The Government has not had adequate opportunity to thoroughly evaluate the processes of these contractors and/or subcontractors. Consequently, the Government reserves the right to review, develop, and evaluate additional and/or different positions as its investigation continues.

(Ex. 8, p. 8).

Interrogatory no. 11 asked for the processes and methods utilized by each of the respective contractors identified in the response to interrogatory no. 10. The US responded:

> Subject to these specific objections and to the General Objections, the Government responds that the information requested in this interrogatory is not in the possession of the Government and such request is best directed to the contractors identified in response to Interrogatory No. 10.

(Ex. 8).

It is impossible that the US does not possess this information. As stated above, the US requires submissions of the detailed descriptions of the treatment and processing steps of dredging activities from each of its contractors to be submitted within 35 or 70 days of receiving notification that the contractor has been awarded a contract for dredging activities. (Exs. 1, 2, and 3). Indeed, there can be no doubt that the US has

such information. The US' response that it has no such documents and directing TDM to obtain this information from contractors is wholly inappropriate and violative of this Court's order. (Ex. 18, pp. 34-35). Even if such information were available from contractors, there is no way for TDM to ascertain if every contract has been produced without a response from the US. In any event, TDM has a right to seek such documents from the US.

In response to interrogatories nos. 12 and 13, wherein TDM requested detailed information regarding the process for treating dredged materials used by the US or its contractors against the claims of the patents-in-suit, the US responded by referencing its response to interrogatory no. 2. (Ex. 8, pp. 18-20). Since the response to interrogatory no. 2 is woefully deficient, so are the responses to interrogatory nos. 12 and 13.

Interrogatory no. 10 sought identification of contractors retained by the US for dredging activities, each contract and the processes used for treating dredged material by the US' contractors. (Ex. 5, p. 8). The US responded to interrogatory no. 10 by attaching a list of contracts and asserted that copies of those contracts are or would be produced. (Ex. 8, pp. 15-16 and attachment A thereto). However, contrary to the requirement of RCFC 33(d), this response failed to identify which documents within those contracts contained information responsive to interrogatory no. 10. In this regard, RCFC 33(d) posits that:

> Where the answer to an interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served . . . A specification [of the documents] shall be in sufficient detail to permit the interrogating party to locate, and to identify, as readily as can the party served, the records from which the answer may be ascertained.

The US' attachment fails to specifically identify such business records. (Ex. 8, attachment A).

**D. The US' Deficient Responses to Document Demands Under RCFC 34**

The US' response to plaintiff's first set of requests for production of documents is equally and completely bereft of substantive information. (Ex. 9). Aside from boiler-plate objections, the majority of the responses merely state that documents are or will be provided. (Ex. 9, see the US' responses to document request nos. 1-5, 12-15, 18 and 20). Moreover, the US fails to and/or outright refuses to respond to document request nos. 8, 9, 13, 16, 17, 21 and 24-30. (Ex. 9). With respect to all requests for key process documents, volumes of treated dredged and disposed material, invoices, detailed process descriptions, and required contractual submissions, the US responded by stating that such documents either are being produced or will be produced. (Ex. 9; request nos. 20, 22 and 23). However, no responses were identified, organized or labeled properly nor were any responsive documents produced.

In this regard, RCFC 34 requires:

> A party who produces documents for inspection shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request.

At various times, albeit untimely and on its own schedule, the US produced documents, which were simply the basic contracts. The process documents were not produced. Moreover, the documents produced were not produced as kept in the ordinary course of business, nor were they categorized or labeled in accordance with RCFC 34. To this day, the US has not categorized or labeled a single document that corresponds to TDM's document requests.

**E. <u>TDM's Good Faith Efforts at Resolution</u>**

In good faith, TDM attempted to resolve these discovery disputes with the US. On January 5, 2007, TDM's counsel sent a letter to counsel for the US detailing the deficiencies in the US' initial disclosures, responses to interrogatories and document demands. (Ex. 10). After further correspondence and discussions, counsel for the US confirmed by letter dated January 16, 2007 that it would be providing process documents and volume related documents. (Ex. 11). That the documents would be provided in two weeks was confirmed by letter dated January 17, 2007. (Ex. 12). However, no process documents or volume related documents were produced. By letter dated January 30, 2007, counsel for the US confirmed that New York district documents would be available for inspection on February 6, 2007. (Ex. 13). The remaining New York district documents were to be produced for inspection in mid-February. (*Id.*). Documents from other districts were to be produced by February 28, 2007. (*Id.*). As shown below, the US prevented a proper inspection and reneged on each of these commitments. Moreover, after this Court ordered the US to allow inspection and/or produce the documents -- the US still failed to do so.

**F. The US Thwarts TDM's Inspection and Defies the February 6, 2007 Court Rulings**

An inspection of New York district documents at Caven Point Marine Terminal, 3 Chapel Avenue, Jersey City, New Jersey (one of the dredging sites) by counsel for TDM was scheduled for February 6, 2007. However, on the eve of that inspection, the US notified TDM's counsel that TDM's officers would not be permitted to inspect those documents. (Adler Dec., ¶6). The US also refused to permit counsel for TDM to take

notes during the inspection, a restriction not made known to TDM until counsel arrived that morning. (*Id.*, ¶10). Notably, the US did not disclose these issues to TDM during negotiations regarding the protective order that were ongoing during this period. (*Id.*, ¶11). Certainly, protective orders should resolve issues of confidentiality. TDM was forced to contact this Court for a resolution.

On February 6, 2007, this Court heard arguments on the discovery dispute. It ordered the US to allow the inspection by TDM's officers. (Ex. 14, p. 11). The court noted that "plaintiff is certainly entitled to have its officers examine documents produced under Rule 34." (*Id.*, p. 11).

Following the February 6, 2007 conference, the US, in defiance of this Court's order, refused to allow the inspection with TDM's officers and stated that it would file a motion for reconsideration. To proceed with discovery and avoid needless motion practice, counsel for TDM agreed to the US' two-tiered protective order.[4] Yet, despite all this, the US *still* refused to allow TDM's officers to inspect the documents because the US had not reviewed and designated the documents. (Adler Dec., ¶14). TDM could not satisfactorily inspect the documents without its officers, but counsel for the US alleged that its failure and/or refusal to first review the documents for privilege somehow justified their refusal to permit TDM's officers to inspect the documents. (Adler Dec., ¶13).

In another display of good faith, and to avoid protracted motion practice, TDM resolved the conflict by agreeing that counsel for the US can first review the documents,

---

4 The US broached a two-tiered protective order in the February 6, 2007 conference, but this Court rejected it outright. (Ex. 14, p.6).

mark them appropriately, and then produce them. Pursuant to this agreement, by letter dated February 13, 2007, TDM's counsel identified categories of documents to be produced. (Ex. 15). TDM based its particularized requests upon its counsel's restricted inspection of the US documents at Caven Point, New Jersey. (Adler Dec., ¶15). The February 13, 2007 letter also confirmed that the US agreed to produce documents responsive to the particularized requests within two (2) weeks (i.e. February 28, 2007). (Ex. 15). That date was, in fact, previously set by counsel for the US. (Ex. 13; Adler Dec., ¶15).

At the February 15, 2007 status conference, TDM's counsel summarized the agreement regarding the protective order and document production for the court. (Ex. 16, pp. 4-5). TDM's counsel expressly noted that the US was to produce its documents within two weeks (i.e., February 28, 2007) and counsel for the US did not disagree. (*Id.*, p. 6).

Despite the aforementioned agreement, the US failed to produce substantive process documents and quantities thereof. Instead, by letter dated February 28, 2007, counsel for the US denied that it ever agreed to produce the documents in two weeks or by February 28, 2007 and refused to provide an alternate production date. (Ex. 17). Apparently, counsel for the US forgot the record before this Court and its own letters. (Exs. 16 and 13, respectively). As a result, counsel for TDM was once again forced to seek court intervention.

### G. <u>The March 6, 2007 Conference and the US' Failure to Comply</u>

On March 6, 2007, the issue of the US' unverified, incomplete interrogatories and failure to produce documents came to this Court's attention yet again. (Ex. 18). This

Court attempted to elicit dates upon which the requested process documents and volume related documents would be produced. (*Id.*, pp. 26-28). Counsel for the US was evasive but finally confirmed that such document production would start within two (2) weeks and be completed shortly thereafter. (*Id.*, pp. 26-28). In a letter dated March 20, 2007, the US argued that it need not produce documents until April 24, 2007 and that TDM could not conduct a deposition until after that date. (Ex. 19). However, the transcripts and records before this Court establish otherwise, and show that the US repeatedly failed to comply with the RCFC discovery rules, as well as this Court's orders. (Exs. 8-17).

### H. The US' Amended Interrogatory Responses Are Insufficient

On March 23, 2007, the US provided its first amended responses to TDM's first set of interrogatories. (Ex. 20). Only two of the fourteen interrogatory responses were amended, namely nos. 5 and 10, and only select interrogatories were verified. (*Id.*). Interrogatory no. 5 requested the identity of persons with relevant knowledge of the matters alleged in the answer. (*Id.*). The US amended its response to interrogatory no. 5 by directing TDM to the US' supplement to its initial disclosures. (*Id.*, p. 11). Interrogatory no. 10 seeks identification of contracts, contractors and all contract and processing information related thereto, specifically "treatment, processing, etc." of the dredged materials. (*Id.*, pp. 15-16). The US amended its response, in essence, to state:

> The Government further responds that the Government elects to provide copies of the contracts listed in the Revised Attachment A, and such copies have been produced. See RCFC 33(d) and 34. Additional documents relating to the listed contracts are in the process of being produced.

(Ex. 20, p. 17 and attachment A). As discussed above, with respect to the US' responses to TDM's first set of interrogatories, this form of a response is woefully short of the

standards set forth in RCFC 33(d) which requires specific identification of documents such that a response (a meaningful one) can be readily ascertained. A response to this request cannot be ascertained from attachment A. (Ex. 20, attachment A). TDM cannot ascertain the process information or find process documents from this response. Thus, despite the amended responses, the key information regarding the process for treating dredged materials remains unanswered. Of course, the remaining non-amended responses to the interrogatories still suffer from the conclusory and evasive deficiencies discussed above.

## I. <u>The US' Answer to the Second Set of Interrogatories is Insufficient</u>

On March 23, 2007, TDM propounded a second set of interrogatories directed, *inter alia*, to the "total volume of and total amounts paid by the US for treatment of dredged material" or for "treated dredged material disposed upland or beneficially reused." (Ex. 21). The US responded, in essence:

> [T]he Government responds that the total amounts paid to contractors for dredging and disposal of processed dredged material and the total volume of dredged material processed for disposal upland or for reuse since 2000 may be derived or ascertained from the business records of the USACE. The Government is in the process of producing these business records to Plaintiff. The Government has collected the available records containing this information and produces them with this interrogatory response as Attachment B.

(Ex. 22, pp. 7, 8).

First, it is clear that attachment B is incomplete because the US admits that it is still in the process of producing documents. (Ex. 21, attachment B). Second, the response is improper because it fails to provide proper guidance so that the response to the interrogatory may be ascertained. (Ex. 22, pp. 7, 8, attachment B). Notably,

information regarding the volumes and total amounts of treated dredged materials should be readily available to the US. In fact, some of this information may be found on the US Army Corps of Engineers' websites. (Ex. 23). The US, however, only produced documents from which no meaningful response could be derived.

**J. Deposition Notices and RCFC 34 Requests Included Are Ignored by the US**

On December 27, 2006, TDM served notices of depositions and document demands upon the US in accordance with RCFC 30(b)(6) and 30(b)(1) naming Bryce Wisemiller, Ella Snell and Thomas J. Shea, III. (Ex. 24). At the request of the US, the notices were amended on February 9, 2007 to various dates in March because the US agreed to produce documents by the end of February and failed to earlier produce process and volume related documents. (Ex. 25; see also Exs. 10-13). Based on the US' agreement to produce documents by the end of February, the amended notices scheduled depositions during March. (Ex. 25, see also Exs. 10-13). However, after the US reneged on its agreement and produced no process and volume-related documents after the conference with the court on March 6, 2007, the notices of depositions were amended a third time. (Ex. 26). These depositions are scheduled for various dates in May 2007; however, still, the US does not produce a witness under RCFC 30(b)(6) for districts other than New York. (Exs. 27 and 28). TDM expects to conduct and continue those depositions even if documents are not produced by that date but are produced or "rolled-in" after that date. Each of the RCFC 34 requests associated with the deposition notices, which were never rescheduled, have not been answered. (Exs. 24, 25 and 26). The US ignored these RCFC 34 requests. Such deficient responses violate RCFC 30 and 34, and warrant the imposition of sanctions against the US pursuant to RCFC 37(b)(2).

**K. The Klein Deposition Notice**

Having been unable to secure process documents, volume related documents, cost and invoicing documents and information on the treatment of dredged material, and amounts thereof, through document requests and interrogatories, on March 7, 2007, TDM served notice of the Klein deposition with a document demand. (Ex. 29). As explained above, Klein has factual knowledge of the US' processing and treatment of dredged material.

On April 2, 2007, counsel for the US informed TDM that Klein would not appear and that the requested documents would not be produced because they were privileged. By preventing the Klein deposition and refusing to produce requested documents, the US continues to thwart TDM's efforts to obtain information on the treatment of dredged materials.

TDM's request does not seek to discover Klein's notes, mental impressions, memos or any selections made or created by him. (Ex. 29). Rather, the request seeks the documents reviewed related to the subject matter of the Klein Letter, which contains the underlying factual information. The rationale is simple; Klein reviewed the very documents that describe the treatment of dredged materials that the US now claims it does not have.

These documents were created in the ordinary course of business because they were necessary components of, and required submissions for, the contracts the US negotiated with its dredging contractors. (See appendix A hereto). Appendix A to this memorandum shows that the US must have process and volume-related documents, as

well as cost and invoicing documents, and must have information related to the process, volumes, costs and invoicing thereof.

As such, TDM can inquire as to Klein's investigation, the documents he reviewed, and the people he spoke with. Further, until these questions are asked, it is not only premature, but improper, to assert privilege. In any event, TDM believes that any privilege has been waived because the US revealed its alleged "privileged" information by sending that letter to TDM in the first place. The Klein Letter, which contains only brief and partial process descriptions, still provides more process information than the US has provided in this action to date. (Ex. 4).

Notably, the US provided no description of the nature of documents, communications or things withheld as required under RCFC 26(b)(5). The US' claim of privilege is a blanket assertion, without any expression or description as required by RCFC 26(b)(5), and is a claim which, in itself, violates this Court's rules.

## III. ARGUMENT IN OPPOSITION TO THE US' COMBINED MOTION TO QUASH THE DEPOSITION OF ALAN P. KLEIN AND FOR A PROTECTIVE ORDER

### A. The Attorney-Client Privilege Does Not Apply To The Information TDM Seeks

RCFC 30(a) grants parties significant latitude to depose individuals during discovery. "A party may take the testimony of any person, including a party, by deposition upon oral examination ...". RCFC 30(a). By definition "any person" includes the attorney for a party. *See Kaiser v. Mutual Life Ins. Co.*, 161 F.R.D. 378, 379 (S.D.Ind. 1994).

The attorney-client privilege protects communications between the attorney and client for the purpose of obtaining legal advice. See *AAB Joint Venture v. The United States,* 75 Fed.Cl. 448 (Fed.Cl. 2007). The privilege only applies if (1) the asserted holder of the privilege is or sought to become a client; (2) (a) the individual is a member of the bar of a court, or his subordinate, and (b) in connection with the communication, is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding; and (4) the privilege has been (a) claimed and (b) not waived by the client. *Id.* at 9. The protection extends only to the communications themselves and not to underlying factual information. *See Id.* Moreover, the burden of establishing the attorney-client privilege rests upon the party claiming the privilege. *See Id.*

In noticing Klein for a deposition, TDM seeks to ask him about documents made available to him, documents that exist regarding the treatment of dredged materials, quantities and volumes therefor, including those he examined, as well as the identities of people he spoke to. The US may not shield Klein from being deposed about the people he spoke to or from producing the process documents available to him simply by making a blanket assertion of attorney-client privilege. *See King-Fisher Company v. The United States*, 58 Fed.Cl. 570, 571 (Fed.Cl. 2003) (party sought to depose plaintiff's counsel regarding documents the attorney used to calculate moneys owed under a labor claim and the court enunciated that such a request was proper and the documents, clearly factual in nature, had to be produced). Here, too, the inquiry is factual in nature.

In *AAB Joint Venture*, this Court held that the attorney-client privilege does not apply to plaintiff's interrogatories requesting dates of defendant's reviews, identity of documents reviewed and names of individuals involved in the review. *AAB Joint Venture v. The United States*, 75 Fed.Cl. 448 (Fed.Cl. 2007). Similarly here, privilege should not apply to the identity of documents reviewed, made available for review and the identity of individuals involved in the review.

The Klein Letter was addressed to TDM and described, at least somewhat, the US' treatment of dredged materials. The US admits in its moving papers that the letter itself is not privileged. (United States' Brief in Support of its Motion, p. 3). To the extent that the US alleges that documents or information are privileged, it should be required to set forth objective facts to establish that the requirements for invoking the privilege are met. *AAB Joint Venture*, 75 Fed.Cl., at 456. The US' conclusory allegations regarding privilege do not satisfy its burden for invoking privilege. *Id.* Indeed, the US has not even provided a privilege log. RCFC 26.

Instead, the US relies on the holding in *Shelton* to conclude that the documents reviewed by Klein automatically fall within the attorney-client privilege. However, the US' reliance on *Shelton* is misguided. *Shelton* does not stand for the proposition that documents become privileged simply because an attorney reviewed them. *Shelton v. American Motors Corporation*, 805 F.2d 1323, 55 USLW 2331 (8th Cir. 1986). In *Shelton*, the court's concern was the plaintiff's attempt to learn the "mental selective process" the attorney had employed in identifying, selecting and compiling documents during discovery. *Id.* at 1329. If this Court adopts the US' interpretation of *Shelton*,

then any party seeking to protect documents from inspection can merely ask its attorney to review them - that is not and has never been the scope of the attorney-client privilege.

[T]he *Shelton* test was intend[ed] to protect against the ills of deposing opposing counsel in a pending case which could potentially lead to the disclosure of the attorney's litigation strategy....[T]his Court erected the *Shelton* test as a barrier to protect trial attorneys from these depositions." *Boston Edison Company v. United States*, 2007 WL 610885 * 5,6 (Fed. Cl. February 26, 2007) (citations omitted). The *Boston* case also noted that it is wrong to apply the *Shelton* test without regard to the subject matter of the deposition or the attorney's role in the litigation. *Boston Edison*, 2007 WL 610885, at 6. Yet, the US is trying to do just that.

The Shelton rule does not apply to the information TDM seeks because TDM is requesting factual information underlying the Klein Letter. TDM is not seeking to discover opposing counsel's trial strategy nor is it requesting that the US produce documents in any selective order. TDM is merely requesting information and documents relating to the underlying facts of this suit – the treatment of dredged material. Such information and documents are not privileged because they were not created by Klein nor were they created in anticipation of litigation. Notably, Klein is not the trial attorney or even opposing counsel here. Klein wrote a letter to TDM and TDM seeks the factual information reviewed for that subject matter. The US should not be permitted to misconstrue the holding in *Shelton* to gain an unfair advantage and shield crucial factual information from discovery.

Alternatively, if the Court finds that the information requested by TDM is privileged -- which it is not -- the US waived any such privilege. It is well settled that a

voluntary and intentional waiver of the attorney-privilege applies to all other communications relating to the same subject matter. *See Blue Lake Forest Products Inc. v. The United States*, 2007 WL 968142 * 15 (Fed.Cl. March 29, 2007) (memorandum filed by the US in the administrative record waived its attorney-client privilege for that document and all communications on the same subject matter).

As applied here, the US voluntarily revealed the information it is now seeking to protect by including it in the Klein Letter to TDM in the first place. The US admits in its moving papers that the Klein Letter itself is not privileged. (United States' Brief in Support of its Motion, p. 3). A party may not selectively reveal attorney-client information and thereby gain an unfair advantage. Therefore, the US should not be permitted to disclose some attorney-client communications while retaining other, potentially harmful communications under the guise of the attorney-client privilege. *Id.* Of course, the process documents and volume related documents reviewed by Klein or others on his behalf are not attorney-client communications in any event nor are Klein's communications with contractors.

### B. The Work-Product Doctrine Does Not Apply To the Information TDM Seeks

"The work product doctrine, codified for the United States Court of Federal Claims in Rule 26(b)(3) of the Rules of the Court of Federal Claims (RCFC), is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal strategy 'with an eye toward litigation,' free from unnecessary intrusion by adversaries." *See Pacific Gas and Elec. Co. v. U.S.* 69 Fed.Cl. 784, 789 (Fed.Cl. 2006) (citations omitted). "The threshold determination in a case involving a claim of work product privilege is whether the material sought to be protected from discovery was prepared in anticipation

of litigation, or was prepared in the ordinary course of business or for other purposes. Documents created for other purposes that prove useful in subsequent litigation are not attorney work product; similarly, documents that are routinely prepared in the ordinary course of business are outside the scope of work product protection." *Pacific Gas and Elec. Co.*, 69 at 790 (citations omitted).

"[T]he party asserting the work product privilege must set forth objective facts to support its claim of privilege; a mere conclusory statement that the work product documents were created in anticipation of litigation is not enough." *AAB Joint Venture* v. *The United States,* 75 Fed.Cl. 432, 445 (Fed. Cl. 2007). Again, the documents TDM seeks were created in the ordinary course of business because they were necessary components of, and required submissions for, the contracts the US negotiated with its dredging contractors. (*See* appendix A hereto). The US makes no showing that the documents reviewed by Klein were created for the primary purpose of assisting in litigation. Hence, there is no basis for the US' invocation of the work product doctrine for documents reviewed by Klein.

## IV. TDM'S CROSS-MOTION FOR SANCTIONS AND/OR TO COMPEL PURSUANT TO RCFC 37

TDM employed virtually every discovery method available in an effort to obtain information about the US' processes for treating dredged materials, volumes of treated and disposed materials and the costs thereof. As discussed above, the most essential document requests and interrogatory responses directed to the US' processes for treating dredged materials, and corresponding volume and amount information, have not been answered or produced by the US for over six months now.

The US' refusal to provide proper discovery has reached a point where it is no longer within the bounds of "reason." Rather, its refusal demonstrates a flagrant disregard for the court and the discovery process and warrants the imposition of sanctions. RCFC 37(b)(2) provides for such sanctions. It states, in relevant part:

> If a party fails to obey an order to provide or permit discovery . . . the court may make such orders in regard to the failure as are just, and among others the following:
>
> (A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;
>
> (B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence;
>
> (C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;
>
> (D) In lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination;
>
> In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order . . .to pay the reasonable attorney's fees. . .

Where as here, deficient interrogatory responses exist and meaningful documents have not been provided, sanctions are particularly appropriate. *See generally, Variable-Parameter Fixture Development Corp., v. Morpheus Lights, Inc.* 1994 WL 419830 *2-6 (S.D.N.Y. Aug. 10, 1994); *AAIPHARMA Inc., v. Kremers Urban Development Co.*, 2006 WL 3096026 *3-6 (S.D.N.Y. Oct. 31, 2006). Similarly, the US' refusal to provide witnesses for depositions and complete interrogatory responses is a sufficient ground for

the imposition of sanctions. *See Properties International Ltd. v. Turner*, 706 F.2d 308, 310 (11th Cir. 1983). Even now, with only a month left before the deadline for service of discovery demands, the US does not provide RCFC 30(b)(6) witnesses for regions other than New York. (Exs. 27, 28). The US first will produce any witnesses in May.

In the event that this Court in its discretion finds that sanctions pursuant to RCFC 37(b)(2) should not be imposed, alternatively TDM seeks an order pursuant to RCFC 37(a)(2)(A) compelling the US to produce *by a date certain* (i) complete and verified responses to interrogatories in accordance with RCFC 33; (ii) responses, production and identification of all requested documents, especially process documents; (iii) Klein for a deposition with the documents and responses to the requests accompanying the Klein deposition notice ; (iv) other deponents in accordance with notices previously served on the US, particularly a RCFC 30(b)(6) witness for all districts, and (v) and reasonable expenses incurred in making this motion including attorneys' fees.

RCFC 37(a)(2)(A) states, in relevant part, "[I]f a party fails to make a disclosure required by RCFC 26(a), any other party may move to compel disclosure and for appropriate sanctions." *Id.* Two very recent decisions by this Court required the US to supplement its document responses and interrogatory responses by a date certain, after the plaintiff in those cases filed motions against the US to compel proper discovery responses. See *AAB Joint Venture* v. United States, 75 Fed.Cl 432, 447 (Fed.Cl. 2007) (imposing a date of March 28, 2007 for full supplementation to document requests); *AAB Joint Venture v. United States*, 75 Fed. Cl. 448, 462 (Fed.Cl. 2007) (imposing a date certain for complete supplementation to interrogatories). The orders also provided an opportunity for a revised discovery schedule for review, further inquiry and additional

discovery. *Id.* The grounds for the orders issued in those cases are analogous to the grounds set forth in TDM's cross-motion herein. Thus, TDM should be entitled to an order compelling the US to properly respond to its document requests and interrogatories *by a date certain.* Similarly, because there is no basis for preclusion, TDM is entitled to an order to compel production of Klein for a deposition and compel production of RCFC 30(b)(6) witnesses.

## V. CONCLUSION

For the foregoing reasons, the US' combined motion to quash the deposition of Alan P. Klein and a protective order should be denied in its entirety and TDM's cross-motion for sanctions pursuant to RCFC 37 should be granted in its entirety.

Respectfully submitted,

DAVIDOFF MALITO & HUTCHER LLP
Attorneys for Plaintiff

Dated: April 20, 2007

s/David W. Denenberg
David W. Denenberg
Michael A. Adler
605 Third Avenue – 34 Fl
New York, NY 10158
Tel: (212) 557-7200
Fax: (212) 286-1884

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TDM America, LLC,<br><br>Plaintiff,<br><br>v.<br><br>The United States of America<br><br>Defendant,<br>and<br><br>Donjon Marine Company, Inc.<br><br>Interested Party. | Civil Action No. 06-472-C<br>Judge Thomas C. Wheeler |

## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2007, I served true and accurate copies of the following documents:

1. TDM'S Cross-Motion for Sanctions and/or to Compel pursuant to RCFC 37;
2. TDM'S Memorandum of Law in Opposition to the US' Motion to Quash the Subpoena of Alan P. Klein and for a Protective Order and in Support of TDM'S Cross-Motion for Sanctions and/or to Compel pursuant to RCFC 37; and
3. Declaration of Michael A. Adler in Support of TDM'S Cross-Motion for Sanctions and/or to Compel pursuant to RCFC 37.

by using the Court's CM/ECF system so that a copy was sent to the following persons automatically via email:

Erica A. Franklin
US Department of Justice
Civil Division
1100 L Street, NW
Suite 1100
Washington, DC 20001

and on counsel for Donjon Marine Company, Inc. by electronic filing at the following address:

Gary J. Campbell
McCarter & English LLP
265 Franklin Street
Boston, MA 02110

s/David W. Denenberg
David W. Denenberg