**Exhibit 10**

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TDM America, LLC,<br><br>Plaintiff,<br><br>v.<br><br>The United States of America<br><br>Defendant,<br>and<br><br>Donjon Marine Company, Inc.<br><br>Interested Party. | Civil Action No. 06-472-C<br><br>Judge Thomas C. Wheeler |

**PLAINTIFF TDM AMERICA, LLC'S OBJECTIONS AND RESPONSES TO DEFENDANT UNITED STATES' FIRST SET OF INTERROGATORIES TO PLAINTIFF (NOS. 1-16)**

Plaintiff TDM America, LLC ("TDM") pursuant to Rule 33 of the Rules of the Court of Federal Claims (the "RCFC") hereby responds to the first set of interrogatories (Nos. 1-16) served by defendant The United States of America ("US") on TDM on February 23, 2007. The following responses are based upon present information and belief. TDM reserves the right to seasonably amend and supplement these responses as required under the RCFC.

**GENERAL OBJECTIONS**

TDM hereby asserts the following general objections to the US interrogatories:

1. TDM objects to each and every instruction and definition in the US first set of interrogatories to TDM to the extent that they exceed the permissible scope of

discovery under the RCFC and/or impose upon defendant duties and responsibilities beyond those required by those rules.

2. TDM objects to the definitions of plaintiff as "you", "your" and "TDM" to the extent it calls for any entity that was or is unaffiliated with the plaintiff in this action. As such, TDM does not have knowledge and cannot speak for any unaffiliated TDM predecessor-in-interest that may have prosecuted or owned the patents-in-suit.

3. TDM objects to each and every interrogatory to the extent they are inconsistent with the requirements and limitations of the RCFC.

4. TDM objects to each and every interrogatory to the extent it is harassing. overbroad, onerous, unduly burdensome, and the information requested is more appropriately elicited through depositions or by other discovery methods.

5. TDM objects to each and every interrogatory to the extent that the information requested is precluded and/or immune from discovery under: (a) the attorney-client privilege; (b) the attorney work product privilege; (c) the community of interest privilege; (d) the deliberative process privilege; and/or (e) might tend to disclose any of the content of such privileged information and such information will not be provided.

6. Responses that contain TDM's proprietary and/or confidential information, will be provided under the protective order entered by the Court.

7. TDM objects to each and every interrogatory to the extent that they seek legal conclusions or opinions, and/or mental impressions, and/or theories of counsel and such information will not be provided.

8. TDM objects to each and every interrogatory to the extent the interrogatory does not set forth a definite time period, sets forth a time period that exceeds any period relevant to this litigation, and, thereby, seeks information that is not reasonably calculated to lead to the discovery of admissible evidence in this action. TDM generally limits the scope of its responses to the relevant time periods.

9. TDM objects to each and every interrogatory to the extent that they are premature.

10. The fact that TDM responds to an interrogatory shall not be construed, in any way, that the response is relevant, material and/or admissible. Accordingly, TDM reserves its right to challenge the relevance, materiality, and admissibility at trial, or in any subsequent proceeding, or any other action, of any of the information TDM provides herein.

11. TDM objects to each and every interrogatory to the extent it seeks information or documents that are generated or created by or for the use of counsel as of the commencement of this case.

12. A response to an interrogatory, despite any general objection and/or specific objection made thereto, does not obligate a continued response when objections have been made.

13. TDM objects to each and every interrogatory response to the extent that they call for the productions of expert opinions and/or claim construction prior to the scheduled date as set forth in the February 23, 2007 scheduling order of this Court.

14. Whenever an interrogatory request seeks identification of documents and/or TDM responds to an interrogatory by referring to documents from which a response may be ascertained, TDM, in good faith, identifies relevant documents, but the lack of identifying all documents shall not preclude TDM from identifying additional documents at a later date.

15. TDM objects to each and every interrogatory to the extent it seeks to identify all documents that pertain to that particular interrogatory. TDM has or will produce relevant non-privileged documents to the extent such documents exist and will use reasonable efforts to identify same. TDM further reserves its right to amend the identified documents and/or supplement same as this case progresses.

16. TDM objects to the numbering sequence of the interrogatories to the extent that disparate subparts have been subsumed under a single interrogatory. TDM will answer each discrete subpart and note the renumbering of the interrogatory sequence.

17. TDM's responses are based upon information that is known or reasonably believed by TDM at the time of its responses to these interrogatories. It is anticipated that further discovery, investigation, and analysis may supply additional facts, provide new meaning to known facts, or entail new factual conclusions. Accordingly, TDM reserves its right to seasonably amend and/or supplement these responses in accordance with RCFC.

**SPECIFIC OBJECTIONS AND RESPONSES**

Each of the general objections are incorporated herein by reference into each of the interrogatory responses. A response to a specific interrogatory is not intended to waive any of the general objections incorporated by reference. Subject to and without waiving its general objections, TDM hereby objects and responds to each interrogatory of the US as set forth below.

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

Identify each claim in each of the patents-in-suit that you allege to be infringed by the United States and for each such claim (a) state whether TDM's infringement contention is based on literal infringement or the doctrine of equivalents; (b) identify the process used by the United States that TDM contends infringes that claim; ( c) describe where each element of each claim is found within the accused process; (d) provide a complete and concise citation and quotation to document(s); testimony, or other evidence upon which TDM relies in support of its infringement contentions( s); and (e) identify all persons having knowledge of each of the facts supporting the foregoing contentions.

**RESPONSE TO INTERROGATORY NO. 1:**

In addition to the general objections, TDM specifically objects to this interrogatory to the extent it is harassing and overly broad. TDM further objects to this interrogatory to the extent it seeks information that is immune from discovery under one or more privileges. TDM further objects to this interrogatory to the extent it calls for claim interpretation, expert witness subject matter, and other information that is premature in view of the scheduling order of this Court. TDM further objects to this interrogatory to the extent it seeks information that is more appropriately obtained through a discovery deposition. TDM further objects to this interrogatory to the extent it seeks attorney mental impressions and thoughts. TDM further objects to this interrogatory to the extent it calls for information to be furnished in a particular format. TDM will provide information in accordance with RCFC 33. TDM further objects to this interrogatory to the extent that the document, and other information sought herein is readily available to the US as it is contained in the US contracts and related materials the US has with dredging contractors. In this respect, not only is such information available to the US, but it has not yet been made available to TDM. TDM explicitly reserves its

right and expects to supplement and/or amend its responses to these interrogatories as this litigation progresses through discovery, expert witnesses, and the Markman hearing.

Notwithstanding these objections, TDM responds as follows:

The claims in the patents-in-suit that TDM alleges are infringed by the US are:

| US Patent Number | Infringed Claims |
|---|---|
| 6,293,731 | 1 |
| 5,542,614 | 1, 2, 4 |
| 5,794,862 | 2, 3, 4, |
| 5,007,590 | 1 |

(a) TDM's infringement claims are based on literal infringement and, to the extent literal infringement is not found, under the doctrine of equivalents. TDM will provide further supplementation as to which claims are literally infringed and which claims are infringed under the doctrine of equivalents after defendants and interested parties produce all relevant information, after experts review same and after claim construction.

(b)-(d) Claim 1 of the '731 patent is infringed by the US when it or its contractors treat or otherwise process dredged materials in a barge-based system. Specifically:

| **Claim 1 of the '731 Patent** | **US' Dredging Activities** |
|---|---|
| A method for producing a structural fill material comprising the steps of: | The preamble is not a claim limitation. However, the US' dredging activities includes producing a structural fill material from dredged materials. (Photographs bearing bates nos. TDM004526-TDM004532; TDM004534-TDM004537; TDM0004539; TDM004542; TDM004557-TDM0004561; TDM |

| | |
|---|---|
| | 004563; TDM004569-TDM004570; TDM004581-TDM0045882; TDM004589-TDM004593; TDM004596-TDM004597; TDM004600; and document bearing bates nos. TDM005114-TDM005120). |
| obtaining a dredged material; | The US, on its own or through contractors, is conducting dredging activities. Those activities include obtaining dredged materials from the harbors in accordance with USACE contracts.<br>(Photographs bearing bates nos. TDM004526-TDM004527; TDM004529; TDM004531; TDM004533;; TDM004536; TDM004542; TDM004557; TDM004558; TDM004561; TDM004563;TDM004568; TDM004570; TDM004582; TDM004589-TDM004593; TDM004596-TDM004597). |
| depositing the dredged material into a containment receptacle; | The US and/or its contractors deposit the dredged materials into a containment receptacle, specifically a barge or scow. The dredged material is deposited in barges or scows.<br>(Photographs bearing bates nos. TDM004526-TDM004529; TDM004531; TDM004533-TDM004534; TDM004536-TDM004542; TDM004557-TDM004558; TDM004561; TDM004563;TDM004568; TDM004570; TDM004582; TDM004589-TDM004593; TDM004596-TDM004597; also see document bearing bates no. TDM004600). |
| removing free water from the dredged material and the containment receptacle; | In the US' or its contractor's processing of the dredged materials, the dredged materials are dewatered in the containment receptacle (i.e., barge or scow).<br>(Photographs bearing bates nos. TDM004526-004527; TDM004596). |
| creating an additive slurry in a mixing container; | In the US' or it contractor's processing of the dredged materials, various storage receptacles, silos or tanks containing additives are adjacent to each other and to a water tank. The silos and water tank are piped to a conveyor-like mixing container which is near each of the silos and pumps material to the containment receptacle.<br>The additives, water, and/or any |

| | |
|---|---|
| | combination thereof, can enter the conveyor mixing container where they are mixed to form an additive slurry. Water may also be added to the additives as they mix on the conveyor or as the mixture leaves the conveyor but before the additive slurry enters the containment receptacle and/or before the additive slurry comes into contact with the mixing assembly. This is creating an additive slurry in the conveyor mixing container. (Photographs bearing bates nos. TDM004528; TDM004530-TDM004533 TDM004582; TDM004589; TDM004591; also see document bearing bates no. 005117). |
| pumping the additive slurry from the mixing container to a mixing assembly disposed within the containment receptacle; | The mixing container itself includes structure to create the additive slurry as it transports that additive slurry to the containment receptacles. Water may be added in the conveyor or as the slurry leaves the conveyor mixing container prior to entering the containment receptacle. The additive slurry drops from the conveyor mixing container to the containment receptacle as water is continuously pumped and added to the slurry. The additive slurry is not mixed into the dredged materials until a mixing assembly is disposed within the containment receptacle and moved to the additive slurry or until the containment receptacle is moved to bring the additive slurry to the mixing assembly disposed within the containment receptacle. The additive mixture is a slurry when it contacts the dredged materials and/or the containment receptacle. The additive slurry, and/or each component thereof, is pumped into the containment receptacle and the additive slurry is brought to a mixing assembly disposed within the containment receptacle. (Photographs bearing bates nos. TDM004528-TDM004531; TDM004533-TDM004534; TDM004582; TDM004589- |

| | |
|---|---|
| | TDM0004593; TDM004606-TDM004607). |
| mixing the additive slurry into the dredged material to form a substantially homogenous mixture; and | After the additive slurry is added to the containment receptacle, the receptacle is moved to the mixing assembly disposed within the receptacle or a mixing assembly is brought to the additive slurry, which mixing assembly then mixes the additive slurry into the dredged material to form a substantially homogenous mixture. The additives are not dry when mixed into the dredged material. (Photographs bearing bates nos. TDM004526-TDM004527; TDM004531; TDM004533; TDM004535-TDM004537; TDM004542; TDM004589; TDM004593). |
| curing the substantially homogenous mixture in the containment receptacle, thereby producing a structural fill material and reducing particulate emissions. | After mixing the additive slurry into the dredged material and forming a substantially homogenous mixture, the homogenous mixture immediately begins to cure and is left in the containment receptacle for any period of time to continue the curing process. The product is a structural fill; that is, fill material that can be disposed upland for beneficial reuse. Reduced particulate emissions is accomplished throughout the process as water is pumped to the additive slurry at the conveyor mixing container, as the additive slurry emerges from the conveyor and as the additive slurry enters the containment receptacle and before the additive slurry is brought to, and mixed by, the mixing assembly disposed within the containment receptacle. The structural fill is bought to another location for beneficial re-use, such as capping, malls, parks, etc. (Photographs bearing bates nos. TDM004528-TDM004529; TDM004531; TDM004533; TDM004536; TDM004539; TDM004542; TDM004589-TDM004594). |

With respect to issues of creating an additive slurry, pumping an additive slurry and mixing an additive slurry, it is TDM's position that the mixing, or pre-mixing, of

additive material itself constitutes, under literal infringement, creating the additive slurry. Namely, if the additives are mixed to form the slurry as the additives are being pumped or transported to the containment receptacle (via conveyor or other transport equipment), the element of creating and pumping are literally met because the conveyor would comprise a mixing container. Moreover, if water is added to the additive at any time prior to the additive being mixed into the dredged material, the elements of creating and pumping are met because the additives and water are each being pumped and create the additive slurry. Moreover, the element of "pumping" and "mixing" is met by additives and water being pumped to the dredged material in the containment receptacle and, at some time after the additive slurry is pumped to the dredged material, the additive slurry is moved to a mixing assembly disposed within that containment receptacle, or a mixing assembly disposed within the containment receptacle is moved to the additive slurry, to mix the additive slurry into the dredged material. There is no requirement that the additive slurry be deposited directly at or on the mixing assembly. There is also no requirement that the slurry have a particular water content; only that the water be added prior to the slurry being mixed into the dredged materials so that particulate emissions are reduced. Dry additives are not mixed into the dredged materials.

The US or its contractors also treat, solidify, stabilize, or otherwise process dredged materials in land-based systems. These land-based systems process dredged materials in methods that infringe the '614, '862 and '590 claimed processes.

Specifically:

| **Claim 1 of the '614 Patent** | **US' Dredging Activities** |
|---|---|
| A method for processing waste material comprising the steps of: | The US' dredging activities, or those of its contractors, include processing waste material, including dredged materials. (Photographs |

| | |
|---|---|
| | bearing bates nos. TDM004543-TDM004556; TDM004564; TDM-004575-TDM004578). |
| receiving said waste material in a vibrating screen box; | Waste material is received in a vibrating screen box. (Photographs bearing bates nos. TDM004544-TDM004549; TDM004552; TDM004553). |
| vibrating said vibrating screen box to separate lumps of said waste material that are larger than a predetermined size thereby removing lumps of said waste material of a size greater than said predetermined size from said waste material; | A vibrating screen box is used to separate larger waste material from smaller waste material. The smaller waste material proceeds to the homogenizer. Larger waste material is otherwise discarded. (Photographs bearing bates nos. TDM004544; TDM004549; TDM004552; TDM004553). |
| discharging said waste material of a size less than said predetermined size into a homogenizer; | The waste material is discharged from the vibrating screen box to a homogenizer. The smaller waste material proceeds to the homogenizer. (Photographs bearing bates nos. TDM004544-TDM004549; TDM004552-TDM004554). |
| receiving said waste material into said homogenizer; | The waste material is received by a homogenizer. (Photographs bearing bates nos. TDM004544-TDM004549; TDM004552; TDM004554). |
| homogenizing said waste material in said homogenizer; | The waste material is homogenized in the homogenizer. (Photographs bearing bates nos. TDM004544-TDM004549; TDM04552-TDM004554). |
| dropping said waste material into a mixer after homogenizing, said mixer located below said homogenizer; | The waste material is dropped into a mixer below (i.e. after) the homogenizing step. (Photographs bearing bates nos. TDM004544-TDM004549; TDM004554-TDM004556). |
| accumulating a batch of waste material in said mixer; | A batch, or a particular amount, of waste material is accumulated in the mixer. (Photographs bearing bates nos. TDM004544-TDM004549; TDM004554-TDM004556). |
| weighing said batch of waste material to determine an amount of additive to be added to said waste material; | A determination of an amount of additive is, and must be, made based upon the weight of the batch or a particular amount of waste material accumulated. (Photographs bearing bates nos. TDM004544-TDM004549; TDM004554-TDM004556). |
| mixing said waste material with said additive in said mixer to form a mixture; and | The waste material and additive are mixed in the mixer. (Photographs bearing bates nos. TDM004544-TDM004549; TDM004554-TDM004556). |
| dropping said mixture from said mixer to a processing terminus | The mixture is dropped from the mixer, meaning after the mixing step, to a terminus (i.e., the end |

| | |
|---|---|
| located below said mixer. | of the process) which is below the mixer. The processing ends after the mixer. (Photographs bearing bates nos. TDM004544-TDM004549; TDM004551; TDM004554). |
| | |
| **Claim 2 of the '614 Patent** | **US Dredging Activities** |
| The method of claim 1 wherein said waste material is solid or semi-solid. | The US or its contractors process solid or semi-solid waste material. (See above with respect to claim 1 and photographs bearing bates nos. TDM004549; TDM004552). |
| | |
| **Claim 4 of the '614 Patent** | **US' Dredging Activities** |
| The method of claim 1 wherein said processing terminus comprises a vehicle. | After processing, the waste material is loaded into vehicles. The vehicles are the processing terminus or the end of the process. (See above with respect to claim 1 and photographs bearing bates nos. TDM004548; TDM004551). |

| **Claim 2 of the '862 Patent** | **US' Dredging Activities** |
|---|---|
| A method for processing waste materials comprising the steps of: | The US' dredging activities, or those of its contractors, include processing waste material, which waste material includes, specifically, dredged material. (Photographs bearing bates nos. TDN004543-TDM004556; TDM004564; TDM004575-TDM004578). |
| receiving a waste material in a vibrating screen box; | Waste material is received in a vibrating screen box. (Photographs bearing bates nos. TDM004544-TDM004549; TDM004552; TDM004553). |
| vibrating the vibrating screen box to separate lumps of the waste material that are larger than a predetermined size thereby removing lumps of the waste material of a size larger than the predetermined size from the waste material; | A vibrating screen box is used to separate larger waste material from smaller waste material. (Photographs bearing bates nos. TDM004544; TDM004549; TDM004552-TDM004453). |
| discharging the waste material of a size less than the predetermined size into a mixer; | The waste material is discharged from the vibrating screen box to a homogenizer. (Photographs bearing bates nos. TDM004544; TDM004549; TDM004552-TDM004554). |
| accumulating a batch of waste material in the mixer; | A batch, or a particular amount, of waste material is accumulated in the mixer. (Photographs bearing bates nos. TDM004544-TDM004549; TDM004554; TDM004556). |

| | |
|---|---|
| weighing the batch of waste material to determine an amount of additive to be added to the waste material; | A determination of an amount of additive is made based upon the weight of the batch, or a particular amount of waste material in the mixer. (Photographs bearing bates nos. TDM004544; TDM004549; TDM004554-TDM004556). |
| mixing and homogenizing the waste material with the additive in the mixer to form a mixture; | The waste material and additive are mixed and homogenized in the mixer to form a mixture of waste material and additive. (Photographs bearing bates nos. TDM004544-TDM004549; TDM004554, TDM004556). |
| dropping the mixture from the mixer to a processing terminus located below the mixer. | The processed waste material drops to a terminus; that is, the processing ends after the mixer. (Photographs bearing bates nos. TDM004544; TDM004549; TDM004551; TDM004555). |
| | |
| **Claim 3 of the '862 Patent** | **US' Dredging Activities** |
| The method of claim 2 wherein the waste material is a solid or semi-solid. | The US, or its contractors, process solid or semi-solid waste material, including dredged materials. (See above with respect to claim 2 and photographs bearing bates nos. TDM004549; TDM004552). |
| | |
| **Claim 4 of the '862 Patent** | **US' Dredging Activities** |
| The method of claim 2 wherein the processing terminus comprises a vehicle. | After processing, the waste material is loaded into vehicles, which vehicles are the processing terminus or the end of the process. After the mixer, the process ends at a vehicle. (See above with respect to claim 2 and photographs bearing bates nos. TDM004548; TDM004551). |

| **Claim 1 of the '590 Patent** | **US' Dredging Activities** |
|---|---|
| A method for treating solid or highly viscous semi-solid waste materials containing lumps of waste comprising the steps of: | The US, or its contractors, treat solid or highly viscous semi-solid waste materials containing lumps of waste. Specifically, the US treats dredged materials. (Photographs bearing bates nos. TDM004551-TDM004555). |
| reducing the size of the lumps in the waste material with a plurality of paddle-type chopper augers, said paddle-type chopper augers being mounted in a separator; | The size of the lumps in the waste material is reduced with paddle-type chopper augers in a separator. (Photographs bearing bates nos. TDM004552; TDM004553). |
| homogenizing the waste material by means of pin mixers; and | The waste material is homogenized using pin mixers. (Photographs bearing bates |

| | |
|---|---|
| | nos. TDM004551; TDM004554). |
| mixing the homogenized waste material with a predetermined amount of at least one selected additive. | The homogenized waste material is mixed with a predetermined amount of an additive. (Photographs bearing bates nos. TDM004551; TDM004554). |

The above-referenced photographs, correspondence and literature, comprise the citations and references upon which TDM relies upon at this time. TDM also identifies the US' contracts with contractors for dredging activities, brochures, summaries of dredging activities, and other photographs, including documents bearing bates nos. TDM0005172-TDM-0005184; TDM0005307-TDM0005323; TDM0005324-TDM0005330; TDM0004391-TDM0004420 and TDM0000772-TDM0000889 among others, that contain information relevant to this interrogatory. TDM, however, reserves its right to seasonably supplement, change and/or amend these references as this action progresses and after expert review and/or the Markman hearing. In addition, TDM relies upon DVDs produced and reserves its right to rely upon other information produced. Obviously, TDM will rely on additional documents that should have been, and should be, produced by the US, interested parties and the US' contractors or on the failure to so produce as evidence of infringement. Unfortunately, after six (6) months of discovery, such documents have not been produced. Therefore, TDM may further rely upon inferences and preclusions with respect to documents not produced.

(e)[1] TDM objects to this interrogatory to the extent that information relevant to this interrogatory already was provided in TDM's initial disclosures. Notwithstanding these objections, TDM responds that Rick Redle, Ritchie G. Studer, Dr. Irfan Toor, Scott

[1] TDM notes that this interrogatory subpart is discrete from the prior parts and re-numbers this interrogatory as no. 2.

Crawford and Ted Johnstun have information regarding TDM's claims of infringement against the US.

**INTERROGATORY NO. 2:**[2]

Describe TDM's organizational structure including, but not limited to, identification of all divisions, departments, subsidiaries, officers and lines of supervision or review during the period of January 1, 1994, to present. In this description, indicate all acquisitions, mergers, spin-offs or other such transactions or reorganizations during the stated period.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to the general objections, TDM specifically objects to this interrogatory to the extent it seeks information that is irrelevant and/or not likely to lead to admissible evidence. TDM further objects to this interrogatory to the extent it is harassing and overly broad. TDM further objects to this interrogatory to the extent it seeks information that is more appropriately obtained through a discovery deposition. Notwithstanding these objections, TDM responds as follows:

TDM America LLC and UTEX Environmental Services, LLC are wholly-owned subsidiaries of UTEX Holdings, LLC. TDM America LLC is a holding company of a patent portfolio including the patents-in-suit. UTEX Environmental Services, LLC is a leading environmental services firm focused on the management and treatment of hazardous, non-hazardous, industrial and municipal waste. Kensington Investments LP holds interests directly or indirectly in UTEX Holdings, LLC. Kensington Capital Management, LLC manages Kensington Investments LP.

TDM's officers and their positions are:

1. **Rick Redle**

---

2 Renumbered as interrogatory no. 3.

Rick Redle is a principal and executive vice president of UTEX Holdings, LLC, and senior vice president of UTEX Environmental Services, LLC. He is also a manager of TDM America, LLC.

2. **Ritchie G. Studer**

Ritchie G. Studer is a principal and the chief operating officer of UTEX Holdings, LLC. He is also the chief executive officer of UTEX Environmental Services, LLC.

3. **Dr. Irfan Toor**

Dr. Irfan Toor is the senior vice president of technology and program management for UTEX Environmental Services, LLC.

4. **F. Scott Crawford**

F. Scott Crawford is the director of engineering services of UTEX Environmental Services; LLC; and the coordinator of contract management for USACE projects and project specifications (technical information and material preparations).

5. **Ted Johnstun**

Ted Johnstun is a principal and a director of UTEX Holdings, LLC. He is also the chief financial officer of UTEX Holdings, LLC and a manager of TDM America, LLC.

6. **Steve M. Peterson**

Steve M. Peterson is a principal, director and president of UTEX Holdings, LLC.

7. **Robert C. Gay**

Robert C. Gay is a principal and director of UTEX Holdings LLC.

8. **Alison Mosca**

Alison Mosca is the president of Kensington Capital Management, LLC.

TDM further responds that documents bearing bates no. TDM005210–TDM005227 provides information relevant to this interrogatory.

**INTERROGATORY NO. 3:** [3]

To the extent that TDM has had any relationship with ECDC Environmental, L.C, and/or ECDC East, L.C. from January I, 1994, until present, describe such relationship(s) in detail and identify all documentation that demonstrates the described relationships.

**RESPONSE TO INTERROGATORY NO. 3:**

In addition to the general objections, TDM specifically objects to this interrogatory to the extent that the term "relationship" is ambiguous and not defined. TDM further objects to this interrogatory to the extent that it seeks irrelevant information and/or information that is not likely to lead to admissible evidence. TDM further objects to this interrogatory to the extent it seeks information that is immune from discovery under one or more privileges. TDM further objects to this interrogatory to the extent it seeks information that is more appropriately obtained through a discovery deposition. Notwithstanding these objections, TDM responds that the relationship between TDM and ECDC Environmental LC derives from a joint effort to provide dredging services to the

[3] Renumbered as interrogatory no. 4.

Port Authority of New York and New Jersey, while the relationship between ECDC East, L.C. and related companies derives from various assignments and transfers and/or an asset sale of one or more of the patents-in-suit.

Specifically, in or about 1997, Investment Resource Management, LP, a Delaware limited liability partnership, d/b/a ITEX, a division of IRM L.P. ("ITEX"), entered into discussions with ECDC Environmental, L.C. ("ECDC"), a subsidiary of Laidlaw, Inc. and Laidlaw Environmental Services, Inc. ("Laidlaw") in connection with a joint effort to provide dredging activities on behalf of the Port Authority of New York and New Jersey (the "Port Authority"). ECDC initially contacted ITEX for its dredging expertise because ECDC was faced with certain difficulties encountered during its dredging operations on behalf of the Port Authority.

In or about December 1997, ECDC assigned its interest in certain patents and/or patent applications to ECDC East LC, a Utah limited liability company. On or about May 15, 1998, ITEX assigned its interest in certain patents and/or patent applications to ECDC East LC. On or about June 25, 1998, ECDC East LC changed its name to SK Services (East) L.C., a Utah limited liability company. ITEX changed its name to IMEX Partners, L.P. ("IMEX"), a Delaware limited partnership.

SK Services (East) L.C. was a wholly owned subsidiary or an affiliated entity of Safety-Kleen Corp. Safety-Kleen Corp. was a successor-in-interest to Laidlaw. Safety-Kleen Corp. and its subsidiaries and affiliates, including SK Services (East) L.C. and Laidlaw, fell into bankruptcy and defaulted on certain payments still owed to IMEX.

In 2001, the '731 patent issued. When the patent issued, it was originally assigned to SK Services (East) L.C. During the pendency of the Safety-Kleen Corp.

bankruptcy, the United States Bankruptcy Court for the District of Delaware issued an order, dated June 13, 2002, which acknowledged that the bankruptcy court authorized and approved the sale of the '731 patent by SK Services (East) L.C. to IMEX. This order provided that the entire right, title and interest of the '731 patent owned by Safety-Kleen Corp. or a related company (i.e. SK Services (East) L.C.) was being transferred and vested in IMEX.

In accordance therewith, on or about June 24, 2002, SK Services (East) L.C. assigned the '731 patent to IMEX. On that same date, SK Services (East) L.C. and IMEX entered into an asset purchase agreement conveying the '731 patent to IMEX. On or about March 23, 2005, IMEX assigned the '731 patent to TDM America, LLC, a Nevada limited liability company ("TDM").

The '614 patent and the '862 patent were originally assigned by inventor Irfan A. Toor to ITEX Environmental Services, Inc., a Texas corporation, on or about April 8, 1994. On or about April 10, 1995, the patents were assigned from ITEX Environmental Services, Inc. to ITEX. On or about March 1, 1998, the patents were assigned from ITEX to ECDC (East) L.C. As stated above, ECDC (East) changed its name to SK Services (East) L.C. On or about December 25, 2003, SK Services (East) L.C. assigned the patents-in-suit to TDM Ltd., a British Virgin Islands international business company ("TDM BVI"). On or about January 1, 2004, TDM BVI assigned the patents to TDM.

The '590 patent was first assigned to ITEX Enterprises, Inc., a Texas corporation, on or about January 16, 1990. On or about January 1, 1992, the '590 patent was assigned by ITEX Enterprises, Inc. to Ritchie G. Studer, who assigned it to ITEX Environmental Services, Inc. effective February 18, 1993. On or about April 10, 1995, the '590 patent

was assigned to ITEX. The remaining assignments track the '862 and '614 patents. The assignment documents, bankruptcy order and asset purchase agreement are produced as documents bearing bates nos. TDM005331–TDM005363; TDM005580–TDM005893.

**INTERROGATORY NO. 4:**[4]

To the extent that TDM has had any relationship with ITEX Environmental Services from January I, 1994, until present, describe such relationship(s) in detail and identify all documentation that demonstrates the described relationships.

**RESPONSE TO INTERROGATORY NO. 4:**

In addition to the general objections, TDM specifically objects to this interrogatory to the extent it is harassing and overly broad. TDM further objects to this interrogatory to the extent that the term "relationship" is ambiguous and not defined. TDM further objects to this interrogatory to the extent it seeks information that is immune from discovery under one or more privileges. TDM further objects to this interrogatory to the extent it seeks information that is more appropriately obtained through a discovery deposition.

Notwithstanding these requests, TDM refers the US to the response to interrogatory no. 3.

**INTERROGATORY NO. 5:**[5]

To the extent that TDM has had any relationship with Investment Resource Management, L.P. from January 1, 1994, until present, describe such relationship(s) in detail and identify all documentation that demonstrates the described relationships.

---

[4] Renumbered as interrogatory no. 5.
[5] Renumbered as interrogatory no. 6.

**RESPONSE TO INTERROGATORY NO. 5:**

In addition to the general objections, TDM specifically objects to this interrogatory to the extent it is harassing and overly broad. TDM further objects to this interrogatory to the extent that the term "relationship" is ambiguous and not defined. TDM further objects to this interrogatory to the extent it seeks information that is immune from discovery under one or more privileges. TDM further objects to this interrogatory to the extent it seeks information that is more appropriately obtained through a discovery deposition.

Notwithstanding these objections, TDM refers to the response to interrogatory no. 3.

**INTERROGATORY NO. 6:** [6]

To the extent that TDM has had any relationship with SK Services and/or SK Services (East), L.C. from January 1, 1994, until present, describe such relationship(s) in detail and identify all documentation that demonstrates the described relationships.

**RESPONSE TO INTERROGATORY NO. 6:**

In addition to the general objections, TDM specifically objects to this interrogatory to the extent it is harassing and overly broad. TDM further objects to this interrogatory to the extent that the term "relationship" is ambiguous and not defined. TDM further objects to this interrogatory to the extent it seeks information that is immune from discovery under one or more privileges. TDM further objects to this interrogatory to the extent it seeks information that is more appropriately obtained through a discovery deposition.

---

[6] Renumbered as interrogatory no. 7.

Notwithstanding these objections, TDM refers to the response to interrogatory no. 3.

**INTERROGATORY NO. 7:**[7]

To the extent that TDM has had any relationship with TDM Ltd. from January 1, 1994, until present, describe such relationship(s) in detail and identify all documentation that demonstrates the described relationships.

**RESPONSE TO INTERROGATORY NO. 7:**

In addition to the general objections, TDM specifically objects to this interrogatory to the extent it is harassing and overly broad. TDM further objects to this interrogatory to the extent that the term "relationship" is ambiguous and not defined. TDM further objects to this interrogatory to the extent it seeks information that is immune from discovery under one or more privileges. TDM further objects to this interrogatory to the extent it seeks information that is more appropriately obtained through a discovery deposition.

Notwithstanding these objections, TDM, Ltd. was an offshore British Virgin Islands international business company that was a predecessor-in-interest to TDM America, LLC. The assets owned by TDM Ltd. were conveyed to TDM America, Ltd. See response to interrogatory no. 3.

**INTERROGATORY NO. 8:**[8]

To the extent that TDM has had any relationship with Utex Environmental Services from January 1, 1994, until present, describe such relationship( s) in detail and identify all documentation that demonstrates the described relationships.

---

[7] Renumbered as interrogatory no. 8.

[8] Renumbered as interrogatory no. 9.

**RESPONSE TO INTERROGATORY NO. 8:**

In addition to the general objections, TDM specifically objects to this interrogatory to the extent it is harassing and overly broad. TDM further objects to this interrogatory to the extent that the term "relationship" is ambiguous and not defined. TDM further objects to this interrogatory to the extent it seeks information that is immune from discovery under one or more privileges. TDM further objects to this interrogatory to the extent it seeks information that is more appropriately obtained through a discovery deposition.

Notwithstanding these objections, TDM refers to the response to interrogatory no. 3.

**INTERROGATORY NO. 9:**[9]

For each claim of the patents-in-suit, if TDM contends that it is entitled to a priority date other than the date of the application from which the claim issued, separately identify the date to which TDM contends that claim is entitled for priority purposes and set forth the basis of each claim of priority.

**RESPONSE TO INTERROGATORY NO. 9:**

In addition to the general objections, TDM specifically objects to this interrogatory to the extent it is harassing and overly broad. TDM further objects to this interrogatory to the extent it seeks information that is immune from discovery under one or more privileges. TDM further objects to this interrogatory to the extent it seeks information that is ascertainable from the face of the patents-in-suit.

Notwithstanding these objections, TDM relies upon the filing date, parent application and/or the corresponding provisional application dates for the priority dates of

[9] Renumbered as interrogatory no. 10.

the patents-in-suit. Accordingly, the priority date for the '731 patent is May 15, 1997 based upon the filing of provisional patent application no. 60/046,616. The priority date for the '614 patent is February 8, 1994 which is the filing date of the patent application that issued as the '614 patent. The priority date for the '862 patent is the filing date of the application which issued as the '614 patent, February 8, 1994. The priority date of the '590 patent is January 23, 1990, which is the filing date of the patent application that issued as the '590 patent.

**INTERROGATORY NO. 10:** [10]

With respect to the subject matter of each claim of the patents-in-suit, identify (a) any disclosure of the subject matter claimed prior to the filing date of the application from which the patent issued, and (b) any written descriptions of the subject matter claimed prior to the filing date.

**RESPONSE TO INTERROGATORY NO. 10:**

In addition to the general objections, TDM specifically objects to this interrogatory to the extent it is harassing and overly broad. TDM further objects to this interrogatory to the extent it seeks information that is immune from discovery under one or more privileges. TDM further objects to this interrogatory to the extent it seeks information that is more appropriately obtained through a discovery deposition. Further, TDM does not possess information with respect to disclosures or written descriptions that may have occurred while Safety-Kleen (or a related entity) was the owner of any of the patents-in-suit or their applications.

Notwithstanding these objections, TDM did not disclose the subject matter claimed prior to the filing date of the applications (or provisional applications) from

[10] Renumbered as interrogatory no. 11.

which each of the patents issued, nor did it disclose any written descriptions of the subject matter claimed prior to the filing date. Documents related to the ECDC and ITEX joint effort to provide dredging services for the Port Authority after the filing date of the '731 patent are produced. See documents bearing bates no. TDM005169–TDM005171.

**INTERROGATORY NO. 11:** [11]

Identify all products or processes manufactured, used, or sold by TDM that embody, practice or use any of the inventions claimed in any part of the patents-in-suit.

**RESPONSE TO INTERROGATORY NO. 11:**

In addition to the General Objections, TDM objects to this interrogatory in that the phrase "any part of the invention" renders this request incomprehensible. Notwithstanding these objections, TDM did not manufacture, use or sell any products or services that use any of the inventions claimed in the patents-in-suit. Documents related to the ECDC and ITEX joint effort to provide dredging services for the Port Authority after the filing date of the '731 patent are produced.

**INTERROGATORY NO. 12:** [12]

Identify every sale, offer to sell, advertisement, distribution, test, demonstration, proposal, price quotation, contract negotiated or formed, commercial exploitation, experimentation, announcement, public use, public display, response to market inquiry, or bid by TDM, whether formal or informal, relating to soil and/or waste processing or remediation technology including, but not limited to, the inventions described in each of the patents-in-suit.

**RESPONSE TO INTERROGATORY NO. 12:**

In addition to the general objections, TDM specifically objects to this interrogatory to the extent it is harassing and overly broad. TDM further objects to this

---

[11] Renumbered as interrogatory no. 12.

[12] Renumbered as interrogatory no. 13.

interrogatory to the extent it seeks information that is irrelevant and/or not likely to lead to admissible evidence. TDM further objects to this interrogatory to the extent it seeks information that is immune from discovery under one or more privileges. TDM further objects to this interrogatory to the extent it seeks information that is more appropriately obtained through a discovery deposition. TDM further objects to this interrogatory to the extent it seeks information on dredging activities in the broad sense and is not limited to the inventions clamed in the patents-in-suit. TDM will respond to this interrogatory in the context of the patents-in-suit.

Notwithstanding these objections, TDM responds that a brochure entitled Dredge Sediments Recovery & Recycling Facility was assembled by ECDC and ITEX in or about 1997. (bates nos. TDM005169–TDM005171)

TDM further responds that the dredging process disclosed in the '731 patent was shown, but in no way disclosed, in a poster session at the International Conference on Contaminated Dredge Sediments which took place in Rotterdam on or about September 7-11, 1997. Dr. Irfan Toor participated in this presentation.

In or about September/October 1997, the process disclosed in the '731 patent was presented to the United States Army Corps of Engineers ("USACE") in Hawaii at the Aliwai Canal. Rick Redle participated in this presentation.

In Fall 1997, the process disclosed in the '731 patent was also presented to representatives of USACE, the U.S. Environmental Protection Agency and a state agency.[13] Rick Redle participated during these discussions.

---

13 TDM does not have the title of the state agency referenced herein and will supplement this information when it becomes known.

The process of the '731 patent was used in conjunction with the MF-207A Port Authority contract. See documents produced as bates nos. TDM001117–TDM001351. Actual disclosure of the process started in or around summer 1997.

**INTERROGATORY NO. 13:** [14]

Describe every instance in which TDM has licensed, attempted to license, litigated, threatened litigation, or otherwise attempted to enforce any of the patents-in-suit and identify all documents referring or relating to each such instance, including but not limited to, all correspondence of any kind referring or relating to each such instance.

**RESPONSE TO INTERROGATORY NO. 13:**

In addition to the general objections, TDM specifically objects to this interrogatory to the extent it is harassing and overly broad. TDM further objects to this interrogatory to the extent it seeks information that is irrelevant and/or not likely to lead to admissible evidence. TDM further objects to this interrogatory to the extent it seeks information that is immune from discovery under one or more privileges. TDM further objects to this interrogatory to the extent it seeks information that is more appropriately obtained through a discovery deposition.

Notwithstanding these objections, TDM does not have written licenses regarding the patents-in-suit. There is a license for the patents-in-suit between TDM America, LLC and UTEX Environmental Services, LLC. TDM America, LLC has not licensed, litigated, threatened litigation, or attempted to enforce the patents-in-suit against third parties other than the present litigation. TDM has engaged in conversations with the Port Authority that relate to the patents-in-suit, but these conversations are under a

[14] Renumbered as interrogatory no. 14.

confidentiality agreement and, in any event, fall under settlement discussions. Such information is not admissible and may not be disclosed to third parties.

**INTERROGATORY NO. 14:** [15]

Identify each and every item of damages that TDM contends it has incurred as a result of the alleged infringement by the United States of the patents-in-suit. For each item of damages, (a) state the total dollar amount of damages claimed; (b) state the theory of recovery on which the damages are based (e.g., lost profits, a reasonable royalty, price erosion, entire market value rule); (c) identify all facts and/or documents on which TDM relies for proof of the fact and amount of damages; (d) describe in detail the method by which the amount of damages have been calculated; and (e) identify each persons with knowledge of the amount of damages and describe the extent of their knowledge.

**RESPONSE TO INTERROGATORY NO. 14:**

In addition to the general objections, TDM specifically objects to this interrogatory to the extent it is harassing and overly broad. TDM further objects to this interrogatory to the extent it seeks information that is irrelevant and/or not likely to lead to admissible evidence. TDM further objects to this interrogatory to the extent it is premature as expert discovery has not yet begun and the US has not completed its production of documents that TDM requires before an answer to this interrogatory may be completely ascertained.

Notwithstanding these objections, TDM has produced documents bearing bates nos. TDM005172–TDM005184 which contain information on the volumes of treatment of dredged materials. TDM will supplement this response after TDM's experts have provided an opinion in accordance with the scheduling order of this Court.

**INTERROGATORY NO. 15:** [16]

[15] Renumbered as interrogatory no. 15.
[16] Renumbered as interrogatory no. 16.

For each of the patents-in-suit, identify all persons(s) who were associated with the filing or prosecution of the patent application resulting in the patent, including all persons who provided information used in the patent application or in the prosecution, as defined by 37 C.F.R. § 1.56(c), and describe the role each such person had in connection with the prosecution of that patent application.

**RESPONSE TO INTERROGATORY NO. 15:**

In addition to the general objections, TDM specifically objects to this interrogatory to the extent it is harassing and overly broad, especially as it demands a response for all persons who provided information used in the patent application or in the prosecutions thereof. TDM further objects to this interrogatory to the extent it seeks information that is irrelevant and/or not likely to lead to admissible evidence. TDM further objects to this interrogatory to the extent it seeks information that is immune from discovery under one or more privileges. TDM further objects to this interrogatory to the extent it seeks information that is more appropriately obtained through a discovery deposition. TDM further objects to this interrogatory to the extent that TDM was not the entity that prosecuted the entirety of the patents so that TDM lacks the knowledge to fully respond to this interrogatory.

Notwithstanding these objections, TDM responds that the named inventors of the patents-in-suit were associated with the filing and/or prosecution of the patents-in-suit. Accordingly, Ritchie G. Studer was associated with the prosecution of the '731 patent in his role as the inventor of the '731 patent. Irfan A. Toor was associated with the prosecution of the '614 and the '862 patents in his role as inventor of these patents. Inventor Patrick D. Taylor was associated with the prosecution of the '590 patent in his role as inventor of the '590 patent.

**INTERROGATORY NO. 16:** [17]

For each named inventor of the patents-in-suit (a) state, separately, each period of time during which he was employed, directly or indirectly, by any branch, department or agency of the United States Government, or worked on any project funded, directly or indirectly or sponsored in whole or in party by any agency or department of the United States, and identify such project; (b) state, separately, each period of time during which he was employed, directly or indirectly, by TDM, including the title and responsibilities for each position held; (c) identify all documents which pertain to or constitute speeches, talks, lectures, articles, publications, consultations, or consultant reports, by the inventor concerning the subject matter described in the patents-in-suit and state to whom such documents were circulated (d) identify all correspondence between the inventor and the State of New Jersey, and/or any other state relating to the subject matter described in the patents-in-suit.

**RESPONSE TO INTERROGATORY NO. 16:**

TDM notes that this interrogatory constitutes four separate sub-parts and renumbers this interrogatory as four separate ones. In addition to the general objections, TDM further objects to this interrogatory to the extent it seeks information that is irrelevant and/or not likely to lead to admissible evidence. TDM further objects to this interrogatory to the extent it seeks information that is immune from discovery under one or more privileges. TDM further objects to this interrogatory to the extent it seeks information that is more appropriately obtained through a discovery deposition. TDM further objects to this interrogatory to the extent this information already has been provided to the US.

Notwithstanding these objections, TDM responds as follows:

**Part a** [18]

---

17 Renumbered as interrogatories nos. 17-20.

18 Renumbered as interrogatory no. 17.

None of the inventors of the patents-in-suit were employed by the United States Government for the period 1994 to the present.

**Part b**[19]

Ritchie G. Studer is a principal in UTEX Holdings, LLC; the Chief Executive Officer of UTEX Environmental Services, LLC; and the named inventor of the '731 patent. Mr. Studer has held these titles since these companies were founded.

Dr. Irfan Toor is a Senior Vice President of UTEX Environmental Services, LLC and named inventor of the '614 and '862 patents. Dr. Toor has been with UTEX Environmental Services, LLC since July 1999.

Patrick D. Taylor is the inventor of the '590 patent. He is not associated with TDM, but was employed with ITEX and held the title of shop manager from about 1984 to 1994.

**Part c**[20]

TDM identifies documents bearing bates nos. TDM004474–TDM004525 as containing information from which the answer to this interrogatory may be ascertained.

**Part d**[21]

At this time, TDM is not aware of correspondence between the inventors of the patents-in-suit and the State of New Jersey.

---

19 Renumbered as interrogatory no. 18.
20 Renumbered as interrogatory no. 19.
21 Renumbered as interrogatory no. 20.

**AS TO RESPONSES:**

I, Rick Redle, hereby declare under penalty of perjury that the foregoing responses to factual interrogatories and factual portions of responses to contention interrogatories are true and accurate to the best of my ability and are based upon information and sources presently available to TDM, and knowledge derived during the course of my duties.

Executed on April 5, 2007

Rick Redle

**AS TO OBJECTIONS AND/OR CONTENTIONS:**

Dated: April ~~5~~ 11, 2007

**DAVIDOFF MALITO & HUTCHER LLP**
*Attorneys for Plaintiff*

David W. Denenberg
Michael A. Adler
605 Third Avenue – 34 Fl
New York, NY 10158
Tel: (212) 557-7200
Fax: (212) 286-1884

**CERTIFICATE OF SERVICE**

I hereby certify that on April 11, 2007, I served a true and accurate copy of PLAINTIFF TDM AMERICA, LLC'S OBJECTIONS AND RESPONSES TO DEFENDANT UNITED STATES' FIRST SET OF INTERROGATORIES TO PLAINTIFF (NOS. 1-16) on counsel for the United States by Federal Express at the following address:

Erica A. Franklin
US Department of Justice
Civil Division
1100 L Street, NW
Suite 1100
Washington, DC 20001

and on counsel for Donjon Marine Company, Inc. by Federal Express at the following address:

Gary J. Campbell
McCarter & English LLP
265 Franklin Street
Boston, MA 02110

Michael A. Adler

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TDM America, LLC,<br>Plaintiff,<br>v.<br>The United States of America<br>Defendant,<br>and<br>Donjon Marine Company, Inc.<br>Interested Party. | Civil Action No. 06-472-C<br><br>Judge Thomas C. Wheeler |

**PLAINTIFF TDM AMERICA, LLC'S OBJECTIONS AND RESPONSES TO INTERESTED PARTY DONJON MARINE COMPANY, INC.'S FIRST SET OF INTERROGATORIES TO PLAINTIFF (NOS. 1-17)**

Plaintiff TDM America, LLC ("TDM") pursuant to Rule 33 of the Rules of the Court of Federal Claims ("RCFC") hereby responds to interested party Donjon Marine Company, Inc.'s ("Donjon's") first set of interrogatories (nos. 1-17) served on TDM on February 28, 2007. The following responses are based upon present information and belief. TDM reserves the right to seasonably amend and supplement these as required under RCFC.

**GENERAL OBJECTIONS**

TDM hereby asserts the following general objections to Donjon's interrogatories:

1. TDM objects to each and every instruction and definition in Donjon's first set of interrogatories to TDM to the extent that they exceed the permissible scope of

discovery under the RCFC and/or impose upon defendant duties and responsibilities beyond those required by those rules.

2. TDM objects to the definitions of plaintiff as "you", "your" and "TDM" to the extent it calls for any entity that was or is unaffiliated with the plaintiff in this action. As such, TDM does not have knowledge and cannot speak for any unaffiliated TDM predecessor-in-interest that may have prosecuted or owned the patents-in-suit.

3. TDM objects to each and every interrogatory to the extent it is inconsistent with the requirements and limitations of the RCFC.

4. TDM objects to each and every interrogatory to the extent it is harassing. overbroad, onerous, unduly burdensome, and the information requested is more appropriately elicited through depositions or by other discovery methods.

5. TDM objects to each and every interrogatory to the extent that the information requested is precluded and/or immune from discovery under: (a) the attorney-client privilege; (b) the attorney work product privilege; (c) the community of interest privilege; (d) the deliberative process privilege; and/or (e) might tend to disclose any of the content of such privileged information and such information will not be provided.

6. Responses that contain TDM's proprietary and/or confidential information, will be provided under the protective order entered by the court.

7. TDM objects to each and every interrogatory to the extent that it seeks legal conclusions or opinions, and/or mental impressions, and/or theories of counsel and such information will not be provided.

8. TDM objects to each and every interrogatory to the extent the interrogatory does not set forth a definite time period, sets forth a time period that exceeds any period relevant to this litigation, and, thereby, seeks information that is not reasonably calculated to lead to the discovery of admissible evidence in this action. TDM generally limits the scope of its responses to the relevant time periods.

9. TDM objects to each and every interrogatory to the extent that it is premature.

10. The fact that TDM responds to an interrogatory shall not be construed, in any way, that the response is relevant, material and/or admissible. Accordingly, TDM reserves its right to challenge the relevance, materiality, and admissibility at trial, or in any subsequent proceeding, or any other action, of any of the information TDM provides herein.

11. TDM objects to each and every interrogatory to the extent it seeks information or documents that are generated or created by or for the use of counsel as of the commencement of this case.

12. A response to an interrogatory, despite any general objection and/or specific objection made thereto, does not obligate a continued response when objections have been made.

13. TDM objects to each and every interrogatory response to the extent that it calls for the expert opinions and/or claim construction prior to the scheduled date as set forth in the February 23, 2007 scheduling order of this Court.

14. Whenever an interrogatory request seeks identification of documents and/or TDM responds to an interrogatory by referring to documents from which a response may be ascertained, TDM, in good faith, identifies relevant documents, but the lack of identifying all documents shall not preclude TDM from identifying additional documents at a later date.

15. TDM objects to each and every interrogatory to the extent it seeks to identify all documents that pertain to that particular interrogatory. TDM has or will produce relevant non-privileged documents to the extent such documents exist and will use reasonable efforts to identify same. TDM further reserves its right to amend the identified documents and/or supplement same as this case progresses.

16. TDM's responses are based upon information that is known or reasonably believed by TDM at the time of its responses to these interrogatories. It is anticipated that further discovery, investigation, and analysis may supply additional facts, provide new meaning to known facts, or entail new factual conclusions. Accordingly, TDM reserves its right to seasonably amend and/or supplement these responses in accordance with RCFC.

17. TDM objects to each and every request to the extent the request states or assumes that TDM is directly making claims of patent infringement against Donjon. TDM responds based on its claim against the US.

## DEFINITIONS

The terms "dredging activities" and "treatment" shall have the meaning ascribed to them in TDM's document requests and interrogatory requests to Donjon.

## SPECIFIC OBJECTIONS AND RESPONSES

Each of the general objections are incorporated herein by reference into each of the interrogatory responses. A response to a specific interrogatory is not intended to waive any of the general objections incorporated by reference. Subject to and without waiving its general objections, TDM hereby objects and responds to each interrogatory of Donjon as set forth below.

## RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 1:

Identify all steps taken by TDM or UTEX to investigate Donjon's dredging activities prior to the filing of the Lawsuit including, but not limited to, the date such investigation commenced and ended, the identity of Persons participating in that investigation, the identity of all Persons who participated in observing, recording and/or photographing Donjon's dredging activities or site, and the identity of all such observations, recordings and/or photographs.

### RESPONSE TO INTERROGATORY NO. 1:

In addition to the general objections, TDM objects to this interrogatory to the extent it calls for privileged information. TDM also objects to this interrogatory to the extent that it calls for anything other than a simple demonstration that TDM conducted the appropriate due diligence with respect to commencing this lawsuit. TDM further objects to this interrogatory to the extent it seeks information that is more appropriately sought through a deposition. TDM further objects to this interrogatory to the extent that TDM initiated this law suit against defendant United States of America ("defendant" or "US"). The US noticed Donjon as an interested third party. There are no direct claims by TDM against Donjon.

Notwithstanding these objections, TDM reviewed the patents-in-suit and each relevant file history. On or about March 10 and November 20, 2005, and February 7 and April 30, 2006, Ritchie Studer and Rick Redle of TDM photographed Donjon's dredging activities using a single lens reflex camera for some of the photographs and a digital camera for others. The photographs were taken from aerial and land positions on or about the various dates set forth above. Likewise, Donjon's dredging activities were observed and witnessed during this time period.

TDM also prepared a document entitled Utex Environmental Services, LLC Presentation to the Honorable Senator Orrin G. Hatch, United States Senate, dated April 1, 2005 by Utex Environmental Services, LLC, which sets forth that TDM is the owner of the patents-in-suit. This submission, also known as the White Paper, includes an analysis section pertaining to the '731 and '614 patents. This section compares the '731 and '614 patents with an explanation and annotations to photographs of Donjon's and others' dredging activities, respectively. The presentation led to numerous correspondence between TDM and US counsel, including Earl Baugher, Esq., COE Senior Counsel for R&D and patent attorney; Alan P. Klein, Esq., Intellectual Property Counsel of the Army; and Lorraine Lee, Esq., over the course of 12-15 months wherein additional information was provided to TDM and its counsel. This also led to an administrative claim. Documents related to such correspondence are produced bearing bates nos. TDM006843-TDM006511.

In addition, TDM reviewed and studied numerous contract documents, dredging program reports, brochures, websites, studies, etc. regarding dredging activities and treatment of dredged materials by or for the US, including documents produced as

bearing bates nos.TDM000001-TDM000336; TDM000605-TDM003524; TDM003883-TDM003950; TDM004023-TDM004380; TDM004391-TDM004406; TDM005024-TDM005113 and TDM006410-TDM006511. TDM also received and reviewed a May 16, 2006 letter by Alan P. Klein produced as bearing bates nos. TDM005114-TDM005120. In addition, privileged discussions occurred among Ritchie Studer, Rick Redle, Dr. Irfan A. Toor and TDM's counsel prior to commencing this action.

**INTERROGATORY NO. 2:**

Identify all Persons having knowledge of facts relating to any allegation or belief by You that Donjon dredging activities infringe the Patents in suit and, for each Person, provide a detailed description of each Person's knowledge and the manner in which such knowledge was acquired.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to the general objections, TDM objects to this interrogatory to the extent it seeks privileged information. TDM also objects to this interrogatory to the extent that it is overly broad and harassing. TDM further objects to this interrogatory to the extent it seeks information that is not relevant and/or information that is not reasonably calculated to lead to the discovery of admissible evidence. TDM further objects to this interrogatory to the extent that TDM initiated this lawsuit against the US. The US noticed Donjon as an interested third party. There are no direct claims by TDM against Donjon.

Notwithstanding these objections, TDM identifies all people already identified by the US, Donjon and TDM. Details are provided for TDM personnel, Ritchie Studer, Rick

Redle, Dr. Irfan A. Toor and F. Scott Crawford who have knowledge of facts relating to allegations of the US' infringement of the patents-in-suit.

1. Ritchie Studer has knowledge of the facts underlying the allegations of the US' infringement of the patents-in-suit. He is the inventor of the '731 patent. He has professional knowledge and expertise of dredging processes from over 15 years of experience. He observed, studied and photographed the US' and/or its contractors' dredging activities and treatment of dredged materials. He reviewed numerous contract documents, photographs, dredging program reports, brochures, websites, studies, etc. regarding dredging activities and treatment of dredged materials by or for the US. Mr. Studer participated in correspondence, presentations and discussions with the US and the administrative claim referred to above, which included various US personnel and concluded with Mr. Klein's May 16, 2006 letter.

2. Rick Redle has knowledge of the facts underlying the allegations of the US' infringement of the patents-in-suit. He is familiar with the patents-in-suit. He has professional knowledge and expertise of dredging processes from over 15 years of experience. He observed, studied and photographed the US' and/or its contractors' dredging activities and treatment of dredged materials. He reviewed numerous contract documents, photographs, dredging program reports, brochures, websites, studies, etc. regarding dredging activities and

treatment of dredged materials by or for the US. Mr. Redle participated in correspondence, presentations and discussions with the US and the administrative claim referred to above, which included various US personnel and concluded with Mr. Klein's May 16, 2006 letter.

3. Dr. Irfan Toor has knowledge of the facts underlying the allegations of the US' infringement of the patents-in-suit. He is the inventor of the '614 and '862 patents. He has professional knowledge and expertise of dredging processes from over 15 years of experience. He studied the US' and/or its contractors' dredging activities and treatment of dredged materials. He reviewed numerous contract documents, photographs, dredging program reports, brochures, websites, studies, etc. regarding dredging activities and treatment of dredged materials by or for the US. Dr. Toor participated in presentations and discussions with the US and the administrative claim referred to above, which included various US personnel and concluded with Mr. Klein's May 16, 2006 letter.

4. F. Scott Crawford has knowledge of the facts underlying the allegations of the US' infringement of the patents-in-suit. He is familiar with the patents-in-suit. He has professional knowledge and expertise of dredging processes from over 15 years of experience. He studied the US' and/or its contractors' dredging activities and treatment of dredged materials. He reviewed numerous contract

documents, photographs, dredging program reports, brochures, websites, studies, etc. regarding dredging activities and treatment of dredged materials by or for the US.

**INTERROGATORY NO. 3:**

State (a) the name and address of any Person who has made a statement regarding this Lawsuit; (b) whether the statement was oral or in writing; (c) the date the statement was made; (d) the name and address of the Person to whom the statement was made; (e) the name and address of each Person present when the statement was made; and (f) the name and address of each Person who has knowledge of the statement.

**RESPONSE TO INTERROGATORY NO. 3:**

In addition to the general objections, TDM objects to this interrogatory to the extent it seeks privileged information. TDM also objects to this interrogatory to the extent that it is overly broad and harassing. TDM further objects to this interrogatory to the extent it seeks information that is not relevant and/or information that is not reasonably calculated to lead to the discovery of admissible evidence. TDM further objects to this interrogatory to the extent that TDM initiated this lawsuit against the US. The US noticed Donjon as an interested third party. There are no direct claims by TDM against Donjon.

TDM further objects to this interrogatory to the extent it seeks information that relates to settlement discussions between TDM and The Port Authority of New York and New Jersey (the "Port Authority"). These settlement discussions are under a non-disclosure agreement and are not admissible in any event.

Notwithstanding these objections, TDM is not aware of any statements responsive to this request.

**INTERROGATORY NO. 4:**

If You claim that Donjon or the United States made any statements or admissions as to the subject matter of this Lawsuit, state: (a) the date made; (b) the name of the Person to whom made; (c) the name and address of the Person to whom made; (d) where made; (e) the name and address of each Person present at the time the admission was made; (f) the contents of the admission; and (g) if in writing, attach a copy.

**RESPONSE TO INTERROGATORY NO. 4:**

In addition to the general objections, TDM objects to this interrogatory to the extent it seeks privileged information. TDM also objects to this interrogatory to the extent that it is overly broad and harassing. TDM further objects to this interrogatory to the extent it seeks information that is not relevant and/or information that is not reasonably calculated to lead to the discovery of admissible evidence. TDM further objects to this interrogatory to the extent that TDM initiated this lawsuit against the US. The US noticed Donjon as an interested third party. There are no direct claims by TDM against Donjon.

Notwithstanding the general objections, plaintiff identifies the pleadings, discovery responses, and documents produced, including documents bearing bates nos. TDM000772-TDM00889; TDM004391-TDM004420; TDM005324-TDM005330; TDM005172-TDM005184; TDM005114-TDM005120 and TDM006483-TDM006511 and documents produced by the US and Donjon.

**INTERROGATORY NO. 5:**

If You allege or believe that Donjon dredging activities infringe any of the claims of the Patents in suit identify each such claim and set forth Your proposed construction for each such claim and identify all evidence supporting that construction with reference to the claim language, the specification, the prosecution history, and any other source on which You rely for claim construction (including any basis on which You assert a given definition is the plain meaning of an element or limitation).

**RESPONSE TO INTERROGATORY NO. 5:**

In addition to the general objections, TDM objects to this interrogatory to the extent it seeks privileged information. TDM also objects to this interrogatory to the extent that it is overly broad and harassing. TDM further objects to this interrogatory to the extent it seeks information that is not relevant and/or information that is not reasonably calculated to lead to the discovery of admissible evidence. TDM further objects to this interrogatory to the extent that TDM initiated this law suit against the US. The US noticed Donjon as an interested third party. There are no direct claims by TDM against Donjon.

TDM further objects to this interrogatory to the extent it calls for claim interpretation, expert witness subject matter, and other information that is premature in view of the scheduling order of this Court. TDM further objects to this interrogatory to the extent it calls for information to be furnished in a particular format. TDM will provide information in accordance with RCFC 33.

TDM further objects to this interrogatory to the extent that the document, and other information sought herein, is readily available to Donjon as it is contained in Donjon's contracts and related materials. In this respect, not only is such information available to Donjon, but it has not yet been made available to TDM. TDM further objects to this interrogatory because TDM's ability to fully respond to this interrogatory has been thwarted by the US and Donjon as these parties have not produced documents that provide the processing steps for the treatment of dredged material. TDM explicitly reserves its right and expects to supplement and/or amend its responses to these

interrogatories as this litigation progresses through discovery, expert witnesses, and the Markman hearing.

Notwithstanding these objections, TDM directs Donjon to TDM's response to interrogatory no. 1 of the US' first set of interrogatories to plaintiff, the patents-in-suit (particularly the specifications) and to documents bearing bates nos. TDM000001-TDM0000336; TDM005024-TDM005113 and TDM006410-TDM006482.

**INTERROGATORY NO. 6:**

If You allege or believe that Donjon dredging activities infringe any of the claims of the Patents in suit identify each such claim and identify with particularity, for each such claim, the factual basis for such allegation, including an element-by-element comparison of each claim element of the asserted patent claims to Donjon's dredging activities.

**RESPONSE TO INTERROGATORY NO. 6:**

See response to interrogatory no. 5.

**INTERROGATORY NO. 7:**

Identify the earliest date that Donjon is alleged to have had actual and/or constructive notice of the Patents in suit.

**RESPONSE TO INTERROGATORY NO. 7:**

In addition to the general objections, TDM objects to this interrogatory to the extent it seeks privileged information. TDM also objects to this interrogatory to the extent that it is overly broad and harassing. TDM further objects to this interrogatory to the extent it seeks information that is not relevant and/or information that is not reasonably calculated to lead to the discovery of admissible evidence. TDM further objects to this interrogatory to the extent that TDM initiated this lawsuit against the US.

The US noticed Donjon as an interested third party. There are no direct claims by TDM against Donjon. TDM further objects to this request to the extent that the actual *earliest date* is only known to Donjon, however, Donjon refuses to provide the information and, instead, provides inaccurate information in response to TDM's interrogatory on this very subject.

Notwithstanding these objections, the earliest date that Donjon is alleged to have had actual and/or constructive notice of the patents-in-suit is, at least, some time prior to April 2002. See documents produced as bearing bates nos. TDM005331-TDM005341.

**INTERROGATORY NO. 8:**

For each claim of the Patents in suit, identify when the alleged invention that is the subject of such claim was purportedly conceived and purportedly first actually reduced to practice. Identify all Documents relating to such conception or reduction to practice.

**RESPONSE TO INTERROGATORY NO. 8:**

In addition to the general objections, TDM objects to this interrogatory to the extent it seeks privileged information. TDM also objects to this interrogatory to the extent that it is overly broad and harassing. TDM further objects to this interrogatory to the extent it seeks information that is not relevant and/or information that is not reasonably calculated to lead to the discovery of admissible evidence. TDM further objects to this interrogatory to the extent that TDM initiated this lawsuit against the US. The US noticed Donjon as an interested third party. There are no direct claims by TDM against Donjon. TDM objects to the gratuitous insertion of the term "purportedly" and will respond to this interrogatory as if the term were stricken therefrom.

Notwithstanding these objections, TDM responds by referring to TDM's responses to interrogatory nos. 9, 10 and 12 of the US' first set of interrogatories to TDM and to TDM's responses to document request nos. 19 and 20 of Donjon's first set of document requests to TDM.

**INTERROGATORY NO. 9:**

Identify the dates on which any process or product falling within the scope of any of the claims of the Patents in suit, was first (i) manufactured, (ii) publicly used, (iii) offered for sale and (iv) sold, including by identifying all Persons with direct knowledge of the facts and circumstances of such manufacture, public use, offer for sale and sale (including by identifying the specific facts known to each Person) and all Documents supporting the existence of those facts and circumstances.

**RESPONSE TO INTERROGATORY NO. 9:**

In addition to the general objections, TDM objects to this interrogatory to the extent it seeks privileged information. TDM also objects to this interrogatory to the extent that it is overly broad and harassing. TDM further objects to this interrogatory to the extent it seeks information that is not relevant and/or information that is not reasonably calculated to lead to the discovery of admissible evidence. TDM further objects to this interrogatory to the extent that TDM initiated this lawsuit against the US. The US noticed Donjon as an interested third party. There are no direct claims by TDM against Donjon. TDM objects to the gratuitous insertion of the term "purportedly" and will respond to this interrogatory as if the term were stricken therefrom.

Notwithstanding these objections, TDM responds by referring to TDM's response to interrogatory no. 12 of the US' first set of interrogatories to TDM.

**INTERROGATORY NO. 10:**

Identify any prior art known to You concerning the subject matter of the Patents in suit, regardless of whether You consider the prior art relevant to the validity of the Patents in suit.

**RESPONSE TO INTERROGATORY NO. 10:**

In addition to the general objections, TDM objects to this interrogatory to the extent it seeks privileged information. TDM also objects to this interrogatory to the extent that it is overly broad and harassing. TDM further objects to this interrogatory to the extent it seeks information that is not relevant and/or information that is not reasonably calculated to lead to the discovery of admissible evidence. TDM further objects to this interrogatory to the extent that TDM initiated this law suit against the US. The US noticed Donjon as an interested third party. There are no direct claims by TDM against Donjon.

Notwithstanding these objections, TDM identifies documents bearing bates nos. TDM000001-TDM000336; TDM005024-TDM005113 and TDM006410-TDM006482 as containing references to prior art. Although TDM does not express an opinion at this time with respect to any other references that do not appear in the previously identified documents provided by the US and Donjon, TDM notes that the US identified references as prior art in its first amended responses to plaintiff's first set of interrogatories, which the US failed to produce, and Donjon identified references as prior art in its first supplemental responses to plaintiff's first set of interrogatories.

**INTERROGATORY NO. 11:**

Identify each step in the chain of title for each of the Patents in suit including, but not limited to, 1) all assignments from the inventors of the Patents in suit to TDM or

UTEX; and 2) the assignments upon which TDM relies to assert its right to sue for infringement of the Patents in suit.

**RESPONSE TO INTERROGATORY NO. 11:**

In addition to the general objections, TDM objects to this interrogatory to the extent it seeks privileged information. TDM also objects to this interrogatory to the extent that it is overly broad and harassing. TDM further objects to this interrogatory to the extent it seeks information that is not relevant and/or information that is not reasonably calculated to lead to the discovery of admissible evidence. TDM further objects to this interrogatory to the extent that TDM initiated this law suit against the US. The US noticed Donjon as an interested third party. There are no direct claims by TDM against Donjon.

Notwithstanding these objections, TDM refers Donjon to TDM's response to interrogatory nos. 3-8 of the US' first set of interrogatories to TDM. TDM further identifies documents bearing bates nos. TDM000001-TDM000336; TDM005024-TDM005113; TDM005331-TDM005363; TDM006410-TDM006482; TDM005580-TDM005906 and TDM006483-TDM006570 as responsive to this request.

**INTERROGATORY NO. 12:**

Identify any and all lawsuits (i) alleging infringement of any of the Patents in suit and/or (ii) requesting a declaratory judgment that any of the Patents in suit is invalid, noninfringed and/or unenforceable.

**RESPONSE TO INTERROGATORY NO. 12:**

In addition to the general objections, TDM objects to this interrogatory to the extent it seeks privileged information. TDM also objects to this interrogatory to the extent that it is overly broad and harassing. TDM further objects to this interrogatory to

the extent it seeks information that is not relevant and/or information that is not reasonably calculated to lead to the discovery of admissible evidence. TDM further objects to this interrogatory to the extent that TDM initiated this lawsuit against the US. The US noticed Donjon as an interested third party. There are no direct claims by TDM against Donjon.

Notwithstanding these objections, there are no other lawsuits.

**INTERROGATORY NO. 13:**

Identify all licensees of any of the Patents in suit, and all agreements entered into by You and a third party relating to any of the Patents in suit.

**RESPONSE TO INTERROGATORY NO. 13:**

In addition to the general objections, TDM objects to this interrogatory to the extent it seeks privileged information. TDM also objects to this interrogatory to the extent that it is overly broad and harassing. TDM further objects to this interrogatory to the extent it seeks information that is not relevant and/or information that is not reasonably calculated to lead to the discovery of admissible evidence. TDM further objects to this interrogatory to the extent that TDM initiated this law suit against the US. The US noticed Donjon as an interested third party. There are no direct claims by TDM against Donjon.

Notwithstanding these objections, TDM does not have written licenses regarding the patents-in-suit. There is a license of the patents-in-suit between TDM America, LLC and UTEX Environmental Services, LLC.

**INTERROGATORY NO. 14:**

Identify all Persons and/or entities known by You that practice any of the claims of the '731 patent. For each Person and/or entity known, separately identify the specific claim alleged by You to be practiced and the date of practice of that claim.

**RESPONSE TO INTERROGATORY NO. 14:**

In addition to the general objections, TDM objects to this interrogatory to the extent it seeks privileged information. TDM also objects to this interrogatory to the extent that it is overly broad and harassing. TDM further objects to this interrogatory to the extent it seeks information that is not relevant and/or information that is not reasonably calculated to lead to the discovery of admissible evidence. TDM further objects to this interrogatory to the extent that TDM initiated this lawsuit against the US. The US noticed Donjon as an interested third party. There are no direct claims by TDM against Donjon.

Notwithstanding these objections, TDM refers to TDM's response to interrogatory no. 1 of the US' first set of interrogatories to TDM. Photographs refer to US' dredging activities conducted through Donjon, Clean Earth and OENJ in 2005 and 2006. TDM also refers to the contracts and contractors identified by the US in its interrogatory responses. Donjon and the US failed to complete and timely produce documents and discovery responses, limiting further identification. However, TDM refers to documents produced by the US and Donjon in further support of TDM's response to interrogatory no. 1 of the US' first set of interrogatories to TDM. TDM reserves its right to supplement its response after it receives complete discovery responses from the US, Donjon and any other third party from which TDM has or will request discovery.

**INTERROGATORY NO. 15:**

Identify all Persons who participated in the preparation and submission of David W. Denenberg's April 4, 2005 letter to Senator Orrin Hatch, (including the "Analysis of Counsel" section that is part of the submission), including the identity of any Person who supplied any information considered in the preparation of that letter and the identity of the information supplied.

**RESPONSE TO INTERROGATORY NO. 15:**

In addition to the general objections, TDM objects to this interrogatory to the extent it seeks privileged information. TDM also objects to this interrogatory to the extent that it is overly broad and harassing. TDM further objects to this interrogatory to the extent it seeks information that is not relevant and/or information that is not reasonably calculated to lead to the discovery of admissible evidence. TDM further objects to this interrogatory to the extent that TDM initiated this lawsuit against the US. The US noticed Donjon as an interested third party. There are no direct claims by TDM against Donjon. TDM further objects to this interrogatory to the extent it seeks attorney work product in terms of "preparation" and "submission" and/or attorney-client privileged information in terms of "participation", and "identity".

Notwithstanding these objections, with respect to all information considered and analyzed prior to commencement of this suit, please see response to interrogatory no. 1 herein. With respect to all information considered and analyzed prior to the April 1, 2005 letter, such is not the request and, if it is, such request is not reasonably calculated to lead to the discovery of admissible evidence and seeks privileged information. It is noted that the White Paper itself cites photographs and information reviewed, all of which are produced. Those contracts, brochures, dredging program reports, websites, studies, etc. regarding dredging activities and treatment of dredged materials by or for the US

produced in this action and dated prior to April 4, 2005 were also available, including those referred to and identified in response to interrogatory no. 1.

**INTERROGATORY NO. 16:**

Identify and explain the basis for any calculation of damages You allege or believe You have sustained as a result of Donjon's dredging activities, along with identification of all evidence related thereto.

**RESPONSE TO INTERROGATORY NO. 16:**

In addition to the general objections, TDM objects to this interrogatory to the extent it seeks privileged information. TDM also objects to this interrogatory to the extent that it is overly broad and harassing. TDM further objects to this interrogatory to the extent it seeks information that is not relevant and/or information that is not reasonably calculated to lead to the discovery of admissible evidence. TDM further objects to this interrogatory to the extent that TDM initiated this lawsuit against the US. The US noticed Donjon as an interested third party. There are no direct claims by TDM against Donjon. TDM objects to this interrogatory to the extent it is premature as expert discovery has not yet begun and the US has not completed its production of documents that TDM requires before an answer to this interrogatory may be completely ascertained.

Notwithstanding these objections, TDM produced documents bearing bates nos. TDM005172-TDM005184; TDM000772-TDM000889; TDM005324-TDM005330 and TDM004391-TDM004420, which contain information on the volumes of treatment of dredged materials. TDM also refers Donjon to the US' deficient responses to interrogatory nos. 15 and 16 of TDM's second set of interrogatories to the US. TDM will

supplement this response after TDM's experts provide an opinion in accordance with the scheduling order of this Court.

**INTERROGATORY NO. 17:**

Identify all Persons who assisted with or were consulted in the preparation of responses to these Interrogatories, and for each Person identified, state the Interrogatory or Interrogatories on which such Persons assisted or was consulted and the nature of such Person's assistance or involvement in the preparation of responses.

**RESPONSE TO INTERROGATORY NO. 17:**

In addition to the general objections, TDM objects to this interrogatory to the extent it seeks privileged information. TDM also objects to this interrogatory to the extent that it is overly broad and harassing. TDM further objects to this interrogatory to the extent it seeks information that is not relevant and/or information that is not reasonably calculated to lead to the discovery of admissible evidence. TDM further objects to this interrogatory to the extent that TDM initiated this law suit against the US. The US noticed Donjon as an interested third party. There are no direct claims by TDM against Donjon.

Notwithstanding these objections, Rick Redle (all interrogatories), Dr. Irfan A. Toor (interrogatories 8 and 9) and F. Scott Crawford (non-specific – background information and supplied certain documents) assisted or were consulted with respect to the factual responses to the interrogatories herein.

**AS TO RESPONSES:**

I, Rick Redle, hereby declare under penalty of perjury that the foregoing responses to factual interrogatories and factual portions of responses to contention interrogatories are true and accurate to the best of my ability and are based upon information and sources presently available to TDM, and knowledge derived during the course of my duties.

Executed on April 24, 2007

Rick Redle

**AS TO OBJECTIONS AND/OR CONTENTIONS:**

DAVIDOFF MALITO & HUTCHER LLP
*Attorneys for Plaintiff*

Dated: April 24, 2007

David W. Denenberg
Michael A. Adler
605 Third Avenue – 34 Fl
New York, NY 10158
Tel: (212) 557-7200
Fax: (212) 286-1884

**CERTIFICATE OF SERVICE**

I hereby certify that on April 24, 2007, I served a true and accurate copy of PLAINTIFF TDM AMERICA, LLC'S OBJECTIONS AND RESPONSES TO INTERESTED PARTY DONJON MARINE COMPANY, INC.'S FIRST SET OF INTERROGATORIES TO PLAINTIFF (NOS. 1-17) on counsel for the United States by Federal Express at the following address:

Erica A. Franklin
US Department of Justice
Civil Division
1100 L Street, NW
Suite 1100
Washington, DC 20001

and on counsel for Donjon Marine Company, Inc. by Federal Express at the following address:

Gary J. Campbell
McCarter & English LLP
265 Franklin Street
Boston, MA 02110

Michael A. Adler