Exhibit 11

**THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| TDM AMERICA, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant<br><br>and<br><br>DONJON MARINE COMPANY, INC.<br><br>Interested Party. | Case No. 06-472 C<br><br>Judge Thomas C. Wheeler |

**NOTICE OF DEPOSITION OF DAVID W. DENENBERG**

You are hereby notified that Interested Party Donjon Marine Company, Inc. ("Donjon") will take the deposition of David W. Denenberg pursuant to Rule 30(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") at 9:30AM on July 2, 2007 or on a date and time to be mutually agreed upon by the parties, and continuing from day to day thereafter until completed or adjourned by mutual consent of the parties, at the office of McCarter & English, LLP, 100 Mulberry Street, Newark, NJ 07102. The deposition will be taken before an officer authorized to administer oaths and will be recorded by stenographic or other means permitted by the Rules of Court.

Pursuant to Rule 30(b)(5) of the RCFC, Donjon requests TDM America LLC produce the documents listed in Exhibit A, or make such documents available for inspection.

Dated: May 31, 2007

Respectfully submitted,

**McCARTER & ENGLISH, LLP**

By: Gary Campbell, APN

Gary J. Campbell
265 Franklin Street
Boston, Massachusetts 02110
Telephone: (617) 449-6500
Facsimile: (617) 607-9200
E-mail:gcampbell@mccarter.com
*Attorney for Donjon Marine Company, Inc.*

*Of counsel:*

John E. Flaherty
Andrew P. Nemiroff
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
Telephone: (973) 622-4444
Facsimile: (973) 624-7070
E-mail:jflaherty@mccarter.com

**Exhibit A to Deposition Notice**

**DEFINITIONS AND INSTRUCTIONS**

1. The term "Donjon" shall refer to interested party Donjon Marine Co., Inc.

2. "You" and "Your" shall mean and refer to the deponent.

3. "TDM" shall mean and refer to Plaintiff TDM America, LLC, and its officers, directors, employees, agents, representatives, attorneys, affiliates, successors, and assigns, and to persons and entities acting or purporting to act on behalf of TDM.

4. "UTEX" shall mean and refer to UTEX Holdings, LLC, and its officers, directors, employees, agents, representatives, attorneys, affiliates, successors, and assigns, and to persons and entities acting or purporting to act on behalf of UTEX .

5. The "United States" shall mean and refer to Defendant the United States of America.

6. "Patents in suit" shall mean and refer to United States Patent Nos. 5,542,614 (the "'614 patent"), 6,293,731 (the "'731 patent") and 5,794,862 (the "'862 patent") and any other patent identified in the Complaint that You allege or believe is infringed by Donjon dredging activities.

7. "Donjon Dredging Activities" shall mean, in addition to dredging, all of Donjon's activities relating to dredging and/or any treatment of dredged material by Donjon and/or upland disposal of dredged material by Donjon. "Treatment" as used herein shall mean processing, stabilization, retention, staging, handling, curing, reuse, remediation, fixation, solidification, and/or disposal.

8. "Lawsuit" shall mean and refer to TDM America, LLC v. The United States of America, Civil No. 06-472 C.

9. "Complaint" shall mean and refer to the Complaint or any Amended Complaint filed by TDM in the Lawsuit.

10. "UTEX's Administrative Claim" shall mean and refer to the administrative claim submitted by UTEX to the United States Army which alleges infringement of the '731 and '614 patents by three contractors, including Donjon.

11. "Person" or "Persons" means all natural persons, individuals, corporations, partnerships or other business associations, and all other legal entities, including all members, officers, predecessors, assigns, divisions, affiliates and subsidiaries.

12. "Claim chart" shall mean and refer to existing charts comparing each claim of the applicable patent to the product or process accused of infringing that claim on an element by element (for apparatus claims) or step by step (for method claims) basis.

13. "Claim construction" shall mean and refer to and refer to the interpretation of the words in the claims so as to determine their meaning and scope.

14. "Prior art" shall refer to all categories of prior art recited in 35 U.S.C. § 102 and as used in 35 U.S.C. § 103.

15. For purposes of these Requests, the term "Document" shall include, but not be limited to, notes, letters, e-mail, correspondence, memoranda, notebooks, patents, patent claim charts, reports, photographs of any sort and recorded in any media, recordings of any sort and in any media, known to or in the possession of the plaintiff. "Documents" shall also include copies of any document to the extent the copies are not identical to the original being referred to. Requests for production of documents require the production of copies that contain any markings, additions, or deletions that make them different in any way from any other version of the Document. "Documents" shall also include all ESI as defined herein.

16. "Things" shall be given the most liberal definition embraced by the RCFC.

**Document Requests**

1. All Documents and Things in your possession that you reviewed or relied on in the preparation of your April 4, 2005 submission to Senator Orrin Hatch (including the "Analysis of Counsel" section that is part of the submission).

## CERTIFICATE OF SERVICE

I hereby certify that on 31 May 2007, I served a true and accurate copy of NOTICE OF DEPOSITION OF DAVID W. DENENBERG upon the attorney of record for each party by hand delivery upon:

David Denenberg, Esq.
Davidoff Malito & Hutcher LLP
605 Third Avenue - 34th Floor
New York, NY 10158

And by overnight mail at the following address:

Erica A. Franklin, Esq.
Attorney
Commercial Litigation Branch
Civil Division
1100 L Street, NW
Washington, DC, 20001

By: ____________________

**Exhibit 12**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TDM AMERICA, LLC, Plaintiff, v. THE UNITED STATES OF AMERICA, Defendant and DONJON MARINE COMPANY, INC. Interested Party. | Case No. 06-472 C<br>Judge Thomas C. Wheeler |

**INTERESTED PARTY DONJON MARINE COMPANY, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS TO PLAINTIFF (NOS. 1-115)**

Pursuant to Rule 36 of the United States Court of Federal Claims ("RCFC"), Interested Party, Donjon Marine Company, Inc. ("Donjon"), hereby requests that Plaintiff TDM America, LLC ("TDM") provide answers to the admissions submitted herein within the time and manner prescribed by the RCFC and in accordance with the Definitions and Instructions set forth below.

**DEFINITIONS AND INSTRUCTIONS**

1. These Requests for Admissions are deemed to be continuing so as to require additional answers and further information as it is obtained through the time of trial.

2. Words in the singular necessarily include those words in the plural and words in the plural necessarily include those words in the singular.

3. Words that designate persons in a masculine or feminine form necessarily refer to persons of either gender.

4. "TDM," "You" and "Your" shall mean and refer to Plaintiff TDM America, LLC, and its officers, directors, employees, agents, representatives, attorneys, affiliates, successors, and assigns, and to persons and entities acting or purporting to act on behalf of TDM.

5. "UTEX" shall mean and refer to UTEX Holdings, LLC, and its officers, directors, employees, agents, representatives, attorneys, affiliates, successors, and assigns, and to persons and entities acting or purporting to act on behalf of UTEX.

6. "Donjon" shall mean and refer to Interested Party Donjon Marine Company, Inc.

7. "Donjon dredging activities" shall mean, in addition to dredging, all of Donjon's activities relating to dredging and/or any treatment of dredged material by Donjon and/or upland disposal of dredged material by Donjon. "Treatment" as used herein shall mean processing, stabilization, retention, staging, handling, curing, reuse, remediation, fixation, solidification, and/or disposal.

8. The "United States" shall mean and refer to Defendant the United States of America.

9. "Lawsuit" shall mean and refer to TDM America, LLC v. The United States of America, Civil No. 06-472 C.

10. "Complaint" shall mean and refer to the Complaint or any Amended Complaint filed by TDM in the Lawsuit.

11. "Patents in suit" shall mean and refer to United States Patent Nos. 5,542,614 (the "'614 patent") and 6,293,731 (the "'731 patent") and any other patent identified in the Complaint that You allege or believe is infringed by Donjon dredging activities.

12. "UTEX's Administrative Claim" shall mean and refer to the administrative claim submitted by UTEX to the United States Army which alleges infringement of the '731 and

'614 patents by three contractors, including Donjon.

13. "Person" or "Persons" means all natural persons, individuals, corporations, partnerships or other business associations, and all other legal entities, including all members, officers, predecessors, assigns, divisions, affiliates and subsidiaries.

14. The terms "and" and "or" as used herein shall be construed either conjunctively or disjunctively as required by the context to bring within the scope of these Requests for Admissions any information which might be deemed outside their scope by any other construction.

15. With respect to any refusal to respond to any of these Requests for Admissions based upon a claim of privilege, state fully for each objection the Request to which the purportedly privileged information is responsive, its general subject matter, all person(s) with information relating to the Request, all person(s) with information relating to the subject matter that is purportedly privileged, and the nature or basis of the privilege claimed.

16. If You claim there is any ambiguity in any term in any Request for Admission, without waiver of Donjon's right to seek a full and complete response to the Request, You shall assume a reasonable meaning, state what that assumed meaning is, and answer the Request according to the assumed meaning.

## REQUEST FOR ADMISSIONS

REQUEST NO. 1

The document bearing Bates Nos. DONJON 003109-003130 is a true and accurate copy of International Patent Publication No. WO 92/06050.

REQUEST NO. 2

The title of International Patent Publication No. WO 92/06050, which bears Bates Nos. DONJON 003109-003130, is "Method And Material For Treating Solid And Semi-Solid Waste Materials Containing Reactive Sulfides."

REQUEST NO. 3

The publication date of International Patent Publication No. WO 92/06050, which bears Bates Nos. DONJON 003109-003130, is April 16, 1992.

REQUEST NO. 4

Itex Enterprises, Inc. was the applicant of International Patent Publication No. WO 92/06050, which bears Bates Nos. DONJON 003109-003130.

REQUEST NO. 5

International Patent Publication No. WO 92/06050, which bears Bates Nos. DONJON 003109-003130, is not listed on the face of the '731 Patent.

REQUEST NO. 6

International Patent Publication No. WO 92/06050, which bears Bates Nos. DONJON

003109-003130, was not submitted to the United States Patent and Trademark Office during the prosecution of the '731 Patent.

REQUEST NO. 7

International Patent Publication No. WO 92/06050, which bears Bates Nos. DONJON 003109-003130, was not brought to the attention of the United States Patent and Trademark Office during the prosecution of the '731 Patent.

REQUEST NO. 8

International Patent Publication No. WO 92/06050, which bears Bates Nos. DONJON 003109-003130, states on Page 5 (DONJON 003113) that "It has been found that solid and semi-solid waste materials containing reactive sulfides can be stabilized by treatment with hydraulic cement and a metal carbonate to produce a solid end product."

REQUEST NO. 9

International Patent Publication No. WO 92/06050, which bears Bates Nos. DONJON 003109-003130, states on Page 4 (DONJON 003112) that "It has been found that solid and semi-solid waste materials containing objectional amounts of reactive sulfides may be economically and effectively treated with a mixture of a metal carbonate, hydraulic cement and optionally water to produce a solid, stable and unobjectionable material."

REQUEST NO. 10

International Patent Publication No. WO 92/06050, which bears Bates Nos. DONJON 003109-003130, discloses a method of treating waste material by mixing with Portland cement,

calcium carbonate, and water.

REQUEST NO. 11

International Patent Publication No. WO 92/06050, which bears Bates Nos. DONJON 003109-003130, is prior art that is relevant to the subject matter disclosed in the '731 Patent.

REQUEST NO. 12

International Patent Publication No. WO 92/06050, which bears Bates Nos. DONJON 003109-003130, is prior art that is material to the subject matter disclosed in the '731 Patent.

REQUEST NO. 13

The document bearing Bates Nos. DONJON 003174-003183 is a true and accurate copy of a reference titled "Beneficial use of mudcrete in reclamations."

REQUEST NO. 14

The reference, which bears Bates Nos. DONJON 003174-003183, was published in 1995.

REQUEST NO. 15

The reference, which bears Bates Nos. DONJON 003174-003183, is not listed on the face of the '731 Patent.

REQUEST NO. 16

The reference, which bears Bates Nos. DONJON 003174-003183, was not submitted to the United States Patent and Trademark Office during the prosecution of the '731 Patent.

REQUEST NO. 17

The reference, which bears Bates Nos. DONJON 003174-003183, was not brought to the attention of the United States Patent and Trademark Office during the prosecution of the '731 Patent.

REQUEST NO. 18

The reference, which bears Bates Nos. DONJON 003174-003183, states on Page 3 (DONJON 003176) that "To gain strength and to minimize leaching of the contaminants, the marine mud was stabilized with ordinary Portland cement to become known as mudcrete."

REQUEST NO. 19

The reference, which bears Bates Nos. DONJON 003174-003183, states on Page 8 (DONJON 003181) that "Dredging was performed by hydraulic excavators discharging to shallow mixing bins on the barges. Cement was sprinkled over the surface of the dredgings and mixing performed using a modified stabiliser hoe adapted to fit on to the beam of a hydraulic excavator."

REQUEST NO. 20

The reference, which bears Bates Nos. DONJON 003174-003183, discloses a method of treating dredged material by mixing with Portland cement.

REQUEST NO. 21

The reference, which bears Bates Nos. DONJON 003174-003183, is prior art that is

relevant to the subject matter disclosed in the '731 Patent.

REQUEST NO. 22

The reference, which bears Bates Nos. DONJON 003174-003183, is prior art that is material to the subject matter disclosed in the '731 Patent.

REQUEST NO. 23

The document bearing Bates Nos. DONJON 003215-003236 is a true and accurate copy of a reference titled "Cementation Of Toxic Sludges: Italian Experience."

REQUEST NO. 24

The reference, which bears Bates Nos. DONJON 003215-003236, was published in 1992.

REQUEST NO. 25

The reference, which bears Bates Nos. DONJON 003215-003236, is not listed on the face of the '731 Patent.

REQUEST NO. 26

The reference, which bears Bates Nos. DONJON 003215-003236, was not submitted to the United States Patent and Trademark Office during the prosecution of the '731 Patent.

REQUEST NO. 27

The reference, which bears Bates Nos. DONJON 003215-003236, was not brought to the attention of the United States Patent and Trademark Office during the prosecution of the '731

Patent.

REQUEST NO. 28

The reference, which bears Bates Nos. DONJON 003215-003236, states on Page 8 (DONJON 003222) that Portland cement can be used to solidify dredged materials.

REQUEST NO. 29

The reference, which bears Bates Nos. DONJON 003215-003236, is prior art that is relevant to the subject matter disclosed in the '731 Patent.

REQUEST NO. 30

The reference, which bears Bates Nos. DONJON 003215-003236, is prior art that is material to the subject matter disclosed in the '731 Patent.

REQUEST NO. 31

The document, attached hereto as Exhibit A, is a true and accurate copy of U.S. Patent No. 4,142,912.

REQUEST NO. 32

The title of U.S. Patent No. 4,142,912, attached hereto as Exhibit A, is "Landfill Material."

REQUEST NO. 33

The issue date of U.S. Patent No. 4,142,912, attached hereto as Exhibit A, is March 6,

1979.

REQUEST NO. 34

U.S. Patent No. 4,142,912, attached hereto as Exhibit A, is not listed on the face of the '731 Patent.

REQUEST NO. 35

U.S. Patent No. 4,142,912, attached hereto as Exhibit A, was not submitted to the United States Patent and Trademark Office during the prosecution of the '731 Patent.

REQUEST NO. 36

U.S. Patent No. 4,142,912, attached hereto as Exhibit A, was not brought to the attention of the United States Patent and Trademark Office during the prosecution of the '731 Patent.

REQUEST NO. 37

The Abstract of U.S. Patent No. 4,142,912, attached hereto as Exhibit A, states that "A method for treating arsenic-containing waste materials for disposal in landfill sites comprises admixing an arsenic waste, Portland cement, sand, one or more water-soluble manganese or alkaline earth metal salts, and water, thereby producing a slurry similar to wet concrete, which slurry, when cured, leaves a rock-like material containing entrapped arsenic."

REQUEST NO. 38

U.S. Patent No. 4,142,912, attached hereto as Exhibit A, discloses a method of treating waste material by mixing said waste material with a slurry, which includes Portland cement and

water.

REQUEST NO. 39

U.S. Patent No. 4,142,912, attached hereto as Exhibit A, is prior art that is relevant to the subject matter disclosed in the '731 Patent.

REQUEST NO. 40

U.S. Patent No. 4,142,912, attached hereto as Exhibit A, is prior art that is material to the subject matter disclosed in the '731 Patent.

REQUEST NO. 41

The document bearing Bates Nos. G01001 00278- G01001 00334 is a true and accurate copy of a reference titled "An Evaluation Of Solidification/Stabilization Technology For Buffalo River Sediment."

REQUEST NO. 42

The reference, which bears Bates Nos. G01001 00278- G01001 00334 was published in 1991.

REQUEST NO. 43

The reference, which bears Bates Nos. G01001 00278- G01001 00334, is not listed on the face of the '731 Patent.

REQUEST NO. 44

The reference, which bears Bates Nos. G01001 00278- G01001 00334, was not submitted to the United States Patent and Trademark Office during the prosecution of the '731 Patent.

REQUEST NO. 45

The reference, which bears Bates Nos. G01001 00278- G01001 00334, was not brought to the attention of the United States Patent and Trademark Office during the prosecution of the '731 Patent.

REQUEST NO. 46

The reference, which bears Bates Nos. G01001 00278- G01001 00334, states on Page 8 (G01001 00289) that Portland cement is one of the binders selected for potential application to Buffalo River sediment.

REQUEST NO. 47

The reference, which bears Bates Nos. G01001 00278- G01001 00334, discloses on Page 36 (G01001 00316) an in situ procedure, wherein dredged material is transported to a mixing area, excess water or supernatant is removed, dredged material is placed in a scow and mixed with a reagent inside the scow, and then transferred to a disposal area for setting.

REQUEST NO. 48

The reference, which bears Bates Nos. G01001 00278- G01001 00334, is prior art that is relevant to the subject matter disclosed in the '731 Patent.

REQUEST NO. 49

The reference, which bears Bates Nos. G01001 00278- G01001 00334, is prior art that is material to the subject matter disclosed in the '731 Patent.

REQUEST NO. 50

Donjon's dredge material processing operation includes the use of blimps which contain dry Portland cement.

REQUEST NO. 51

At all times relevant to this lawsuit, Donjon's dredge material processing operation includes the use of blimps which contain dry Portland cement.

REQUEST NO. 52

The blimps used in Donjon's dredge material processing operation do not contain wet cement.

REQUEST NO. 53

At all times relevant to this lawsuit, the blimps used in Donjon's dredge material processing operation do not contain wet cement.

REQUEST NO. 54

In Donjon's dredge material processing operation, dry cement flows from blimps through dry cement hose lines for delivery to a vane feeder.

REQUEST NO. 55

At all times relevant to this lawsuit, in Donjon's dredge material processing operation, dry cement flows from blimps through dry cement hose lines for delivery to a vane feeder.

REQUEST NO. 56

In Donjon's dredge material processing operation, dry cement is deposited onto a screw conveyor from the vane feeder.

REQUEST NO. 57

At all times relevant to this lawsuit, in Donjon's dredge material processing operation, dry cement is deposited onto a screw conveyor from the vane feeder.

REQUEST NO. 58

In Donjon's dredge material processing operation, a screw conveyor conveys dry cement through an enclosed housing to a telescoping spout.

REQUEST NO. 59

At all times relevant to this lawsuit, in Donjon's dredge material processing operation, a screw conveyor conveys dry cement through an enclosed housing to a telescoping spout.

REQUEST NO. 60

The screw conveyor used in Donjon's dredge material processing operation does not convey a wet slurry to the telescoping spout.

REQUEST NO. 61

At all times relevant to this lawsuit, the screw conveyor used in Donjon's dredge material processing operation does not convey a wet slurry to the telescoping spout.

REQUEST NO. 62

Dry cement conveyed by the screw conveyor through an enclosed housing drops through the enclosed spout onto the surface of the dredged material.

REQUEST NO. 63

At all times relevant to this lawsuit, dry cement conveyed by the screw conveyor through an enclosed housing drops through the enclosed spout onto the surface of the dredged material.

REQUEST NO. 64

In Donjon's dredge material processing operation, a spray of water is optionally used to control dust after delivery of dry cement to the surface of dredged materials.

REQUEST NO. 65

At all times relevant to this lawsuit, in Donjon's dredge material processing operation, a spray of water is optionally used to control dust after delivery of dry cement to the surface of dredged materials.

REQUEST NO. 66

In Donjon's dredge material processing operation, dry cement is deposited directly onto the dredged materials.

REQUEST NO. 67

At all times relevant to this lawsuit, in Donjon's dredge material processing operation, dry cement is deposited directly onto the dredged materials.

REQUEST NO. 68

Donjon's dredge material processing operation is a dry process using dry cement deposited onto the surface of dredged materials.

REQUEST NO. 69

At all times relevant to this lawsuit, Donjon's dredge material processing operation is a dry process using dry cement deposited onto the surface of dredged materials.

REQUEST NO. 70

Water used during Donjon's dredge material processing operation is sprayed such that the water is directed into the barge containing dredged material and dry cement.

REQUEST NO. 71

At all times relevant to this lawsuit, water used during Donjon's dredge material processing operation is sprayed such that the water is directed into the barge containing dredged material and dry cement.

REQUEST NO. 72

Water used during Donjon's dredge material processing operation is not directed onto the conveyor.

REQUEST NO. 73

At all times relevant to this lawsuit, water used during Donjon's dredge material processing operation is not directed onto the conveyor.

REQUEST NO. 74

Donjon's dredge material processing operation does not involve a separate mixing container.

REQUEST NO. 75

At all times relevant to this lawsuit, Donjon's dredge material processing operation does not involve a separate mixing container.

REQUEST NO. 76

Donjon's dredge material processing operation does not involve the creation of an additive slurry.

REQUEST NO. 77

At all times relevant to this lawsuit, Donjon's dredge material processing operation does not involve the creation of an additive slurry.

REQUEST NO. 78

Donjon's dredge material processing operation does not involve pumping an additive slurry from a mixing container to a mixing assembly.

REQUEST NO. 79

At all times relevant to this lawsuit, Donjon's dredge material processing operation does not involve pumping an additive slurry from a mixing container to a mixing assembly.

REQUEST NO. 80

Donjon's dredge material processing operation does not utilize an additive made from a plurality of agents.

REQUEST NO. 81

At all times relevant to this lawsuit, Donjon's dredge material processing operation does not utilize an additive made from a plurality of agents.

REQUEST NO. 82

Donjon's dredge material processing operation does not utilize an additive slurry comprising $CaO$, $Ca(OH)_2$, $CaCO_3$, natural soils or mixtures thereof.

REQUEST NO. 83

At all times relevant to this lawsuit, Donjon's dredge material processing operation does not utilize an additive slurry comprising $CaO$, $Ca(OH)_2$, $CaCO_3$, natural soils or mixtures thereof.

REQUEST NO. 84

Donjon's dredge material processing operation does not utilize an additive slurry comprising $FeCl_3$, coal ash, fly ash, bed ash, cement kiln dust, lime kiln dust, clay slag, sodium silicate, calcium silicate, wood chips, ground corn cobs, diatomaceous earth, natural soil, or mixtures thereof.

REQUEST NO. 85

At all times relevant to this lawsuit, Donjon's dredge material processing operation does not utilize an additive slurry comprising $FeCl_3$, coal ash, fly ash, bed ash, cement kiln dust, lime kiln dust, clay slag, sodium silicate, calcium silicate, wood chips, ground corn cobs, diatomaceous earth, natural soil, or mixtures thereof.

REQUEST NO. 86

Donjon's dredge material processing operation does not utilize an additive slurry comprising iron salts, ferrous sulfate, magnesium salts, silica, asphalt emulsions, alcohols, amides, amines, carboxylic acids, carbonyls, sulfonates, activated carbons, sodium carbonates, potassium permanganate, calcium hypochlorite, sodium hypochlorite or mixtures thereof.

REQUEST NO. 87

At all times relevant to this lawsuit, Donjon's dredge material processing operation does not utilize an additive slurry comprising iron salts, ferrous sulfate, magnesium salts, silica, asphalt emulsions, alcohols, amides, amines, carboxylic acids, carbonyls, sulfonates, activated

carbons, sodium carbonates, potassium permanganate, calcium hypochlorite, sodium hypochlorite or mixtures thereof.

REQUEST NO. 88

Donjon's dredge material processing operation does not infringe Claim 2 of the '731 Patent.

REQUEST NO. 89

Donjon's dredge material processing operation does not infringe Claim 3 of the '731 Patent.

REQUEST NO. 90

Donjon's dredge material processing operation does not infringe Claim 4 of the '731 Patent.

REQUEST NO. 91

Donjon's dredge material processing operation does not infringe Claim 5 of the '731 Patent.

REQUEST NO. 92

Donjon's dredge material processing operation does not infringe Claim 6 of the '731 Patent.

REQUEST NO. 93

Donjon's dredge material processing operation does not infringe Claim 7 of the '731 Patent.

REQUEST NO. 94

Donjon's dredge material processing operation does not infringe Claim 8 of the '731 Patent.

REQUEST NO. 95

Donjon's dredge material processing operation does not infringe Claim 9 of the '731 Patent.

REQUEST NO. 96

Donjon's dredge material processing operation does not infringe Claim 10 of the '731 Patent.

REQUEST NO. 97

Donjon's dredge material processing operation does not infringe Claim 11 of the '731 Patent.

REQUEST NO. 98

Donjon's dredge material processing operation does not infringe Claim 12 of the '731 Patent.

REQUEST NO. 99

The use of dry additives is not claimed in the '731 Patent.

REQUEST NO. 100

An Amendment was filed on April 19, 2001 in the United States Patent and Trademark Office in connection with U.S. patent application Serial No. 09/080,062.

REQUEST NO. 101

The term "slurry" was added to Claim 3 in the Amendment dated April 19, 2001 in connection with U.S. patent application Serial No. 09/080,062.

REQUEST NO. 102

The phrase "creating an additive slurry in a mixing container" was added to Claim 3 in the Amendment dated April 19, 2001 in connection with U.S. patent application Serial No. 09/080,062.

REQUEST NO. 103

The phrase "pumping the additive slurry from the mixing container to a mixing assembly disposed within the containment receptacle" was added to Claim 3 in the Amendment dated April 19, 2001 in connection with U.S. patent application Serial No. 09/080,062.

REQUEST NO. 104

Page 5 of the Amendment dated April 19, 2001 in connection with U.S. patent application Serial No. 09/080,062 includes the following:

> "An additive slurry is created in a mixing container which is separate from the containment receptacle."

REQUEST NO. 105

Page 3 of the Amendment dated April 19, 2001 in connection with U.S. patent application Serial No. 09/080,062 includes the following:

> "The pending amended claims require the steps of creating an additive slurry in a mixing container and pumping the additive slurry from the mixing container to a mixing assembly disposed within the containment receptacle. These steps are necessary to reduce particulate emissions."

REQUEST NO. 106

Page 3 to Page 4 of the Amendment dated April 19, 2001 in connection with U.S. patent application Serial No. 09/080,062 includes the following:

> "MIYOSHI '518, in addition to KAPLAND, shows a process for strengthening a soft soil by admixing the water saturated soft soil added with a first, dry fine ingredient, and a second, dry fine ingredient to obtain compressive strength of the soil greater than the water saturated soft soil. Again, the pending amended claims require the steps of creating an additive slurry in a mixing container and pumping the additive slurry from the mixing container to a mixing assembly disposed within the container receptacle. Applicant respectfully submits that KAPLAND in view of MIYOSHI in fact teaches away from the Applicant's present invention by adding dry additives which contribute to potentially harmful particulate emissions."

REQUEST NO. 107

Prior to filing this Lawsuit, no representative of TDM observed water being added to additives in a mixing container allegedly used in Donjon's dredge material processing operation, as described in David Denenberg's letter of April 4, 2005 to Senator Hatch at Page 4.

REQUEST NO. 108

Prior to filing this Lawsuit, counsel for TDM never observed water flowing into a mixing container allegedly used in Donjon's dredge material processing operation.

REQUEST NO. 109

Prior to filing this Lawsuit, neither Ritchie G. Studer nor Rick Redle observed water flowing into a mixing container allegedly used in Donjon's dredge material processing operation.

REQUEST NO. 110

Prior to filing this Lawsuit, TDM did not contact Donjon or the United States to request access to Donjon's dredge material processing operation.

REQUEST NO. 111

Prior to filing this Lawsuit, neither Ritchie G. Studer nor Rick Redle contacted Donjon or the United States to request access to Donjon's dredge material processing operation.

REQUEST NO. 112

Prior to filing this Lawsuit, TDM did not visit Donjon's dredge material processing operation.

REQUEST NO. 113

Prior to filing this Lawsuit, neither Ritchie G. Studer nor Rick Redle visited Donjon's dredge material processing operation.

REQUEST NO. 114

Prior to filing this Lawsuit, TDM did not observe Donjon's dredge material processing operation.

REQUEST NO. 115

Prior to filing this Lawsuit, neither Ritchie G. Studer nor Rick Redle observed Donjon's dredge material processing operation.

Respectfully submitted,

Dated: May 29, 2007

**McCARTER & ENGLISH, LLP**

By: Gary Campbell /APN

Gary K. Campbell
265 Franklin Street
Boston, MA 02110
Telephone: (617) 449-6500
Facsimile: (617) 607-9200
E-mail: gcampbell@mccarter.com
*Attorneys for Donjon Marine Company, Inc.*

*Of counsel:*
John E. Flaherty
Andrew P. Nemiroff
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
Telephone: (973) 622-4444
Facsimile: (973) 624-7070
E-mail: jflaherty@mccarter.com

**CERTIFICATE OF SERVICE**

I hereby certify that on 29 May 2007, I served a true and accurate copy of INTERESTED PARTY DONJON MARINE COMPANY, INC.'S FIRST SET OF REQUESTS FOR ADMISSIONS (NOS. 1-115) upon the attorney of record for each party by hand delivery upon:

David Denenberg, Esq.
Davidoff Malito & Hutcher LLP
605 Third Avenue - 34th Floor
New York, NY 10158

And by overnight mail at the following address:

Erica A. Franklin, Esq.
Attorney
Commercial Litigation Branch
Civil Division
1100 L Street, NW
Washington, DC, 20001

By: [signature]

Exhibit A

**United States Patent** [19] [11] **4,142,912**

**Young** [45] **Mar. 6, 1979**

[54] **LANDFILL MATERIAL**

[75] Inventor: **Dean A. Young, Yorba Linda, Calif.**

[73] Assignee: **Union Oil Company of California, Los Angeles, Calif.**

[21] Appl. No.: **924,897**

[22] Filed: **Jul. 17, 1978**

**Related U.S. Application Data**

[63] Continuation-in-part of Ser. No. 818,305, Jul. 25, 1977, abandoned.

[51] Int. Cl.[2] .......... **C04B 31/02**

[52] U.S. Cl. .......... **106/98; 405/129; 106/97; 106/288 B; 210/42 R; 210/59**

[58] Field of Search .......... **106/89, 97, 98, 288 B; 61/35; 210/42 R, 59**

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 254,530 | 3/1882 | Budlong | 106/98 |
| 954,692 | 4/1910 | Phillips | 106/98 |
| 1,875,897 | 9/1932 | Stalhane | 106/89 |
| 3,980,558 | 9/1976 | Thompson | 210/59 |
| 4,046,674 | 9/1977 | Young | 208/251 H |

*Primary Examiner*—Helen McCarthy
*Attorney, Agent, or Firm*—Richard C. Hartman; Lannas S. Henderson; Gregory F. Wirzbicki

[57] **ABSTRACT**

A method for treating arsenic-containing waste materials for disposal in landfill sites comprises admixing an arsenic waste, Portland cement, sand, one or more water-soluble manganese or alkaline earth metal salts, and water, thereby producing a slurry similar to wet concrete, which slurry, when cured, leaves a rock-like material containing entrapped arsenic. This material may be used for landfill without danger of ground or rain waters leaching arsenic therefrom.

**17 Claims, No Drawings**

## LANDFILL MATERIAL

## CROSS-REFERENCE TO RELATED APPLICATIONS

This is a continuation-in-part of copending application Ser. No. 818,305 filed July 25, 1977, now abandoned.

## BACKGROUND OF THE INVENTION

This invention relates to the disposal of arsenic-containing wastes. More specifically, it relates to a method for treating arsenic-containing waste materials so that they are rendered suitable for sanitary landfills.

Waste materials containing high concentrations of arsenic and/or arsenic compounds are obtained in certain commercial processes. One such is in the smelting of nickel-containing ores to obtain nickel metal. These ores often contain arsenic oxides as well as nickel constituents so that a byproduct containing arsenic is produced along with the nickel metal. Similarly, shale oil produced from any oil shales contains high concentrations of arsenic. These shale oils are virtually unsaleable until the arsenic is removed, such as by the process described in my U.S. Pat. No. 4,046,674 or by methods as shown, for example, in U.S. Pat. Nos. 3,804,750 and 3,933,624. In all such processes, however, a problem is ultimately encountered in disposing of the arsenic-containing byproduct.

At the present time arsenic wastes are usually stored, much like radioactive wastes, in holding areas designed to prevent the release of the arsenic into the ground. Some of the arsenic is marketable, primarily to steel producers, but the proportion thus sold is relatively small. Hence, the amount of arsenic held in holding areas is continually increasing, primarily because no satisfactory means are available for rendering it innocuous for use as a landfill.

## SUMMARY OF THE INVENTION

According to the present invention, arsenic-containing wastes are mixed in water with (1) a suitable setting agent, such as Portland cement combined with sand and (2) one or more additive water-soluble manganese and alkaline earth metal compounds, said compounds being soluble in water at 25° C at least to the extent of 100 grams per liter. The proportions of water, additive metal compound, Portland cement, and sand are sufficient to produce a material having a consistency similar to that of wet concrete, which, when cured under conditions sufficient to cause solidification, such as by allowing the mixture to stand undisturbed for an extended period of time, usually about 1 to 2 days, yields a concrete or rock-like substance essentially completely impervious to the arsenic-leaching effects of ground or rain waters.

In simplified form, this invention involves adding an arsenic waste and one or more water-soluble manganese or alkaline earth metal compounds to a mixture otherwise comprising wet concrete. When cured, a solid material is produced similar to concrete but having the additional property of resisting the arsenic-leaching effects of ground or rain water.

As used herein, the terms "arsenic" and "arsenic components" are used interchangeably and are intended to include arsenic in whatever form, elemental or combined, it may be present. Also, all weight-percent proportions of arsenic or arsenic components, unless otherwise specified, are calculated as elemental arsenic.



## DETAILED DESCRIPTION OF THE INVENTION

In the practice of this invention, waste materials containing arsenic are treated so that they may be used as a landfill. The invention is particularly designed for treating solid wastes containing at least 1 wt.% arsenic components or concentrated slurries containing at least 10%, usually 10–20%, by weight of solids containing at least 1 wt.% arsenic components. The invention is particularly designed for treating solid waste materials containing large proportions of arsenic, i.e., at least 20 wt.%, usually between 20 and 50 wt.% of arsenic components.

According to the invention a solid waste, preferably crushed to particulate form, or a slurry waste, preferably containing solids in particulate form, is admixed with a setting agent, such as a mixture of Portland cement and sand, in ratios ranging as follows:

TABLE I

| | Wt. % of Admixed Components | | |
|---|---|---|---|
| | Waste Solids[1] | Cement | Sand |
| Preferred Range | 2 – 15 | 30 – 60 | 40 – 75 |
| Practical Range | 0.1 – 25 | 20 – 70 | 35 – 85 |

[1]For waste slurries, the amount of waste solids includes dissolved solids.

Any of several commercial Portland cements may be used for purposes herein. In general, such cements will have a composition as shown in the following Table II:

TABLE II

| Weight-Percent Of Components In Portland Cement, Measured As Oxides | | | |
|---|---|---|---|
| $SiO_2$ | 5 – 27 | CaO | 30 – 70 |
| $Al_2O_3$ | 4 – 40 | MgO | 1.0 – 3.0 |
| $Fe_2O_3$ | 0.5 – 15 | $SO_3$ | 0 – 2.5 |
| Combustibles | 0 – 3 | Undeterminable | 0 – 5 |

Also admixed with the arsenic-containing wastes, Portland cement, and sand is sufficient of one or more highly water soluble (i.e., at least 100 grams per liter at 25° C.) manganese or alkaline earth compounds, as a solid or in aqueous solution, to provide a mole-ratio of total added alkaline earth metal and manganese to arsenic of between about 1 and 10, preferably 2 and 5, in the final mixture. Sufficient water is then added, if necessary, and thoroughly admixed to dissolve the additive and produce a material having a consistency similar to wet concrete, which material may be poured into molds and the like. Following curing of this material, a rock-like or concrete-like landfill material containing entrapped or encapsulated arsenic is obtained.

Landfill material made by the method above described is substantially inert and insoluble in ground or rain water. It is also substantially impervious to the leaching effects of such waters, which will leach out no more arsenic from said landfill material than from the surrounding soils. As a result, no contamination of underground waters or neighboring streams with pollutive or toxic amounts of arsenic is produced when leachates from landfill sites containing landfill material prepared in accordance with the invention are commingled

with such underground waters or streams. (As used in the art, the term "leachate" refers to the liquid produced when rain or ground waters contact the landfill site, as by percolating or permeating through said landfill site.)

What leaching effects ground and rain waters do have on the landfill material of the invention may be substantially reduced by preparing it in large aggregates. The larger the volume to surface area ratio of the aggregate the lower will be the concentration of arsenic leached therefrom by ground or rain waters. Aggregates having volume to surface ratios above 1 $ft^3$:10 $ft^2$ and of volume of at least 0.1 $ft^3$ are preferred.

The following Examples demonstrate the performance of landfill materials of the invention when subjected to strong leachants under conditions abnormally favoring arsenic leaching.

## EXAMPLE I

A catalytic absorbent used to absorb arsenic from shale oil in accordance with the method shown in may U.S. Pat. No. 4,046,674 contained 26.8 wt.% arsenic. It was ground to 60 mesh and mixed with dry components in the following weight proportions: 5 parts ground absorbent, 100 parts Portland cement, and 140 parts 100/30 mesh sand. The mixture was divided into 16 portions, to 15 of which various additives as shown in Table III were introduced, three of said additives being in solid form and the remainder as aqueous solutions. To the three mixtures containing solid additives and the one mixture containing no additive sufficient water was added to make a material having a consistency similar to the mixtures containing liquid additives. All mixtures were poured into a mold for making ⅛-inch diameter by 3/16-inch thick wafers. All of the mixtures hardened into rock-like substances.

A leaching solution comprising water containing 3400 ppmw $NaHCO_3$, 10,700 ppmw $Na_2SO_4$, and 1300 ppmw NaCl, which solution was representative of drainage water obtained by retorting oil shale, was prepared. It was added to each of the wafers held in a suitable vessel in an amount such that for each gram of arsenic in the wafers, 20 liters of solution would be in contact therewith. The vessels were heated to 140° F for one day, and then allowed to stand at room temperature for eight days thereafter. The data shown in Table III show the concentration of arsenic in the leaching solutions, based on samples taken on the third, fourth, sixth, and eighth day of the experiment.

TABLE III

| ADDITIVE | | LEACHING SOLUTION | | | |
|---|---|---|---|---|---|
| Material | Mol Ratio of Additive Metal to As | Days | ppmw As | Days | ppmw As |
| None | — | 4 | 4.7 | 6 | 5.3 |
| 1.0 M $CaCl_2$ | 2.8 | 4 | 2.6 | 6 | 3.3 |
| 2.0 M $CaCl_2$ | 6.1 | 3 | 1.6 | 8 | 1.7 |
| $CaSO_4$ (powder) | 9.0 | 3 | 5.8 | 8 | 5.8 |
| $Ca(OH)_2$ (powder) | 9.0 | 3 | 3.4 | 8 | 3.0 |
| 1.0 M $MgCl_2$ | 2.8 | 4 | 2.9 | 6 | 3.3 |
| 2.0 M $MgCl_2$ | 6.5 | 3 | 2.9 | 8 | 2.4 |
| 1.0 M $MgSO_4$ | 2.8 | 4 | 2.9 | 6 | 3.2 |
| 2.0 M $MgSO_4$ | 6.7 | 3 | 3.3 | 8 | 3.4 |
| MgO (powder) | 9.0 | 3 | 4.9 | 8 | 5.5 |
| 2.0 M $Fe(NO_3)_3$ | 14.4 | 3 | 6.2 | 8 | 5.8 |
| 0.5 M $FeSO_4$ | 1.8 | 3 | 13 | 8 | 12 |
| 1.0 M $Al_2(SO_4)_3$ | 8.0 | 3 | 9.3 | 8 | 10 |
| 1.0 M $MnCl_2$ | 2.8 | 4 | 3.6 | 6 | 3.2 |
| 6.5% $SiO_2$, $Na_2SiO_3$ | 4.8 | 4 | 8.8 | 6 | 11 |
| 6.1% $SiO_2$,Ludox | 4.4 | 4 | 6.9 | 6 | 7.2 |

As shown, the wafers made with soluble alkaline earth metal compounds (i.e., $CaCl_2$, $MgCl_2$, and



$MgSO_4$) or soluble manganese compounds retained substantially more arsenic than the wafer made with no additive. Of the remainder, only that wafer prepared with calcium hydroxide showed much higher retention for arsenic than the wafer made with no additive. However when the data obtained from the wafers made from calcium hydroxide and calcium chloride are compared, the water-soluble calcium chloride proves to be the superior additive.

Although the concentration of arsenic in all the leaching solutions is above that tolerated by most environmental regulations, it must again be emphasized that the data in Table III were obtained from an experiment conducted under conditions highly favorable for leaching arsenic. The extremely small volume (0.0368 $in^3$) of the wafers favors arsenic leaching, as does the use of both a solution highly concentrated in salts and a high temperature, the latter being used on the first day of the experiment. The data do show, however, the relative tendency of the various compositions to retain arsenic. Hence, when large aggregates of the landfill material prepared as described herein are contacted with low salt-containing ground or rain waters under ambient conditions, essentially no arsenic will be leached therefrom into the surrounding soils.

## EXAMPLE II

A second experiment was performed wherein arsenic oxide-containing aggregates were produced and compared for arsenic-retaining properties when exposed to a severe leachant. The procedure used was as follows: A 2:1 mixture of 30 mesh sand and Portland cement was mixed with $As_2O_3$ powder. The mixture was divided into five samples, four of which were then admixed with a magnesium or zinc additive shown in Table IV in the proportion shown therein. After water was added to the mixtures in the proportions shown in Table IV, the mixtures, containing 4.0 wt.% of $As_2O_3$ as the oxide, were stirred to form thick pastes, which were then cast into 0.123 inch diameter × 0.060 inch thick wafers. The wafers were then cured in water-saturated air for three days at 140° F.

The cured wafers were soaked in a one kilogram aqueous 10% $NaHCO_3$ solution (pH 7.8) at 140° F. for 6 days. Liquid samples withdrawn at 3 day intervals were analyzed for dissolved arsenic, and the results so obtained are tabulated in Table IV.

TABLE IV

| Sample No. | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Additive | None | MgO | ZnO | Magnesium Acetate | Zinc Acetate |
| Wt. Additive: Wt. Cement | 0 | 0.044 | 0.044 | 0.155 | 0.098 |
| Wt. Water: Wt. Cement | 0.27 | 0.26 | 0.22 | 0.23 | 0.32 |
| Wt. Wafer per kg. of solution | 0.0080 | 0.0080 | 0.0083 | 0.0088 | 0.0073 |
| ppmw conc. of As in Soln. | | | | | |
| After 3 days | 219 | 211 | 222 | 62 | 192 |
| After 6 days | 220 | 214 | 219 | 59 | 145 |
| Theoretical Max. pppmw As leachable | 213 | 217 | 233 | 222 | 200 |

The data in Table IV clearly show the superiority of a soluble magnesium component for retarding the leaching of arsenic from the aggregates.

Although the invention has been described in conjunction with specific examples thereof, it is evident that many alterations, modifications, and variations will be apparent to those skilled in the art in light of the foregoing description. Accordingly, it is intended to embrace all such alternatives, modifications, and variations that fall within the spirit and scope of the appended claims.

I claim:

1. A process for treating an arsenic-containing waste to produce an arsenic-containing landfill material essentially completely impervious to the arsenic-leaching effects of ground or rain waters, which process comprises:

(a) admixing said arsenic-containing waste with (1) sufficient of one or more additive components selected from the group consisting of those alkaline earth metal and manganese compounds soluble in water at 25° C. to the extent of at least 100 grams per liter such that said one or more additive components are present in a total mole ratio to arsenic of between about 1 and 10, calculated as the total moles of alkaline earth and manganese metals in said one or more additive components to the total moles of arsenic in said arsenic-containing waste and (2) a setting agent comprising Portland cement and sand, said admixing being accomplished in the presence of sufficient water and with sufficient of said setting agent to produce a mixed material having the consistency of wet concrete;

(b) curing the mixed material under conditions sufficient to cause solidification; and

(c) recovering a rock-like aggregate essentially completely impervious to the leaching of arsenic therefrom by ground or rain waters.

2. A process as defined in claim 1 wherein said additive components are selected from the group consisting of calcium chloride, magnesium chloride, manganese chloride, magnesium sulfate, and magnesium acetate.

3. A process as defined in claim 1 wherein said arsenic-containing waste contains at least one weight percent arsenic components.

4. A process as defined in claim 3 wherein the aggregate recovered in step (c) has a volume to surface ratio above 1 $ft^3$:10 $ft^2$ and a volume of at least 0.1 $ft^3$.

5. A process as defined in claim 1 wherein said arsenic waste is a catalytic absorbent containing arsenic removed from shale oil.

6. A landfill material comprising a rock-like aggregate obtained by curing under conditions sufficient to cause solidification a mixture consisting essentially of an arsenic-containing waste, a setting agent comprising Portland cement and sand, water, and one or more additive components selected from the group consisting of those manganese and alkaline earth metal compounds soluble in water at 25° C. to the extent of at least 100 grams per liter, said landfill material being substantially more impervious to the arsenic-leaching effects of ground or rain waters than if said one or more additive components had not been present in said mixture.

7. A landfill material as defined in claim 6 wherein said additive components are selected from the class consisting of calcium chloride, magnesium chloride, manganese chloride, magnesium sulfate, and magnesium acetate.

8. A landfill material as defined in claim 6 wherein said arsenic-containing waste contains at least one weight percent arsenic components.

9. A landfill material as defined in claim 8 wherein the landfill material is in the form of an aggregate having a volume to surface ratio above 1 $ft^3$:10 $ft^2$ and a volume of at least 0.1 $ft^3$.

10. A landfill material as defined in claim 9 wherein said mixture contains sufficient of said one or more additive components such that said alkaline earth metal and manganese compounds are present in a total mole ratio to arsenic components, calculated as the total moles of alkaline earth and manganese metals in said additive components to the total moles of arsenic in said arsenic components, of between about 1 and 10.

11. A landfill material as defined in claim 10 wherein said arsenic waste is a catalytic absorbent containing arsenic removed from shale oil.

12. A process for treating an arsenic-containing waste to produce an arsenic-containing landfill material essentially impervious to the arsenic-leaching effects of ground or rain waters, which process comprises:

(a) admixing said arsenic-containing waste with a setting agent comprising Portland cement and sand such that the resulting composition contains between about 0.1 and 25 wt.% of said arsenic-containing waste, between about 20 and 70 wt.% of Portland cement, and between about 35 and 85 wt.% of sand, and further admixing said resulting composition with (1) one or more additive components selected from the group consisting of those alkaline earth metal and manganese compounds soluble in water at 25° C. to the extent of at least 100 grams per liter and (2) sufficient water to dissolve said one or more additive components and produce a mixed material having the consistency of wet concrete;

(b) curing the mixed materials under conditions sufficient to cause solidification; and

(c) recovering a rock-like aggregate substantially more impervious to the leaching effects of arsenic therefrom by ground or rain waters than if said one or more additive components had not been present.

13. A process as defined in claim 12 wherein said resulting composition contains between about 2 and 15 wt.% of arsenic-containing waste, between about 30 and 60 wt.% of said Portland cement, and between about 40 and 75 wt.% of sand.

14. A process as defined in claim 13 wherein said additive components are selected from the group consisting of calcium chloride, magnesium chloride, manganese chloride, magnesium sulfate, and magnesium acetate.

15. A rock-like landfill material produced by curing under conditions sufficient to cause solidification a mixture comprising (1) an admixture comprising between about 0.1 and 25 wt.% of an arsenic-containing waste, between about 20 and 70 wt.% of Portland cement, and between about 35 and 85 wt.% of sand, (2) sufficient of one or more additive components selected from the group consisting of those manganese and alkaline earth metal compounds soluble in water at 25° C. to the extent of at least 100 grams per liter such that said one or more additive components are present in a total mole ratio to arsenic of between about 1 and 10, calculated as the total moles of alkaline earth and manganese metals in said one or more additive components to the total moles of arsenic in said arsenic-containing waste, and (3) sufficient water to dissolve said one or more additive components and produce a mixed material having the consistency of wet concrete, said landfill material being

essentially completely impervious to the arsenic-leaching effects of ground or rain waters.

16. A landfill material as defined in claim 15 wherein said admixture comprises between about 2 and 15 wt.% of arsenic-containing waste, between about 30 and 60 wt.% of Portland cement, and between about 40 and 75 wt.% of sand.

17. A landfill material as defined in claim 15 wherein said additive components are selected from the group consisting of calcium chloride, magnesium chloride, manganese chloride, magnesium sulfate, and magnesium acetate.

* * * * *