**UNITED STATES COURT**
**OF FEDERAL CLAIMS**

| | |
|---|---|
| TDM AMERICA, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant.<br><br>and<br><br>DONJON MARINE COMPANY, INC.,<br><br>Interested Party. | Civil Action No. 06-472 C<br><br>Judge Thomas C. Wheeler |

**DECLARATION OF THOMAS VALENTI**

I, **THOMAS VALENTI**, declare and say as follows:

1. I am the Vice President of Operations of Redevelopment Materials, Inc. ("RMI") formerly known as OENJ Cherokee Corp ("OENJ" collectively "RMI"). I make this declaration in support of RMI's opposition to the motion to compel discovery that has been filed by TDM America, LLC ("TDM") in a lawsuit as to which RMI is not a party.

2. TDM has sent virtually identical subpoenas to RMI and OENJ, each of which contained more than forty categories of documents that TDM was requesting RMI to

produce. I have reviewed these subpoenas, both of which were delivered to RMI in East Rutherford, New Jersey on May 16, 2007. Potentially tens of thousands of pages of documents are responsive to these subpoena categories, some of which seek documents going back ten years or more.

3. RMI has only eight employees remaining. I am one of only four individuals who comprise the office staff. RMI is, in fact, financially distressed. I understand that TDM's requests relate to RMI's construction of a landfill in Bayonne, New Jersey and specifically, the processing of dredge material used at that site. These operations ceased in 2003. RMI did, however, operate this site for years.

4. During the construction of this landfill, approximately six to eight million yards of fill material, including processed dredge material, were utilized. The fill was not entirely composed of dredge material but dredge was processed and disposed of at this Bayonne facility pursuant to agreements with parties who were performing work for the U.S. Army Corps of Engineers. The Bayonne landfill site was ultimately covered in a cap of processed dredge material two feet thick. The site was sold in December 2005 and is now being operated as an 18 hole golf course, which clearly indicates the size of the site and the extensive scope of the operations.

5. The operations, however, concluded more than three and one-half years ago. After that time, and certainly since the sale of the site, nearly all of the documentation related to RMI's operations at Bayonne were moved into storage. I understand that TDM is interested in documents related to the dredge processing at this project. For the most part, these documents are now in storage.

6. RMI's documentation is stored in approximately 250 bankers type boxes located in two 12x20 foot storage units in a storage facility in Hasbrouck Heights, New Jersey. The boxes are indexed and somewhat organized by type but they are not organized at all as to year. They are organized by project. RMI also maintains five computers at its office in East Rutherford. There may be documents located on the computers that are responsive to TDM's requests.

7. With respect to the documentation located in the storage facility, the documents in the boxes are commingled, such that some of the documentation will be related to TDM's request for documents and some will not.

8. When putting these documents into storage RMI did not separate correspondence between RMI and its attorneys. RMI regularly communicated with its attorneys via the exchange of email and written correspondence and other documents regarding the many disputes and issues that arose during the five years the Bayonne site was operating. All these written communications are commingled with the other documents.

9. RMI also accepted and disposed of fill material at Bayonne that was brought in by truck. This was not dredge materials subject to processing and, thus, as I understand it, TDM is not interested in reviewing this information. However, the large volume of documentation related to this overland trucking of fill material is also commingled with dredge processing and disposal information and documents.

10. During the construction of the Bayonne landfill, RMI entered into numerous of contracts with numerous dredging companies. These contracts, which are of particular interest to TDM, were not separately filed, either. They, too, are included among the many other

documents RMI has boxed away in the storage facility. While they may not be difficult to identify, a review of the boxes will be necessary to locate them. There is no one left at RMI who knows what contracts had confidentiality provisions.

11. RMI did locate in its office one agreement between itself and a dredging company, pursuant to which RMI agreed to accept dredge material for disposal at the Bayonne project. I signed this agreement on behalf of RMI. Attached hereto as Exhibit A is a copy of the page of the contract that contains the confidentiality provision from that contract, which by its terms survives its termination. I believe, based upon my experience, that the confidentiality provisions to which RMI is subject typically survive the termination of the agreement.

In accordance with 28 U.S.C. ¶1746 I declare under penalty of perjury that the foregoing is true and correct.

THOMAS VALENTI

Dated: August 10, 2007

::ODMA\PCDOCS\ghcdocs\598225\1

# EXHIBIT A

12.10 Confidentiality. (a) Each of the parties hereto acknowledge that it or its employees or Subcontractors may, in the course of performing its responsibilities under this Agreement, be exposed to or acquire information which is deemed by the other party to be both proprietary to and highly confidential (the "Confidential Information"). Any and all Confidential Information obtained by a party hereto, its employees or Subcontractors, in the performance of this Agreement shall be deemed to be confidential and proprietary information. Each party hereto agrees to hold such Confidential Information in the strictest of confidence and not to disclose such Confidential Information to third parties ("Third Parties"), as hereinafter defined, or to use such Confidential Information for any purpose whatsoever other than the provision of services as contemplated by this Agreement and to advise each of its employees and Subcontractors who may be exposed to such proprietary and confidential information of their obligations to keep such information confidential. Third Parties, as defined herein, shall include, but not be limited to a party's respective parent companies, corporations and/or partnerships, and/or joint ventures and its owned controlled affiliate, associated and subsidiary companies, corporations and partnerships, their agents, representatives or partners, officers, shareholders, directors and employees.

(b) Contractor, its employees, Subcontractors, and Third Parties shall be prohibited from storing any equipment on the Site without the prior written approval of OENJ.

Each party agrees and acknowledges that the confidentiality terms set forth in Section 12.10 are a material term of this Agreement, the breach of which will result in irreparable harm to the other party. The parties hereto further acknowledge that any breach of the terms and conditions of Section 12.10 may result in irreparable harm to the other party for which money damages would not be a sufficient remedy. Accordingly, in the event of a breach or threatened breach of any of the terms and conditions of Section 12.10, and in addition to any other remedy provided herein or by law or in equity, the damaged party shall be entitled to seek appropriate equitable relief, including injunctive relief and specific performance, in any court of competent jurisdiction.

This Section shall survive the termination of this Agreement.

12.11 Excuse of Performance. Neither Contractor nor OENJ shall be liable for any delays or defaults in performance occasioned by events beyond their respective reasonable control, including, but not limited to, fires, floods, storms, accidents, wars, or civil commotion.