Exhibit 15

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TDM AMERICA, LLC,<br>Plaintiff,<br>v.<br>THE UNITED STATES OF AMERICA,<br>Defendant,<br>and<br>DONJON MARINE COMPANY, INC.,<br>Third-Party Defendant. | No. 06-472 C<br>Judge Thomas C. Wheeler |

**DEFENDANT UNITED STATES' SECOND AMENDED RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES (NOS. 1-14)**

Pursuant to Rules 26(e) and 33 of the Rules of the Court of Federal Claims ("RCFC"), defendant United States ("the Government') hereby amends its responses plaintiff TDM America, LLC's ("TDM") First Set of Interrogatories (Nos. 1-14), served on the United States on November 6, 2006. This amendment supplements responses to interrogatory numbers 2-5 and 7-14 with newly available information and/or additional objections. The Government reserves the right to amend and supplement these responses as it learns of new information relevant hereto, through discovery or otherwise.

**GENERAL OBJECTIONS**

Each response set forth below is subject to the general objections set forth in this section. Where a specific interrogatory is objectionable on one or more grounds, the Government may

explicitly state or restate an objection in its response to the interrogatory. Such specific objections are not intended to waive any of the following general objections, which apply to each interrogatory.

The Government hereby makes the following General Objections to TDM's interrogatories:

1. The Government objects to TDM's interrogatories to the extent that the information information requested is protected by the following privileges, exemptions, and restrictions:

(a) the attorney-client privilege;

(b) the attorney work product doctrine;

(c) the community of interest privilege;

(d) the deliberative process privilege;

(e) the "FOR OFFICIAL USE ONLY" (FOUO) restriction;

(f) the Trade Secrets Act, 18 U.S.C. § 1905, or documents containing proprietary or other commercial information provided to the Government on a pledge of secrecy and confidentiality.

With respect to responses which contain information proprietary to the Government, or another third party, or information subject to the "FOR OFFICIAL USE ONLY," or Privacy Act restrictions, such responses will be subject to a protective order which is stipulated to by the parties and is entered by the Court.

2. The Government objects to each and every Instruction and Definition in TDM's interrogatories to the extent that they exceed the permissible scope of discovery under the RCFC

and/or seek to impose upon defendant duties and responsibilities beyond those required by those Rules.

3. The Government objects to TDM's interrogatories to the extent that they seek legal conclusions or opinions, the mental impressions of Government counsel and the Government's legal theories. RCFC 26(b)(3).

4. The Government objects to the indefinite time period governing some of the interrogatories because it renders such interrogatory overly broad, unduly burdensome, and seeks information that is not reasonably calculated to lead to the discovery of admissible evidence in this action. The Government generally limits its answers relating to its processing of dredged material by contractors of the United States Army Corps of Engineers to the period beginning six years before the filing of the complaint in this action.

5. The Government objects to TDM's interrogatories to the extent that they are premature. Further, the Government's responses are based upon information that is known or reasonably believed by the Government at the time of its responses to these interrogatories. It is anticipated that further discovery, independent investigation, and analysis may supply additional facts, give new meaning to known facts, or entail new factual conclusions. The Government therefore reserves the right to amend and/or supplement these responses if it learns of new information relevant hereto, through discovery or otherwise.

6. The Government reserves the right to challenge the relevance, materiality, and admissibility at trial, or in any subsequent proceeding, of this or any other action, of any of the information it provides in response to these interrogatories.

7. The Government objects to TDM's interrogatories to the extent that they seek information relating to allegations of willful infringement because the intent of the Government and its contractors is irrelevant in an action brought under 28 U.S.C. § 1498 in the United States Court of Federal Claims. Likewise, the existence or lack of opinions and/or advice of counsel is irrelevant to any issue in this litigation.

8. The Government objects to TDM's interrogatories to the extent that they seek information or documents that are generated or created by or for the use of counsel after the filing of TDM's Complaint.

9. The Government objects that TDM's definition and use of the term "defendant" and "US" incorporated into TDM's Interrogatories to the United States is overly broad to the extent that it purports to include the Legislative Branch and the Judicial Branch, and every agency of the Executive Branch of the federal government as the defendant in this litigation. Plaintiff's definition is overly broad and unduly burdensome in that requiring Government counsel to request information from every government entity would be cumbersome and would require a substantial amount of time. Further, under RCFC 11, plaintiff bears the burden of comparing the accused item or process with the construed patent claims, and making a good faith assertion of infringement as to each accused item or process. *See Antonious v. Spaulding & Evenflo Cos.*, 275 F.3d 1066, 1072-73 (Fed. Cir. 2002). Plaintiff's Complaint contains averments only as to the activities of the United States Army Corps of Engineers ("USACE") and only to activity involving harbor dredging materials. Thus, the USACE is the only federal entity accused of infringement as a defendant in this litigation. The Government therefore limits its responses to interrogatories referencing the terms "defendant" and "US" as such terms relate to the USACE

and to those activities reasonably related to remediation and processing of harbor dredging materials.

10. The Government objects that TDM's definition and use of the term "contractor" incorporated into TDM's Interrogatories to the United States is overly broad to the extent that it purports to include any contractors and/or subcontractors without limitation. Plaintiff's Complaint contains averments only as to any contractors or subcontractors of the USACE relating to the subject of the patents-in-suit, i.e., remediation and processing of dredged materials. For the reasons stated in the foregoing paragraph, the Government limits its responses to these interrogatories by limiting the term "contractor" to contractors awarded contracts by the USACE for dredging activities and the subcontractors selected by those contractors to conduct remediation and processing of harbor dredging materials.

11. The Government objects to TDM's interrogatories to the extent that they call for the production of expert opinions prior to the time called for under Rule 26(a)(2) and the Court's February 23, 2007 scheduling order.

## SPECIFIC OBJECTIONS AND RESPONSES

Subject to and without waiving its general objections, the Government hereby objects and responds to each interrogatory of TDM as set forth below.

**INTERROGATORY NO. 1**

State when and how the US first learned of the patents-in-suit including identifying the persons, dates and documents involved.

**RESPONSE TO INTERROGATORY NO. 1**

The Government objects to this interrogatory because it seeks the mental impressions, conclusions, opinions or legal theories of Government counsel. Accordingly, the Government limits its answer as permitted by RCFC 26(b)(3) and the Work Product Doctrine.

Further, in General Objection 9, the Government has objected to TDM's use of a broad definition for US that includes every agency and all branches of the federal government.

Subject to these general and specific objections, the Government responds, if TDM's broad definition of "US" is employed, the United States Patent and Trademark Office was the first government agency to learn of the patents-in-suit, in that on August 6, 1996, it issued patent number 5,542,614 ("the '614 patent"), and on September 25, 2001, it issued patent number 6,293,731 B1 ("the '731 patent"). The Government further responds, utilizing the Government's narrow definition of "US" in General Objection 9, the patents-in-suit were brought to the attention of the United States Army Corps of Engineers when United States Senator Orrin Hatch, by letter dated May 24, 2005, forwarded materials from counsel for UTEX Environmental Services, dated April 4, 2005, to the USACE.

**INTERROGATORY NO. 2**

Separately, for each claim of the patents-in-suit, state with particularity the factual basis for the US' contention that it has not infringed any claims of the patents-in-suit.

**AMENDED RESPONSE TO INTERROGATORY NO. 2**

The Government objects to this interrogatory because it seeks the mental impressions, conclusions, opinions or legal theories of Government counsel. Accordingly, the Government limits its answer as permitted by RCFC 26(b)(3) and the Work Product Doctrine.

The Government also objects to this interrogatory because it essentially constitutes at least twenty parts, as it seeks information relating to a number of infringement claims for twenty contracts. The Government further objects to this interrogatory on the grounds that it is premature in that the Government has not completed its identification and interview of potential witnesses, investigation of the facts, and identification and review of documents in this case. Although discovery is in its early stage and the Government believes that it is too early to fully address contention interrogatories relating to issues of patent infringement, the Government provides the following general statement of its contentions as to non-infringement.

Subject to these specific objections and the General Objections, the Government responds that the basis for the assertion that neither the USACE nor its contractors have infringed any claims of the '731 patent is that processing of dredged material for the USACE does not include one or more of the following limitations contained in each of the independent claims of the '731 patent: "creating an additive slurry in a mixing container"; "pumping the additive slurry from the mixing container to a mixing assembly disposed within the containment receptacle"; "mixing the additive slurry into the dredged material to form a substantially homogenous mixture"; and "curing the substantially homogenous mixture in the containment receptacle."

Similarly, the basis for the assertion that neither the Government nor its contractors have infringed any claims of the '614 patent is that processing of dredged material for the USACE

does not include at least one of the following limitations contained in both of the independent claims of the '614 patent: "receiving said waste material in a vibrating screen box;" "vibrating said vibrating screen box;" "weighing said batch of waste material to determine an amount of additive to be added to said waste material."

The remediation processes at issue in this case are performed by contractors (or their subcontractors) of the USACE, and the Government has not had adequate opportunity to thoroughly evaluate the processes of these contractors and/or subcontractors. The USACE generally does not direct nor control what processes used by its contractors. The knowledge of the USACE is based on the casual observations of its employees in the ordinary course of their duties and upon review of documents supplied to USACE by the contractors. Those observations and documents are not directed to specific details of the processes used, but to other matters, such as insuring that the contractor is performing in accordance with the contract terms. As are result, the knowledge of USACE employees is incomplete.

Plaintiff has issued a number of subpoenas to USACE contractors seeking testimony and documents regarding their manner of processing dredged material. While depositions are scheduled for a few of these contractors, no depositions have yet taken place. Consequently, the Government is without the benefit of deposition testimony of the contractors, who are most knowledgeable of the processes they used, to supplement its interrogatory response. Similarly, the Government has only recently received documents responsive to the subpoena requests from only two contractors. By letter dated May 22, 2007, Plaintiff's counsel forwarded documents it received from EIC Associates and documents from Great Lakes Dredge and Dock Company.

Consequently, the Government reserves the right to review, develop, and evaluate additional and/or different positions as its investigation and the discovery process continue.

The Government further responds that to the extent any infringement of the patents-in-suit is demonstrated, any use by the government's contractors of the patents-in-suit in the performance of the USACE contracts was not a use "by" or "for" the Government within the meaning of the 28 U.S.C. § 1498(a). *See Carrier Corp. v. United States*, 534 F.2d 244 (Ct. Cl. 1976).

**INTERROGATORY NO. 3**

Separately, for each claim of the patents-in-suit, state with particularity the factual basis for the US' contention that the patents-in-suit are invalid.

**AMENDED RESPONSE TO INTERROGATORY NO. 3**

The Government objects to this interrogatory because it seeks the mental impressions, conclusions, opinions or legal theories of Government counsel. Accordingly, the Government limits its answer as permitted by RCFC 26(b)(3) and the Work Product Doctrine.

The Government objects to this interrogatory on the grounds that it is premature in that the Government has not completed its investigation of the facts relating to the invalidity of the patents-in-suit. Given that discovery is in its early stage, the Government believes that it is too early to fully address contention interrogatories relating to issues of patent invalidity. Consequently, the Government reserves the right to review, develop, and evaluate additional

and/or different positions as its investigation continues. In light of the foregoing general and specific objections, the Government provides the following statement of its contentions.

Subject to these specific objections and the General Objections, the Government responds that there are several bases for the assertion that the claims of the '731 patent are invalid. Under 35 U.S.C. § 102(b), at least claims 3, 4, 6, 7, 8, 9, 10, 11, and 12 of the '731 patent are invalid as having been first disclosed in a non-provisional application filed more than one year after the invention was on sale in this country. The non-provisional application was filed on May 15, 1998, and the invention was offered for sale prior to May 15, 1997, the date that performance of a contract with the New York Harbor Authority began, which involved using the process claimed in the '731 patent. May 15, 1997 was also the date that the provisional application for the invention was filed.

Under 35 U.S.C. § 103, each asserted claim of the '731 and '614 patents is invalid because it would have been obvious to a person having ordinary skill in the art at the time the invention was made. *See KSR Int'l Co. v. Teleflex Inc.*, 127 S.Ct. 1727 (Apr. 30, 2007). The prior art identified in response to Interrogatory No. 7 below discloses the process of mixing additives with de-watered dredged material, adding water and curing the product for use as a structural fill. Additionally, the use of a mixing container during the creation of the additive slurry, as required by the claims of the '731 patent, rather than mixing the additives directly with the dredged material without use of a container, would have been well within the general knowledge to the person of ordinary skill in the art at the time the invention was made and therefore the claims are obvious and lack patentability.

Under 35 U.S.C. § 112, at least independent claims 1, 5, 7 and 9 of the '731 patent are not enabled or are indefinite because the claimed process does not include a step for removing large objects to enable the production of a "homogenous mixture."

**INTERROGATORY NO. 4**

Separately, for each of the patents-in-suit, state whether the US is contending that one or more claims of the patents-in-suit are unenforceable and, if so, identify each such claim and state with particularity the factual basis therefor.

**AMENDED RESPONSE TO INTERROGATORY NO. 4**

The Government objects to this interrogatory because it seeks the mental impressions, conclusions, opinions or legal theories of Government counsel. RCFC 25 (b)(3). The Government objects to this interrogatory on the grounds that it is premature in that the Government has not completed its investigation of the facts relevant to the patents-in-suit. Given that discovery is in its early stage, the Government believes that it is too early to fully address contention interrogatories relating to whether the patents-at-issue are enforceable.

Subject to these specific objections and the General Objections, the Government responds that its contentions regarding its defenses to TDM's assertion of infringement of the patents-in-suit are fully set forth in its Answer and that the Government will move to amend its answer or otherwise provide notice to TDM should it develop additional defenses, e.g., based upon the

deposition testimony of TDM employees and/or inventors of the patents-in-suit, relating to the enforceability of the patents in suit.

**INTERROGATORY NO. 5**

Identify all persons with any relevant knowledge of the matters alleged in the answer.

**AMENDED RESPONSE TO INTERROGATORY NO. 5**

The Government objects to this interrogatory on the grounds that it is premature in that the Government's investigation of this matter continues. The Government further objects that this interrogatory is unduly broad and burdensome. Subject to these specific objections and the General Objections, the Government responds that persons believed to be most knowledgeable as to the matters relevant to TDM's claims were properly listed in the Initial Disclosures of the United States submitted on November 22, 2006 and on March 23, 2007. The Government further responds that additional persons believed to have relevant knowledge in this case include: Mr. John Bearce, USACE, Jacksonville District, Jacksonville, Florida; Ms. Virginia Pankow, USACE, National Data Center, Alexandria, Virginia; and Mr. Kent W. Loest, Waste By Rail, Inc., Newport Beach, California.

**INTERROGATORY NO. 6**

State with particularity all grounds in support of each denial made in the answer to this action.

**RESPONSE TO INTERROGATORY NO. 6**

The Government objects to this interrogatory because it seeks the mental impressions, conclusions, opinions or legal theories of Government counsel. Accordingly, the Government limits its answer as permitted by RCFC 26(b)(3) and the Work Product Doctrine.

The Government responds that paragraph 1 of the Answer explains that the Government denied averments for which it was without knowledge or information sufficient to form a belief as to the truth of the such averments. The denied averments contained in paragraph 2 of the Answer are based on the reasons set forth in response to Interrogatory No. 2. Paragraph 3 of the Answer explains that it denied averments for which it was without knowledge or information sufficient to form a belief as to the truth of the such averments. The denied averments contained in paragraphs 4, 10, and 14 of the Answer are based on the reasons set forth in response to Interrogatory No. 2. Paragraph 5, 7, and 13 of the Answer explains that the Government denied averments for which the Government was without knowledge or information sufficient to form a belief as to the truth of the such averments. Paragraph 9 of the Answer explains that the Government denied averments for which it was without knowledge or information sufficient to form a belief as to the truth of the such averments. Paragraph 11 of the Answer explains that the denied averments are based on the fact that UTEX and not TDM provided notice to the Government prior to the filing of the Complaint relating to allegations of infringement involving the patents-at-issue. The remaining denied averments contained in paragraph 11 of the Answer are based on the reasons set forth in response to Interrogatory No. 2. The denied averments contained in paragraph 12 of the Answer are based on the fact that TDM did not advise the USACE of alleged infringement of the patent-in-suit as early as April 2005. The first such notice

that the USACE received from TDM occurred with the service of its Complaint filed on June 21, 2006. Similarly, the USACE did not engage in "numerous exchanges" with TDM regarding the patents prior to the filing of the Complaint. The first communication that the USACE received regarding infringement allegations involving the patents-in-suit came from Senator Orrin Hatch on or about May 24, 2005. The first communication that the USACE had with UTEX counsel regarding infringement allegations involving the patents-in-suit occurred on or about June 7-8, 2005. The remaining denied averments contained in paragraph 12 of the Answer are based on the reasons set forth in response to Interrogatory No. 2. The denied averments contained in paragraph 15 of the Answer are based on the fact that TDM is not entitled to reasonable and entire compensation from the Government for reasons set forth in response to Plaintiff's Interrogatory No. 2 and that Plaintiff's assertion that such compensation is "no less than $300 million" is unsupported.

**INTERROGATORY NO. 7**

Separately, for each of the patents-in-suit, identify all prior art to the patents-in-suit.

**AMENDED RESPONSE TO INTERROGATORY NO. 7**

The Government objects to this interrogatory because it seeks the mental impressions, conclusions, opinions or legal theories of Government counsel. Accordingly, the Government limits its answer as permitted by RCFC 26(b)(3) and the Work Product Doctrine.

The Government further objects to this interrogatory on the grounds that it is premature in that the Government has not completed its identification and review of documents that may be categorized as prior art.

Subject to these specific objections and to the General Objections, the Government responds that the prior art cited in the prosecution histories of the patents-in-suit is relevant. Further, the following prior art documents are presently known to be relevant to the patents-in-suit: USACE, Engineering and Design, *Beneficial Uses of Dredged Material,* EM-1110-2-5026 (June 1987); Fleming, Elizabeth, et al., *An Evaluation of Solidification/Stabilization Technology for Buffalo River Sediment,* Miscellaneous Paper-EL-91-11 (May 1991); Channell, Michael, et al., *An Evaluation of Solidification/Stabilization for Treatment of New York/New Jersey Harbor Sediments*, Technical Report-EL-97-10 (June 1997); USACE, Water Resources Support Center, *Management of Bottom Sediments Containing Toxic Substances, Proceedings of the 7th U.S./Japan Experts Mtg 2-4 Nov. 1981* (Oct. 1983); and USACE, New York District, *Dredged Material Management Plan for the Port of New York and New Jersey,* Interim Report (Sept. 1996).

**INTERROGATORY NO. 8**

Identify all opinions, reports and evaluations concerning the patents-in-suit.

**AMENDED RESPONSE TO INTERROGATORY NO. 8**

The Government objects to this interrogatory to the extent that it seeks the mental impressions, conclusions, opinions or legal theories of Government counsel. Accordingly, the Government limits its answer as permitted by RCFC 26(b)(3) and the Work Product Doctrine.

The Government objects to this interrogatory on the grounds that it is premature and to the extent that it calls for the production of expert opinions prior to the time established under Rule 26(a)(2) and the Court's February 23, 2007 scheduling order.

Subject to these specific objection and to the General Objections, the Government responds that following non-privileged, discoverable documents are deemed responsive to this interrogatory:

(a) a letter sent by David W. Denenberg to Senator Orrin Hatch, dated April 4, 2005, and the material accompanying that letter; and

(b) a letter from the Department of the Army, United States Army Legal Services Agency, dated May 16, 2006, denying the administrative claim of UTEX for alleged infringement of patents including the patents-at-issue; and

(c) a letter from John A. Witte, President of Donjon Marine Co., Inc., to Raynette H. Gurney, Contracting Officer, New York District, Corps of Engineers, dated December 8, 2005; and

(d) a letter from Richard Steady, Weeks Marine, Inc., to Raynette H. Gurney, Contracting Officer, New York District, Corps of Engineers, dated December 5, 2005.

**INTERROGATORY NO. 9**

Identify the US' proposed construction for each claim of the patients-in-suit and all intrinsic and extrinsic evidence supporting that construction.

**AMENDED RESPONSE TO INTERROGATORY NO. 9**

The Government objects to this interrogatory because it seeks the mental impressions, conclusions, opinions or legal theories of Government counsel. Accordingly, the Government limits its answer as permitted by RCFC 26(b)(3) and the Work Product Doctrine.

The Government objects to this interrogatory on the grounds that it prematurely calls for the production of claim constructions and supporting material prior to the time established by the Court's February 23, 2007 scheduling order.

**INTERROGATORY NO. 10**

Identify each and every specific contract, and identify each and every contractor retained by the US for dredging activities at any port, harbor and/or waterway since 1997 to the present and for each such contract specify all contract information and processing information relevant to those contracts and the dredging activities, including specifically the treatment, processing, stabilization, retention, staging, handling, curing, reuse, remediation, solidification and/or disposal of the dredged materials.

**AMENDED RESPONSE TO INTERROGATORY NO. 10**

The Government objects to this interrogatory to the extent it seeks the mental impressions, conclusions, opinions or legal theories of Government counsel regarding what contracts are relevant to this litigation and which information is relevant to those contracts. Accordingly, the Government limits its answer as permitted by RCFC 26(b)(3) and the Work Product Doctrine.

The Government also objects to this interrogatory because it essentially constitutes at least twenty parts, as it seeks various information relating to each of twenty contracts. The Government objects to this interrogatory on the grounds that it is premature in that the Government has not completed its investigation of the facts and identification and review of documents in this case. The Government also objects to this interrogatory to the extent that the "contract information" requested is readily available in the listed contracts. *See* RCFC 33(d) *and* 34. Additionally, the Government objects to the extent that the requested "processing information relevant to those contracts and the dredging activities" is not in the possession of the Government and such request is best directed to the contractors.

The Government further objects to this interrogatory on the ground that the phrase "since 1997" is overly broad. TDM has a cause of action for reasonable and entire compensation, if at all, going back only six years from the filing of its Complaint pursuant to 35 U.S.C. § 286. Additionally, the Government objects to this interrogatory on the ground that the phrase "any dredging activity" is overly broad. The patents-in-suit generally relate to treatment and processing of dredged and waste materials and do not claim processes for dredging itself.

Accordingly, the Government limits its response to contracts involving treatment or processing of dredged material and for which the USACE was a party since 2000.

Subject to these specific objections and the General Objections, the Government responds with Revised Attachment A, hereto. The Government further responds that the Government elects to provide copies of the contracts listed in Revised Attachment A, and such copies have been produced. *See* RCFC 33(d) and 34. Additionally, the Government responds that insofar as the information requested is contained documents in the possession of the Government, other than the contracts themselves, such documents have also been produced to Plaintiff in a manner in which the documents are kept in the usual course of business, pursuant to RCFC 34(b). To the extent that the requested information is not in the possession of the Government, such request is best directed to the contractors identified in the Revised Attachment A.

**INTERROGATORY NO. 11**

Identify all processes and methods utilized by each of the respective contractors identified in the Amended Response to Interrogatory No. 10, and all documents, specifications, data, and other writings that describe and set forth the methods, processes and/or manner utilized for the dredging activities.

**AMENDED RESPONSE TO INTERROGATORY NO. 11**

The Government objects to this interrogatory to the extent it seeks the mental impressions, conclusions, opinions or legal theories of Government counsel as the process and

methods used by parties other than the USACE. Accordingly, the Government limits its answer as permitted by RCFC 26(b)(3) and the Work Product Doctrine.

The Government also objects to this interrogatory because it constitutes at least twenty parts, as it seeks various information relating to twenty contracts. The Government objects to this interrogatory on the grounds that it is premature in that the Government has not completed its investigation of the facts and identification and review of documents in this case. The Government also objects to the extent that the requested information relating to "all processes and methods utilized by each of the ... contractors" is not in the possession of the Government and such request is best directed to the contractors. The Government further objects to this interrogatory on the ground that the phrase "since 1997" is overly broad. TDM has a cause of action for reasonable and entire compensation, if at all, going back only six years from the filing of its Complaint pursuant to 35 U.S.C. § 286. Additionally, the Government objects to this interrogatory on the ground that the phrase "any dredging activity" is overly broad. The patents-in-suit generally relate to treatment and processing of dredged and waste materials and do not claim processes for dredging itself. Accordingly, the Government limits its response to contracts involving treatment or processing of dredged material and for which the USACE was a party since 2000.

Subject to these specific objections and to the General Objections, the Government responds that insofar as the information requested in this interrogatory is in the possession of the Government, such information is set forth in documents that have been made available for inspection and produced to Plaintiff in a manner in which the documents are kept in the usual course of business, pursuant to RCFC 34(b). To the extent that the requested information is not

in the possession of the Government, such request is best directed to the contractors identified in the Amended Response to Interrogatory No. 10.

**INTERROGATORY NO. 12**

For each contract that the US was or is a party to since 1997 for any dredging activity at any port, harbor and/or waterway, complete the chart below either confirming that the contractor is performing the referenced element of the patent claim for the '731 patent or describe the manner in which the particular dredging activity and/or processing activity is performed and how the activity differs from referenced one.

**AMENDED RESPONSE TO INTERROGATORY NO. 12**

The Government objects to this interrogatory because it seeks the mental impressions, conclusions, opinions or legal theories of Government counsel. Accordingly, the Government limits its answer as permitted by RCFC 26(b)(3) and the Work Product Doctrine.

The Government also objects to this interrogatory because it constitutes at least twenty parts, as it seeks information relating to twenty contracts. The Government objects to this interrogatory on the grounds that it is premature in that the Government has not completed its investigation of the facts and identification and review of documents in this case. The Government also objects to the extent that the requested information relating to activities of contractors is not in the possession of the Government and such request is best directed to the contractor. The Government further objects to this interrogatory on the ground that the phrase "since 1997" is overly broad. TDM has a cause of action for reasonable and entire compensation,

if at all, going back only six years from the filing of its Complaint pursuant to 35 U.S.C. § 286. Additionally, the Government objects to this interrogatory on the ground that the phrase "any dredging activity" is overly broad. The patents-in-suit generally relate to treatment and processing dredged and waste materials and do not claim processes for dredging itself. Accordingly, the Government limits its response to contracts involving treatment or processing of dredged material and for which the USACE was a party since 2000.

Subject to these specific objections and the General Objections, the Government responds that the information sought by this interrogatory is available from the response to Amended Interrogatory number 2.

**INTERROGATORY NO. 13**

For each contract that the US was or is a party since 1997 for any dredging activity at any port, harbor and/or waterway, complete the chart below either confirming that the contractor is performing the referenced element of the patent claim for the '614 patent or describe the manner in which the particular dredging activity and/or processing activity is performed and how the activity differs from the referenced one.

**AMENDED RESPONSE TO INTERROGATORY NO. 13**

The Government objects to this interrogatory because it seeks the mental impressions, conclusions, opinions or legal theories of Government counsel. Accordingly, the Government limits its answer as permitted by RCFC 26(b)(3) and the Work Product Doctrine.

The Government also objects to this interrogatory because it constitutes at least twenty

parts, as it seeks information relating to twenty contracts. The Government objects to this interrogatory on the grounds that it is premature in that the Government has not completed its investigation of the facts and identification and review of documents in this case. The Government also objects to the extent that the requested information relating to activities of contractors is not in the possession of the Government and such request is best directed to the contractor. The Government further objects to this interrogatory on the ground that the phrase "since 1997" is overly broad. TDM has a cause of action for reasonable and entire compensation, if at all, going back only six years from the filing of its Complaint pursuant to 35 U.S.C. § 286. Additionally, the Government objects to this interrogatory on the ground that the phrase "any dredging activity" is overly broad. The patents-in-suit generally relate to treatment and processing dredged and waste materials and do not claim processes for dredging itself. Accordingly, the Government limits its response to contracts involving treatment or processing of dredged material and for which the USACE was a party since 2000.

Subject to these specific objections and the General Objections, the Government responds that the information sought by this interrogatory is available from the response to Amended Interrogatory number 2.

**INTERROGATORY NO. 14**

State the amount, in percentage and dollar terms, that the US believes is a reasonable royalty for each of the patents-in-suit, explain the basis therefor and identify the documents relied upon to support that basis.

**AMENDED RESPONSE TO INTERROGATORY NO. 14**

The Government objects to this interrogatory because it seeks the mental impressions, conclusions, opinions or legal theories of Government counsel. Accordingly, the Government limits its answer as permitted by RCFC 26(b)(3) and the Work Product Doctrine.

The Government further objects to this interrogatory on the grounds that it is premature in that the Government has not completed its identification and interview of potential witnesses, investigation of the facts, and identification and review of documents in this case. The Government also objects to this interrogatory to the extent that it calls for the production of expert opinions prior to the time established under Rule 26(a)(2) and the Court's February 23, 2007 scheduling order.

At present, the Government has not formed a belief as to what is a reasonable royalty.

DATED: May 30, 2007

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JOHN FARGO
Director

Erica A. Franklin by Gary Hausken

ERICA A. FRANKLIN
Attorney
Commercial Litigation Branch
Department of Justice
Washington, D.C. 20530
Telephone: (202) 353-0517
Facsimile: (202) 307-0345

OF COUNSEL:

GARY L. HAUSKEN
Assistant Director
Department of Justice

**SIGNATURE AND OATH AS TO AMENDED ANSWERS**

The foregoing amended responses to Interrogatory Numbers 5, 8 and 10-13 are based upon such information as is presently available to the United States Army Corps of Engineers and was derived from sources available to me in the course of my duties and that I deem to be reliable. Upon information and belief, I declare under penalty of perjury that these responses are true and accurate.

Daniel Inkelas
Assistant Counsel for Litigation
Office of the Chief Counsel
United States Army Corps of Engineers
441 G Street, NW
Washington, DC 20314

| District | Contract # | Project | Contractor |
|---|---|---|---|
| New York | W912DS-07-C-0003 | Anchorage Channel | Donjon |
| | W912DS-06-C-0018 | Mnt Newark Bay | GLDD |
| | W912DS-05-C-0003 | AK 2/3 | Don Jon |
| | W912DS-05-C-0004 | S-KVK-2 | Bean |
| | W912DS-05-C-0020 | Maint AK | DonJon |
| | W912DS-04-C-0008 | Port Jersey 2 | GLDD |
| | W912DS-04-C-0016 | Mnt Seguine Point | DonJon |
| | DACW51-03-C-0001 | Port Jersey 1 | DonJon |
| | DACW51-03-C-0012 | AK #1 | DonJon |
| | DACW51-03-C-0014 | KVK Area 8 | Jay Cashman |
| | DACW51-03-C-0019 | Mnt Flushing Bay | Bean |
| | DACW51-03-C-0021 | Maint AK | DonJon |
| | DACW51-02-C-0001 | KVK Area 5 | Bean |
| | DACW51-02-C-0002 | Minish #2 | Cruz Construction |
| | DACW51-02-C-0019 | KVK Area 6 | Bean |
| | DACW51-02-C-0022 | Mnt Newark Bay | DonJon |
| | DACW51-01-C-0006 | KVK Area 7 | DonJon |
| | DACW51-01-C-0023 | Mnt Eliz Pierhead | GLDD |
| Detroit | None | | |
| Los Angeles | DACW09-D-0010-0003 | LA River Estuary Dredging/Stabiliz Study | Buddy's Contracting |
| Jacksonville | W912EP-04-C-0021 | Miami River | Weston Bean Jt Venture |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 30th day of May 2007, a copy of the foregoing DEFENDANT UNITED STATES' SECOND AMENDED RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES (NOS. 1-14) was sent to the following counsel of record, via electronic mail and Federal Express:

David W. Denenberg, Esq.
Michael A. Adler, Esq.
DAVIDOFF MALITO & HUTCHER LLP
605 Third Avenue - 34 Fl
New York, New York 10158
dwd@dmlegal.com
maa@dmlegal.com

Counsel for Plaintiff TDM America, LLC

Gary J. Campbell, Esq.
John E. Flaherty, Esq.
MCCARTER & ENGLISH, LLP
265 Franklin Street
Boston, Massachusetts 02110
gcampbell@mccarter.com
jflaherty@mccarter.com

Counsel for Donjon Marine Company, LLC

Gary L. Hausken
Department of Justice

**Waste by Rail Inc.**
**Calif Office—2240 Newport Blvd**
**Newport Beach CA. 92663**
**Colo Office—1393 Park Pl**
**Broomfield, CO 80020**
**Site Services—Kent Loest**
**A-754044-Haz**

September 11, 2002

Mr. Richie Jones
Buddy's Contracting Service, Inc.
P.O. Box 1950
Visalia, CA 93279

Re: COE Contract DACW 09-01-D-0010 Task Order #3--Pilot Sediment Stabilization
Final Report

Dear Mr. Jones:

Six inserts for the revised final WBR Pilot Sediment Stabilization Report, Volume I are enclosed. The report is divided into four Volumes:

- Volume I includes the table of contents, report and tables of the laboratory and field testing data. The pages forwarded should be inserted into Volume I report binders.
- Volume II includes photos of project activities and photos of the Smith-Emery laboratory test equipment. Also included are project location maps, figures of process area cells and compaction pads etc.
- Volume III contains the Smith-Emery and ToxScan laboratory reports.
- Volume IV contains the Smith-Emery and ToxScan QA/QC procedures. The ToxScan QA/QC summary is very brief. However, there is a great deal of ToxScan QA/QC comparitive data and additional procedures description in Volume III data reports.

Please note that each Volume I insert folder includes four new report cover inserts for report Volumes I, II, III and IV. These new inserts have the correct report number, the current date and note that this is the final report. The various comments from Mr. Halzack and other COE representatives have been incorporated in Volume I text and tables per our meeting at COE offices in Los Angeles on 9/3/02. No changes were made to report Volumes II, III and IV, so only new cover inserts for Volumes II, III and IV are included with Volume I insert folders.

It has been a pleasure working with you and the rest of Buddy's Staff as well as with the COE contract and field operations representatives. Please don't hesitate to contact me, John Lindsey or Craig Barrett if you have questions or require additional information.

Sincerely,

Kent W. Loest

Cc: J. Lindsey/C. Barrett

**Phone (303) 464-1588** **Fax (303) 465-0561** **CA License Number A-754044 Haz.**

**Waste by Rail Inc.**
**Calif Office—2240 Newport Blvd.**
**Newport Beach CA. 92663**
**Colo Office—1393 Park Pl**
**Broomfield, CO 80020**
**Site Services—Kent Loest**
**A-754044-Haz**

September 11, 2002

Mr. Richie Jones
Buddy's Contracting Service, Inc.
P.O. Box 1950
Visalia, CA 93279

Re: COE Contract DACW 09-01-D-0010 Task Order #3--Pilot Sediment Stabilization
Final Report

Dear Mr. Jones:

Six inserts for the revised final WBR Pilot Sediment Stabilization Report, Volume I are enclosed. The report is divided into four Volumes:

- Volume I includes the table of contents, report and tables of the laboratory and field testing data. The pages forwarded should be inserted into Volume I report binders.
- Volume II includes photos of project activities and photos of the Smith-Emery laboratory test equipment. Also included are project location maps, figures of process area cells and compaction pads etc.
- Volume III contains the Smith-Emery and ToxScan laboratory reports.
- Volume IV contains the Smith-Emery and ToxScan QA/QC procedures. The ToxScan QA/QC summary is very brief. However, there is a great deal of ToxScan QA/QC comparitive data and additional procedures description in Volume III data reports.

Please note that each Volume I insert folder includes four new report cover inserts for report Volumes I, II, III and IV. These new inserts have the correct report number, the current date and note that this is the final report. The various comments from Mr. Halzack and other COE representatives have been incorporated in Volume I text and tables per our meeting at COE offices in Los Angeles on 9/3/02. No changes were made to report Volumes II, III and IV, so only new cover inserts for Volumes II, III and IV are included with Volume I insert folders.

It has been a pleasure working with you and the rest of Buddy's Staff as well as with the COE contract and field operations representatives. Please don't hesitate to contact me, John Lindsey or Craig Barrett if you have questions or require additional information.

Sincerely,

Kent W. Loest

Cc: J. Lindsey/C. Barrett

# COE Dredge Sediment Project

## Cement Based Stabilization of Dredged Material
## Pilot Field Test Results

Final Project Report Prepared For:

**U.S. Army Corps of Engineers**
**Los Angeles District**

**Contract No. DACW 09-01-D-0010**
**Task Order #3**

**Prepared by:**
**Waste by Rail, Inc.**

# REPORT VOLUMES

**VOLUME I—REPORT TEXT AND LABORATORY TABLES**

**VOLUME II—(APPENDIX i) PHOTOS, MAPS, FIGURES & FIELD LOGS**

**VOLUME III—(APPENDIX ii) LABORATORY GEOTECHNICAL AND CHEMICAL TEST RESULTS**

**VOLUME IV—(APPENDIX iii) LABORATORY QA/QC PROCEDURES**

# CONTENTS--Volume 1


| | | page |
|---|---|---|
| 1.0 | INTRODUCTION AND OBJECTIVES.............. | 1 |
| 2.0 | TEST MATERIAL SOURCE.......................... | 1-2 |
| 3.0 | TREATMENT SYSTEM............................... | 2-3 |
| | 3.1 Treatment Equipment............................ | 2-3 |
| | 3.2 Material Handling Equipment.................... | 3 |
| 4.0 | TREATMENT ACTIVITIES.............................. | 4-19 |
| | 4.1 Site Preparation...................................... | 4-5 |
| | 4.2 Equipment Mobilization............................. | 5-6 |
| | 4.3 Test Material Handling and Preparation.......... | 6 |
| | 4.4 Preprocessing........................................... | 6-8 |
| | 4.5 Treatment................................................. | 8-13 |
| | 4.6 Stockpiling................................................ | 13-14 |
| | 4.7 Compaction Pad Laydown............................. | 14-16 |
| | 4.8 Compaction............................................... | 16-17 |
| | 4.9 Treatment Cell Backfill............................... | 17 |
| | 4.10 Debris Disposal ....................................... | 17-18 |
| | 4.11 Site Restoration....................................... | 18 |
| | 4.12 Demobilization......................................... | 18-19 |
| **5.0** | SAMPLING AND TESTING ACTIVITIES............ | 19-23 |
| | **5.1** Sampling.................................................. | 19 |
| | 5.1.1 Raw Material.................................. | 19-21 |
| | 5.1.2 Initial cured material......................... | 21-22 |
| | 5.1.3 7-Day cured material.......................... | 22 |
| | 5.1.4 28-Day cured material........................ | 22 |
| | 5.1.5 Process Water.................................. | 22-23 |
| | 5.1.6 Binder............................................. | 23 |

## CONTENTS—continued

PAGE

5.2 Testing.................................................. 23-27
5.2.1 Raw Material.................................. 24-25
5.2.2 Initial cured material......................... 25
5.2.3 7-Day cured material......................... 25-26
5.2.4 28-Day cured material........................ 26
5.2.5 Process water.................................. 26-27

5.3 Quality Assurance and Control.......................... 28

6.0 RESULTS AND DISCUSSION.................................. 28-42
6.1 Physical characteristics................................. 30
6.1.1 Raw Material.................................. 28-29
6.1.1.1 Soil Classification & Grain Size. 29
6.1.1.2 Moisture Content................ 29-30
6.1.1.3 Shear Strength.................. 30
6.1.1.4 Compaction...................... 30

6.1.2 Initial cured material......................... 30-31
6.1.2.1 Soil classification & Grain Size. 31-32
6.1.2.2 Moisture Content................. 32

6.1.3 7-Day cured material......................... 32-33
6.1.3.1 Shear strength.................... 33
6.1.3.2 Unconfined compressive strength 33
6.1.3.3 Field Density..................... 33

6.1.4 28-Day cured material....................... 33
6.1.4.1 Soil Classification & Grain Size. 34
6.1.4.2 Moisture Content................ 34
6.1.4.3 Shear Strength................... 34
6.1.4.4 Atterberg Limits................. 34
6.1.4.5 R-value.......................... 35
6.1.4.6 Consolidation.................... 35
6.1.4.7 Permeability..................... 35

**CONTENTS—continued**

| | | PAGE |
|---|---|---|
| 6.1.5 | Treatment Performance Evaluation.......... | 35 |
| 6.1.5.1 | Soil Classification &Grain Size. | 35 |
| 6.1.5.2 | Moisture Content................ | 36 |
| 6.1.5.3 | Shear Strength.................. | 36 |
| 6.1.5.4 | Treated Product Characteristics | 36-37 |
| 6.2 | Chemical Characteristics...................... | 37-38 |
| 6.2.1 | Raw Material..................... | 38 |
| 6.2.2 | Process Water.................... | 38-39 |
| 6.2.3 | 28-Day Cure Material........... | 39-40 |
| 6.2.4 | Summary......................... | 40 |
| 6.3 | Chemical Test Procedures..................... | 40 |
| 6.3.1 | Bulk Chemistry.................. | 41 |
| 6.3.1.1 | Leach Tests...................... | 41 |
| 6.3.1.1.1 | W.E.T. ........................... | 41 |
| 6.3.1.1.2 | S.P.L.P. ......................... | 41-42 |
| 6.3.1.1.3 | ANS 16.1 Modified............. | 42 |
| 6.4 | Operations Issues--Summary.................. | 42-43 |
| 6.5 | Pilot Project Costs.............................. | 43 |
| 7.0 | FULL SCALE IMPLEMENTATION........................ | 44-45 |
| 7.1 | Treatment Design Considerations............. | 45 |
| 7.1.1 | Siting and Site Requirements........... | 45-46 |
| 7.1.2 | Equipment Requirements................ | 46 |
| 7.1.3 | Binder Requirements..................... | 47 |
| 7.2 | Scale-up costs.................................... | 48-49 |
| 8.0 | CONCLUSIONS ................................................... | 50 |
| 9.0 | REFERENCES .................................................... | 50 |

## 1.0 INTRODUCTION AND OBJECTIVES

Contaminated dredge material from harbors and river estuaries has the potential to impact the environment through groundwater or soil contamination if it is simply deposited "as dredged" on land. In addition, raw dredge material is generally not suitable for immediate use as structural fill for harbor area construction projects and the previous practice of offshore disposal of contaminated dredge material is no longer acceptable. Some of Southern California's harbors and river estuaries contain dredge sediments that are contaminated with various toxic metal and organic chemicals. In order to better define the contamination levels and treatment alternatives, the US Army Corps of Engineers (COE) evaluated samples from four Southern California project areas in an earlier bench test series conducted by Waste by Rail (WBR) under the direction of Moffatt-Nichol Engineers, Inc. The samples were obtained from:

1. Marina del Rey
2. Los Angeles River Estuary
3. The Port of Long Beach—Channel 2
4. The Port of Los Angeles—Consolidated Slip

The preliminary bench test results indicated good success in stabilizing sediments from the different sample areas with cement-based reagents. However, the bench test series used small, about 50 pound sediment samples for the stabilization testing. Projecting field operating conditions, results and costs is difficult when using these small-scale bench tests.

In order to address environmental concerns while evaluating the effectiveness and cost of recycling contaminated dredge material, the US Army Corps of Engineers, Los Angeles District, (COE) developed the "Pilot Stabilization Program". The program was designed to evaluate stabilization treatment alternatives for contaminated dredge sediments from the Southern California Region. The program goal is to demonstrate cost effective treatment and stabilization of contaminated dredge materials and show that the stabilized dredge sediments can be effectively used in port area construction projects without a negative impact to the environment. A further goal was to use typical construction type equipment to complete the work and to operate in a manner that would be typical of a large-scale sediment stabilization project. The testing plan was prepared in accordance with the tasks as outlined in the Scope of Work (SOW) for Contract No. DACW-09-01-D-0010, Task Order #3 between Buddy's Contracting Service (BCS) and the COE. WBR, a consulting and industrial waste management company based in Newport Beach, CA, contracted with BCS to perform the Pilot Stabilization Program.

## 2.0 <u>Test Material and Source</u>

The Pilot Study test sediments were excavated from the Port of Los Angeles Anchorage Way Settling Basin and disposal area (AWSB). The settling basin contained a large volume of contaminated sediments, dredged from the Port of Los Angeles, that were determined to be unsuitable for ocean disposal or any other type of aquatic re-use. The Sediments from the AWSB were similar to contaminated sediment samples that were stabilized in the previous completed WBR bench scale study.

Sediments were taken from the southeast side of the AWSB and from two areas along the west side. Dump trucks were loaded with 3.4 cubic meters per load (4.5 cubic yards) with a CAT Excavator equipped with a 152 cm (60 inch) bucket. The Pilot Study sediments were black in appearance, having odors of hydrocarbons and organic materials ranging from strong to 'noticeable'. The sediments also contained rock and debris.



**AWSB near process area, note trucks dumping and debris**

Ten wheel dump trucks were used to load each cell to capacity by dumping directly into the excavated cells. Although some dewatering occurred in the AWSB, the sediments were fluid enough to self-level in the cell. All of the trucks were able unload at one location in each cell and the sediments flowed evenly to fill the cell. Each cell was loaded to within about 61 cm (24 inches) of the top of the cell wall or approximately 85 % of capacity. This allowed enough freeboard for reagent addition as well as additional seawater required to simulate the viscosity of dredged sediments delivered by barge.

Seawater added to the cells was obtained from the Consolidated Slip channel adjacent to the POLA barge-unloading site, located on the north side of Anchorage Way. The seawater was pumped into a 7,579 liter (2000)-gallon water truck and transported approximately 500 yards to the Pilot Study site where it was discharged into the designated cell. Each cell received about 37,850 liters (10,000) gallons of additional seawater.

## 3.0 TREATMENT SYSTEM

### 3.1 Treatment Equipment

The equipment used for the stabilization/treatment and addition of the reagents was standard construction-type equipment with the exception of the patented WBR Inc. mixing head. The WBR mixing head is a rotary, down-thrust mixer with proprietary specifications.

The following equipment was utilized in the treatment of sediments for the Pilot Study:

| Item | Depth | Weight | Height | Length | Width |
|---|---|---|---|---|---|
| CAT 225 Excavator | 23' | 56,000lbs. | 10'7" | 32'7" | 11'1" |
| Hitachi EX 400 | 27' | 93,000lbs. | 11'4" | 37'7" | 11'4" |

**Attachments/Accessories/Vehicles:**

Project photos showing the debris rake, the WBR hydraulic mixing head , transit mix concrete trucks (adding binder reagents), the tank truck for seawater addition and other field activities are included in Volume II (Appendix i).

1. Rake attachment with stationary thumb—used for debris removal, by 'raking' the sediments contained in the Pilot Treatment cell. The CAT 225 excavator was used with the 132 cm (52 inch) rake attachment to rake the sediments for debris removal. The CAT 225 equipped with a bucket was also used for obtaining samples of raw and stabilized sediments from the treatment cells.
2. WBR Inc. Hydraulic Mixing Head (patent pending)—used to mix the project reagents with the contaminated sediments. The WBR mixer was mounted on the Hitachi EX 400 and provided thorough mixing of reagent slurry with sediments.
3. Transit mix concrete truck—standard industry transit mix concrete truck. Payload capacity of about 18,180 kg (40,000lbs) loaded, with 3.6 to 4.3 meters (12-14ft) of slurry discharge chute. The transit mix concrete trucks were used to mix and deliver cement slurry and cement/fly ash slurries to the mixing cells.
4. Water truck—a 37,850 liter (2000)-gallon water truck was used to deliver added seawater to the mixing cells so that the sediments would more closely resemble the 'as dredged' condition of the sediments. The truck was equipped with 2hp suction lift pump with an attached sediment screen for self-loading.

### 3.2 Material Handling Equipment

The material handling equipment used for the excavation and compaction of the stabilized contaminated dredge sediments for the Pilot Study included:

| Item | Depth | Weight | Height | Length | Width |
|---|---|---|---|---|---|
| CAT 225 Excavator | 23' | 56,000lbs. | 10'7" | 32'7" | 11'1" |
| Hitachi EX 400 | 27' | 93,000lbs. | 11'4" | 37'7" | 11'4" |
| CAT 980 Loader | n/a | 61,000lbs. | 12'10" | 28'8" | 10'2" |
| CAT 963 Loader | n/a | 43,500 | 10'10" | 21'0" | 8'2" |
| CAT 14G Motor Grader | | 48,000 | 11'0" | 35'0" | 9'4" |
| J. Deere 650 Dozer | | 15,200 | 8'5" | 14'9" | 8'6" |

1. CAT 225 and Hitachi EX 400 excavators—used to excavate the stabilized sediments and to sample the cells.
2. CAT 980 and CAT 963 Loaders—were used to assist in treatment cell excavation and for removal of the stabilize sediments. The loaders were also used to close treatment cells and to compact cell pads.
3. CAT 14G Motor Grader—was used for various site construction and maintenance purposes and to maintain site runoff berms.
4. John Deere 650 Dozer—was used to pull the 91.4 cm (36 inch) hydraulic aeration disc, stockpile stabilized sediment and to assist in compaction. Dual Slope boards were used to assist in cell construction.

## 4.0 TREATMENT ACTIVITIES

### 4.1 Site Preparation

The site layout was designed to accommodate four separate treatment "cells" with approximately 578 cubic meter (600 cubic yards) of capacity each. The cells were sloped 1.5 to 1 on all four sides and the material excavated from the cells was used to raise the grade of the adjacent area to create 2.7 meter (9ft.) of depth in each of the four cells. A CAT 980 Wheel Loader was used to create the cells. The 980 also spread the excavated material in 305 cm (1 ft.) lifts and compacted the material to new grade adjacent to the cells. After the rough cut had been made with the CAT 980, a John Deere 650 track dozer, equipped with dual slope boards, was used to finish the sides and bottom of the cells as per the specification on the drawing (see figure 1).



**Dozer digging process cell**

**Completed process cell**



After the completion of the treatment cells, the entire area was secured with temporary orange safety fence and caution tape in order to prevent any unintended access to the area. Safety signs, as required by the COE, were placed at the entrance to the area and in two additional conspicuous places to inform all personnel and visitors that they were required to wear personal protective equipment (PPE) when entering the Pilot Test area. The PPE included but was not limited to: Hard Hat, Safety Shoes, Reflective Vests, and Hearing Protection (as required for operators).

The thin slurry nature of the raw sediments posed a potential danger for anyone falling into the treatment cells. During the sampling of the raw sediment material an OSHA approved Life Vest was required for technicians working around the cells. Additionally,

lifeline throw ropes were positioned near cells that were undergoing any type of activity with personnel present within 3 meters (~10 ft.) of the cell.

Cell construction dimensions were nominally 10.7 meters width—top of cell by 2.7 meters width—bottom of cell by 27.4 meters length (35 ft W.T. x 9ft W.B. x 90 ft length). Ten wheel dump trucks with an average load of 3.44 cubic meters (4.5 cubic yards) were used to fill each cell. Each cell was surveyed and the capacity of each cell was recorded as follows:

| Item | ten wheel truck loads—estimated | Delivered Sediment |
|---|---|---|
| Cell #1 | 145 truck loads | 500 cubic meters |
| Cell #2 | 142 truck loads | 488 cubic meters |
| Cell #3 | 129 truck loads | 444 cubic meters |
| Cell #4 | 122 truck loads | 419 cubic meters |

Combined capacity of the cells was 2421 cubic yards, or 1851 cubic meters. Samples of the cell sidewalls and bottoms were taken and archived to address any future questions regarding unknown cross contamination. The sidewall samples are being kept under refrigeration at the WBR Lab located in Newport Beach, CA. After all data has been reviewed and the Quality Assurance and Quality Control practices approved the samples will be disposed of properly and in accordance with all State and Federal Laws.

Prior to loading the cells, the area around each cell was compacted/graded and roads were cut/graded utilizing a CAT 14G motor grader. Additionally a 0.45 meter (1.5 ft.) soil berm was constructed around the entire site to divert runoff that could be generated by unforeseen conditions, ie: rain and thunderstorms.

**Process cell #4 with AWSB sediment--prior to seawater addition and debris removal**



### 4.2 Equipment Mobilization

Before activities commenced within the project boundaries, a list of equipment priorities and requirements were established. Due to the space constraints of the project site equipment was mobilized only as necessary for the specified task. The following table describes the requirements for mobilization of equipment utilized in the Pilot Study:

| Item | Date Mobilized In | Date Mobilized Out | Type of Mobilized Equipment. | Use |
|---|---|---|---|---|
| CAT 225 Excavator | 9-17-01 | 10-05-02 | Heavy Load Low Bed | Debris Removal/Excavate Material |
| Hitachi EX 400 W/ WBR Mixing Attachment | 9-20-01 | 10-04-02 | Heavy Load Low Bed | Mixing Reagents/Seawater |
| John Deere 650 Dozer | 9-04-01 | 10-30-02 | Low Bed | Using Slope Boards, Grade Cell Slopes and Bottom |
| CAT 14G Motor Grader | 9-05-01 | 10-30-02 | Low Bed | Berms, grade and roads |
| CAT 963 Track Loader | 9-26-02 | 10-30-02 | Low Bed | Compaction Activities |
| CAT 980 Wheel Loader | 9-04-01 | 10-30-02 | Heavy Load Low Bed | Excavation of Cell Compaction Activities |
| 2000 Gallon Water Truck | 9-17-01 | 10-30-02 | Low Bed | Sea Water Addition Dust Suppression |
| Site Office Trailer | 9-17-01 | 11-02-02 | Delivered by Vendor | Office/ Decontamination Station |
| 36 inch Tractor Disc Only | 9-27-02 | 10-30-02 | Low Bed | Compaction Activities |

In addition to the construction equipment mobilized for the Pilot Study, a 30.6 cubic meter (40 cubic yard) storage container was delivered to the site as a storage location of Personal Protective Equipment. Two 32.1 cubic meter (42 cubic yard) tarped roll-off type containers were also delivered for disposal of debris removed from the sediments and for general project waste control.

### 4.3 Test Material Handling and Preparation

The test material was obtained from the AWSB using the equipment described above. The material was excavated from two areas on the "back side" of the settling basin and loaded into trucks. This area had relatively less debris material than the "front side" dumping area. Trucks unloaded the material into the processing cells.

### 4.4 Pre-processing

Prior to reagent mixing, debris must be removed from the sediments in each of the cells. A CAT 225 excavator equipped a special fabricated rake attachment was used for debris


PROPRIETARY INFORMATION G02007 00012

removal. The debris removal process was conducted in a methodical manner, from end to end and top to bottom in each cell. This insured that all of the debris that could cause any type of impact to the stabilization process was removed. The typical debris found in most harbors was well represented in the material from AWSB. Included were: Rope, Wire Cables, Pipe, Timbers, Rock, Metallic Assemblies, ie: gear drives, pulleys etc., long steel rods and a variety of non-descript items.



**Rake removing debris**

**Excavator raking sediment**



Extreme care was taken during the debris removal process to not impact the cell wall with the tines of the WBR rake attachment. This is the same care that would be necessary for debris removal from a barge or metal walled treatment cell, so as to not damage sidewalls or bottom. As the debris was raked from the cells, it was removed from the rake by an on-site technician. After all the debris had been removed and



**Debris removed from process cell**

stockpiled, the material was collected and loaded into a 32.1 cubic meter (42 cubic yard) roll off container and transported to the ECDC Environmental L.C. industrial landfill located in East Carbon, Utah.

**Loading debris container**



### 4.5 Treatment

**WBR Mixer**

The treatment process for this Pilot Study centers on the WBR specially engineered mixing head attached to an excavator equipped with a separate variable hydraulic power system. The mixing head attachment was designed and built by WBR to blend stabilizing reagents with dredge sediments, pond sludges and any other type of contaminated slurry. The reagents used for this test program were formulated for the specific constituents within the sediments to be stabilized or processed. The mixing head used has the unique ability to thoroughly blend reagents by propelling the viscous sediment and reagent mixture vertically, from top to bottom, through the rotating mixer, thus insuring



**WBR mixer with dry reagent injection hose attached**

that all particulates of the sediments are introduced to the reagent formula. This allows for maximum binding or encapsulation of the sediment particulates.

The WBR mixing head was designed to operate between 0-300 rpm and can move in both vertical and horizontal directions throughout the cell. It is of paramount importance that the mixing mechanism generates sufficient agitation to blend the entire batch of sediments with the reagent formula. The WBR mixer has the ability to re-distribute sediments within a barge or mixing cell in a manner that promotes the consistent blending of all reagents and sediments throughout the barge or cell. This re-distribution of sediments was achieved by moving the mixing head left, right, vertically or horizontally, creating a blending action throughout the cell area.

During all phases of blending the reagents into the test sediments, a member of the WBR project management team was in position to carefully observe and monitor the blending of the reagents and sediments within the cell. As the sediments were blended, the mixing unit moved along the side of cell mixing the entire area within the reach of the excavator/mixing unit and then it was repositioned to an untreated area that allowed the blending of the previously treated sediments. Due to the immediate increase in viscosity of the treated sediments, it was important that the mixing progress rapidly across the cell. Depending on the size or the surface area of the cell, the time required to mix each cell was between 2.5 to 3.5 hours. This mixing time may also vary due to the change in reagent formulas. The quantities of reagents were also a factor in the mixing and blending time. Higher percentages of reagents required a somewhat longer duration of mixing in order to insure a thorough blend.

__Seawater Addition__

Prior to the addition of the reagents, the moisture content of the AWSB dredge sediments was observed to be considerably lower than normal 'as dredged' sediments. Seawater was added to all cells in order to more closely simulate sediments from recently dredged material. Each cell received about 37,850 liter (10,000) gallons of seawater, blended

**Seawater addition to process cell**



with the WBR mixing head to suspend the solids prior to the addition of the reagents. The addition of seawater brought the cell moisture levels to between 43.6% (cell #4) and 48%(cell#1). Please see tables 1 and 3 for additional information.



**WBR mixer working in process cell sediment to pre-mix for raw sampling**

## Reagent Addition

As part of the Pilot Project evaluation dry cement reagent addition was attempted for cell #1. A dry cement delivery hose was mounted along the EX 400 boom and extended to connect with a dry bulk cement truck trailer equipped with a blower. The WBR mixing head was modified to include a dry cement discharge port within the dome of the housing for the purpose of directly injecting dry cement. The mixing head was designed so that the reagent and sediments would be forced down, mixing the cement into the sediment.



**Dry cement injection**

The cement was injected at rates of approximately 136 to 227 kg (300 lbs. to 500 lbs) per minute from a self-contained truck-mounted pneumatic delivery system. The WBR mixing head received the dry material directly through a 10.2 cm (4-inch) hose to a discharge mounted on the top of the mixing head's frame, to the side of the parabolic dome. This method produced small amounts of cement dust that was not acceptable for the project location. An immediate on-site modification as made to the dry cement injection system. A 10.2 cm x 1.2 meter (four inch diameter x 4ft.) long steel tube was attached to the steel support of the protective shroud and a 90 degree fitting added to direct the discharge of the dry reagents directly into the blending action created by the rotating blades. These design change decreased the airborne particulate by approximately 50%, however, the amount of airborne particulate was still excessive for this location.

A decision was made by the project management team and COE representative to discontinue the pneumatic injection method and switch to an aqueous based slurry method of reagent addition to complete the treatment of cell #1. A field estimate was made of the amount of dry reagents already injected into cell #1. An order was placed with the designated cement batch plant to deliver one additional load of pre mixed cement slurry into cell #1.

Constant blending of the dry injected reagents continued until the aqueous slurry reagents arrived and were added. The blending process continued until all the sediments contained in cell #1 were completely blended. The mixer modifications and changes from dry cement to slurry cement significantly increased the mixing time for Cell #1. A total of 8 hours of blending by the WBR mixer was documented for cell #1. Following review of truck weight tickets, it was determined that 1.55% of cement reagent was blended into the contaminated sediments within cell #1. This established cell #1 as the 'minimal' or baseline cement addition cell.

The cement and cement/fly ash aqueous slurry formulas were mixed at A&A Ready Mixed Concrete, Inc. and Standard Concrete Products, Inc. batch plants located in the immediate project area and delivered to the site via conventional transit mix concrete truck. The trucks arrived in consecutive loads as ordered for all three of the remaining cells. Prior to the discharge of the slurry from the truck, the mixture payload is visually checked for the desired viscosity. The pre-mixed slurries were added to the cells at the surface and at a rate that could be thoroughly blended by the mixing head. The primary mode of expressing reagent addition percentages is dry reagent tons added per quantity of wet sediment tons. Table 1 summarizes reagent mix design, actual reagent and seawater additions and reagent percentages on a 'wet' sediment and 'dry' sediment basis.

The reagent slurries were discharged from the truck chute adjacent to the mixing head. This allowed for immediate blending of the slurry and sediments and prevented settling or clumping. Once the addition of the pre-established quantities of slurried reagents had been completely added and blended within the cell, the stabilized sediments began to cure. The cure time within the cells was observed to be a minimum of about 8 hours before any treated sediments could be excavated, depending on the concentration of the reagents. Within twelve hours after reagent addition, the sediments had become firm enough to support a person standing on the process cell surface.



**Slurry reagent addition to WBR mixer**

**Stabilized cell about 16 hours after reagent addition**



Except for cell #1, all cells cured sufficiently to be excavated and stockpiled within twenty-four hours after the reagents had been added. Cell #3, with 6% Portland Cement, could have been excavated within 4 to 8 hours after the completion of the cement addition. Cells #2 and #4 were mixed with a blend of fly ash and Portland Cement and were excavated the following morning, about 18 hours after cement/ash reagent addition. Cell #1 cured for seventy-two hours prior to excavation and stockpiling. Cure times are critical to efficient use of all equipment in dredge sediment stabilization operations. For example, an 8 hour cure time (eg cell #3) means that one barge with a capacity of 1093 cubic meter (1000 cubic yard) could cycle every 24 hour period. Assuming about 6 hours

for dredging and tow, with 2 hours for dewatering and debris removal, 2 hours for binder addition and mixing and 8 hours cure and 6 hours for unloading and return tow.

### 4.6 Stockpiling

After initial curing of the material and sampling of the cell as specified in the Sampling Plan, the stabilized sediments were excavated and stockpiled. CAT 225 excavator equipped with a 106.6 cm (42 inch) bucket was used to remove the stabilized sediment. The stabilized sediment material was excavated and deposited directly into the bucket of a CAT 980 wheel loader equipped with a 5.35 cubic meter (7 cubic yard bucket).



**Four sampling pits per cell to obtain representative samples of stabilized sediments**

**Samples obtained from each sampling pit were combined**





**Combined samples from each cell were blended and sampled for chemical and geotech testing**

The excavator moved laterally across the side of the cell and the operator exercised extreme care to avoid including any of the untreated cell wall material. The stabilized sediments within the cell adhered to the untreated soil cell walls; this mix of sediments and soil was not excavated. The CAT 980 was used to transport the excavated sediments the designated stockpile area. The stabilized sediments were stockpiled adjacent to the designated lay down (compaction pad) areas and a sign was posted on the stockpile designating the cell number. The numerical designation insured that the stabilized sediments would only be used on the corresponding designated compaction pad. (See fig 2). The stabilized sediment material was excavated and deposited directly into the bucket of a CAT 980 wheel loader in order avoid contamination with working site soils.

**Excavator placing stabilized sediment into loader bucket for stockpile/pad**





**Compaction pad lift and stockpile in background**

### 4.7 Compaction Pad—Lay Down Areas

Four compaction pad areas were laid out to accommodate the different stabilized sediments. Each pad was approximately 10.7 meters by 22.9 meters (35 ft. wide by 75 ft.) long and delineated by six grade stakes, 3 per side. Each grade stake was clearly marked

with color-coded grade tape to signify the height required: red at plus 30.4 cm (1ft.), red and white at plus 60.8 (2ft.) and white at plus 91.2 cm (3 ft.) These elevations were shot from a benchmark at the center of each designated lay down pad areas.



**First lift of pad #1--note extremely wet material from cell #1 (low cement addition). This was not typical of other, higher reagent content cells.**

Following completion of sediment stockpiling, the first lift of approximately 25.4 cm (10 inches) of sediments was laid out within the delineated compaction pad area. A CAT 980, equipped with a 5.3 cubic meter (7 cubic yard) bucket, was used to place the first lift at the opposite side of the corresponding stockpile. The stockpile material was carefully applied to the pad area to avoid mixing the first lift with graded and compacted site soil.

"Drying" of the stabilized sediments in the stockpiles and pads proceeded at different rates, depending upon the binder mixture and weather. Two mechanisms impacted the drying process:

1. **Hydration** of the cement based binder materials. Cement continues to attach water present in the stabilized sediment as part of the hydrated cement structure. The amount of water taken-up is directly proportional to the amount of cement present, but is also influenced by air temperature and the presence of fly ash. Higher levels of cement, such as cell #3 at 6%, "dry" much quicker due to the larger amounts of water consumed in the hydration process.
2. **Air-drying** is dependent upon sunlight, air temperature, humidity and wind. While hydration consumes important amounts of sediment moisture, air-drying is necessary to remove sediment moisture to levels that allow for optimum compaction. Air-drying is enhanced by placing the stabilized sediments in relatively thin lifts and exposing fresh surfaces by turning the stabilized sediment with a disc. Air temperatures, humidity, wind and sun were less than optimum during the September/October Pilot Test. Cool, foggy mornings and little wind delayed air-drying and likely doubled air-drying time compared with optimum conditions available during the warm and dry summer months.

After 1 to 4 days (depending upon the degree/duration time for drying) the initial lift of stabilized sediments was graded and back dragged utilizing a CAT 963 track loader equipped a with a 4-in-1 hydraulic actuated bucket. Once the initial lift of each pad cured and dried, a second lift was applied using the same techniques and equipment. A CAT 963 equipped with a 88.9 cm (35-inch) tractor disc was used to blend and turn the sediments to expedite the air-drying process. Pads #1, #2, #4 contained less than 6% Portland Cement and required significantly more time to dry between lifts (see Volume II (Appendix i) for Site Progress Chart details).

### 4.8 Compaction

The Pilot Study compaction techniques simulated a large-scale fill and compaction operation. The equipment used in the compaction of the sediments and throughout the Pilot Study was very similar to equipment that would be used to compact large volumes of soil in a typical fill project.

Each pad was inspected daily. A plan specific to that pad was formulated each morning that included techniques to maximize the compaction efforts in order to achieve the goals set forth in the Scope of Work. Depending upon the stabilized sediment moisture content, the pads were either compacted and an additional lift of material added or the

**Dozer with disc aerating and compacting stabilized sediment pad**



pad was turned to maximize drying, using the CAT 963 equipped with a tractor disc. The tractor and disc tilled the material in two directions: east to west and west to east. This tilling method simulated expected larger scale operations. The operator isolated the movement of the machine and disc to the surface of the pad, minimizing foreign material from being tracked onto the pad.

A CAT 980 was used for pad compaction. The 980 is similar to a CAT 824 Static Compactor with a rubber tire configuration, but weighs approximately 6000 lbs <u>less</u> due to the 5.3 cubic meter (7 cubic yard) loading bucket configuration. The additional weight comes from the blade attachment that is standard on the CAT 824. The CAT 980 performed multiple tasks during Pilot Study operations, including pad compaction that gave similar results to a CAT 824 type compactor.

During stabilized sediment compaction, when any areas were identified that required additional manipulation, the CAT 963 was utilized to expose, turn, and/or blend material to aid in achieving the required compaction prior to adding the next lift. Additional machine weight was added as needed by loading approximately 1.5 cubic meters (2 cubic yards) of sediments (from the same stockpile) into the CAT 980 bucket providing an approximate weight equal to the weight of a CAT 824.

The practices discussed simulate common field operations for the compaction of material containing greater than optimum percentages of moisture. The compaction of each pad lift took approximately 10 to 15 minutes. Each lift was compacted prior to the placement of the subsequent lift placement. See Volume III Appendix i for details on the development and progression of field activities regarding the compaction of the sediments.

### 4.9 Treatment Cell Backfill

Following completion of the excavation and stockpiling of the treated stabilized sediments, the vacated cells were backfilled. This provided a compaction pad lay down area within the Pilot Study operating site footprint. Backfilling was performed utilizing the CAT 980 and the CAT 963. Initially the CAT 963 track loader was used to push the previously excavated material that had been used for sidewalls of the cell and fill in the

**Closing the process cells**



vacated cell area. The CAT 980 wheel loader moved additional material and compacted the cell backfill material to approximately 90% of maximum density. The two pieces of equipment worked in unison to complete backfilling and compaction of each cell in les than 5 hours. After the completion of the backfilling of the cell a CAT 14G Motor Grader was used to grade and level the former cell area and provide a clean finish grade. Additional core samples were taken from each pad and archived.

### 4.10 Debris Disposal

All of the debris removed from the sediments, as well as used Personal Protective Equipment, (PPE) etc. was placed in 30.6 cubic meter (40 cubic yard )roll off type tarped containers. A skip loader was used for loading the larger pieces of debris. All Tyvek® coveralls, rubber gloves, dust masks, and disposal sampling equipment were placed in the

roll off container for shipment to the ECDC Environmental industrial landfill for disposal. All material in containers was considered to be non-hazardous, it was classified as contaminated waste material and disposed of in accordance with state and local regulations governing contaminated material. The roll off container was transported via truck to the ECDC Intermodal Facility located in Los Angeles, CA. and loaded onto a railroad flat-car. The containerized waste material was then shipped via rail to the ECDC Environmental industrial landfill facility. A Non-Hazardous waste manifest document accompanied the container. This document is required when shipping any containerized waste material and contains all of the pertinent shipping information including a description waste material, site address, name of generator and estimated quantity.

The ECDC landfill facility received the container and unloaded the waste. Total of 6.53 metric tons (7.18 short tons) of debris generated from the site represented approximately 12.2 cubic meters (16 cubic yards) of wood debris, rope, steel cables, tires, and non-descript material. This level of debris was likely considerably lower than would have been encountered with freshly dredged material due to sediment placement in the AWSB. A completed, signed copy of the manifest was returned the generator (WBR), this copy provided proof that the material was received at the landfill and had been disposed properly in accordance with all state and local regulations.

### 4.11 Site Restoration

Following the final "28 day sample", taken on pad #4, all sampling and operation was considered completed in accordance with the Pilot Study sampling Plan. The COE and the Port of Los Angeles decided to leave the four Pilot Study compacted pads in place for an undetermined amount of time. The stockpiled quantities of treated sediments that were not utilized within the compacted pads were relocated using the CAT 980. The surplus stockpiled sediments were placed into the berm surrounding the Anchorage Way Settling Basin dredge sediments.

The orange safety fence was re-positioned to enclose the four pads. The safety fence will aid in maintaining the integrity of the pads to allow for any additional sampling, if necessary due to unforeseen QA/QC concerns.

All other site equipment or engineering controls such as; office trailer tie downs, signs, graded roads, were removed and the affected area restored to the conditions that existed at the site prior to the commencement of the Pilot Study. Additional core samples were taken from each pad and archived. After all of the data and the QA and QC requirements were reviewed and the data had been certified by the laboratory as being correct, the pads were removed from the lay down area and utilized as part of the existing berms of the AWSB.

### 4.12 Demobilization

After completing each Pilot Study specified task, a determination was made regarding the equipment need for any other site operation. The equipment was demobilized when it was no longer needed at the project site. The next step in this process was to decontaminate or clean away any of the treated or untreated sediments. The first step in

this process was to position the equipment within the designated decontamination area directly adjacent to the AWSB.

The decontamination area was engineered to direct all the rinse water and the sediments back to the AWSB where the solids will settle and evaporation of the water will continue. A 7,570 liter (2000) gallon water truck equipped with a 5.08 cm (2-inch) hose and adjustable nozzle powered by the truck's PTO system provided a high volume, high-pressure, water rinse that effectively removed the sediments from the equipment. In addition to the water rinse, brushes, shovels and breaker bars were used to remove all sediments trapped or that adhered onto the equipment.

After the equipment was cleaned it was staged at an area that provided sufficient access to accommodate low bed truck and trailers for easy and safe loading. After the equipment was positioned for loading, a dry decontamination or cleaning procedure using brooms and brushes was performed to remove any dry soil or debris that may have accumulated during the repositioning of the equipment to the demobilization staging area.

## 5.0 SAMPLING AND TESTING ACTIVITIES

### 5.1 Sampling

The Pilot Study Sampling Plan identified the samples to be taken at different project locations. The following sections describe sample preparation and equipment that were used for each sample group. Table 12 summarizes the sample collection dates and the corresponding geotechnical testing dates.

#### 5.1.1 Raw Material

Four grab samples were taken as described in the Sampling Plan. Following delivery of the dredge sediment to the processing cell, a backhoe excavator equipped with a rock bucket/rake was used to remove debris such as pilings, cable and trash. After the debris were removed and placed in a roll-off container, seawater was added to each cell to more closely simulate "as dredged" material. The WBR hydraulic mixer was used to thoroughly blend the seawater and dredge sediments prior to sampling. Four grab samples of raw sediment were taken from the mixed dredge material in each processing cell with site processing equipment. A CAT 225 type excavator equipped with a digging bucket was used to sample each cell:

1. The excavator bucket was lowered to the bottom of the cell and then slowly raised to the surface at an angle.
2. The loaded bucket was placed adjacent to the cell for WBR technician-sampling access.
3. The samples were taken from the excavator bucket using a clean 18.9 liter (5-gallon) plastic bucket. The four-each five-gallon grab samples were combined in a ~ 120 liter (32 gallon) concrete type mixer and blended. The concrete mixer had been previously cleaned by thorough washing and use of a scrub brush.

4. Following blending, samples were split out for laboratory processing.

    - A ~18.9 liter (5-gallon) sample was placed in a clean plastic bucket, fitted with a plastic lid, labeled, recorded in the WBR Chain of Custody (COC) book and sent for geotechnical testing at Smith-Emery.
    - A ~1 liter (0.26-gallon) sample was placed in a clean glass jar with a secure plastic screw lid, labeled, recorded in the WBR COC book, cooled to 35 to 42 degrees Fahrenheit and shipped to ToxScan for chemical analysis.

**Sampling raw sediment from excavator bucket--four samples per process cell**





**Mixer for raw sediment samples**

All project samples taken for geotechnical or chemical testing were handled as follows:

- A 18.9 liter (5-gallon) plastic bucket was used for all project samples sent to Smith-Emery for geotechnical testing at:

Smith-Emery Geoservices
791 East Washington Boulevard
Los Angeles, CA 90021
Attn: Raf Hutalla

Project samples taken for chemical analysis were handled as follows:

- All samples sent to ToxScan for chemical analysis taken from the mixed cell sample and placed in 1 liter (0.26 gallon) glass jar with a screw-on plastic lid. Each jar was labeled, placed inside a zip-lock type plastic bag and cooled to 35 to 42 degrees Fahrenheit. All samples shipped to ToxScan for chemical analysis were shipped by overnight express freight in coolers with sealed "ice" blocks to maintain the required cool temperature. The chemical test samples were sent to:

  ToxScan, Inc.
  42 Hangar Way
  Watsonville, CA 95076-2404
  Attn: Phil Carpenter

All samples for geotechnical and chemical testing were labeled with the following information:

- The WBR sample number.
- The project designation DACW 09-01-D-0010, Task Order #3.
- Sample location.
- Sampling date and clock time.
- A brief sample description.

### 5.1.2 <u>Initial Cure Material</u>

Approximately 12 to 24 hours following stabilization mixing of the dredge sediments in the processing cell, a composite sample of stabilized sediments was taken:

- The CAT 225 excavator, equipped with a digging bucket was used to sample each cell at four evenly spaced locations within the cell. A trench was dug to the bottom of the cell. The excavator bucket was then used to 'scrape' the trench wall from the bottom of the cell to the top, filling the bucket.
- A small shovel was used to obtain an 18.9 liter plastic bucket sample from the excavator bucket. The process was repeated at four different evenly spaced cell locations.
- The four cell sample buckets were combined on a clean ~10' x 10' plastic tarp and blended with a shovel using the cone and quarter blending method. The method is standard practice for relatively large volumes of bulk materials:

  1. The material is piled in a cone shape.
  2. ¼ of the cone is removed and placed on a clean corner of the tarp. The remaining ¾ are blended with a shovel and formed into a cone.
  3. A second ¼ of the cone is removed and placed on a clean corner of the tarp, and the 1st of the ¼ portions is added to the top of the cone, allowing the material to cascade from the top.

4. The cone is blended with the shovel and the process repeated until four ¼ portions have been removed, the cone blended and the ¼ portions added back to the mass.
5. Following blending, the cone is flattened and a shovel is used to obtain the final 18.9 liter geotechnical sample from the blended material by taking thief samples from random areas of the mass.

   - The ~18.9 liter (5-gallon) sample was placed in a clean plastic bucket, fitted with a plastic lid, labeled and sent for geotechnical testing at Smith-Emery.
   - A ~1 liter (0.26-gallon) sample for ToxScan was taken from the blended material on the plastic tarp using a clean spatula. The sample was placed in a clean glass jar with a secure plastic screw lid, labeled, cooled to 35 to 42 degrees Fahrenheit.

#### 5.1.3 7-Day Cure Material

Core samples were taken from the compaction pad areas by Smith-Emery field technicians after seven days of pad curing. A split-tube coring unit was used and was driven by hand. Two cores were taken from different areas ("east" and "west") of each of the four compaction pads.

The cores were labeled and recorded as previously noted. Smith-Emery evaluated the cores for engineering properties and sent portions of the cores to ToxScan, under the protocols previously noted, for chemical analysis.

#### 5.1.4 28-Day Cure Material

Smith-Emery technicians also took compaction pad measurements after 28 days of curing, using the split tube core unit. Two areas from each pad("east" and "west") were measured for Field Density. The "east" pad area core was also evaluated for additional geotechnical tests by Smith-Emery. A portion of the sampled core material was also sent to ToxScan for chemical analysis. Sample labeling and shipment protocols were observed as previously described.

#### 5.1.5 Process Water

Process water samples were taken from:

1. Seawater added to the processing cells.
2. Fresh water used in binder reagent slurry mixtures.

   - Seawater was added to the dredge sediments in the land barge processing cells in order to produce a slurry that more closely simulated "as dredged" materials. Seawater was pumped from the POLA Consolidated Slip channel area and transported to the processing area using a 7,570 liter (2,000) gallon water truck.

- A one-liter (0.26 gallon) sample of the seawater was taken from each truckload as the seawater discharged into the processing cell. The one-liter sample from each truckload was combined in a seawater composite sample (in a 18.9 liter plastic bucket).
- A one-liter sample of the composite seawater was retained in a glass jar and refrigerated for shipment to ToxScan.
- Batch plant process water samples were taken in one-liter (0.26 gallon) glass jars from the two cement slurry and cement/fly ash slurry contractors.
- The seawater and batch plant process water samples were cooled and shipped to ToxScan per the protocols previously described.

#### 5.1.6 Binder

Reagent binder samples were taken for the Type II Portland cement and Class F coal fly ash from the contractor supply sources.

- A sample of reagent was taken from each of the three contractor sources utilized to supply binder reagents for the project. The project sources were:

    1. Standard Concrete—source Mitsubishi Cement, Type II Portland.
    2. A&A Ready Mixed Concrete, Inc.—Calavaras Cement, Type II Portland.
    3. Kitchen's Transport—Mitsubishi Cement, Type II Portland.
    4. A sample of Class F fly ash reagent from ISG Resources (Navajo Generating Station).

The Portland Cement and Class F Fly Ash samples were shipped to:

U.S. Army Corps of Engineers
Baseyard Soil Laboratory
North Durfee Avenue
South El Monte, CA 91733-4399
Attn: Art Moncayo

### 5.2 Testing

Table 4 summarizes the various chemical and geotechnical tests for the different pilot project samples. The test program matrix was designed to provide both raw and stabilized material geotechnical and chemical data. The following sections summarize test results and methodologies. The following notes summarize the various tests and methodologies:

1. Bulk Chemistry: Bulk chemistry as noted in Tables 8 & 9 of the COE Sediment Stabilization Bench Testing Protocol. EPA Standard Methods and minimum laboratory reporting limits consistent with COE 2001 were used for bulk chemistry and for analysis of the leachate extracts from SPLP and WET testing.

- pH—by EPA method 150.1
- Total Organic Carbon—EPA method 415.1
- Organochlorine Pesticides & PCB's—by EPA method 8081A
- Semivolatiles—by EPA method 8270C
- Butyltins—by GC, with a flame photometric detector
- Sulfide—by EPA method 376.1
- Mercury—by cold vapor AA, EPA method 245.1
- Total Metals—by ICP/MS, EPA method 200.8
- Total recoverable petroleum hydrocarbons—by EPA method 1664
- Sodium Chloride mobilization—modified ANS 16.1 test protocol

2. Wet Testing--W.E.T. (waste extraction test—Title 22 CCR) to determine leaching characteristics of the stabilized sediments.
3. SPLP Testing: S.P.L.P. (Synthetic Precipitation Leaching Procedure—EPA Method 1312) to determine leaching characteristics of the stabilized sediments.
4. Monolithic Leach Test: Modified procedure, ANS 16.1, as agreed upon between WBR and COE representatives to determine sodium chloride leaching.
5. Sieve Graduation: Tested per ASTM D422.
6. Direct Shear: Tested per ASTM D3080.
7. Soil Classification: Tested per ASTM D2487.
8. Moisture Content: Tested for moisture content per ASTM D2216.
9. Atterberg Limits: Tested per ASTM D4318
10. Compaction: Tested per ASTM D1557
11. Resistance R Value and Expansion Pressure of Compacted Soils: Tested per CTM 301
12. Unconfined Compressive Strength: Tested per ASTM D 2166
13. Consolidation: Tested per ASTM D 2435
14. Constant Head Permeability: Tested per ASTM D 2434/CA220
15. Specific Gravity: Tested per ASTM D 854

Smith-Emery GeoServices performed the geotechnical testing for pilot project samples. The following tests as described, were also performed for the bench scale project as reported by Moffatt Nichol Engineers. The following provides a general description of each of the physical tests performed including their relevance. The ASTM testing method used is also referenced.

- **Grain Size-Sieve Graduation** – Grain size distribution is a key parameter in characterizing a soil type, and plays an important role in determining both physical and chemical (i.e., contaminant binding) characteristics (ASTM D 422). The relative distribution of sands, silts and clays are reported for each raw site material. The Unified Soil Classification System (USCS) was also used to classify the materials.
- **Atterberg Limits** – Test determines the *liquid limit* (LL), *plastic limit* (PL), and the *plasticity index* (PI) of soils. The test is commonly used as an integral part of several engineering classification systems to characterize the fine-grained

fractions of soils. The LL, PL and PI are also used extensively with other soil properties to correlate with engineering behavior such as compressibility, permeability, compactibility, shrink-swell and shear strength (ASTM D 4318).

- **Compaction** – This test is used to determine the relationship between water content and dry unit weight of soils. Soil placed as engineering fill (embankments, foundation pads, road base) is compacted to a dense state to obtain satisfactory engineering properties such as shear strength, compressibility, or permeability. Laboratory compaction tests provide the basis for determining the percent compaction and water content needed to achieve the required engineering properties, and for controlling construction to assure that the required compaction and water contents are achieved. Results are provided in terms of *maximum dry density* and *optimum moisture content* (ASTM D 1557).
- **Direct Shear** – Measures consolidated drained shear strength in direct shear. Key test results include the *cohesion*, or *strength intercept* of the material, and *the friction angle* (ASTM D 3080). These values were used to calculate the *remolded shear strength* of the various mixes for strength comparison purposes.
- **Unconfined Compressive Strength** – Determines compressive strength of soil-cement using molded cylinders as test specimens (ASTM D 2166). It should be noted that test accuracy with within approximately 700 psf.
- **Consolidation** – Test to determine rate and magnitude of consolidation of a soil. Compressibility of soils as determined from this test is used to estimate rate and total amount of differential and total settlement of a structure or landfill (ASTM 2435). Test results were used in this study to calculate the *compression index* of the material, providing a relative measure of its compressibility.
- **Permeability** - This test measures ease at which water passes through soil. Results are applied in drainage, seepage and consolidation analyses (ASTM D 2434).

### 5.2.1 Raw Material

Raw sample composites were taken as noted in the sampling plan, section 5.1.1. The raw samples were tested by Smith-Emery for the following geotechnical tests:

- Moisture
- Sieve Gradation
- Soil Classification
- Compaction
- Atterberg Limits
- Direct Shear

Geotechnical test results are noted on Table 3. Samples of raw material were sent to ToxScan in one liter glass jars that were cooled and maintained at approximately 40 degrees Fahrenheit in insulated containers. Smith-Emery also dried portions of the raw samples and prepared core samples for chemical testing by ToxScan. The ToxScan analysis included:

- pH
- Heavy metal analysis (As, Cd, Cr, Cu, Pb, Hg, Ni, Ag, Zn)
- Sulfide
- Butyltins
- T.O.C.
- TRPH
- Pesticides
- PAH-semivolatiles
- Modified ANS—salt leaching

Both Smith-Emery and ToxScan used the prescribed standard analytical and testing methods and conducted strict laboratory quality control programs; see Appendix iii.

### 5.2.2 Initial Cured Material

The initial cured samples were taken as noted in section 5.1.2. The cone and quarter blended samples were collected in a plastic 18.9 liter (5 gallon) bucket, labeled and recorded in the Pilot Project chain of custody book. The samples were sent to Smith-Emery laboratories along with the COC form.

Smith-Emery geotechnical testing included:

- Moisture
- Soil Classification
- Laboratory Compaction
- Sieve Gradiation

Per the approved sampling protocol, ToxScan did not perform chemical analysis on the initial cured material, but did analyze stabilized sediment core samples taken from the compaction pads after 28 days.

### 5.2.3 7-Day Cured Material

Split core samples were taken by Smith-Emery technicians from each of the four compaction pads seven days after placement of the first pad lift. Split core sampling relies on thin walled metal tubes and machined rings to obtain a relatively undisturbed sample. The core sample is taken by driving the core tube with a 40 pound hammer on a 'California' sampler barrel lined with rings. Hammer drop height is approximately 76.2 cm (30 inches). The samples were analyzed for:

- Unconfined Compressive Strength--ASTM D 2166
- Direct Shear--ASTM D 3080

The unconfined compressive strength tests were done on core samples obtained from the compaction pad. This material had been stabilized with reagents, stockpiled, air dried and compacted with heavy equipment. Cores taken from the pad were competent and suitable for direct testing by ASTM D 2166. This contrasts with

unconfined compressive strength (UCS) tests on stabilized sediments from the earlier bench scale test program. The bench test program sought to simulate field operations as nearly as possible. Samples of stabilized bench test sediments were air dried in the Smith Emery laboratory and formed into cores using with laboratory compaction equipment. This procedure was a modified form of ASTM D 1633 designed to simulate the pilot project field procedures and was developed in consultation with COE, Moffatt Nichol Engineers and Smith Emery.

Smith-Emery technicians also performed field density measurements, using the sand cone method, at the project work site. Sand cone test were run on each of the four compaction pads after seven days of curing.

#### 5.2.4 28—Day Cure Material

Split core samples were taken by Smith-Emery technicians from each of the four compaction pads. The samples were taken from the east and west areas of each pad 28 days after the first pad lift was placed. The samples were labeled and treated according to the COC and temperature control protocols previously noted.

Smith-Emery retained the bulk of the core samples for geotechnical tests. Smith-Emery technicians also bagged, labeled, refrigerated and overnight freighted portions of the cores to ToxScan for chemical analysis.

Smith-Emery geotechnical testing included:

- Moisture
- Falling Head Permeability
- Consolidation Testing
- Unconfined Compressive Strength--see UCS notes on 7-day cores.
- Soil Classification
- R Value
- Direct Shear
- Sieve Gradiation
- Atterberg Limits

Results are summarized in Table 3. The 28 day core samples sent to ToxScan were analyzed for:

- WET Leach Test
- SPLP Leach Test
- Modified ANS 16.1 sodium chloride leach test

Results for each of the four test cells are summarized in Tables 5,6,7 and 8.

#### 5.2.5 Process Water

Process water samples include seawater that was added to each cell. Thirty seven thousand eight hundred and fifty liters (ten thousand gallons) of seawater was added