# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TDM America, LLC,

Plaintiff,

v.

The United States of America,

Defendant,

and

Donjon Marine Company, Inc.,

Interested Party.

Civil Action No. 06-472-C
Judge Thomas C. Wheeler

## TDM AMERICA LLC'S MEMORANDUM IN SUPPORT OF TDM'S MOTION PURSUANT TO RCFC 37 AGAINST THE US

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES .......... ii

PRELIMINARY STATEMENT .......... 3

FACTS AND LAW .......... 5

A. Sanctions are Warranted Against the US .......... 5

B. The US' Improper Response to TDM's Interrogatories .......... 5
1. Interrogatory Nos. 15 and 16 .......... 5
2. Interrogatory Nos. 11, 12, and 13 .......... 7
3. Interrogatory No. 10 .......... 8
4. Interrogatory No. 20 .......... 12
5. Interrogatory Nos. 23, 24, 25 and 26 .......... 14

C. The US' Failure to Provide Appropriate 30(b)(6) Witnesses .......... 15

D. The US' Continued Wholesale and Indiscriminatory Designation of Transcript Testimony as Proprietary Without Any Justification .......... 16

E. The US' Attempt to Thwart TDM's Designation of An Expert Witness .......... 18

CONCLUSION .......... 21

# TABLE OF AUTHORITIES

**Page**

## Cases

*Advanced America Services, Inc. v. the United States,* 32 Fed.Cl. 191 (Fed. Cl. 1994) ................5
*Boeing Company v. United States of America,* Civil Action No. 00-705-C ................19
*Creative Resources Group of New Jersey v. Creative resources Group, Inc.* 212 F.R.D. 94 (E.D.N.Y. 2002) ................5
*English Feedlot, Inc. v. Norden Laboratories, Inc.*, 833 F.Supp. 1498 (D. CO. 1993) ................19
*Great Lakes Dredge & Dock Company v. Harnischfeger Corporation,* 734 F.Supp. 334 (N.D. Ill. 1990) ................19
*United States ex. rel. Cherry Hill Convalescence Center, Inc. v. Healthcare Rehab Systems, Inc.* 994 F.Supp. 244 (D. NJ. 1997 ................19
*United States Medical Supply Company Inc. v. the United States* 77 Fed.Cl. 257 (Fed. Cl. 2007) ................5

## Statutes

RCFC 26(e) ................2
RCFC 30 ................1
RCFC 30(b)(1) ................2
RCFC 30(b)(6) ................1, 2,15
RCFC 33 ................8, 14
RCFC 33 (a) ................8, 1
RCFC 34 ................14
RCFC 37 ................1
RCFC 37(a)(2) (A) ................2, 4, 21
RCFC 37(a)(2) (B) ................2, 4, 21
RCFC 37(a)(4)(A). ................2, 4, 22
RCFC 37(b)(2) ................7, 8
RCFC 37 (b)(2)(A) ................2, 4, 21

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TDM America, LLC,<br><br>Plaintiff,<br><br>v.<br><br>The United States of America,<br><br>Defendant,<br>and<br><br>Donjon Marine Company, Inc.,<br><br>Interested Party. | Civil Action No. 06-472-C<br>Judge Thomas C. Wheeler |

**TDM AMERICA LLC'S MEMORANDUM IN SUPPORT**
**OF TDM'S MOTION PURSUANT TO RCFC 37 AGAINST THE US**

Despite TDM America, LLC's ("TDM") prior motion for sanctions and/or to compel and this Court's April 30, 2007 Discovery Order (the "Discovery Order"), the United States of America ("US") did not comply with RCFC 30, 33, 34 and 37 nor the Discovery Order. Specifically, the US (1) failed to completely and properly respond to document and interrogatory demands in direct violation of this Court's Discovery Order; (2) refused to provide an RCFC 30(b)(6) witness to testify regarding nationwide treatment or processing of dredged material, related contracts and summary volumetric information, but instead misled TDM through its piecemeal designation of ill-prepared witnesses; (3) abused this Court's protective order by designating entire deposition transcripts of US witnesses proprietary; and (4) improperly thwarts TDM's use of an expert witness.

Therefore, this Court should:

(1) sanction the US pursuant to RCFC 37 (b)(2)(A) for failing to completely and properly respond to interrogatory nos. 10, 11, 12, 13, 15 and 16 and for failing to testify pursuant to RCFC 30(b)(1) and 30(b)(6) by ordering that (a) it is established for the purposes of this litigation that the total volume of treated dredged material for the years of 2000 to 2006 is 133,143,631 cubic yards consistent with the amount of dredged material disposed "Upland" listed in the United States Army Corps of Engineers ("USACE") website,[1] (b) it is established for purposes of this litigation that the 133,143,631 cubic yards were treated in accordance with the methods of the contracts already produced in this litigation, (c) it is established for the purposes of this litigation that the contract documents identified by the US in this litigation are actual US records and admissible in evidence;

(2) order that, pursuant to RCFC 37(a)(2) (A) and (B), the US be compelled to completely and properly respond to interrogatory nos. 20, 23, 24, 25 and 26;

(3) order that, pursuant to the February 16, 2007 Protective Order, the US re-designate all transcripts of US witnesses by October 30, 2007 or all such transcripts should be deemed non-proprietary and non-confidential;

(4) overrule the US' objections to Michael J. Chapman being designated by TDM as an expert witness;[2] and

(5) award TDM its attorney's fees related to the instant motion pursuant to RCFC 37(a)(4)(A).

---

[1] While figures for the year 2007 are not yet available on the USACE website, TDM reserves the right to add this amount to the total volume when available from the USACE website as a supplement or correction from the US as required pursuant to RCFC 26(e).

## I. PRELIMINARY STATEMENT

TDM sought this Court's intervention in discovery disputes on April 23, 2007 by filing a motion for sanctions and/or to compel the US pursuant to RCFC 37. On April 30, 2007, this Court issued the Discovery Order directing the US "to provide complete and verified responses to plaintiff's interrogatories and to respond properly to all of plaintiff's document requests within 30 days." (*See* the Declaration of Michael A. Adler (the "Adler Dec.") Ex. 1). Even before filing its motion for sanctions and/or to compel, TDM raised some of these same discovery issues in telephone conferences with this Court on February 6, 2007, February 15, 2007 and March 6, 2007, wherein this Court ordered the US to provide documents and respond to interrogatories by, at the latest, mid-April 2007. (*See* Adler Dec., Exs. 2, 3, and 4). After the parties filed a joint status report on June 12, 2007, this Court issued an order on June 15, 2007 encouraging the parties to "resolve discovery disputes among themselves" and directed that to the extent any discovery disputes could not be resolved after the pursuit of reasonable efforts, "such disputes should be the subject of an appropriate motion filed with the Court." (*See* Adler Dec., Ex. 5).

In compliance with this Court's instructions encouraging the parties to resolve discovery disputes, TDM attempted, over the last few months, to work out discovery disputes with the US. However, as explained below, several discovery issues are not resolved despite TDM's efforts. For example, several interrogatories and noticed depositions directed to key issues such as (1) US contracts for the treatment of dredged materials, (2) the method for treatment of dredged materials, and (3) total amounts of treated dredged materials are still not

[2] The US has made it clear that intends to object to Michael J. Chapman as an expert witness. Accordingly, the damage to TDM's preparation is already in progress because TDM expended much effort educating Mr. Chapman.

completely and properly responded to by the US. This information goes to the essence of this action and the US should not be permitted to avoid producing knowledgeable witnesses and completely responding to document demands and interrogatory requests.

Therefore, this Court should (1) sanction the US pursuant to RCFC 37 (b)(2)(A) for failing to completely and properly respond to interrogatory nos. 10, 11, 12, 13, 15 and 16 and for failing to testify pursuant to RCFC 30(b)(1) and 30(b)(6) by ordering that (a) it is established for the purposes of this litigation that the total volume of treated dredged material for the years of 2000 to 2006 is 133,143,631 cubic yards consistent with the amount of dredged material disposed "Upland" listed in the USACE website, (b) it is established for purposes of this litigation that the 133,143,631 cubic yards were treated in accordance with the methods of the contracts already produced in this litigation, (c) it is established for the purposes of this litigation that the contract documents identified by the US in this litigation are actual US records and admissible in evidence;

(2) order that, pursuant to RCFC 37(a)(2) (A) and (B), the US be compelled to completely and properly respond to interrogatory nos. 20, 23, 24, 25 and 26;

(3) order that, pursuant to the February 16, 2007 Protective Order, the US re-designate all transcripts of US witnesses by October 30, 2007 or all such transcripts should be deemed non-proprietary and non-confidential;

(4) overrule the US' objections to Michael J. Chapman being designated by TDM as an expert witness; and

(5) award TDM its attorney's fees related to the instant motion pursuant to RCFC 37(a)(4)(A).

## II. FACTS AND LAW

### A. Sanctions are Warranted Against the US

The Court of Federal Claims possesses the inherent authority to impose sanctions for abuses of the discovery process. *United Medical Supply Company, Inc. v. United States,* 77 Fed.Cl. 257 (Fed. Cl. 2007). RCFC 37 provides for the imposition of sanctions whenever a party abuses the discovery process or violates a court order. Sanctions are particularly appropriate here because the US still has not completely or properly responded to numerous interrogatory requests in direct violation of this Court's Discovery Order. *Advanced America Services, Inc. v. the United States,* 32 Fed.Cl. 191 (Fed. Cl. 1994); *Creative Resources Group of New Jersey v. Creative resources Group, Inc.* 212 F.R.D. 94 (E.D.N.Y. 2002).

### B. The US' Improper Response to TDM's Interrogatories

#### 1. Interrogatory Nos. 15 and 16

Interrogatories nos. 15 and 16 constitute TDM's second set of interrogatories to the US and are directed to (i) the total volumes of dredged materials treated by, or on behalf of, the US and (ii) the amounts paid for such treatment.[3] (*See* Adler Dec., Ex. 6). In the April 23, 2007 motion, TDM demonstrated that, although the US identified various contracts by contract number (but not by providing the bates nos.) and certain payment estimates ("Attachment B") in responding to these interrogatories, total volumes cannot be ascertained. (*See* Adler Dec., Ex. 7). In the Discovery Order, this Court required complete responses. (*See* Adler Dec., Ex. 1).

---

[3] Interrogatory no. 15 asks for "The total volume of, and total amounts paid by the US for, dredging activities and treatment of dredged material on behalf of the US since 1997. This information should be provided for the entire United States, each United States Army Corps of Engineers civil engineer division and/or civil engineer district."

Interrogatory 16 asks for the "The total volume of, and total amounts paid by the US for, treated dredged material disposed upland or beneficially reused in the United States. This information should be provided for the entire United States."

PAGE 6

SEALED PORTION

PAGE 7

SEALED PORTION

the documents are kept in the ordinary course of business, pursuant to RCFC 34(b)." (*See* Adler Dec., Ex. 15).

RCFC 33 requires a party to answer the interrogatory or to actually identify the specific documents from which an answer can be readily ascertained. RCFC 33(b),(d). Merely referring to documents produced in the ordinary course of business as a global response to an interrogatory without more violates RCFC 33 and this Court's Discovery Order. Further, the second amended response, as it now stands, ultimately ends by telling TDM to request the information from the contractors -- a position criticized by the Court early on when it stated in a March 6, 2007 telephone conference: "Well, I think that documents should be produced by anybody who has them. If it's the same documents -- if the government has them, if the contractor has them -- the Plaintiff is within its rights to request those documents from both of those parties." (*See* Adler Dec., Ex 4).

Therefore, the US should be sanctioned for violating the Discovery Order by not completely and properly responding to interrogatories 11, 12, and 13. Pursuant to RCFC 37(b)(2)(A), it should be established that all 133,143,631 cubic yards of dredged material processed during the period of 2000 to 2006 was processed in accordance with the methods for treating or processing of dredged material set forth in those contracts produced in this litigation.

3. **Interrogatory No. 10**

Interrogatory no. 10 asks the US to "[i]dentify each and every specific contract, and identify each and every contractor retained by the US for dredging activities at any port, harbor and/or waterway since 1997 to the present and for each such contract specify all contract information and processing information relevant to those contracts and the dredging activities,

PAGE 9

SEALED PORTION

PAGE 10

SEALED PORTION

TDM's discussions with counsel for the US in an attempt to resolve this issue procured no result as counsel for the US responded that she should "not act as a paralegal for TDM". (*See* Adler Dec.,¶ 5). This glib response evinces the US' bad faith because, as explained above, its own witnesses were unable to agree as to the description and nature of the very same documents presented to them. Additionally, it is very clear that the US has this information, but refuses to furnish it to TDM.

Moreover, the US refuses to provide essential processing information requested by interrogatory 10; instead, the US responds that processing information relevant to those contracts is a request "best directed to the contractors." (*See* Adler Dec., Ex. 15). The US' attempt to shift the burden of providing responses onto the contractors is a position that has already been criticized by this Court early on. (*See* Adler Dec., Ex. 4). In the March 6, 2007, telephone conference the court stated that "I think this ought to be clear to everyone, but it's not a proper objection to say that Plaintiff should get the documents from the government. The sole question is whether Donjon has copies of the requested documents. It doesn't matter if somebody else has them too. If you have the documents, you need to produce them." (*See* Adler Dec., Ex. 4). The US should be held to the same standard.

The US' response to interrogatory no. 10 also included a list of contracts that the US represents as being a complete list of all contracts where dredged material was treated with an additive ("Attachment A"). (*See* Adler Dec., Ex. 15). However, a witness recently testified that Clean Earth Dredging Technologies, Inc. ("CEDTI") processed dredged material for contractors working on behalf of the US under three contracts never identified by the US. (*See* Adler Dec., Ex. 22). Those contracts included treatment or processing of dredged material for

---

information. That's what I mean by the protocol." (*See* Adler Dec., Snell Transcript, p. 62, Lines 12-16; pp. 63 Lines 22-25; p. 64, Lines 2-4; p. 65, Lines 2-7.)

the US Coast Guard, the US Naval Station Earle, and the United States Merchant Marines Academy. (*See* Adler. Dec., Ex. 22). These contracts were never identified by the US in any of its interrogatory responses. When TDM's counsel asked the US' counsel about this, Ms. Franklin responded that she would take it under advisement – nothing more has been forthcoming. (*See* Adler Dec., ¶ 7).

The US should be sanctioned for violating the Discovery Order by not completely and properly responding to interrogatory no. 10. It should, therefore, be established, pursuant to RCFC 37(a)(2)(A), that all contracts and documents identified by TDM as exhibits constitute the official US contracts, admissible in evidence. Likewise, as all contracts clearly have not been produced, it should be established that contracts do exist which provide for treatment or processing of all of the 133,143,631 cubic yards of dredged material listed as disposed "Upland" in the USACE website.

**4. <u>Interrogatory No. 20</u>**

Interrogatory no. 20 asks "To the extent not previously requested, identify, by bates numbers, all documents that constitute each of the contracts listed on Attachment A, any modifications thereto, all 35-day and/or 70-day submissions that correspond to the contracts and/or "binder" submissions, and/or all permits that contain descriptions of the process for the treatment of dredged material with an additive(s) for upland disposal." (*See* Adler Dec., Ex. 23). In its response to interrogatory no. 20 of plaintiff's third set or interrogatories, the US included Attachment D as a list that specified records from which answers may be derived or ascertained for each contract. (*See* Adler Dec., Ex. 24).

However, Attachment D includes a fifty-one page list of documents by bates range classified by contract number. Hundreds of documents were listed under each contract and

TDM's counsel expended much time and effort sorting through the US' production using this list to locate actual contracts. Instead, many of the documents identified by the US were, in fact, daily or quarterly assurance reports, daily weather reports, and transportation and placement logs. (*See* Adler Dec., Ex. 25). Moreover, the few contract documents that were located were the very same documents refuted by US witnesses. For example, Exhibit D listed documents with bates number ranges G0100611293-G0100611350 as being responsive to interrogatory 20 for contract no. DACW51-02-C-001. (*See* Adler Dec., Ex. 25). A cursory review of these documents will reveal that the entire range consists mostly of quality assurance reports and USACE transportation logs.[6] Clearly, the US engaged in an effort to divert TDM's attention by identifying irrelevant and unresponsive documents by representing them as being relevant to the contracts for which TDM sought an identification. TDM respectfully asks the Court to view these documents from TDM's perspective and determine whether any of these documents are useful for ascertaining a proper interrogatory response.

When TDM's counsel broached this topic in a recent telephone conversation with counsel for the US, she retorted that TDM was harassing her for sending an initial letter and a follow-up letter on this matter. (*See* Adler Dec., ¶ 6). TDM sent the August 13, 2007 and September 17, 2007 letters as a good faith attempt to resolve outstanding issues with the US and to avoid unnecessary motion practice as required by RCFC 34 and this Court's June 15, 2007 Order. However, the US was not receptive to such attempts, thereby compelling TDM to file the instant motion. Therefore, TDM is entitled to an order compelling the US pursuant to RCFC 37 (a)(2)(A) and (B) compelling the US to completely and properly respond to interrogatory 20.

[6] TDM has attached a fifty-seven page range of documents as an exemplar. In it's response the US lists hundreds of other similar documents but TDM has not attached them all here so as not to burden the Court.

5. **Interrogatory Nos. 23, 24, 25 and 26**

The US refuses to respond to these interrogatories on the ground that they exceed the number of interrogatories under RCFC 33(a).[7] (*See* Adler Dec., Ex. 24). The parties agreed upon forty (40) interrogatories to be served by each party. TDM disagrees with the arbitrary and self-serving numbering system employed by the US. TDM is entitled to full and complete answers to interrogatories 23 through 26.

TDM was willing to negotiate a reasonable compromise with the US even though the interrogatories generally requested updated information on the patents added in the amended complaint. In correspondence and telephone conversations between the parties, TDM offered to hear a US proposal to resolve this issue but any such attempts were met with snide remarks from the US' counsel. (*See* Adler Dec., ¶8, and Ex. 26). For example, in a recent telephone conversation with counsel for the US regarding this matter, the US' counsel snidely remarked that the proposal is that the US will choose any interrogatories it feels like choosing. (*See* Adler Dec., ¶ 8). This is clearly an indication of bad faith with a mocking undertone. TDM is entitled to an order compelling the US pursuant to RCFC 37 (a)(2)(A) and (B) to completely and properly respond to interrogatory 23, 24, 25 and 26.

---

[7] Interrogatory no 23 asks "To the extent not provided in previous responses and amended responses, please supplement responses to all interrogatories which refer to the "patents-in-suit" so that the response covers all patents-in-suit, including the '862 and '590 patents."

Interrogatory no. 24 asks "[f]or each contract that the US was or is a party to since 1997 for any dredging activity at any port, harbor and/or waterway, complete the chart below either confirming that the contractor is performing the referenced element of the patent claim for the '862 patent or describe the manner in which the particular dredging activity and/or processing activity is performed and how the activity differs from the referenced one."

Interrogatory no. 25 asks "[f]or each contract that the US was or is a party to since 1997 for any dredging activity at any port, harbor and/or waterway, complete the chart below either confirming that the contractor is performing the referenced element of the patent claim for the '590 patent or describe the manner in which the particular dredging activity and/or processing activity is performed and how the activity differs from the referenced one."

Interrogatory no. 26 asks the US "[i]dentify all documents used to respond to interrogatories 1-25 above.

PAGE 15

SEALED PORTION

Therefore, the US should be sanctioned pursuant to RCFC 37 (a)(2)(B). It should be established that the 133,143,631 cubic yards listed in the USACE website for dredged material disposed "Upland" is the total volume of treated dredged material for the years of 2000 to 2006. It should further be established that the 133,143,631 cubic yards of dredged material were treated in accordance with the methods of the contracts already produced in this litigation.

**D. The US' Continued Wholesale and Indiscriminatory Designation of Transcript <u>Testimony as Proprietary Without Any Justification</u>**

The protective order clearly states that a party designating transcript testimony under any one of the enumerated categories must specify which portions of testimony and which exhibits are protected. (*See* Adler Dec., Ex. 28, p. 9). Yet, at the outset of every deposition of a US witness, the US designated every single deposition transcript completely proprietary without specifying under which categories any testimony falls. This is exactly the situation this very Court expressed concern about in a February 6, 2007 telephone conference when it stated "[Y]ou can't unreasonably mark documents as proprietary as a ploy to prevent Plaintiff from reviewing them." (*See* Adler Dec., Ex. 2).

To date, no significant portions of these depositions were ever re-designated, despite TDM's repeated requests for the US to redesignate such transcripts.[8] The US acknowledges that it has yet to modify any of the previously designated transcripts and claims that it is working to review each transcript designation to determine which portions of the testimony may be redesignated. (*See* Adler Dec., Ex. 26). As shown from the listing below, the first deposition of Bryce Wisemiller was conducted over five (5) months ago and additional US witnesses were also deposed about four (5) months ago.

---

[8] The only transcript testimony ever re-designated by the US is the testimony cited in the instant motion and in TDM's April 23, 2007 motion to compel and/or for sanctions against the US.

| **Date** | **Deponent** |
|---|---|
| May 10, 2007 | Bryce Wisemiller |
| May 16, 2007 | Harold Hawkins |
| May 18, 2007 | Ella Snell |
| May 22, 2007 | Bryce Wisemiller |
| May 31, 2007 | John Bearse |
| June 6, 2007 | James Fields |
| July 10, 2007 | John Tavolaro |
| July 11, 2007 | Salvatore Didato |
| July 27, 2007 | Virginia Pankow |

TDM addressed this issue in its correspondence to the US. (*See* Adler Dec., Exs. 18 and 19). The US responded by stating that the wholesale designation is necessary because the examinations of US witnesses involved questions relating to processing methods used for treating dredged material, therefore it needs certain approvals from other parties to re-designate these deposition transcripts. (*See* Adler Dec., Ex. 26). Yet, those other parties already produced confidential and proprietary documents to TDM. Thus, the US' reasoning appears to be inconsistent with the actions of those third parties. Such action by the US is more easily explained as a maneuver to evade discovery. This is particularly true because the US also admits in its letter that "there are portions of the testimony that may not require protection." (*See* Adler Dec., Ex. 26).

The US should not be permitted to manipulate the protective order for the purpose of hampering TDM's prosecution of its case. Due to the US' wholesale proprietary designation of entire transcripts, TDM is unable to share pertinent information with its clients and other experts thereby delaying its preparation of its case. Moreover, to the extent that any third-party approvals were necessary for the US, it is clear that any such approvals could have been obtained months ago. Pointedly, the US fails to provide any reason why deposition testimony that does not concern other parties has not yet been redesignated.

When TDM's counsel discussed this issue with counsel for the US she asserted that, according to the US' interpretation of the Protective Order, TDM should have to review the transcripts and request that the US re-designate the portions it needs. (*See* Adler Dec., ¶ 9). This is a self-serving and inaccurate interpretation of the Protective Order. According to the Protective Order, the producing party bears the burden of specifying what testimony is designated protected information and must also state what category such testimony falls under warranting protection. (*See* Adler Dec., Ex. 28). The US blatantly disregarded the protocol set forth in the Protective Order by designating entire transcripts proprietary and it should not be permitted to further hamper TDM's ability to prepare for its case.

Based on the foregoing, TDM is entitled to an order compelling the US to comply with the Protective Order and properly re-designate transcript testimony within fourteen (14) days and/or an order re-designating the transcripts non-proprietary.

### E. The US' Attempt to Thwart TDM's <u>Designation of An Expert Witness</u>

On September 4, 2007, TDM sent an e-mail to counsel for the US attaching the curriculum vitae and an executed undertaking of Michael J. Chapman, Ph.D., Vice President of the Analysis Group. (*See* Adler Dec. Ex. 29). UTEX Holdings LLC ("UTEX"), TDM's parent company and TDM, retained the Analysis Group in November of 2005 to assist in TDM's administrative claim against the US. (*See* the Declaration Michael J. Chapman ("Chapman Dec." ¶2). Mr. Chapman and John J. Jarosz, a managing principal of the Analysis Group, worked on the matter for UTEX and TDM in 2005. (*See* Chapman Dec. ¶3 and the Declaration of John J. Jarosz ("Jarosz Dec.") ¶2). TDM sent the e-mail to inform the US that TDM intends to designate Mr. Chapman as an expert witness for this litigation.

Counsel for the US, by letter dated September 13, 2007, responded that there is a conflict with respect to Mr. Chapman serving as an expert for TDM because the Analysis Group was retained by the US in another totally unrelated case entitled the *Boeing Company v. United States of America,* Civil Action No. 00-705-C. (*See* Adler Dec., Ex. 30). Significantly, the US retained the Analysis Group for the *Boeing* case in or about April 2006 – five months after UTEX and TDM retained it. *(See* Jarosz Dec. ¶4). Mr. Jarosz is working on behalf of the US in the *Boeing* matter but Mr. Chapman has no involvement in it whatsoever. (*See* Jarosz Dec., ¶ 4 and Chapman Dec., ¶ 4). TDM attempted to discuss this issue with counsel for the US who replied that the US would be objecting to TDM's designation of Mr. Chapman as a witness based on this alleged conflict. (*See* Adler Dec., ¶5).[9]

Federal courts have held that where an expert witness does not receive confidential information from the party seeking such witness' disqualification, no conflict of interest exists. *See English Feedlot, Inc. v. Norden Laboratories, Inc.*, 833 F.Supp. 1498 (D. CO. 1993); *United States ex. rel. Cherry Hill Convalescence Center, Inc. v. Healthcare Rehab Systems, Inc.* 994 F.Supp. 244 (D. NJ. 1997); *Great Lakes Dredge & Dock Company v. Harnischfeger Corporation,* 734 F.Supp. 334 (N.D. Ill. 1990). The US has no basis for its objection because Mr. Chapman has no involvement in the *Boeing* case and Mr. Jarosz has not been involved in the present case since December 2005. (*See* Jarosz Dec., ¶ 4 and Chapman Dec., ¶ 4). The US has never disclosed any information -- confidential or otherwise -- to Mr. Chapman regarding the *Boeing* case. (*See* Jarosz Dec. ¶ 4 and Chapman Dec., ¶ 5).

If any conflict exists, the US waived same by hiring the Analysis Group initially, subsequent to UTEX's retention of Mr. Chapman. Moreover, Mr. Jarosz informed counsel for

---

[9] TDM should be entitled to additional time to serve expert reports commensurate with the time lost as a result of the US' machinations.

the US on the *Boeing* case that the Analysis Group has set up a separation wall so that employees who work on the TDM case do not work on the *Boeing* case and *vice versa*. (*See* Jarosz Dec. ¶ 5). Additionally, employees may not disclose information about each case to anyone. (*See* Jarosz Dec. ¶ 5). At the time that US counsel was so informed by Mr. Jarosz, counsel stated that there would be no problem with conflicts. (*See* Dec. Jarosz, ¶ 5). Therefore, the US should be estopped from asserting an objection now and, as a sanction, the US should be precluded from using the Analysis Group in the *Boeing* case.

"Courts have expressed concern that if experts are too easily subjected to disqualification, unscrupulous attorneys and clients may attempt to create an inexpensive relationship with potentially harmful experts solely to keep them from the opposing party." *See English Feedlot, Inc. v. Norden Laboratories, Inc.*, 833 F.Supp. 1498, 1499 (D. Co. 1993). If the US' acts of brinkmanship are not sanctioned, the US has only to hire a previously retained expert of another party to invalidate and interfere with a party's trial preparation.[10] Certainly, the US knew that TDM and UTEX hired Analysis Group for this matter when it, thereafter, hired Analysis Group on a separate matter. Not only do such tactics evince bad faith but the US' wrongful actions may rise to the level of tortuous interference with contractual relations. The right to pursue such claims is expressly reserved by UTEX and TDM.

Therefore, TDM requests an order overruling any objections the US may assert to TDM's designation of Michael Chapman as an expert witness. To the extent that this Court finds that a conflict exists and/or as a sanction, TDM requests an order precluding the US from designating the Analysis Group as an expert witness in *Boeing*.

---

[10] Thus, the natural order should be to disqualify Mr. Jarosz from serving as an expert witness.

## III. CONCLUSION

For the foregoing reasons, TDM's motion pursuant to RCFC 37 should be granted in its entirety. Plaintiff should be entitled to an order that: Therefore, this Court should:

(1) sanction the US pursuant to RCFC 37 (b)(2)(A) for failing to completely and properly respond to interrogatory nos. 10, 11, 12, 13, 15 and 16 and for failing to testify pursuant to RCFC 30(b)(1) and 30(b)(6) by ordering that (a) it is established for the purposes of this litigation that the total volume of treated dredged material for the years of 2000 to 2006 is 133,143,631 cubic yards consistent with the amount of dredged material disposed "Upland" listed in the United States Army Corp. of Engineers ("USACE") website, (b) it is established for purposes of this litigation that the 133,143,631 cubic yards were treated in accordance with the methods of the contracts already produced in this litigation, (c) it is established for the purposes of this litigation that the contract documents identified by the US in this litigation are actual US records and admissible in evidence;

(2) order that, pursuant to RCFC 37(a)(2) (A) and (B), the US be compelled to completely and properly respond to interrogatory nos. 20, 23, 24, 25 and 26;

(3) order that, pursuant to the February 16, 2007 Protective Order, the US re-designate all transcripts of US witnesses by October 30, 2007 or all such transcripts should be deemed non-proprietary and non-confidential;

(4) overrule the US' objections to Michael J. Chapman being designated by TDM as an expert witness; and

(5) award TDM its attorney's fees related to the instant motion pursuant to RCFC 37(a)(4)(A).

Respectfully submitted,

DAVIDOFF MALITO & HUTCHER LLP
*Attorneys for Plaintiff*

Dated: October 16, 2007

s/David Denenberg
David W. Denenberg
Michael A. Adler
605 Third Avenue – 34 Fl
New York, NY 10158
Tel: (212) 557-7200
Fax: (212) 286-1884

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2007, I served a true and accurate copy of the TDM'S MEMORANDUM OF LAW IN SUPPORT OF TDM'S PURSUANT TO RCFC 37 AGAINST THE US by using the Court's CM/ECF system so that a copy was sent to the following persons automatically via email:

Walter Wade Brown

Walter.Brown2@usdoj.gov

Walter W. Wade
US Department of Justice
Civil Division
1100 L Street, NW
Suite 1100
Washington, DC 20001

and on interested party Donjon Marine Company, Inc.'s counsel by using the Court's CM/ECF system so that a copy was sent to the following persons automatically via email as follows:

John Flaherty

jflaherty@mccarter.com

John Flaherty
McCarter & English LLP
265 Franklin Street
Boston, MA 02110

s/David W. Denenberg
David W. Denenberg