**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| TDM AMERICA, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant,<br><br>and<br><br>DONJON MARINE COMPANY, INC.,<br><br>Third-Party Defendant. | ) | No. 06-472 C<br><br>Judge Thomas C. Wheeler |

**THE UNITED STATES' OPPOSITION TO TDM'S MOTION PURSUANT TO RCFC 37 AGAINST THE US**

# TABLE OF CONTENTS

Page

Table of Authorities . . . . . iii

List of Exhibits . . . . . iv

Summary of Argument . . . . . 1

I. STATEMENT OF MATERIAL FACTS . . . . . 2

A. Timing of TDM's Motion . . . . . 2

B. Interrogatory Responses . . . . . 3

1. Interrogatory Nos. 15 and 16 . . . . . 3

2. Interrogatory No. 10 . . . . . 4

3. Interrogatory Nos. 11, 12, and 13 . . . . . 5

4. Interrogatory No. 20 . . . . . 6

5. Interrogatory Nos. 23-26 . . . . . 6

C. 30(b)(6) Deposition of Virginia Pankow . . . . . 7

D. TDM'S Requests For Re-designated Transcripts . . . . . 8

E. TDM's Designation of Michael J. Chapman, Ph.D. As An Expert Witness . . . . . 9

F. TDM's Efforts To Meet and Confer Regarding Discovery Issues . . . . . 9

II. ARGUMENT . . . . . 11

A. The US Has Properly Responsed To Each of TDM's Interrogatories . . . . . 11

1. Interrogatory Nos. 15 and 16 . . . . . 11

2. Interrogatory Nos. 11-13 . . . . . 14

3. Interrogatory No. 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

4. Interrogatory No. 20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

5. Interrogatory Nos. 23-26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

B. The Government Designated An Appropriate 30(b)(6) Witness . . . . . . . . . . . . . . . . 20

C. The Government's Actions Regarding The Re-designation Of Its Deposition Transcripts Have Been Appropriate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

D. The Government Did Not Object To TDM's Expert Designation, But Raised Valid Concerns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

E. Sanctions Are Not Warranted Against The Government . . . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

# TABLE OF AUTHORITIES

## CASES

Pages

*Boeing Co. v. United States*,
CFC No. 00-705 . . . . . . . . . . . . 22, 25

*English Feedlot, Inc. v. Norden Labs., Inc.*,
833 F. Supp. 1498 (D. Col. 1993) . . . . . . . . . . . . 24

*Great Lakes Dredge & Dock, Co. v. Harnishfeger Corp.*,
734 F. Supp. 334 (N.D. Ill. 1990) . . . . . . . . . . . . 24

*United Medical Supply Co., Inc. v. United States*,
77 Fed. Cl. 257 (2007) . . . . . . . . . . . . 26

*United States ex rel. Cherry Hill Convalescent Ctr. v. Healthcare Rehab Systems, Inc.*,
994 F. Supp. 244 (D. N.J. 1997) . . . . . . . . . . . . 24

## STATUTES

28 U.S.C. § 1491 . . . . . . . . . . . . 25

33 U.S.C. § 540 . . . . . . . . . . . . 15

35 U.S.C. § 286 . . . . . . . . . . . . 3

## OTHER AUTHORITIES

RCFC 26 . . . . . . . . . . . . 1, 14

RCFC 30(b)(6) . . . . . . . . . . . . 2, 7, 20

RCFC 33 . . . . . . . . . . . . 7, 11, 19

RCFC 37 . . . . . . . . . . . . 1, 11, 24

RCFC 37(b)(2) . . . . . . . . . . . . 13

## LIST OF EXHIBITS

Page

Exhibit 1-ECF Notification dated October 16, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1

Exhibit 2-Letter from Walter W. Brown dated October 16, 2007 . . . . . . . . . . . . . . . . . . . . . . . . A3

Exhibit 3-Attachment B to Government's Responses to TDM's Interrogatories . . . . . . . . . . . A11

Exhibit 4-Letter from Walter W. Brown dated November 1, 2007. . . . . . . . . . . . . . . . . . . . . A132

Exhibit 5-Letter from Erica A. Franklin dated August 15, 2007. . . . . . . . . . . . . . . . . . . . . . A134

Exhibit 6-Transcript from deposition of Virginia R. Pankow on July 27, 2007. . . . . . . . . . . .A138

Exhibit 7-Letter from Walter W. Brown dated November 2, 2007. . . . . . . . . . . . . . . . . . . . . A151

Exhibit 8-Transcript Excerpts from deposition of Ella Snell on May 18, 2007. . . . . . . . . . . A155

Exhibit 9-U.S. Navy memorandum regarding maintenance dredging at U.S. Merchant Marine Academy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A177

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

TDM AMERICA, LLC,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant,

and

DONJON MARINE COMPANY, INC.,

Third-Party Defendant.

No. 06-472 C

Judge Thomas C. Wheeler

**THE UNITED STATES' OPPOSITION TO TDM'S**
**<u>MOTION PURSUANT TO RCFC 37 AGAINST THE US</u>**

Pursuant to RCFC 26, the United States ("the government") hereby opposes plaintiff TDM America, LLC's ("TDM's") Motion Pursuant To RCFC 37 Against The US, which seeks sanctions and other relief for a variety of ongoing discovery disputes. In accordance with the Court's order of November 1, 2007, this brief is timely filed.

**<u>Summary of Argument</u>**

TDM's motion should be denied in full because the government's responses to TDM's discovery were proper when made and because its motion addresses issues for which TDM did not properly meet and confer. Most notably, present government counsel sent TDM a letter responding to TDM's demands relating to several of the issues addressed in the present motion, but TDM nonetheless filed the present motion a few hours after receiving that response, and

apparently without any consideration of the Government's response. More generally, TDM's motion cobbles together an amalgam of alleged discovery issues without demonstrating that it ever properly met and conferred with past or present government counsel on the disputed topics.

Instead, TDM chose to occupy the Court's time and resources with its broad-sweeping complaints regarding the government's (1) interrogatory responses, (2) designation of a 30(b)(6) witness, (3) efforts to re-designate deposition transcripts, and (4) concerns about TDM's designation of an expert witness. A review of the written record clearly shows the government's actions were proper with regard to all issues raised in TDM's motion. Accordingly, the Court should deny TDM's motion to compel in its entirety as well as its uncalled for requests for sanctions.

## I. STATEMENT OF MATERIAL FACTS

### A. Timing of TDM's Motion

TDM states that it brought the present motion to address "several discovery issues" that were "not resolved despite TDM's efforts." TDM's Memorandum In Support of TDM's Motion ("TDM Mem.") at 3. Based on this Court's electronic filing notifications, TDM counsel began filing the present motion around 8:00 PM on October 16, 2007, roughly twelve hours prior to a status conference with the Court the following morning. Defendant's Exhibit ("Def's Ex.") 1 at A2. The filing of this motion, however, was preceded by a letter from present government counsel ("government's October 16th letter"), which was faxed and e-mailed to TDM counsel Michael A. Adler around 4:30 PM the same day. Def's Ex. 2. This letter addressed numerous discovery issues presented in a previous letter to past government counsel, including many of the issues presented in the present motion. Nevertheless, the government's October 16th letter is not

discussed, mentioned, or even attached to the present motion. To date, TDM counsel has not responded to this letter.

### B. Interrogatory Responses

The bulk of TDM's motion relates to what it contends are improper government responses to TDM's Interrogatory Nos. 10-16, 20, and 23-26. TDM Mem. at 5-14. Each of these responses is discussed below.

#### 1. Interrogatory Nos. 15 and 16

Interrogatory No. 15 requests the (1) total volume of "dredging activities and treatment of dredged material" and (2) the amounts paid by the government for this work since 1997. Pl's Ex. 7 at 5. In slight contrast, Interrogatory No. 16 is directed only to (1) the total volume of "treated dredged material disposed upland or beneficially reused in the United States" and (2) the amount paid for the government for this work. Pl's Ex. 7 at 7.

In its March 23, 2007, responses, the government specifically objected to Interrogatory No. 15 as overly broad, in that it was directed to "dredging activity," whereas the patents-in-suit relate to "the treatment and processing of dredged and waste materials" and do not claim methods for dredging itself. Pl's Ex. 7 at 6. Accordingly, the government limited its response to activities in USACE districts with contracts involving the treatment of dredged materials since 2000.[1] *Id.*

The government also objected to Interrogatory No. 16 because total amounts paid for and total volumes of treated and disposed dredged material are not separately identified from the

---

1 The government has limited all of its interrogatory responses to activities since 2000 because any cause of action TDM may have, it at all, can only relate to activities occurring six years or less prior to the filing of their complaint. 35 U.S.C. § 286.

overall dredging activities in many USACE contracts. Pl's Ex. 7 at 7. Likewise, the government responded that "the USACE has not paid for 'treated dredged material disposed upland or beneficially reused in the United States.' Rather, the USACE has paid for disposal of dredged material which sometimes required treatment/processing for disposal upland or for beneficial reuse." *Id.* at 8.

For both Interrogatory Nos. 15 and 16, the government answered that responsive information could be ascertained (1) from business records it was then in the process of producing and (2) from then-available materials that were attached as Attachment B. *Id.* at 7-8. Attachment B is attached as Defendant's Exhibit 3. TDM's motion, however, barely mentions this attachment. TDM Mem. at 6-7.

**2. Interrogatory No. 10**

Interrogatory No. 10 calls for the government to identify "each and every" contract and contractor for dredging activities and to specify "all contract information and processing information relevant to those contracts . . . ." Pl's Ex. 15 at 17. As with Interrogatory Nos. 15 and 16, the government limited its response to "contracts involving treatment or processing of dredged material and for which the USACE was a party since 2000." *Id.* at 19.[2] In its amended responses, served May 30, 2007, the government provided Revised Attachment A, which lists 20 contracts from three USACE districts. Pl's Ex. 15.

Since the government's amended responses were served, a third-party witness testified on September 10, 2007, that contractor/subcontractor Clean Earth Dredging Technologies, Inc.

2 The government limited its responses to the USACE because TDM's "Complaint contains averments only as to the activities of the" USACE "and only to activity involving harbor dredging materials." Pl's Ex. 15 at 4.

("CEDTI") processed dredged material under three contracts with the U.S. Coast Guard, the U.S. Naval Station Earle, and the United States Merchant Marine Academy respectively. Pl's Ex. 22. Since the filing of TDM's motion, the government provided responsive documents relating to these recently discovered contracts on November 1, 2007. Def's Ex. 4.

Nevertheless, no discovery or government investigation has indicated that any other USACE contract since 2000 involves the processing or treatment of dredged material. In this respect, the government maintains that the amended responses, which were signed by USACE counsel Daniel Inkelas, were accurate as to the USACE. Pl's Ex. 15 at 25.

**3. Interrogatory Nos. 11, 12, and 13**

Interrogatory Nos. 11-13 request additional information on the contracts and contractors sought in response to Interrogatory No. 10. Pl's Ex. 15 at 19-22. Interrogatory No. 11 calls for "all processes and methods utilized by each of the respective contractors" identified in response to Interrogatory No. 10 as well as the documents that describe them. *Id.* at 19. In response, the government states that relevant documents, insofar as they are in its possession, have been provided to TDM. *Id.* at 20. The response further states that "[t]o the extent that the requested information is not in the possession of the Government, such request is best directed to the contractors" identified in response to Interrogatory No. 10. *Id.*

Interrogatory Nos. 12 and 13 call for the government to describe the processes used in its dredging contracts and to describe those processes in relation to specific patent claims of TDM's U.S. Patent Nos. 6,293,731 B1 ("the '731 patent") and 5,542,614 ("the '614 patent") respectively. The government responded to both interrogatories by directing TDM to its response to Interrogatory No. 2. *Id.* at 21-23. In that response, the government presents its

noninfringement contentions with regard to the '731 and '614 patents. *Id.* at 7-8. The response also explains that (1) "[t]he remediation processes at issue in this case are performed by contractors (or subcontractors) of the USACE," and (2) "[t]he USACE generally does not direct nor control what processes [are] used by its contractors." *Id.* at 8. Thus, with regard to government knowledge of the processes, the response further explains that:

> The knowledge of the USACE is based on the casual observations of its employees in the ordinary course of their duties and upon review of documents supplied to USACE by the contractors. Those observations and documents are not directed to specific details of the processes used, but to other matters, such as insuring that the contractor is performing in accordance with the contract terms. As a result, the knowledge of USACE employees is incomplete.

*Id.*

**4. Interrogatory No. 20**

Interrogatory No. 20 asks the government "to identify, by bates numbers, all documents that constitute each contract listed on Attachment A, any modifications thereto, all 35-day and/or 70-day submissions . . . and or all permits that contain descriptions of the process for the treatment of dredged material . . . ." Pl's Ex. 24 at 11. In response, the government included Attachment D, which identified, from over 150,000 pages of government production documents, lists of Bates ranges for each identified contract.3 Pl's Ex. 24.

**5. Interrogatory Nos. 23-26**

Interrogatory No. 23 calls for the government to supplement all of its previous responses "to all interrogatories which refer to the patents-in-suit" such that the responses cover two additional TDM patents, U.S. Patent Nos. 5,794,862 ("the '862 patent) and 5,007,590 ("the '590 patent"). Pl's Ex. 24 at 15. As with Nos. 12 and 13, Interrogatory Nos. 24 and 25 call for the

government to describe the processes used in the performance of dredging contracts in relation to specific patent claims of the '862 and '590 patents. *Id.* at 15-16. Finally, Interrogatory No. 26 asks the government to "[i]dentify all documents used to respond to interrogatories 1-25 above." *Id.* at 17.

The government declined to answer Interrogatory Nos. 23-26 because they exceeded the twenty-five interrogatories permitted by RCFC 33(a). Counting the subparts added by these additional interrogatories, (in asking for responses to either all other interrogatories or all 20 identified contracts) the government believes that TDM's interrogatories total 123 in number. *Id.* at 17. Nonetheless, past government counsel expressed the government's willingness to discuss this issue further. Def's Ex. 5. In his October 16th letter, present government counsel offered a framework for reaching a compromise on the issue. Def's Ex. 2 at A7.

**C. 30(b)(6) Deposition of Virginia Pankow**

Additionally, TDM's motion addresses the 30(b)(6) deposition of government witness Virginia Pankow, taken July 27, 2007. Ms. Pankow testified on behalf of the government regarding two of the fifty-nine categories contained within TDM's Second Amended Notice of Rule 30(b)(6) Deposition With Document Demand. Pl's Ex. 27; Def's Ex. 6 at A142 (pp. 10-11). Specifically, Pankow testified regarding Category Nos. 35 and 37:

> 35. Summaries showing quantities and qualities of dredging activities for each region and/or district within that region;
>
> 37. USACE websites and other documents that contain summaries of dredging activities and/or projected dredging amounts.

Pl's Ex. 27 at 3; Def's Ex. 6 at A142 (pp. 10-11).

---

3 In contrast, TDM has produced roughly 9,000 pages of production.

Ms. Pankow is employed with the USACE headquarters and her duties include management of the USACE dredging information system. Def's Ex. 6 at A140-41 (pp. 5-8). Ms. Pankow testified that the published database is updated once a year and is based on data that is entered by each separate USACE district, which in turn collects its data from "the project manager or from contracts or from someone in their division." *Id.* at A144 (pp. 20-21). As such, the database is only as accurate as the accuracy of the data actually entered by the persons in each district. *Id.* at A148-49 (pp. 36, 41). Pankow also testified regarding the limitations in the information provided by the database, including the fact that the volume numbers provided for the Upland Disposal category do not distinguish between treated/processed and untreated/unprocessed dredged material. *Id.* at A149 (pp. 40-41). Thus, the USACE database provides no specific information on volumes relating to the processing or treatment of dredged material. *Id.* at A149 (p. 41).

**D. TDM'S Requests For Re-designated Transcripts**

TDM's motion also addresses its informal request for the government to essentially re-designate all deposition transcripts of government witnesses, which had been marked Proprietary under the Stipulated Protective Order. TDM has not identified particular portions of transcripts or even prioritized among the nine requested transcripts, despite government counsel's requests that TDM do so. Ex. 5 at A35-36; Def's Ex. 2. Nonetheless, government counsel has consistently represented that it will endeavor to re-designate all non-proprietary portions of these transcripts on a rolling basis. *Id.* On November 2, 2007, government counsel waived all Proprietary designations for the depositions of John Bearce and Virginia Pankow and again indicated its intentions to re-designate non-proprietary portions of the remaining transcripts.

Def's Ex. 7.

**E. TDM's Designation of Michael J. Chapman, Ph.D. As An Expert Witness**

TDM's motion also raises an alleged government objection to TDM's designation of Michael J. Chapman as an expert witness. TDM informed the government of its retention of Mr. Chapman in an e-mail dated September 4, 2007. Pl's Ex. 29. In a letter dated September 13, 2007, the government responded unequivocally that it did not object to the disclosure of proprietary information to Mr. Chapman under the protective order. Pl's Ex. 30. However, the government "asserted that there is a conflict with respect to Mr. Chapman serving as an expert for TDM" because John C. Jarosz, the managing partner of The Analysis Group, Mr. Chapman's employer, is serving as the government's expert in another case. *Id.* Government counsel at that time, Erica A. Franklin, invited TDM to discuss the issue further. *Id.* No further discussions regarding Mr. Chapman are memorialized in writing, except for the assertion in the Adler Declaration that Ms. Franklin orally objected to Mr. Chapman in a telephone conversation. Adler Dec. at ¶10. TDM's attorneys have never discussed this alleged objection, orally or in writing, with present government counsel.

**F. TDM's Efforts To Meet and Confer Regarding Discovery Issues**

TDM summarizes its meet and confer efforts prior in the Declaration of Michael A. Adler, Esq., who is one of TDM's attorneys and senior counsel with the law firm of Davidoff, Malito & Hutcher LLP. Mr. Adler declares that he "conferred in good faith with the United States of America (the "US") in an effort to resolve the issues raised in the accompanying motion, to secure the discovery responses and disclosures without court action, but was unable to do so." Adler Dec. at ¶4. Mr. Adler's declaration further describes a number of communications

with previous government counsel Erica A. Franklin, Esq. during August and September of this year. Adler Dec. at ¶¶5-10.

Other than references to TDM counsel's August 13th and September 17th letters, Pl's Exs. 18-19, the declaration only references conversations between Mr. Adler and Ms. Franklin. *Id.* In particular, Mr. Adler's declaration includes various representations of statements allegedly made by Ms. Franklin in conversations with TDM counsel. *Id.* These communications were not memorialized contemporaneously and apparently are only recorded in Mr. Adler's declaration. Mr. Adler's declaration does not refer to any communications with present counsel, Walter W. Brown. Nevertheless, Mr. Brown did confer with Mr. Adler shortly after the government's October 16th letter. Mr. Adler and Mr. Brown discussed extending various discovery dates, in view of the status conference scheduled for the following morning. Mr. Adler, however, did not mention the motion to compel that TDM would file later that evening.

Likewise, Mr. Adler's declaration does not reference or include Ms. Franklin's August 15th letter, which responded to TDM's August 13th letter. Def's Ex. 5. Ms. Franklin's letter addressed several issues that are the subject of the present motion and indicated the government's willingness to work with TDM on them. In particular, the government noted that "the Government is diligently working to review each transcript designation . . . . In most instances, this requires the assistance and approval of the contractor or subcontractor for which the information relates." *Id.* at A135. Likewise, with regard to unanswered interrogatories, the government expressed willingness to discuss TDM's "preference for which additional interrogatories the United States should respond." *Id.* at A136.

## II. ARGUMENT

In its motion, TDM addresses a litany of matters that are subject of ongoing discovery. For the reasons stated below, there are no factual or legal bases for TDM's present motion and, accordingly, TDM's requests for sanctions are baseless and without merit. Further, TDM did not properly meet and confer with the government as required by RCFC 37(a). Accordingly, the Court should deny TDM's motion in its entirety.

### A. The US Has Properly Responded To Each Of TDM's Interrogatories.

As discussed herein, the government has submitted proper responses to TDM's Interrogatories, Nos. 10-13, 15-16, 20, and 23-26, as required by RCFC 33.

#### 1. Interrogatory Nos. 15 and 16

With regard to the government's responses to Interrogatory Nos. 15 and 16, TDM complains that the (1) total volumes of dredged material treated on behalf of the US and (2) the amounts paid for treated dredge material cannot be ascertained from the government's response. TDM Mem. at 5. Nonetheless, TDM acknowledges that the government has identified relevant contracts by number and provided "certain payment estimates" in Attachment B. *Id.*

As noted in its objections to Interrogatory No. 16, the government does not always possess information on the total volumes and amounts of *treated* dredged materials for particular USACE contracts. Pl's Ex. 7 at 7. Rather, under these types of contracts, the USACE pays for the disposal of dredged material, which *may or may not* require treatment for upland disposal or for beneficial reuse. Pl's Ex. 7 at 7. Thus, what TDM seeks to compel – information specific to all volumes of and amounts paid for treated dredged material – is unlikely to be in the government's possession. The government has indicated the same in its response to the

interrogatory. TDM has failed to demonstrate that this response in inaccurate or untrue.

In the same vein, no USACE contract-at-issue involves dredging activities conducted by the government itself. Instead, contractors and subcontractors perform this work on behalf of the government. Therefore, contractors and subcontractors to these contracts certainly have more information regarding processing activities and volumes than the government. *See* Pl's Ex. 15 at 8. Even though TDM has taken extensive document and deposition discovery of the various contractors and subcontractors to the USACE contracts-at-issue, TDM's motion does not discuss what evidence it has obtained from third parties that is relevant to these interrogatories.

Likewise, TDM's motion barely mentions the evidence the government did provide. Attachment B, submitted in response to both interrogatories, is a collection of documents that was attached to the government responses for both Interrogatory Nos. 15 and 16. Def's Ex. 3. Totaling roughly 130 pages, the attachment contains signed Payment Estimates for identified contracts, along with relevant official contract modifications and technical specifications. *Id.*

TDM's motion, however, does not address the details of these documents, nor why they are not sufficient. Ironically, TDM demands, in part, that the government should have "specifically referenced documents from which a response could be derived . . . ." TDM Mem. at 6. This is what the government attempted to do in offering Attachment B. TDM has chosen not to address the Government's response in the present motion. Likewise, in response to TDM Interrogatory No. 20, the government identified (within its over 150,000 page production) the documents constituting the USACE contracts, but TDM now asserts that the identified documents are too voluminous. TDM Mem. at 12-13.

TDM instead relies on select portions of fact depositions that were taken of three

government witnesses: Ella Snell, Bryce Wisemiller, and Harold Hawkins. As USACE employees, their names (and signatures) appear often on the Attachment B documents. TDM Mem. at 6. Specifically, TDM asserts that the witnesses "testified that final volume amounts of dredged materials and other documents that derive from an electronic financial system maintained by USACE contain more accurate information than the pay estimates provided." *Id.*

Though TDM did mention at various points in the depositions, that it wanted documents relevant to this system produced (if they had not been already), Pl's Ex. 8 at 22, present counsel is unaware that TDM raised this issue in any later written correspondence. *See, e.g.*, Pl's Exs. 18-19. Accordingly, present counsel has not investigated whether these documents have been produced within the over 150,000 pages of government documents. However, the government will endeavor to produce responsive documents if they have not been produced already.

Nevertheless, it is important to note that Ella Snell testified that the electronic system allows the contracting personnel to electronically generate a "final pay estimate," which relates to the same estimates the witnesses testified about and that are included in Attachment B. Pl's Ex. 8 at 21-22; Def's Ex. 8 at A174-75. Also, the citations to the Wisemiller and Hawkins depositions do not appear to reference an electronic system. Pl's Ex. 9 at 24-25, 67-68; Pl's Ex. 10 at 272.

Finally, TDM requests that, pursuant to RCFC 37(b)(2), the United States be sanctioned by a stipulation that the total volume of dredged material for 2000-2006 be deemed consistent with the amount of upland disposal indicated on the USACE website. For the reasons stated, the government has properly responded to Interrogatory Nos. 15 and 16. And, in addition to lacking underlying factual grounds, TDM cites no legal authority for such a stipulation. The relative

merits of the volume numbers on the USACE website are nonetheless discussed, *infra* Section II.B, with regard to Ms. Pankow's deposition.

**2. Interrogatory Nos. 11-13**

TDM Interrogatory Nos. 11, 12, and 13 request additional processing information for contracts involving dredged materials that were identified in response to Interrogatory No. 10. TDM argues that the government's responses to these interrogatories improperly direct TDM to government production documents. TDM Mem. at 7-8. TDM further complains that the government has not "referred to any particular documents or any one document from which a response can be ascertained." *Id.* at 7.

Each of the government's responses, however, point out that such a request is best directed to the identified contractors, who actually conducted the treatment of dredged materials. Pl's Ex. 15 at 7-8, 20-23. The government explained in its responses that the USACE employees do not have knowledge of the "specific details of the processes used" and have made only "casual observations" based on their duties and documents provided by contractors. *Id.* at 8. Subsequent depositions of USACE employees have reiterated this point. *See, e.g.,* Ex. 8 at A165-66. Contrary to TDM's assertions, however, the government has nonetheless conducted a search and produced all responsive documents in accordance with the Court's instructions and RCFC 26. TDM Mem. at 8.[4]

Moreover, Interrogatory Nos. 12 and 13 are essentially contention interrogatories, which call on the government to describe dredging treatment processes in detail in relation to specific patent claims. While the government has provided such positions in response to Interrogatory

---

4 These arguments apply with equal force to similar assertions by TDM with regard to

No. 2, TDM is essentially seeking the details of the government's infringement positions prior to the close of fact discovery and any *Markman* proceedings. Thus, in view of all these arguments, the government has properly responded to these interrogatories and TDM's requests for sanctions should be denied.

**3. Interrogatory No. 10**

Interrogatory No. 10 calls for the government to identify "each and every" contract and contractor for dredging activities and to specify "all contract information and processing information relevant to those contracts . . . ." Pl's Ex. 15 at 17. TDM asserts that the government has both improperly (1) identified every relevant contract and (2) specified contract and processing information.

With regard to the former assertion, the government's responses, served on May 30, 2007, identified 20 USACE contracts from three USACE districts. Pl's Ex. 15 (Revised Attachment A). The responses were signed by counsel for the USACE. *Id.* at 25. At that time, the focus of discovery had been on the role of the USACE in the processing of dredged materials, given that it is the federal agency with chief responsibility for federal dredging under the Rivers and Harbors Act, 33 U.S.C. § 540. Likewise, TDM's Complaint only references activities of the USACE. Docket No. 37 at ¶22.

However, on September 10, 2007, a third-party contractor witness from CEDTI identified apparent dredge processing activities involving the U.S. Coast Guard, U.S. Navy, and U.S. Merchant Marine Academy. Pl's Ex. 22. As TDM's motion indicates, past government counsel took the matter under advisement and investigated these contracts. TDM Mem. at 12. Present

---

Interrogatory No. 10. TDM Mem. at 11.

counsel further pursued the matter and in the October 16th letter indicated that "the government is now endeavoring to produce the relevant documents relating to these contracts." Def's Ex 2 at A8. On November 1, 2007, the government, as promised, produced documents collected from the U.S. Coast Guard and U.S. Navy.[5] Def's Ex. 4. As these documents have become recently available, the government is now endeavoring to evaluate their substance and, if necessary, amend its response to Interrogatory No. 10. Contrary to TDM's assertions, the government has never refused to identify federal contracts involving the processing of dredged material. TDM Mem. at 9.

With regard to contract and processing information, TDM appears to assert that the government has failed to meet its discovery obligations because "the US' own witnesses were unable to confirm whether or not the documents provided by the US to TDM were the actual contracts." TDM Mem. at 9. TDM specifically cites isolated portions of the deposition transcripts of four government fact witnesses: Ella Snell, Harold Hawkins, Bryce Wisemiller, and Salvatore Didato. *Id.*

With regard to Ms. Snell, TDM complains that she did not know (1) details of the dredging activities under the New York District contracts or (2) "final payment amounts." *Id.* It is not surprising that Ms. Snell did not know the details of the dredging activities or payment amounts. As Chief of the Contracting Division, she was responsible for awarding contracts at issue, but was only aware of dredge processing activities "to a limited extent." Ex. 8 at A158-59, A163-64. Likewise, after a contract is awarded, Ms. Snell is only involved to a limited extent in

5 Although the government has not yet produced documents from the U.S. Merchant Marine Academy, certain produced Navy documents appear to reference the Merchant Marine contract-at-issue. Def's Ex. 9.

contract payments, until the final payment. *Id.* at A159-62.

TDM further argues that Ms. Snell testified that the individuals with "actual knowledge" were contract officers and assistant contract officers. TDM Mem. at 9. In fact, Ms. Snell explained that the contract office representative (COR) and administrative contracting officer (ACO) managed a contract after it is awarded. She could not recall every ACO and COR for every contract. *Id.* at A167-68.[6] While TDM asserts that the "contracting officers and assistant contracting officers" have never been identified, present counsel is unaware of any request by TDM to depose these individuals. TDM Mem. at 10.

TDM admits that Mr. Hawkins identified relevant contract documents, but complains that Bryce Wisemiller could only testify that such documents appear to be contracts and did so "to avoid providing TDM with a clear response." TDM Mem. at 10. TDM has no basis, however, for asserting that Mr. Wisemiller was not giving his full recollection of documents, given that, as a fact witness, he was unaware of what documents he would be shown.[7] TDM counsel, in fact, never asked Mr. Wisemiller to clarify these innocuous statements. Pl's Ex. 10 at 243, 253, 290, 293, 299, 305. It is also ironic that TDM would make these suggestions, given that Mr. Wisemiller is the only government witness to be deposed on multiple days. In any event, these arguments are far removed from any issues relating to the government's interrogatory responses.

With regard to Mr. Didato, TDM asserts that he testified that some of the Hawkins and

6 Footnote 5 in TDM's Memorandum is misleading in asserting that "Ms. Snell was not forthcoming with information." Ms. Snell, in fact, explained that she did not know how she would ascertain information in the context of litigation request as opposed to other protocols like FOIA requests. Ex. 8 at A169-71. Rather than clarify his questions on that point, TDM counsel moved on to other topics. *Id.* at A172-73. The suggestion that a government witness withheld nonprivileged information is not well taken.

7 Again, the suggestion that a government witness withheld information is not well taken.

Wisemiller exhibits were "incomplete contracts." TDM Mem. at 10. In fact, Mr. Didato on several occasions explained that he was given complete sections of some contracts, but other parts were missing. Pl's Ex. 21 at 90, 97. Given the length of the contract documents for a multi-million dollar federal dredging project, it is not surprising that Mr. Didato found that sections were missing from a particular deposition exhibit. These arguments also are far removed from any issues relating to the government's interrogatory responses.

Accordingly, the government's responses to Interrogatory No. 10 should be deemed proper, based on presently available knowledge, and the government's representation that it will amend its response, if necessary. Likewise, TDM's request for sanctions should be denied.

**4. Interrogatory No. 20**

Similar to the issues raised with regard to No. 10, Interrogatory No. 20 essentially calls for the government to identify by Bates numbers all documents that constitute the contracts at issue. Pl's Ex. 24 at 11. The government responded by identifying ranges corresponding to each identified contract in Attachment D within its over 150,000 pages of produced documents. Pl's Ex. 24.

TDM, however, complains that "[h]undreds of documents" were listed under each contract and included documents such as "daily or quarterly assurance reports, daily weather reports, and transportation and placement logs." TDM Mem. at 13. TDM then references several interactions with past government counsel, mostly alleged oral communications, but does not address any efforts to discuss the issue with present government counsel.

Nevertheless, the government's October 16th letter addressed this issue. Present counsel explained that TDM's request itself highlights the fact that identification of all documents in the

"official" file of a multi-million dollar dredging contract require the production of hundreds (if not thousands) of documents. Def's Ex. 2 at A6.

Thus, the government properly responded to TDM's request, as it is written. TDM's request that the government be sanctioned "to completely and properly respond to interrogatory [No.] 20" is similarly misplaced.

**5. Interrogatory Nos. 23-26**

The government refused to respond to these interrogatories because they exceeded the number permitted under RCFC 33(a). Though the parties had agreed to increase the number of interrogatories to 40,[8] the government contends that these interrogatories, counting subparts, increase TDM's total interrogatories to 123, in that these requests call for (1) supplementation of all previous requests or (2) addressing each identified USACE contract-at-issue. Def's Ex. 5.

In its motion, TDM indicates its willingness to consider a "reasonable compromise." TDM Mem. at 14.[9] Though not considered by TDM prior to its motion, the government offered the framework for such a compromise in its October 16th letter. Specifically, the government stated that it:

> would discuss an arrangement with TDM that would narrow the scope of (1) Interrogatory Nos. 23 and 26, which call for the government to supplement all other interrogatories, and (2) Interrogatory Nos. 24 and 25, which call for extensive information on 'each contract that the US was or is a party to since 1997, for any dredging activity at any port, harbor and/or waterway.

Def's Ex. 2 at A7. The government remains willing to discuss this issue further.

---

8 Present counsel mistakenly disavowed this agreement in his October 16th letter. Nevertheless, the October 16th letter responds to the request for a compromise solution that TDM requests in the present motion.

9 Despite TDM's discussion of alleged phone calls with Erica Franklin, Ms. Franklin's written communications also indicate her willingness to discuss the issue. Def's Ex. 5.

### B. The Government Designated An Appropriate 30(b)(6) Witness.

TDM's motion also concerns the government's designation of Virginia Pankow to address two topics of a TDM 30(b)(6) notice. Specifically, Ms. Pankow testified with regard Category Nos. 35 and 37:

> 35. Summaries showing quantities and qualities of dredging activities for each region and/or district within that region;
>
> 37. USACE websites and other documents that contain summaries of dredging activities and/or projected dredging amounts.

Pl's Ex. 27 at 3; Def's Ex. 6 at A142 (pp. 10-11).

Ms. Pankow could and did address these topics. In her duties at USACE headquarters, she manages the USACE dredging information system, which summarizes dredging data, including summaries on the USACE website. Def's Ex. 6 at A142 (pp. 10-11). Ms. Pankow explained how the data system was maintained, but also explained how the collection is assembled from data entered by each individual USACE district. *Id.* at A144 (pp. 20-21). Accordingly, she could not address detailed questions about the original source of volume numbers that are compiled on the USACE website. *See, e.g., id.* at A144-45 (pp. 21-22).

TDM argues that Ms. Pankow is an insufficient witness because she could not address the disparity between the volumes of "Upland" disposal reported on the USACE website and the volumes of treated dredge material indicated in the identified USACE contracts at issue. TDM Mem. at 15. TDM, in turn, has discussed this issue with past and present government counsel. In the October 16th letter and in phone conferences, the government has indicated that it would discuss other witnesses on these topics with TDM. At present, the government believes that the most feasible solution would be depositions of government employees at each individual district.

There does not appear to be one witness who can address the details of the volume numbers for the entire USACE.

Nevertheless, Ms. Pankow has also testified about the limitations implicit in the database numbers for upland disposal. As TDM acknowledges, not all dredged material that is subject to upland disposal is processed, which is the subject matter of the patents-in-suit. TDM Mem. at 15. Ms. Pankow, however, noted that the USACE system does not provide volume information that is specific to the processing of dredged material. Ex. 6 at A149 (p. 41).

In view of the facts surrounding Ms. Pankow's testimony and the government's willingness to discuss the issue further, the government's response should be deemed proper and TDM's requests for sanctions should be denied.

### C. The Government's Actions Regarding The Re-designation Of Its Deposition Transcripts Have Been Appropriate.

TDM also asserts that the government's designation of deposition transcripts as proprietary under the protective order has been improper. TDM Mem. at 16. TDM has requested the re-designation of all government deposition transcripts, but refuses to prioritize among transcripts or even specify sections of individual transcripts for re-designation. Def's Ex. 2.

The government has consistently represented that it would de-designate nonproprietary portions of its transcripts, but also explained that this required the agreement of nonparty contractors, from whom virtually all of the government's proprietary information originates. Pl's Ex. 5. The government's October 16th letter indicated that it would begin providing re-designated transcripts "in the near future." Def's Ex. 2 at A5.

The government has subsequently re-designated two transcripts on November 2, 2007. Def's Ex. 7. Present counsel is unable to provide a specific timetable for completion of the seven remaining transcripts due to the uncertainty surrounding third-party involvement. It is virtually certain, however, that the 14 days requested by TDM would be insufficient. TDM Mem. at 18.

### D. The Government Did Not Object To TDM's Expert Designation, But Raised Valid Concerns.

TDM next claims that the government attempted to "thwart" TDM's designation of an expert witness, Michael J. Chapman. TDM Mem. at 18. As sanctions, TDM seeks to have Mr. John Jarosz, the government's expert in another case before this court (*Boeing Co. v. United States*, No. 00-705), disqualified from testifying on behalf of the government.[10] TDM's allegation lacks any factual or legal basis, and seeks a remedy that this court is not empowered to employ.

The crux of TDM's factual allegation is that the United States "objected" to TDM's employment of Mr. Chapman, and therefore "thwarted" TDM's effort to employ Mr. Chapman in this case. *Id.* What is plainly evident, however, is that the government did not "thwart" anything, nor did it attempt to do so.

Messr. Chapman and Jarosz are both members of the firm the Analysis Group, which specializes in, among other areas, forensic accounting. Jarosz Dec. at 1; Chapman Dec. at 1. The government was informed of Mr. Chapman's employment on September 4, 2007. Pl's Ex. 29. The government had hired Mr. Jarosz to work on the Boeing case in 2006. Jarosz Dec. at ¶ 4. TDM has not demonstrated that the government was aware of Mr. Chapman's participation in

---

10 We note that Mr. Jarosz testified, at trial, in *Boeing*, on October 16, 2007 before Judge Allegra, a fact for which this Court can take judicial notice based on its own records.

this matter at any time before September 4, 2007.[11]

Upon receiving TDM's e-mail, the government responded by letter on September 13, 2007. Pl's Ex. 30. In that letter, the government specifically stated that "the government does not object to the disclosure of confidential information to Mr. Chapman . . . ." *Id.* While not objecting, the government did note that a conflict existed. That conflict is evident in that Mr. Chapman and Mr. Jarosz, who work in the same office, are taking opposite side in litigation involving the same client (specifically, Mr. Chapman is appearing for a plaintiff against the government, while Mr. Jarosz is being employed on behalf of the government against a different plaintiff).

Although the government's response offered to discuss the matter, TDM's motion only alleges that Erica Franklin orally objected to Mr. Chapman.[12] Adler Dec. at ¶10. No writing memorialized this conversation, and the issue was never discussed with present counsel. Instead, TDM filed the present motion.

From a factual perspective, the government "thwarted" nothing. TDM does not allege that it changed its position as a result of this alleged objection, and, as the requested relief makes clear, still intends to present Mr. Chapman as its accounting expert. TDM Mem. at 21. More importantly, the government did not even attempt to "thwart" the employment of Mr. Chapman, and the government's letter specifically states that it is not objecting. Pl's Ex. 30.

TDM's legal premise is equally untenable. Citing three cases, TDM argues that the

[11] TDM states: "Certainly, the US knew that TDM and UTEX hired Analysis Group for this matter when it, thereafter, hired Analysis Group on a separate matter." TDM Mem. at 20. Yet, it offers no proof that the government did know.

[12] The written record fails to establish that TDM ever sought to meet or confer regarding

government "has no basis for its objection." Pl. Br. at 19. The cases cited by TDM stand for the unremarkable proposition that *for testifying experts* (as opposed to consulting experts) the witness cannot be *disqualified from testifying* without a showing of actual transfer of information from one party to another. *Great Lakes Dredge & Dock, Co. v. Harnishfeger Corp.*, 734 F. Supp. 334, 339 (N.D. Ill. 1990); *see also English Feedlot, Inc. v. Norden Labs., Inc.*, 833 F. Supp. 1498, 1501-02 (D. Col. 1993) (party seeking to disqualify expert bears burden of establish existence of confidentiality and non-waiver); *United States ex rel. Cherry Hill Convalescent Ctr. v. Healthcare Rehab Systems, Inc.*, 994 F. Supp. 244, 249 (D. N.J. 1997).[13]

But TDM skips over the first determination that this court must make: whether the government has sought Mr. Chapman's disqualification. The government has not moved for disqualification. In short, TDM has assumed a predicate exists for its motion, when in fact the government has never sought to disqualify Mr. Chapman.

Since a motion to disqualify has not been filed, this court has no basis for sanctioning the government. To be sure, RCFC 37 does not provide any basis for sanctioning the government,

---

this matter prior to bringing the present motion. TDM Mem. at 18-20.

[13] We submit that these cases are short-sighted in failing to recognize that a conflict can occur not only from improper use of confidential information, but also from taking conflicting positions in litigation in similar cases against a single entity, as in this case. We need not debate that proposition now, however, since the Government has not sought to disqualify Mr. Chapman.

even if the government had sought disqualification. Rule 37 applies only to failures to make disclosures or cooperate in discovery within the provisions of RCFC 26-36. TDM also fails to provide any support for the proposed sanction that it seeks: disqualification of Mr. Jarosz from the *Boeing* case. RCFC 37, the only authority cited, does not specifically provide for the type of injunctive relief that TDM contemplates. TDM Mem. at 21. And this court's injunctive powers, especially in the government contracts arena are expressly limited by statute. *See* 28 U.S.C. § 1491(a)(2) & (9)(b). Here, TDM seeks *prospective* relief: an injunction against certain *future* acts by the government. Yet, TDM offers no source of the court's authority to grant such relief. Accordingly, the request must be denied.

Finally, TDM alleges that the government's "tactics evince bad faith" and "may rise to the level of tortuous interference with contractual relations." TDM Mem. at 20. TDM's allegations are frivolous. To be sure, this court's rules require that parties "meet and confer" regarding disputes and, likewise, the court's protective order similarly requires such discussions. Thus, merely raising the belief that an expert has a conflict that allowed TDM the opportunity to evaluate the matter for itself, is hardly a "bad faith." As for "interference with contractual relations," TDM provides no legal or factual basis for its allegation. Thus, the court should ignore that specious allegation.[14]

**E. Sanctions Are Not Warranted Against The Government.**

For all the reasons provided, all of TDM's requests for sanctions should be denied.

---

[14] TDM has not accused the government of contacting Mr. Chapman. Indeed, if any one interfered with contractual relations it was TDM, who obtained the declaration of Mr. Jarosz, for use against the government, without informing the government that it was communicating with the government's contractor.

Under RCFC 37(d), sanctions may not be imposed unless a party wholly fails to respond to a discovery request. *See, e.g., United Medical Supply Co., Inc. v. United States*, 77 Fed. Cl. 257, 271 (2007). As discussed, the government has made proper responses to all of TDM's discovery requests, and certainly has not failed to respond to any requests.

## CONCLUSION

For the reasons set forth herein, the government respectfully requests that the Court deny TDM's motion to compel in its entirety as well as its requests for sanctions.

Dated: November 6, 2007

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JOHN FARGO
Director

s/Walter W. Brown
Walter W. Brown
Attorney
Commercial Litigation Branch
Department of Justice
Washington, D.C. 20530
Telephone: (202) 307-0341
Facsimile: (202) 307-0345

Attorneys for the United States