# DEFENDANT'S EXHIBIT 6

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
------------------------------X
TDM America, LLC,             :
                              :
              Plaintiff       : No. 06-472 C
                              :
        v.                    :
                              :
THE UNITED STATES OF AMERICA, :
                              :
              Defendant       :
------------------------------X
```

Alexandria, Virginia

Friday, July 27, 2007

Deposition of VIRGINIA R. PANKOW, a witness herein, called for examination by counsel for the plaintiff in the above-entitled matter, at the Offices of U.S. Army Corps of Engineers, Institute for Water Resources, Navigation data Center, 7701 Telegraph Road, Casey Bldg, Alexandria, Virginia, before Tracy E. Barksdale, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Virginia.

JOB NO. 12953

David Feldman Worldwide

From File to Trial™

California | New York | Texas

www.david-feldman.com

APPEARANCES:

On behalf of Plaintiff: (Appearing via telephone)
MICHAEL A. ADLER, ESQ.
DIMITRA TZORTZATOS, ESQ.
Davidoff, Malito & Hutcher, LLP
605 Third Avenue
New York, NY 10158

On behalf of Defendant United States of America:
ERICA A. FRANKLIN, ESQ.
U.S. Department of Justice, Civil Division
1100 L Street, NW, Suite 1100
Washington, DC 20001
(202) 353-0517
DANIEL INKELAS, ESQ. (Appearing via telephone)
United States Army Corps of Engineers
Office of the Chief Counsel
441 G Street, NW
Washington, DC 20314

On behalf of Defendant Donjon Marine Company:
GARY J. CAMPBELL, ESQ. (Appearing via telephone)
McCarter & English, LLP
265 Franklin Street
Boston, MA 02110



I-N-D-E-X


| WITNESS | EXAMINATION |
|---|---|
| VIRGINIA R. PANKOW | |
| By Mr. Adler | 4 |
| By Ms. Franklin | 41 |


EXHIBITS


| PLAINTIFF'S EXHIBIT NO. | PAGE MARKED |
|---|---|
| 150 Second Amended Notice of Rule 30(b)(6) with Document Demand | 9 |


Exhibit 150 was attached by counsel.



P R O C E E D I N G S
10:33 a.m.
Whereupon,
VIRGINIA R. PANKOW,
a witness, was called for examination by counsel for the plaintiff, and having been duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF
BY MR. ADLER:
Q Good, Ms. Pankow. My name is Michael Adler.
**A Good morning.**
Q And I represent the plaintiff TDM in this case. Thank you for coming in.
Just as a few background ground rules so you understand. If at any time you want a break, please let me know, and of course, one will be provided. In addition, at the end of the day, when we leave here, the only thing that remains is the transcript, it's important that your responses to my questions, which will be many today, be verbal; nods and gestures cannot be recorded by the court reporter.
Do you understand that?
**A Yes, I do.**
MR. ADLER: I'd like the court reporter to mark



as an exhibit a document that says second amended notice of Rule 30(b) deposition with documents.
Please provide that to the witness.
(Thereafter a discussion was held off the record.)
BY MR. ADLER:
Q Ms. Pankow, are you presently employed?
**A Yes, I am.**
Q With whom are you employed?
**A U.S. Army Corps of Engineers.**
Q Could you please briefly describe your educational background since high school.
**A I have a bachelor's degree in physical oceanography. I've taken a couple of graduate courses but have not gotten a further degree.**
Q Where is that degree from?
**A University of Maryland.**
Q Okay. And can you briefly describe your employment positions since college.
**A Since college. My first position was with the EPA in Annapolis, Maryland, as a field technician. I then went to the Corps of Engineers in Stevensville, Maryland, as an employee of the Waterways Experiment Station, which is located in Vicksburg, Mississippi. Stevensville, Maryland, contained a building with a**

physical model of the Chesapeake Bay, and I was a civil engineering technician on that project. I was working in that facility for about nine years, and in that time I went from civil engineering tech to oceanographer to project manager.

When that facility closed, I moved to Vicksburg, Mississippi, and I worked on numerical modeling of the Chesapeake and San Francisco Bays. I also worked in the dredging research program, dealing with instrumentation on dredges and the technique and technology of dredging activities.

In 1991 I had the opportunity to come to my present position here in Alexandria, as a project manager for the dredging information system. Currently, I manage the dredging information system. I also manage the lock performance monitoring system and am a senior manager in the navigation data center part of the Institute for Water Resources.

Q And how long have you been employed by the Army Corps of Engineers?

A Excuse me? How many years have I been employed?

Q With the Army Corps --

A Army Corps of Engineers, 32.

Q Okay. What are your current duties?



A My current duties involve the project management of the lock and dredging database systems, and this involves seeing that the systems stay up and running; meeting headquarters' needs if databases have to be modified to capture information that we don't currently capture; developing reports for users answering requests from Corps, federal government, academia, the public. As a senior manager in the navigation data center, I have input into the strategic plans for the organization, our directions, our budget, our funding, our long-term plans. I have responsibilities for the Institute for Water Resources, which is the parent organization, as to the knowledge and the function of the institute and to be a public relations person, basically, to inform and educate others as to what our capabilities are.

Q I believe that you mentioned your responsibilities for the lock and dredging system?

A Yes. They are two separate databases. It's a navigation system.

Q Could you explain what each of them are to someone that would be considered a novice.

A Okay. The dredging information system collects information on all Corps-performed and contracted dredging information -- dredging jobs from



prebid estimate through completion. It consists of information on where the dredging is being done, what district; the government estimate; the winning bid; the winning bidder; the number of bids; equipment used in the dredging process; placement of the material; pay, how the pay is calculated; and information like that.

The information is entered by the district person. The district person is responsible for the completeness and accuracy of the database. My responsibility is to be sure the database is up and running, that I answer their questions if they have questions, and give them assistance if they need it.

The lock performance monitoring system gathers information on every lockage that is performed that the Corps locks. The vessels, the commodity, the time of arrival, the time it takes to lock through, information like that. Again, my responsibility is to be sure the database is up and running and that there's user support, that there are modifications made, if necessary, due to proponent's requests, and the accuracy and completeness of the database is the responsibility of the lock operator.

Q Now, with respect to the dredging information database, you had mentioned that it has information regarding the placement of material?



A Yes.

Q And what did you mean by the placement of material?

A These are just broad categories of information, beach nourishment, overboard and open water, upland, confined disposal, to just give us a general idea of where the material is going.

Q Now, I'd like the court reporter to mark that second amended notice as plaintiff's Exhibit No. 150.

(Thereafter Exhibit 150 was marked for identification.)

BY MR. ADLER:

Q Ms. Pankow -- let the record reflect that Ms. Pankow has been given Exhibit No. 150.

Have you seen it before?

A Yes, I have.

Q And other than today, when did you last see it?

A Yesterday.

Q And do you know what this document is? Do you have an understanding of what this document is?

A A general understanding, yes.

Q And this is a notice to appear for a deposition, correct?

A Yes.
Q And are you here today pursuant to this notice?
A Yes, I am.
Q As Exhibit A, which is the third page of this document, until the end of the document, there are a number of categories listed. Are you here with respect to testifying today to any of these categories?
A To any of these categories?
Q Correct.
A Yes.
Q Which ones are they?
MS. FRANKLIN: Michael, you have several. I mean, there are 59 categories. Why don't you just direct the witness to the two categories that the government has identified this witness for. We provided you that in an e-mail.
MR. ADLER: Okay. Then I'll direct --
BY MR. ADLER:
Q Well, first of all, do you know which category, before I direct you, do you know which categories in this document you're going to be testifying about?
A I'd have to look for them. It has to do with the dredging database.



Q All right. Then I'll turn your attention to categories Nos. 35 and 37.
A Okay.
Q Are those the two categories?
A Yes, they are.
Q Okay.
MS. FRANKLIN: I'm going to object, because I believe we limited that to the dredging information system.
BY MR. ADLER:
Q Now, getting back to -- with respect to the various -- you are here today to testify with respect to the notice with respect to categories 35 and 37 as it relates to the dredging system; is that correct?
MS. FRANKLIN: I'm going to object to the extent that the government had also served objections to this notice for 30(b)(6) witnesses that apply to this witness also.
BY MR. ADLER:
Q All right. But is that your understanding?
A Yes, it is.
Q Now, you had mentioned the various broad categories, you mentioned one was beach nourishment?
A Yes.
Q What is that?



A That is material placed on the beach to renourish the beach, especially after storms when the sand has been removed by storm waves, material is placed on the beach to reestablish that profile.
Q Okay. Is another one of those broad categories confined?
A Yes. There are constructed facilities, holes in the ground, basically, either on land or under water, where material is placed because it is considered potentially hazardous and does not want to be released into the environment, and these facilities can be capped, they can have clay layers underneath them. They can be contained. The material is usually contained in the confined area.
Q Do you know whether or not the material that goes into these areas is treated, such as with cement or an additive?
A No.
MS. FRANKLIN: Objection. Vague. Sorry, go ahead.
THE WITNESS: No. I do not know that.
BY MR. ADLER:
Q You don't know if it's treated, is that what your answer is?
A Correct. I do not know if the material is



treated.
Q Is another one of those broad categories underwater confined?
A Yes, it is.
Q What is that?
A That is the same as the confined facility, only it is underwater. It is usually a hole in the excavated area in the bottom of -- underwater. Material is put in that and then is generally capped with clean material.
Q And again, do you know whether or not that material is treated with an additive such as cement?
MS. FRANKLIN: Objection, vague.
THE WITNESS: I do not know if it is treated or not.
BY MR. ADLER:
Q Now, when I say treated, do you have an understanding that some dredged material is processed and treated with an additive?
A Yes, I understand that that does happen.
Q Do you have an understanding that often that occurs with material that is disposed of upland?
A I understand that it can be, yes.
Q Now, is another one of those broad categories mixed modes?

14

A Yes.
Q What is that?
A That is when material is disposed in more than any of those options that are on the pick list for the data entry person.
Q Could you give me some more detail where that disposal may occur.
A Sometimes material is put on the beach, and then a little bit is put behind the initial sand dune, and then further material might be put in a landfill. We do not have enough categories in this database to identify each one of those, so we give the data entry person the option of just putting in mixed.
Q So mixed modes would then include dredge material, mixed modes would, according to -- let me rephrase.
Is my understanding correct that according to your testimony, mixed -- some material that's disposed at a landfill --
MS. FRANKLIN: You're coming in and out. Can you repeat that.
BY MR. ADLER:
Q Okay. Is my understanding correct that according to your testimony, the mix modes includes some material that is disposed of at a landfill?

15

MS. FRANKLIN: Objection. Misstates statement.
BY MR. ADLER:
Q Do you understand the question?
A Yes, I do.
Q Okay.
A And it might, the answer is mixed mode might include all of these categories.
Q Does your database have any information of whether or not in actuality mixed modes does -- does your database have any information that for any of its tracking in this mixed modes category whether or not dredge material actually was placed in a landfill?
A No, it does not.
Q Would that information be available from those others, from the various people that you get your information from?
MS. FRANKLIN: Objection. Vague.
THE WITNESS: I understand you to ask me if that information is available from other people who put the information in?
BY MR. ADLER:
Q From any people, from any other source.
A Any other source. No, I don't know that any other source would know what goes into these multiple disposal categories.

16

Q Do you know whether or not you safe track what gets disposed of, if any does, at a landfill under this list mixed mode category?
MS. FRANKLIN: Objection. Vague.
THE WITNESS: No, I don't.
BY MR. ADLER:
Q Is any one of those general broad categories overboard and open water?
A Yes.
Q And what is your understanding of that?
A This is usually harbor dredging, and when they're dredging, the hopper gets filled, and they will allow the fluid to flow overboard, and then they transit to the disposal site, and they open the hopper doors, and that is open water disposal.
Q Is that because the disposal site is open waters?
A Yes, it is.
Q Is another one of those broad categories open water and upland?
A Yes.
Q And what is that?
A That is when material is disposed in open water such as underwater in a near shore berm so that the material can be washed up on shore, and then part of the

17

material can be disposed upland, such as behind the primary dune to build that backup dune. It's a mixture of combinations, and that's just one of the examples that I would think of.
Q Do you know whether or not that upland portion may be disposed at areas such as landfill sites?
A No, I don't.
Q Do you know whether or not the material that's disposed upland under the open water and upland category has to be treated with an additive such as Portland Cement?
A No, I don't.
Q The next one is another one of those broad categories, beach nour and upland?
A Beach or upland?
Q Beach nour, N-o-u-r.
A Beach nourishment. Okay. Yes, it is.
Q What is that?
A That is when material is placed on the beach to reestablish the beach profile, and some material might be disposed upland, again behind that primary dune or some other place.
Q Is another one of those broad categories upland?
A Yes, it is.

Q What is that category?
A That when material is placed above the water line, adjacent to the dredging area but above the water line. Any time it's behind the primary dune, it could be anyplace upland.
Q What do you mean by primary dune?
A At a beach there is normally a sand dune that protects the beach. From the sand dune to the ocean would be the beach. Behind the sand dune could be considered upland.
Q Let's say there's no beach there. Let's say the dredging is being done at a berth.
A Well, then, if it was placed on land, it would be upland.
Q Okay. Do you know whether or not the material that's placed upland has to be treated with an additive such as Portland cement?
MS. FRANKLIN: Objection, vague.
Go ahead.
THE WITNESS: No, I do not.
BY MR. ADLER:
Q Do you know whether or not the Army Corps of Engineers tracks with respect to the dredging material that's under the category upland, whether how much, if any, of that material is treated with an additive such as



Portland Cement?
A No, I do not.
MR. ADLER: I'd like the court reporter to provide to the witness a document that has been previously marked as plaintiff's Exhibit No. 39 by the Bates numbers TDM006751 through TDM007 --
MS. FRANKLIN: 6751 to 6755.
BY MR. ADLER:
Q Ms. Pankow, this Exhibit has been previously marked in another deposition, and it really has -- the pages from the USACE Army database, and the first one is, I guess, two sets, first one consisting of pages 1 and 2, then the latter set consists of pages 1 through 3. I first I want to focus on the first set entitled on top dredging information system, material disposal, quantity dredged by type of material disposal. Do you see those two sheets?
A Yes.
Q Now, does this come from the -- does this stem from the database that you say your responsibility is for?
A Yes, it does.
Q And there is a column on the left-hand side of Bates No. TDM006751 that says at the top DISPTYPE.
A Yes.



Q Does that stand for disposal type?
A Yes, it does.
Q And below that there are a number of categories. Are those some of the categories that we discussed earlier today?
A Yes, they are.
Q Now -- and then you have data, which is in contracts, cubic yards, and then you have the years on top going across.
Where do you get the numbers to fill into that chart?
A I get them from the database.
Q Where do you get -- how does the database get those numbers?
A The -- each district has a point of contact, a data entry person, and they enter the information into the database.
Q Do you know where the data entry person get the number?
A They get it from the project manager or from contracts or from someone in their division.
Q And how often, if at all, is this updated?
A This chart --
Q Hold on for a moment. How often is the database updated?



A The database is updated as needed. As information becomes available, the database is updated.
Q And by becomes available, does that mean when the data entry person enters the data into the database?
A Yes.
Q And how -- do you have any responsibilities with respect to publishing or otherwise maintaining the Web site from which this document derived from?
A Yes. We update and publish the document once a year.
Q And when do you publish it?
A Usually in the March time frame.
Q Are there other times that the document may be updated?
A It could be updated any time. This is just our standard procedure to do that.
Q Let me rephrase the question. Over the last five or six years, has the Web site information been updated more than once a year?
A Not to my knowledge.
Q If I want to know the cubic yards of material that was treated for upland disposal -- by treated, I mean mixed with Portland Cement or another additive -- do you have -- do you know how I would be

able to obtain that information from the Army Corps?
**A I would assume it would have to be a data call to the districts to see if any district had done that.**
Q Okay. By data call, do you mean me contacting the district --
**A Yes.**
Q -- for that question?
**A Yes.**
Q Now, do you have any familiarity whether or not the Army Corps of Engineers tracks in cubic yards or otherwise, the amount of non-HARS suitable material that was dredged?
**A I don't know.**
Q Do you have an understanding of what non-HARS mean?
**A That's a disposal site in the New York area; is that correct?**
Q Okay.
MS. FRANKLIN: I'm going to object that the extent that your questions go beyond the scope that this witness was designated for.
BY MR. ADLER:
Q Now, let's turn back to that category known as upland on this document, which is TDM006751.



**A Okay.**
Q My understanding is that you said that you do not have information as to whether or not the numbers contained in this category refer to the cubic yards of dredging material which was treated with Portland Cement, correct?
**A Yes.**
Q You have no knowledge whether or not none of that was treated with Portland Cement; is that correct?
MS. FRANKLIN: Objection. Vague.
BY MR. ADLER:
Q Do you understand the question?
**A No.**
Q Let me rephrase it, then.
That means the possibility that the cubic yard numbers that are contained in the row across upland disposal could mean that every one of those cubic yards was actually treated with Portland Cement; isn't that correct?
MS. FRANKLIN: I'm going to object to the extent you're asking this 30(b)(6) witness to speculate.
MR. ADLER: I'm just asking if my understanding is correct.
BY MR. ADLER:



Q So you don't know whether or not those numbers would be all treated, partly treated, or some other way treated with Portland Cement; is that correct?
MS. FRANKLIN: Same objection.
You can answer.
THE WITNESS: That's correct. I have no knowledge about if or how many cubic yards in any of these upland-treated categories was treated -- upland categories.
BY MR. ADLER:
Q And as you mentioned before, the way that we would find out is to inquire with respect to each of those districts, correct?
**A Correct.**
Q Now, I'd like to turn your attention to the latter three pages of the document TDM006753 through TDM006755.
**A Okay.**
Q Now, again, this information, I'll represent to you, is from the database, and am I correct that you publish the database as well?
**A Yes.**
Q This also is updated once a year?
**A Yes.**
Q And do you also receive this information



from the database which in turn receives its information from the data entry people?
**A Yes.**
Q Can you briefly describe the information contained in these three pages. Actually, the next two pages, the last page is the contact page.
**A It's the amount of cubic yards, the number of contracts, and the bid dollars for contracts that were awarded in each of the Corps of Engineers districts for the years 2001 through 2006.**
Q And that's by the number of contracts and by cubic yards and dollars?
**A Uh-huh, yes.**
Q And when is this portion updated?
**A At the same time as the other information that's on that section of the Web page, usually the March time frame.**
Q Okay. Give me one moment, please.
You had mentioned before that some of your responsibilities involve the strategy budget and funding for dredging activity?
**A Yes.**
Q In those -- do you have meetings with respect to those activities?
**A Yes, I do.**

Q Okay. With respect to those meetings or those activities, do you ever discuss the amount of cubic yards or any other information pertaining to dredged material that has to be disposed of upland for beneficial reuse or for other purposes?
MS. FRANKLIN: I'm going to object to the extent this question exceeds the scope for which this witness was designated.
MR. ADLER: Actually, it doesn't; it pertains to information included in the Web site.
THE WITNESS: No, it does not come into our discussions.
BY MR. ADLER:
Q Just so I understand for the sake of asking or not asking other questions, what responsibilities do you have with respect to the strategy budget and funding for dredging material?
MS. FRANKLIN: Same objection.
But you can answer.
BY MR. ADLER:
Q You can answer.
**A The program has a responsibility to meet information needs from the Corps districts, divisions, and headquarters, so they can manage their dredging programs. The program also has a responsibility for**



**making available to contractors information on where the Corps plans to dredge in that next year. In order to do this, I need funding, so I do work up a budget, requesting the funds, to maintain the database and the personnel working on the database. I attend dredging meetings within the industry and with Corps to see what their data needs are and what their strategies are for using that information, and if the database does not apply that information, we reprogram it to supply the information to meet those users' needs.**
Q Does that include disposal of dredge materials?
**A Other than the broad categories that we have in the database, that has never come up as a need for further information.**
MR. ADLER: Can the court reporter please provide the witness with what's previously been marked as plaintiff's Exhibit No. 7. And let the record reflect the witness has plaintiff's Exhibit No. 7.
BY MR. ADLER:
Q Can you please review it briefly and let me know whether you're familiar with this document.
**A No, I am not familiar with this document.**
Q Do you know or have any knowledge who prepares this?



**A Well, it's from the New York District Corps of Engineers, so it's a Corps document. Obviously from the Web page.**
Q But you don't have it. How about I turn your attention not to the whole document but to the page of what has been Bates numbers TDM006587 through --
MS. FRANKLIN: Michael, I'm going to interrupt. I think we're looking at the wrong exhibit.
(Thereafter a discussion was held off the record.)
THE WITNESS: Okay. This is a different story.
MS. FRANKLIN: I would like to note that this plaintiff's Exhibit 7 does contain over a hundred pages. Do you want her to look through the entire exhibit?
MR. ADLER: No. Let me just go back, because there's no formal question here because we just changed exhibits.
BY MR. ADLER:
Q So the first I'm going to ask you is to briefly review the document, whether or not you recognize it, generally.
**A Yes, I do.**
Q What is it?
**A It is a copy of the navigation data center dredging information home page, with many of the pages**



**printed out.**
Q Is this part of that database that you're responsibility is for?
**A Yes, it is.**
Q Now I want to turn your attention to the page that begins TDM006577.
**A Okay.**
Q And on the left-hand side is a -- on the middle of the page there's a chart, and there's various categories on the left-hand side. Do you see those?
**A Yes, I do.**
Q One of those categories states total non-hopper dredging for FY 2005, which I would imagine is fiscal year 2005.
**A Correct.**
Q Do you have any understanding what that category is for?
**A Yes, I do.**
Q What is it?
**A That is the cubic yards of maintenance dredging for that fiscal year.**
Q Okay. And then the next page, that's one that we discussed already, it just has two years on it, correct?
**A Yes.**

Q Now I'd like to turn your attention to the page that bears TDM006585. The title is -- well, dredging information system, number of contracts, cubic yards, and total bid dollars for the engineer district and fiscal year, and on the left-hand side it has dredge type, and it has categories such as bucket, dustpan and so on and so forth.
Do you see that?
**A Yes, I do.**
Q Can you briefly describe what those categories are under dredge type.
**A It's the type of dredge that was used for these contracts.**
Q And do you have an understanding of why the Army Corps tracks the type of dredge that was used for these contracts?
**A Yes, I do. We want to know what equipment is used so we're sure that there is equipment available for performing the dredge work that's needed to be done.**
Q Please describe what a bucket is.
**A A bucket is a mechanical dredge, a clamshell or a bucket. It's mechanical dredging.**
Q How about dustpan?
**A Dustpan is a specific type of dredge that has a large dustpan-type drag head that injects water**



**into the soil to fluidize it, then it sucks it up through a centrifugal pump and then out a pipeline.**
Q How about hopper?
**A A hopper is a self-propelled dredge that dredges the sea bottom, deposits the material in a hopper on the dredge itself, then travels to a disposal site and dumps the material or pumps it out.**
Q How about nonconventional?
**A There's one dredge that the Corps has, a nonconventional, it's a small hopper-type dredge that is used for close-to-shore dredging.**
Q Pipeline?
**A Pipeline is a pipeline dredge, it's a suction dredge or a cutter head dredge. It uses a mechanical basket that spins around, loosening up the dredge material. It's pulled up through a centrifugal pump and deposited through a pipeline to a disposal site.**
Q I turn your attention -- I assume that the other categories below that are just categories of more than one type of the types we just discussed?
**A Correct.**
Q Turn your attention to TDM006587. Do you have an understanding what's shown on these pages?
**A Yes.**
Q And what are these pages?



**A This is information on each contract that has been awarded. This report is fiscal year 2007 report.**
Q Do you have an understanding under status, it says E or S, et cetera, or those are initials. Do you have an understanding what that means?
**A The status is the business status of the dredging company, large, small, or emerging.**
Q Do you have any knowledge with respect to the quantities and qualities -- let me rephrase that.
Do you have any understanding or knowledge of the quantities of dredge material that was disposed of upland and treated with an additive such as Portland Cement by region or by district?
MS. FRANKLIN: I'm going to object to the extent that's already been asked and answered.
THE WITNESS: No, I have no knowledge of that.
BY MR. ADLER:
Q Do you have an understanding -- do you know whether or not the Army Corps of Engineers Web sites or database contain any information from which derive the number or the quantity of dredged materials that was treated with an additive such as Portland Cement or for upland disposal?
**A No, I have no knowledge of that.**



Q Do you know with respect to any of the last two questions, other than as you mentioned before, asking each of the districts, whether there is another way to obtain that information?
**A No, I do not.**
MR. ADLER: If we can take a short break, I may conclude this deposition very shortly. Can you give me about five minutes?
(Pause in proceedings.)
BY MR. ADLER:
Q I wanted to go back to the Exhibit No., I think it was No. 39. Do you have that?
**A Yes, I do.**
Q Now, first of all, let's say beach nourishment and upland for a moment. Okay? The dollars -- what do the dollars -- it says dollars, and then in parentheses bid in the row next to the disposal type, beach nourishment and upland.
Do you see that?
**A Yes. The dollars bid is what the contract was awarded at as opposed to the actual dollars paid. There's a difference in dollars at different times during the contract.**
Q So for example, this one would be correct, if I wanted to find out the average, the average dollars

bid per cubic yard is to maybe dollars by cubic yards as shown in each of these columns?

A Correct.

Q Is it generally more expensive, by looking at these numbers, upland disposal than other disposals such as underwater and the like?

A I didn't hear the first part of your question.

Q Is it generally more expensive to dispose of dredge material upland than not?

MS. FRANKLIN: I'm going to object to the extent this question exceeds the topics for which this witness was designated.

BY MR. ADLER:

Q I'm asking that question based on the numbers we have shown in this database.

MS. FRANKLIN: Same objection.

But she can answer.

THE WITNESS: We're comparing upland with which one?

BY MR. ADLER:

Q Upland and non-upland.

A Non-upland. I'd have to calculate it out and see. I'm not sure. I don't have a calculator here.

Q What I'm trying to get at is, doesn't



upland disposal require uploading, staging it, trucking it, has a lot more steps to it than just those depositing it right into the ocean, would make upland disposal more expensive?

MS. FRANKLIN: I'm going to object again in that this exceeds the scope for which this witness was designated.

BY MR. ADLER:

Q Now you can answer.

A In some cases it could be, but not in all cases. Again, it depends on where the upland is and if rehandling is required.

Q Well, otherwise, if rehandling is not required, does it just sit there in a big dump, a pile, after pile after pile?

MS. FRANKLIN: Same objection.

BY MR. ADLER:

Q You can answer.

A The material is usually sprayed into the disposal area and moved around, and when the water drains off, a backhoe or a -- some kind of equipment will get in and level it out. So it's not necessarily a dump.

Q As far as you're concerned, are the numbers on Exhibit No. -- are the entries, the entries on Exhibit No. 39 with respect to years 2001 to 2006 accurate?



MS. FRANKLIN: Objection. Vague.

BY MR. ADLER:

Q Do you believe those numbers to be accurate?

A They are as accurate as the data entry persons put it in. I cannot independently verify that these are accurate.

Q Do you know whether or not the Army Corps of Engineers would generally and routinely publish inaccurate numbers on a public Web site?

MS. FRANKLIN: Objection to the form of the question.

BY MR. ADLER:

Q Answer the question.

Just so you know, when your counsel objects, you're still required to answer.

A Oh, I understand that.

Q Unless you're directed not to.

A These numbers are accurate. I cannot verify that all of the contracts are in the database.

Q Okay. Now, do you have knowledge of which people are -- the names of the persons that enter the numbers into the database?

MS. FRANKLIN: Objection. Vague. For forever? What time frame, what district?



BY MR. ADLER:

Q Each database, the numbers are entered by the various contacts -- by the data entry people for each of the districts?

A Correct.

Q Do you have knowledge of the names of the people that enter those numbers in each of the districts?

MS. FRANKLIN: Same objection.

THE WITNESS: Yes, I do.

BY MR. ADLER:

Q Who are they, by district?

A I don't have their names offhand. They are users of the database, and when they call and have questions, I answer their questions, so I am knowledgeable and familiar with many of the data entry personnel.

Q Do you have a listing of that anywhere?

A Yes, I do.

Q And I would ask that that be produced if it has not been.

A Excuse me?

Q I would ask that that be produced if it's not been produced.

MS. FRANKLIN: He's not asking a question of you.

BY MR. ADLER:
Q I'm making a statement for the record.
Let's go to the disposal type beach nourishment for a moment.
**A Okay.**
Q Do you have a knowledge whether or not that's generally sand?
**A It is generally sand.**
Q Okay. Do you have knowledge as to what material would be disposed upland?
**A No, I do not.**
Q Beach nourishment and upland, that category, at this point all you know is that beach nourishment is sand, but you don't have any idea what material upland is if it's beach nourishment and upland?
**A I would assume they would both be sand, because they come from the same location.**
Q How about open water and upland?
**A That would be wherever the dredging takes place. It would be site specific from the dredge site.**
Q Do you know whether or not it would be sand or other material?
**A It could be sand with silt.**
Q Okay. And then do you know whether or not silt generally has to be treated?



**A I do not know.**
Q And how about with respect to upland? Is that generally silt?
MS. FRANKLIN: I'm going to object to the extent that question has been asked several times and answered.
THE WITNESS: I do not know what the material is for upland disposal.
BY MR. ADLER:
Q Now, with respect to TDM006754, the form that says New York, right?
**A Yes.**
Q I'm just asking from your experience and your knowledge of dealing with the database, the numbers for New York for years 2001 through 2006 as shown here, are, compared to the other districts, fairly large. Do you have an understanding of whether most of that material represents dredge material that was disposed upland and that was treated?
MS. FRANKLIN: Objection. Vague to the extent that you're representing that the numbers in the New York column are larger.
MR. ADLER: They are what they are.
BY MR. ADLER:
Q But do have an understanding that most of that material was treated for upland disposal?



MS. FRANKLIN: And I also object you're asking questions outside the scope for which this witness was designated.
BY MR. ADLER:
Q You can answer the question.
**A I have no knowledge if any of that material was treated.**
MR. ADLER: Just one second, please.
All right, so at this point I have no further questions for the witness, though I will say that TDM still expects to have a witness from the United States that will be able to testify regarding the amounts of material that were not treated, were treated, so these numbers can be explained.
MS. FRANKLIN: I can't hear you. I hear air.
MR. ADLER: I want to make a statement on the record that the United States has asked on several occasions for a knowledgeable witness that can explain -- TDM has explained -- sorry, that TDM has requested on numerous occasions for a witness that would have knowledge that would explain the numbers that the U.S. provided to us that were represented as representing or that are the quantities of dredge material that were treated for upland disposal versus the amounts of material that are shown in the Web site and for someone



to say that with respect to any information, quantities that were not -- with respect to any quantities that were given to us regarding dredge material that was treated for upland disposal, to testify that all other quantities shown in this Web site have not been treated for upland disposal.
I have no further questions for this witness.
MS. FRANKLIN: I just have one or two questions for this witness, then I'll make my statement for the record.
EXAMINATION BY COUNSEL FOR THE DEFENDANT
BY MS. FRANKLIN:
Q My first question is, you indicated previously that this database contains information independently entered by someone at each district; is that correct?
**A That's correct.**
Q Is this database, any portion of the database that you have been asked to look at today, does it provide information relating to processing or treatment of dredged material?
**A No, it does not.**
MR. ADLER: Asked and answered.
BY MS. FRANKLIN:
Q And is it part of your function with the

United States Army Corps to collect or publish information relating to the cubic yards of treated dredge material?

MR. ADLER: Objection. Asked and answered.

THE WITNESS: No.

MS. FRANKLIN: Okay. Those are all the questions I have.

Now I'll make a statement for the record. That is, the United States Army Corps has provided you on numerous occasions those contracts which involve treatment of or processing of dredged material in any respect. Most of which -- I'll just say in any respect.

So from that list that has been provided to you in revised Attachment A you have all the information you need relating to information in these charts or otherwise on the database, as the database does not provide information relating to treatment of dredged material. We have specifically performed a data call and provided you the results of that data call and revised attachment amount.

MR. ADLER: Okay. Once again, my notes standard stand as I said, and I'm not sure what you mean by data call.

MS. FRANKLIN: The witness described data call today.



MR. ADLER: But I don't know what you said that you've already given us the data call when we just learned about that today.

MS. FRANKLIN: I said the results of the data call, which is the revised attachment A.

MR. ADLER: Okay. Thank you, so much, for your time, Ms. Pankow.

(Whereupon the deposition concluded at 11:54 a.m.)

-o0o-



CERTIFICATE OF DEPONENT

I hereby certify that I have read the foregoing pages of my deposition testimony in this proceeding, and with the exception of changes and/or corrections, if any, find them to be a true and correct transcription thereof.

________________________

DEPONENT

NOTARY PUBLIC

Subscribed and sworn to before me this _____ day of __________, 2007.



CERTIFICATE OF COURT REPORTER

I, TRACY E. BARKSDALE, the court reporter before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by a Notary Public; that the foregoing testimony is a complete, true, and correct transcription of the stenographic notes as taken by me in said manner on said date; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

DATED______________

TRACY E. BARKSDALE, RPR
Registration No. 7052914
Notary Public for the
Commonwealth of Virginia
My commission expires
September 30, 2010

# DEFENDANT'S EXHIBIT 7

November 2, 2007

**IMPORTANT**: This facsimile is intended only for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected from disclosure under applicable law. If the reader of this transmission is not the intended recipient or the employee or agent responsible for delivering the transmission to the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this transmission or it's contents is strictly prohibited. If you have received this transmission in error, please notify us by telephoning and return the original transmission to us at the address given below.

**FROM:** Commercial Litigation Branch
Civil Division
U. S. Department of Justice
Washington, D.C. 20530

Fax No. (202) 307-0345
Voice No. (202) 307-0341

**SENT BY:** Walter W. Brown

**TO:** Michael A. Adler, Esq.
DAVIDOFF, MALITO, & HUTCHER LLP

**FAX No.** (212) 286-1884

**NUMBER OF PAGES SENT (INCLUDING COVER PAGE):** 2

**SPECIAL INSTRUCTIONS:**

**U.S. Department of Justice**

Civil Division

WWB
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

Telephone: (202) 307-0341
Facsimile: (202) 307-0345

*Washington, DC 20530*

November 2, 2007

**BY FACSIMILE AND E-MAIL**

Michael A. Adler, Esq.
Davidoff Malito & Hutcher LLP
605 Third Avenue, 34th Floor
New York, New York 10158

Re: *TDM America, LLC v. United States*
Court of Federal Claims No. 06-0472C

Dear Mr. Adler:

Further to my October 16, 2007, letter, the government is removing all proprietary designations from the deposition transcripts of Virginia Pankow, taken July 27, 2007, and John Bearce, taken May 31, 2007. As we have previously indicated, we will continue our efforts to review the remaining transcripts for which TDM requests redesignation. Again, we will entertain any requests by TDM (1) to prioritize the transcripts or (2) to review select portions of these transcripts.

Very truly yours,

Walter W. Brown
Attorney
Commercial Litigation Branch
Civil Division

cc (by e-mail): John E. Flaherty, Esq.
Gary J. Campbell, Esq.

P. 01

TRANSACTION REPORT

NOV-02-2007 FRI 05:34 PM

FOR:

SEND

| DATE | START | RECEIVER | TX TIME | PAGES | TYPE | NOTE | M# | DP |
|---|---|---|---|---|---|---|---|---|
| NOV-02 | 05:34 PM | 912122861884 | 26" | 2 | FAX TX | OK | 373 | |

TOTAL : 26S PAGES: 2

November 2, 2007

DEPARTMENT OF JUSTICE

QUI PRO DOMINA JUSTITIA SEQUITUR

**IMPORTANT:** This facsimile is intended only for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected from disclosure under applicable law. If the reader of this transmission is not the intended recipient or the employee or agent responsible for delivering the transmission to the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this transmission or it's contents is strictly prohibited. If you have received this transmission in error, please notify us by telephoning and return the original transmission to us at the address given below.

**FROM:** Commercial Litigation Branch
Civil Division
U. S. Department of Justice
Washington, D.C. 20530

Fax No. (202) 307-0345
Voice No. (202) 307-0341

**SENT BY:** Walter W. Brown

**TO:** Michael A. Adler, Esq.
DAVIDOFF, MALITO, & HUTCHER LLP

**FAX No.** (212) 286-1884

**NUMBER OF PAGES SENT (INCLUDING COVER PAGE):** 2

**SPECIAL INSTRUCTIONS:**