# EXHIBIT 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------------------)
TDM AMERICA, LLC )
Plaintiff, )
vs. )
)
THE UNITED STATES )
)
Defendant. )
and )
DONJON MARINE COMPANY, INC., )
Third-Party Defendant. )
----------------------------------------)

May 10, 2007

9:31 a.m.

**** C O N F I D E N T I A L *****

Contains PROPRIETARY INFORMATION. Designated parts not to be used, copied or disclosed except as authorized by Court Order or the party or parties whose PROPRIETARY INFORMATION is included.

**********************************

DEPOSITION of Defendant by BRYCE W. WISEMILLER, held at the offices of Davidoff, Malito & Hutcher, LLP, 605 Third Avenue, New York, New York, pursuant to Notice, before ELIZABETH SANTAMARIA, a Notary Public of the State of New York.

Wisemiller

Do you have any documents that you have brought with you or anything like that that we haven't received yet?

09:32:32 We need a verbal response.

A. I have not brought any documents.

Q. Mr. Wisemiller, are you currently employed?

A. Yes.

09:32:47 Q. Who is your employer?

A. U.S. Army Corps of Engineers.

Q. What is your title?

A. I am the project manager, which is under the pay grade of a civil engineer.

09:33:32 Q. Are you a civil engineer?

A. My training is a Bachelor of Science degree in chemical engineering, but I've worked at the Corps of Engineers primarily in the environmental engineering area.

09:33:46 Q. And how long have you had this title?

A. Six years, approximately.

Q. How many years have you been employed?

A. Eighteen years.

09:33:59 Q. Eighteen years with --

09:34:06 09:34:13 09:34:36 09:34:53 09:35:12

A. Nine days.
Q. Congratulations.
A. Thank you.
Q. That's with the U.S. Army Corps of Engineers?
A. New York District.
Q. New York District?
A. Yes.
Q. If throughout this day I refer to the United States Army Corps of Engineers as USACE, you will understand what that means?
A. We refer to it USACE.
Q. When you first started with USACE, what was your title?
A. I was a civil engineer. I worked as plan formulator within the Planning Division, Plan Formulation Branch. That was my first job.
Q. And then?
A. After six years there approximately I transferred to the Environmental Assessment Branch, also in the Planning Division, and there I was also a civil engineer in employment with the Corps.
Q. What was your title then?
A. It was the civil engineer.

Wisemiller

Q. And the next step?

A. I was the project manager in the Programs and Project Management Division at the New York District, approximately six years ago.

09:35:24

Q. Were you employed prior to USACE?

A. No. Small jobs. College primarily.

Q. Briefly describe your college education.

09:35:39

A. I went to Kansas State University from 1983 to 1988. I received a Bachelor of Science degree in chemical engineering, as I mentioned.

I'm not sure --

Q. I just wanted a synopsis.

09:35:58

A. Okay.

Q. As a project manager in the Project Management Division Harbor Programs Branch, what are your general duties?

A. My general duties are to manage the schedule, funding and execution of the projects that are assigned to me. Currently I have assigned to me a variety of different either projects or efforts within the Corps.

09:36:12

The predominant project that I am assigned to construction-wise is Port Jersey Channel

09:36:32

Wisemiller

navigation deepening project located in the upper bay of New York Harbor, which is currently under construction. I am also the project manager for the New York District Dredged Material Management Plan which has been under development and updating for approximately the last 15 years. I actually had that job when I was in the Planning Division earlier and that essentially transferred with me from when I went from one division to the other.

There are others. I'm not sure of the relevance, but I also manage a restoration study in the Hackensack Meadowlands.

Q. What was the first two words, what kind of study?

A. Restoration. Ecosystem restoration, which is cross-shared with the New Jersey Meadowlands Commission as the non-federal sponsor.

Q. What is the Port Jersey Channel navigation deepening project?

A. It was authorized for construction by Congress in 1986 in the Water Resources Development Act. It is a federal navigation channel construction project located in the western side of the upper bay of New York Harbor. It is

Wisemiller

09:38:23 cross-shared with the non-federal sponsors of the State of New Jersey as the primary sponsor and the Port Authority of New York and New Jersey, the limited sponsor solely for the purposes of indemnification of the government.

09:38:42 It is a navigation deepening project to deepen the current non-federal channel of approximately 36-foot depth to navigable depth of 41 feet. Its overall total projected cost is approximately $110 million. It's currently I would say two-thirds complete, construction.

Q. Can you briefly describe the New York District Dredged Material Management Plan?

09:39:10 A. The New York District Dredged Material Management Plan was -- is an active plan that was put together by both the New York District, the Port Authority of New York and New Jersey, our primary non-federal sponsor on many of our

09:39:29 navigation channel projects, with the active involvement of both the states of New York and New Jersey, both regulatory agencies as well as economic development and maritime resource agencies.

09:39:43 It was developed over the last 15 years approximately, and it is essentially a plan

09:40:02 which outlines the volumes and types of dredge material that are anticipated to be dredged within the Port of New York and New Jersey over the next 65 years and outlines the various alternatives or options to manage that material over that time horizon.

Q. With respect to the Port Jersey Channel navigation deepening project, does that
09:40:22 involve dredging activities as well?

A. Absolutely, yes.

Q. Let's take this one at a time.

First, with respect to the Port Jersey Channel navigation deepening project, you
09:40:53 stated that it does involve dredging. In addition to the actual dredging of material, does it also involve treatment of dredge material?

A. Treatment has been defined by different folks in different ways. Generally
09:41:22 speaking I would say "yes" but I would wish to clarify that the dredging that is within that project involves a number of different types of sediment, dredge material. Depending on the nature, characteristics -- physical, chemical, biological --
09:41:41 those various materials are managed differently and

only a select portion of those dredge materials are processed to make them suitable or need to be processed with some type of additive mixture to make them suitable for ultimate placement at upland identified sites, subject to the regulatory approval of either one or both of the states involved.

Q. And that's New York and New Jersey?

A. Yes.

Q. How many contractors on behalf of the U.S. are involved in the Port Jersey Channel navigation deepening project?

A. Two contractors, prime contractors, have been retained by the New York District to construct the first two contracts, which have both been completed as part of the Port Jersey Channel deepening. A third contract is expected to be advertised within the month.

Q. Who are the two contractors that already have been awarded the contracts?

A. Donjon Marine was the prime contractor on the first contract and Great Lakes Dredge & Dock Company was the prime contractor on the second contract.

Q. And you said that both these

A. Yes.

Q. What does it stand for?

A. Historic Area Remediation Site.

10:19:45 Q. Can you please explain that.

A. The HARS is an ocean disposal site designated in September of 1997 by the U.S. EPA Region 2 for the placement of suitable remediation material dredged from the Port of New York and

10:20:09 New Jersey. Material which has been found or is considered to be unsuitable for placement there is referred to as unsuitable HARS material.

Q. And is it -- do you have an understanding of whether or not material that's

10:20:34 suitable for placement at HARS, does it require treatment?

MS. FRANKLIN: Objection. Vague.

Q. Does it requiring processing of the dredged material with an additive?

10:20:45 A. No.

Q. The material that's not suitable for HARS, does it require processing of the material with an additive?

MS. FRANKLIN: Objection.

10:21:03 Ambiguous.

Wisemiller

Q. What I am trying to get at is the material that is not suitable for HARS, does that have to be treated?

10:21:11 MS. FRANKLIN: Same objection.

Q. You can answer the question.

A. I'm sorry. It depends on the material.

Q. Can you explain?

10:21:25 A. Some -- when material is found unsuitable for HARS, it does not mean that it must therefore be processed for it to be taken upland. There are a wide variety of different types of material, particularly under our deepening contracts

10:21:43 as we dredge through different sediment strata, and we have several different types of alternative placement sites for the different types of material.

Only a portion of those types needs to be solidified through the processing technique to

10:22:07 make it usable for immediate upland placement at the identified upland sites. Material can also be -- has also been taken upland without processing. Material which would have required processing to be taken upland has been disposed in aquatic

10:22:34 contained -- an aquatic disposal facility owned and

operated by the Port Authority of New York and New Jersey in Newark Bay.

There are a number of other sites, fish reef sites, to which we take dredged bedrock material for purposes of beneficial use, marsh restoration, which has been done with material, beach nourishment with sandy material. All this material was not disposed at the HARS but did not require processing.

10:22:50

10:23:11

Q. Does USACE track the quantity of dredged material that has to be processed using an additive versus other dredged material that does not have to be processed and, as you say, may be disposed of in these other areas?

10:23:32

MS. FRANKLIN: Objection. Vague.

Can you define "track"?

Q. Does it keep records of the cubic yardage of dredged material that has been processed for upland disposal?

10:23:49

A. It depends upon the contract.

We have had lump sum contracts which essentially require the contractor to remove all material to a required depth and dispose of it in an environmentally acceptable permitted method.

10:24:12

More recently we use unit price contracts and the volume of material which would include material that would be processed is a separate line item in the contracts typically and is -- the volumes that we pay the contractor for removing and taking that material upland with processing is measured separately.

10:24:35

Q. And you said more recently you have been doing this. How recently?

10:24:54

A. My recollection is --

May I see that list of contracts?

Q. Sure. Or if you know --

Answer the question first.

10:25:10

A. This table doesn't have that information. My recollection is around 2000 to 2002 is when we shifted from using lump sum contract mechanisms to unit price contracts. I would have to refer to the specific contract paperwork.

10:25:31

Q. Can you tell from the contract number DACW51-03-C-0001, which is Plaintiff's Exhibit 2, whether this was a lump sum contract?

A. It was a unit price contract.

Q. Can you tell from this contract the volume in cubic yards of material that was -- of

10:25:50

dredged material that was treated for upland disposal?

A. There was an estimated amount. However, I would have to refer to the subsequent documents that were done as they were executing the contract.

I recall there was an area in Port Jersey contract 1 where excessive steel debris was encountered by the prime contractor, such that an alternative method to manage that material was employed and found acceptable to the New Jersey Department of Environmental Protection. For that material that had an excessive amount of debris it was taken to the Newark Bay CDF, which I mentioned earlier, and disposed there without processing.

Q. How did that affect the line item in this contract for --

MS. FRANKLIN: Objection.

Foundation.

MR. ADLER: I will rephrase it.

Q. From Plaintiff's Exhibit 2, with respect to the volume of dredged material that was estimated to be treated for upland disposal, can you tell us the volume?

Wisemiller

managed, that had a lot of debris, that had some difficulties of some sort or material that was dredged from the harbor --

01:29:47 Not by the Corps, mind you, but that was dredged right after September 11 as part of emergency dredging around the World Trade Center.

-- it's been a very useful disposal site as a contingency or as some kind of a

01:30:03 relief-valve placement site when we have encountered difficulties in being able to take the material upland and, again, depending on whether it needs to be processed or not.

Q. Do you know whether USACE keeps

01:30:23 records of the dollar amounts that they paid for dredged material that is treated versus dredged material that is deposited upland but not necessarily treated?

MS. FRANKLIN: Objection. Vague.

01:30:55 A. When material has been taken upland without processing, the only contract I know of that has had that occur was the Port Jersey contract 2, which had some sandy material that was already of acceptable physical nature.

01:31:20 I do not recall directly. It would

01:31:32 reflect it in the solicitation or the contract documents as to whether or not there was a separate line item for the cost of taking material upland without processing versus upland with processing. In the rare occasion that may have occurred, where that has happened on some other contract, it would probably be dealt with in terms of the cost of processing versus nonprocessing of material being

01:31:53 taken upland as some type of contract modification which would be developed and executed by our construction management office.

Did I answer your question?

Q. I will flesh it out a little more.

01:32:13 So if the U.S. wanted to find out how much money they paid for dredged material that is treated with additives year by year, what would they do?

MS. FRANKLIN: Objection.

01:32:23 MR. FLAHERTY: Objection to form.

A. Still answer, right?

Q. Please.

MS. FRANKLIN: Are you asking --

MR. ADLER: Let me rephrase.

01:32:33 Q. From your knowledge of USACE, is the

dollar amount that USACE has paid for treatment of dredged material with an additive for beneficial use be determined on a year by year basis starting with 2000?

01:32:52

A. The specific penny amount, the answer to your question is "No."

The line item that we have in our contracts for material that's targeted to be processed and taken upland includes the dredging cost, the cost for the clamshell dredging itself, the waterborne transport of the material where it is being dredged to the treatment facility, processing facility, and then of course the steps subsequent to that point. So there is no way to distinguish in the line item.

01:33:05

01:33:36

From the government's perspective, all we care about is hiring someone who, in an environmentally acceptable permitted manner that can be demonstrated at the time of the solicitation and contract award, that they have all the materials, equipment, et cetera, in place to do that, to be able to take that layer of silt that is out in a particular area of the harbor and acceptably remove it and dispose of it ultimately somewhere.

01:33:49

01:34:07

Wisemiller

For the reason of trying to keep as much flexibility and competition among our contractors, we try not to constrain the contract any more because it then makes it very cumbersome to execute and lays grounds for disputes and claims. So it's really the bottom-line result. It's a performance-based contract. We are paying someone to perform to get rid of the material that is in the channel in a permitted, acceptable way. How much they spend then to do the dredging, to do the transport, the dewatering and all the other elements we try not to separate out any more than is necessary.

Q. So the U.S. doesn't have records of just a volume of treated dredged material that was disposed of upland for beneficial use?

A. If we do, it's general and not specific because it doesn't relate to our payment to the contractor. If he gets rid of it --

If some of the material --

Let's say we issued the contract and he started to process all of that silt -- we are talking only about a silt contract, for example -- process all of the silt and take it to a single

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x
TDM AMERICA, LLC, :
Plaintiff, :
:
-against- Index No. 06-472 C
THE UNITED STATES OF AMERICA,
Defendant,
- and - :
DONJON MARINE COMPANY, INC.,
:
Third-Party Defendant.
:
- - - - - - - - - - - - - - - - - - - - -x

CONTINUED DEPOSITION of BRYCE W. WISEMILLER, taken by Plaintiff at the offices of Davidoff, Malito & Hutcher, 605 Third Avenue, New York, New York 10158, on Tuesday, May 22, 2007, commencing at 9:38 o'clock a.m., before Annette Forbes, a Certified Shorthand (Stenotype) Reporter and Notary Public within and for the State of New York.

A P P E A R A N C E S:

DAVIDOFF, MALITO & HUTCHER
Attorneys for Plaintiff
605 Third Avenue
New York, New York 10158

BY: MICHAEL A. ADLER, ESQ.
DIMITRA TZORTZATOS, ESQ.

UNITED STATES DEPARTMENT OF JUSTICE
Attorneys for Defendant
1100 L Street, N.W.
Washington, D.C. 20005

BY: ERICA FRANKLIN, ESQ.

- and -

RITA M. FANG, ESQ.
Associate District Counsel
U.S. Army Corps of Engineers
26 Federal Plaza
Room 1837
New York, New York 10278

McCARTER & ENGLISH, LLP
Attorneys for Third-Party Defendant
Four Gateway Center
100 Mulberry Street
Newark, New York 07102-4056

BY: JOHN E. FLAHERTY, ESQ.

B R Y C E W. W I S E M I L L E R, recalled as a witness, having been previously sworn by a Notary Public within and for the State of New York, was examined and testified further as follows:

MS. FORBES: Mr. Wisemiller, I remind you that you are still under oath.

09:39:09 THE WITNESS: Okay, thank you.

DIRECT EXAMINATION

BY MR. ADLER:

Q Good morning, Mr. Wisemiller, welcome back.

09:39:20 A Thank you.

Q The court reporter has reminded you this is a continuation of your deposition and you are still under oath.

Same rules will apply.

09:39:29 If you need a break, just let me know.

A Yes.

Q I had asked you last time whether or not you prepared for this deposition.

09:39:36 Did you meet with counsel in

preparation for this deposition?

A Yes, to go over the general procedures for the 30(b(1).

09:39:47 MS. FRANKLIN: I will remind the witness not to share any attorney-client privileged information.

You can just answer yes or no.

09:39:55 Q How many times did you meet with counsel?

A I don't know exactly.

Q Was Mr. Flaherty present at any of those meetings?

09:40:08 A No.

MS. FRANKLIN: Michael, before we get started today, I wanted to provide to you, I have here four copies of the photographs relating to

09:40:19 Plaintiff's Exhibit 18 from the Barkcamp Mine Facility.

You requested these from the witness last time.

MR. ADLER: Thank you.

09:40:38 Q I will now show you what has been

Wisemiller

marked Plaintiff's Exhibit 29.

I ask you to please generally review it and to let me know whether or not you have familiarity with it.

09:40:47

MS. FRANKLIN: Sorry, Michael, I should have also indicated the Bates range.

MR. ADLER: It's G0102200001 through G0102200008.

09:41:01

Q Do you recognize it?
A (Perusing document.) Generally, yes.
Q What is it?
09:41:30
A It appears to be the contract package or Anchorage Channel contract 3, otherwise known as S-AN-1.
Q Have you seen contracts like this before?
09:41:46
A Yes.
Q As part of your general duties at the USACE?
A Yes.
Q With respect to this contract for
09:42:05
the Anchorage Channel, did you have any

responsibilities with respect to it?

A No.

MS. FRANKLIN: Objection. Vague.

09:42:11

A Sorry.

Q I turn your attention to the page that ends in Bates No. 66, item No. 0003AA --

A 0003AA, correct?

09:42:43 Q Correct.

-- and ask whether or not you have an understanding of the verbiage that appears a little bit to the right and below that entry?

A Yes.

09:42:59 Q How do you have that understanding?

A This is the line item in the bid schedule that describes the management of the surficial silty material generally encountered in our navigation contracts in the harbor.

09:43:21 Q Can you tell from the, do you have knowledge to be able to tell from this description whether or not this entry, item No. 0003AA, includes treatment for dredge materials for upland disposal?

09:43:44 A It includes processing and placement

of silt materials, as well as other items.

Q By processing, do you mean treatment of the material with an additive?

09:43:59 A I am uncertain as to your definition of treatment versus processing.

Q I am defining treatment really to include processing dredge material with an additive, such as cement or fly ash, et cetera.

09:44:14 I am using that to be consistent throughout the deposition.

A The reason I ask, just to clarify, was there were various authorities that have been given to the Corps in the last decade having to do

09:44:30 with treatment of dredge material using decontamination technologies, technologies that include processing with cement, but other technologies, more incineration, et cetera.

Q For purposes of this deposition I'm

09:44:45 referring to treatment with additives such as cement or fly ash, et cetera, not the others.

A Okay. Sorry. What was your question originally?

Q Now, your entry under 0003AA, do you

09:44:59 have knowledge whether or not that included

treatment of dredge material for upland disposal?

A Treatment, as you have defined it with cement, it doesn't explicitly say that.

09:45:15 Processing can be accomplished by a variety of means. It has been by our contractors, depending on what processing facility they use, what placement site.

So to say that this includes

09:45:30 treatment with cement is overstating the definition.

It's essentially treatment, processing of the material to be able to make it acceptable for the contractor's proposed placement

09:45:49 sites.

Q And according to this, do you know where the placement sites are?

A Not on this page, no.

Q Would you agree it's not at the

09:46:03 HARS, H-A-R-S?

A Yes.

Q With respect to whether or not this material would be deposited in aquatic landfill, would it have to be treated?

09:46:18 A Define aquatic landfill for me,

09:46:25
09:46:33
09:46:41
09:46:58
09:47:24

please.

Q You had used that term in the deposition originally?

A Aquatic.

Q Aquatic fill.

MS. FRANKLIN: I will object as vague.

Are you posting a hypothetical?

MR. ADLER: No.

MS. FRANKLIN: Will you repeat it?

Q What I want to know is can you tell from the description here whether or not by process of elimination this material was destined for upland disposal, because it's not at the HARS?

There is no mention of it being deposited in an aquatic fill.

MS. FRANKLIN: Objection.

Calls for speculation.

A On some of our deepening contracts there were line items where a small portion of the surficial silty material in the contract was costed for being placed at the Newark Bay CDF

Acquatic Disposal Facility, not landfill. That's where I was confused.

Q Okay.

09:47:36 A I don't know if this contract has that separate line item for a small portion of material.

This line item typically is for processing and placement upland. However, we

09:47:53 leave it to the contractor to really define the complete removal and transport and whatever processing/treatment is necessary to get rid of the material at upland sites.

If the contract wished to propose

09:48:12 placement of this material at an upland disposal facility without treatment and if that were permitted and acceptable and usable, the contractor could identify such as part of this contract.

09:48:30 The contract as written is a performance-based contract.

The goal of the Government is to remove the material from a channel in an environmentally acceptable way, cost effective, by

09:48:43 letting the contracting community bid, get the

lowest price overall cost for that.

And that includes taking that surficial silting material which is not acceptable for the HARS to alternative sites, the sites that have been typically used to process the material and have placed it at either landfill or ground fields in the region.

Q Do you know what process was used with respect to the entry under item No. 0003AA in this contract?

A I don't know for certain what the low bidder -- I thought it was Donjon. I don't know directly. I would assume that would be Donjon's, but I would have to look through the contract documents.

Q Why don't you look through it, just let me know if it's Donjon.

A (Perusing document.) It was Donjon.

Q Do you know who the processor was for this contract?

A I believe it was Donjon's processing facility in Port Newark.

Q Is that a land-based system or barge-based system?

# EXHIBIT 2

| District | Contract # | Project | Contractor |
|---|---|---|---|
| New York | W912DS-07-C-0003 | Anchorage Channel | Donjon |
| | W912DS-06-C-0018 | Mnt Newark Bay | GLDD |
| | W912DS-05-C-0003 | AK 2/3 | Don Jon |
| | W912DS-05-C-0004 | S-KVK-2 | Bean |
| | W912DS-05-C-0020 | Maint AK | DonJon |
| | W912DS-04-C-0008 | Port Jersey 2 | GLDD |
| | W912DS-04-C-0016 | Mnt Seguine Point | DonJon |
| | DACW51-03-C-0001 | Port Jersey 1 | DonJon |
| | DACW51-03-C-0012 | AK #1 | DonJon |
| | DACW51-03-C-0014 | KVK Area 8 | Jay Cashman |
| | DACW51-03-C-0019 | Mnt Flushing Bay | Bean |
| | DACW51-03-C-0021 | Maint AK | DonJon |
| | DACW51-02-C-0001 | KVK Area 5 | Bean |
| | DACW51-02-C-0002 | Minish #2 | Cruz Construction |
| | DACW51-02-C-0019 | KVK Area 6 | Bean |
| | DACW51-02-C-0022 | Mnt Newark Bay | DonJon |
| | DACW51-01-C-0006 | KVK Area 7 | DonJon |
| | DACW51-01-C-0023 | Mnt Eliz Pierhead | GLDD |
| Detroit | None | | |
| Los Angeles | DACW09-D-0010-0003 | LA River Estuary Dredging/Stabiliz Study | Buddy's Contracting |
| Jacksonville | W912EP-04-C-0021 | Miami River | Weston Bean Jt Venture |