(1) Actively participates in the group;

(2) Makes every effort to ensure that the group has a positive impact on the employment of minorities and women in the industry;

(3) Ensures that concrete benefits of the program are reflected in the Contractor's minority and female workforce participation;

(4) Makes a good-faith effort to meet its individual goals and timetables; and

(5) Can provide access to documentation that demonstrates the effectiveness of actions taken on behalf of the Contractor. The obligation to comply is the Contractor's, and failure of such a group to fulfill an obligation shall not be a defense for the Contractor's noncompliance.

(i) A single goal for minorities and a separate single goal for women shall be established. The Contractor is required to provide equal employment opportunity and to take affirmative action for all minority groups, both male and female, and all women, both minority and nonminority. Consequently, the Contractor may be in violation of Executive Order 11246, as amended, if a particular group is employed in a substantially disparate manner.

(j) The Contractor shall not use goals or affirmative action standards to discriminate against any person because of race, color, religion, sex, or national origin.

(k) The Contractor shall not enter into any subcontract with any person or firm debarred from Government contracts under Executive Order 11246, as amended.

(l) The Contractor shall carry out such sanctions and penalties for violation of this clause and of the Equal Opportunity clause, including suspension, termination, and cancellation of existing subcontracts, as may be imposed or ordered under Executive Order 11246, as amended, and its implementing regulations, by the OFCCP. Any failure to carry out these sanctions and penalties as ordered shall be a violation of this clause and Executive Order 11246, as amended.

(m) The Contractor in fulfilling its obligations under this clause shall implement affirmative action procedures at least as extensive as those prescribed in paragraph (g) of this clause, so as to achieve maximum results from its efforts to ensure equal employment opportunity. If the Contractor fails to comply with the requirements of Executive Order 11246, as amended, the implementing regulations, or this clause, the Deputy Assistant Secretary shall take action as prescribed in 41 CFR 60-4.8.

(n) The Contractor shall designate a responsible official to--

(1) Monitor all employment-related activity to ensure that the Contractor's equal employment policy is being carried out;

(2) Submit reports as may be required by the Government; and

(3) Keep records that shall at least include for each employee the name, address, telephone number, construction trade, union affiliation (if any), employee identification number, social security number, race, sex, status (e.g., mechanic, apprentice, trainee, helper, or laborer), dates of changes in status, hours worked per week in the indicated trade, rate of pay, and locations at which the work was performed. Records shall be maintained in an easily understandable and retrievable form; however, to the degree that existing records satisfy this requirement, separate records are not required to be maintained.

Nothing contained herein shall be construed as a limitation upon the application of other laws that establish different standards of compliance or upon the requirements for the hiring of local or other area residents (e.g., those under the Public Works Employment Act of 1977 and the Community Development Block Grant Program).

52.222-35 AFFIRMATIVE ACTION FOR DISABLED VETERANS AND VETERANS OF THE VIETNAM ERA (APR 1998)

(a) ) Definitions. As used in this clause--

All employment openings includes all positions except executive and top management, those positions that will be filled from within the contractor's organization, and positions lasting 3 days or less. This term includes full-time employment, temporary employment of more than 3 days' duration, and part-time employment.

Appropriate office of the State employment service system means the local office of the Federal-State national system of public employment offices with assigned responsibility to serve the area where the employment opening is to be filled, including the District of Columbia, Guam, the Commonwealth of Puerto Rico, and the Virgin Islands.

Positions that will be filled from within the Contractor's organization means employment openings for which no consideration will be given to persons outside the Contractor's organization (including any affiliates, subsidiaries, and parent companies) and includes any openings that the Contractor proposes to fill from regularly established "recall" lists. The exception does not apply to a particular opening once an employer decides to consider applicants outside of its organization.

Veteran of the Vietnam era means a person who--

(1) Served on active duty for a period of more than 180 days, any part of which occurred between August 5, 1964, and May 7, 1975, and was discharged or released therefrom with other than a dishonorable discharge; or

(2) Was discharged or released from active duty for a service-connected disability if any part of such active duty was performed between August 5, 1964, and May 7, 1975.

(b) General. (1) Regarding any position for which the employee or applicant for employment is qualified, the Contractor shall not discriminate against the individual because the individual is a disabled veteran or a veteran of the Vietnam era. The Contractor agrees to take affirmative action to employ, advance in employment, and otherwise treat qualified disabled veterans and veterans of the Vietnam era without discrimination based upon their disability or veterans' status in all employment practices such as--

(i) Employment;

(ii) Upgrading;

(iii) Demotion or transfer;

(iv) Recruitment;

(v) Advertising;

(vi) Layoff or termination;

(vii) Rates of pay or other forms of compensation; and

(viii) Selection for training, including apprenticeship.

(2) The Contractor agrees to comply with the rules, regulations, and relevant orders of the Secretary of Labor (Secretary) issued under the Vietnam Era Veterans' Readjustment Assistance Act of 1972 (the Act), as amended.

(c) Listing openings. (1) The Contractor agrees to list all employment openings existing at contract award or occurring during contract performance, at an appropriate office of the State employment service system in the

locality where the opening occurs. These openings include those occurring at any Contractor facility, including one not connected with performing this contract. An independent corporate affiliate is exempt from this requirement.

(2) State and local government agencies holding Federal contracts of $10,000 or more shall also list all their employment openings with the appropriate office of the State employment service.

(3) The listing of employment openings with the State employment service system is required at least concurrently with using any other recruitment source or effort and involves the obligations of placing a bona fide job order, including accepting referrals of veterans and nonveterans. This listing does not require hiring any particular job applicant or hiring from any particular group of job applicants and is not intended to relieve the Contractor from any requirements of Executive orders or regulations concerning nondiscrimination in employment.

(4) Whenever the Contractor becomes contractually bound to the listing terms of this clause, it shall advise the State employment service system, in each State where it has establishments, of the name and location of each hiring location in the State. As long as the Contractor is contractually bound to these terms and has so advised the State system, it need not advise the State system of subsequent contracts. The Contractor may advise the State system when it is no longer bound by this contract clause.

(d) Applicability. This clause does not apply to the listing of employment openings that occur and are filled outside the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, and the Virgin Islands.

(e) Postings. (1) The Contractor agrees to post employment notices stating (i) the Contractor's obligation under the law to take affirmative action to employ and advance in employment qualified disabled veterans and veterans of the Vietnam era, and (ii) the rights of applicants and employees.

(2) These notices shall be posted in conspicuous places that are available to employees and applicants for employment. They shall be in a form prescribed by the Deputy Assistant Secretary for Federal Contract Compliance Programs, Department of Labor (Deputy Assistant Secretary), and provided by or through the Contracting Officer.

(3) The Contractor shall notify each labor union or representative of workers with which it has a collective bargaining agreement or other contract understanding, that the Contractor is bound by the terms of the Act, and is committed to take affirmative action to employ, and advance in employment, qualified disabled veterans and veterans of the Vietnam Era.

(f) Noncompliance. If the Contractor does not comply with the requirements of this clause, appropriate actions may be taken under the rules, regulations, and relevant orders of the Secretary issued pursuant to the Act.

(g) Subcontracts. The Contractor shall include the terms of this clause in every subcontract or purchase order of $10,000 or more unless exempted by rules, regulations, or orders of the Secretary. The Contractor shall act as specified by the Deputy Assistant Secretary to enforce the terms, including action for noncompliance.

(End of clause)

52.222-36 AFFIRMATIVE ACTION FOR WORKERS WITH DISABILITIES (JUN 1998)

(a) General. (1) Regarding any position for which the employee or applicant for employment is qualified, the Contractor shall not discriminate against any employee or applicant because of physical or mental disability. The Contractor agrees to take affirmative action to employ, advance in employment, and otherwise treat qualified individuals with disabilities without discrimination based upon their physical or mental disability in all employment practices such as--

(i) Recruitment, advertising, and job application procedures;

(ii) Hiring, upgrading, promotion, award of tenure, demotion, transfer, layoff, termination, right of return from layoff, and rehiring;

(iii) Rates of pay or any other form of compensation and changes in compensation;

(iv) Job assignments, job classifications, organizational structures, position descriptions, lines of progression, and seniority lists;

(v) Leaves of absence, sick leave, or any other leave;

(vi) Fringe benefits available by virtue of employment, whether or not administered by the Contractor;

(vii) Selection and financial support for training, including apprenticeships, professional meetings, conferences, and other related activities, and selection for leaves of absence to pursue training;

(viii) Activities sponsored by the Contractor, including social or recreational programs; and

(ix) Any other term, condition, or privilege of employment.

(2) The Contractor agrees to comply with the rules, regulations, and relevant orders of the Secretary of Labor (Secretary) issued under the Rehabilitation Act of 1973 (29 U.S.C. 793) (the Act), as amended.

(b) Postings. (1) The Contractor agrees to post employment notices stating--

(i) The Contractor's obligation under the law to take affirmative action to employ and advance in employment qualified individuals with disabilities; and

(ii) The rights of applicants and employees.

(2) These notices shall be posted in conspicuous places that are available to employees and applicants for employment. The Contractor shall ensure that applicants and employees with disabilities are informed of the contents of the notice (e.g., the Contractor may have the notice read to a visually disabled individual, or may lower the posted notice so that it might be read by a person in a wheelchair). The notices shall be in a form prescribed by the Deputy Assistant Secretary for Federal Contract Compliance of the U.S. Department of Labor (Deputy Assistant Secretary) and shall be provided by or through the Contracting Officer.

(3) The Contractor shall notify each labor union or representative of workers with which it has a collective bargaining agreement or other contract understanding, that the Contractor is bound by the terms of Section 503 of the Act and is committed to take affirmative action to employ, and advance in employment, qualified individuals with physical or mental disabilities.

(c) Noncompliance. If the Contractor does not comply with the requirements of this clause, appropriate actions may be taken under the rules, regulations, and relevant orders of the Secretary issued pursuant to the Act.

(d) Subcontracts. The Contractor shall include the terms of this clause in every subcontract or purchase order in excess of $10,000 unless exempted by rules, regulations, or orders of the Secretary. The Contractor shall act as specified by the Deputy Assistant Secretary to enforce the terms, including action for noncompliance.

(End of clause)

52.222-37 EMPLOYMENT REPORTS ON DISABLED VETERANS AND VETERANS OF THE VIETNAM ERA (JAN 1999)

(a) Unless the Contractor is a State or local government agency, the Contractor shall report at least annually, as required by the Secretary of Labor, on--

(1) The number of disabled veterans and the number of veterans of the Vietnam era in the workforce of the contractor by job category and hiring location; and

(2) The total number of new employees hired during the period covered by the report, and of that total, the number of disabled veterans, and the number of veterans of the Vietnam era.

(b) The above items shall be reported by completing the form entitled "Federal Contractor Veterans' Employment Report VETS-100."

(c) Reports shall be submitted no later than September 30 of each year beginning September 30, 1988.

(d) The employment activity report required by paragraph (a)(2) of this clause shall reflect total hires during the most recent 12-month period as of the ending date selected for the employment profile report required by paragraph (a)(1) of this clause. Contractors may select an ending date: (1) As of the end of any pay period during the period January through March 1st of the year the report is due, or (2) as of December 31, if the contractor has previous written approval from the Equal Employment Opportunity Commission to do so for purposes of submitting the Employer Information Report EEO-1 (Standard Form 100).

(e) The count of veterans reported according to paragraph (a) of this clause shall be based on voluntary disclosure. Each Contractor subject to the reporting requirements at 38 U.S.C. 4212 shall invite all disabled veterans and veterans of the Vietnam era who wish to benefit under the affirmative action program at 38 U.S.C. 4212 to identify themselves to the Contractor. The invitation shall state that the information is voluntarily provided; that the information will be kept confidential; that disclosure or refusal to provide the information will not subject the applicant or employee to any adverse treatment; and that the information will be used only in accordance with the regulations promulgated under 38 U.S.C. 4212.

(f) Subcontracts. The Contractor shall include the terms of this clause in every subcontract or purchase order of $10,000 or more unless exempted by rules, regulations, or orders of the Secretary.

(End of clause)

52.223-6 DRUG-FREE WORKPLACE (JAN 1997)

(a) Definitions. As used in this clause --

"Controlled substance" means a controlled substance in schedules I through V of section 202 of the Controlled Substances Act (21 U.S.C. 812) and as further defined in regulation at 21 CFR 1308.11 - 1308.15.

"Conviction" means a finding of guilt (including a plea of nolo contendere) or imposition of sentence, or both, by any judicial body charged with the responsibility to deter- mine violations of the Federal or State criminal drug statutes.

"Criminal drug statute" means a Federal or non-Federal criminal statute involving the manufacture, distribution, dispensing, possession, or use of any controlled substance.

"Drug-free workplace" means the site(s) for the performance of work done by the Contractor in connection with a specific contract at which employees of the Contractor are prohibited from engaging in the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance.

"Employee" means an employee of a Contractor directly engaged in the performance of work under a Government contract. "Directly engaged" is defined to include all direct cost employees and any other Contractor employee who has other than a minimal impact or involvement in contract performance.

"Individual" means an offeror/contractor that has no more than one employee including the offeror/contractor.

(b) The Contractor, if other than an individual, shall-- within 30 days after award (unless a longer period is agreed to in writing for contracts of 30 days or more performance duration), or as soon as possible for contracts of less than 30 days performance duration--

(1) Publish a statement notifying its employees that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited in the Contractor's workplace and specifying the actions that will be taken against employees for violations of such prohibition;

(2) Establish an ongoing drug-free awareness program to inform such employees about--

(i) The dangers of drug abuse in the workplace;

(ii) The Contractor's policy of maintaining a drug-free workplace;

(iii) Any available drug counseling, rehabilitation, and employee assistance programs; and

(iv) The penalties that may be imposed upon employees for drug abuse violations occurring in the workplace;

(3) Provide all employees engaged in performance of the contract with a copy of the statement required by subparagraph (b)(1) of this clause;

(4) Notify such employees in writing in the statement required by subparagraph (b)(1) of this clause that, as a condition of continued employment on this contract, the employee will--

(i) Abide by the terms of the statement; and

(ii) Notify the employer in writing of the employee's conviction under a criminal drug statute for a violation occurring in the workplace no later than 5 days after such conviction.

(5) Notify the Contracting Officer in writing within 10 days after receiving notice under subdivision (b)(4)(ii) of this clause, from an employee or otherwise receiving actual notice of such conviction. The notice shall include the position title of the employee;

(6) Within 30 days after receiving notice under subdivision (b)(4)(ii) of this clause of a conviction, take one of the following actions with respect to any employee who is convicted of a drug abuse violation occurring in the workplace:

(i) Taking appropriate personnel action against such employee, up to and including termination; or

(ii) Require such employee to satisfactorily participate in a drug abuse assistance or rehabilitation program approved for such purposes by a Federal, State, or local health, law enforcement, or other appropriate agency; and

(7) Make a good faith effort to maintain a drug-free workplace through implementation of subparagraphs (b)(1) though (b)(6) of this clause.

(c) The Contractor, if an individual, agrees by award of the contract or acceptance of a purchase order, not to engage in the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance while performing this contract.

(d) In addition to other remedies available to the Government, the Contractor's failure to comply with the requirements of paragraph (b) or (c) of this clause may, pursuant to FAR 23.506, render the Contractor subject to suspension of contract payments, termination of the contract for default, and suspension or debarment.

(End of clause)

52.223-14 TOXIC CHEMICAL RELEASE REPORTING (OCT 2000)

(a) Unless otherwise exempt, the Contractor, as owner or operator of a facility used in the performance of this contract, shall file by July 1 for the prior calendar year an annual Toxic Chemical Release Inventory Form (Form R) as described in sections 313(a) and (g) of the Emergency Planning and Community Right-to-Know Act of 1986 (EPCRA) (42 U.S.C. 11023(a) and (g)), and section 6607 of the Pollution Prevention Act of 1990 (PPA) (42 U.S.C. 13106). The Contractor shall file, for each facility subject to the Form R filing and reporting requirements, the annual Form R throughout the life of the contract.

(b) A Contractor owned or operated facility used in the performance of this contract is exempt from the requirement to file an annual Form R if--

(1) The facility does not manufacture, process, or otherwise use any toxic chemicals listed under section 313(c) of EPCRA, 42 U.S.C. 11023(c);

(2) The facility does not have 10 or more full-time employees as specified in section 313(b)(1)(A) of EPCRA, 42 U.S.C. 11023(b)(1)(A);

(3) The facility does not meet the reporting thresholds of toxic chemicals established under of EPCRA, 42 U.S.C. 11023(f) (including the alternate thresholds at 40 CFR 372.27, provided an appropriate certification form has been filed with EPA);

(4) The facility does not fall within Standard Industrial Classification Code (SIC) major groups 20 through 39 or their corresponding North American Industry Classification System (NAICS) sectors 31 through 33; or

(5) The facility is not located within any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Northern Mariana Islands, or any other territory or possession over which the United States has jurisdiction.

(c) If the Contractor has certified to an exemption in accordance with one or more of the criteria in paragraph (b) of this clause, and after award of the contract circumstances change so that any of its owned or operated facilities used in the performance of this contract is no longer exempt--

(1) The Contractor shall notify the Contracting Officer; and

(2) The Contractor, as owner or operator of a facility used in the performance of this contract that is no longer exempt, shall (i) submit a Toxic Chemical Release Inventory Form (Form R) on or before July 1 for the prior calendar year during which the facility becomes eligible; and (ii) continue to file the annual Form R for the life of the contract for such facility.

(d) The Contracting Officer may terminate this contract or take other action as appropriate, if the Contractor fails to comply accurately and fully with the EPCRA and PPA toxic chemical release filing and reporting requirements.

(e) Except for acquisitions of commercial items, as defined in FAR Part 2, the Contractor shall--

(1) For competitive subcontracts expected to exceed $100,000 (including all options), include a solicitation provision substantially the same as the provision at FAR 52.223-13, Certification of Toxic Chemical Release Reporting; and

(2) Include in any resultant subcontract exceeding $100,000 (including all options), the substance of this clause, except this paragraph (e).

52.225-9 BUY AMERICAN ACT--BALANCE OF PAYMENTS PROGRAM—CONSTRUCTION MATERIALS (FEB 2000)

(a) Definitions. As used in this clause--

Component means any article, material, or supply incorporated directly into construction materials.

Construction material means an article, material, or supply brought to the construction site by the Contractor or a subcontractor for incorporation into the building or work. The term also includes an item brought to the site preassembled from articles, materials, or supplies. However, emergency life safety systems, such as emergency lighting, fire alarm, and audio evacuation systems, that are discrete systems incorporated into a public building or work and that are produced as complete systems, are evaluated as a single and distinct construction material regardless of when or how the individual parts or components of those systems are delivered to the construction site. Materials purchased directly by the Government are supplies, not construction material.

Cost of components means--

(1) For components purchased by the Contractor, the acquisition cost, including transportation costs to the place of incorporation into the end product (whether or not such costs are paid to a domestic firm), and any applicable duty (whether or not a duty-free entry certificate is issued); or

(2) For components manufactured by the Contractor, all costs associated with the manufacture of the component, including transportation costs as described in paragraph (1) of this definition, plus allocable overhead costs, but excluding profit. Cost of components does not include any costs associated with the manufacture of the end product.

Domestic construction material means--

(1) An unmanufactured construction material mined or produced in the United States; or

(2) A construction material manufactured in the United States, if the cost of its components mined, produced, or manufactured in the United States exceeds 50 percent of the cost of all its components. Components of foreign origin of the same class or kind for which nonavailability determinations have been made are treated as domestic.

Foreign construction material means a construction material other than a domestic construction material.

United States means the 50 States and the District of Columbia, U.S. territories and possessions, Puerto Rico, the Northern Mariana Islands, and any other place subject to U.S. jurisdiction, but does not include leased bases.

(b) Domestic preference. (1) This clause implements the Buy American Act (41 U.S.C. 10a-10d) and the Balance of Payments Program by providing a preference for domestic construction material. The Contractor shall use only domestic construction material in performing this contract, except as provided in paragraphs (b)(2) and (b)(3) of this clause.

(2) This requirement does not apply to the construction material or components listed by the Government as follows: None

(3) The Contracting Officer may add other foreign construction material to the list in paragraph (b)(2) of this clause if the Government determines that

(i) The cost of domestic construction material would be unreasonable. The cost of a particular domestic construction material subject to the requirements of the Buy American Act is unreasonable when the cost of such material exceeds the cost of foreign material by more than 6 percent. For determination of unreasonable cost under the Balance of Payments Program, the Contracting Officer will use a factor of 50 percent;

(ii) The application of the restriction of the Buy American Act or Balance of Payments Program to a particular construction material would be impracticable or inconsistent with the public interest; or

(iii) The construction material is not mined, produced, or manufactured in the United States in sufficient and reasonably available commercial quantities of a satisfactory quality.

(c) Request for determination of inapplicability of the Buy American Act or Balance of Payments Program. (1)(i) Any Contractor request to use foreign construction material in accordance with paragraph (b)(3) of this clause shall include adequate information for Government evaluation of the request, including--

(A) A description of the foreign and domestic construction materials;

(B) Unit of measure;

(C) Quantity;

(D) Price;

(E) Time of delivery or availability;

(F) Location of the construction project;

(G) Name and address of the proposed supplier; and

(H) A detailed justification of the reason for use of foreign construction materials cited in accordance with paragraph (b)(3) of this clause.

(ii) A request based on unreasonable cost shall include a reasonable survey of the market and a completed price comparison table in the format in paragraph (d) of this clause.

(iii) The price of construction material shall include all delivery costs to the construction site and any applicable duty (whether or not a duty-free certificate may be issued).

(iv) Any Contractor request for a determination submitted after contract award shall explain why the Contractor could not reasonably foresee the need for such determination and could not have requested the determination before contract award. If the Contractor does not submit a satisfactory explanation, the Contracting Officer need not make a determination.

(2) If the Government determines after contract award that an exception to the Buy American Act or Balance of Payments Program applies and the Contracting Officer and the Contractor negotiate adequate consideration, the Contracting Officer will modify the contract to allow use of the foreign construction material. However, when the basis for the exception is the unreasonable price of a domestic construction material, adequate consideration is not less than the differential established in paragraph (b)(3)(i) of this clause.

(3) Unless the Government determines that an exception to the Buy American Act or Balance of Payments Program applies, use of foreign construction material is noncompliant with the Buy American Act or Balance of Payments Program.

(d) Data. To permit evaluation of requests under paragraph (c) of this clause based on unreasonable cost, the Contractor shall include the following information and any applicable supporting data based on the survey of suppliers:

Foreign and Domestic Construction Materials Price Comparison

| Construction material description | Unit of measure | Quantity | Price (dollars) \1\ |
|---|---|---|---|
| Item 1 | | | |

Foreign construction material.... ...................... ...................... ......................
Domestic construction material... ...................... ...................... ......................
Item 2
Foreign construction material.... ...................... ...................... ......................
Domestic construction material... ...................... ...................... ......................

---

Include all delivery costs to the construction site and any applicable duty (whether or not a duty-free entry certificate is issued).
List name, address, telephone number, and contact for suppliers surveyed. Attach copy of response; if oral, attach summary.
Include other applicable supporting information.

(End of clause)

52.225-11 BUY AMERICAN ACT--BALANCE OF PAYMENTS PROGRAM--CONSTRUCTION MATERIALS UNDER TRADE AGREEMENTS (FEB 2000)

(a) Definitions. As used in this clause--

Component means any article, material, or supply incorporated directly into construction materials.

Construction material means an article, material, or supply brought to the construction site by the Contractor or subcontractor for incorporation into the building or work. The term also includes an item brought to the site preassembled from articles, materials, or supplies. However, emergency life safety systems, such as emergency lighting, fire alarm, and audio evacuation systems, that are discrete systems incorporated into a public building or work and that are produced as complete systems, are evaluated as a single and distinct construction material regardless of when or how the individual parts or components of those systems are delivered to the construction site. Materials purchased directly by the Government are supplies, not construction material.

Cost of components means--

(1) For components purchased by the Contractor, the acquisition cost, including transportation costs to the place of incorporation into the end product (whether or not such costs are paid to a domestic firm), and any applicable duty (whether or not a duty-free entry certificate is issued); or

(2) For components manufactured by the Contractor, all costs associated with the manufacture of the component, including transportation costs as described in paragraph (1) of this definition, plus allocable overhead costs, but excluding profit. Cost of components does not include any costs associated with the manufacture of the end product.

Designated country means any of the following countries: Aruba, Austria, Bangladesh, Belgium, Benin, Bhutan, Botswana, Burkina Faso, Burundi, Canada, Cape Verde, Central African Republic, Chad, Comoros, Denmark.

Djibouti, Equatorial Guinea, Finland, France, Gambia, Germany, Greece, Guinea, Guinea-Bissau, Haiti, Hong Kong, Ireland, Israel, Italy, Japan.

Kiribati, Korea, Republic of, Lesotho, Liechtenstein, Luxembourg, Malawi, Maldives, Mali, Mozambique, Nepal, Netherlands, Niger, Norway, Portugal, Rwanda.

Sao Tome and Principe, Sierra Leone, Singapore, Somalia, Spain, Sweden, Switzerland, Tanzania U.R., Togo, Tuvalu, Uganda, United Kingdom, Vanuatu, Western Samoa, Yemen.

Designated country construction material means a construction material that--

(1) Is wholly the growth, product, or manufacture of a designated country; or

(2) In the case of a construction material that consists in whole or in part of materials from another country, has been substantially transformed in a designated country into a new and different construction material distinct from the materials from which it was transformed.

Domestic construction material means--

(1) An unmanufactured construction material mined or produced in the United States; or

(2) A construction material manufactured in the United States, if the cost of its components mined, produced, or manufactured in the United States exceeds 50 percent of the cost of all its components. Components of foreign origin of the same class or kind for which nonavailability determinations have been made are treated as domestic.

Foreign construction material means a construction material other than a domestic construction material.

North American Free Trade Agreement country means Canada or Mexico.

North American Free Trade Agreement country construction material means a construction material that--

(1) Is wholly the growth, product, or manufacture of a North American Free Trade Agreement (NAFTA) country; or

(2) In the case of a construction material that consists in whole or in part of materials from another country, has been substantially transformed in a NAFTA country into a new and different construction material distinct from the materials from which it was transformed.

United States means the 50 States and the District of Columbia, U.S. territories and possessions, Puerto Rico, the Northern Mariana Islands, and any other place subject to U.S. jurisdiction, but does not include leased bases.

(b) Construction materials. (1) This clause implements the Buy American Act (41 U.S.C. 10a-10d) and the Balance of Payments Program by providing a preference for domestic construction material. In addition, the Contracting Officer has determined that the Trade Agreements Act and the North American Free Trade Agreement (NAFTA) apply to this acquisition. Therefore, the Buy American Act and Balance of Payments Program restrictions are waived for designated country and NAFTA country construction materials.

(2) The Contractor shall use only domestic, designated country, or NAFTA country construction material in performing this contract, except as provided in paragraphs (b)(3) and (b)(4) of this clause.

(3) The requirement in paragraph (b)(2) of this clause does not apply to the construction materials or components listed by the Government as follows: NONE

(4) The Contracting Officer may add other foreign construction material to the list in paragraph (b)(3) of this clause if the Government determines that--

(i) The cost of domestic construction material would be unreasonable. The cost of a particular domestic construction material subject to the restrictions of the Buy American Act is unreasonable when the cost of such material exceeds the cost of foreign material by more than 6 percent. For determination of unreasonable cost under the Balance of Payments Program, the Contracting Officer will use a factor of 50 percent;

(ii) The application of the restriction of the Buy American Act or Balance of Payments Program to a particular construction material would be impracticable or inconsistent with the public interest; or

(iii) The construction material is not mined, produced, or manufactured in the United States in sufficient and reasonably available commercial quantities of a satisfactory quality.

(c) Request for determination of inapplicability of the Buy American Act or Balance of Payments Program. (1)(i) Any Contractor request to use foreign construction material in accordance with paragraph (b)(4) of this clause shall include adequate information for Government evaluation of the request, including--

(A) A description of the foreign and domestic construction materials;

(B) Unit of measure;

(C) Quantity;

(D) Price;

(E) Time of delivery or availability;

(F) Location of the construction project;

(G) Name and address of the proposed supplier; and

(H) A detailed justification of the reason for use of foreign construction materials cited in accordance with paragraph (b)(3) of this clause.

(ii) A request based on unreasonable cost shall include a reasonable survey of the market and a completed price comparison table in the format in paragraph (d) of this clause.

(iii) The price of construction material shall include all delivery costs to the construction site and any applicable duty (whether or not a duty-free certificate may be issued).

(iv) Any Contractor request for a determination submitted after contract award shall explain why the Contractor could not reasonably foresee the need for such determination and could not have requested the determination before contract award. If the Contractor does not submit a satisfactory explanation, the Contracting Officer need not make a determination.

(2) If the Government determines after contract award that an exception to the Buy American Act or Balance of Payments Program applies and the Contracting Officer and the Contractor negotiate adequate consideration, the Contracting Officer will modify the contract to allow use of the foreign construction material. However, when the basis for the exception is the unreasonable price of a domestic construction material, adequate consideration is not less than the differential established in paragraph (b)(4)(i) of this clause.

(3) Unless the Government determines that an exception to the Buy American Act or Balance of Payments Program applies, use of foreign construction material is noncompliant with the Buy American Act or Balance of Payments Program.

(d) Data. To permit evaluation of requests under paragraph (c) of this clause based on unreasonable cost, the Contractor shall include the following information and any applicable supporting data based on the survey of suppliers:

Foreign and Domestic Construction Materials Price Comparison

| Construction material description | Unit of measure | Quantity | Price (dollars) \1\ |
|---|---|---|---|
| Item 1: | | | |
| Foreign construction material.... | ...................... | ...................... | ...................... |
| Domestic construction material... | ...................... | ...................... | ...................... |
| Item 2: | | | |

Foreign construction material.... ...................... ...................... ......................
Domestic construction material... ...................... ...................... ......................

---

\1\ Include all delivery costs to the construction site and any applicable duty (whether or not a duty-free entry certificate is issued).
List name, address, telephone number, and contact for suppliers surveyed. Attach copy of response; if oral, attach summary.
Include other applicable supporting information.

(End of clause)

52.225-13 RESTRICTIONS ON CERTAIN FOREIGN PURCHASES (JUL 2000)

(a) The Contractor shall not acquire, for use in the performance of this contract, any supplies or services originating from sources within, or that were located in or transported from or through, countries whose products are banned from importation into the United States under regulations of the Office of Foreign Assets Control, Department of the Treasury. Those countries are Cuba, Iran, Iraq, Libya, North Korea, Sudan, the territory of Afghanistan controlled by the Taliban, and Serbia (excluding the territory of Kosovo).

(b) The Contractor shall not acquire for use in the performance of this contract any supplies or services from entities controlled by the government of Iraq.

(c) The Contractor shall insert this clause, including this paragraph (c), in all subcontracts.

(End of clause)

52.226-1 UTILIZATION OF INDIAN ORGANIZATIONS AND INDIAN-OWNED ECONOMIC ENTERPRISES (JUN 2000)

(a) Definitions. As used in this clause:

"Indian" means any person who is a member of any Indian tribe, band, group, pueblo or community that is recognized by the Federal Government as eligible for services from the Bureau of Indian Affairs (BIA) in accordance with 25 U.S.C. 1452(c) and any ``Native" as defined in the Alaska Native Claims Settlement Act (43 U.S.C. 1601).

"Indian organization" means the governing body of any Indian tribe or entity established or recognized by the governing body of an Indian tribe for the purposes of 25 U.S.C., chapter 17.

"Indian-owned economic enterprise" means any Indian-owned (as determined by the Secretary of the Interior) commercial, industrial, or business activity established or organized for the purpose of profit, provided that Indian ownership constitutea not less than 51 percent of the enterprise.

"Indian tribe" means any Indian tribe, band, group, pueblo or community, including native villages and native groups (including corporations organized by Kenai, Juneau, Sitka, and Kodiak) as defined in the Alaska Native Claims Settlement Act, that is recognized by the Federal Government as eligible for services from BIA in accordance with 25 U.S.C. 1542(c).

"Interested party" means a prime contractor or an actual or prospective offeror whose direct economic interest would be affected by the award of a subcontract or by the failure to award a subcontract.

(b) The Contractor shall use its best efforts to give Indian organizations and Indian-owned economic enterprises (25 U.S.C. 1544) the maximum practicable opportunity to participate in the subcontracts it awards to the fullest extent consistent with efficient performance of its contract.

(1) The Contracting Officer and the Contractor, acting in good faith, may rely on the representation of an Indian organization or Indian-owned economic enterprise as to its eligibility, unless an interested party challenges its status or the Contracting Officer has independent reason to question that status. In the event of a challenge to the representation of a subcontractor, the Contracting Officer will refer the matter to the U.S. Department of the Interior, Bureau of Indian Affairs (BIA), Attn: Chief, Division of Contracting and Grants Administration, 1849 C Street, NW., MS 2626-MIB, Washington, DC 20240-4000.

The BIA will determine the eligibility and notify the Contracting Officer. No incentive payment will be made within 50 working days of subcontract award or while a challenge is pending. If a subcontractor is determined to be an ineligible participant, no incentive payment will be made under the Indian Incentive Program.

(2) The Contractor may request an adjustment under the Indian Incentive Program to the following:

(i) The estimated cost of a cost-type contract.

(ii) The target cost of a cost-plus-incentive-fee prime contract.

(iii) The target cost and ceiling price of a fixed-price incentive prime contract.

(iv) The price of a firm-fixed-price prime contract.

(3) The amount of the adjustment to the prime contract is 5 percent of the estimated cost, target cost, or firm-fixed-price included in the subcontract initially awarded to the Indian organization or Indian-owned economic enterprise.

(4) The Contractor has the burden of proving the amount claimed and must assert its request for an adjustment prior to completion of contract performance.

(c) The Contracting Officer, subject to the terms and conditions of the contract and the availability of funds, will authorize an incentive payment of 5 percent of the amount paid to the subcontractor. The Contracting Officer will seek funding in accordance with agency procedures.

(End of clause)

52.227-1 AUTHORIZATION AND CONSENT (JUL 1995)

(a) The Government authorizes and consents to all use and manufacture, in performing this contract or any subcontract at any tier, of any invention described in and covered by a United States patent (1) embodied in the structure or composition of any article the delivery of which is accepted by the Government under this contract or (2) used in machinery, tools, or methods whose use necessarily results from compliance by the Contractor or a subcontractor with (i) specifications or written provisions forming a part of this contract or (ii) specific written instructions given by the Contracting Officer directing the manner of performance. The entire liability to the Government for infringement of a patent of the United States shall be determined solely by the provisions of the indemnity clause, if any, included in this contract or any subcontract hereunder (including any lower-tier subcontract), and the Government assumes liability for all other infringement to the extent of the authorization and consent hereinabove granted.

(b) The Contractor agrees to include, and require inclusion of, this clause, suitably modified to identify the parties, in all subcontracts at any tier for supplies or services (including construction, architect-engineer services, and materials, supplies, models, samples, and design or testing services expected to exceed the simplified acquisition

threshold (however, omission of this clause from any subcontract, including those at or below the simplified acquisition threshold, does not affect this authorization and consent.)

52.227-2 NOTICE AND ASSISTANCE REGARDING PATENT AND COPYRIGHT INFRINGEMENT (AUG 1996)

(a) The Contractor shall report to the Contracting Officer, promptly and in reasonable written detail, each notice or claim of patent or copyright infringement based on the performance of this contract of which the Contractor has knowledge.

(b) In the event of any claim or suit against the Government on account of any alleged patent or copyright infringement arising out of the performance of this contract or out of the use of any supplies furnished or work or services performed under this contract, the Contractor shall furnish to the Government, when requested by the Contracting Officer, all evidence and information in possession of the Contractor pertaining to such suit or claim. Such evidence and information shall be furnished at the expense of the Government except where the Contractor has agreed to indemnify the Government.

(c) The Contractor agrees to include, and require inclusion of, this clause in all subcontracts at any tier for supplies or services (including construction and architect-engineer subcontracts and those for material, supplies, models, samples, or design or testing services) expected to exceed the simplified acquisition threshold at (FAR) 2.101.to exceed the dollar amount set forth in 13.000 of the Federal Acquisition Regulation (FAR).

(End of clause)

52.227-4 PATENT INDEMNITY--CONSTRUCTION CONTRACTS (APR 1984)

Except as otherwise provided, the Contractor agrees to indemnify the Government and its officers, agents, and employees against liability, including costs and expenses, for infringement upon any United States patent (except a patent issued upon an application that is now or may hereafter be withheld from issue pursuant to a Secrecy Order under 35 U.S.C. 181) arising out of performing this contract or out of the use or disposal by or for the account of the Government of supplies furnished or work performed under this contract.

52.228-1 BID GUARANTEE (SEP 1996)

(a) Failure to furnish a bid guarantee in the proper form and amount, by the time set for opening of bids, may be cause for rejection of the bid.

(b) The bidder shall furnish a bid guarantee in the form of a firm commitment, e.g., bid bond supported by good and sufficient surety or sureties acceptable to the Government, postal money order, certified check, cashier's check, irrevocable letter of credit, or, under Treasury Department regulations, certain bonds or notes of the United States. The Contracting Officer will return bid guarantees, other than bid bonds, (1) to unsuccessful bidders as soon as practicable after the opening of bids, and (2) to the successful bidder upon execution of contractual documents and bonds (including any necessary coinsurance or reinsurance agreements), as required by the bid as accepted.

(c) The amount of the bid guarantee shall be 20 percent of the bid price or $3,000.0000.00, whichever is less.

(d) If the successful bidder, upon acceptance of its bid by the Government within the period specified for acceptance, fails to execute all contractual documents or furnish executed bond(s) within 10 days after receipt of the forms by the bidder, the Contracting Officer may terminate the contract for default.

(e) In the event the contract is terminated for default, the bidder is liable for any cost of acquiring the work that exceeds the amount of its bid, and the bid guarantee is available to offset the difference.

# EXHIBIT 23

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TDM America, LLC,<br><br>Plaintiff,<br><br>v.<br><br>The United States of America<br><br>Defendant,<br>and<br><br>Donjon Marine Company, Inc.<br><br>Interested Party. | ) | Civil Action No. 06-472-C<br><br>Judge Thomas C. Wheeler |

**PLAINTIFF TDM AMERICA, LLC'S OBJECTIONS AND RESPONSES TO DEFENDANT UNITED STATES' FIRST SET OF INTERROGATORIES TO PLAINTIFF (NOS. 1-16)**

Plaintiff TDM America, LLC ("TDM") pursuant to Rule 33 of the Rules of the Court of Federal Claims (the "RCFC") hereby responds to the first set of interrogatories (Nos. 1-16) served by defendant The United States of America ("US") on TDM on February 23, 2007. The following responses are based upon present information and belief. TDM reserves the right to seasonably amend and supplement these responses as required under the RCFC.

**GENERAL OBJECTIONS**

TDM hereby asserts the following general objections to the US interrogatories:

1. TDM objects to each and every instruction and definition in the US first set of interrogatories to TDM to the extent that they exceed the permissible scope of

discovery under the RCFC and/or impose upon defendant duties and responsibilities beyond those required by those rules.

2. TDM objects to the definitions of plaintiff as "you", "your" and "TDM" to the extent it calls for any entity that was or is unaffiliated with the plaintiff in this action. As such, TDM does not have knowledge and cannot speak for any unaffiliated TDM predecessor-in-interest that may have prosecuted or owned the patents-in-suit.

3. TDM objects to each and every interrogatory to the extent they are inconsistent with the requirements and limitations of the RCFC.

4. TDM objects to each and every interrogatory to the extent it is harassing. overbroad, onerous, unduly burdensome, and the information requested is more appropriately elicited through depositions or by other discovery methods.

5. TDM objects to each and every interrogatory to the extent that the information requested is precluded and/or immune from discovery under: (a) the attorney-client privilege; (b) the attorney work product privilege; (c) the community of interest privilege; (d) the deliberative process privilege; and/or (e) might tend to disclose any of the content of such privileged information and such information will not be provided.

6. Responses that contain TDM's proprietary and/or confidential information, will be provided under the protective order entered by the Court.

7. TDM objects to each and every interrogatory to the extent that they seek legal conclusions or opinions, and/or mental impressions, and/or theories of counsel and such information will not be provided.

8. TDM objects to each and every interrogatory to the extent the interrogatory does not set forth a definite time period, sets forth a time period that exceeds any period relevant to this litigation, and, thereby, seeks information that is not reasonably calculated to lead to the discovery of admissible evidence in this action. TDM generally limits the scope of its responses to the relevant time periods.

9. TDM objects to each and every interrogatory to the extent that they are premature.

10. The fact that TDM responds to an interrogatory shall not be construed, in any way, that the response is relevant, material and/or admissible. Accordingly, TDM reserves its right to challenge the relevance, materiality, and admissibility at trial, or in any subsequent proceeding, or any other action, of any of the information TDM provides herein.

11. TDM objects to each and every interrogatory to the extent it seeks information or documents that are generated or created by or for the use of counsel as of the commencement of this case.

12. A response to an interrogatory, despite any general objection and/or specific objection made thereto, does not obligate a continued response when objections have been made.

13. TDM objects to each and every interrogatory response to the extent that they call for the productions of expert opinions and/or claim construction prior to the scheduled date as set forth in the February 23, 2007 scheduling order of this Court.

14. Whenever an interrogatory request seeks identification of documents and/or TDM responds to an interrogatory by referring to documents from which a response may be ascertained, TDM, in good faith, identifies relevant documents, but the lack of identifying all documents shall not preclude TDM from identifying additional documents at a later date.

15. TDM objects to each and every interrogatory to the extent it seeks to identify all documents that pertain to that particular interrogatory. TDM has or will produce relevant non-privileged documents to the extent such documents exist and will use reasonable efforts to identify same. TDM further reserves its right to amend the identified documents and/or supplement same as this case progresses.

16. TDM objects to the numbering sequence of the interrogatories to the extent that disparate subparts have been subsumed under a single interrogatory. TDM will answer each discrete subpart and note the renumbering of the interrogatory sequence.

17. TDM's responses are based upon information that is known or reasonably believed by TDM at the time of its responses to these interrogatories. It is anticipated that further discovery, investigation, and analysis may supply additional facts, provide new meaning to known facts, or entail new factual conclusions. Accordingly, TDM reserves its right to seasonably amend and/or supplement these responses in accordance with RCFC.

**SPECIFIC OBJECTIONS AND RESPONSES**

Each of the general objections are incorporated herein by reference into each of the interrogatory responses. A response to a specific interrogatory is not intended to waive any of the general objections incorporated by reference. Subject to and without waiving its general objections, TDM hereby objects and responds to each interrogatory of the US as set forth below.

## RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 1:

Identify each claim in each of the patents-in-suit that you allege to be infringed by the United States and for each such claim (a) state whether TDM's infringement contention is based on literal infringement or the doctrine of equivalents; (b) identify the process used by the United States that TDM contends infringes that claim; ( c) describe where each element of each claim is found within the accused process; (d) provide a complete and concise citation and quotation to document(s); testimony, or other evidence upon which TDM relies in support of its infringement contentions( s); and (e) identify all persons having knowledge of each of the facts supporting the foregoing contentions.

### RESPONSE TO INTERROGATORY NO. 1:

In addition to the general objections, TDM specifically objects to this interrogatory to the extent it is harassing and overly broad. TDM further objects to this interrogatory to the extent it seeks information that is immune from discovery under one or more privileges. TDM further objects to this interrogatory to the extent it calls for claim interpretation, expert witness subject matter, and other information that is premature in view of the scheduling order of this Court. TDM further objects to this interrogatory to the extent it seeks information that is more appropriately obtained through a discovery deposition. TDM further objects to this interrogatory to the extent it seeks attorney mental impressions and thoughts. TDM further objects to this interrogatory to the extent it calls for information to be furnished in a particular format. TDM will provide information in accordance with RCFC 33. TDM further objects to this interrogatory to the extent that the document, and other information sought herein is readily available to the US as it is contained in the US contracts and related materials the US has with dredging contractors. In this respect, not only is such information available to the US, but it has not yet been made available to TDM. TDM explicitly reserves its

right and expects to supplement and/or amend its responses to these interrogatories as this litigation progresses through discovery, expert witnesses, and the Markman hearing.

Notwithstanding these objections, TDM responds as follows:

The claims in the patents-in-suit that TDM alleges are infringed by the US are:

| US Patent Number | Infringed Claims |
|---|---|
| 6,293,731 | 1 |
| 5,542,614 | 1, 2, 4 |
| 5,794,862 | 2, 3, 4, |
| 5,007,590 | 1 |

(a) TDM's infringement claims are based on literal infringement and, to the extent literal infringement is not found, under the doctrine of equivalents. TDM will provide further supplementation as to which claims are literally infringed and which claims are infringed under the doctrine of equivalents after defendants and interested parties produce all relevant information, after experts review same and after claim construction.

(b)-(d) Claim 1 of the '731 patent is infringed by the US when it or its contractors treat or otherwise process dredged materials in a barge-based system. Specifically:

| Claim 1 of the '731 Patent | US' Dredging Activities |
|---|---|
| A method for producing a structural fill material comprising the steps of: | The preamble is not a claim limitation. However, the US' dredging activities includes producing a structural fill material from dredged materials. (Photographs bearing bates nos. TDM004526-TDM004532; TDM004534-TDM004537; TDM0004539; TDM004542; TDM004557-TDM0004561; TDM |

| | |
|---|---|
| | 004563; TDM004569-TDM004570; TDM004581-TDM0045882; TDM004589-TDM004593; TDM004596-TDM004597; TDM004600; and document bearing bates nos. TDM005114-TDM005120). |
| obtaining a dredged material; | The US, on its own or through contractors, is conducting dredging activities. Those activities include obtaining dredged materials from the harbors in accordance with USACE contracts. (Photographs bearing bates nos. TDM004526-TDM004527; TDM004529; TDM004531; TDM004533;; TDM004536; TDM004542; TDM004557; TDM004558; TDM004561; TDM004563;TDM004568; TDM004570; TDM004582; TDM004589-TDM004593; TDM004596-TDM004597). |
| depositing the dredged material into a containment receptacle; | The US and/or its contractors deposit the dredged materials into a containment receptacle, specifically a barge or scow. The dredged material is deposited in barges or scows. (Photographs bearing bates nos. TDM004526-TDM004529; TDM004531; TDM004533-TDM004534; TDM004536-TDM004542; TDM004557-TDM004558; TDM004561; TDM004563;TDM004568; TDM004570; TDM004582; TDM004589-TDM004593; TDM004596-TDM004597; also see document bearing bates no. TDM004600). |
| removing free water from the dredged material and the containment receptacle; | In the US' or its contractor's processing of the dredged materials, the dredged materials are dewatered in the containment receptacle (i.e., barge or scow). (Photographs bearing bates nos. TDM004526-004527; TDM004596). |
| creating an additive slurry in a mixing container; | In the US' or it contractor's processing of the dredged materials, various storage receptacles, silos or tanks containing additives are adjacent to each other and to a water tank. The silos and water tank are piped to a conveyor-like mixing container which is near each of the silos and pumps material to the containment receptacle. The additives, water, and/or any |

| | |
|---|---|
| | combination thereof, can enter the conveyor mixing container where they are mixed to form an additive slurry. Water may also be added to the additives as they mix on the conveyor or as the mixture leaves the conveyor but before the additive slurry enters the containment receptacle and/or before the additive slurry comes into contact with the mixing assembly. This is creating an additive slurry in the conveyor mixing container.<br>(Photographs bearing bates nos. TDM004528; TDM004530-TDM004533 TDM004582; TDM004589; TDM004591; also see document bearing bates no. 005117). |
| pumping the additive slurry from the mixing container to a mixing assembly disposed within the containment receptacle; | The mixing container itself includes structure to create the additive slurry as it transports that additive slurry to the containment receptacles. Water may be added in the conveyor or as the slurry leaves the conveyor mixing container prior to entering the containment receptacle. The additive slurry drops from the conveyor mixing container to the containment receptacle as water is continuously pumped and added to the slurry. The additive slurry is not mixed into the dredged materials until a mixing assembly is disposed within the containment receptacle and moved to the additive slurry or until the containment receptacle is moved to bring the additive slurry to the mixing assembly disposed within the containment receptacle. The additive mixture is a slurry when it contacts the dredged materials and/or the containment receptacle. The additive slurry, and/or each component thereof, is pumped into the containment receptacle and the additive slurry is brought to a mixing assembly disposed within the containment receptacle.<br>(Photographs bearing bates nos. TDM004528-TDM004531; TDM004533-TDM004534; TDM004582; TDM004589- |

| | |
|---|---|
| | TDM0004593; TDM004606-TDM004607). |
| mixing the additive slurry into the dredged material to form a substantially homogenous mixture; and | After the additive slurry is added to the containment receptacle, the receptacle is moved to the mixing assembly disposed within the receptacle or a mixing assembly is brought to the additive slurry, which mixing assembly then mixes the additive slurry into the dredged material to form a substantially homogenous mixture. The additives are not dry when mixed into the dredged material. (Photographs bearing bates nos. TDM004526-TDM004527; TDM004531; TDM004533; TDM004535-TDM004537; TDM004542; TDM004589; TDM004593). |
| curing the substantially homogenous mixture in the containment receptacle, thereby producing a structural fill material and reducing particulate emissions. | After mixing the additive slurry into the dredged material and forming a substantially homogenous mixture, the homogenous mixture immediately begins to cure and is left in the containment receptacle for any period of time to continue the curing process. The product is a structural fill; that is, fill material that can be disposed upland for beneficial reuse. Reduced particulate emissions is accomplished throughout the process as water is pumped to the additive slurry at the conveyor mixing container, as the additive slurry emerges from the conveyor and as the additive slurry enters the containment receptacle and before the additive slurry is brought to, and mixed by, the mixing assembly disposed within the containment receptacle. The structural fill is bought to another location for beneficial re-use, such as capping, malls, parks, etc. (Photographs bearing bates nos. TDM004528-TDM004529; TDM004531; TDM004533; TDM004536; TDM004539; TDM004542; TDM004589-TDM004594). |

With respect to issues of creating an additive slurry, pumping an additive slurry and mixing an additive slurry, it is TDM's position that the mixing, or pre-mixing, of

additive material itself constitutes, under literal infringement, creating the additive slurry. Namely, if the additives are mixed to form the slurry as the additives are being pumped or transported to the containment receptacle (via conveyor or other transport equipment), the element of creating and pumping are literally met because the conveyor would comprise a mixing container. Moreover, if water is added to the additive at any time prior to the additive being mixed into the dredged material, the elements of creating and pumping are met because the additives and water are each being pumped and create the additive slurry. Moreover, the element of "pumping" and "mixing" is met by additives and water being pumped to the dredged material in the containment receptacle and, at some time after the additive slurry is pumped to the dredged material, the additive slurry is moved to a mixing assembly disposed within that containment receptacle, or a mixing assembly disposed within the containment receptacle is moved to the additive slurry, to mix the additive slurry into the dredged material. There is no requirement that the additive slurry be deposited directly at or on the mixing assembly. There is also no requirement that the slurry have a particular water content; only that the water be added prior to the slurry being mixed into the dredged materials so that particulate emissions are reduced. Dry additives are not mixed into the dredged materials.

The US or its contractors also treat, solidify, stabilize, or otherwise process dredged materials in land-based systems. These land-based systems process dredged materials in methods that infringe the '614, '862 and '590 claimed processes.

Specifically:

| Claim 1 of the '614 Patent | US' Dredging Activities |
|---|---|
| A method for processing waste material comprising the steps of: | The US' dredging activities, or those of its contractors, include processing waste material, including dredged materials. (Photographs |

| | |
|---|---|
| | bearing bates nos. TDM004543-TDM004556; TDM004564; TDM-004575-TDM004578). |
| receiving said waste material in a vibrating screen box; | Waste material is received in a vibrating screen box. (Photographs bearing bates nos. TDM004544-TDM004549; TDM004552; TDM004553). |
| vibrating said vibrating screen box to separate lumps of said waste material that are larger than a predetermined size thereby removing lumps of said waste material of a size greater than said predetermined size from said waste material; | A vibrating screen box is used to separate larger waste material from smaller waste material. The smaller waste material proceeds to the homogenizer. Larger waste material is otherwise discarded. (Photographs bearing bates nos. TDM004544; TDM004549; TDM004552; TDM004553). |
| discharging said waste material of a size less than said predetermined size into a homogenizer; | The waste material is discharged from the vibrating screen box to a homogenizer. The smaller waste material proceeds to the homogenizer. (Photographs bearing bates nos. TDM004544-TDM004549; TDM004552-TDM004554). |
| receiving said waste material into said homogenizer; | The waste material is received by a homogenizer. (Photographs bearing bates nos. TDM004544-TDM004549; TDM004552; TDM004554). |
| homogenizing said waste material in said homogenizer; | The waste material is homogenized in the homogenizer. (Photographs bearing bates nos. TDM004544-TDM004549; TDM04552-TDM004554). |
| dropping said waste material into a mixer after homogenizing, said mixer located below said homogenizer; | The waste material is dropped into a mixer below (i.e. after) the homogenizing step. (Photographs bearing bates nos. TDM004544-TDM004549; TDM004554-TDM004556). |
| accumulating a batch of waste material in said mixer; | A batch, or a particular amount, of waste material is accumulated in the mixer. (Photographs bearing bates nos. TDM004544-TDM004549; TDM004554-TDM004556). |
| weighing said batch of waste material to determine an amount of additive to be added to said waste material; | A determination of an amount of additive is, and must be, made based upon the weight of the batch or a particular amount of waste material accumulated. (Photographs bearing bates nos. TDM004544-TDM004549; TDM004554-TDM004556). |
| mixing said waste material with said additive in said mixer to form a mixture; and | The waste material and additive are mixed in the mixer. (Photographs bearing bates nos. TDM004544-TDM004549; TDM004554-TDM004556). |
| dropping said mixture from said mixer to a processing terminus | The mixture is dropped from the mixer, meaning after the mixing step, to a terminus (i.e., the end |

| | |
|---|---|
| located below said mixer. | of the process) which is below the mixer. The processing ends after the mixer. (Photographs bearing bates nos. TDM004544-TDM004549; TDM004551; TDM004554). |
| | |
| **Claim 2 of the '614 Patent** | **US Dredging Activities** |
| The method of claim 1 wherein said waste material is solid or semi-solid. | The US or its contractors process solid or semi-solid waste material. (See above with respect to claim 1 and photographs bearing bates nos. TDM004549; TDM004552). |
| | |
| **Claim 4 of the '614 Patent** | **US' Dredging Activities** |
| The method of claim 1 wherein said processing terminus comprises a vehicle. | After processing, the waste material is loaded into vehicles. The vehicles are the processing terminus or the end of the process. (See above with respect to claim 1 and photographs bearing bates nos. TDM004548; TDM004551). |

| **Claim 2 of the '862 Patent** | **US' Dredging Activities** |
|---|---|
| A method for processing waste materials comprising the steps of: | The US' dredging activities, or those of its contractors, include processing waste material, which waste material includes, specifically, dredged material. (Photographs bearing bates nos. TDN004543-TDM004556; TDM004564; TDM004575-TDM004578). |
| receiving a waste material in a vibrating screen box; | Waste material is received in a vibrating screen box. (Photographs bearing bates nos. TDM004544-TDM004549; TDM004552; TDM004553). |
| vibrating the vibrating screen box to separate lumps of the waste material that are larger than a predetermined size thereby removing lumps of the waste material of a size larger than the predetermined size from the waste material; | A vibrating screen box is used to separate larger waste material from smaller waste material. (Photographs bearing bates nos. TDM004544; TDM004549; TDM004552-TDM004453). |
| discharging the waste material of a size less than the predetermined size into a mixer; | The waste material is discharged from the vibrating screen box to a homogenizer. (Photographs bearing bates nos. TDM004544; TDM004549; TDM004552-TDM004554). |
| accumulating a batch of waste material in the mixer; | A batch, or a particular amount, of waste material is accumulated in the mixer. (Photographs bearing bates nos. TDM004544-TDM004549; TDM004554; TDM004556). |

| | |
|---|---|
| weighing the batch of waste material to determine an amount of additive to be added to the waste material; | A determination of an amount of additive is made based upon the weight of the batch, or a particular amount of waste material in the mixer. (Photographs bearing bates nos. TDM004544; TDM004549; TDM004554-TDM004556). |
| mixing and homogenizing the waste material with the additive in the mixer to form a mixture; | The waste material and additive are mixed and homogenized in the mixer to form a mixture of waste material and additive. (Photographs bearing bates nos. TDM004544-TDM004549; TDM004554, TDM004556). |
| dropping the mixture from the mixer to a processing terminus located below the mixer. | The processed waste material drops to a terminus; that is, the processing ends after the mixer. (Photographs bearing bates nos. TDM004544; TDM004549; TDM004551; TDM004555). |
| | |
| **Claim 3 of the '862 Patent** | **US' Dredging Activities** |
| The method of claim 2 wherein the waste material is a solid or semi-solid. | The US, or its contractors, process solid or semi-solid waste material, including dredged materials. (See above with respect to claim 2 and photographs bearing bates nos. TDM004549; TDM004552). |
| | |
| **Claim 4 of the '862 Patent** | **US' Dredging Activities** |
| The method of claim 2 wherein the processing terminus comprises a vehicle. | After processing, the waste material is loaded into vehicles, which vehicles are the processing terminus or the end of the process. After the mixer, the process ends at a vehicle. (See above with respect to claim 2 and photographs bearing bates nos. TDM004548; TDM004551). |

| **Claim 1 of the '590 Patent** | **US' Dredging Activities** |
|---|---|
| A method for treating solid or highly viscous semi-solid waste materials containing lumps of waste comprising the steps of: | The US, or its contractors, treat solid or highly viscous semi-solid waste materials containing lumps of waste. Specifically, the US treats dredged materials. (Photographs bearing bates nos. TDM004551-TDM004555). |
| reducing the size of the lumps in the waste material with a plurality of paddle-type chopper augers, said paddle-type chopper augers being mounted in a separator; | The size of the lumps in the waste material is reduced with paddle-type chopper augers in a separator. (Photographs bearing bates nos. TDM004552; TDM004553). |
| homogenizing the waste material by means of pin mixers; and | The waste material is homogenized using pin mixers. (Photographs bearing bates |

| | |
|---|---|
| | nos. TDM004551; TDM004554). |
| mixing the homogenized waste material with a predetermined amount of at least one selected additive. | The homogenized waste material is mixed with a predetermined amount of an additive. (Photographs bearing bates nos. TDM004551; TDM004554). |

The above-referenced photographs, correspondence and literature, comprise the citations and references upon which TDM relies upon at this time. TDM also identifies the US' contracts with contractors for dredging activities, brochures, summaries of dredging activities, and other photographs, including documents bearing bates nos. TDM0005172-TDM-0005184; TDM0005307-TDM0005323; TDM0005324-TDM0005330; TDM0004391-TDM0004420 and TDM0000772-TDM0000889 among others, that contain information relevant to this interrogatory. TDM, however, reserves its right to seasonably supplement, change and/or amend these references as this action progresses and after expert review and/or the Markman hearing. In addition, TDM relies upon DVDs produced and reserves its right to rely upon other information produced. Obviously, TDM will rely on additional documents that should have been, and should be, produced by the US, interested parties and the US' contractors or on the failure to so produce as evidence of infringement. Unfortunately, after six (6) months of discovery, such documents have not been produced. Therefore, TDM may further rely upon inferences and preclusions with respect to documents not produced.

(e) [1] TDM objects to this interrogatory to the extent that information relevant to this interrogatory already was provided in TDM's initial disclosures. Notwithstanding these objections, TDM responds that Rick Redle, Ritchie G. Studer, Dr. Irfan Toor, Scott

[1] TDM notes that this interrogatory subpart is discrete from the prior parts and re-numbers this interrogatory as no. 2.

Crawford and Ted Johnstun have information regarding TDM's claims of infringement against the US.

**INTERROGATORY NO. 2:** [2]

Describe TDM's organizational structure including, but not limited to, identification of all divisions, departments, subsidiaries, officers and lines of supervision or review during the period of January 1, 1994, to present. In this description, indicate all acquisitions, mergers, spin-offs or other such transactions or reorganizations during the stated period.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to the general objections, TDM specifically objects to this interrogatory to the extent it seeks information that is irrelevant and/or not likely to lead to admissible evidence. TDM further objects to this interrogatory to the extent it is harassing and overly broad. TDM further objects to this interrogatory to the extent it seeks information that is more appropriately obtained through a discovery deposition. Notwithstanding these objections, TDM responds as follows:

TDM America LLC and UTEX Environmental Services, LLC are wholly-owned subsidiaries of UTEX Holdings, LLC. TDM America LLC is a holding company of a patent portfolio including the patents-in-suit. UTEX Environmental Services, LLC is a leading environmental services firm focused on the management and treatment of hazardous, non-hazardous, industrial and municipal waste. Kensington Investments LP holds interests directly or indirectly in UTEX Holdings, LLC. Kensington Capital Management, LLC manages Kensington Investments LP.

TDM's officers and their positions are:

1. **Rick Redle**

---

2 Renumbered as interrogatory no. 3.