Exhibit 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TDM AMERICA, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant<br><br>and<br><br>DONJON MARINE COMPANY, INC.,<br><br>Third-Party Defendant | Civil Action No. 06-472 C<br><br>Judge Thomas C. Wheeler |

**JOINT STATUS REPORT**

The parties submit this joint status report in compliance with the April 30, 2007 order and to identify remaining discovery issues.

The parties indicate compliance as follows:

**I. Statements of TDM America, LLC ("TDM")**

**A. Compliance**

1. Defendant United States of America ("US") did not produce Army patent counsel for a deposition or respond to the accompanying document requests in paragraphs 2-4 of the notice of deposition.

2. Plaintiff TDM America, LLC ("TDM") conducted the depositions of US witnesses Ella Snell, Harold Hawkins and Bryce Wisemiller, in accordance with RCFC 30(b)(1).

3. Portions of the RCFC 30(b)(6) deposition of the US (in Jacksonville and Los Angeles) were conducted and other portions are scheduled in June 2007 for deponents in the New York and Jacksonville districts.

4. TDM noticed depositions of four Donjon witnesses in accordance with RCFC 30(b)(1) and RCFC 30(b)(6). Some of these depositions are scheduled in June and July 2007.

5. Donjon noticed depositions of four TDM witnesses and an RCFC 30(b)(6) deposition of TDM. These depositions are being scheduled.

6. Numerous other nonparty depositions were noticed and the parties are working to schedule dates.

7. Due to the number of depositions, it is jointly requested by the parties that this Court amend the scheduling order to allow depositions to be conducted until August 27, 2007.

**B. Remaining Discovery Issues**

**1. TDM's Overview Of Remaining Discovery Issues**

This Court should note that TDM provided its portion of this report to the US and Donjon last week. The US and Donjon did not provide their portions or comments to TDM until 11:45 a.m. on this date. No attempt to work with TDM was made.[1]

Despite TDM's prior motion for sanctions and/or to compel ("plaintiff's motion") and this Court's April 30, 2007 orders, there still exist several areas of discovery that the US did not answer or properly supplement and, therefore, are still deficient. These key areas are directed to (i) the volumes of treated dredged material for upland disposal by contractors for the US; (ii) disclosure of the treatment processes used to treat dredged material for upland disposal; (iii) a designation of a 30(b)(6) witness to testify regarding the treatment of dredged materials outside of the New York, Jacksonville and Los Angeles districts, i.e., most of the United States; (iv) production of electronic records that contain volume and final payments for US contracts for dredging that include the treatment of dredged material; and (v) an identification of each US contract that includes or included the treatment of dredged material by bates number, the processing site and processor (if different from the contractor).

**2. TDM's Position on Defendant's Failure to Comply with the April 30, 2007 Order**

The US did not comply with this Court's April 30, 2007 order to provide complete and verified responses to plaintiff's interrogatories and to respond properly to all of plaintiff's document requests.[2]

In general, the US has not properly supplemented or amended its responses to plaintiff's interrogatories. The US amended selected responses to TDM's first set of interrogatories, but did not amend the responses to TDM's second set of interrogatories. The amendments merely add a statement that plaintiff should refer to documents produced in the ordinary course of business under RCFC 34(b), leaving plaintiff to sift through more than 200,000 documents. (Ex. 1 hereto, the US' second amended responses to plaintiff's first set of interrogatories at nos. 10 and 11). Such responses are unequivocally deficient as RCFC 33 requires each interrogatory to be answered fully or, if an answer may be derived or ascertained from business records, these records must be specified "in significant detail to permit the interrogating party to locate and to identify [the records], as readily as can the party served." This was not done. It is plaintiff's position that the same discovery issue set forth in its previously filed motion remains with respect to these responses. However, the negative impact on TDM now is much greater as it impedes TDM's ability to fully prepare for depositions because TDM is forced to expend substantial time and resources to sift through documents to find information that often does not exist. The specific deficiencies are particularized below.

**3. TDM's Position On The US' Deficient Discovery Responses**

**a. TDM's Interrogatories**

Interrogatory no. 2 is directed to the US' reasons for non-infringement. The US'

---

1 Both counsel for the US and Donjon have been in possession of the documents referenced herein as exhibits. There is no justification for their refusal to review them since they have had TDM's portion of the joint status report for a week.

response to interrogatory no. 2 continues to be conclusory and simply states that the US does not know the process and TDM should seek this information from the contractors. (Ex. 1 hereto and Ex. 20 to plaintiff's motion). Yet, the US' witnesses to date did know facts regarding the processes and stated that contracting officers and assistant contracting officers have additional knowledge regarding the processes for the treatment of dredged material, the payment amounts and quantities therefor. (Ex. 2 hereto, transcript of Ella Snell at pp. 18-24). Despite initial disclosure requirements and interrogatory no. 5 which seek identification of people with relevant knowledge and the subject matter thereof, these contracting officers have never been identified. Even in the US's second amended response to interrogatory no. 5, no contracting officers are identified. (Ex. 1).

RCFC 33 requires a party to answer the interrogatory or to actually identify the specific documents from which an answer can be readily ascertained. RCFC 33(b) (d). Interrogatories seeking identification of contracts, contractors, and processing information (no. 10) and identification of all processes and methods, as well as documents thereto (no. 11), are still unanswered. (Ex. 1). Specifically, with respect to the processing of dredged materials, the US has not referred to any particular documents or any one document from which a response can be ascertained with respect to the interrogatories. Instead, the US disregarded any obligation to provide a reasonable response by stating that "insofar as the information requested is contained documents [sic] in the possession of the government, other than the contracts themselves, such documents have also been produced to plaintiff in a manner in which the documents are kept in the ordinary course of business, pursuant to RCFC 34(b)." (Ex. 1 at nos. 10 and 11). Merely referring to documents produced in the ordinary course of business as a global response to an interrogatory without more violates RCFC 33 and this Court's April 30, 2007 order. Further, the second amended response as it now stands <u>ultimately</u> ends by telling

---

[2] These are plaintiff's first and second set of interrogatory requests and first request for documents submitted to this Court as Exhibits 5, 21 and 6, respectively, to plaintiff's motion. Since plaintiff's interrogatory requests and defendant's responses were submitted in plaintiff's motion, they are not resubmitted.

TDM to request the information from the contractors -- a position criticized by the Court early on. (Ex. 1 at nos. 10 and 11).

The responses to interrogatory nos. 12-14 seeking description of the processes were not amended at all. (Ex. 1 hereto and Ex. 20 to plaintiff's motion).

Notably, despite the April 30, 2007 order, the US failed to amend or otherwise supplement its responses to TDM's second set of interrogatories. (See US' response at Ex. 22 to plaintiff's motion). Interrogatories nos. 15 and 16 which constitute TDM's second set of interrogatories to the US are directed to (i) the total volumes of dredged materials treated by contractors for the US and (ii) the amounts paid for such treatment. (See Ex. 22 to plaintiff's motion). Although the US identified various contracts by contract number (but not by providing the bates nos.) and certain payment estimates ("Attachment B") in responding to these interrogatories (*Id.*), total volumes cannot be ascertained. Moreover, USACE employees testified that final volume amounts and other documents that derive from USACE's electronic financial system contain more accurate information and are readily available. (Ex. 2, transcript of Ella Snell at pp. 18-24; Ex. 3 hereto, transcript of Harold Hawkins at pp. 24-25, 67-68; and Ex. 4 hereto, transcript of Bryce Wisemiller at p. 272). Witnesses also referred to scow volume surveys and an electronic system which would provide final numbers in terms of total volumes of treated dredged materials and payments. (Ex. 2, transcript of Ella Snell at pp. 18-24; Ex. 3, transcript of Harold Hawkins at pp. 24-25, 67-68; and Ex. 4, transcript of Bryce Wisemiller at p. 272). Scow volume surveys and the electronic system documentation were either not provided or not identified. TDM has not been able to decipher final volumes and amounts; and, in any event, the US should have answered these interrogatories or specifically referenced documents from which a response could be derived, such as, the contracts, corresponding amendments to same, final amounts and final payments. These documents are critical because the volumes of dredged material shown in the contracts identified by the US account for only a fraction of the volumes

of dredged materials that appear on USACE websites. (Ex. 5 hereto). Thus, plaintiff should now be entitled to rely on the volumes and amounts contained in USACE's websites.

**b. 30(b)(6) Deposition Designations**

Plaintiff TDM noticed an RCFC 30(b)(6) deposition of defendant US wherein the categories cover contracts that include treatment of dredged materials in the US, the volumes of treated dredged materials and the volumes of materials disposed upland in the US. (See Ex. 26 to plaintiff's motion). TDM notes that summary dredging information contained in the USACE's website contains substantial volumes of dredged material disposed upland. (See Ex. 5). Referring to the documents from the USACE's website, TDM notes that "Upland" disposal type accounts for over 100,000,000 cubic yards of dredged material; "Open Water & Upland" disposal type accounts for over 50,000,000 cubic yards of dredged material; and "Beach Nour and Upland" disposal type accounts for 100,000,000 cubic yards of dredged material. (Ex. 5). Moreover, deponents of USACE, to date, testified that the US possesses information from which total and final volumes of treated dredged materials may be ascertained. (Ex. 2, transcript of Ella Snell at pp. 18-24; Ex. 3, transcript of Harold Hawkins at pp. 24-25, 67-68; and Ex. 4, transcript of Bryce Wisemiller at p. 272).

The contracts provided by the US from New York, Jacksonville and Los Angeles appear to account for far less volume than what is reported on the USACE website, to the extent amounts can even be determined. The website also shows significant volumes of dredged materials in every district of the country for dredging activities. (Ex. 5). It is reasonable to assume that, since upland disposal occurs in all these districts and, by the deposition testimony, require treatment, that contracts for treatment should exist in numerous districts. Yet, the US has not designated a witness to testify regarding treatment of dredged materials throughout the country.

c. **Deposition Scheduling**

The US and Donjon produced most of their documents in early May 2007, requiring that noticed depositions be conducted after that date despite plaintiff's expeditiously noticing those depositions in January 2007.

Based upon those depositions and documents, numerous other noticed depositions are still being scheduled. Plaintiff noticed depositions of 12 non-parties as well as 11 depositions of party witnesses.[3] In working with defendant US and, particularly, with the schedule of defendant's counsel, all parties concur that they cannot complete those depositions by July 13, 2007 without scheduling the depositions on dates that defendant's counsel finds inconvenient. As such, the parties respectfully request that the last date to schedule depositions be moved to August 27, 2007 and all other dates after the close of fact discovery also be moved back by 45 days. However, the May 30, 2007 deadline to serve interrogatories, document requests, etc. remains in effect.

d. **Responses to Document Requests and Initial Disclosures**

Regarding the US' document production, it is clear that documents showing final volumes and total payments have not been produced even though they exist. The US should have identified and produced all responsive documents, such as scow reports, final surveys and electronic files that contain final volumes and amounts. This further supports imposing sanctions on the US. (Ex. 2, transcript of Ella Snell at pp. 18-24; Ex. 3, transcript of Harold Hawkins at pp. 24-25, 67-68; and Ex. 4, transcript of Bryce Wisemiller at p. 272).

e. **The US' Initial Disclosures**

The US' initial disclosures (Ex. 7 to plaintiff's motion) are misleading because they did not identify the contracting officers and/or assistant contracting officers who were knowledgeable of the methods used for treating dredged materials, quantities therefor and total

---

3 In all likelihood, TDM will actually depose fewer than the noticed non-parties and will decide after all documents are produced.

amounts paid. Instead, the US disclosed Ella Snell and Hal Hawkins, who had little to no knowledge in these areas.

f. **TDM's Position That Sanctions Against The US Are Warranted**

Plaintiff should be entitled to rely on the figures set forth in the USACE website for upland, open waters and upland, and beach nour and upland disposal. Moreover, defendant should be precluded from arguing that those figures do not provide the volumes of treated dredged material. Further, because the US failed to properly respond to the interrogatories directed to the methods for treating dredged materials for upland disposal for purposes of this action, the processes should be established in accordance with TDM's position.

g. **TDM'S Response to the US' Statements**

At the outset it should be noted that this joint status report was ordered as a result of TDM's motion to compel. As such, TDM is well within its rights to bring to the court's attention open discovery issues that remain unresolved; hence, the US' "objection to form" is unfounded.

Regarding the US' argument that all responsive documents have been produced, it is apparent that the US is confusing the production of documents in the ordinary course of business with properly responding to interrogatories by relying upon documents. Such documents must be identified specifically. As stated above, the US has the contracts, final amendments, final volumes and final payments for each contract, but refuses to identify them.

The US complains of not confirming the deposition date for Virginia Pankow. Yet, this very issue was the subject of an email from Michael Adler, counsel for TDM, to Erica Franklin, Counsel for the US, dated May 29, 2007 that requests that counsel discuss the date for Ms. Pankow's deposition. On May 31, 2007, after the close of the US(30)(b)(6) deposition of John Bearce, TDM's counsel requested to speak to Ms. Franklin, but she retorted that I am hanging up now. TDM's counsel also requested all dates on which the US and Donjon are unavailable for depositions to

facilitate scheduling. Donjon responded, but the US did not. Despite the above, TDM confirmed the deposition date for Ms. Pankow, as it has routinely and diligently done throughout this litigation, rendering this US issue moot. (Exhibit 6 attached hereto).[4]

4. **Donjon's Deficient Discovery Responses**

a. **TDM'S Position on TDM's First Set of Interrogatories to Donjon**

The US directs TDM to seek information from contractors. In its first set of interrogatories to Donjon, TDM sought process and volume information from Donjon and Donjon responds that TDM should seek the information from the US. (Ex. 6 hereto at nos. 10-14). Plaintiff noted these deficiencies and sent several letters to counsel for Donjon requesting complete responses regarding process and volume information. (Ex. 7 hereto). Yet, as Donjon's first supplemental responses to plaintiff's first set of interrogatories clearly show, requests for total payments and volumes of treated dredged material and volumes disposed upland, whether by Donjon, its subcontractors, or where Donjon is a subcontractor, were responded to with "Donjon will produce" documents. (Ex. 6, nos. 11-14.) Until almost the eve of this submission, there was no actual response and no reference to a particular document from which a response can be ascertained. *Id.* On June 8, 2007, Donjon served its second supplemental responses to plaintiff's first set of interrogatories (nos. 1-14). No additional supplementation to interrogatories 11 and 13 directed to total amounts of treated dredged materials and total amounts invoiced or paid for same, respectively, was provided. Donjon in a letter dated June 8, 2007, identified certain documents bearing bates nos. 268 through 3236, close to 3,000 pages of log book entries. (Ex. 8 hereto). It is impossible to ascertain a response from these documents. Surely, Donjon must have summary reports or similar information that was submitted to USACE in connection with Donjon's revenue and tax payments. Further, Donjon has not provided any guidance on how to interpret the figures (in the close to 3,000 pages) it references as its response

---

4 To the extent that the US' counsel takes issue with traveling for the depositions of US witnesses, counsel also has the option of defending the deposition via telephone.

to questions regarding volumes of material.

b. **TDM'S Position Regarding the Place of Depositions**

TDM noticed depositions of Donjon at the offices of TDM's counsel in New York, but Donjon demands that they occur in Newark, New Jersey. TDM's attorneys explained that the depositions were noticed in New York because there are voluminous documents rendering taking the depositions in Newark impractical. To bring boxes upon boxes of documents to Newark is unduly cumbersome -- a fact that Donjon knows from attending prior depositions of the US. TDM's deposition notices properly designated the place of deposition in New York and there is a reasonable basis for doing so. Donjon should appear in New York for these depositions.

5. **TDM's Response to Donjon's Discovery Requests**

Approximately six weeks after receiving TDM's responses to Donjon's first set of interrogatories (sent April 24, 2007), and over a month after TDM served an amended response to Donjon's interrogatory no. 1, Donjon enumerated alleged deficiencies with some of TDM's interrogatories, accusing TDM of being "specious and disingenuous" (Ex. 8, hereto). The temporal juxtaposition of Donjon's issue regarding TDM's discovery responses and the instant joint status report is quite telling. TDM will, of course, review Donjon's sudden, alleged concerns and will seasonably supplement and/or amend its responses as required under RCFC. Further, it does not go unnoticed that Donjon only notified TDM of these alleged deficiencies on June 8, 2007, almost a week after receiving TDM's draft of the joint status report. (A copy of TDM's responsive letter is annexed hereto as Exhibit 9.)

Ironically, Donjon's letter points to an alleged deficiency in interrogatory no. 5, which is directed to claim construction. However, TDM provided its claim construction in its responses to the US' and Donjon's interrogatories. (Ex. 10). Yet, Donjon has not provided its claim construction to TDM, rendering Donjon's interrogatory response deficient in this respect.

6. **Donjon's Notice of Deposition for David Denenberg, Esq.**

Donjon noticed the deposition of David W. Denenberg, Esq., lead and trial counsel in this case, on May 31, 2007 *after* the close of discovery pursuant to this Court's April 30, 2007 discovery order ("Denenberg deposition notice," Ex. 11 hereto). TDM objects to the untimely Denenberg deposition notice and, on this basis alone, the notice should be deemed a nullity and should have no effect – not even requiring a response. Donjon should not be permitted to unilaterally and surreptitiously arrogate additional discovery time in violation of this Court's order. Donjon contends that the late notice is not prejudicial. However, the discovery order governs discovery cut-off, not Donjon's view of what is or is not prejudicial.

Noticing Mr. Denenberg for a deposition can only be viewed as a retaliatory and harassing strike against TDM. Interestingly, the Denenberg notice not only was untimely served, but it was also served separately after Donjon served TDM with:

a. Notice of deposition of Ritchie G. Studer;

b. Notice of deposition of Rick Redle;

c. Notice of deposition of Dr. Irfan Toor;

d. Notice of deposition of Scott Crawford;

e. Interested Party Donjon Marine, Inc.'s second set of requests for production of documents and things to plaintiff; and

f. Interested party Donjon Marine Company Inc.'s first set of requests for admissions to plaintiff (Ex. 12 hereto, nos. 1-115).

There is no reasonable justification for not including the Denenberg deposition notice with the above on May 30, 2007 other than for a bad faith motive.

Donjon is keenly aware that this Court quashed the deposition notice of Alan P. Klein, Esq. and granted a protective order for documents requested in connection with that notice. The grounds for quashing the Denenberg deposition notice and issuing a protective order on the document request are far more compelling here than they were for Alan P. Klein.

Mr. Denenberg, as intellectual property counsel to TDM, has been their attorney in these matters since 2005. He is responsible for evaluating and prosecuting potential patent infringement lawsuits on behalf of TDM. His knowledge, analysis and impression on this case are clearly privileged. In this regard, it should be noted "[w]hile there is no prohibition in the Federal Rules of Civil procedure against taking opposing counsel's deposition, doing so has been found to disrupt the adversarial system and lower the standards of the profession, adding to the burdensome time and costs of litigation. See *Shelton v. American Motors* Corp. 805 F.2d 1323, 1327 (8th Cir. 1986)." (Plaintiff's Memorandum of Law in Opposition to the US' Motion to Quash the Subpoena of Alan P. Klein and for a Protective Order and in Support of TDM's Cross-Motion for Sanctions and/or to Compel Pursuant to RCFC 37, p. 4). Thus, it is, indeed, difficult to comprehend how Donjon's attorney would even conceive serving the Denenberg deposition notice in view of the April 30, 2007 order.

In any event, just as with Mr. Klein, the information Donjon seeks from Mr. Denenberg is privileged and immune from discovery, as such information relates to privileged communications, mental impressions and evaluations, and legal strategy. There simply cannot be any justification for deposing Mr. Denenberg other than one of retaliation and interruption. Accordingly, Donjon's twisted discovery attempt should be totally disregarded, the Denenberg deposition notice should be quashed and the document request should be subject to a protective order.

7. **<u>TDM's Response to Donjon Statement</u>**

As with the US, TDM is well within its rights to bring to the court's attention open discovery issues that remain unresolved; hence, Donjon's "objection to form" is unfounded.

Donjon's comment below that TDM served two notices of deposition after the close of business on May 30, 2007 is inaccurate and misleading. The notices were properly served by mail, which is wholly proper under the RCFC. It is clear from Donjon's statement that the untimely Denenberg deposition notice was in retaliation to TDM's timely notices of depositions on Donjon.

## II. Statement of the United States

Defendant United States of America ("United States" or "Government") objects to the form of Plaintiff TDM America, LLC.'s ("TDM" or "Plaintiff") portion of this Joint Status Report.[5] Plaintiff misuses this Court-ordered status report as a means of arguing issues that properly should be raised and argued in discovery motions, and in at least one instance, a motion for summary judgment, although unsupported in any form. Consequently, counsel for the United States submits the following in effort to truly comply with the Court's Order for the submission of a Joint Status Report.

### A. Compliance

1. The United States has complied with the Court's Order to provide complete and verified responses to Plaintiff's interrogatories. On May 30, 2007, the United States submitted to the parties via electronic mail and Federal Express delivery the United States' Second Amended Responses to Plaintiff's First Set of Interrogatories (Nos. 1-14). The United States supplied amended responses to each interrogatory, except numbers 1 and 6, which did not require amendment. As occurred previously on March 23, 2007, the United States responses were again properly verified by Assistant Counsel for Litigation in the Office of the Chief Counsel of the United States Army Corps of Engineers and objections were again properly raised by counsel for the United States, pursuant to RCFC 33(b)(1). Similarly, the United States properly verified complete responses and raised appropriate objections to Plaintiff's Second Set of Interrogatories (Nos. 15-16) on March 23, 2007. In responding to interrogatory numbers 15 and 16, the United States attached relevant documents for each district, including payment estimates, which Plaintiff subsequently referenced in depositions of USACE

---

[5] The draft report TDM submitted for review by the Government and Donjon was approximately nine pages long and reads more like a motion than a status report. After 4:00 p.m. on the date that this report is due, TDM re-submitted the draft with an additional three pages of argument and more that 140 pages of unnumbered exhibits. Consequently, the United States is without sufficient time to respond to numerous inflammatory statements. Moreover, if TDM properly presented these issues in the context of a motion, the United States would have had a full and fair opportunity to respond and defend itself against TDM's unsupported accusations.

witnesses. As responses and objections to interrogatories 15 and 16 were complete, the United States did not understand the Court's Order to apply to them.

Plaintiff complains that the United States' responses are deficient with regard to processes used by its contractors and their subcontractors. As noted in the responses and objections, with the exception of the Los Angeles contract, detailed information relating to the processing of dredged material by these contractors and subcontractors must be obtained from the contractors as the USACE does not have such information in its records. With the exception of Los Angeles, the USACE did not instruct, advise, or consult with the contractors or their subcontractors regarding the manner in which the dredged material would be processed. Further, submissions from the contractors to the USACE regarding processing methods were very limited, e.g., permits relating to the processing site. Such submissions were timely produced to Plaintiff and have been the subject of questions raised in depositions of USACE witnesses.[6]

As for the Los Angeles contract, technical specifications for this contract were produced on or before January 17, 2007. These specifications detail the USACE instructions to the contractor regarding treatment of dredged material. The United States later located a report prepared by the subcontractor who treated the dredged material which further detailed the processes used.[7] Similarly, the United States is amenable to amending its interrogatory responses upon receiving additional information from documents and testimony retrieved from contractors pursuant to previously issued subpoenas.

---

[6] The United States and Donjon note that Plaintiff suggested that we point to each other regarding requested documents. In doing so, Plaintiff misrepresented statements of both the United States and Donjon. While the United States has urged Plaintiff to obtain documents detailing processing methods from Donjon, Donjon has properly directed the Plaintiff to the United States for documents relating to volumes of dredged material- which documents have been produced.

[7] This report was produced along with the United States' Second Amended Responses on May 30, 2007. An appendix relating to this report was identified immediately prior to the deposition of the Government's witness on June 6, 2007, and was promptly produced electronically to the parties and discussed with the witness during the deposition. If the Court requires, the United States will again amend related interrogatory responses with regard to these documents, although RCFC 26(e)(2) does not require such amendment as the additional information has otherwise been made known to the parties during the discovery process, i.e., deposition testimony regarding the documents.

2. The United States has complied with the Court's Order to respond properly to all of Plaintiff's document requests. As the Court instructed during the teleconference on March 6, 2007, the United States diligently located and produced all documents described in Plaintiff's revised document requests. Specifically, subsequent to the March 6, 2007 teleconference and prior to May 5, 2007, the United States produced 108,293 responsive pages from the New York District, 16,976 responsive pages from the Jacksonville District, and 1,196 pages from the Los Angeles District. Separately, in response to depositions notices, the United States produced an additional 5,223 pages from the USACE districts. Counsel for the United States reviewed each of the produced pages and appropriately labeled the pages in accordance with the Court's February 16, 2007 Stipulated Protective Order.[8] Other than this labeling, the documents were produced in the same manner as they were kept during the USACE's normal course of business pursuant to RCFC 34(b).

3. The United States has complied with the Court's Order to allow Plaintiff's depositions noticed at the time of the Order to either be taken or scheduled by May 30, 2007. Prior to the time that Plaintiff filed its Cross Motion for Sanctions on April 23, 2007, the parties had already scheduled and confirmed a number of the depositions noticed for USACE employees, including three depositions confirmed to take place on May 1-3, 2007. As of this report, Plaintiff has taken seven depositions of USACE employees. These depositions have occurred in New York, Jacksonville, and Los Angeles.[9] The remaining depositions that were noticed prior to the Court's Order have been scheduled to occur in June and July, with the exception of the Rule 30(b)(6) deposition of Ms. Virginia Pankow, USACE Project Manager at the National Data Center in Alexandria, Virginia. Although Mr.

---

[8] The United States notes that Plaintiff has not submitted required statements regarding disclosure or protected information to its officers or in-house counsel as required by the Protective Order. Consequently, it is apparent that such documents have not been shared with these individuals.

[9] Counsel for the United States has traveled on six occasions to defend these depositions, while striving to respond to additional discovery demands from Plaintiff's counsel. On the other hand Plaintiff's counsel has not traveled for a single deposition. Plaintiff's counsel opted to conduct depositions in the New York City area at his office and all other depositions by telephone.

Bryce Wisemiller testified as a fact witness regarding certain aspects of the "upland" entries on the USACE Dredging Information System website, Plaintiff's counsel subsequently requested the United States to designate a Rule 30(b)(6) witness to address the Dredging Information System. On May 29, 2007, the United States responded to Plaintiff's counsel by designating Ms. Pankow and providing information relating to her availability for deposition on June 29, 2007, in Alexandria, Virginia. Plaintiff has not responded, as requested, to confirm this deposition date, and therefore has not complied with the Court's Order. Rather, Plaintiff has disregarded testimony by Mr. Bryce Wisemiller that the data on the website largely related to dredged material that was disposed without processing, including the majority of the data categorized as "upland" disposal, and instead improperly seeks some type of summary judgment via this status report.

4. The United States has complied with the Court's Order to produce all non-privileged documents that Mr. Alan Klein may have reviewed. On May 29, 2007, the United States produced a number of letters, including the specifically requested letter from Mr. John A. Witte to Ms. Raynette H. Gurney. In the cover letter for this production, the United States indicated that this production was in accordance with the Court's Orders of April 30, 2007, and May 8, 2007.

**B. <u>Remaining Discovery Issues</u>**

1. While new discovery issues have been raised following the Court's April 30, 2007 Order, the United States asserts that it has fully complied with the Court's Orders relating to any previous discovery issues, as described in section II. A. The eight pages of argument regarding discovery issues by Plaintiff largely reflect Plaintiff counsel's unwillingness to review and become familiar with the documents that it demanded the United States to expeditiously locate and produce. Plaintiff's failure to review these requested documents and exert the effort that a case of this magnitude requires has resulted in a number of attacks directed at counsel for the United States during the depositions of USACE witnesses regarding allegations that the Government failed to produce certain documents. However, each such attack has been met with either the Government's identification of

the previously produced document or Plaintiff counsel's subsequent introduction of the allegedly missing document at the same deposition. These documents have included USACE contracts, and the volume surveys and electronic financial management records described in Plaintiff's portion of this Status Report.

**III. Statement of Donjon Marine Company, Inc.**

Donjon disavows and disputes many of TDM's statements. Donjon also objects to the form of TDM's portion of this Joint Status Report, and agrees with the U.S. that TDM's arguments are more appropriate for a motion, rather than this status report. TDM's abuse of the status report process is demonstrated by its excessive inclusion of exhibits more appropriate for a motion to compel discovery.

**A. Compliance**

1. Donjon has responded to TDM discovery requests in part by providing thousands of pages of documents, including records for all processing performed at Donjon's facility under its contracts with the U.S. Donjon has provided responses and supplemental responses to plaintiff's interrogatories, document requests, and voluminous requests for admissions. By May 3, 2007, Donjon had produced in excess of 54,000 pages of documents.

2. TDM has scheduled approximately 20 depositions of USACE, Donjon (including its general counsel and president), and other entities, including a cement supplier. TDM has recently served a second set of interrogatories (Nos. 15-27), a second set of requests for production of documents (Nos. 36-39) and a second set of requests for admissions (Nos. 151-180).

3. In addition to answering interrogatories and producing documents regarding process, Donjon invited TDM and its counsel to visit the Donjon processing operation. Counsel visited on April 26, 2007. Donjon has repeatedly extended invitations for the plaintiff to also visit the Donjon processing operation, but, to date, TDM has not agreed to do so.

**B. Donjon's Outstanding Discovery Issues**

1. Mr. Denenberg's Deposition

Donjon has noticed five depositions of TDM witnesses and one 30(b)(6) deposition of TDM. Plaintiff has objected to—but has not filed a Motion to Quash—one deposition notice as it was personally served on May 31, 2007 instead of May 30, 2007. The notice is directed to David Denenberg, Esq. Mr. Denenberg in April 2005 provided an infringement opinion to TDM's predecessor that was included in correspondence to Senator Orrin Hatch.

The Court's February 23, 2007 Scheduling Order did list May 30, 2007 as the last day to serve notices of deposition, except for experts. However, discovery is not scheduled to end until July 13, 2007, and through this submission, the parties are jointly requesting the Court to extend the time to conduct depositions until August 27, 2007. Additionally, TDM first served two notices of deposition of Donjon personnel—its President and General Counsel—by electronic mail after business hours on May 30, 2007, less than 20 hours before Donjon hand delivered its notice to Mr. Denenberg. TDM cannot demonstrate any prejudice by the deposition notice being served approximately 15 hours late. Donjon respectfully requests that this deposition notice be deemed timely served.

2. TDM's Deficient Discovery Responses

TDM's response to Donjon's discovery has been inadequate, incomplete and unresponsive. Particular instances are addressed in Donjon counsel's June 8, 2007 letter to TDM counsel. See attached letter, Exhibit A. If the parties cannot resolve these issues, Donjon will file a Motion to Compel.

### C. Donjon's Response to TDM's Statements

#### 1. Donjon's Response to TDM's Allegation of Deficient Discovery Responses

As the U.S. notes, despite TDM's contentions, Donjon has not refused to produce any document because the U.S. has that document. Donjon has been clear, both in correspondence with counsel and on the record with the Court, that it does not possess all contract documents, and that the U.S. will have documents regarding volume. Further, Donjon has responded thoroughly to the TDM's inquiries regarding process. Donjon's Second Supplemental Response to TDM's First Set of Interrogatories cited to specific Donjon bates numbers for final payment estimates in response to Interrogatory No. 12, and Donjon's Response and First Supplemental Response provided a thorough description of its process. See Responses to Interrogatory Nos. 12 and 14 of Donjon Marine Company, Inc.'s Second Supplemental Responses to Plaintiff's First Set of Interrogatories (Nos. 1-14), Exhibit B.

a. Donjon has taken the position from the outset of this matter that its operation does not infringe any valid claim of the '731 patent. In support of its position, it has provided equipment manuals for the equipment used in the process to move the dry cement from storage "blimps" to the surface of the dredge material. Donjon has provided records for all processing performed at Donjon's facility under its contracts with the U.S. The site inspection, deposition testimony, and the documents confirm that Donjon's operation is a dry operation and does not entail "creating an additive slurry in a mixing container" or "pumping the additive slurry from the mixing container to a mixing assembly disposed within the containment receptacle." U.S. Patent No. 6,293,731B1, claim 1. See Deposition Transcript of Bryce Wisemiller at 146-47, attached as Exhibit D ("The cement is . . . pumped out a chute on a boom arm, where it is added directly, dry cement, to the dredged material in the scow").

In addition, as pointed out in Donjon's responses to TDM's interrogatories, TDM is estopped from claiming Donjon's in-barge operation infringes the '731 patent in part because in amending the patent claims the applicant made clear that "[a]n additive slurry is created in a mixing container which

is separate from the containment receptacle." Donjon Supplemental Answer to TDM Interrogatory 3, citing page 5, Line 3-5 of the Amendment dated April 19, 2001. Emphasis supplied.

Donjon notes the majority of TDM's complaints during discovery involve payment and volume information—damages issues. TDM has ignored what should be plain from the evidence and from its own counsel's observations from a site visit: there is and has been no infringement. The inordinate amount of time and resources that TDM has devoted to pursuing the damages information, and the U.S. and Donjon have expended in responding to those requests, is evidence that TDM's objection to bifurcating the liability and damages issues in this matter was misguided.

b. Donjon's response to TDM's June 6, 2007 letter/complaints regarding discovery is set forth in Donjon counsel's letter to TDM counsel dated June 8, 2007, addressing that letter. See attached letter, Exhibit C.

2. Donjon's Position Regarding the Location of Deposition of Donjon Personnel

Although the depositions of Donjon's employees were noticed for New York, Donjon requests that they take place at the Newark, New Jersey office of McCarter & English. All of the noticed employees and counsel are located in New Jersey. In the unlikely event that plaintiff's counsel chooses not to travel from Manhattan to Newark, he can participate via telephone, as he has in depositions held in Florida and California.

Respectfully submitted,

DAVIDOFF MALITO & HUTCHER LLP
*Attorneys for Plaintiff*

Dated: June 12, 2007

s/David W. Denenberg
David W. Denenberg
Michael A. Adler
605 Third Avenue – 34 Fl
New York, NY 10158
Tel: (212) 557-7200
Fax: (212) 286-1884

PETER D. KEISLER
Assistant Attorney General

JOHN FARGO
Director

Dated: June 12, 2007

s/Erica Franklin
Erica A. Franklin
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530
Tel.: (202) 353-0517
Fax : (202) 307-0345

Attorneys for the United States

Dated: June 12, 2007

s/Gary J. Campbell
Gary J. Campbell
McCarter & English LLP
225 Franklin Street
Boston, MA 02110
Tel.: (617) 449-6558
Fax: (617) 326-3097

Attorneys for Donjon Marine Co.

CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2007, I served a true and accurate copy of JOINT STATUS REPORT by using the Court's CM/ECF system so that a copy was sent to the following persons automatically via email:

Erica A. Franklin
Erica.franklin@usdoj.gov

Erica A. Franklin
US Department of Justice
Civil Division
1100 L Street, NW
Suite 1100
Washington, DC 20001

and on interested party Donjon Marine Company, Inc.'s counsel as follows:

Gary J. Campbell
GCampbell@McCarter.com

Gary J. Campbell
McCarter & English LLP
265 Franklin Street
Boston, MA 02110

Michael Adler

**Exhibit 2**

**Tzortzatos, Dimitra**

**From:** Tzortzatos, Dimitra
**Sent:** Friday, October 12, 2007 8:09 AM
**To:** 'Brown, Walter (CIV)'
**Subject:** TDM America LLC v. the United States
**Attachments:** 4481_001.pdf

Dear Walter:

Attached for your convenience are copies of the most recent correspondence exchanged between Mr. Adler and Ms. Franklin regarding discovery issues.

Regards,
Dimitra Tzortzatos, Esq.
Davidoff Malito & Hutcher LLP
605 Third Avenue, 34th Floor
New York, New York 10158
(212) 557-7200

**Exhibit 3**

**U.S. Department of Justice**

Civil Division

WWB
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

Telephone: (202) 307-0341
Facsimile: (202) 307-0345

*Washington, DC 20530*

October 16, 2007

**BY FACSIMILE AND E-MAIL**

Michael A. Adler, Esq.
Davidoff Malito & Hutcher LLP
605 Third Avenue, 34th Floor
New York, New York 10158

Re: *TDM America, LLC v. United States*
Court of Federal Claims No. 06-0472C

Dear Mr. Adler:

I write in response to your September 17, 2007, letter to Erica A. Franklin, which addresses numerous discovery issues. As you know by now, Ms. Franklin is no longer with this office and I have been assigned as attorney of record for the United States. I will address each of the issues raised by your letter.

First, you reassert TDM's request that the government "redesignate transcript testimony that the US has designated as proprietary" for nine full-length depositions of eight government witnesses. While you acknowledge that the government's statements that it is reviewing the transcripts and must obtain approvals from third parties (because these transcripts often reflect the proprietary information of government contractors), you nonetheless demand a date certain for completion of this task.

Further to Ms. Franklin's earlier communications, the government is continuing its efforts to review these transcript and plans to begin submitted redesignated transcripts in the near future. As Ms. Franklin has previously noted, the Government has responded in a timely fashion to all requests by TDM for expedited review of <u>selected portions</u> of deposition transcripts. In this case, however, TDM has refused to limit its wholesale request for redesignation or to even prioritize among the various transcripts as to which it particularly seeks. In fact, at the date of your letter, it appears that your request for redesignation encompassed all depositions of government witnesses.

Indeed, it is also entirely unclear to me why TDM seeks a date certain for the redesignation of these transcripts at this time. The Stipulated Protective Order does not establish

a time frame for these types of requests, and this case is not presently approaching trial, which is generally the impetus for such requests.

Second, you also contend that the government's discovery responses are "inaccurate and misleading," and, further, that its responses to TDM's third set of interrogatories is "deficient." Specifically, TDM contends that the government's responses "failed to specify which documents constitute the actual contracts and the amendments thereto." TDM makes this assertion with little or no mention of the thousands of pages of responsive contract documents the government has produced or of the numerous depositions of the relevant contracting officers that TDM has taken since discovery began in this case.

Instead, TDM complains that the identification of responsive documents in the government's interrogatory responses resulted in a "fifty-one page list of documents by bates range" for "hundreds of documents" identified for each contract. TDM further complains that these ranges included "daily quarterly assurance reports, daily weather reports, and transportation and placement logs," although you have not specifically identified any such pages, even as examples. Based on these contentions, TDM asserts that the government is attempting to divert TDM's attention by identifying "irrelevant and unresponsive documents."

TDM's response, however, highlights the fact that requests such as TDM's, which seek identification of all documents in the "official" file of a multi-million dollar federal dredging contract are indeed burdensome because it requires the production of hundreds (if not thousands) of documents. Earlier this year, we produced all of the documents in New York District for your inspection. Rather than review the documents and choose those that were relevant, you asked that we copy the documents in several broad categories. As a result, you should not complain that the results are not to your liking. While it is understandable that TDM seeks identification of the most relevant aspects of the contracts, TDM has failed to specify, in its discovery responses and correspondence, what those aspects are, and is apparently unwilling to perform its duty to review the documents.

In the same vein, TDM's assertions regarding the government's deposition witnesses are also unconvincing. Your letter contends that the government witnesses were "unable to agree to as to the description and nature" of the documents presented to them, though no specific instances are presented. Similarly, TDM's assertion that "the few contract documents that were located were in fact the very same documents refuted by US witnesses" is also unspecified and unexplained. TDM nonetheless contends that "it is clear that the US has this information, but refuses to furnish it to TDM." This assertion, however, is unsupported, given that TDM has deposed the government employees who are most knowledgeable about the contracts-at-issue. Just because those witnesses do not answer certain questions to the satisfaction to TDM counsel does not mean that the government has not complied with its discovery obligations.

Third, your letter objects to the government's refusal to respond to TDM Interrogatories 23, 24, 25, and 26 because they exceed the permissible number of interrogatories under RCFC

33(a). Though your letter states that "TDM advised the Court that the parties agreed upon forty (40) interrogatories," I am unaware that there are any documents or other evidence that reflects this agreement. Likewise, Ms. Franklin's position, as she previously stated to TDM, was that there was no such agreement. Accordingly, the government maintains its position on this issue under Rule 33(a) as well as its calculation of the number of interrogatories.

TDM specifically requests a "full and complete answer" to Interrogatory Nos. 23 and 26, and is "willing to entertain a reasonable compromise" on the other interrogatories. Given that all of these interrogatories exceed the numerical limit, the government is willing to consider a reasonable compromise for all four interrogatories. Specifically, we would discuss an arrangement with TDM that would narrow the scope of (1) Interrogatory Nos. 23 and 26, which call for the government to supplement all other interrogatories, and (2) Interrogatory Nos. 24 and 25, which call for extensive information on "each contract that the US was or is a party to since 1997, for any dredging activity at any port, harbor and/or waterway."

Fourth, TDM demands "an explanation of the disparity between volumes of dredged material reported on US websites and volumes of treated dredged material identified by the US in this litigation." As noted in previous correspondence from Ms. Franklin, this question is addressed in interrogatory responses, including our responses to Interrogatory Nos. 18, 19, and 22. It is unclear from your letter as to what aspects of those responses are deficient.

Since our interrogatory responses were served, TDM has also taken the deposition of Virginia Pankow of the USACE-NDC, regarding the maintenance of information on the referenced websites. In my phone conference with TDM counsel David Denenberg last week, he indicated that Ms. Pankow's testimony was insufficient and that he believed better witnesses existed. As I stated to Mr. Denenberg, we are open to discussing this issue further and will consider any additional information that TDM wishes to bring to our attention.

Fifth, your letter seeks payment from the government to TDM "for the copying expenses incurred from third parties, as well as the US' portion of the conference calls, saving the US the expense for personally appearing at the depositions." Earlier correspondence from Ms. Franklin has clearly stated the government's positions on these issues. Namely, the government has not agreed, orally or in writing, to pay these costs. Therefore, we see no reason to discuss this issue further.

Given the apparent confusion that has surrounded this issue, please note that any future requests for the sharing of costs should be documented in writing by the parties. If the government wishes to enter into a cost-sharing agreement, I will be happy to state our position in writing.

Finally, your letter also requests that the government amend its response to Interrogatory No. 10, which calls for a list of contracts where dredged material was treated with an additive. Specifically, you note that three additional government contracts, outside of the USACE, which

were identified during the deposition of a Clean Earth Dredging Technologies, Inc., witness. Per your request, the government is now endeavoring to produce the relevant documents relating to these contracts. The government will also endeavor to amend its interrogatory response when information regarding those contracts becomes available. We are not aware of any other relevant contracts (where dredged materials were treated with an additive) that have not been previously identified. We note, however, that your clients are very familiar with the dredging industry and yet your complaint names only the Army Corps of Engineers by name. It is not surprising then that we have focused on that agency, as have you. If, after reasonable inquiry, you form a good faith belief that any other agency has engaged in infringement of the patents at issue, please let me know. I will certainly investigate any specific allegations of infringement by other government agencies.

Very truly yours,

Walter W. Brown
Attorney
Commercial Litigation Branch
Civil Division

cc (by e-mail): John E. Flaherty, Esq.
Gary J. Campbell, Esq.

P. 01

TRANSACTION REPORT

OCT-16-2007 TUE 04:37 PM

FOR:

| SEND DATE | START | RECEIVER | TX TIME | PAGES | TYPE | NOTE | M# | DP |
|---|---|---|---|---|---|---|---|---|
| OCT-16 | 04:37 PM | 912122861884 | 55" | 5 | FAX TX | OK | 353 | |

TOTAL : 55S PAGES: 5

October 16, 2007

**IMPORTANT:** This facsimile is intended only for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected from disclosure under applicable law. If the reader of this transmission is not the intended recipient or the employee or agent responsible for delivering the transmission to the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this transmission or it's contents is strictly prohibited. If you have received this transmission in error, please notify us by telephoning and return the original transmission to us at the address given below.

**FROM:** Commercial Litigation Branch
Civil Division
U. S. Department of Justice
Washington, D.C. 20530

Fax No. (202) 307-0345
Voice No. (202) 307-0341

**SENT BY:** Walter W. Brown WWB

**TO:** Michael A. Adler, Esq.
DAVIDOFF, MALITO, & HUTCHER LLP

**FAX No.** (212) 286-1884

**NUMBER OF PAGES SENT (INCLUDING COVER PAGE):** 5

**SPECIAL INSTRUCTIONS:**