**Exhibit 5**


TDM v. United States
CIV-06-472
G01019 00001
May 8, 2007
The Beneficial Uses of Dredged Material
Harbor Programs Branch / US Army CoE
26 Federal Plaza, Rm 2119A
New York, New York 10278-0090

The port and the estuary have been developed over the last several hundred years. During the organization and industrialization of the port, many contaminants have flowed into the estuary and have bound onto the sediment particles in the water column. The sediment particles employing the estuary are then deposited into the navigation channels that the Corps. of Engineers has and then maintains.

**In recognition of the potential ecological impacts of dredged material disposal in open waters, the Corps. and its partners have been evaluating alternative means of managing dredged material since 1977. Since then, a number of feasible alternatives have been identified which shifted management strategies toward utilizing dredged material as a resource with known beneficial uses.** During this project, we encountered several different layers of material that we had to remove to deepen the channel. The first layer of silt material which often times has levels of contamination within it due to the pollution in the harbor has already been removed. But as we deepen further, we dig into materials such as glacial tills and even bedrock material. When dredged material is first removed from the bottom of the bay, it's very soupy like black mayonnaise and it goes through a series of processes in order to prepare it for upland placement. First, the sediment is allowed to settle and the water over the top is decanted off and back into the water body from where the sediment came. Then the debris is raked out of the sediment in the scows here. **Then Portland cement is added between 8 and even as much as 20% by weight and then it is mixed up to make sure that all the sediment and the cement is completely mixed.** Then the material is allowed to sit for 24 hours and cure, much like cement would cure in concrete. Then it's removed with an escavator bucket and placed in a pile and allowed to sit for another 24 hours before it's placed into trucks and hauled to the placement site.

Through various means, the Corps conducts extensive testing of all types of material prior to dredging to determine how best to manage it and where it can be placed. Each testing method used is designed specifically to protect the environment in which the material is being considered for placement. **For example, material can go upland to cap a landfill or to the Atlantic Ocean to remediate the HARS.** While the tests for upland and ocean suitable material are different, both are equally as rigorous. The Corps follows the testing standards set forth by the USEPA and the local regulatory agency like the NJDEP.

**The State of New Jersey sees dredged material as a resource. If it's used properly, dredged material can provide both economic gain and environmental benefit.**

(emphasis added)

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TDM America, LLC,<br><br>Plaintiff,<br><br>v.<br><br>The United States of America<br><br>Defendant,<br>and<br><br>Donjon Marine Company, Inc.<br><br>Interested Party. | Civil Action No. 06-472-C<br>Judge Thomas C. Wheeler |

## DECLARATION OF OI SI LO

I, **OI SI LO**, under penalty of perjury, state:

1. I, am a paralegal with the firm of Davidoff Malito & Hutcher LLP.

2. On November 27, 2007, I compared the transcription that is attached as Exhibit 5 to the Declaration of David Denenberg dated November 27, 2007 with the corresponding portion of the CD entitled "The Beneficial Uses of Dredged Material" bearing bates no. G01019 00001 and found the transcription to be a true and accurate transcription thereof.

Dated: New York, New York
November 27, 2007

s/Oi Si Lo
Oi Si Lo

**Exhibit 6**

DAVIDOFF MALITO & HUTCHER LLP
ATTORNEYS AT LAW
605 THIRD AVENUE
NEW YORK, NEW YORK 10158
(212) 557-7200
FAX (212) 286-1884
WWW.DMLEGAL.COM

GARDEN CITY
200 GARDEN CITY PLAZA
GARDEN CITY, N.Y. 11530
(516) 248-6400

MELVILLE
105 MAXESS RD., SUITE 124S
MELVILLE, NY 11747
(631) 574-4510

ALBANY
150 STATE STREET
ALBANY, N.Y. 12207
(518) 465-8230

WASHINGTON, D.C.
444 NORTH CAPITOL STREET, N.W.
WASHINGTON, D.C. 20001
(202) 347-1117

WRITER'S DIRECT: (646) 428-3210
E-MAIL: dwd@dmlegal.com

February 13, 2007

**BY EMAIL AND FEDERAL EXPRESS**

Erica A. Franklin, Esq.
US Department of Justice
Civil Division
1100 L Street, NW - Suite 1100
Washington, DC 20001

Re: **TDM America, LLC v. United States of America**
**Civil Action No. 06-472C (Judge Thomas C. Wheeler)**
**Our Ref: 7683.001**

Dear Ms. Franklin:

This letter confirms our February 6-7, 2007 agreement and resolution of discovery disputes pertaining to the proposed protective order, the timing and manner of document production and inspections, verifications to interrogatory responses and completeness of discovery responses.

## I. February 6, 2007 Rulings

On Tuesday, February 6, 2007, Hon. Judge Thomas C. Wheeler heard argument on a discovery dispute that arose in connection with an imminent document inspection of defendant US' documents being produced at Caven Point, New Jersey and at 26 Federal Plaza, New York. The US took the position that TDM's officers should not be present at the document inspections even if the officers signed an undertaking, pursuant to a protective order for confidential information. The US also wanted the protective order to be two-tiered (i.e. privileged and attorneys' eyes only) and to provide for more in-house personnel (favoring the US) to see proprietary documents if the personnel are attorneys rather than officers. TDM sought judicial intervention.

Judge Wheeler ruled that (i) plaintiff's officers should be allowed to join in the inspections provided the officers sign an appropriate undertaking, pursuant to a standard protective order, (ii) a protective order should be entered that includes an undertaking for in-house people to protect proprietary information; (iii) the number of in-house personnel having

access to proprietary documents pursuant to the protective order should be equal for all parties, regardless of whether the personnel are officers or attorneys (i.e. the issue is one of resources); and (iv) the protective order should only provide a single tier for designating proprietary documents.

## II. Protective Order and Discovery Dispute Resolution

Subsequent to the hearing, you advised this office that defendant would be filing a motion for reconsideration of Judge Wheeler's rulings. In an effort to resolve this dispute and not burden the court with unnecessary motions, I suggested that a compromise be reached which allows officers to see proprietary documents, the number of in-house personnel who could see documents be equal on all sides, provides a two-tiered proprietary designation and avoids the inspection issue by having the US produce its documents. The US and TDM agreed:

1. A protective order will be entered that provides for a maximum of four (4) in-house officers or attorneys to be able to see proprietary documents provided that each person execute an appropriate undertaking.

2. The protective order will have two-tiers for designating confidential information. The first tier allows in-house officers and attorneys to be able to see privileged or confidential documents, and the second tier would limit such access to outside attorneys only. On behalf of the US, you confirmed that the number of documents designated under the second tier ("outside attorneys eyes only") would be very limited.

3. To limit the need for on-site inspections of documents by TDM's outside counsel together with TDM's officers, the US agreed to produce documents to this office contingent upon this office's providing a letter with a detailed and comprehensive list of the documents that TDM seeks.

4. The US will verify its interrogatory responses and minimize the number of people verifying those responses to one, if possible, but in any event no more than three individuals.

5. The US will name its deponents for the Rule 30(b)(6) depositions noticed by TDM.

6. The US will circulate a revised protective order reflecting the above agreements.

7. This office will circulate a letter containing a detailed and comprehensive list of the documents it seeks production of.

## III. TDM's Document Requests

TDM represents that it has used its best efforts in compiling the below list of documents identifying all categories of documents it seeks. While it is not intended that additional broad categories of requests be made after the U.S. produces the documents responsive to this list, the US and TDM acknowledged that TDM will not be precluded from seeking additional documents that it may become aware of subsequent to this production (i.e. at a deposition). TDM's list, however, is thorough and comprehensive, but not preclusive.

### A. Narrow Scope of Summary Documents and Information Sought by TDM

TDM notes that the documents and information it seeks as set forth herein is intended to streamline the process for the convenience of the US and TDM. Specifically, TDM seeks:

1. Total amounts of dredged material that was treated (defined to include processing, stabilization, treating, remediating, etc.) and total amounts of dredged material that was disposed upland;

2. The detailed description of the treatment process;

3. The amount paid for dredged material treated and for its disposal; and

4. Information relevant to notice issues.

To expedite production, TDM requested responses to these questions in its interrogatory requests. TDM notes summary documents which provide this information should be provided and would render much other information unnecessary. Moreover, to the extent a contract with a particular contractor could, by agreement, represent the process for all treatment by that contractor, then only such contract and associated documents, need be produced.

### B. Documents TDM does not Seek

In accordance with TDM's best efforts to thoroughly identify the documents it seeks, it believes it prudent to first summarize the documents that TDM does not believe need to be produced. The preclusion of these documents should substantially reduce the US' burden in producing the requested documents. In this regard, TDM is not seeking:

1. Accident prevention and reporting documents;

2. Copies of contractor payrolls;

3. Documents related to blasting activities including the numerous binders that contain photos of houses in connection with blasting activities;

4. CDs of hatcheries;

5. Computer software manuals;

6. Hydrographic and fathometric surveys that do not have attachments of dredging volumes;

7. Pipeline removal contracts and manuals; and

8. Protest documents that do not contain substantive dredging process information (these account for virtually all of the protest documents).

C. **Detailed and Comprehensive Document List Sought by TDM**

The specific categories and description of documents that TDM seeks are:

1. All documents required to be submitted under the "Special Contract Requirements" such as offloading, processing and disposal site construction activities schedule, project construction schedule, synopsis of proposed operations which contain a detailed description of the dredging and treatment processes including identification of processing, transportation and operating procedures. These documents are supplemental information to contracts which typically must be submitted within seventy (70) calendar days. For example, a reference is made to such documents in documents bearing Bates Stamp Nos. G011499-G011504; and G012760-G012764. For ease of reference, these documents are attached as hereto as Exhibits A and B and request that contractors provide a detailed description of the proposed processing technology including dewatering, material treatment specifying the method of treatment, additives used during the processing, the mechanical processing used, decontamination and stabilization methods incorporated, chemical treatment, interim storage, etc.

2. All beneficial use determination permits (BUDs), waterside development contracts, state water quality permits and/or certificates, processing and disposal permits/requirements for the sites identified by the contractor, dewatering permits, commercial zone permits, CZMs, and any documents submitted to the permit agencies for the issuance of these permits. By way of example, reference is made to the highlighted portions of documents produced by the US bearing Bates Stamp Nos. G011499-G011504 (Exhibit B) and G011581 (Exhibit C).

3. Summaries showing logging of dredging activities for each region and/or district within that region, that may include monthly summary reports of volumes and monthly progress reviews.

4. Publicly disclosed summary and research & development documents related to dredging activities. This includes content found in USACE websites for the years 1999 to the present and documents that contain summaries of dredging activities and/or projected dredging amounts. For example, reference is made to the documents attached as Exhibit D and already sent with my February 1, 2007 letter. This category also includes: (1) publicly available dredged sediment research and development reports that originated with USACE; (2) videos that show the processing of dredged materials carried out by any of USACE's contractors; (3) USACE publications and media that contain segments on the processing and upland disposal of dredged materials; and (4) other documents disseminated by USACE including interviews, that pertain to the processing and upland disposal of dredged materials.

5. Dredge materials processing documents. Reference is made to G012760-G012764.

6. Total volumes and costs incurred by region and by district for the dredging, treatment and upland disposal of dredged materials.

7. Photos of actual dredging activities. Reference is made to the highlighted portions of documents produced by the US bearing Bates Stamp Nos. G010149-G010154 which specifically call for digital photograph submissions. These documents are attached hereto as Exhibit E hereto.

8. Quality control plans and disposal plans. Reference is made to the highlighted portions of documents produced by the US bearing Bates Stamp Nos. G011608-G011611. These documents are attached hereto as Exhibit F. TDM seeks the documents and information that respond to those highlighted portions. TDM also seeks de-watering quality assurance plans. (Not to exclude de-watering documents that are relevant to the dredging processes.)

9. Bid solicitation proposal and amendment documents, pre-award files, contractor brochures and partnering documents.

10. Letters and documents that mention patents, especially the ones that mention patent numbers.

11. USACE transportation logs and replacement documents, upland scow placement documents and summaries of debris removal.

12. Documents that describe the amount of cement to be added to dredged material during the processing thereof and documents that mention Portland Cement.

13. Cornerstone consulting documents.

Thank you for your attention to this matter. Please call with any questions or comments.

Very truly yours,

David W. Denenberg

DWD/lsh
Enclosures

cc: Gary J. Campbell (w/enclosures)

**Exhibit 7**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TDM America, LLC,<br>Plaintiff,<br>v.<br>THE UNITED STATES OF AMERICA,<br>Defendant. | No. 06-472 C<br>Judge Thomas C. Wheeler |

JOINT DISCOVERY PLAN (proposed)

| | | |
|---|---|---|
| 1. | October 23, 2006 | Fact discovery opens. First day to serve interrogatories, document requests, notices of depositions, and/or requests for admissions.<br><br>Unless leave of the court is granted, the number of interrogatories shall not exceed forty (40).<br><br>Unless leave of the court is granted, the number of fact witness depositions shall not exceed twelve (12).<br><br>The number of expert depositions for each party shall be equal to the number of experts and rebuttal experts of the other party. In the event an expert and rebuttal expert are the same for one party, then the other party may depose the expert separately on the issues in chief and on the rebuttal issues. |
| 2. | Two (2) weeks after the Rule 16(b) Conference | Last day for exchange of initial disclosures pursuant the Rule 26(a)(1) of the United States Court of Federal Claims. |
| 3. | January 19, 2007 | No additional parties may be joined after this date without leave of the court. |
| 4. | March 30, 2007 | Last day to serve interrogatories, document requests notices of depositions, and/or requests to admit. |
| 5. | May 15, 2007 | Fact discovery closes. |

| | | |
|---|---|---|
| 6. | May 25, 2007 | Exchange of expert reports on issues on which the parties have the burden of proof.[1]<br><br>Expert deposition discovery begins. |
| 7. | June 22, 2007 | Exchange of rebuttal expert reports.<br><br>Expert deposition discovery begins on the rebuttals. |
| 8. | July 13, 2007 | Close of expert discovery. |
| 9. | July 27, 2007 | Parties exchange proposed claim term construction. |
| 10. | August 3, 2007 | Last day for the parties to meet and confer regarding claim term construction. |
| 11. | August 10, 2007 | Parties file joint claim construction statement. |
| 12. | August 24, 2007 | Parties to serve opening Markman briefs on claim term construction and to file dispositive motions, if any. |
| 13. | September 7, 2007 | Parties to serve opposition briefs on claim term construction and on the dispositive motions. |
| 14. | September 21, 2007 | Parties to serve reply briefs on claim term construction and on the dispositive motions. |
| 15. | September 28, 2007 | Markman hearing and oral argument on the dispositive motions. |

Respectfully submitted,

DAVIDOFF MALITO & HUTCHER LLP
*Attorneys for Plaintiff*

Dated: October 12, 2006

s/Michael A. Adler
David W. Denenberg
Michael A. Adler
605 Third Avenue – 34 Fl
New York, NY 10158
Tel: (212) 557-7200
Fax: (212) 286-1884

[1] The parties have agreed to confer regarding any adjustment to the period of expert discovery in the event that the experts are unavailable during the proposed period.

PETER D. KEISLER
Assistant Attorney General

JOHN FARGO
Director

Dated: October 12, 2006

s/Erica A. Franklin
Erica A. Franklin
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530
Telephone: (202) 353-0517
Facsimile: (202) 307-0345

Attorneys for the United States

## Other Documents

1:06-cv-00472-TCW TDM AMERICA, LLC v. USA

**US Court of Federal Claims**

**United States Court of Federal Claims**

Notice of Docketing
This notice indicates that activity has occurred in the case identified below. Please note that these notices are generated for all public entries in all cases with the court, paper and electronic, and is therefore NOT NECESSARILY INDICATIVE OF AN ELECTRONIC FILING.

The following transaction was received from Adler, Micheal entered on 10/12/2006 at 4:06 PM EDT and filed on 10/12/2006

**Case Name:** TDM AMERICA, LLC v. USA
**Case Number:** 1:06-cv-472
**Filer:** TDM AMERICA, LLC
**Document Number:** 10

**Docket Text:**
JOINT PRELIMINARY STATUS REPORT. (Attachments: # (1) Supplement Proposed Joint Discovery Plan)(Adler, Micheal)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1131461693 [Date=10/12/2006] [FileNumber=399405-0
] [4a136ccd0369cff203123a8a35ad4b5ee7900e2df25fb5d7132e7d7fbfccd7fd2cc
16a61c4ba88a3b0b952f00491bc90626dce4124e8461f890b536ce16de3fb]]
**Document description:**Supplement Proposed Joint Discovery Plan
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1131461693 [Date=10/12/2006] [FileNumber=399405-1
] [05cd3f8e607af67dd5f6769be7ccefdfeae2380cf26204ad6a36ea7bb75483fbc95
22469d0f54c8db2151a6bbea8c490d484e26bd2d3c86b3824ba12f487a608]]

**1:06-cv-472 Notice will be electronically mailed to:**

David W. Denenberg dwd@dmlegal.com

Erica A. Franklin erica.franklin@usdoj.gov

**1:06-cv-472 Notice will NOT be delivered to:**

**Sealed Document - Exhibit 8**

**Sealed Document - Exhibit 9**

Exhibit 10

Coastal and Hydraulics Laboratory

Meeting Tomorrow's Water Resources Challenges Today

US Army Engineer Research and Development Center

# Beach Nourishment



*Beach nourishment is the introduction of material along a shoreline to supplement the natural littoral drift.*
*Enlarge:* **260x173(6kb)**



*Construction of a low retaining sill to trap sand results in a pearched beach*
*Enlarge:* **289x192(7kb)**

Beach nourishment is the introduction of material along a shoreline to supplement the natural littoral drift. There are several reasons for nourishing a shore. These include:

- Controlling erosive forces by providing a sacrificial area as a source of littoral material
- Supplementing littoral drift to offset particular actions or works
- Replenishing reserves of littoral material normally available in sand dunes

The effects of beach nourishment are generally short-lived (i.e., as long as the supply of material exists).

Beach fills are quantities of sand placed on the shoreline by mechanical means, such as dredging and pumping from offshore deposits or overland hauling and dumping by trucks. The resulting beach provides some protection to the area behind it and also serves as a valuable recreational resource.

The beach fill functions as an eroding buffer zone. As large waves strike it, sand is carried offshore and deposited in a bar. As the bar grows, it causes incoming waves to break farther offshore. The useful life of such a beach, which depends on how quickly it erodes, can be completely eliminated in a short period of time by a rapid succession of severe storms. The owner must expect, therefore, to periodically add more fill as erosion continues. Beach fills generally have a relatively low initial cost but a periodic maintenance cost of adding new fill (periodic nourishment).

The rate at which new fill must be added depends on the relative coarseness of the fill material in relation to the native beach material. Ideally, fill and native beach materials should be perfectly matched, but this is virtually impossible. Generally speaking, if fill material is coarser than the native material, the fill erodes more slowly and if it is finer, it erodes more quickly.

Beach nourishment and beach fills are often used in combination with construction of other protection methods such as a perched beach, or groin field.

*Collapse All*

**See Also...**

**Non-Structural Methods for Coastal Shore Protection**

- **Vegetation Planting** - Vegetation is an effective and inexpensive way to stabilize dunes and protect marshes.
- **Groundwater Drainage** - Groundwater drainage, or bluff dewatering is a common practice used to rapidly drain ground and surface waters away from a bluff in order to eliminate or reduce bluff failures initiated by groundwater seepage.
- ***Beach Nourishment*** - *Beach nourishment is the introduction of material along a shoreline to supplement the natural littoral drift.*
- **Sand Bypassing** - Sand bypassing is the hydraulic or mechanical movement of sand, from an area of accretion to a downdrift area of erosion, across a barrier to natural sand transport.
- **Flood Proofing** - One of the most common flood proofing measures is the elevation of homes.
- **Zoning** - Zoning measures involve the implementation and enforcement of planning and zoning by-laws to control development in flood and erosion hazard zones.
- **Retreat** - In some cases, it may be less expensive to relocate endangered structures than to invest in large scale shore protection.
- **Do Nothing** - The no action, or do nothing approach is commonly used by engineers to help evaluate different courses of action.

Coastal and Hydraulics Laboratory - Engineer Research and Development Center
Waterways Experiment Station - Vicksburg, Mississippi
CHL-Webmaster@erdc.usace.army.mil