| | |
|---|---|
| TDM America, LLC,<br><br>Plaintiff,<br><br>v.<br><br>The United States of America<br><br>Defendant,<br>and<br><br>Donjon Marine Company, Inc.<br><br>Interested Party. | Civil Action No. 06-472-C<br>Judge Thomas C. Wheeler |

**[CORRECTED]**

**TDM'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION PURSUANT TO RCFC 37 AGAINST THE US**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .... 2

STATEMENT OF FACTS .... 3

A. TDM's Initial Efforts to Compel Discovery .... 3

B. TDM's Lengthy Good Faith Efforts to Obtain Discovery Responses from the US .... 4

ARGUMENT

A. Interrogatory Nos. 10-13 and 15-16 .... 6

1. Interrogatory Nos. 15-16 .... 6

2. Interrogatory Nos. 11-13 .... 8

3. Interrogatory No. 10 .... 9

B. Interrogatory Nos. 20, 23-26 .... 10

1. Interrogatory No. 20 .... 11

2. Interrogatory Nos. 23-26 .... 12

C. The US' Failure to Provide an Appropriate 30(b)(6) Witness .... 14

D. Re-Designation of Transcript Testimony .... 19

E. Objection to Michael C. Chapman .... 20

F. Meet and Confer .... 21

CONCLUSION .... 22

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*Advanced America Services, Inc. v. The United States,*
32 Fed.Cl. 191 (Fed.Cl. 1994) .......... 6

*Boeing Company Company v.The United States of America,*
Civil Action No. 00-705-C .......... 21

*Creative Resources Group of New Jersey v. Creative Resources Group, Inc.,*
212 F.R.D. 94 (E.D.N.Y. 2002) .......... 6

*English Feedlot, Inc. v. Norden Laboratories, Inc.,*
833 F.Supp. 1498 (D. CO. 1993) .......... 20

*Great Lakes Dredge & Dock Company v. Harnischfeger Corporation,*
734 F.Supp. 334 (N.D. III. 1990) .......... 20

*United Medical Supply Company, Inc. v. The United States,*
77 Fed.Cl. 257 (Fed.Cl. 2007) .......... 10

*United States ex. rel. Cherry Hill Convalescence Center v.*
*Healthcare Rehab Systems, Inc.,*
994 F.Sup. 244 (D. NJ. 1997) .......... 20

**Statutes**

RCFC 30 .......... *passim*

RCFC 37 .......... *passim*

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TDM America, LLC,<br><br>Plaintiff,<br><br>v.<br><br>The United States of America<br><br>Defendant,<br>and<br><br>Donjon Marine Company, Inc.<br><br>Interested Party. | Civil Action No. 06-472-C<br>Judge Thomas C. Wheeler |

**TDM'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION PURSUANT TO RCFC 37 AGAINST THE US**

Plaintiff TDM America, LLC ("TDM") respectfully submits this memorandum (i) in reply to the opposition of the defendant United States of America ("US") and (ii) in further support of TDM's motion against defendant US pursuant to RCFC 37. That motion seeks:

(1) sanctions pursuant to RCFC 37 (b)(2)(A) and an order that (a) establishes for the purposes of this litigation that the total volume of treated dredged material for the years of 2000 to 2006 is 133,143,631 cubic yards consistent with the amount of dredged material disposed "Upland" listed in the United States Army Corps of Engineers ("USACE") website, (b) establishes for purposes of this litigation that the 133,143,631 cubic yards were treated in accordance with the methods of the contracts already produced in this litigation, and (c) establishes for the purposes of this litigation that the contract documents identified by the US in this litigation are actual US records and admissible in evidence;

(2) an order that, pursuant to RCFC 37(a)(2)(A) and (B), the US be compelled to completely and properly respond to interrogatory nos. 20, 23, 24, 25 and 26;

(3) an order that, pursuant to the February 16, 2007 Protective Order, the US re-designate all transcripts of US witnesses within fourteen (14) days of this order or all such transcripts should be deemed non-proprietary and non-confidential; and

(4) an order that the US' objections to Michael J. Chapman's designation by TDM as an expert witness are overruled.

**PRELIMINARY STATEMENT**

This Court issued a Discovery Order on April 30, 2007 (the "Discovery Order") directing the US "to provide complete and verified responses to plaintiff's interrogatories and to respond properly to all of plaintiff's document requests within 30 days." (*See* Declaration of Michael A. Adler sworn to on October 16, 2007 and submitted with TDM's moving memorandum ("Adler Moving Dec.") at Ex. 1. As set forth herein and in TDM's moving memorandum, the US should be sanctioned because it failed to comply with the Discovery Order by not properly or completely responding to interrogatory nos. 10-13 and 15-16. The US did not amend or supplement the very responses to interrogatories and document requests that were the subject of the Discovery Order particularly with respect to volumes of treated dredged material. In addition, the US refused to provide RCFC 30(b)(6) witnesses knowledgeable on the volumes of treated dredged materials and/or the volumes provided on the USACE website. Therefore, the appropriate sanction is a ruling that the volume of treated dredged material is in accordance with that website; namely, 133,143,631 cubic yards, and that the method for processing of same is in accordance with contracts already produced.

The US should also be sanctioned and compelled to properly and completely respond to interrogatory nos. 20 and 23-26. Moreover, the US' disregard for this Court's orders is further evinced by its wholesale designation of US witness transcripts as proprietary in blatant violation of this Court's February 16, 2007 Protective Order (the "Protective Order"). (*See* Adler Moving Dec. at Ex. 28). Finally, the US should not be permitted to interfere with TDM's retention of Michael C. Chapman as an expert witness and any objections to his designation as an expert witness should be overruled by this Court.

## STATEMENT OF FACTS

### A. TDM's Initial Efforts to Compel Discovery

TDM moved for sanctions and/or to compel the US pursuant to RCFC 37 on April 23, 2007 for the US' failure to properly respond to interrogatory nos. 10-13 and 15-16. On April 30, 2007, this Court issued a Discovery Order directing the US "to provide complete and verified responses to plaintiff's interrogatories and to respond properly to all of plaintiff's document requests within 30 days." (*See* Adler Moving Dec. at Ex. 1). That same Discovery Order directed all parties to submit a joint status report at the end of the 30 day period. *Id.* On June 12, 2007, the joint status report was filed with this Court. (*See* Declaration of David W. Denenberg ("Denenberg Reply Dec.") at Ex. 1). TDM explained in the joint status report that the US still had not sufficiently responded to discovery requests. *Id.* On June 15, 2007, this Court issued an order encouraging all parties to "resolve discovery disputes among themselves" and to the extent that any discovery disputes remained unresolved "such disputes should be the subject of an appropriate motion filed with the Court." (*See* Adler Moving Dec. at Ex. 5).

**B. TDM's Lengthy Good Faith Efforts to <u>Obtain Discovery Responses From the US</u>**

TDM addressed these and subsequent discovery issues, and very patiently so, with the US through telephone conversations and written correspondence in an effort to resolve these disputes without further court intervention. For example, TDM sent a letter on August 13, 2007 to Erica A. Franklin, counsel for the US, wherein TDM raised its concerns with the US' (i) deficient responses to interrogatories, (ii) inappropriate wholesale designation of US witness transcripts as proprietary, and (iii) failure to explain the disparity between the volumes of dredged material disposed "Upland" as reported in the USACE website and the amount of treated dredged material indicated by the projects identified by the US during discovery. (*See* Adler Moving Dec. at Ex. 18). Another letter from TDM regarding these issues dated September 17, 2007 followed. (*See* Adler Moving Dec. at Ex. 19). TDM's counsel also called Ms. Franklin during this time period to discuss these discovery issues. (*See* Adler Moving Dec. at ¶¶ 5-10).

On October 12, 2007, counsel for TDM had a conversation with Walter W. Brown, present counsel for the US, regarding the then upcoming status conference and several outstanding discovery issues. (*See* Denenberg Reply Dec. at ¶¶ 4-7). During this conversation, TDM's counsel asked for a date by when it would receive documents regarding three contracts for treatment of dredged material the US never identified. (*See* Denenberg Reply Dec. at ¶ 4). Yet, it is well worth noting that counsel for the US would not commit to a time table despite the fact that the discovery period was nearing its end and the US would probably never have produced these documents had it not been for non-party Clean Earth Dredging Technologies, Inc.'s ("Clean Earth") witness Steven Sands testifying to the existence of these contracts. (*See* Adler Moving Dec. at Ex. 22). As a courtesy to Mr. Brown, TDM counsel e-mailed him a copy

of both its August 13, 2007 and September 17, 2007 letters on that very same day. (*See* Denenberg Reply Dec. at ¶ 6 and Ex. 2).

During that same call, Mr. Denenberg noted that the USACE website showed substantially greater volumes of treated dredged material as disposed "Upland" than the US produced. Mr. Denenberg noted the US' failure to produce a witness who could explain the website or the discrepancy. (*See* Denenberg Reply Dec. at ¶5). Clearly, the US has not produced and fully responded to document requests. Such failure to produce responsive documents is sanctionable and supports using the 133,143,631 cubic yards of dredged material disposed "Upland" listed in the USACE website. (*See* Adler Moving Dec. at Exs. 11-12).

The US finally chose to respond to TDM's September 17, 2007 letter on October 16, 2007 – one month later – and four hours before the filing of the instant motion. (*See* Denenberg Reply Dec. at Ex. 3). The US' October 16, 2007 letter mostly reiterates the US' long held positions regarding these discovery issues, namely that (i) its wholesale designation of transcript testimony is proper and (ii) its interrogatory responses are not deficient. *Id.* In this letter, the US also disavowed its agreement to respond to 40 interrogatories as agreed upon before this Court, something the US changed its mind about in the United States' Opposition to TDM's Motion Pursuant to RCFC 37 Against the US ("US Opp."). (*See* US Opp. at p. 19, fn. 8). With respect to providing a witness to explain the disparity between volumes of dredged material disposed upland and volumes of treated dredged material indicated by projects identified by the US in this litigation, the US gave another non-committal response indicating that it was open to discussion. (*See* Denenberg Reply Dec. at Ex. 3). Therefore, present counsel's October 16, 2007 letter did little to address the deficient responses and the real discovery issues here.

# ARGUMENT

## A. Interrogatory Nos. 10-13 and 15-16

RCFC 37 provides for the imposition of sanctions whenever a party abuses the discovery process or violates a court order. Sanctions are particularly appropriate here because the US still has not completely or properly responded to numerous interrogatory and document requests in direct violation of this Court's Discovery Order. *Advanced America Services, Inc. v. The United States*, 32 Fed.Cl. 191 (Fed.Cl. 1994); *Creative Resources Group of New Jersey v. Creative Resources Group, Inc.* 212 F.R.D. 94 (E.D.N.Y. 2002).

Interrogatory nos. 10-13 and 15-16 were among the critical interrogatories included in TDM's motion to compel and/or for sanctions against the US filed with this Court on April 23, 2007. RCFC 30(b)(6) depositions of the US, including the category of volumes of treated dredged materials, were also part of that motion. As set forth herein and in TDM's moving memorandum, despite this Court's Discovery Order directing the US to completely and properly respond to TDM's interrogatory and discovery responses, and produce appropriate RCFC 30(b)(6) witnesses, the US failed to do so. Pursuant to RCFC 37(b)(2)(A), a court may sanction a party for failing to obey a court order by issuing "an order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order."

### 1. Interrogatory Nos. 15-16

Interrogatory nos. 15 and 16 constitute TDM's second set of interrogatories to the US and are directed to (i) the total volumes of dredged materials treated by, or on behalf of, the US and (ii) the amounts paid for such treatment. (*See* Adler Moving Dec. at Ex. 6) [1]. In the

[1] Interrogatory no. 15 asks for "The total volume of, and total amounts paid by the US for, dredging activities and treatment of dredged material on behalf of the US since 1997. This information should be provided for the entire

April 23, 2007 motion, TDM demonstrated that, although the US identified various contracts by contract number (but not by providing the bates nos.) and certain payment estimates ("Attachment B") in responding to these interrogatories, total volumes cannot be ascertained. (*See* Adler Moving Dec. at Ex. 7). The Discovery Order directed the US to properly and completely respond.

Despite the Discovery Order, the US failed to amend or otherwise supplement its responses to TDM's second set of interrogatories. The US has an obligation to properly and completely respond to interrogatory requests pursuant to RCFC 37 and this Court's Discovery Order. The US' contention that third parties may be in possession of the same information does not ameliorate that obligation. That the responses were deficient, as were the responses to document demands related to volumes, is quite clear as TDM found, through the deposition of non-party Clean Earth by Steven Sands its president and founder, that at least three more contracts never produced or identified by the US did, in fact, exist. (*See* Adler Moving Dec. at Ex. 22).

The US should be sanctioned for violating the Discovery Order by not completely and properly responding to interrogatory nos. 15 and 16. It should be established pursuant to RCFC 37(b)(2) that the total volume of treated dredged material for the years 2000 to 2006 is 133,143,631 cubic yards consistent with the amount of dredged material disposed "Upland" as listed in the USACE website. (*See* Adler Moving Dec. at Exs. 11 and 12).

---

United States, each United States Army Corps of Engineers civil engineer division and/or civil engineer district." *Id.*

Interrogatory no. 16 asks for the "The total volume of, and total amounts paid by the US for, treated dredged material disposed upland or beneficially reused in the United States. This information should be provided for the entire United States." *Id.*

2. **Interrogatory Nos. 11-13**

Interrogatory nos. 11, 12 and 13 seek processing information and identification of all processes and methods, as well as documents regarding same. (*See* Adler Moving Dec. at Ex. 14)[2]. With respect to the processing of dredged materials, the US has not referred to any particular documents or any one document from which a response can be ascertained. Instead, the US responded to interrogatory nos. 11, 12, and 13 by stating that "insofar as the information requested is contained documents [sic] in the possession of the government, other than the contracts themselves, such documents have also been produced to plaintiff in a manner in which the documents are kept in the ordinary course of business, pursuant to RCFC 34(b)." (*See* Adler Moving Dec. at Ex. 15). This response is woefully deficient because it does not respond to the question posed and refers to no document from which a response may be ascertained.

Again, the US attempts to shirk its responsibility to provide proper responses to interrogatories by alleging that the processing information requested by these interrogatories should be requested from the contractors – non-parties to this action. The US self-servedly claims not to have complete knowledge of the process, but its own contracts require submittals from the contractors that must include a detailed description of their processing and all necessary

[2] Interrogatory no. 11 asks the US to "[i]dentify all processes and methods utilized by each of the respective contractors identified in the response to Interrogatory No. 10, and all documents, specifications, data, and other writings that describe and set forth the methods, processes and/or manner utilized for the dredging activities." *Id.*

Interrogatory no. 12 asks "For each contract that the US was or is a party to since 1997 for any dredging activity at any port, harbor and/or waterway, complete the chart below either confirming that the contractor is performing the referenced element of the patent claim for the '731 patent or describe the manner in which the particular dredging activity and/or processing activity is performed and how the activity differs from the referenced one." *Id.*

Interrogatory no. 13 asks "For each contract that the US was or is a party to since 1997 for any dredging activity at any port, harbor and/or waterway, complete the chart below either confirming that the contractor is performing the referenced element of the patent claim for the '614 patent or describe the manner in which the particular dredging activity and/or processing activity is performed and how the activity differs from the referenced one." *Id.*

permits from federal and state regulatory agencies. (*See* Denenberg Reply Dec. at Ex. 4). Moreover, the US' contentions regarding lack of knowledge related to processing is belied by the information contained in a CD entitled "Beneficial Use of Dredging Material, Harbor Programs Branch/US Army CoE" (the "CD") produced by the US, wherein Bryce Wisemiller, a project manager for the Programs and Project Management Division, Harbor Programs Branch of USACE, New York District, and other US employees discuss in great detail the processing and beneficial reuse of dredged material. (*See* Denenberg Reply Dec. at Ex. 5).

Based on the US' blatant failure to comply with the Discovery Order by not properly or completely responding to interrogatory nos. 11, 12, and 13, the US should be sanctioned pursuant to RCFC 37(b)(2)(A) and it should be established that the 133,143,631 cubic yards of dredged material disposed "Upland" during the period of 2000 to 2006 were processed in accordance with the methods for treating or processing of dredged material set forth in those contracts produced in this litigation.

**3. Interrogatory No. 10**

Interrogatory no. 10 asks the US to "[i]dentify each and every specific contract, and identify each and every contractor retained by the US for dredging activities at any port, harbor and/or waterway since 1997 to the present and for each such contract specify all contract information and processing information relevant to those contracts and the dredging activities, including specifically the treatment, processing, stabilization, retention, staging, handling, curing, reuse, remediation, solidification and/or disposal of the dredged materials." (*See* Adler Moving Dec. at Ex. 10).

In its amended responses, the US provided revised Attachment A listing twenty (20) contracts and the project names. However, the US failed to specify what documents

constitute those contracts and failed to specify documents regarding processing information for same. The US' contention that it conducted a proper investigation is belied by the fact that a recent non-party witness, Mr. Sands of Clean Earth testified to the existence of three other US contracts for the treatment of dredged materials - something present counsel does not deny. (Def. Opp. at ¶¶ 5, 15-16). Therefore, the US' present assurances that no other contracts exist are plainly wrong and the US should be sanctioned because, without the testimony of a non-party witness, documents relating to several contracts would never have been produced.

Moreover, the US refuses to provide essential processing information requested by interrogatory no. 10; instead, the US responds that processing information relevant to those contracts is a request "best directed to the contractors." (*See* Adler Moving Dec. at Ex. 15). The US' attempt to shift the burden of providing responses onto the contractors is a position that has already been criticized by this Court early on. (*See* Adler Moving Dec. at Ex. 4).

Therefore, the US should be sanctioned for violating the Discovery Order by not completely and properly responding to interrogatory no. 10. It should, therefore, be established, pursuant to RCFC 37(a)(2)(A), that all contracts and documents identified by TDM as exhibits constitute the actual US contracts, admissible in evidence. Likewise, as all contracts clearly were not produced, it should be established that contracts do exist which provide for treatment or processing of the entire 133,143,631 cubic yards of dredged material listed as disposed "Upland" in the USACE website.

**B. <u>Interrogatory Nos. 20, 23-26</u>**

The Court of Federal Claims possesses the inherent authority to impose sanctions for abuses of the discovery process. *United Medical Supply Company, Inc. v. The United States,* 77

Fed Cl. 257 (Fed.Cl. 2007). Pursuant to RCFC 37 (a)(2)(A) and (B), the US should be sanctioned and compelled to respond to interrogatory nos. 20, 23-26.

**1. <u>Interrogatory No. 20</u>**

Contrary to the US' contentions, interrogatory no. 20 does not ask for all the documents in the "official file" of the US. Instead, it asks that the US produce all contracts for processing of dredged materials and that those contracts, which the US listed in Attachment A, be specified by bates number. (*See* Adler Moving Dec., Ex. 24)[3]. Despite the voluminous production, TDM diligently reviewed these documents and attempted to identify which constitute the actual US contracts for projects specified by the US in its Revised Attachment A. However, when those documents were presented to US witnesses, TDM received conflicting responses regarding their authenticity as the complete and official contracts. (*See* Adler Moving Dec. at Ex. 8, Snell transcript, pp. 27-28, 45-46, 70-71, 78, 97; Ex. 9 Hawkins transcript, pp. 12, 38, 41, 43-44, 48, 68, and 99; Wisemiller transcript, pp. 243, 253, 290, 293, 299, and 305; Adler Moving Dec. at Ex. 22, Didato transcript, pp. 81, 89-90, 90-91, 97 -98).[4]

In the US' response to this interrogatory, it referenced Attachment D, a list of thousands of documents categorized by contract number. Most of those bates ranges contained documents that were completely irrelevant to identifying the documents that constitute the actual

---

[3] "To the extent not previously requested, identify, by bates numbers, all documents that constitute each of the contracts listed on Attachment A, any modifications thereto, all 35-day and/or 70-day submissions that correspond to the contracts and/or "binder" submissions, and/or all permits that contain descriptions of the process for the treatment of dredged material with an additive(s) for upland disposal." *Id.*

[4] The exhibits at issue were marked as Plaintiff's Exhibits 2, 29, 31, 32, 33, 34, 37, 40, 52, 58, and 70 at the May 10, 2007 (initial) and May 22, 2007 (continued) depositions of Bryce Wisemiller , the May 16, 2007 deposition of Harold Hawkins, and the May 18, 2007 deposition of Ella Snell. Due to the volume of these documents they are not attached hereto but if the Court requests we will file same.

US contracts such as weather reports, transportation logs, and quality assurance reports. (*See* Adler Moving Dec. at Ex. 35).[5]

Moreover, after TDM's inspection of documents at Caven Point, New Jersey in February 2007, TDM counsel sent the US a letter specifying the categories of documents it sought and excluding other irrelevant categories such as accident prevention reporting documents and documents related to blasting activities. (*See* Denenberg Reply Dec. at Ex. 6). Despite this, the US not only sent over thousands of such documents, but also included them in its response to interrogatory no. 20. TDM attempted, in good faith, to resolve this discovery impasse. Unfortunately, the US responded in bad faith by referring to any and all irrelevant documents it could get its hands on.

The only party capable of identifying the bates ranges that constitute the actual contracts is the US. [6] The US' refusal to do so reflects bad faith and a willful disregard of the standards set forth in RCFC 37. Therefore, TDM is entitled to an order compelling the US, pursuant to RCFC 37 (a)(2)(A) and (B) to completely and properly respond to interrogatory 20.

**2. <u>Interrogatory Nos. 23-26</u>**

The US refuses to respond to interrogatories nos. 23-26 on the ground that they exceed the number of interrogatories under RCFC 33(a). (*See* Adler Moving Dec. at Ex. 25) [7].

---

[5] TDM and its counsel apologize to the Court for attaching this voluminous exhibit but there was no other way to demonstrate to the Court the insufficiency of the US' response to interrogatory no. 20.

[6] The Court is asked to take judicial notice of the fact that the US recently filed a partial summary judgment motion against TDM wherein it attached only excerpts of US contracts involving the treatment of dredged material that TDM has never seen in any of the documents produced thus far. Therefore, it is underhanded for the US to now argue that it is unduly burdensome for it to identify the actual contracts given the facility with which it located them for its own motion. *Id.*

[7] Interrogatory no 23 asks "To the extent not provided in previous responses and amended responses, please supplement responses to all interrogatories which refer to the "patents-in-suit" so that the response covers all patents-in-suit, including the '862 and '590 patents." *Id.*

The parties agreed upon forty (40) interrogatories to be served by each party. TDM disagrees with the arbitrary and self-serving numbering system employed by the US. TDM is entitled to full and complete answers to interrogatory nos. 23 through 26.

TDM was willing and attempted to negotiate a reasonable compromise with the US even though the interrogatories generally requested updated information on the patents added in the amended complaint. In correspondence and telephone conversations between the parties, TDM offered to hear a US proposal to resolve this issue but any such attempts were met with snide remarks from the US' former counsel – something present counsel for the US does not deny. (*See* Adler Moving Dec. at ¶8 and Ex. 27). Present counsel's October 16, 2007 letter - sent four hours before this motion was filed - was the first time the US offered any compromise. Specifically, the US offered to discuss an arrangement with TDM that would narrow the scope of these interrogatories, but only after disavowing its agreement with TDM to answer forty (40) interrogatories - - even though former US counsel, indeed, acknowledged this agreement. (*See* Denenberg Reply Dec. at Ex. 3 and Ex. 7).

As explained above, TDM is entitled to an order compelling the US pursuant to RCFC 37 (a)(2)(A) and (B) to completely and properly respond to interrogatory nos. 23, 24, 25 and 26.

---

Interrogatory no. 24 asks "[f]or each contract that the US was or is a party to since 1997 for any dredging activity at any port, harbor and/or waterway, complete the chart below either confirming that the contractor is performing the referenced element of the patent claim for the '862 patent or describe the manner in which the particular dredging activity and/or processing activity is performed and how the activity differs from the referenced one." *Id.*

Interrogatory no. 25 asks "[f]or each contract that the US was or is a party to since 1997 for any dredging activity at any port, harbor and/or waterway, complete the chart below either confirming that the contractor is performing the referenced element of the patent claim for the '590 patent or describe the manner in which the particular dredging activity and/or processing activity is performed and how the activity differs from the referenced one." *Id.*

Interrogatory no. 26 asks the US "[i]dentify all documents used to respond to interrogatories 1-25 above. *Id.*

## C. The US' Failure to Provide an Appropriate 30(b)(6) Witness

As stated in numerous letters (*see* Adler Moving Dec. at Exs. 16-19), TDM's first motion to compel filed with this Court on April 23, 2007 and TDM's moving papers for the instant motion to compel, the US has yet to produce documents, update discovery responses or provide a witness sufficiently knowledgeable to explain the disparity between the volumes of dredged material disposed "Upland" listed in the USACE website, which is 133,143,631 cubic yards and volumes of treated dredged materials represented in the contracts the US has with dredging contractors that it has produced.

Specifically, the US periodically publishes dredging statistics on the USACE website and elsewhere. (*See* Adler Moving Dec. at Exs. 11-12). For example, USACE's webpage identified as Exhibit 11 in the Adler Moving Dec. below shows annual dredging information by number of contracts, cubic yards, and bid totals for the period 2001 through 2006 by disposal type. Exhibit 12 to the Adler Moving Dec. shows a similar webpage including bid totals for the period 2000 through 2003.

**SEE NEXT PAGE FOR TABLE**

Welcome to the US Army Corps of Engineers

NDC Home
Back
Data

## Dredging Information System

### Number of Contracts, Cubic Yards, and Total Bid Dollars by Type of Material Disposal and Fiscal Year

| | | FY | | | | | |
|---|---|---|---|---|---|---|---|
| DISPTYPE | Data | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| Beach Nourishment | Contracts | 39 | 28 | 29 | 29 | 30 | 24 |
| | Cubic Yards (Bid) | 25,330,073 | 11,679,137 | 14,697,600 | 15,749,200 | 12,237,200 | 9,380,088 |
| | Dollars (Bid) | $124,321,650 | $73,422,901 | $80,175,527 | $84,845,092 | $109,894,150 | $93,725,974 |
| Confined | Contracts | 18 | 20 | 17 | 15 | 20 | 26 |
| | Cubic Yards (Bid) | 12,310,036 | 22,772,591 | 12,989,979 | 7,661,493 | 10,022,406 | 10,982,272 |
| | Dollars (Bid) | $53,329,854 | $87,857,386 | $56,374,834 | $28,889,219 | $64,543,978 | $75,777,338 |
| Underwater Confined | Contracts | 2 | 3 | 1 | 3 | 1 | 4 |
| | Cubic Yards (Bid) | 1,274,470 | 3,037,400 | 958,000 | 1,985,000 | 125,000 | 3,274,000 |
| | Dollars (Bid) | $6,185,200 | $7,779,120 | $2,417,303 | $13,802,323 | $2,255,000 | $14,725,749 |
| Mixed Modes | Contracts | 16 | 11 | 9 | 8 | 9 | 6 |
| | Cubic Yards (Bid) | 37,690,000 | 20,233,172 | 8,653,414 | 6,167,593 | 8,588,100 | 2,603,658 |
| | Dollars (Bid) | $147,144,105 | $210,342,999 | $71,158,686 | $23,728,237 | $36,527,526 | $19,950,347 |
| Overboard & Open Wate | Contracts | 46 | 47 | 70 | 57 | 28 | 30 |
| | Cubic Yards (Bid) | 86,604,312 | 80,949,400 | 95,889,350 | 72,356,036 | 57,675,032 | 42,523,238 |
| | Dollars (Bid) | $186,674,904 | $130,112,325 | $203,825,575 | $138,699,313 | $98,242,845 | $94,893,077 |
| Open Water & Upland | Contracts | 8 | 10 | 5 | 9 | 5 | 1 |
| | Cubic Yards (Bid) | 6,974,600 | 23,398,000 | 6,907,000 | 7,067,390 | 10,267,091 | 300,000 |
| | Dollars (Bid) | $15,192,496 | $171,630,803 | $44,258,407 | $188,245,002 | $22,898,576 | $0 |
| Beach Nour and Upland | Contracts | 3 | 5 | 6 | 2 | 6 | 2 |
| | Cubic Yards (Bid) | 1,209,430 | 4,520,100 | 2,316,500 | 205,049 | 7,970,710 | 951,000 |
| | Dollars (Bid) | $4,822,771 | $42,670,477 | $8,682,326 | $2,135,132 | $36,492,418 | $9,909,871 |
| Upland | Contracts | 25 | 24 | 25 | 27 | 17 | 14 |
| | Cubic Yards (Bid) | 14,940,173 | 36,000,178 | 18,106,224 | 20,343,146 | 18,315,816 | 13,010,293 |
| | Dollars (Bid) | $93,079,240 | $206,436,689 | $66,795,398 | $141,398,063 | $56,024,244 | $73,715,806 |
| Wetland Nour or Creatio | Contracts | 7 | 5 | 4 | 5 | 5 | 5 |
| | Cubic Yards (Bid) | 28,628,142 | 7,160,000 | 11,425,000 | 11,014,100 | 9,570,000 | 7,895,000 |
| | Dollars (Bid) | $114,727,257 | $16,725,500 | $14,810,000 | $18,476,375 | $32,797,526 | $27,825,900 |
| Undefined | Contracts | 15 | 14 | 12 | 12 | 5 | 19 |
| | Cubic Yards (Bid) | 8,047,540 | 20,404,382 | 10,380,900 | 9,213,300 | 6,031,000 | 22,894,072 |
| | Dollars (Bid) | $49,352,303 | $68,706,842 | $62,392,733 | $36,332,399 | $12,847,345 | $81,443,824 |
| Total Contracts | | 179 | 167 | 178 | 167 | 126 | 131 |
| Total Cubic Yards (Bid) | | 223,038,776 | 230,154,360 | 182,323,967 | 151,762,307 | 140,802,355 | 113,813,621 |
| Total Dollars (Bid) | | $794,829,780 | $1,015,685,043 | $610,890,789 | $676,551,154 | $472,525,608 | $491,967,346 |

TDM006751

As shown in the above table, there are several disposal categories for disposing dredged material. These categories include Beach Nourishment, Confined, Underwater Confined, Mixed Modes, Overboard & Open Water, Open Water & Upland, Beach Nour and Upland, Upland, Wetland Nour or Creatio, and Undefined. It is often the case that certain dredged material, namely silt and clay, contains contaminants and may not be dumped back into the ocean or otherwise used for beach nourishment; but, rather must first be treated (essentially using the methods of the patents-in-suit). (*See* Denenberg Reply Dec. at Ex. 8, transcript of Bryce Wisemiller at pp. 58-59; 62-64, 109-110, 114, 248-249; Ex. 9, transcript of Harold Hawkins at pp. 91-94; Ex. 11 and Ex. 5). This category is referenced as "Upland" in the USACE table above. The US admitted that the majority of the dredged material included in the "Upland" disposal type category requires treatment before that dredged material can be beneficially reused. (*See* Adler Moving Dec. at Ex. 10 transcript of Harold Hawkins at p. 92). The US provided no further details for its own volume numbers. As per the table above and exhibit 11 to the Adler Moving Dec. the total amount of such material for the years 2001 to 2006 is 120,715,830 cubic yards.

TDM contends that (i) the US' failure to provide a knowledgeable witness to explain the precise number of cubic yards included in the "Upland" category ; (ii) the US' failure to produce documents that account for the number of cubic yards shown in the "Upland" category; and (iii) the US' failure to account for any discrepancy between the total number of cubic yards identified in select dredging contracts and the total number of cubic yards in the "Upland" disposal type category in the table above justifies a finding that the total number of cubic yards in the "Upland" category totaling 133, 143,631 should be adjudged to be the operative number of total cubic yards of treated dredged material for this litigation.

Importantly, the US does not substantively disagree that the majority of the dredged material disposed "Upland" indeed requires treatment. The US provides no further information to resolve the aforesaid discrepancies that have been lingering in this case during the last year; accordingly, the requested sanction is appropriate and reasonable.

TDM noticed an RCFC 30(b)(6) deposition of the US wherein the categories cover contracts that include treatment of dredged materials in the US, the volumes of treated dredged materials and the volumes of materials disposed 'upland' in the US. (*See* Adler Moving Dec. at Ex. 28). As TDM noted above, summary dredging information contained in the USACE's website contains substantial volumes of dredged material disposed "Upland." (*See* Adler Moving Dec. at Exs. 11 and 12). Further, testimony, the CD and documents show that dredged material disposed upland was processed; otherwise, US standards are such that dredged material which is "clean" (i.e., does not require processing) could be disposed in the ocean (i.e. "Open Water"), or as "Beach Nourishment". It is only contaminated dredged material that requires processing in order to be placed upland and beneficially reused. (*See* Denenberg Reply Dec. at Ex. 8 transcript of Bryce Wisemiller at pp. 58-59; 62-64, 109-110, 114, 248-249; Ex. 9, transcript of Harold Hawkins at pp. 91-94; Ex. 10 and Ex. 5).

TDM requested an RCFC 30(b)(6) witness to explain the disparity between the amount of dredged material listed as disposed "Upland" in the USACE website and the number of contracts provided thus far. The US designated Virginia A. Pankow as its RCFC 30(b)(6) witness to testify regarding this topic. (*See* Adler Moving Dec. at ¶5). However, as set forth in TDM's moving memorandum, Ms. Pankow's testimony did not explain why this disparity exists as she had no knowledge if any material was treated. (*See* Adler Moving Dec. at Ex. 13, transcript of Virginia Pankow at pp. 39-40).

The US designated Virginia A. Pankow as a witness in response to TDM's repeated requests for a witness who can explain nationwide processing volumes for the US. To the extent that the government now claims that Ms. Pankow was not that witness, it never addressed TDM's concerns regarding this 30(b)(6) topic. Present counsel's representations that the US is now willing to provide appropriate witnesses many months into the discovery period does not undermine TDM's request for sanctions at this juncture.

Moreover, contrary to the US' contention, TDM never acknowledged that "not all dredged material that is subject to upland disposal is processed." (Def. Opp. at 21). Rather, TDM pointed out that the US' own witness admitted that most of the material disposed "Upland" is treated. (*See* Adler Moving Dec. at Ex. 9, Hawkins transcript at p. 23). Indeed, Mr. Sands' testimony confirms TDM's suspicions that the US failed to identify or produce all its contracts involving treatment of dredged material. As explained above, dredged material that does not require treatment can be used as beach nourishment or disposed in the ocean; it is contaminated dredged material that requires processing in order to be stabilized and solidified for beneficial reuse upland as structural fill. (*See* Denenberg Reply Dec. at Ex. 8, transcript of Bryce Wisemiller at pp. 58-59; 62-64, 109-110, 114, 248-249; Ex. 9, transcript of Harold Hawkins at pp. 91-94; Ex. 10 and Ex. 5). Contracts produced by the US thus far account for less volume than what is reported on the USACE website.

Therefore, the US should be sanctioned pursuant to RCFC 37 (a)(2)(B) and it should be established that the 133,143,631 cubic yards listed in the USACE website for dredged material disposed "Upland" is the total volume of treated dredged material for the years 2000 through 2006. It should further be established that the 133,143,631 cubic yards of dredged

material were treated in accordance with the methods of the contracts already produced in this litigation.

**D. <u>Re-Designation of Transcript Testimony</u>**

The Protective Order clearly requires a party designating transcript testimony to specify (i) the portions of testimony and the exhibits to be protected and (ii) which of the enumerated categories the information falls under. (*See* Adler Moving Dec. at Ex. 29, p. 9). Clearly, the US did not do so. Therefore, the US' contention that TDM bear the burden of identifying what portions it seeks re-designation is completely baseless. This is yet another attempt by the US to improperly shift its responsibility onto TDM and to prolong discovery. The fact is the US never properly stated a basis for the wholesale designation of these transcripts as required by the Protective Order.[8] *Id.* Instead it expects TDM to expend time and money requesting piece meal re-designations of transcript testimony.

Despite present and former counsel's assurances that the US is working to re-designate transcripts, to date, some six (6) months have past since the first US witness was deposed and only two insignificant transcripts have been re-designated and those only after TDM filed the instant motion. Moreover, counsel for TDM advised Ms. Franklin in a telephone conversation that the transcripts of Bryce Wisemiller were a priority for TDM. (*See* Declaration of Michael A. Adler sworn to November 27, 2007 submitted herewith ("Adler Reply Dec." at ¶ 4). Although the US insists that it is working on redesignating transcripts, it notably failed to submit a declaration with its opposition brief to demonstrate what it has done so far.[9]

---

[8] For example Ex. 8, transcript of Bryce Wisemiller at pp. 55-56 and Ex. 9, transcript of Harold Hawkins at pp. 108-109.

[9] The US should not be permitted to do so now, thereby depriving TDM of the opportunity to respond to any such declaration.

The US' inappropriate wholesale designations hamper TDM's ability to prepare its case. The US should not be permitted to manipulate the terms of the Protective Order to gain an unfair advantage. Based on the foregoing, TDM is entitled to an order compelling the US to comply with the Protective Order and properly re-designate transcript testimony within fourteen (14) days and/or an order re-designating the transcripts non-proprietary.

**E. <u>Objection to Michael C. Chapman</u>**

Federal courts have held that where an expert witness does not receive confidential information from the party seeking such witness' disqualification, no conflict of interest exists. *See English Feedlot, Inc. v. Norden Laboratories, Inc.*, 833 F.Supp. 1498 (D. CO. 1993); *United States ex. rel. Cherry Hill Convalescence Center, Inc. v. Healthcare Rehab Systems, Inc.* 994 F.Supp. 244 (D. NJ. 1997); *Great Lakes Dredge & Dock Company v. Harnischfeger Corporation,* 734 F.Supp. 334 (N.D. Ill. 1990).

TDM expended much time and money in educating Michael C. Chapman on this case. TDM's preparation of its case would be severely hampered if the US was permitted to object to his designation late into this litigation. Although the US would now have this Court believe otherwise, the US did object via its former counsel to Mr. Chapman's designation as an expert witness in a telephone conversation with Mr. Adler. (*See* Adler Moving Dec. at ¶5). Present counsel for the US refutes this but does not submit any evidence from the US' former counsel to support this contention and refuses to give a clear answer.[10]

In any event, the US has no basis for its objection. Mr. Chapman is not involved in the *Boeing* case and Mr. Jarosz has not been involved in the present case since December 2005. (*See* Jarosz Dec. at ¶ 4 and Chapman Dec. at ¶ 4). The US never disclosed any

[10] The US cannot self-servedly do so now as it would prevent TDM from responding.

information -- confidential or otherwise -- to Mr. Chapman regarding the *Boeing* case. (*See* Jarosz Dec. at ¶ 4 and Chapman Dec. at ¶ 5). Pursuant to TDM's retention agreement with the Analysis Group, Mr. Jarosz was obligated to inform the US of its prior retention by UTEX, so naturally TDM thought Jaroszc had done so. Therefore, if any conflict exists, the US waived same by its hiring of the Analysis Group subsequent to UTEX's retention of the Analysis Group.

Therefore, TDM requests an order overruling any objections the US may assert to TDM's designation of Michael Chapman as an expert witness. To the extent that this Court finds a conflict exists, and/or as a sanction, TDM requests an order precluding the US from designating the Analysis Group as an expert witness in *Boeing Company v. The United States of America,* Civil Action No. 00-705-C.

**F. <u>Meet and Confer</u>**

The US attempts to undermine the Adler Moving Dec. regarding conversations with Erika Franklin, former counsel for the US, yet glaringly omits to include a declaration from Ms. Franklin refuting anything contained in the Adler Moving Dec.[11] Present counsel's attempt to malign TDM's counsel by alleging that counsel did not properly meet and confer should not be countenanced by this Court. TDM consistently attempted to resolve outstanding discovery disputes with the US since December 2006 through numerous letters and phone calls. (*See* Adler. Dec. at Exs. 16, 17, 18, 19 and at ¶¶5-10). Moreover, TDM raised these discovery issues in telephonic status conferences with this Court on three separate occasions over this past year. (*See* Adler Moving Dec. at Exs. 2-4).

Present counsel for the US seems to forget that this is TDM's second motion for sanctions against the US stemming from the US failure to properly and completely respond to

---

[11] Again, the US should not be able to do so now as it would deprive TDM of the opportunity to respond.

interrogatory requests.[12] As a result of the prior motion, the Court issued the Discovery Order that, *inter alia*, ordered the US to provide complete and verified responses and to respond properly to all of plaintiff's interrogatory and document requests, including, specifically, the same requests at issue here. (*See* Adler Moving Dec. at Ex. 1). As demonstrated in TDM's moving papers, the US woefully failed to comply with that order. It is this failure that forms the basis of TDM's present motion. This fact is conveniently omitted from the US' opposition.

TDM is not responsible for educating the US' new counsel about the issues raised in this case thus far. Nor does the fact that the US changed attorneys negate TDM's right to move against the US for discovery abuses that are ongoing for almost a year. As set forth herein and in TDM's moving memorandum, counsel for TDM complied with the provisions of RCFC 37(a)(2)(A) and properly met and conferred with US counsel prior to bringing the instant motion.

## CONCLUSION

For all the foregoing reasons, this Court should grant TDM's motion pursuant to RCFC 37 against the US seeking:

(1) sanctions pursuant to RCFC 37 (b)(2)(A) and an order (a) establishing for the purposes of this litigation that the total volume of treated dredged material for the years of 2000 to 2006 is 133,143,631 cubic yards consistent with the amount of dredged material disposed "Upland" listed in the United States Army Corps of Engineers ("USACE") website, (b) establishing for purposes of this litigation that the 133,143,631 cubic yards were treated in accordance with the methods of the contracts already produced in this litigation, and (c) establishing for the purposes of this litigation that the contract documents identified by the US in this litigation are actual US records and admissible in evidence;

[12] In an attempt to further discredit TDM's counsel, the US inappropriately alleges that TDM did not reference Ms. Franklin's August 15, 2007 letter in its moving papers. This is wrong as the August 27, 2007 letter is referenced therein as Exhibit 27 in TDM's moving memorandum.

(2) an order that, pursuant to RCFC 37(a)(2) (A) and (B), the US be compelled to completely and properly respond to interrogatory nos. 20, 23, 24, 25 and 26;

(3) an order that, pursuant to the February 16, 2007 Protective Order, the US re-designate all transcripts of US witnesses by October 30, 2007 or all such transcripts should be deemed non-proprietary and non-confidential; and

(4) an order that the US' objections to Michael J. Chapman being designated by TDM as an expert witness are overruled.

Respectfully submitted,

DAVIDOFF MALITO & HUTCHER LLP
*Attorneys for Plaintiff*

Dated: November 28, 2007

s/David W. Denenberg
David W. Denenberg
Michael A. Adler
605 Third Avenue – 34 Floor
New York, NY 10158
Tel: (212) 557-7200
Fax: (212) 286-1884

**CERTIFICATE OF SERVICE**

I hereby certify that on November 28, 2007, I served a true and accurate copy of [CORRECTED] TDM'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION PURSUANT TO RCFC 37 AGAINST THE US by using the Court's CM/ECF system so that a copy was sent to the following persons automatically via email:

Walter W. Brown
Walter.Brown2@usdoj.gov

Walter W. Brown
US Department of Justice
Civil Division
1100 L Street, NW
Suite 1100
Washington, DC 20001

and on interested party Donjon Marine Company, Inc.'s counsel by using the Court's CM/ECF system so that a copy was sent to the following persons automatically via email as follows:

John Flaherty
jflaherty@mccarter.com

John Flaherty
McCarter & English LLP
265 Franklin Street
Boston, MA 02110

s/David W. Denenberg
David W. Denenberg