**Exhibit 9**

UNITED STATES DISTRICT COURT OF FEDERAL CLAIMS

-----------------------------------------x

TDM AMERICA, LLC,

Plaintiff,

- vs -

THE UNITED STATES OF AMERICA,

Defendant, INDEX No.
- and - 06-472-C

DONJON MARINE COMPANY, INC.,

Third-Party Defendant.

-----------------------------------------x

TRANSCRIPT MARKED PROPRIETARY

Deposition of HAROLD HAWKINS, taken by Plaintiff, pursuant to Notice, at the offices of Davidoff, Malito & Hutcher LLP, 605 Third Avenue, New York, New York, on Wednesday, May 16, 2007 commencing at 9:40 a.m., before Linda D. Danelczyk, a Certified Shorthand Reporter, Registered Professional Reporter and a Notary Public of the State of New York.

to Donjon additional quantities of material if additional areas that he will dredge and have to dispose of material.

10:07:35 Q. Okay.

How about specifically with respect to the treatment of dredged material for upland disposal?

A. It's basically if we say silt that

10:07:52 would be implied that it would have to be treated and -- there is a line item for dewatering before you treat it. You basically dewater it.

But as far as treatment, there isn't a specific line item for treatment of silt and a

1ⅽ.08:09 big quantity to dredge and treat silt.

Q. So, for example, if you take a look on option 14, which is on page Bates-numbered G0100400072.

MS. FRANKLIN: Are you looking

10:08:32 at the item number or the option?

MR. ADLER: I'm sorry. Item number -- item number 0014.

Q. It's optional item nine and it's on page G0100400072.

10:08:53 MS. FRANKLIN: I'm going to

help the witness.

MR. ADLER: Sure.

A. Okay. 33,000 quantity, it was basically to dredge and process silt. As I said before.

10:09:12

Q. And this would be for upland disposal?

A. For upland disposal.

10:09:19

Q. Now, with respect -- and you had mentioned before that this is an estimated quantity?

A. This is a -- an estimated quantity.

Q. Is there a way to determine actual amounts that were processed -- that was treated for upland disposal?

1. J9:28

MS. FRANKLIN: Objection. Vague.

Q. Is there a way to estimate the actual volume, in cubic yards, of dredged material that was treated for upland disposal to date under this contract?

10:09:35

MS. FRANKLIN: Same objection.

A. I would say it's not an estimate at that particular point in time. We would

.0:09:51

essentially have an after-dredged survey. The way we work with the contractor is, we would survey an area and the area that was moved, the silt in this particular contract. We have a little bit of another difficulty because he's dredging sand and silty sand and depending upon the siltiness of it, some of it gets processed, some of it doesn't get processed with cement.

So we would probably have to go to the actual records that they submit to DEP as to what the material ended up going to. Or the dredged disposal facility.

So it's -- usually, a little bit easier black and white. This particular case it's not as easy, you know, past.

Q. Do you have copies of those records that were submitted to the DEP?

A. No.

Q. Do you know where the -- under this contract where the dredged material that was treated is disposed?

A. It ended up being now in, I think, two locations. I've kind of lost track. I've dealing with some other issues but FDP and EnCap

Q. Please review it generally and let me know if you've seen this document before.

A. Yes, I have.

10:27:37 (Interruption.)

MR. ADLER: Let's go off the record.

(Discussion off the record.)

(Recess taken.)

10:38:43 MR. ADLER: Back on the record.

BY MR. ADLER:

Q. So I'm going to ask you to, please, take a look at what's been marked as

10:38:50 Exhibit No. 31.

And do you recognize it?

A. Yes.

Q. And what is it?

A. It's the contract for SKVK2.

10:39:09 Q. And do you know when this contract began?

MS. FRANKLIN: Objection. Vague.

Q. Do you know when this contract

10:39:18 was -- do you know the -- approximately when the

believe it occurred at Clean Earth.

10:42:44 Q. Did you ever have an opportunity to visit Clean Earth's processing site where they treated dredged material under this contract?

A. Only from a distance.

10:43:35 MR. ADLER: I'd like the court reporter to mark as Exhibit No. 32, a document bearing Bates-numbers G0101311597 through G0101311616.

(Whereupon, Document bearing Bates-numbers G0101311597 through G0101311616, was marked as Exhibit 32 for identification, as of this date.)

10:43:59 MR. ADLER: Let the record reflect that the witness has been provided with Plaintiff's Exhibit 32.

Q. Do you recognize it?

A. It's again the award of SKVK2.

10:44:14 Q. And if you take a look at -- if I can direct your attention to what has been -- or the page that has Bates-numbers G0101311601, which also reads page 471 at the top.

10:44:50 Does that give you any recollection which company did the perform the treatment of the

A. Once before I visited the -- their facility for a meeting.

I can't remember which contract. But it was once I went to the trailers.

Q. So with respect to contract number W912DS05C0004, do you have any knowledge what method was used to treat dredged material under this contract?

A. Other than the site has a pug mill and that was probably used.

MR. ADLER: I'd like the court reporter to mark as the next exhibit, a document bearing Bates-number G0101302738 through G0101302792.

(Whereupon, Document bearing Bates-number G0101302738 through G0101302792, was marked as Exhibit 33 for identification, as of this date.)

MR. ADLER: Let the record reflect that the witness has been provided with Exhibit No. 33.

Q. Do you recognize it?

A. It's the solicitation for area seven -- sorry, contract seven, area six of the

45-foot project.

Q. Okay.

And do you know about when this contract was awarded?

10:48:18

A. Sometime in, probably, 2002.

Q. And do you know whether or not this was -- contract is ongoing?

A. This is completed.

10:48:45

Q. And do you know which company was awarded the contract?

A. This contract was awarded to Bean Stuyvesant. I believe.

Q. Do you know whether or not dredged materials were treated under this contract?

10:48:58

A. Yes. It was.

Q. And do you know which company actually performed the treatment of the dredged material?

10:49:12

A. Offhand, I can't remember which of the processing facilities treated it.

Q. Did you ever have an occasion to visit the processing material -- the processing facility that was treating the dredged material under this contract?

10:49:30

Harold Hawkins - Proprietary

which is the document bearing

Bates-numbers G004006 through G004101.

(Whereupon, Document bearing Bates-numbers G004006 through G004101, was marked as Exhibit 34 for identification, as of this date.)

10:54:39

MR. ADLER: Let the record reflect that the witness has been provided with Exhibit No. 34.

10:54:51

Hold it one second.

Q. Do you recognize this document?

A. Yes, this is the contract documents for area seven, which was contract four of the 45-foot project.

1 55:15

Q. And is this -- do you know whether or not this contract is still ongoing?

A. This contract is complete.

Q. Do you know about when the -- when the dredging operations under this contract began?

10:55:30

A. Sometime in 2000.

Q. And do you know about when dredging operations under this contract terminated?

A. I believe sometime in 2002.

10:55:47

Q. And do you know which contractor was

volume surveys would be kept?

11:35:07 A. It's a survey which is a map and you have a before dredged survey, which would be like a map with little (indicating) indications of depth on a channel map. And you have one that you do before and then after they've completed the dredge, you do another one, and then what occurs is they process it using a program called TINS

11:35:27 (phonetic) and they determine the volume that has been removed between the two surveys.

Q. Do you have copy of those surveys?

A. The Corps has copies of those surveys.

11:35:40 I personally don't.

Q. Do you know which office would have copies of them?

A. Our survey section.

Q. "Survey section."

11:35:48 Do you know if they were produced in this litigation?

A. As far as I know, I believe you've gotten the surveys. I -- I am not privy to all the information you've been provided.

11:36:02 Q. And who conducts those surveys?

volume surveys would be kept?

A. It's a survey which is a map and you have a before dredged survey, which would be like a map with little (indicating) indications of depth on a channel map. And you have one that you do before and then after they've completed the dredge, you do another one, and then what occurs is they process it using a program called TINS (phonetic) and they determine the volume that has been removed between the two surveys.

Q. Do you have copy of those surveys?

A. The Corps has copies of those surveys.

I personally don't.

Q. Do you know which office would have copies of them?

A. Our survey section.

Q. "Survey section."

Do you know if they were produced in this litigation?

A. As far as I know, I believe you've gotten the surveys. I -- I am not privy to all the information you've been provided.

Q. And who conducts those surveys?

A. We do. The Corps survey section.
And maybe during the course of contracts survey, but I would say, you know, 99.9, that's something that we do in-house, surveys.

11:36:14

MR. ADLER: Another contract bearing Bates-numbers G004585 through G004656 marked as Exhibit No. 37.

(Whereupon, Document with Bates-numbers G004585 through G004656, was marked as Exhibit 37 for identification, as of this date.)

11:36:39

MR. ADLER: Let the record reflect that the witness has been provided with what has been marked as Plaintiff's Exhibit 37.

1 ;6:58

Q. Do you recognize this document?
A. Just give me one second.

(Pause.)

A. It appears to be the contract for area eight of the 45-foot project.

11:37:25

Q. Is that one of them that you had responsibilities for?
A. Yes.
Q. And do you know who the contractor

11:37:35

issued. And then, the second line is the cubic yards that were bid for those contracts, and the approximate dollar value.

12:08:35 Q. Do you have an understanding of what upland means?

A. Upland is base clay, the material that cannot go out to the ocean.

Q. Is that mostly treated dredged

12:08:45 material?

A. Mostly, yes.

Q. Do you have idea if it's more than like 75 percent?

A. I have no idea of the percentage.

1. J8:56 Q. You think it's a majority or more than 50 percent?

A. I would say so. I mean, most of the material that we dredge is silt which is usually treated.

12:09:06 We have as I said, in the past, you know, had some contracts that were sand and because it was not tested, ended up being brought upland and we did have sometimes some clay-ish material that also had to go upland that didn't

L2:09:23 need to be treated as well.

recognize this document?

A. Yes, this is the award for Arthur Kill one.

01:37:37

Q. And is this one of the contracts that you have responsibility for?

A. I've assisted on this one.

Q. Okay.

And do you know whether or not this contract is still ongoing?

01:37:45

A. This contract was complete.

Q. And do you know about when dredging activity for this contract began?

A. Sometime in 2003.

01:38:00

Q. And do you know when it ended?

A. I think it was '4, 2004. It took two years.

Q. And do you know whether or not -- do you know who the contractor is?

01:38:13

A. This is Donjon.

Q. And do you know who treated -- who treated dredged material -- well, was any material treated for upland disposal under this contract?

A. Yes.

01:38:25

Q. And do you know who treated the