Exhibit 16

DAVIDOFF MALITO & HUTCHER LLP
ATTORNEYS AT LAW
605 THIRD AVENUE
NEW YORK, NEW YORK 10158
(212) 557-7200
FAX (212) 286-1884
WWW.DMLEGAL.COM

GARDEN CITY
200 GARDEN CITY PLAZA
GARDEN CITY, N.Y. 11530
(516) 248-6400

NEW JERSEY
744 BROAD STREET, FL. 16
NEWARK, N.J. 07102
(973) 735-0543

ALBANY
150 STATE STREET
ALBANY, N.Y. 12207
(518) 465-8230

WASHINGTON, D.C.
444 NORTH CAPITOL STREET, N.W.
WASHINGTON, D.C. 20001
(202) 347-1117

WRITER'S DIRECT: (646) 428-3210
E-MAIL: dwd@dmlegal.com

December 27, 2006

**BY EMAIL**

Erica A. Franklin, Esq.
US Department of Justice
Civil Division
1101 L Street, NW - Suite 1100
Washington DC 20001

**Re: TDM America, LLC v. United States of America**
**Civil Action No. 06-472-C (Judge Thomas C. Wheeler)**
**Our Ref; 7683.001**

Dear Ms. Franklin:

Pursuant to the United States Court of Federal Claims Rule 37(a)(2)(A) and 37(d)(2) and (3), this letter sets forth deficiencies in the responses of the United States of America (the "US") to plaintiff's first set of interrogatories (nos. 1-14) in an attempt to resolve the deficiencies without court intervention. This letter does not address the US' responses to plaintiff's first request for production of documents and things. Specific, requests for information is in bold.

## I. General Objections

In accordance with the US' first general objection, the United States Court of Federal Claims Rule 26(b)(5) requires that a privilege log be provided with respect to any documents withheld on the ground of privilege. That log should describe the nature of the documents withheld, the privilege asserted and the basis for that privilege.

With respect to the US' third objection, any basis for denial of allegations in the claims must be provided. An objection that a response to an interrogatory seeks legal conclusions, opinions or mental impressions should not apply to a request for the factual or legal basis supporting the US' allegations. Legal conclusions, legal opinions or mental impressions do not include the facts upon which the US relies to support its allegations. For example, a non-infringement defense requires construing the claims of the patents-in-suit and then comparing the allegedly infringing methods to the claims as construed. A request seeking the claim construction utilized in the analysis and the facts relied upon to assert non-infringement is not

subject to privilege. If the US did not have its purported claim construction, there is no basis to deny infringement. If infringement is being denied, the claim construction utilized in such denial is subject to discovery. This request is not for any written opinion, mental processes or legal conclusions, but only seeks the bases for the conclusion itself which are the facts (US' processes for treating dredged material) and legal theory (claim construction) relied upon.

The defendant is the United States of America. It is unclear if the interrogatory responses are limited only to the ports of New York and New Jersey. **Please confirm that the responses are not so limited. If the responses are so limited, that limitation is improper and supplementation is required.**

The United States Army Corps of Engineers (the "USACE") is involved in dredging activities as set forth in the definitions preceding the interrogatories, which includes remediation and processing of harbor dredging materials. However, the US' objection is too restrictive. Any dredging activities which have remediation and processing should be included in the US' responses, and not just "harbor dredging materials". Likewise, other agencies of the US may be involved in such activities. If they are, that is subject to discovery.

As stated above, limiting the requests to only the USACE for dredging activities is not an acceptable response. **Please confirm that only the USACE conducts, or contracts, for such activities. If other agencies of the US conduct such activities, or contracts such activities, those contracts are also subject to discovery.**

## II. Responses to All Interrogatories

All documents must be produced. As stated in the document demands and as required by the federal and local rules, documents must be provided. **Please confirm when all documents will be provided.**

### A. Interrogatories Nos. 2, 11, 12 and 13

Please provide responses to these requests. Specifically, the response to interrogatory no. 2 is referred to in several other interrogatory responses wherein TDM requests a description of the processing methods utilized by the US and/or its contractors. To date, no information has been provided regarding those processes except a blanket denial that certain limitations or elements of the patents-in-suit are met. Please provide full descriptions of the processes utilized or documents which would provide that information. Asking plaintiff to seek the information from a non-party, third party and/or interested party is not an acceptable response. If the US has those documents in its possession, and we believe it must, those documents must be provided.

B. Interrogatory No. 3

In response to interrogatory no. 3, the US states that the invention was offered for sale prior to May 15, 1997, the date that performance of a contract with the New York Harbor Authority began, which allegedly involved the process claimed in the '731 patent. No other information is provided. This response is insufficient. **Please provide information regarding that contract including dates, contract numbers, contractors/parties thereto, all documentation supporting the assertion that it involved the process set forth in the '731 patent and any other related information such as location, amount, dates of performance, etc.**

C. Interrogatory No. 7

The response to interrogatory no. 7 cites, among other things, certain prior art documents. Those documents have not been provided. **Pursuant to the interrogatory request and the accompanying document demands, those documents should have been provided. Please provide.**

D. Interrogatory No. 9

As stated above with respect to the general objections, this request does not seek attorney work product, thought processes, mental impressions or privileged communications. Plaintiff has a right to know the legal and factual basis for denying infringement. To deny infringement requires a comparison of the allegedly infringing methodology to the claims as construed by the US. The legal and factual basis for denying infringement is discoverable. Opinions, thought processes and mental impressions utilized to determine the legal and factual basis is not what is being sought. The legal basis is the US' claim construction. The factual basis is the methodology utilized by the US and/or its contractors. Plaintiff is entitled to this information. The US provided neither. Instead, the US refuses to provide the claim construction and the details of the processes it utilizes in its contracts. The US even refuses to provide documentation from which that information can be ascertained. The US states that plaintiff should seek that information from other sources, which is inappropriate when a party to this action has that information. Further, the US would not have any justification in denying infringement, unless it has the proof. **Plaintiff is entitled to discover the US' proofs. Please provide.**

E. Interrogatory No. 10

This interrogatory seeks details of contracts, contractors, processes, etc. for the US' dredging activities. **Documents and details responsive to this interrogatory, which were referred to in the US' responses, must be provided.**

F. **Interrogatory Nos. 11, 12 and 13**

To reiterate, the factual bases for the denials of infringement must be the processes utilized by the US and/or its contractors. **A description of, and documents showing, those processes, must be produced.**

With respect to interrogatory nos. 12 and 13, the cross-reference to interrogatory no. 2 is not a satisfactory response. **For each contract, plaintiff is entitled to know which elements of the method claim the US contends are not being practiced and the factual basis for that assertion which must be documents showing the processes utilized for each such contract. Please produce.**

In an effort to comply with United States Court of Federal Claims Rules 37(a)(2)(A) and 37(d)(2) and (3) and to resolve this matter without resorting to court intervention, we request that you respond within seven (7) days.

Thank you for your attention to this matter. Please call me with any questions or comments.

Very truly yours,

David W. Denenberg

DWD/lsh

Exhibit 17

DAVIDOFF MALITO & HUTCHER LLP

ATTORNEYS AT LAW
605 THIRD AVENUE
NEW YORK, NEW YORK 10158
(212) 557-7200
FAX (212) 286-1884
WWW.DMLEGAL.COM

GARDEN CITY
200 GARDEN CITY PLAZA
GARDEN CITY, N.Y. 11530
(516) 248-6400

MELVILLE
105 MAXESS RD., SUITE 124S
MELVILLE, NY 11747
(631) 574-4510

ALBANY
150 STATE STREET
ALBANY, N.Y. 12207
(518) 465-8230

WASHINGTON, D.C.
444 NORTH CAPITOL STREET, N.W.
WASHINGTON, D.C. 20001
(202) 347-1117

WRITER'S DIRECT: (646) 428-3210
E-MAIL: dwd@dmlegal.com

February 1, 2007

**BY EMAIL AND FIRST CLASS MAIL**

Erica A. Franklin, Esq.
US Department of Justice`
Civil Division
1100 L Street, NW - Suite 1100
Washington, DC 20001

**BY EMAIL AND FIRST CLASS MAIL**

Gary J. Campbell, Esq.
McCarter & English, LLP
225 Franklin Street
Boston, MA 02110

**Re: TDM America, LLC v. United States of America, et al**
**Civil Action No. 06-472C (Judge Thomas C. Wheeler)**
**Our Ref: 7683.001**

Dear Counsel:

I am writing in response to Erica Franklin's January 30, 2007 letter.

The letter stated that plaintiff's counsel would like to delay the previously noticed depositions. However, plaintiff did not indicate that it wished to delay any depositions. To the contrary, Mr. Campbell requested adjournment of these depositions because of his lack of availability. Moreover, despite the fact that TDM provided the U.S. with extensions of time to produce documents, discovery was still outstanding. In fact, it was Ms. Franklin's request to reschedule those depositions to a date subsequent to the U.S.' production of outstanding documents. Therefore, the statement that plaintiff's counsel indicated that it would like to delay the depositions is inaccurate and unfair. The delay was at defendants' request.

Thank you for clarifying that Mr. Wisemiller is available on March 7, 2007, Ms. Snell on March 8, 2007 and Mr. Hawkins on March 9, 2007. This office will provide notices accordingly. Please advise as to people designated, and dates, for the 30(b)(6) depositions.

Throughout this discovery process, plaintiff consistently requested all contracts for dredging activities that include treatment of the dredged materials. Treatment would include stabilization, remediation, processing and/or other treatments. To date, defendant only provided a list of contracts and generalized bid documents devoid of any supplemental processing documents. Plaintiff continues to demand the detailed description of the processing, amounts and costs, as well as, the requisite detailed description of the dredging procedures which are required in the contract supplementation material. Plaintiff does not believe, based upon information and belief, that schedule A annexed to plaintiff's interrogatory responses is a complete list. For possible additional contracts, I refer you to documents bearing Bates Nos. TDM 000772-889 that were produced in conjunction with plaintiff's initial disclosures.

From the USACE's websites and documents, it appears that the US publicly discloses summaries of dredging activities and projected dredging amounts by region. Copies of reports for fiscal year 2007 for the Ports of New York and New Jersey and a dredging program report for fiscal year 2002 are enclosed. These reports indicate USACE's projections for dredging activities and disposal at HARS (presumably no treatment) and at sites other than HARS which would require processing. The list of contracts provided by the US only account for a fraction of the dredging activities publicly disclosed in the enclosed reports (i.e., 3.5 million cubic yards vs. 20 million cubic yards).

It is our understanding that summary documents exist that show projected and actual dredging activities and identify whether the dredging required treatments. These summary documents also contain costs and volumes of dredging activities. We have requested these summary documents in our discovery requests. (See document requests nos. 13, 15, 18 and 20[1] and instruction F preceding the document requests). Moreover, payments are made by USACE for actual work done and there are projections and records for budgetary and accounting requirements that show what was projected and what was actually completed. These summaries should not be difficult to obtain as they are maintained on an on-going basis and would streamline the U.S' production of requested documents.

In sum, TDM seeks:

1. Summaries showing logging of dredging activities for each region and/or district within that region;

2. Processing documents;

---

[1] Other more general requests cover such summaries, as well.

3. Total costs incurred by region and by district for dredging and treatment; and

4. Persons that can speak to each of these topics.

The draft protective order must be finalized as soon as possible. However, this should not inhibit production as the parties agreed to regard everything that has been produced, or that will be produced, on a confidential basis in the interim. As you know, TDM objects to the US' attempt to restrict any person who reviewed information designated as "confidential attorneys' eyes only" from participating, *inter alia*, in any patent application process. It extorts a concession that exceeds the bounds of reasonableness, is unacceptable and could be resolved by the court. With respect to the number of people who will see the confidential documents, defendant has three in-house counselors and plaintiff has none. Instead, plaintiff has key employees who are knowledgeable in this field. There is no rational basis for disagreement on this point. Finally, we are waiting for Donjon to provide its input.

Regarding the inspection of USACE documents, given the 22 file cabinet drawers, it makes sense to commence the inspection on February 6, 2007 at 9:00 a.m. Upon review on February 6, 2007, we will advise what other dates will be required. However, it can be assumed that each of the February 6-9 dates will be required.

I again refer to the enclosed summary documents as a mechanism wherein production from each region and district can be streamlined into summary reports. As a further follow-up to the interrogatory responses and as disclosed during our last telephone conversation, the US' interrogatory responses must be verified. However, if you prefer providing declarations from each region, that would be acceptable.

Thank you for your anticipated courtesy and cooperation. Please call me with any questions or comments.

Very truly yours,

David W. Denenberg

DWD/lsh
Enclosures

**Exhibit 18**

DAVIDOFF MALITO & HUTCHER LLP

ATTORNEYS AT LAW
605 THIRD AVENUE
NEW YORK, NEW YORK 10158

(212) 557-7200
FAX (212) 286-1884
WWW.DMLEGAL.COM

GARDEN CITY
200 GARDEN CITY PLAZA
GARDEN CITY, N.Y. 11530
(516) 248-6400

MELVILLE
105 MAXESS RD., SUITE 124S
MELVILLE, NY 11747
(631) 574-4510

ALBANY
150 STATE STREET
ALBANY, N.Y. 12207
(518) 465-8230

WASHINGTON, D.C.
444 NORTH CAPITOL STREET, N.W.
WASHINGTON, D.C. 20001
(202) 347-1117

WRITER'S DIRECT: 646-428-3283
E-MAIL: maa@dmlegal.com

August 13, 2007

Erica A. Franklin, Esq.
U.S. Department of Justice
Civil Division
1100 L Street NW - Suite 1100
Washington, D.C. 20001

Re: Omnibus Issues Relating to Discovery

Dear Erica:

This letter sets forth several areas that TDM believes the US needs to address in order to resolve several outstanding discovery issues, some of which are long standing and have been ignored by the US.

## I. THE US' WHOLESALE AND INDISCRIMINATORY DESIGNATION OF TRANSCRIPT TESTIMONY AS PROPRIETARY WITHOUT ANY JUSTIFICATION FOR DOING SO

TDM has, on several occasions, requested that the US redesignate transcript testimony that the US previously designated as proprietary. As the US is aware, it has, in wholesale fashion, designated transcript after transcript as proprietary without further specifying the actual passages in each of the transcripts that merit a confidentiality designation.

The US has an absolute obligation to properly designate only those passages that it believes warrant a confidential designation. By failing to particularize which passages the US believes are proprietary, the US is thwarting TDM's ability to disseminate certain information for discussion and other purposes. Any contrary position by the US or any observation by the US that TDM officers can simply engage in accepting the undertaking, and thereby would be entitled to see that proprietary information, misses the point. By designating this information as proprietary, TDM may not show this to outside experts or any other individuals that TDM may believe warrant discussion of the transcripts. Thus, TDM's request that such transcripts be redesignated is certainly within the good faith parameters of attempting to resolve this issue.

Further, on several occasions, TDM had to request that the US review certain excerpts of transcripts and redesignate those parts so that those excerpts may be used in motion practice for submission to the Court such that TDM would not have to make those submissions under confidentiality. Despite the fact that the non-discretionary designation of proprietary information was committed by the US, the US complained that TDM did not provide sufficient time for the US to review those excerpts, which led to exchanges of e-mails. Simply put, if the US had properly designated all the transcripts with the appropriate confidentiality designations, the entire exercise of exchanging e-mails and requesting the quick review for redesignation of excerpts would have been avoided. By not doing so, the US brought on its own deadline.

While the US had mentioned earlier that it believed it had thirty (30) days to designate such testimony as proprietary, a review of the protective order shows otherwise. The thirty-day period is for the deponent to review the transcript and make any corrections to testimony as given at that deposition. This thirty-day period does not apply to redesignating the confidentiality level of transcripts, especially when the initial designation was improperly done. Thus, if the US does not provide a detailed and specific designation of transcript testimony no later than Friday, August 17, 2007, TDM will have no alternative but to seek court intervention.

## II. THE US' INACCURATE AND MISLEADING IDENTIFICATION OF INDIVIDUALS LIKELY TO HAVE DISCOVERABLE INFORMATION IN ITS INITIAL DISCLOSURES

TDM has consistently requested that the US provide witnesses who can testify regarding USACE contracts for the maintenance and deepening of navigation channels involving the treatment of dredged materials, as well as, the volumes of such treated dredged material for each contract. In its initial disclosures, the US identified some individuals as possessing relevant knowledge. Relying on those disclosures TDM issued subpoenas for the deposition of those witnesses. However, the individuals identified by the US as having such knowledge did not.

Specifically, the US identified Ella Snell a contracting officer for USACE, New York District as an individual possessing information regarding USACE maintenance and management dredging contracts. However, during the deposition of Ms. Snell it became apparent that she possessed very little actual knowledge regarding USACE maintenance and management dredging contracts. For example, when presented with copies of contracts produced by the US, she did not know (1) if the contracts provided for the treatment of dredged material with an additive, (2) where the dredging occurred under the contracts, (3) whether activity under the contracts was completed, or (4) final payment amounts. (See Snell transcript, pp. 27-28, 45-46, 70-71, 78, 97.) Moreover, Ms. Snell testified that the individuals who work for USACE who would have such actual knowledge are in fact the contracting officers and assistant contracting officers. (See Snell transcript pp. 18-19.) Yet none of the contracting officers or assistant contracting officers for any of

the relevant USACE contracts were ever identified by the US in its initial disclosures or at any subsequent time.[1]

Harold Hawkins was identified by the US in its initial disclosures as a project manager for the Harbor Program Branch of the New York District possessing knowledge of the USACE Kill Van Kull and Newark Bay Navigation Improvement Project. During his deposition Mr. Hawkins identified certain documents produced by the US as the contracts for maintenance and dredging of navigation channels in the New York and New Jersey waterways. Such documents were marked as exhibits in the deposition. (See for example, Hawkins transcript, pp. 12 (Ex. 29), 38 (Ex. 31), 41 (Ex. 32), 43-44 (Ex. 33), 48 (Ex. 34), 68 (Ex. 37), 99 (Ex. 40).) However, Bryce Wisemiller, who was identified by the US in its initial disclosures as a project manager for the Programs and Project Management Division, Harbor Programs Branch of USACE, New York District, possessing knowledge of the USACE Dredged Material Management Program, testified on numerous occasions that such documents only appear to be contracts - - a non-committal answer to avoid providing TDM with a clear response. (See for example, Wisemiller transcript, pp. 243, (Ex. 29), pp. 253 (Ex. 52), 290 (Ex. 70), 293 (Ex. 58), 299 ( Ex. 62), 305 (Ex. 64).)

To add to the confusion, Salvatore Didato (a contracting officer for USACE dredging contracts) testified on numerous occasions that some of the very same exhibits shown to Mr. Hawkins and Mr. Wisemiller were "incomplete contracts." (See for example, Didato transcript, pp. 81 (Ex. 32), 89-90 (Ex. 2), 90-91 (Ex. 40), 91 (Ex. 37), 97 (Ex. 33), 98 (Ex. 34).) If TDM does not receive clarification regarding which documents produced by the US are the actual contract documents for the contracts the US has identified in revised attachment A to its responses to interrogatories, TDM will seek a negative inference against the US regarding same. TDM will no longer tolerate the US' vacillation on these topics.

## III. THE US' DEFICIENT RESPONSES TO <u>PLAINTIFF'S THIRD SET OF INTERROGATORIES</u>

**<u>Response to Interrogatory No. 18</u>**

Interrogatory No. 18 is directed to the volumes in cubic yards of dredged material that was treated with an additive for each contract listed in Revised Attachment A previously provided by the US. The response indicates that volumes may be ascertained by referencing dredging surveys or the approved payment estimates that have previously been produced. This response is insufficient. With respect to the surveys, the applicable RCFC rules require that the response may reference

---

[1] Ms. Snell admitted that she was not forthcoming with information because this was a deposition. She testified as follows: "I can't answer that question. I can talk about how things work prior to coming into an environment like this, but once we are in this environment, I don't know what the protocol is for asking for additional information or documents. . . .It's pretty clean cut. When I say this environment where we are all sitting around the table and trying to resolve issues with attorneys. So when I say once we are in this environment, I don't know what the protocol is that you have to go through a lawyer and say I need additional information, whether you ask me for additional information. That's what I mean by the protocol." (See Snell Transcript, p. 62, Lines 12-16; pp. 63 Lines 22-25; p. 64, Lines 2-4; p. 65, Lines 2-7.)

documents if it is as easy for the proponent to determine the response as it is for the respondent. In this case, it is clear that the US possesses substantially more expertise in determining how to interpret the dredged surveys than does TDM. Thus, TDM demands that the US identify which are the final surveys and provide an explanation on how to interpret those surveys in order to obtain cubic yards of treated dredged material. In addition, the US referenced various payment estimates. Yet, to date, we have not received a clear indication that the payment estimates previously submitted by the US were, indeed, the final payment estimates (other than the final $100), or any other indication that additional payments are expected to be made by the US and, if so, when.

## IV. INTERROGATORIES NO. 23, 24, 25, 26

The US has utterly refused to respond to these interrogatories on the grounds that they exceed the number of interrogatories permitted under RCFC Rule 33(a). TDM disagrees. In addition, the parties have agreed, as denoted in the proposed joint discovery plan submitted to this Court dated October 12, 2006, that each of the parties can propound forty (40) interrogatories. Even with respect to those 40 interrogatories, the US has not responded. Moreover, the US should have advised TDM, of it's concern and request that an agreement be reached or in the alternative, at least request from TDM a preference for which interrogatories the US should respond to. TDM, however, is steadfast in that subparts, as used by the US, is incorrect. In the event an amicable resolution cannot be reached, TDM will present this to the Court. Moreover, complete responses to the interrogatories will assist the US by reducing deposition time. Otherwise, the US is placing TDM in a position where it will be necessary to request an additional two (2) days to take the 30(b)(6) deposition of the US. By answering these interrogatories, the additional deposition time can be reduced.

## V. OTHER INTERROGATORY RESPONSES

The US refers to an Attachment D with respect to its response to interrogatory number 20, which pertains to all documents that constitute each contract listed on its Revised Attachment A previously provided by the US. However, the list in Attachment D is a wholesale listing of documents that do not segregate the actual contracts from other documents such as submissions or from the amendments to the contract, etc. In addition, a review of some of these responses do not comprise the actual contracts. Nevertheless, in testimony, it is clear that with respect to contracts for dredging activities that are the subject of this lawsuit, the US has knowledge of the entire contract. Accordingly, TDM requests that the US recast these responses and provide a clear indication which bates numbers comprise which contracts, the amendments, the 30 day or 70 day submissions, so on and so forth. This way it would be clear on the record that what the US submits actually constitutes each of the contracts. In the event that this is not done, TDM will request that the Court order that whatever TDM presents as a contract, with a reasonable justification for doing so, shall be considered the government contract for the purposes of this litigation, and in the event that there is a discrepancy as to volumes or dollars paid for these contracts, any doubt should favor TDM.

TDM further advises that the US's responses (initial and/or amended) to the following interrogatories are insufficient:

(i) Interrogatory No. 3 - failure to show how non-provisional application is relevant to invalidity and basis therefor; failure to show "obviousness"; and failure to show "not enabling" under 35 U.S.C. §112;

(ii) Interrogatory No. 4 - not yet answered. The US has not noticed the deposition of a single TDM witness; discovery is ending so there is no basis for the US' allegation that TDM's claims are premature.

(iii) Interrogatory No. 10 - incomplete; and

(iv) Interrogatory Nos. 17-21 - should be answered as a single interrogatory as the subparts are not discreet. These responses are also incomplete.

In addition, the US appears to refuse to answer many interrogatories based upon the allegation that they seek mental impressions. Actually, the US is confusing a privileged mental impression with a response to contention interrogatories. As such, all such interrogatories should be answered.

## VI. THE US' FAILURE TO EXPLAIN THE INSIGNIFICANT PROPORTION OF TREATED DREDGED MATERIAL IN CONTRAST TO DREDGED MATERIAL

As the US is clearly aware, TDM, since the inception of this lawsuit, has expended significant discovery time and invested other resources to obtain the precise volumes of dredged material that have been treated with an additive by the US' contractors. It appears from the gross numbers on US websites and in other sources that only a very small percentage of dredged material is actually treated with an additive. TDM has requested an explanation why the percentage of treated dredged material is indeed so insignificant, especially with the general knowledge that there is significant contamination in the larger ports, such as in the major eastern and major western areas of the US. To date, no elucidating information has been provided by the US. Please do so.

## VII. The US' Reneging on Its Agreement to Pay for Copying Expenses

In a letter dated July 31, 2007, the US, by its counsel Erica Franklin, objected to reimbursing TDM for copying costs associated with producing non-party documents to the US that TDM acquired through the subpoena process. Instead, the US took the position that it would be amenable to discussing an arrangement for sharing the costs of document production in this litigation. TDM was guided by the US's representation at the deposition of Kerri Mullins where Ms. Erica Franklin stated "You could have offered for me to pay for it, the mail." (See Mullins Transcript, pp. 144.)

For the US to now renege on its representation after providing such guidance to TDM is merely another demonstration of the US' vacillation on this and other issues in this litigation.

Very truly yours,

Michael A. Adler

MAA/taf

cc: David W. Denenberg, Esq.

Exhibit 19

DAVIDOFF MALITO & HUTCHER LLP

ATTORNEYS AT LAW
605 THIRD AVENUE
NEW YORK, NEW YORK 10158
(212) 557-7200
FAX (212) 286-1884
WWW.DMLEGAL.COM

GARDEN CITY
200 GARDEN CITY PLAZA
GARDEN CITY, N.Y. 11530
(516) 248-6400

MELVILLE
105 MAXESS RD., SUITE 124S
MELVILLE, NY 11747
(631) 574-4510

ALBANY
150 STATE STREET
ALBANY, N.Y. 12207
(518) 465-8230

WASHINGTON, D.C.
444 NORTH CAPITOL STREET, N.W.
WASHINGTON, D.C. 20001
(202) 347-1117

WRITER'S DIRECT: 646-428-3283
E-MAIL: maa@dmlegal.com

September 17, 2007

**BY E-MAIL and**
**FIRST CLASS MAIL**

Erica A. Franklin, Esq.
U.S. Department of Justice
Civil Division
1100 L Street NW - Suite 1100
Washington, D.C. 20001

**Re: <u>Omnibus Issues Relating to Discovery</u>**

Dear Erica:

This letter follows up on my letter dated August 13, 2007, responds to your letter dated August 15, 2007 and also discusses additional outstanding discovery issues.

## I. THE US' CONTINUED WHOLESALE AND INDISCRIMINATORY DESIGNATION OF TRANSCRIPT TESTIMONY AS PROPRIETARY WITHOUT ANY JUSTIFICATION

TDM repeats its request that the US redesignate transcript testimony that the US has designated as proprietary. As the US acknowledges, it has yet to modify any of the previously designated transcripts. The US claims that it is working to review each transcript designation to determine which portions of the testimony may be redesignated. However, as shown from the listing below, the first deposition of Bryce Wisemiller was conducted over four (4) months ago and additional US witnesses were also deposed about four (4) months ago.

| Date | Deponent |
|---|---|
| May 10, 2007 | Bryce Wisemiller |
| May 16, 2007 | Harold Hawkins |
| May 18, 2007 | Ella Snell |
| May 22, 2007 | Bryce Wisemiller |
| May 31, 2007 | John Bearse |
| June 6, 2007 | James Fields |
| July 10, 2007 | John Tavolaro |
| July 11, 2007 | Salvatore Didato |
| July 27, 2007 | Virginia Pankow |

While the US asserts that it needs certain approvals from other parties in order to redesignate these deposition transcripts, it is clear that any such approvals could have been obtained months ago. Further, the US fails to provide any reason why deposition testimony not concerning other parties has not yet been redesignated. If we do not receive a date certain before the US' 30(b)(6) deposition by which all US transcripts will be appropriately redesignated, TDM will have no choice but to seek court intervention to resolve this issue.

## II. THE US' INACCURATE AND MISLEADING RESPONSES TO TDM'S DISCOVERY REQUESTS AND THE US' DEFICIENT RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES

On numerous occasions, TDM requested the identification of the specific US contracts with subcontractors that included the processing of dredged material. However, to date, the US has failed to specify which documents constitute the actual contracts and the amendments thereto. The US has refused to identify these contracts by alleging that such documents are as easy for TDM to identify as they are for the US to identify. This is simply untrue because the US is the only party capable of identifying which documents constitute its own official contracts. Further the US' glib response that the US should not act as a paralegal for TDM is similarly unavailing given that, as the US is well aware, its own witnesses were unable to agree as to the description and nature of the very same documents presented to them. Additionally, it is very clear that the US has this information, but refuses to furnish it to TDM.

More recently, the US' interrogatory responses referenced Attachment D as a list that specified records from which answers may be derived or ascertained for each contract in response to TDM's interrogatory requesting identification of the actual contract documents and amendments thereto. Attachment D included a fifty-one page list of documents by bates range classified by contract number. Hundreds of documents were listed under each contract and TDM's counsel expended much time and effort sorting through the US' production using this list to locate actual contracts. However, many of the documents identified by the US were in fact daily quarterly assurance reports, daily weather reports, and transportation and placement logs. Moreover, the few contract documents that were located were in fact the very same documents refuted by US witnesses. It seems that the US has engaged in an effort to divert TDM's attention by identifying

irrelevant and unresponsive documents by representing them as being relevant to the contracts for which TDM sought an identification.

## III. INTERROGATORY NOS. 23, 24, 25 AND 26

As stated in my letter dated August 13, 2007, the US refuses to respond to these interrogatories on the grounds that they exceed the number of interrogatories under RCFC Rule 33(a). As discussed during our recent telephone conversation, TDM advised the Court that the parties agreed upon forty (40) interrogatories to be served by each party. In addition, TDM disagrees with the arbitrary and self-serving numbering system employed by the US. Thus, with respect to interrogatory no. 23, TDM expects a full and complete answer, as it does with respect to interrogatory no. 26.

With respect to the intervening interrogatories, TDM is willing to entertain a reasonable compromise and awaits to hear the US' proposal. In the event none is forthcoming within a short period of time, TDM will bring this issue to the court's attention as well.

## IV. THE US' FAILURE TO EXPLAIN THE INSIGNIFICANT AMOUNT OF TREATED DREDGED MATERIAL IN PROPORTION TO THE TOTAL VOLUME OF DREDGED MATERIAL

We reiterate our request for an explanation of the disparity between volumes of dredged material reported on US websites and volumes of treated dredged material identified by the US in this litigation. Since the inception of this lawsuit TDM has expended significant discovery time and invested other resources to obtain the precise volumes of dredged material that have been treated with an additive by the US' contractors. It appears from the gross numbers on the US' websites and in other sources that only a small percentage of dredged material is actually treated with an additive. TDM has requested an explanation why the percentage of treated dredged material is indeed so low, especially with the general knowledge that significant contamination exists in the larger ports, such as in the major eastern and major western areas of the US. TDM also requested a 30(b)(6) witness who would be able to testify on this topic with respect to the entire United States. To date, the US has not provided a single witness who can explain this disparity.

## V. THE US' RENEGING ON ITS AGREEMENT TO PAY FOR COPYING EXPENSES

We have reviewed the US' letter regarding their position for the payment of copying expenses. TDM believes that it is entitled to be paid for the copying expenses incurred from third parties, as well as for the US' portion of the conference calls, saving the US the expense for personally appearing at the depositions. If the US is not amenable to reimbursing these costs, then TDM will seek court intervention. Moreover, TDM has in accordance with RCFC Rules 45 (b)(1) and 5(b) served copies of all non-party subpoenas upon the US. Despite this, the US has never made any arrangements to obtain discovery from those non-parties. Nonetheless, TDM has in good

faith produced copies of discovery received by non-parties at its sole expense. There is simply no reasonable or logical basis why TDM should have to bear the cost of producing same to the US.

## VI. THE US' INCOMPLETE RESPONSE TO INTERROGATORY NO. 10

The US' First Amended Response to interrogatory no. 10, included a list of contracts that the US represents as being a complete list of all contracts where dredged material was treated with an additive. However, a witness recently testified that Clean Earth Dredging Technologies, Inc. processed dredged material for contractors working on behalf of the US under three contracts never identified by the US. These contracts were not identified in the US' list or in any of its interrogatory responses. If the US does not produce all relevant documents pertaining to these contracts and any other relevant contracts not previously identified immediately, TDM will be forced to seek the Court's intervention on this matter as well, especially in view of this week's 30(b)(6) deposition.

Very truly yours,

Michael A. Adler

MAA/taf/lsh

cc: David W. Denenberg, Esq.
John E. Flaherty, Esq.