**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| TDM AMERICA, LLC, | ) | |
| Plaintiff, | ) | No. 06-472 C |
| v. | ) | |
| THE UNITED STATES OF AMERICA, | ) | Judge Thomas C. Wheeler |
| Defendant, | ) | |
| and | ) | |
| DONJON MARINE COMPANY, INC., | ) | |
| Third-Party Defendant. | ) | |

**DEFENDANT'S MOTION TO COMPEL PLAINTIFF'S COMPLIANCE WITH THE COURT'S DECEMBER 13, 2007 DISCOVERY ORDER, OR, IN THE ALTERNATIVE, AN EXTENSION OF TIME FOR THE GOVERNMENT TO RESPOND**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

LIST OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I. STATEMENT OF MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

A. TDM's Submission Fails to Comply With This Court's Order. . . . . . . . . . . . . . . 13

1. TDM's Submission Is Based On Insufficient Data From the USACE Website. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

2. TDM's Submission Is Incomplete Because It Has Ignored The 20 Identified USACE Contracts-At-Issue. . . . . . . . . . . . . . . . . . . . . . . . . . 18

3. TDM Has Improperly Placed An Undue Burden On The Government To Prove The Negative That USACE Contracts Did Not Involve Treatment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

B. The Government Needs At Least 12 Months To Respond To TDM's Submission. . . . . . . . . . . . . . . . . . . . 24

C. TDM Rejected The Government's Proposal Of A Reasonable And Less-Time-Consuming Alternative. . . . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

# TABLE OF AUTHORITIES

## CASES

Micro Motion, Inc. v. Kane Steel Co.,
894 F.2d 1318 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## STATUTES

Rivers and Harbors Act, 33 U.S.C. § 540 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5 n. 1

35 U.S.C. § 286 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5 n. 1

## OTHER AUTHORITIES

RCFC 37(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

# LIST OF EXHIBITS


| | | |
|---|---|---|
| Exhibit 1 | TDM's Submission dated January 14, 2008 | A1 |
| Exhibit 2 | Defendant United States' First Amended Responses to Plaintiff's First Set of Interrogatories (Nos. 1-14) | A129 |
| Exhibit 3 | Transcript from the December 13, 2007, hearing before the Court | A156 |
| Exhibit 4 | Excerpts from the fact deposition of Harold Hawkins | A235 |
| Exhibit 5 | Excerpts from the fact deposition of Bryce Wisemiller | A262 |
| Exhibit 6 | Excerpts from the Rule 30(b)(6) deposition of James Fields | A279 |
| Exhibit 7 | Excerpts from the Rule 30(b)(6) deposition of Bryce Wisemiller | A286 |
| Exhibit 8 | Excerpts from the fact deposition of Ella Snell | A294 |
| Exhibit 9 | Documents associated with Contract No. W912DS-06-0018 | A303 |
| Exhibit 10 | Declaration of Daniel Inkelas | A331 |
| Exhibit 11 | Letter from Michael Adler dated February 5, 2008 | A335 |
| Exhibit 12 | Letter from Walter Brown dated February 6, 2008 | A338 |
| Exhibit 13 | E-mail from David Denenberg dated February 8, 2008 | A343 |
| Exhibit 14 | Letter from David Denenberg dated February 11, 2008 | A345 |

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| TDM AMERICA, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant,<br><br>and<br><br>DONJON MARINE COMPANY, INC.,<br><br>Third-Party Defendant. | No. 06-472 C<br><br>Judge Thomas C. Wheeler |

**DEFENDANT'S MOTION TO COMPEL PLAINTIFF'S COMPLIANCE WITH THE COURT'S DECEMBER 13, 2007 DISCOVERY ORDER, OR, IN THE ALTERNATIVE, AN EXTENSION OF TIME FOR THE GOVERNMENT TO RESPOND**

Defendant United States of America (the government) moves pursuant to Rule 37(a) of the Rules of the Court of Federal Claims (RCFC) to compel plaintiff TDM America, LLC (TDM) to comply with the Court's December 17, 2007 Discovery Order requiring it to provide for each entry identifying the volume, price, and method, if available, for the treatment of dredged material, "the basis of its understanding and the document(s) upon which it relies." Docket No. 106 at 3, ¶ 7(a). TDM's "Identification of the United States of America's Dredging Contracts Understood To Provide For Treatment of Dredged Material" (TDM's submission), attached as Exhibit 1, is deficient. TDM has failed to identify for each entry in its submission the basis of its understanding and the document(s) upon which it relies to support its assertions that each entry constitutes *treated* dredged material.

In the alternative, if the Court deems plaintiff's paper to be responsive to its order, the government requests an extension of time of 12 months for the government's response under paragraph 7(b) of the order, currently due on February 13, 2008. For each entry that the government denies, this Court's order requires it to provide what it believes is more accurate data, along with the basis of its understanding and the document(s) upon which it relies; otherwise the entry will be deemed uncontested. As fully explained below and as supported by Mr. Daniel Inkelas's declaration, the government cannot in the time allotted fully investigate the over 650 entries that the plaintiff lists by job name, with no corresponding contract number, to determine if these projects encompass treatment of dredged material and provide the supporting documentation for such investigation. The government immediately began its investigation of the accuracy of the entries in TDM's submission, and will continue to do so during the pendency of this motion. If the Court deems TDM's submission to be responsive to its Order, the government respectfully requests that this Court allow the government sufficient time to investigate and respond to TDM's submission and hold in abeyance its stricture that any entry for which the government does not provide its own data, the basis of its understanding for that data, and documents to support that conclusion, the entry shall be deemed uncontested.

Government counsel has met and conferred with TDM counsel about the time constraints associated with investigating the submission entries by job name with no corresponding contract numbers, as well as the difficulties in providing documentation for all contracts implicated by TDM's entries to show the lack of treatment of dredged material. On February 4, 2007, TDM counsel and government counsel had a lengthy discussion regarding alternatives to producing contract documents in response to TDM's over 650 entries, given that the government believed

that few, if any, new contracts would be uncovered relating to the treatment of dredged materials. Accordingly, the parties discussed an arrangement by which the government would provide detailed declarations regarding TDM's entries and fully provide the necessary documentation and information with regard to any additional contracts that may be discovered involving treatment (beyond those previously identified in the government's interrogatories). Based upon those discussions, the government did not file this motion at that time. Subsequently, however, TDM flatly rejected the government's offer, as detailed *infra* Section II.C and in Exhibits 11-14, and proposed no other alternatives. TDM's rejection of reasonable alternatives, in turn, necessitated this motion.

**Summary of Argument**

In an effort to narrow the issues in controversy, the Court ordered TDM to provide specific information regarding volumes of dredged material *treated* by the government, the amounts paid for treatment, the methods of treatment employed, if available, and the contract number or Corps of Engineers District where the treatment took place. The Court required TDM to support these entries with the "basis of its understanding and the document(s) upon which it relies." Docket No. 106 at 3(¶7(a)).

In response to this requirement, TDM listed 657 entries from the United States Army Corps of Engineers (USACE) website for projects in 32 USACE districts that it contends represents its "understanding of the contracted volumes of treated dredged material for each of the US' dredging contracts by United States Army Corps of Engineers district." Ex. 1 at A2. TDM's only basis for selecting these entries is a snippet taken out of context from the deposition of a Corps employee, who works exclusively on dredging of the New York harbor, that "upland"

disposal material was "mostly treated." From that thin reed, TDM makes the leap in logic that these alleged contracts all involve treated material. It also states that "the contracts identified and listed in these exhibits [in its submission] were selected by TDM because the US categorized the disposal type for dredged material as: (i) upland; (ii) beach nourishment and upland; (iii) open water and upland; or (iv) undefined." Ex. 1 at A5 (underline in original). TDM provides no basis for assuming that "beach nourishment"; "open water"; or "undefined" disposal contains treated material. *See* Ex. 1 at A6.

TDM then makes the bald assertion with no support that the methods of treatment of dredged material employed are the land-based processes and/or barge-based processes described in the patents-in-suit. "Specifically, the methods employed are either the land-based methods of EIC Associates, OENJ Cherokee Corp., Clean Earth Dredging Technologies, Inc. and/or Consolidated Technologies Inc. or the barge-based method of Donjon Marine Co." Ex. 1 at A6. In fact, TDM's entries disclose many winning bidders that are not one of these four companies.

In providing such an incomplete response to the Court's Order, TDM completely ignores the government's interrogatory response that identified only 20 USACE contracts since 2000 that involve the treatment of dredged material as well as extensive document and deposition discovery that it has taken regarding those contracts. This includes discovery received from (1) the government, (2) Third Party Defendant Donjon Marine Company, Inc. (Donjon), and (3) numerous nonparties, including the contractors and subcontractors who performed the treatment methods-at-issue. Accordingly, TDM's response, listing projects for which it has no basis for asserting that treatment of dredged material was conducted, attempts to shift the burden of proof on liability to the government to establish a negative, namely that entries on the USACE website

do not represent contracts involving the treatment of dredged materials. Therefore, the government requests that this Court order TDM to comply with its Order, or in the alternative, grant the government a 12-month extension of time to respond to TDM's submission to establish the negative, by producing the main contract and modifications corresponding to each job name.

## I. STATEMENT OF MATERIAL FACTS

A short recitation of the facts surrounding the discovery for the 20 contracts currently at issue is in order. TDM served its first set of interrogatories to the government on November 6, 2006. Interrogatory No. 10 requested the government to:

> Identify *each and every specific contract*, and identify each and every contractor retained by the US for dredging activities at any port, harbor and/or waterway since 1997 to the present and for each such contract specify all contract information and processing information relevant to those contracts and the dredging activities, including specifically the treatment, processing, stabilization, retention, staging, handling, curing, reuse, remediation, solidification and/or disposal of the dredged materials.

*See* Ex. 2 at A144-45 (emphasis added).

In response, the government provided a complete list of "contracts involving treatment or processing of dredged material and for which the USACE was a party since 2000." *See id.* at A146.[1] On March 23, 2007, the government served an amended response to this interrogatory. The amended response included "Revised Attachment A," listing 20 USACE contracts which

[1]The government limited its response to Interrogatory No. 10 to USACE contracts executed within six years of the filing of the Complaint and which involved treatment of dredged material. *Id.* at A145. Although the interrogatory requested contracts from 1997 to present, the appropriate statute of limitations is six years from the date of the complaint. 35 U.S.C. § 286. The government limited its responses to USACE contracts because TDM's complaint only references activities of the USACE, Docket No. 37 at ¶22, and the USACE was the central focus of discovery, as the agency with chief responsibility for dredging under the Rivers and Harbors Act, 33 U.S.C. § 540.

"involv[ed] treatment or processing of dredged material and for which the USACE was a party since 2000." *Id.* at A146, A155. Revised Attachment A included two contracts that were not previously identified and omitted 11 previously identified contracts that were determined to involve no treatment of dredged material. Daniel Inkelas, counsel for the USACE, verified the completeness of the government's amended responses. *Id.* at A152.

TDM has taken a substantial amount of document and deposition discovery from the government, Donjon, and other parties relating to the 20 USACE contracts identified by the government. For example, TDM has taken 9 depositions of government witnesses, 3 depositions of Donjon witnesses, and 7 depositions of other nonparty contractors, subcontractors, and processors, including EIC Associates, Inc.; Great Lakes Dredging and Dock Company; Bean Stuyvesant, LLC; Jay Cashman, Inc.; Encap Golf LLC; Clean Earth Dredging Technologies, Inc.; and OENJ Cherokee Corporation. TDM has also received vast numbers of documents from Donjon, a defendant-intervenor in this case, and nonparties. The government has produced over 150,000 pages of documents and Donjon has produced over 60,000 pages of documents, many detailing the financial and operational aspects of Donjon's treatment activities as they relate to several USACE contracts-at-issue. Numerous nonparties have also produced substantial numbers of documents including EIC Associates, Great Lakes Dredging and Docking, Bean Stuyvesant, Jay Cashman, Clean Earth Dredging Technologies, OENJ, Weston Solutions, Metals Management, Hercules, and the New Jersey Department of Environmental Protection.

Dissatisfied with the discovery, TDM filed a motion to compel on October 16, 2007, which resulted in the Court's Order at issue in this motion. At the December 13, 2007, hearing regarding the motion to compel, the Court identified the primary issue raised in the motion to

compel: "[TDM] really want[s] to find out how much dredged material has been treated with processes that may . . . be infringements of the patents." *Id.* at A171. TDM likewise conceded that "[t]he patents go to a process for treating dredged materials." *Id.* at A174. Government counsel emphasized that only treated dredged material is relevant to this case. *Id.* at A179.

TDM counsel acknowledged that there are "different ways to understand what the total amount of dredging and processing of dredged materials was . . . ." *Id*. at A172. Nonetheless, it repeatedly returned to Mr. Hawkins' testimony as its only basis for alleging that all dredged material disposed upland was also treated. *See id.* at A175 ("Mr. Hawkins testified as well as others that at least most of what's disposed upland would be treated."); *id.* at A177 ("We have witnesses that said upland, yes, most of that would be treated, and yet we have a small fraction of the 133 million cubic yards and 140 contracts actually produced.")[2]; *id*. at A138-39 ("Mr. Hawkins, who is a project manager, clearly testified that at least most of the upland disposal category from the U.S. Army Corps of Engineers website would be treated dredged material."); *id*. at A188.

The government reiterated that its witnesses refuted TDM's notion that all of the upland disposal is treated dredged material. *Id*. at A180. Further, government counsel explained that the government's involvement in treating dredged material is "very, very limited," and that nonparty contractors are the best source of determining the volumes of treated dredged materials. *Id.* Nonetheless, the government repeated a previously made offer of deponents for each USACE district to efficiently address specific contracts involving upland disposal. *Id*. at A184

---

[2]In spite of this representation at the hearing, TDM's submission only cited to one excerpt of Mr. Hawkins' deposition to support all of its contentions regarding upland disposal. Ex. 1.

("[W]e're willing to put up deponents in individual districts.").

In an effort to resolve the dispute over volumes of *treated* dredged material and amounts paid for such treatment, the Court issued its December 17, 2007, Discovery Order. The Court ordered TDM to provide a list:

> identifying by either contract number or Corps of Engineers District what Plaintiff understands to be the volume of *treated* dredged material, the price paid by the United States for the *treatment* of dredged material, and if available, the method of treatment employed. *Plaintiff also shall identify for each entry the basis of its understanding and the document(s) upon which it relies.*

Docket No. 106 at ¶ 7(a) (emphases added).

In response to TDM's submission, the order requires the government to review data provided by TDM and provide a statement admitting or denying the accuracy of each entry in its chart. Docket No. 106 at ¶7(b). Where an entry is denied, the government must provide "the accurate data, along with the basis of its understanding and the document(s) upon which it relies." *Id.* The Order also provides that "[a]ny entry that Defendant does not deny and also provide its own entry of what it believes is more accurate, shall be deemed uncontested. It is insufficient for Defendant simply to deny the accuracy of Plaintiff's data." *Id.* The order provided each party roughly 30 days each to complete its charts. *Id.* at ¶7.

Rather than providing a comprehensive response by including information on the 20 identified USACE contracts for which TDM had ample discovery, Ex. 11, TDM produced a list of 657 entries of completely new jobs listed on the USACE website that in its view resulted, or could have resulted at least partially, in upland or "unidentified" disposal of dredged material. TDM's stated its entire basis for listing these jobs as:

> The US testified that most, if not all, dredged material disposed "upland" was treated. Therefore, the contracts identified and listed in these exhibits were selected by TDM because the US categorized the disposal type for dredged material as: (i) upland; (ii) beach nourishment and upland; (iii) open water and upland; or (iv) undefined. Where no disposal type was provided, and for Exhibit F (San Francisco district), all of the contracts were selected.

Ex. 1 at A5-6 (underline in original).

By its own criteria, TDM was grossly overinclusive in its listing of potential jobs for which it alleges some dredged material was treated. TDM included jobs that involved "beach nourishment" and "open water" disposal of dredged material. By TDM's admission to this Court, none of this type of disposal involves treatment of dredge material. While discussing the patented process, Mr. Denenberg stated:

> The treatment methodology stabilizes or solidifies the contaminants in the dredged material, which then allows that dredged material to be disposed upland for a beneficial reuse that could be capping, fill material, supermarket-type buildings afterwards. *If the dredge material is clean, noncontaminated, then typically it could be put back into the ocean or used for beach nourishment if it were sand that didn't need to be treated.*

Ex. 3 at A174 (emphasis added). Certainly, the inclusion of jobs from the USACE website that discloses no type of disposal whatsoever, whether treated or untreated, is improper. TDM has the burden of proof for liability and must have some good faith basis to believe that the government or its contractors performed some infringing treatment on a particular job to include it in response to this Court's Order.

By the same token, TDM's inclusion of any job relating to "upland" disposal is overreaching. The sole citation TDM provides in support for its assertion that "upland" disposal should be equated with *treated* material is the terse testimony of Harold Hawkins. *See* Ex. 1 at A6. The portion of Mr. Hawkins' equivocal testimony repeatedly cited by TDM states:

Q: Do you have an understanding of what upland means?
A: Upland is base clay, the material that cannot go out to the ocean.
Q: Is that mostly treated dredged material?
A: Mostly, yes.
Q: Do you have an idea if it's more than like 75 percent?
A: I have no idea of the percentage.
Q: You think it's a majority or more than 50 percent?
A: I would say so. I mean, most of the material that we dredge is silt which is usually treated.
We have as I said, in the past, you know, had some contracts that were sand and because it was not tested, ended up being brought upland and we did have sometimes some clayish material that also had to go upland that didn't need to be treated as well.

Ex. 4 at A253.

TDM fails to cite to Mr. Hawkins testimony concerning his experience as limited to approximately ten contracts, all relating to New York Harbor dredging for deepening the harbor. *See id.* at A238 (discussing Hawkins as the project manager for the harbor deepening for the Ambrose Channel, Anchorage Channel, Kill van Kull, Newark Bay, Arthur Kill and potentially Bay Ridge Channel); *id.* at A244 (discussing Hawkins has had 10 contracts). When specifically asked about contracts that he did not administer, Mr. Hawkins clearly stated that he could only speak to contracts with which he was involved in the administration. *Id.* at A254, A243 (testifying not familiar with a contract that is not his responsibility). Mr. Hawkins statements concerning the USACE website upon which TDM relies to assert that any "upland" disposal necessitates treatment, when put into context, show that he was talking about his experience with his ten contracts for dredging the New York harbor in responding to the question concerning the percentage of upland disposal that involves treatment. Unfortunately, TDM applied this statement to any contract in any USACE district. Many other statements made by Mr. Hawkins

during his deposition, as well as other government witnesses, prove that such a blanket assertion that any upland disposal requires treatment is incorrect and overreaching.

For the contracts for which Mr. Hawkins had knowledge, the contracts that he administered for deepening the New York Harbor, he testified repeatedly that "upland" disposal is not equivalent to *treated* dredged material. For instance, for a contract for the Kill van Kull channel, Mr. Hawkins testified that a good amount of the quantity of dredged material that was disposed "upland" was not treated. *Id.* at A246; *see also id.* at A255-57 (stating he can tell from a contract line-item the amount of material taken "upland," but not the amount that was treated because "treatment is basically determined by the nature of the material and could change from what was in the bid document" and requires review to see if any material required treatment); *id.* at A260-61 (line-item for upland disposal does not necessarily entail treated material)**.**

In reviewing a volume survey indicating the volume of dredged material for one of Mr. Hawkins contracts that he administered, Mr. Hawkins responded that he could not tell what percentage of the volume was *treated* for upland disposal. He testified that he could determine the volume that was removed and was disposed of upland, but

> [w]hether or not it was treated or not, you would have to then look at the, you know, disposal records that the contractor keeps.
>
> We only – we pay strictly on material that is removed for upland disposal. How it gets disposed is not so much our purview, whether or not you add cement or don't add cement or fly ash or whatever, you know, our concern is that the material is moved – removed and not necessarily the way it was treated, you know, once it's been removed.

*Id.* at A248-49. When pressed on determining a percentage of upland disposal that constituted treated dredge material, Mr. Hawkins testified that he could not provide such a percentage, and specifically could not testify whether it was more than fifty percent treated material. *Id.* at

A249-50.[3]

TDM's interpretation of Mr. Hawkins' testimony is also contradicted by the testimony of other government deponents, who have also made clear that dredged materials that are disposed upland are often not treated or processed. For example, TDM deposed Bryce Wisemiller, a USACE engineer in the New York District, on three separate occasions. In fact testimony, Mr. Wisemiller was presented with similar USACE website data and stated that the treatment of silt material in New York harbor "is, not to my knowledge not done except on rare occasions by any of the other districts," while acknowledging that "upland disposal is a predominately used method for managing material through much of the country." Ex. 5 at A277-78. Earlier in the deposition, Mr. Wisemiller similarly testified that "predominantly through many areas of the country, similar silty material is taken to confined upland disposal facilities where the material is not processed at all and is simply allowed to air dry or some other type of active drying mechanism is used . . . ." *Id.* at A271.

The TDM submission contains several other unsupported statements. TDM argues, without reference to any evidence, that it "believes that the actual volumes may be substantially higher and requests that the US produce the accurate numbers for actual volumes." Ex. 1 at A6.

---

[3]The specific testimony is as follows.

Q: In your experience from all these contracts and throughout the years, do you have an estimate of the percentage of dredged material that was disposed upland, how much of that was treated? . . .

A: Offhand, I don't think that we have an amount of material that is, you know, been treated upland. You know, which you had to do treatment of it. We don't basically pay whether it's treated or not treated. We pay based that it's removed and it has to go upland. . . . So we don't keep track of material that is treated or nontreated, other than it went upland.

Q: So you have no idea, let's say, more than half of that volume is treated or not?

A: No.

Moreover, without reference to any source, TDM "asserts that the methods of treatment of dredged material employed for the above-identified and listed contracts are the land-based processes and/or barge-based processes described in the patents-in-suit." *Id.* TDM specifically asserts that "the methods employed are either the land-based methods of EIC Associates, OENJ Cherokee Corp., Clean Earth Dredging Technologies, Inc. and/or Consolidated Technologies Inc. or the barge-based method of Donjon Marine Co." *Id.* Regarding these allegations, TDM offers no evidence from the voluminous discovery record.

## II. <u>ARGUMENT</u>

### A. TDM's Submission Fails to Comply With This Court's Order.

TDM's submission essentially consists of a laundry list of 657 entries that it found on the USACE website, with little or no evidence that those entries represent USACE contracts for which dredged materials were processed or treated since 2000. In the same vein, TDM ignores the vast amount of discovery it has taken with regard to the 20 USACE contracts identified by the government, which undisputedly involve the treatment of dredge materials, thus failing to fully comply with this Court's order to identify by contract or district what TDM believes to be the volumes and amounts paid for treating dredged materials. Instead, TDM attempts to place an undue discovery burden on the government for issues relating to treatment volumes and amounts paid by the government for treatment by requiring the government to prove a negative, i.e., that a vast number of USACE contracts, and alleged contracts, did not involve the processing or treatment of dredged materials.

**1. TDM's Submission Is Based On Insufficient Data From the USACE Website**.

Rather than identify specific contracts by number or cumulative data for individual districts as called for by the Discovery Order, TDM instead provides a hodgepodge of 657 entries from the USACE website, which references activities in 32 USACE districts. TDM lists these entries with no supporting documentation or testimony for its assertions that the dredged material were treated, much less with an infringing process.

Specifically, TDM provides six lists of entries in Exhibits A through F of its submission. All of these lists are based on TDM's principal contentions that (1) each entry represents contracted dredging activities where upland disposal or unidentified disposal was used, or may have been used, and (2) most, if not all, of the dredged material is treated. However, each list, upon inspection, fails with regard to one or both of those contentions and each contains very little information that is responsive to paragraph 7 of the Discovery Order.

Most notably, none of the lists contain any information regarding an alleged treatment or processing method or who performed the alleged methods.[4] Instead, TDM blindly asserts, with no cited evidence, that the "methods of treatment of dredged material employed for the above-identified and listed contracts are the land-based processes and/or barge processes described in the patents-in-suit." Ex. 1 at A6. It then recites "the land-based methods of EIC Associates, OENJ Cherokee Corp., Clean Earth Dredging Technologies, Inc. and/or Consolidated Technologies Inc. or the barge-based method of Donjon Marine Co." *Id.* TDM does not explain its basis for asserting that those companies were involved in any of the 657 entries in its lists and

[4]The government is aware that the Court only required TDM to provide the treatment method if available. Docket No. 106 at 3(¶7). TDM, however, did list treatment methods and contractors who allegedly performed the treatment with no support. Ex. 1 at A6.

offers no support from the record.

A close examination of TDM's lists evidences numerous other deficiencies. Exhibit A, for example, contains 362 unnumbered entries and supposedly "identifies and lists US awarded contracts for fiscal years 1999 through 2006."[5] For these entries, the website indicates that upland disposal was used.[6] From that basic information, coupled with the equivocal testimony of Mr. Hawkins, TDM concludes that the entries (and other similar entries) describe dredging contracts, for which "most, if not all" of the dredged material was treated. Ex. 1 at A6. TDM then makes the completely unsupported leap that these alleged treatment activities used an infringing process. *Id.* at A6-7.

As discussed above, Mr. Hawkins' testimony does not support this contention. Likewise, TDM also ignores testimony by Mr. Wisemiller indicating that a substantial portion of upland disposal material is not treated.

TDM's allegations regarding treatment volumes and amounts paid in Exhibit A are similarly flawed. TDM seemingly contends that the columns "Actual Quantity" and "Actual Cost" (in Exhibit A and subsequent lists) correspond to the precise quantity of treated dredged material and amounts paid for that treatment. *Id.* at A3-6. These are figures for an entire job and, thus, represent the total volume of all dredged material and the total monetary value of an

---

[5] TDM fails to explain its basis for alleging that the contracts it identifies as being executed in 1999 implicate activities occurring within six years of the filing of this suit (in 2006). 35 U.S.C. § 286.

[6] Though TDM touts that it has provided less than 12% of the total number of contracts on the USACE website in Exhibit A, it apparently only narrowed the list to 362 entries based on fiscal year of the listed jobs and whether upland disposal was indicated. Also, the 12% figure only relates to Exhibit A and does not address the subsequent lists of nearly 300 additional entries in Exhibits B-F. Ex. 1 at A3.

entire job, not just the cost of treatment. *E.g. id.* at A29. TDM provides no support for the assumption that the total actual cost listed corresponds to the cost of treating or processing dredged material.

As shown with identified New York District contracts where some form of treatment undisputably occurs, only a portion of the dredged material is actually treated. *See, e.g., id.* at A267-68. Nothing in the extensive record of this case indicates that all dredged material under a particular contract has been treated or that all monies paid under a contract went solely to the treatment of dredged material.

The exhibits that follow Exhibit A contain even less probative evidence, even when applying TDM's own standards. Exhibit B lists 57 jobs described on the USACE website as "1999 through 2006 Corps Owned Projects." Ex. 1 at A16-17. However, only 20 jobs are indicated to be upland-disposal-only jobs. The rest are described as open water and upland disposal or, in many cases, have an "undefined" disposal type or no indication at all.[7] *Id.*

Exhibit C is entitled "All Awarded USACE Dredging Contracts for 2007," and was apparently derived from a website chart with a similar name. Ex. 1 at A18-19. It lists certain details for 114 projects that were apparently awarded in 2007. *Id.* As TDM admits, however, the website provides no information on disposal type, so there is no information whatsoever that indicates that upland disposal will or has occurred for these projects. *Id.* Thus, even under its articulated standard, TDM has no basis for alleging that these contracts relate to the treatment of dredged materials, much less any infringing methods of treatment.

[7]TDM counsel has conceded that "[i]f the dredge material is clean, non-contaminated, then typically it could be put back into the ocean or used for beach nourishment if it were sand that didn't need to be treated." Ex. 3 at A174.

It is also very uncertain as to whether any of these recently awarded contracts have been completed, given that the website provides no information for "Actual Quantity" and "Actual Cost." *Id.* Accordingly, it is unclear what information TDM expects that the government could obtain regarding treatment volumes and amounts paid, assuming that any of these recently awarded contracts even contemplate treatment of dredged materials in the future.

Exhibit D is entitled "Planned USACE Dredging Projects for 2008." It contains 70 entries for planned 2008 USACE projects, but does not indicate that any contracts have been executed. *Id.* at A20-22. The website, in fact, does not indicate that any contracts have been awarded, but instead indicates that bidding for many of the contracts will not begin until some later date in 2008.[8] Accordingly, it is not conceivable how the government could provide accurate data regarding the volume of dredged material or the price paid by the government for work that has not yet been done. Without any legitimate bases, TDM incorrectly assumes that at least a portion of dredged material from these projects will be treated because upland disposal or some combination of disposal types is indicated on the website.

Exhibit E is entitled "Dredging for San Francisco District 2000-2005." It contains 27 entries, and none of them indicate that the disposal type is "upland." The entries describe the disposal type for different entries as "In-Bay," "Ocean," "Beneficial Reuse," and "U-W-R." TDM does not explain why it believes that these alleged contracts involve the treatment of dredged materials based on that description. In fact, as TDM's counsel admitted, disposal in the ocean does not implicate treated material. Ex. 3 at A174.

Finally, Exhibit F provides 27 additional entries and is entitled "Planned Dredging for

---

[8] http://www.ndc.iwr.usace.army.mil/dredge/pdf/dredgerpts/drgadvcu.pdf.

San Francisco District 2007-2009." Ex. 1 at A24. These entries are derived from a USACE website chart (and description) entitled "Business Plan for 2007-2009 SF Bay Maintenance Dredging." Ex. 1 at A44-49. Contrary to TDM's assertions, the USACE website clearly states that the volumes cited by TDM are "approximate." *Id.* at A45. It further states that the plan was "intended to depict the Corps *best forecast of a generalized level of projected effort* for O&M [Operation & Maintenance] work in the Bay." *Id*. (emphasis added). Accordingly, the website dictates that the plan outlined in the chart "should not be used for purposes of preparing bids on specific projects and is subject to available appropriations and schedules . . . ." *Id.*

TDM's entries for Exhibit F relate to generalized forecasts of dredging activities in San Francisco Bay and do not relate to specific contracts. Thus, it is impossible to provide accurate data regarding treatment volumes and amounts paid for future work based on such forecasts, nor was this required by the Discovery Order. Moreover, the USACE website does not indicate that the USACE is even considering upland disposal.[9] Instead, the plan indicates that dredged material will be beneficially reused to support tidal and seasonal marsh restoration in an ocean bay (San Pablo Bay, California), activities for which TDM admits treated dredged material is not typically used. *Id.*; Ex. 3 at A174.

**2. TDM's Submission Is Incomplete Because It Has Ignored The 20 Identified USACE Contracts-At-Issue.**

In contrast to the laundry list of entries from the USACE website, TDM's submission completely ignores the government's response to Interrogatory No. 10, in which it identified the

---

[9]The entries for Exhibits E and F (as well as other entries where no disposal type is given) contradict TDM counsel's recent representation that "TDM narrowed the information sought to instances in which a portion of the dredged material is categorized by the US as 'upland disposal.'" Ex. 14 at A347.

20 USACE contracts involving treatment of dredged materials that have been the focus of TDM's fact discovery. In doing so, TDM has failed to comply with the Court's order to identify the volume and price of treated dredged material by contract or district.

The government has produced over 150,000 pages of documents that were principally collected from the contract files of the 20 identified USACE contracts. Likewise, TDM has taken 10 depositions of government witnesses. As a result of this discovery, TDM has been provided with extensive information that is highly relevant to their submission under paragraph 7 of the Discovery Order.

With regard to treatment volumes, some government witnesses have given TDM very specific information. In the Rule 30(b)(6) deposition of James Fields, for example, Mr. Fields specifically testified that he believed 1,850 cubic meters of material was treated with respect to Los Angeles District Contract No. DACW09–01-D-0010. Ex. 6 at A284-85. In other instances, government deponents clearly stated how one could determine the government's best estimate of the total volume of dredging under a contract-at-issue and the common complications in determining the volume of treated matter. For example, Harold Hawkins, when asked if there is "a way to estimate the actual volume" of treated dredged material, testified, with regard to an identified New York District contract, that:

> We would essentially have an after-dredged survey. The way we work with the contractor is, we would survey an area and the area that was moved, the silt in this particular contract. We have a bit of another difficulty because he's dredging sand and silty sand and depending on the siltiness of it, some of it gets processed, some of it doesn't get processed with cement.
>
> So we would probably have to go to the actual records that they [the contractors] submit to DEP [Department of Environmental Protection] as to what the material ended up going to. Or the dredged disposal facility.

Ex. 4 at A241.

Like Mr. Hawkins, other government witnesses indicated that contractors would have the best estimate of the volume of treated dredged materials. For example, Mr. Wisemiller also addressed the government surveys and its limitations in determining the precise amount of dredged material that was treated. Ex. 5 at A272-75.

Mr. Wisemiller also gave extensive testimony on such topics when he was deposed as a Rule 30(b)(6) witness for the New York District of the USACE. Ex. 7 at A288. He testified that the New York contracts are performance-based, and contractors are generally paid on "how much material they move out of the channel." *Id.* at A290. Thus, while certain line items specifically contemplate treatment activities in combination with other activities, the government evaluates overall performance of the contract (e.g. deepening of a particular channel) and does not specifically track the amounts of treated material. *Id.* at A289-91, A292-93.

There has also been pertinent deposition testimony regarding the amounts paid for the treatment of dredged material. TDM counsel, for example, deposed Ella Snell, who is the Chief of the Contracting Division for the New York District of the USACE. Ex. 8 at A296. Ms. Snell generally explained how payments under particular contracts worked. Referencing various pay estimates, she testified that payments are made during the management of the contract by the contracting officer (COR) and administrative contracting officer (ACR), but the final payment is made by her, and accordingly generally the final pay estimate bears her signature. *Id*. at A297-98, A300-02. Most importantly, Ms. Snell also confirmed that certain line items corresponded to, in part, the processing of dredged materials and set forth unit prices per cubic yard of dredged material. For example, Ms. Snell confirmed that a certain line item in a contract award, which

related in part to "Dredging, Processing, Transportation, and Placement (Shoal #3)," contained a unit price of $61 per cubic yard. *Id.* at A299 (citing Ex. 9 at A310).

Perhaps most egregiously, TDM's submission does not disclose the numerous depositions it has taken and documents it has received from Donjon and other nonparty contractors and subcontractors who have performed the actual treatment and have records indicating the volume of and price paid for the treatment. *See supra* Section II. TDM has taken over 10 depositions of 9 such entities, including three depositions of Donjon witnesses. Given that many of these entities were directly involved in the processing of dredged material, TDM clearly obtained useful information from its discovery efforts, but refuses to discuss it, as contemplated by the Discovery Order in an effort to narrow the issues in controversy. In contrast, government counsel has indicated that TDM's contractor discovery may provide data that it would not dispute. Ex. 3 at A181.

As noted earlier, TDM's submission alleges that the treatment methods involved for its 657 entries are "either the land-based methods of EIC Associates, OENJ Cherokee Corp., Clean Earth Dredging Technologies, Inc. and/or Consolidated Technologies Inc. or the barge-based method of Donjon Marine Co." Ex. 1 at A6. TDM has taken deposition testimony and received documents relating to the treatment methods and activities conducted by all of these entities. While TDM provides no basis to allege that these entities were involved in treatment for entries on the USACE website, it is not disputed that they were involved in treating dredged materials as contractors or subcontractors for many of the 20 USACE contracts-at-issue.

TDM, however, does not address these 20 contracts or what useful information it has gleaned from contractors and subcontractors regarding them, as required by the Court's order.

Instead, in recent correspondence relating to the discussions concerning the government's paragraph 7(b) response, TDM now asserts that it "did not ask for redundant information by including these contracts in the chart**"** and instead is relying entirely on the government's submission under paragraph 6 of the Discovery Order for the information it needs. Ex. 11 at A337. TDM does not explain how the government's paragraph 6 submission obviates any concerns about the 2 USACE contracts that are not subject to government's long-pending motion for partial summary judgment, or how its concerns regarding the 18 contracts were deemed completely obviated (1) by documents it claimed the government had (and has) not adequately identified or (2) more generally, by the government's paragraph 6 submission, which it did not receive before its paragraph 7 submission was due**.** More importantly, TDM does not explain how the omission of these 20 contracts is consistent with the Court's stated "purpose of narrowing the issues in controversy" through the paragraph 7 procedure, where the Court contemplated a comprehensive listing by the parties of the volumes of treated dredge material and the price paid for such treatments. Docket No. 106 at 2-3(¶7).[10]

**3. TDM Has Improperly Placed An Undue Burden On The Government To Prove The Negative That USACE Contracts Did Not Involve Treatment.**

Accordingly, TDM tries to place an undue discovery burden on the government, in essentially forcing the government to establish through contract documentation that each contract implicated by TDM's entries does not involve the treatment of dredged materials.

---

[10]Likewise, TDM does not adequately explain why TDM did not mention the three contracts involving the U.S. Navy and U.S. Coast Guard. TDM merely states that the U.S. provided the contract documents and that the "only way for us [TDM] to ascertain additional information is to conduct a deposition which the Court provided for in the Order at paragraph 7(c)." *Id.* at A337. Again, TDM does not explain how this position will narrow the issues in controversy.

Instead of supplying a comprehensive, supported listing of a contract's or district's amount of treated dredged material and the amounts paid for treatment, TDM chooses to have the government explain the details of 657 new job listings on a website and, if it denies that most if not all of the dredging activities involve treatment, require that it provide "the accurate data, along with the basis of its understanding and the document(s) upon which it relies." Ex. 1 at A7.

While its own submission inadequately establishes treatment activities, TDM is nonetheless calling for the government to (1) prove the negative, e.g. that no treatment occurred for entries identified by TDM, and (2) substantiate its position with documents, data, and other information. As the Court has acknowledged with regard to earlier TDM discovery efforts, requests that encompass the entirety of the USACE or other governmental entities are "daunting to say the least." Docket No. 106 at 2(¶7). In this case, proof of a negative – that no treatment of dredged materials occurred – is likely to be extremely burdensome. *Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318, 1323 (Fed. Cir. 1990) (stating that discovery may not be head where "compliance would be unduly burdensome, or where harm to the person from who discovery is sought outweighs the need of the person seeking discovery").

Common sense dictates that documents are not likely to exist that record things that were not done. Thus, TDM seeks to exploit the likely lack of documentary proof to conclusively show things that never occurred by deluging the government with its list of hundreds of poorly identified jobs. In this situation, the burden and harm on the government (and specifically the USACE) far outweigh the needs of TDM to receive all of this documentation. *Id.* Accordingly, the government discussed reasonable alternatives with TDM counsel that were ultimately rejected. *See infra* Section II.C.

**B. The Government Needs At Least 12 Months To Respond To TDM's Submission.**

The Court's Discovery Order contemplated that the government could respond within roughly 30 days of receiving TDM's submission. Docket No. 106 at 3(¶7(b)). This, however, is simply not possible given that TDM has identified 657 new job/project names from the USACE website. Likewise, rather than helping to resolve substantive issues and moving the case forward towards a claim construction proceeding, TDM's submission instead has raised a multitude of new issues for which it has little support.

If the government were to proceed in accordance with the Court's Order, based on TDM's flawed submission, government counsel, through the assistance of USACE personnel, would have to pursue a lengthy and tremendously burdensome process. First, USACE personnel would have to determine the contract number, if any, that is associated with each of TDM's 657 entries. Ex. 10 at A333(¶9). In some instances, it is likely that more than one contract will correspond to a TDM entry. *Id.* Because contracts are administered entirely by individual USACE districts, the USACE would have to conduct this search on a district-by-district basis. *Id.*

Second, the USACE must locate personnel in each district most knowledgeable about the financial and technical aspects of each of the 657 entries. *Id.* at A333(¶10). Given that TDM's lists implicate 32 districts, this will conceivably require hundreds of interviews with USACE personnel who are familiar with the activities and documents associated with particular contracts. *Id.*

Third, the USACE must work with the identified individuals to also locate relevant documents for each of the 657 entries. *Id.* at A333(¶11). In so doing, the USACE must also

locate the contract files, which in some cases will be in paper form and in other cases electronic form. *Id.* In many cases, locating such documents may entail retrieving a substantial number of records from storage facilities. *Id.*

Fourth, and finally, USACE personnel must search for any documents that establish whether or not dredged materials were treated, and if so, what the volumes of material were treated, and what amounts were specifically paid for treatment. *Id.* at A333(¶12). To provide documentation of the negative, i.e., that no dredged material was treated, the government believes it must produce the basic contracts (and modifications to these contracts) that correspond to a TDM entry. *Id.* Once the relevant documents are located, USACE personnel would have to coordinate with government counsel to have the documents copied or scanned so that they could be eventually provided to TDM counsel. *Id.* at A334(¶13). In view of these extensive efforts, it is estimated that fully responding to TDM's 657 entries would take at least twelve months. *Id.* at A334(¶14). If additional documentation is deemed necessary, substantially more time could be required. *Id.*

**C. TDM Rejected The Government's Proposal Of A Reasonable And Less-Time-Consuming Alternative.**

In view of this burdensome process that would require the government to provide documentation for many irrelevant contracts, the government discussed reasonable alternatives with TDM. Counsel for both parties ultimately had a lengthy discussion on February 4, 2008. Government counsel explained that providing contract documents for each of TDM's entries would take at least a year. As an alternative, the government proposed that it would provide detailed sworn declarations from USACE personnel, which would (1) identify contracts, by number, that were associated with TDM's entries and (2) whether these contracts involved the

treatment of dredged material. Government counsel indicated that this process would proceed more quickly than one involving the wholesale production of contract documents and could be completed in as little as three months.

TDM counsel, in turn, said they would consider the government's proposal, but only if it was reduced to writing. On the following day, TDM counsel confirmed by letter that the government had proposed "alternative methods for providing the required information to TDM" and that they had requested "a written proposal to review and assess." Ex. 11 at A336. The rest of TDM's letter related to its defense to the government's assertion that their submission was incomplete. *Id.* at A336-37; *see supra* Section II.A.2. The letter did not discuss any details of the government's oral proposal. Ex. 11.

On February 6, 2008, the following day, the government provided a written proposal that set forth the details of the declarations the parties had discussed. Ex. 12. In accordance with the government's initial oral proposal and input given by TDM counsel during the parties' discussion, the government proposed sworn declarations that would include, *inter alia*, (a) declarants from the 32 districts implicated by TDM's request; (b) statements identifying each contract implicated by each TDM entry; (c) statements indicating whether a particular contract involved the treatment of dredged material; (d) statements, where appropriate, regarding known information responsive to the topics of paragraph 7; and (e) additional statements relating to "whether any other contracted dredging activities awarded from fiscal year 1999 to present [in a particular district] involve the treatment of dredged material." *Id.* at A340. This last provision, addressing all district dredging activities from 1999 to present, was included based on the specific comments of David W. Denenberg, TDM's lead counsel.

The government's letter stated that the declarations could be completed in three months, and that the government would inform the Court of the agreement by an unopposed motion that would be provided to TDM before filing. *Id.* The government likewise agreed to TDM's request to provide deponents from the U.S. Navy and U.S. Coast Guard for three contracts involving those agencies, even though TDM did not address those contracts in its paragraph 7 submission. *Id.* at 340-41. Given its impending deadline, the government requested that TDM respond to its proposal by the end of the week. *Id.* at A341.

TDM was unable to respond by the end of that week, Ex. 13, but the following Monday, February 11, 2008, flatly rejected all aspects of the government's proposal. Ex. 14. In its responsive letter, TDM contends that the "Discovery Order is the result of the US' failure to identify and provide pertinent information" during the fact discovery period, and that it is unwilling to "wait three (3) months for far less information or another year for the very information the Court ordered to be provided . . . ." *Id.* at A347. Notably, TDM's comments ignore the Court's stated purpose of the paragraph 7 procedure, which is to narrow "the issues in controversy," and contemplates informal discovery to address such issues in a time efficient manner. Docket No. 106 at 3(¶7). TDM's position is also inconsistent with the Court's instructions that counsel for the parties "try to answer questions [relating to paragraph 7] and get this worked out." Ex. 3 at A201; *see also* Docket No. 106 at 3(¶7(c)) (calling for "informal discussions" to resolve disputes). Rather, TDM's response indicates its desire to exploit this Court's order by flooding the government with its lengthy list of hundreds of items in the hope that it could never comply with the order, and thereby, TDM could profit from its over-inclusiveness by having its unsupported assertions accepted as uncontested fact.

In the same vein, TDM's position that the proposed declarations provide "far less information" than the Court ordered and are "unreasonable" stands in stark contrast to its own comments at the December, 2007 hearing. At the hearing, TDM counsel stated that "if a district was willing to certify that they've never treated dredged materials, that would be fine." *Id.* at A188. This is exactly the procedure that the government seeks to pursue through the proposed declarations and that TDM is now unwilling to accept.

Finally, TDM takes a draconian view of the government's February 13th deadline that was not envisioned by the Court. TDM argues that the "Court set February 13, 2008 as the date to comply with section 7.b" because it acknowledged "the length of time already spent in the discovery process" and that the government had over a year to provide this information. Ex. 14 at A348. On this basis, TDM also contends that it is unreasonable for the government to request even another three months. *Id.* Apart from again ignoring the government's response to Interrogatory No. 10, TDM's position ignores the Court's comment at the hearing that "if any party thinks they may need more time, they can say so." Ex. 3 at A208.

Based on TDM's position, the government cannot reach an agreement as to a more reasonable and timely approach to addressing TDM's 657 entries. Despite TDM's unwillingness to accept the government's proposal, the government remains open to considering any alternatives, including declarations, that the Court may propose for addressing TDM's submission.

## CONCLUSION

For the reasons set forth above, the government requests that the Court order TDM to provide adequate bases of its understanding for each entry that some treatment was performed, and to provide adequate documentation for that assertion. Alternatively, if the Court deems TDM's submission sufficient, the government requests that the Court grant it a 12-month extension of time to respond to TDM's submission.

DATED: February 12, 2008

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JOHN FARGO
Director

s/Walter W. Brown
WALTER W. BROWN
Attorney
Commercial Litigation Branch
Department of Justice
Washington, D.C. 20530
Telephone: (202) 307-0341
Facsimile: (202) 307-0345

Attorneys for the United States

Of Counsel:
JOSHUA B. BRADY