# Exhibit 5
# Excerpts From The Fact Deposition Of Bryce Wisemiller

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------------------)
TDM AMERICA, LLC )
Plaintiff, )
9:23AM vs. )
)
THE UNITED STATES )
)
Defendant. )
and )
DONJON MARINE COMPANY, INC., )
Third-Party Defendant. )
---------------------------------------------)

9:23AM May 10, 2007
9:31 a.m.

**** C O N F I D E N T I A L *****

Contains PROPRIETARY INFORMATION. Designated parts not to be used, copied or disclosed except as authorized
9:23AM by Court Order or the party or parties whose PROPRIETARY INFORMATION is included.

*********************************

DEPOSITION of Defendant by

BRYCE W. WISEMILLER, held at the offices of
9:23AM Davidoff, Malito & Hutcher, LLP, 605 Third Avenue, New York, New York, pursuant to

Notice, before ELIZABETH SANTAMARIA, a

Notary Public of the State of New York.

Wisemiller

reflected in the transcript. It is important that we have a clear record. Okay?

A. Yes.

9:31AM Q. Do you understand those instructions?

A. Yes.

Q. If at any time you wish to have a break, let me know and we will give you a break.

MR. ADLER: I will ask the court

9:31AM reporter to mark exhibit 1.

(Plaintiff's Exhibit 1, Second Amended Notice of Deposition With Document Demand, marked for identification, as of this date.)

9:31AM Q. I show you what has been marked for identification as Plaintiff's Exhibit 1. It is entitled "Second Amended Notice of Deposition With Document Demand." Have you seen that before?

A. Yes.

9:32AM Q. Is your presence here today pursuant to this notice?

A. Yes, and a subsequent letter confirming the date.

Q. Correct. Because the date on here is

Wisemiller

Do you have any documents that you have brought with you or anything like that that we haven't received yet?

9:32AM We need a verbal response.

A. I have not brought any documents.

Q. Mr. Wisemiller, are you currently employed?

A. Yes.

9:32AM Q. Who is your employer?

A. U.S. Army Corps of Engineers.

Q. What is your title?

A. I am the project manager, which is under the pay grade of a civil engineer.

9:33AM Q. Are you a civil engineer?

A. My training is a Bachelor of Science degree in chemical engineering, but I've worked at the Corps of Engineers primarily in the environmental engineering area.

9:33AM Q. And how long have you had this title?

A. Six years, approximately.

Q. How many years have you been employed?

A. Eighteen years.

Wisemiller

A. Nine days.

Q. Congratulations.

A. Thank you.

9:34AM Q. That's with the U.S. Army Corps of Engineers?

A. New York District.

Q. New York District?

A. Yes.

9:34AM Q. If throughout this day I refer to the United States Army Corps of Engineers as USACE, you will understand what that means?

A. We refer to it USACE.

Q. When you first started with USACE,

9:34AM what was your title?

A. I was a civil engineer. I worked as plan formulator within the Planning Division, Plan Formulation Branch. That was my first job.

Q. And then?

9:34AM A. After six years there approximately I transferred to the Environmental Assessment Branch, also in the Planning Division, and there I was also a civil engineer in employment with the Corps.

Q. What was your title then?

A. Yes.
Q. What does it stand for?
A. Historic Area Remediation Site.
Q. Can you please explain that.
A. The HARS is an ocean disposal site designated in September of 1997 by the U.S. EPA Region 2 for the placement of suitable remediation material dredged from the Port of New York and New Jersey. Material which has been found or is considered to be unsuitable for placement there is referred to as unsuitable HARS material.
Q. And is it -- do you have an understanding of whether or not material that's suitable for placement at HARS, does it require treatment?
MS. FRANKLIN: Objection. Vague.
Q. Does it requiring processing of the dredged material with an additive?
A. No.
Q. The material that's not suitable for HARS, does it require processing of the material with an additive?
MS. FRANKLIN: Objection.

Wisemiller

Q. What I am trying to get at is the material that is not suitable for HARS, does that have to be treated?

10:21AM MS. FRANKLIN: Same objection.

Q. You can answer the question.

A. I'm sorry. It depends on the material.

Q. Can you explain?

10:21AM A. Some -- when material is found unsuitable for HARS, it does not mean that it must therefore be processed for it to be taken upland. There are a wide variety of different types of material, particularly under our deepening contracts

10:21AM as we dredge through different sediment strata, and we have several different types of alternative placement sites for the different types of material.

Only a portion of those types needs to be solidified through the processing technique to

10:22AM make it usable for immediate upland placement at the identified upland sites. Material can also be -- has also been taken upland without processing. Material which would have required processing to be taken upland has been disposed in aquatic

Wisemiller

material that's dredged, which may be silty, can be managed without processing at a lower cost and in a permitted environmental acceptable manner, that is
11:11AM something that is open to the contractor through the solicitation process or as a value engineering proposal subsequent to contract award to identify to the Corps.

Q. Now, with respect to dredged material
11:11AM that I believe you said has to be treated for solidification --

A. As opposed to --

May I clarify?

Q. Sure.
11:11AM A. When cement, fly ash or other additives of that nature are added to dredged material it is typically done for one of two primary purposes, the solidification or stabilization.

The end result accomplishes both.
11:11AM However, solidification refers to trying to take the material from a fluid, soupy mud consistency to a more physically solid consistency, so it's primarily done for physical characteristics reasons. Stabilization, on the other hand, is done primarily

Wisemiller

contaminants which may be within the material that is needed so that the material meets some type of an environmental condition. The material that we dredge is processed and taken upland, is done so predominantly -- solely for the purpose to make the material of an acceptable physical nature for the targeted upland placement site.

So if the material that we are dredging, which has happened, is already of a physical suitable nature, some of the material that would be included within this upland silt bar chart would be taken upland without processing. This has occurred on the Port Jersey 2 contract and may occur on future contracts.

Q. Do you know the breakdown of the estimated amounts for material that has to be processed for upland disposal versus the silt material that would not have to be processed for upland disposal?

MS. FRANKLIN: Objection. Vague and ambiguous.

Are you referring to this projection or for a particular project?

Wisemiller

the projection in Exhibit 4.

A. The database that we have does not nor is it always possible to estimate this when

11:13AM material is sufficiently of --

It's dependent not only on what we encounter when we dredge or when the contractor dredges as to whether or not the material has to be processed, but it's also dependent upon the targeted

11:14AM placement site for the material.

Quite often material, predominantly through many areas of the country, similar silty material is taken to confined upland disposal facilities where the material is not processed at

11:14AM all and is simply allowed to air dry or some other type of active drying mechanism is used so that the material attains a solid, soil-like nature as part of disposal at those facilities.

So here we identified the volume of

11:14AM material that we plan to have processed and taken upland. The majority of what is shown on this bar is anticipated to be managed in that manner. However, there may be material encountered in any particular contract.

Wisemiller

For the reason of trying to keep as much flexibility and competition among our contractors, we try not to constrain the contract
1:34PM any more because it then makes it very cumbersome to execute and lays grounds for disputes and claims. So it's really the bottom-line result. It's a performance-based contract. We are paying someone to perform to get rid of the material that is in the
1:34PM channel in a permitted, acceptable way. How much they spend then to do the dredging, to do the transport, the dewatering and all the other elements we try not to separate out any more than is necessary.

1:35PM Q. So the U.S. doesn't have records of just a volume of treated dredged material that was disposed of upland for beneficial use?

A. If we do, it's general and not specific because it doesn't relate to our payment to
1:35PM the contractor. If he gets rid of it --
If some of the material --
Let's say we issued the contract and he started to process all of that silt -- we are talking only about a silt contract, for example --

Wisemiller

upland placement site. Or let's say he has two processing facilities, to make it more interesting, and two upland placement sites. How much he's
1:35PM paying for his dredging company, the waterborne transport to either of those facilities, how much he's paying if it's a subcontracted processing facility, to those facilities to process material and how much he is paying to transport the material
1:36PM from those processing facilities to the placement sites, it's really not --

It's our business to make sure it's safe, it meets the specs for performance and that it's permitted and environmentally acceptable in
1:36PM terms of the NEPA compliance -- it's an acronym, N-E-P-A -- that has been performed for the project. But to get into niches is getting into the contractor's shoes. It's really has he removed all of the required material.
1:36PM And beyond that amount there is a certain prism that's allowed in the contract that he can go beyond and still get paid to remove. That's referred to as the allowable overdepth dredging, because of the inaccuracies of the dredging process

Wisemiller

channel that we are concerned with. That's how the material is disposed of, whether it's taken to HARS or any other things. We have a goal of using it 1:37PM beneficially and the processing in upland placement of the superficial silt material in the channel is the selected method by the Corps and the other involved stakeholder agencies in this region as a preferred method to deal with that material.

1:37PM But it's -- we don't measure, "Oh, the processing facility took 13.2 cubic yards today" or 13,000 or whatever.

Q. Or even over a month they don't measure?

1:37PM A. We measure it, but we measure it in terms of how much he has removed from the channel, and then it's measured on a scow basis as to which processing facility and then maybe on a truck basis as to what placement site it's gone to, depending on 1:38PM how many sites and both processing and placement we have on that contracts.

Q. That information is with the construction office?

A. Yes.

Wisemiller

whether -- when it is a partial payment, which is what we were going through --

Here it is, in Exhibit -- is this 8?

1:38PM MS. FRANKLIN: Yes.

A. These are typically based upon the contractor survey demonstrating the progress that they have done. When it comes to the ultimate actual amount paid in total for the contract, that

1:38PM relates back to the government's own surveys that are performed prior and after each of the various layers and the various acceptance layers of the contract performed.

Q. But there are different amounts paid

1:39PM depending on whether dredged material is processed or treated, isn't it?

A. If it's separated as a separate line item in the contract, then you have a separate volume for it. If it's grouped together or if it's

1:39PM something that came up as an anomaly on the contract it may have been dealt with as a contract modification.

Q. And since 2002 you said there have been separate line items for the treatment of

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x

TDM AMERICA, LLC, :

Plaintiff, :

:

-against- Index No. 06-472 C

THE UNITED STATES OF AMERICA,

Defendant,

- and - :

DONJON MARINE COMPANY, INC.,

:

Third-Party Defendant.

:

- - - - - - - - - - - - - - - - - - - - -x

CONTINUED DEPOSITION of BRYCE W. WISEMILLER, taken by Plaintiff at the offices of Davidoff, Malito & Hutcher, 605 Third Avenue, New York, New York 10158, on Tuesday, May 22, 2007, commencing at 9:38 o'clock a.m., before Annette Forbes, a Certified Shorthand (Stenotype) Reporter and Notary Public within and for the State of New York.

Wisemiller

Q Do you have any knowledge, as you sit here today, whether or not the contracts that relate to upland material were -- let me start

11:23:09 that again.

With respect to the contracts that appear in the row upland, under those, do those contracts include dredge, treatment of dredged material with an additive for upland disposal?

11:23:29 A I am unsure how the contracts that had treatment of dredge material that were issued by the New York district were dispersed among the various column headings, whether they would have been characterized under the open water and upland

11:23:46 or the upland -- I would think open water and upland.

However, I should note since this is apparently a compilation of dredging contracts issued by the Corps throughout the nation, a

11:24:10 variety of different districts, the processing of material with additives that is done typically with the soft silt surficial material in New York, encountered in New York Harbor, is to my knowledge not done except on rare occasions by any of the

11:24:33 other districts and that upland disposal is a

Wisemiller

predominantly used method for managing material through much of the rest of the country.

The Corps has probably dozens of upland CDF sites throughout the nation. Material is typically put in, no material without processing, either pumped in or mechanically placed in.

11:24:51

Q Do you know any person or persons at the Corps that would be able to explain the compilation of these numbers and what is included in each one of these categories?

11:25:06

A Apart from the point of contact listed on the NDC with the phone number, the National Data Center that's listed.

11:25:28

Q You are referring to Bates No. TDM 006755?

A Probably there, too, but I was actually referring to the last three digits, 752.

Appears to be the same point of contact information.

11:25:44

Q Okay. I see what you are saying.

MR. ADLER: Can we take a five-minute break here?

MS. FRANKLIN: Sure.

11:27:57

# Exhibit 6
# Excerpts From The Rule 30(b)(6) Deposition Of James Fields

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TDM AMERICA, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 06-472 C |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

P R O P R I E T A R Y

OUTSIDE ATTORNEYS' EYES

30(b)(6) DEPOSITION OF JAMES FIELDS

LOS ANGELES, CALIFORNIA

WEDNESDAY, JUNE 6, 2007

Reported by:
Michelle Hutton
CSR No. 7322
Job No. 12710

signing of it. The redesignation of it I'd like it as early as possible, and that was my caveat at the very beginning. I don't want to wait 45 days or whatever it is to receive the designation.

MS. FRANKLIN: We can discuss that later.

MR. ADLER: I'm sorry?

MS. FRANKLIN: We can discuss that later.

MR. ADLER: It's on the record now. That's all I'm going to say about it.

Q Mr. Fields, by whom are you employed?

A The U.S. Army Corps of Engineers.

Q And what is your title?

A Civil engineer.

Q I didn't hear the beginning of that response.

A Civil engineer.

Q And is that your entire title?

MS. FRANKLIN: Objection, vague.

BY MR. ADLER:

Q Is that your complete title, civil engineer?

A As I know it.

Q Do you work in a particular division?

A Yes.

Q Which division?

A The Construction Operation Division.

Q And what is the Construction Operation Division?

A It's a part of the Los Angeles district that's in charge of the construction operations within the Corps for this district.

Q And what is entailed in the Construction Operation Division's responsibilities?

A New construction, operations and maintenance, some maintenance on facilities.

Q What kind of facilities?

A Some bases. We do work for local sponsors. We do work for -- we work on the dams that we have responsibility for, we work on the harbors, and we take care of the maintenance dredging. We do construction for beach erosion projects, flood control, various other watershed enhancements.

Q For which district did you say you work for?

A Los Angeles District.

Q What does the Los Angeles District cover, which territories?

A Southwest portion of the United States. We go as far north as Morrow Bay down to the San Diego border and then inland quite a ways.

Q What are your responsibilities as a civil engineer?

A I do project management in the operations branch which has a navigation section, and my responsibilities

are maintenance dredging and rock work.

Q And what does maintenance dredging entail?

A Maintaining depths of channels to federally authorized depths.

Q And is there dredging involved in those responsibilities?

A Yes.

MR. ADLER: I'd like the court reporter to mark as exhibit No. 94, Plaintiff's Exhibit No. 94 a document bearing Bates number G02001 00108 through G02001 00107.

MS. FRANKLIN: Michael, did you want the notice marked?

MR. ADLER: We can agree it was already marked. We don't have to mark it again.

MS. FRANKLIN: Do you have the number?

MR. ADLER: I think it's 79, but I'll check on that.

MS. FRANKLIN: Okay.

MR. ADLER: I'd just ask the court reporter when it's marked, to please let me know.

THE REPORTER: Okay.

MS. FRANKLIN: Can you repeat the Bates range for that.

MR. ADLER: The last digits are 108 -- actually, it's 107 through 121.

understanding what that means?
A Yes.
Q Did you hear my question?
A Yes.
Q What does that mean?
A That's the way you break down the items that are listed.
Q I didn't ask you about how you do something. I asked you your understanding of what that entry means. Do you understand the question or do you want me to rephrase it?
MS. FRANKLIN: That was asked and answered. Did you not hear it?
MR. ADLER: I heard it, but he wanted me to rephrase the question.
Q There was an entry that was LS 2450 under "Unit." Do you have an understanding what that means?
A I understand the LS, not the 2450.
Q What is the LS?
A Lump sum.
Q And do you have an understanding of the volume in cubic yards of the material that was treated with the additives as you described before with respect to this contract?
A No. Ours was in cubic meters.

Q Do you have an understanding of how many cubic meters it was?

A Yes.

Q How many?

A I believe 1,850.

Q That's your recollection of the total contract?

A Yes.

MR. ADLER: Would someone be kind enough to let me know when you receive a fax that bears Bates No. G02002 00317 through 318.

Q Now, lets for a moment go back to that exhibit that I originally marked as No. 96. It ends in Bates number 00201. I'd like to have that marked as exhibit No. 97.

MS. FRANKLIN: Michael, I'm confused on that exhibit. For exhibit -- let's ask the court reporter. For Exhibit 96, what is that exhibit?

THE REPORTER: We couldn't find the Bates number ending 201 so we didn't mark it, and then we marked Exhibit 96 as Bates ending 266.

MR. ADLER: So you don't have the one ending 00201?

THE REPORTER: No.

MR. ADLER: All right. We'll fax it to you. All right. So let's go to the document that

# Exhibit 7
# Excerpts From The Rule 30(b)(6) Deposition Of Bryce Wisemiller

P R O P R I E T A R Y

IN THE UNITED STATES COURT

OF FEDERAL CLAIMS

-----------------------------x

TDM AMERICA, LLC,

Plaintiff,

vs. No. 06-472

THE UNITED STATES OF AMERICA,

Defendant.

and

DONJON MARINE COMPANY, INC.,

Interested Party.

-----------------------------x

September 19, 2007
9:41 a.m.

Deposition of BRYCE W. WISEMILLER, held at the offices of Davidoff Malito & Hutcher LLP, 605 Third Avenue, New York, New York, pursuant to Notice, before Theresa Tramondo, a Notary Public of the State of New York.

Wisemiller - Proprietary

Q. Are you here pursuant to this notice of deposition?

A. Yes.

MS. FRANKLIN: I would like to just clarify. This witness is here subject to objections submitted by the United States on about May 25, 2007.

I would also like to go ahead and request an opportunity for the witness to review his testimony today, and this transcript shall be designated as "proprietary" insofar as if there is any testimony regarding processes of subcontractors or contractors.

Q. Mr. Wisemiller, are you aware that today you're here to represent the United States for this deposition?

A. Insofar as the New York District activities with this lawsuit is my understanding.

Q. Therefore, when I ask you "the U.S." or I say "you" during the deposition, which I assure you will occur many times, I don't mean you personally. I mean you here

Wisemiller - Proprietary

payments to them are based on surveys taken before and after each of those sediment strata are removed or during the sediment strata. The management of the sediment strata, whether or not that included or not treatment of processing of material relates back to the documents that the contractor provided to us related to their proposed method to manage the material.

Q. Isn't it true that the United States pays its contractors based on the volume of dredge material that is processed?

MS. FRANKLIN: Objection.

A. No.

Q. You're telling me if the contracts don't have line items, that the United States pays a certain dollar amount per cubic yard for dredge material, that includes dredge material that has to be processed for upland disposal?

A. I'm saying that there is a line item that includes the removal of material from the channel that is measured by surveys taken before and after of the removal of

Wisemiller - Proprietary material. For the contractor's part of a performance-based contract, to take that material and in an environmentally acceptable way get rid of it.

That line items talks about dredging, transportation, processing and upland placement. The contractor, to the extent that he requires to do treatment with additives, to what extent processing is needed to be able to accomplish that entire dredging through ultimate placement, is part of his dredge submission package, and is subject to change per the regulatory permits that he has to do that work from the involved state, local regulatory agencies that oversees that type of upland placement.

As a performance-placed contract, we pay them on how much material they move out of the channel. That line item for that material may involve on any one contract a lot, maybe all of the material being processed maybe having an additive, but we, the Government, do not pay them specifically for that point. We pay them for the removal

of the material from that contract area.

Q. Does some of that dredge material have to be dewatered?

MS. FRANKLIN: Objection, vague.

A. Could you be more specific?

Q. Prior to treatment?

A. We pay the contractor --

Q. I am not asking about payment. I am asking does some of that dredge material have to be dewatered prior to treatment?

MS. FRANKLIN: Objection to the extent you're asking this 30(b)(6) witness a question relating to the processing by a contractor or a subcontractor.

A. Can you be specific to the contract?

Q. Generally, I want to know --

A. In general.

Q. -- whether --

A. My understanding of your question is, is dewatering done by our contractors in the execution of their contracts? Some contractors have for some material done

description summary, the contractor and then also the Army contracting -- or the contracting officer representative on those contracts.

Q. Let me see them for a moment.

I am going to turn your attention to Exhibit Number 152, and I believe that there are two contracts on that exhibit that have two entries for the processors for those corresponding contracts. Okay.

Does the U.S. have an understanding of how much dredge material was processed by each of those entities where more than one entity is specified for the contract -- where more than one processing entity is specified for the contract?

A. We only know how much volume of material was removed from the contract area as part of the dredging operation.

We supervise the contractor to ensure their work is being done safely, and in accordance in general with the permits, to ensure that their work is being done in an environmentally acceptable manner. We may

Wisemiller - Proprietary

observe and see generally how much material is going here or there, but to be able to estimate how much material went to one processor versus another, no.

We pay the prime contractor on a performance-based contract to remove the material from the channel, and that's determined by surveys. And that's the basis that the Government has for our payments, and that includes the dredging, transporting and all the other steps that the prime contractor and any subs that they may have have to do. We try not to get in their -- we don't get specific into how they perform their contract or track it that way.

Q. I believe you just used the phrase, and you probably did it more than once, "in an environmentally acceptable manner." What do you mean by that?

A. "Environmental acceptability" relates to the regulatory, federal, state, local regulatory agencies and their enforcement of the various laws that exist to protect threatened endangered species,

# Exhibit 8
# Excerpts From The Deposition Of Ella Snell

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - -x

TDM AMERICA, LLC, :

Plaintiff, :

:

-against- Index No. 06-472 C

THE UNITED STATES OF AMERICA,

Defendant, :

- and - :

DONJON MARINE COMPANY, INC.,

:

Third-Party Defendant.

:

- - - - - - - - - - - - - - - - - - - - - -x

DEPOSITION of ELLA D. SNELL, taken by Plaintiff at the offices of Davidoff, Malito & Hutcher, 605 Third Avenue, New York, New York 10158, on Friday, May 18, 2007, commencing at 9:30 o'clock a.m., before Annette Forbes, a Certified Shorthand (Stenotype) Reporter and Notary Public within and for the State of New York.

Snell

break or you need a few minutes, just let me know and we will break, okay?

A I understand.

09:34:47 Q Are you currently employed?

A Yes, I am.

Q Who is your employer?

A U.S. Army Corps of Engineers, New York District.

09:34:55 Q What is your title?

A Chief, contracting division.

MR. ADLER: I would like the court reporter to mark as Plaintiff's Exhibit 51 a document that says

09:35:12 amended notice of deposition.

(Notice was marked as Plaintiff's Exhibit No. 51 for identification, as of this date.)

BY MR. ADLER:

09:35:44 Q I am going to ask you whether or not you have seen Plaintiff's Exhibit 51 before.

A (Perusing document.) Yes, I have.

Q Are you here today pursuant to that notice?

09:35:57 A Yes, I am.

Snell

A Typically this document remains in the file of my COR, my contracting officer's representative.

09:56:28 Q Do you know whether or not in order to pay these documents, certain information has to be provided by the contractor in order to authorize payment?

A Yes. Certain information has to be provided.

09:56:41

Q What information has to be provided?

A Well, the contractor -- this is submittal of an invoice for payment. And the contractor would have to submit, for example,

09:56:56 quantities dredged, the COR considers the percentage of completion and a number of things, then the COR makes the payment.

Remember, earlier I told you I only make the final payment. I only see the final paid

09:57:12 document because I have to make that final payment. And it might help if I explain that process to you.

Q Sure.

A The way the process works is once I

09:57:23 award a contract, I designate a contracting

Snell

officer representative, as well as an administrative contracting officer, called COR and ACO, respectively.

09:57:34 Those people are responsible for complete management of this contract until it's ready to be closed out.

That means that they will have lots of letters. They will be pay estimates. They

09:57:47 will have a lot of documents that I will never see and I don't have a need to see them as long as things are working properly.

At the end of the contract period, what they have to do, according to regulation, is

09:58:01 box up all of those documents and send them to me because I'm responsible for the final pay, as well as the final closeout of the document.

I merge all of their files with my files. They box them, we put them in a storage

09:58:21 area.

That's how the process works.

Q Do you know whether or not the contract number W912DS-07-C-0003 has ended or is it still ongoing?

09:58:45 A I don't know.

Snell

Q For example, if we turn to, in this contract, if you turn to Bates No., the page that's Bates numbered G0100300110, item No. 0006?

10:16:01 A 110?

Q Do you see that?

A Yes, I do.

Q There is a unit price of $61 per cubic yard?

10:16:10 A Yes.

Q Do you have an understanding, or when you make the determination as to whether the unit price is reasonable, do you have an understanding of what item number 0006, Option 3,

10:16:25 is?

A You mean technically?

Q Correct.

A No. And I don't need to.

I like, for example, to put it in

10:16:42 perspective, I have also purchased missile systems, the Red Line, the Hawk system.

As a contracting person, you don't have to have the technical knowledge, but you do need to have just a basic understanding of what

10:16:58 you are buying, because we have what you call

Snell

contract was awarded?

A Yes.

Q To whom was it awarded?

11:26:37 A It was awarded to Donjon Marine Company, Incorporated.

Q Do you know whether or not activities on this contract are still ongoing?

A I do not know that.

11:26:49 Q Does that also mean that you don't know whether final payment was made under this contract?

A That's correct.

Q Did you designate a COR or ACO for

11:27:17 this contract?

A We would have to, but without seeing the designation letter that was signed by Major Freedman at that time, I don't know who that would be.

11:27:59 Q I refer you again to Plaintiff's Exhibit No. 8, to the document bearing Bates No. G01020 00003, actually, make that 00004.

A Okay.

Q On the left-hand side, in the lower

11:28:44 left-hand side of the document that ends in 04

Snell

Bates number, there is a box that says contracting officer approval signature.

Do you see that box?

11:28:57 A Yes, I do.

Q Is that your signature?

A No.

Q Whose signature is it?

A That's Major Hang.

11:29:11 Q In the typed portion of that box, it says Ella D. Snell.

Is that you?

A That's correct, that's me.

Q You said Major Hang signed it?

11:29:23 A Yes.

Q With his name or your name?

A Actually, he signed his name. That's how I recognize his signature.

I remember during this period I was in Baghdad, so he had to sign for me. 11:29:31

Actually, he doesn't sign for me. He signed under his own recognizance as a contracting officer.

He was a contracting officer, which means he had the authority to sign this final pay 11:29:44

Snell

estimate.

Q Then why is your name Ella D. Snell typed there?

11:29:55 A I don't know.

Q You viewed that document.

Does this refresh your recollection whether final payment has been made under this contract?

11:30:06 A Yes.

Q Has final payment been made?

A Yes. Should have been made, yes. It's been signed.

(Discussion off the record.)

11:41:18 (Whereupon, at 11:30 o'clock a.m., a recess was taken.)

(Whereupon, at 11:40 o'clock a.m., the deposition resumed with all parties present.)

11:41:18 E L L A N. S N E L L, resumed and testified further as follows:

BY MR. ADLER:

Q I would like to hand the witness what has been marked Plaintiff's Exhibit 2.

11:41:26 Excuse the stain on the top.

# Exhibit 9

DEPARTMENT OF THE ARMY
NEW YORK DISTRICT, CORPS OF ENGINEERS
JACOB K. JAVITS FEDERAL BUILDING
NEW YORK, N.Y. 10278-0090

REPLY TO
ATTENTION OF

CENAN- CT-apl

26 Sep 2006

Great Lakes Dredge & Dock Company, LLC.
(Attn: Mr. Steven F. O'Hara, Vice President)
2122 York Road
Oak Brook, IL 60523

SUBJECT: Contract W912DS-06-C-0018 (initiated under IFB W912DS-06-B-0005), Maintenance Dredging of Newark Bay, New Jersey

Dear Mr. O'Hara:

You are hereby notified that your bid dated 05 May 2006 submitted in response to the subject IFB is accepted in the amount of $23,535,270.00 for line items 0001 through 0009. However, the amount obligated for this contract is $14,816,245.00 for line items 0001, 0002, 0005, and 0006.

Prior to issuance of the Notice to Proceed you must submit two originals each of your executed payment and performance bonds, as required by the solicitation, **USING THE LATEST VERSION OF THE BONDS AS PROVIDED WITH THIS LETTER (SF 25: 5/96; SF25A: 10/98) – prior versions are unacceptable**. In accordance with Section 00800, "Insurance-Work on a Government Installation", it is requested that you furnish evidence of insurance. On your Certificate of Liability Insurance please have you insurance company remove the language in the cancellation instructions ("endeavor to") and ("But failure to do so shall impose no obligation or liability of any kind upon the insurer, its agents or representatives.").

No work to be performed prior to Notice to Proceed and within ten (10) days of this letter, please submit the enclosed payment and performance bonds and return to this office, Attn: Alan P. Link, Room 1843, Contracts Branch.

Sincerely,

Ella D. Snell
Contracting Office

Enclosures:
1) 2 performance bonds
2) 2 payment bondS
3) Contract copy

G0100300104

**SOLICITATION, OFFER, AND AWARD (Continued)**
*(Construction, Alteration, or Repair)*

**OFFER** *(Must be fully completed by offeror)*

14. NAME AND ADDRESS OF OFFEROR *(Include ZIP Code)*
Great Lakes Dredge & Dock Company, LLC
2122 York Road
Oak Brook, IL 60523

CAGE CODE: 4AAF3 D&B: 36-128-3844

CODE | FACILITY CODE

15. TELEPHONE NO *(Include area code)*
630/574-3000

16. REMITTANCE ADDRESS *(Include only if different than Item 14)*
See Item 14

17. The offeror agrees to perform the work required at the prices specified below in strict accordance with the terms of this solicitation, if this offer is accepted by the Government in writing within ________ calendar days after the date offers are due. *(Insert any number equal to or greater than the minimum requirements stated in Item 13D. Failure to insert any number means the offeror accepts the minimum in Item 13D.)*

AMOUNTS | SEE SCHEDULE OF PRICES

18. The offeror agrees to furnish any required performance and payment bonds.

19. ACKNOWLEDGMENT OF AMENDMENTS
*(The offeror acknowledges receipt of amendments to the solicitation – give number and date of each)*

| AMENDMENT NO | 0001 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| DATE | 4/25/06 | | | | | | | | | |

20A. NAME AND TITLE OF PERSON AUTHORIZED TO SIGN OFFER *(Type or print)* Steven F. O'Hara, Vice President

20B. SIGNATURE [signature]

20C. OFFER DATE May 9, 2006

**AWARD** *(To be completed by Government)*

21. ITEMS ACCEPTED: 0001-0009.

ITEMS AWARDED: 0001 ($945,000.00), 0002 ($10,054,780.00, 0005($1,338,950.00), 0006 ($2,477,515.00)

22. AMOUNT $14,816,245.00

23. ACCOUNTING AND APPROPRIATION DATA
SEE ATTACHED SCHEDULE

24. SUBMIT INVOICES TO ADDRESS SHOWN IN *(4 copies unless otherwise specified)* ITEM 26

25. OTHER THAN FULL AND OPEN COMPETITION PURSUANT TO
☐ 10 U.S.C. 2304(c) ☐ 41 U.S.C. 253(c)

26. ADMINISTERED BY CODE E3R0000
OPERATIONS DIVISION
USACE-NYD (Attn: CENAN-EN-CP)
New York, NY 10278-0090

27. PAYMENT WILL BE MADE BY: CODE
USACE-FINANCE CENTER MILLINGTON
ATTN: CEFC-AO-P, ACCOUNTS PAYABLE
5722 Integrity Drive
Millington, TN 38054-5005

*CONTRACTING OFFICER WILL COMPLETE ITEM 28 OR 29 AS APPLICABLE*

☐ 28. NEGOTIATED AGREEMENT *(Contractor is required to sign this document and return ______ copies to issuing office.)* Contractor agrees to furnish and deliver all items or perform all work, requisitions identified on this form and any continuation sheets for the consideration stated in this contract. The rights and obligations of the parties to this contract shall be governed by (a) this contract award, (b) the solicitation, and (c) the clauses, representations, certifications, and specifications or incorporated by reference in or attached to this contract.

☒ 29. AWARD *(Contractor is not required to sign this document.)* Your offer on this solicitation, is hereby accepted as to the items listed. This award consummates the contract, which consists of (a) the Government solicitation and your offer, and (b) this contract award. No further contractual document is necessary.

30A. NAME AND TITLE OF CONTRACTOR OR PERSON AUTHORIZED TO SIGN *(Type or print)*

31A. NAME OF CONTRACTING OFFICER *(Type or print)*
Ella O Snell
TEL: EMAIL:

30B. SIGNATURE | 30C. DATE

31B. UNITED STATES OF AMERICA
BY [signature]

31C. AWARD DATE 2006 Sep 29

NSN 7540-01-155-3212 STANDARD FORM 1442 BACK (REV. 4-85)

G0100300105

| SOLICITATION, OFFER, AND AWARD (Construction, Alteration, or Repair) | 1. SOLICITATION NO. W912DS-06-B-0005 | 2. TYPE OF SOLICITATION [X] SEALED BID(IFB) [ ] NEGOTIATED(RFP) | 3. DATE ISSUED 05-Apr-2006 | PAGE OF PAGES 1 OF 34 |
|---|---|---|---|---|

IMPORTANT - The "offer" section on the reverse must be fully completed by offeror.

| 4. CONTRACT NO. | 5. REQUISITION/PURCHASE REQUEST NO. W16ROE-6011-4023 | 6. PROJECT NO. |
|---|---|---|

| 7. ISSUED BY CODE W912DS | 8. ADDRESS OFFER TO (If Other Than Item 7) CODE |
|---|---|
| USA ENGINEER DISTRICT, NEW YORK<br>ATTN:CENAN-CT ROOM 1843<br>26 FEDERAL PLAZA<br>NEW YORK NY 10278 | See Item 7 |
| TEL:212-264-0238 FAX:212-264-3013 | TEL: FAX: |

| 9. FOR INFORMATION CALL: | A. NAME KATINA L DICKERSON-HALE | B. TELEPHONE NO. (Include area code) (NO COLLECT CALLS) 1917-790-8180 |
|---|---|---|

## SOLICITATION

**NOTE: In sealed bid solicitations "offer" and "offeror" mean "bid" and "bidder".**

10. THE GOVERNMENT REQUIRES PERFORMANCE OF THE WORK DESCRIBED IN THESE DOCUMENTS (Title, identifying no., date):

Maintenance Dredging of the Newark Bay, New Jersey.

THIS REQUIREMENT IS PURSUANT TO FAR SUBPART 19.10 SMALL BUSINESS COMPETITIVENESS DEMONSTRATION PROGRAM.

This is an unrestricted procurement.
NAICS CODE: 237990 SIZE STANDARD: $18.5 Million.
Contract Specialist: Katina Dickerson (917) 790-8180
Technical POC: Kenneth Peterson (917) 790-8541

11. The Contractor shall begin performance within 5 calendar days and complete it within 33 calendar days after receiving [ ] award, [X] notice to proceed. This performance period is [X] mandatory, [ ] negotiable. (See ______________.)

| 12 A. THE CONTRACTOR MUST FURNISH ANY REQUIRED PERFORMANCE AND PAYMENT BONDS? (If "YES," indicate within how many calendar days after award in Item 12B.) [X] YES [ ] NO | 12B. CALENDAR DAYS 10 |
|---|---|

13. ADDITIONAL SOLICITATION REQUIREMENTS:

A. Sealed offers in original and 2 copies to perform the work required are due at the place specified in Item 8 by 02:00 PM (hour) local time 09 May 2006 (date). If this is a sealed bid solicitation, offers must be publicly opened at that time. Sealed envelopes containing offers shall be marked to show the offeror's name and address, the solicitation number, and the date and time offers are due.

B. An offer guarantee [X] is, [ ] is not required.

C. All offers are subject to the (1) work requirements, and (2) other provisions and clauses incorporated in the solicitation in full text or by reference

D. Offers providing less than 120 calendar days for Government acceptance after the date offers are due will not be considered and will be rejec

NSN 7540-01-155-3212 1442-101 STANDARD FORM 1442 (REV. 4-85)
Prescribed by GSA
FAR (48 CFR) 53.236-1(e)

G0100300106

Section SF 30 - BLOCK 14 CONTINUATION PAGE

SF 1442 CONTINUATION SHEET

Contractor's Bid dated 9 May 2006 for $23,535,270.00 for Items 0001-0009 is accepted.

ITEMS AWARDED

Items 0001, 0002, 0005, and 0006.

ACCOUNTING AND APPROPRIATION DATA

96 NA X 3123.0000 08 2421 012550 S96303=$5,102,187.00 (FEDERAL O & M FUNDS)
96 NA X 8862.0000 08 2421 012550 S96303=$9,714,058.00 (NON-FEDERAL FUNDS)
TOTAL FUNDING=$14,816,245.00

ALLOCATION OF FUNDING

| CLIN | TOTAL CLIN COST | NON-FEDERAL SHARE | FEDERAL SHARE |
|---|---|---|---|
| 0001 | $ 945,000.00 | $ 400,000.00 | $ 545,000.00 |
| 0002 | $10,054,780.00 | $6,721,365.00 | $3,333,415.00 |
| 0005 | $ 1,338,950.00 | $ 909,608.00 | $ 429,342.00 |
| 0006 | $ 2,477,515.00 | $1,683,085.00 | $ 794,430.00 |
| TOTALS= | $14,816,245.00 | $9,714,058.00 | $5,102,187.00 |

REVISED BID SCHEDULE

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001 | MOBILIZATION AND DEMOBILIZATION<br>FFP<br>PURCHASE REQUEST NUMBER: W16ROE-6011-4023 | 1 | Lump Sum | 945,000 | |

945,000.

NET AMT

FOB: Destination

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0002 | DREDGING, PROCESSING, TRANSPORTATION,<br>FFP<br>Dredging, Processing, Transportation and Placement of Basic Work (Shoal #1 Removal of material except ledge rock lying above the plane of minus 40 feet below mean low water plus 1 foot allowable overdepth from the Pt. Newark Pierhead Federal Navigation Channel as shown on the contract drawings, File #872, page 3 of 7 and placement of dredged material at a contractor provided, Government approved ~~upland disposal site.~~ | 170,420 | Cubic Yard | 59.00 | 10,054,780. |

NET AMT

FOB: Destination

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0003 | | | Cubic Yard | | |
| | NOT USED<br>FFP | | | | |

NET AMT

FOB: Destination

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0004 | | 9,955 | Cubic Yard | 69.00 | 686,895 |
| OPTION | OPTION 1<br>FFP<br>Dredging, Processing, Transportation and Placement (Shoal #1A)<br>Removal of material except ledge rock lying above the plane of minus 40 feet below mean low water plus 1 foot allowable overdepth from the Pt. Newark Federal Navigation Channel as shown on the contract drawings, File #872, page 4 of 7 and placement of dredged material at a contractor provided, Government approved upland disposal site. | | | | |

NET AMT

FOB: Destination

G0100300109

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0005 | | 21,950 | Cubic Yard | 61.00 | 1,338,950. |
| OPTION | OPTION 2 | | | | |

FFP
Dredging, Processing, Transportation and Placement (Shoal #2)
Removal of material except ledge rock lying above the plane of minus 40 feet below mean low water plus 1 foot allowable overdepth from the Pt. Newark Federal Navigation Channel as shown on the contract drawings, File #872, page 5 of 7 and placement of dredged material at a contractor provided, Government approved upland disposal site.

NET AMT

FOB: Destination

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0006 | | 40,615 | Cubic Yard | 61.00 | 2,477,515 |
| OPTION | OPTION 3 | | | | |

FFP
Dredging, Processing, Transportation and Placement (Shoal #3)

Removal of material except ledge rock lying above the plane of minus 40 feet below mean low water plus 1 foot allowable overdepth from the Pt. Newark Federal Navigation Channel as shown on the contract drawings, File #872, page 6 of 7 and placement of dredged material at a contractor provided, Government approved upland disposal site.

NET AMT

FOB: Destination

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0007 | | 19,160 | Cubic Yard | 60.00 | 1,149,600. |

OPTION

OPTION 4
FFP
Dredging, Processing, Transportation and Placement (Shoal #4)

Removal of material except ledge rock lying above the plane of minus 40 feet below mean low water plus 1 foot allowable overdepth from the Pt. Newark Federal Navigation Channel as shown on the contract drawings, File #872, page 6 of 7 and placement of dredged material at a contractor provided, Government approved upland disposal site.

NET AMT

FOB: Destination

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0008 | | 36,605 | Cubic Yard | 58.00 | 2,123,090 |

OPTION

OPTION 5
FFP
Dredging, Processing, Transportation and Placement (Shoal #5)

Removal of material except ledge rock lying above the plane of minus 40 feet below mean low water plus 1 foot allowable overdepth from the Pt. Newark Federal Navigation Channel as shown on the contract drawings, File #872, page 6 of 7 and placement of dredged material at a contractor provided, Government approved upland disposal site.

NET AMT

FOB: Destination

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0009 | | 84,990 | Cubic Yard | 56.00 | 4,759,440 |
| OPTION | OPTION 6<br>FFP<br>Dredging, Processing, Transportation and Placement (Shoal #6)<br><br>Removal of material except ledge rock lying above the plane of minus 40 feet below mean low water plus 1 foot allowable overdepth from the Pt. Newark Federal Navigation Channel as shown on the contract drawings, File #872, page 6 of 7 and placement of dredged material at a contractor provided, Government approved upland disposal site. | | | | |
| | | | | NET AMT | |

FOB: Destination

TOTAL BASE (CLIN 0001 and CLIN 0002)............................. 10,999,780

TOTAL ALL OPTIONS (CLIN 0004 – CLIN 0009).................... 12,535,440

TOTAL BID PRICE (BASIC PLUS ALL OPTIONS)................ 23,535,270

BIDDING INSTRUCTIONS

OFFLOADING, PROCESSING, AND DISPOSAL SITES INFORMATION (TO BE PROVIDED BY BIDDERS):

Name of Site(s) SEE ATTACHED PAGES

Name of POC(s)__________

Address of Site(s)__________

Telephone Number(s)__________

G0100300112

NOTE 1: Bidders must bid on all items.

NOTE 2: Award of contract will be based on the lowest total price for the total of the Basic Work and Options 1, 2, 3, 4, 5, and 6.

NOTE 3: All bidders are hereby advised that the quantities for placement in the price schedule are estimated and based on the survey data collected in June 15, 16, 28-30, July 5, 6, 8, 12, 13, 19, 20, 26, and 27 of 2005.

NOTE 4: The government may reject a bid as non-responsive if the prices bid are materially unbalanced between line items and if there is a reasonable doubt that the bid will result in the lowest overall cost to the government even though it may be the low bid.

NOTE 5: All options will be exercised, at the Government's discretion, within fifty-eight (58) calendar days of receipt by the Contractor of the Notice to Proceed (Basic Work), if they are exercised at all. Even if exercised, the Options listed above may not be exercised in numerical order. If the Options are exercised, their performance periods will be consecutive.

NOTE 6: Bidders will identify their offloading, processing, and disposal sites with their bid. Bidders will write on all the blank lines provided on the Price Schedule the name(s) of the site(s), POC(s), address(es), and phone(s) of their site(s) included in that line item.

NOTE 7: Note that the 90-day rule may apply to this contract if the sediment testing and permitting are delayed. The "90-day" rule references 29CFR 1.6(c) (3) (iv) as set forth in FAR 22.404-6(b)(6) provides that if a contract to which a general wage determination has been applied is not awarded within 90 days after bid opening, any modification to that wage rate determination published prior to contract award shall be effective unless the agency obtains an extension of the 90-day period from the Administrator, US Department of Labor.

NOTE 8: The apparent low bidder shall submit the documents specified in Section 00800, Special Contract Requirements paragraph I, Commencement, Prosecution and Completion of Work. If the Apparent low bidder does not submit the required information within 70 calendar days from the date the Apparent low bidder is notified of being the low bidder, the bidder will be considered non-responsible and it's bid will no longer be considered.

SECTION 00010 - SOLICITATION CONTRACT FORM

The Issued By organization below has been added:

USA ENGINEER DISTRICT, NEW YORK
ATTN:CENAN-CT ROOM 1843
26 FEDERAL PLAZA
NEW YORK NY 10278

CLIN 0002

The CLIN extended description has changed from Dredging, Processing, Transportation and Placement of Basic Work (Shoal #1A Removal of material except ledge rock lying above the plane of minus 40 feet below mean low water plus 1 foot allowable overdepth from the Pt. Newark Pierhead Federal Navigation Channel as shown on the contract drawings, File #872, page 3 of 7 and placement of dredged material at a contractor provided, Government approved upland disposal site. to Dredging, Processing, Transportation and Placement of Basic Work (Shoal #1)Removal of material except ledge rock lying above the plane of minus 40 feet below mean low water plus 1 foot allowable overdepth from the Pt. Newark Pierhead Federal Navigation Channel as shown on the contract drawings, File #872, page 3 of 7 and placement of dredged material at a contractor provided, Government approved upland disposal site..

The pricing detail quantity has increased by 113,875.00 from 56,545.00 to 170,420.00.

**DISPOSAL SITES**

N.J.M.C. IE Landfill
100 Baler Road
No. Arlington NJ
Mr. Thomas Witte
(908) 964-8812

EnCap Meadowlands Project Site
500 Frank W. Burr Blvd.
Glenpoint Center West
Teaneck, NJ 07666
Mr. James Hockensmith
(201) 907-5288

F.D.P. Enterprises Intermodal Const.
Facility Improvement Prov.
Mr. Steven Sands
Seacaucus Road
Jersey City, NJ 07305
(215)734-1400 ext. 212

Koppers Seaboard Site
2 Fish House Road, Kearny, NJ
Mr. Steven O'Hara
Great Lakes Dredge & Dock Company
(630) 574-3001

Koppers Woodbridge Site
Middlesex Coutny, NJ
Mr. Steven Sands
(215)734-1400 ext. 212

Fresh Kills Landfill
Staten Island, NY
David Alverez
(212) 312-3742

Bayshore Recycling Corporation
75 Crows Mill Road
Keasby, NJ 08832
Mrs. Valerie Montecalvo
(732) 738-6000

FORMER GATX STATEN ISLAND SITE
500 WESTERN AVE
S.I., NY 10303
OWNER 380 DEV'P LLC
STEVE SANDS
215 734 1400 EX 212

PORT READING BUSINESS PARK REDEV'P PROJECT
50 MIDDLESEX AVE / INDUSTRIAL Rd.
CARTERET, NJ
STEVE SANDS
215 734 1400 EX 212

G0100300114

**PROCESSORS**

Clean Earth Dredging Technologies
Mr. Kenneth Sykes
Claremont Dredged Material Processing Ctr.
One Linden Avenue East
Jersey City, NJ 07305

Don Jon Marine
Berths 32 & 36
Port Newark and Elizabeth
Mr. Thomas Witte
(908) 964-8812

Great Lakes Dredge & Dock Company
Koppers Seaboard Site
2 Fish House Road, Kearny, NJ
Mr. Steven O'Hara
(630) 574-3001

Bayshore Recycling Corporation
75 Crows Mill Road
Keasby, NJ 08832
Mrs. Valerie Montecalvo
(732) 738-6000

EIC Associates
aka 148 Doremus Ave., LLC
Doremus Avenue
Newark, NJ
Mr. Leo Pflug, Jr.
(973) 315-0200

CLAUSES INCORPORATED BY FULL TEXT

52.214-5000 APPARENT CLERICAL MISTAKES (MAR 1995)--EFARS

(a) For the purpose of initial evaluations of bids, the following will be utilized in the resolving arithmetic discrepancies found on the face of bidding schedule as submitted by the bidder:

(1) Obviously misplaced decimal points will be corrected;

(2) Discrepancy between unit price and extended price, the unit price will govern;

(3) Apparent errors in extension of unit prices will be corrected;

(4) Apparent errors in addition of lump-sum and extended prices will be corrected.

(b) For the purpose of bid evaluation, the government will proceed on the assumption that the bidder intends his bid to be evaluated on basis of the unit prices, the totals arrived at by resolution of arithmetic discrepancies as provided above and the bid will be so reflected on the abstract of bids.

(c) These correction procedures shall not be used to resolve any ambiguity concerning which bid is low.

(End of statement)

Section 00700 - Contract Clauses

CLAUSES INCORPORATED BY REFERENCE

| | | |
|---|---|---|
| 52.202-1 | Definitions | JUL 2004 |
| 52.203-3 | Gratuities | APR 1984 |
| 52.203-5 | Covenant Against Contingent Fees | APR 1984 |
| 52.203-7 | Anti-Kickback Procedures | JUL 1995 |
| 52.203-8 | Cancellation, Rescission, and Recovery of Funds for Illegal or Improper Activity | JAN 1997 |
| 52.203-12 | Limitation On Payments To Influence Certain Federal Transactions | SEP 2005 |
| 52.204-4 | Printed or Copied Double-Sided on Recycled Paper | AUG 2000 |
| 52.209-6 | Protecting the Government's Interest When Subcontracting With Contractors Debarred, Suspended, or Proposed for Debarment | JAN 2005 |
| 52.211-18 | Variation in Estimated Quantity | APR 1984 |
| 52.214-26 | Audit and Records--Sealed Bidding | OCT 1997 |
| 52.214-27 | Price Reduction for Defective Cost or Pricing Data - Modifications - Sealed Bidding | OCT 1997 |
| 52.214-28 | Subcontracting Cost Or Pricing Data--Modifications--Sealed Bidding | OCT 1997 |
| 52.214-29 | Order Of Precedence--Sealed Bidding | JAN 1986 |
| 52.219-4 | Notice of Price Evaluation Preference for HUBZone Small Business Concerns | JUL 2005 |
| 52.219-8 | Utilization of Small Business Concerns | MAY 2004 |
| 52.219-9 | Small Business Subcontracting Plan | JUL 2005 |
| 52.219-9 Alt I | Small Business Subcontracting Plan (Jul 2005) Alternate I | OCT 2001 |
| 52.219-14 | Limitations On Subcontracting | DEC 1996 |
| 52.219-16 | Liquidated Damages-Subcontracting Plan | JAN 1999 |
| 52.222-3 | Convict Labor | JUN 2003 |
| 52.222-4 | Contract Work Hours and Safety Standards Act - Overtime Compensation | JUL 2005 |
| 52.222-6 | Davis Bacon Act | JUL 2005 |
| 52.222-7 | Withholding of Funds | FEB 1988 |
| 52.222-8 | Payrolls and Basic Records | FEB 1988 |
| 52.222-9 | Apprentices and Trainees | JUL 2005 |
| 52.222-10 | Compliance with Copeland Act Requirements | FEB 1988 |
| 52.222-11 | Subcontracts (Labor Standards) | JUL 2005 |
| 52.222-12 | Contract Termination-Debarment | FEB 1988 |
| 52.222-13 | Compliance with Davis-Bacon and Related Act Regulations. | FEB 1988 |
| 52.222-14 | Disputes Concerning Labor Standards | FEB 1988 |
| 52.222-15 | Certification of Eligibility | FEB 1988 |
| 52.222-21 | Prohibition Of Segregated Facilities | FEB 1999 |
| 52.222-26 | Equal Opportunity | APR 2002 |
| 52.222-27 | Affirmative Action Compliance Requirements for Construction | FEB 1999 |
| 52.222-35 | Equal Opportunity For Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans | DEC 2001 |
| 52.222-36 | Affirmative Action For Workers With Disabilities | JUN 1998 |
| 52.222-37 | Employment Reports On Special Disabled Veterans, Veterans Of The Vietnam Era, and Other Eligible Veterans | DEC 2001 |
| 52.223-14 | Toxic Chemical Release Reporting | AUG 2003 |

| | | |
|---|---|---|
| 52.225-11 | Buy American Act--Construction Materials Under Trade Agreements | JAN 2006 |
| 52.226-1 | Utilization Of Indian Organizations And Indian-Owned Economic Enterprises | JUN 2000 |
| 52.227-1 | Authorization and Consent | JUL 1995 |
| 52.227-2 | Notice And Assistance Regarding Patent And Copyright Infringement | AUG 1996 |
| 52.227-4 | Patent Indemnity-Construction Contracts | APR 1984 |
| 52.228-11 | Pledges Of Assets | FEB 1992 |
| 52.228-14 | Irrevocable Letter of Credit | DEC 1999 |
| 52.228-15 | Performance and Payment Bonds--Construction | SEP 2005 |
| 52.229-3 | Federal, State And Local Taxes | APR 2003 |
| 52.232-5 | Payments under Fixed-Price Construction Contracts | SEP 2002 |
| 52.232-23 | Assignment Of Claims | JAN 1986 |
| 52.232-27 | Prompt Payment for Construction Contracts | SEP 2005 |
| 52.233-1 | Disputes | JUL 2002 |
| 52.233-3 | Protest After Award | AUG 1996 |
| 52.236-5 | Material and Workmanship | APR 1984 |
| 52.236-6 | Superintendence by the Contractor | APR 1984 |
| 52.236-7 | Permits and Responsibilities | NOV 1991 |
| 52.236-15 | Schedules for Construction Contracts | APR 1984 |
| 52.236-16 | Quantity Surveys | APR 1984 |
| 52.236-17 | Layout of Work | APR 1984 |
| 52.236-21 | Specifications and Drawings for Construction | FEB 1997 |
| 52.236-26 | Preconstruction Conference | FEB 1995 |
| 52.242-13 | Bankruptcy | JUL 1995 |
| 52.242-14 | Suspension of Work | APR 1984 |
| 52.243-4 | Changes | AUG 1987 |
| 52.244-6 | Subcontracts for Commercial Items | DEC 2004 |
| 52.246-1 | Contractor Inspection Requirements | APR 1984 |
| ~~52.246-12~~ | ~~Inspection of Construction~~ | ~~AUG 1996~~ |
| 52.247-34 | F.O.B. Destination | NOV 1991 |
| 52.249-2 Alt I | Termination for Convenience of the Government (Fixed-Price) (May 2004) - Alternate I | SEP 1996 |
| 52.249-10 | Default (Fixed-Price Construction) | APR 1984 |
| 52.253-1 | Computer Generated Forms | JAN 1991 |
| 252.201-7000 | Contracting Officer's Representative | DEC 1991 |
| 252.203-7001 | Prohibition On Persons Convicted of Fraud or Other Defense-Contract-Related Felonies | DEC 2004 |
| 252.203-7002 | Display Of DOD Hotline Poster | DEC 1991 |
| 252.204-7003 | Control Of Government Personnel Work Product | APR 1992 |
| 252.204-7004 Alt A | Central Contractor Registration (52.204-7) Alternate A | NOV 2003 |
| 252.205-7000 | Provision Of Information To Cooperative Agreement Holders | DEC 1991 |
| 252.209-7004 | Subcontracting With Firms That Are Owned or Controlled By The Government of a Terrorist Country | MAR 1998 |
| 252.219-7003 | Small, Small Disadvantaged and Women-Owned Small Business Subcontracting Plan (DOD Contracts) | APR 1996 |
| 252.225-7012 | Preference For Certain Domestic Commodities | JUN 2004 |
| 252.232-7003 | Electronic Submission of Payment Requests | JAN 2004 |
| 252.236-7002 | Obstruction of Navigable Waterways | DEC 1991 |
| 252.236-7004 | Payment for Mobilization and Demobilization | DEC 1991 |
| 252.236-7008 | Contract Prices-Bidding Schedules | DEC 1991 |
| 252.243-7001 | Pricing Of Contract Modifications | DEC 1991 |
| 252.243-7002 | Requests for Equitable Adjustment | MAR 1998 |

| | | |
|---|---|---|
| 252.244-7000 | Subcontracts for Commercial Items and Commercial Components (DoD Contracts) | NOV 2005 |
| 252.246-7000 | Material Inspection And Receiving Report | MAR 2003 |
| 252.247-7023 | Transportation of Supplies by Sea | MAY 2002 |
| 252.247-7024 | Notification Of Transportation Of Supplies By Sea | MAR 2000 |

CLAUSES INCORPORATED BY FULL TEXT

52.211-10 COMMENCEMENT, PROSECUTION, AND COMPLETION OF WORK (APR 1984)

The Contractor shall be required to (a) commence work under this contract within 5 calendar days after the date the Contractor receives the notice to proceed, (b) prosecute the work diligently, and (c) complete the entire work ready for use not later than 33 days. The time stated for completion shall include final cleanup of the premises.

(End of clause)

52.211-12 LIQUIDATED DAMAGES--CONSTRUCTION (SEP 2000)

(a) If the Contractor fails to complete the work within the time specified in the contract, the Contractor shall pay liquidated damages to the Government in the amount of $2030.00 for each calendar day of delay until the work is completed or accepted.

(b) If the Government terminates the Contractor's right to proceed, liquidated damages will continue to accrue until the work is completed. These liquidated damages are in addition to excess costs of repurchase under the Termination clause.

(End of clause)

52.211-18 VARIATION IN ESTIMATED QUANTITY (APR 1984)

If the quantity of a unit-priced item in this contract is an estimated quantity and the actual quantity of the unit-priced item varies more than 15 percent above or below the estimated quantity, an equitable adjustment in the contract price shall be made upon demand of either party. The equitable adjustment shall be based upon any increase or decrease in costs due solely to the variation above 115 percent or below 85 percent of the estimated quantity. If the quantity variation is such as to cause an increase in the time necessary for completion, the Contractor may request, in writing, an extension of time, to be received by the Contracting Officer within 10 days from the beginning of the delay, or within such further period as may be granted by the Contracting Officer before the date of final settlement of the contract. Upon the receipt of a written request for an extension, the Contracting Officer shall ascertain the facts and make an adjustment for extending the completion date as, in the judgement of the Contracting Officer, is justified.

52.219-4 NOTICE OF PRICE EVALUATION PREFERENCE FOR HUBZONE SMALL BUSINESS CONCERNS (JUL 2005)

(a) Definition. HUBZone small business concern, as used in this clause, means a small business concern that appears on the List of Qualified HUBZone Small Business Concerns maintained by the Small Business Administration.

(b) Evaluation preference. (1) Offers will be evaluated by adding a factor of 10 percent to the price of all offers, except--

(i) Offers from HUBZone small business concerns that have not waived the evaluation preference; and

(ii) Otherwise successful offers from small business concerns.

(2) The factor of 10 percent shall be applied on a line item basis or to any group of items on which award may be made. Other evaluation factors described in the solicitation shall be applied before application of the factor.

(3) A concern that is both a HUBZone small business concern and a small disadvantaged business concern will receive the benefit of both the HUBZone small business price evaluation preference and the small disadvantaged business price evaluation adjustment (see FAR clause 52.219-23). Each applicable price evaluation preference or adjustment shall be calculated independently against an offeror's base offer.

These individual preference amounts shall be added together to arrive at the total evaluated price for that offer.

(c) Waiver of evaluation preference. A HUBZone small business concern may elect to waive the evaluation preference, in which case the factor will be added to its offer for evaluation purposes. The agreements in paragraph (d) of this clause do not apply if the offeror has waived the evaluation preference.

___ Offeror elects to waive the evaluation preference.

(d) Agreement. A HUBZone small business concern agrees that in the performance of the contract, in the case of a contract for

(1) Services (except construction), at least 50 percent of the cost of personnel for contract performance will be spent for employees of the concern or employees of other HUBZone small business concerns;

(2) Supplies (other than procurement from a nonmanufacturer of such supplies), at least 50 percent of the cost of manufacturing, excluding the cost of materials, will be performed by the concern or other HUBZone small business concerns;

(3) General construction, at least 15 percent of the cost of the contract performance incurred for personnel will be spent on the concern's employees or the employees of other HUBZone small business concerns; or

(4) Construction by special trade contractors, at least 25 percent of the cost of the contract performance incurred for personnel will be spent on the concern's employees or the employees of other HUBZone small business concerns.

(e) A HUBZone joint venture agrees that in the performance of the contract, the applicable percentage specified in paragraph (d) of this clause will be performed by the HUBZone small business participant or participants.

(f) A HUBZone small business concern nonmanufacturer agrees to furnish in performing this contract only end items manufactured or produced by HUBZone small business manufacturer concerns. This paragraph does not apply in connection with construction or service contracts.

(End of clause)

52.228-1 BID GUARANTEE (SEP 1996)

(a) Failure to furnish a bid guarantee in the proper form and amount, by the time set for opening of bids, may be

cause for rejection of the bid.

(b) The bidder shall furnish a bid guarantee in the form of a firm commitment, e.g., bid bond supported by good and sufficient surety or sureties acceptable to the Government, postal money order, certified check, cashier's check, irrevocable letter of credit, or, under Treasury Department regulations, certain bonds or notes of the United States. The Contracting Officer will return bid guarantees, other than bid bonds, (1) to unsuccessful bidders as soon as practicable after the opening of bids, and (2) to the successful bidder upon execution of contractual documents and bonds (including any necessary coinsurance or reinsurance agreements), as required by the bid as accepted.-

(c) The amount of the bid guarantee shall be 20 percent of the bid price or $3,000,000, whichever is less.-

(d) If the successful bidder, upon acceptance of its bid by the Government within the period specified for acceptance, fails to execute all contractual documents or furnish executed bond(s) within 10 days after receipt of the forms by the bidder, the Contracting Officer may terminate the contract for default.-

(e) In the event the contract is terminated for default, the bidder is liable for any cost of acquiring the work that exceeds the amount of its bid, and the bid guarantee is available to offset the difference.

(End of clause)

52.236-1 PERFORMANCE OF WORK BY THE CONTRACTOR (APR 1984)

The Contractor shall perform on the site, and with its own organization, work equivalent to at least 20 percent of the total amount of work to be performed under the contract. This percentage may be reduced by a supplemental agreement to this contract if, during performing the work, the Contractor requests a reduction and the Contracting Officer determines that the reduction would be to the advantage of the Government.

(End of clause)

52.236-4 PHYSICAL DATA (APR 1984)

Data and information furnished or referred to below is for the Contractor's information. The Government shall not be responsible for any interpretation of or conclusion drawn from the data or information by the Contractor.

(a) The indications of physical conditions on the drawings and in the specifications are the result of site investigations by . . . . . . . . . [insert a description of investigational methods used, such as surveys, auger borings, core borings, test pits, probings, test tunnels].

(b) Weather conditions . . . . . . . . . (insert a summary of weather records and warnings).

(c) Transportation facilities . . . . . . . . . (insert a summary of transportation facilities providing access from the site, including information about their availability and limitations.

(d) . . . . . . . . . . (insert other pertinent information).

(End of clause)

52.252-2 CLAUSES INCORPORATED BY REFERENCE (FEB 1998)

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at this/these address(es):

http://farsite.hill.af.mil
http://www.acq.osd.mil/dpap/dars/dfars/index.htm

(End of clause)

52.252-6 AUTHORIZED DEVIATIONS IN CLAUSES (APR 1984)

(a) The use in this solicitation or contract of any Federal Acquisition Regulation (48 CFR Chapter 1) clause with an authorized deviation is indicated by the addition of "(DEVIATION)" after the date of the clause.

(b) The use in this solicitation or contract of any Federal Acquistion Regulation (48 CFR Chapter 1) clause with an authorized deviation is indicated by the addition of "(DEVIATION)" after the name of the regulation.

(End of clause)

252.236-7001 CONTRACT DRAWINGS AND SPECIFICATIONS (AUG 2000)

(a) The Government will provide to the Contractor, without charge, one set of contract drawings and specifications, except publications incorporated into the technical provisions by reference, in electronic or paper media as chosen by the Contracting Officer.

(b) The Contractor shall--

(1) Check all drawings furnished immediately upon receipt;

(2) Compare all drawings and verify the figures before laying out the work;

(3) Promptly notify the Contracting Officer of any discrepancies;

(4) Be responsible for any errors that might have been avoided by complying with this paragraph (b); and

(5) Reproduce and print contract drawings and specifications as needed.

(c) In general--

(1) Large-scale drawings shall govern small-scale drawings; and

(2) The Contractor shall follow figures marked on drawings in preference to scale measurements.

(d) Omissions from the drawings or specifications or the misdescription of details of work that are manifestly necessary to carry out the intent of the drawings and specifications, or that are customarily performed, shall not relieve the Contractor from performing such omitted or misdescribed details of the work. The Contractor shall perform such details as if fully and correctly set forth and described in the drawings and specifications.

(e) The work shall conform to the specifications and the contract drawings identified on the following index of drawings:

Title File Drawing No.
(SEE SECTION 00800, PARAGRAPH 5)

(End of clause)

252.247-7023 Transportation of Supplies by Sea (MAY 2002)

(a) Definitions. As used in this clause --

(1) "Components" means articles, materials, and supplies incorporated directly into end products at any level of manufacture, fabrication, or assembly by the Contractor or any subcontractor.

(2) "Department of Defense" (DoD) means the Army, Navy, Air Force, Marine Corps, and defense agencies.

(3) "Foreign flag vessel" means any vessel that is not a U.S.-flag vessel.

(4) "Ocean transportation" means any transportation aboard a ship, vessel, boat, barge, or ferry through international waters.

(5) "Subcontractor" means a supplier, materialman, distributor, or vendor at any level below the prime contractor whose contractual obligation to perform results from, or is conditioned upon, award of the prime contract and who is performing any part of the work or other requirement of the prime contract.

(6) "Supplies" means all property, except land and interests in land, that is clearly identifiable for eventual use by or owned by the DoD at the time of transportation by sea.

(i) An item is clearly identifiable for eventual use by the DoD if, for example, the contract documentation contains a reference to a DoD contract number or a military destination.

(ii) "Supplies" includes (but is not limited to) public works; buildings and facilities; ships; floating equipment and vessels of every character, type, and description, with parts, subassemblies, accessories, and equipment; machine tools; material; equipment; stores of all kinds; end items; construction materials; and components of the foregoing.

(7) "U.S.-flag vessel" means a vessel of the United States or belonging to the United States, including any vessel registered or having national status under the laws of the United States.

(b)(1) The Contractor shall use U.S.-flag vessels when transporting any supplies by sea under this contract.

(2) A subcontractor transporting supplies by sea under this contract shall use U.S.-flag vessels if—

(i) This contract is a construction contract; or

(ii) The supplies being transported are--

(A) Noncommercial items; or

(B) Commercial items that--

(1) The Contractor is reselling or distributing to the Government without adding value (generally, the Contractor does not add value to items that it contracts for f.o.b. destination shipment);

(2) Are shipped in direct support of U.S. military contingency operations, exercises, or forces deployed in humanitarian or peacekeeping operations; or

(3) Are commissary or exchange cargoes transported outside of the Defense Transportation System in accordance with 10 U.S.C. 2643.

(c) The Contractor and its subcontractors may request that the Contracting Officer authorize shipment in foreign-flag vessels, or designate available U.S.-flag vessels, if the Contractor or a subcontractor believes that --

(1) U.S.-flag vessels are not available for timely shipment;

(2) The freight charges are inordinately excessive or unreasonable; or

(3) Freight charges are higher than charges to private persons for transportation of like goods.

(d) The Contractor must submit any request for use of other than U.S.-flag vessels in writing to the Contracting Officer at least 45 days prior to the sailing date necessary to meet its delivery schedules. The Contracting Officer will process requests submitted after such date(s) as expeditiously as possible, but the Contracting Officer's failure to grant approvals to meet the shipper's sailing date will not of itself constitute a compensable delay under this or any other clause of this contract. Requests shall contain at a minimum --

(1) Type, weight, and cube of cargo;

(2) Required shipping date;

(3) Special handling and discharge requirements;

(4) Loading and discharge points;

(5) Name of shipper and consignee;

(6) Prime contract number; and

(7) A documented description of efforts made to secure U.S.-flag vessels, including points of contact (with names and telephone numbers) with at least two U.S.-flag carriers contacted. Copies of telephone notes, telegraphic and facsimile message or letters will be sufficient for this purpose.

(e) The Contractor shall, within 30 days after each shipment covered by this clause, provide the Contracting Officer and the Maritime Administration, Office of Cargo Preference, U.S. Department of Transportation, 400 Seventh Street SW., Washington, DC 20590, one copy of the rated on board vessel operating carrier's ocean bill of lading, which shall contain the following information:

(1) Prime contract number;

(2) Name of vessel;

(3) Vessel flag of registry;

(4) Date of loading;

(5) Port of loading;

(6) Port of final discharge;

(7) Description of commodity;

(8) Gross weight in pounds and cubic feet if available;

(9) Total ocean freight in U.S. dollars; and

(10) Name of the steamship company.

(f) The Contractor shall provide with its final invoice under this contract a representation that to the best of its knowledge and belief–

(1) No ocean transportation was used in the performance of this contract;

(2) Ocean transportation was used and only U.S.-flag vessels were used for all ocean shipments under the contract;

(3) Ocean transportation was used, and the Contractor had the written consent of the Contracting Officer for all non-U.S.-flag ocean transportation; or

(4) Ocean transportation was used and some or all of the shipments were made on non-U.S.-flag vessels without the written consent of the Contracting Officer. The Contractor shall describe these shipments in the following format:

| ITEM DESCRIPTION | CONTRACT LINE ITEMS | QUANTITY |
|---|---|---|
| | | |
| | | |
| | | |
| TOTAL | | |

(g) If the final invoice does not include the required representation, the Government will reject and return it to the Contractor as an improper invoice for the purposes of the Prompt Payment clause of this contract. In the event there has been unauthorized use of non-U.S.-flag vessels in the performance of this contract, the Contracting Officer is entitled to equitably adjust the contract, based on the unauthorized use.

(h) In the award of subcontracts for the types of supplies described in paragraph (b)(2) of this clause, the Contractor shall flow down the requirements of this clause as follows:

(1) The Contractor shall insert the substance of this clause, including this paragraph (h), in subcontracts that exceed the simplified acquisition threshold in part 2 of the Federal Acquisition Regulation.

(2) The Contractor shall insert the substance of paragraphs (a) through (e) of this clause, and this paragraph (h), in subcontracts that are at or below the simplified acquisition threshold in part 2 of the Federal Acquisition Regulation.

(End of clause)

SECTION 00900
General Decision Number: NJ030006 12/02/2005 NJ6

State: New Jersey sg 12/13/05

Construction Type: Heavy Dredging

Counties: Atlantic, Bergen, Camden, Cape May, Cumberland, Gloucester, Hudson, Mercer, Middlesex, Monmouth, Ocean, Salem and Union Counties in New Jersey.

STATEWIDE

All dredging except self-propelled hopper dredging on the Atlantic Coast and tributary waters emptying into the Atlantic Ocean

| Modification Number | Publication Date |
|---|---|
| 0 | 06/13/2003 |
| 1 | 05/21/2004 |
| 2 | 12/03/2004 |
| 3 | 05/06/2005 |
| 4 | 12/02/2005 |

* ENGI0025-001 10/01/2005

STATEWIDE

| | Rates | Fringes |
|---|---|---|
| Company Lead Dredgeman | | |
| Lead Dredgeman | $ 29.62 | 8.20+a+b |
| Dipper & Clamshell Dredge | | |
| Boat Captain | $ 23.70 | 7.60+a+b |
| Boat Master | $ 24.79 | 8.20+a+b |
| Deckhand, Tug Deckhand | $ 19.48 | 7.00+a+b |
| Engineer | $ 26.02 | 8.20+a+b |
| Maintenance Engineer | $ 25.14 | 7.60+a+b |
| Mate | $ 23.54 | 7.60+a+b |
| Oiler | $ 19.94 | 7.00+a+b |
| Operator | $ 29.62 | 8.20+a+b |
| Scowman | $ 19.43 | 7.00+a+b |
| Welder | $ 24.77 | 7.60+a+b |
| Diver | | |
| Diver | $ 41.53 | 6.87+a+b |
| Standby Diver | $ 27.85 | 6.87+a+b |
| Standby Tender | $ 23.26 | 6.27+a+b |
| Tender | $ 32.11 | 6.87+a+b |
| Drag Bucket Dredge | | |
| Deckhand | $ 16.17 | 5.25+a+b |
| Engineer | $ 21.41 | 6.45+a+b |
| Maintenance Engineer | $ 21.21 | 5.85+a+b |

| | | |
|---|---|---|
| Mate | $ 19.82 | 5.85+a+b |
| Operator | $ 25.09 | 6.45+a+b |
| Dredging Pipeline Cable-Laying | | |
| Control Tower Operator | $ 25.55 | 6.87+a+b |
| Diver Tender | $ 26.58 | 6.87+a+b |
| Diver | $ 42.42 | 6.87+a+b |
| Leverman | $ 28.83 | 6.87-a+b |
| Line up Operator, End Prep. | $ 18.47 | 5.67+a+b |
| Rigger | $ 19.07 | 5.67+a+b |
| Drill Boats | | |
| Blaster | $ 23.81 | 6.45+a-b |
| Core Driller | $ 19.00 | 5.25+a+b |
| Driller | $ 23.55 | 6.45+a+b |
| Engineer | $ 23.54 | 6.45+a+b |
| Machinist | $ 23.30 | 5.85+a+b |
| Oiler | $ 20.46 | 5.25+a+b |
| Tug Captain | $ 19.53 | 5.85+a+b |
| Tug Deckhand | $ 15.97 | 5.25+a+b |
| Tug Master | $ 20.48 | 6.45+a+b |
| Welder | $ 23.30 | 5.85+a+b |
| Engineer | | |
| 1st | $ 25.55 | 6.87+a+b |
| 2nd, 3rd and 4th | $ 25.23 | 6.87+a+b |
| Electrician | $ 25.68 | 6.87+a+b |
| Electro Hydro Technician | $ 20.79 | 6.27+a+b |
| Tug Captain | $ 23.44 | 6.87+a+b |
| Tug Master | $ 26.80 | 6.87+a+b |
| Hydraulic Dredge | | |
| Asst. Fill Placer | $ 23.35 | 8.20+a+b |
| Boat Captain | $ 23.70 | 7.60+a+b |
| Boat Master | $ 24.78 | 8.20+a+b |
| Chief Mate | $ 25.37 | 8.20+a+b |
| Chief Welder | $ 26.03 | 8.20+a+b |
| Deckhand | $ 19.88 | 7.00+a+b |
| Engineer | $ 25.47 | 8.20+a-b |
| Fill Placer | $ 25.37 | 8.20+a+b |
| Janitor/Porter | $ 19.04 | 7.00+a+b |
| Leverman | $ 29.62 | 8.20+a+b |
| Maintenance Engineer | $ 25.14 | 7.60+a+b |
| Mate | $ 23.54 | 7.60+a+b |
| Messman | $ 19.04 | 7.00+a+b |
| Night Cook | $ 19.55 | 7.00+a+b |
| Oiler | $ 19.94 | 7.00+a+b |
| Shoreman | $ 19.45 | 7.00+a+b |
| Spider Barge Operator | $ 24.56 | 7.60+a+b |
| Steward | $ 23.49 | 8.20+a+b |
| Welder-Dredge | $ 24.76 | 7.60+a+b |
| Tug Boats over 1000 H.P. with master or captain having license endorsed for 200 miles off shore | | |
| Tug Captain | $ 25.24 | 8.20+a+b |
| Tug Chief Engineer | $ 24.50 | 7.60+a+b |
| Tug Deckhand | $ 19.88 | 7.00-a+b |

Tug Engineer..............$ 24.03 7.60+a+b

PREMIUMS: Additional 20% for hazardous material work

FOOTNOTES APPLICABLE TO ABOVE CRAFTS:

a. PAID HOLIDAYS: New Year's Day, Martin Luther King, Jr.'s Birthday, Memorial Day, Good Friday, Independence Day, Labor Day, Veterans' Day, Thanksgiving Day and Christmas Day

b. VACATION: Seven percent (7%) of the straight time rate multiplied by the total hours worked.

---

WELDERS - Receive rate prescribed for craft performing operation to which welding is incidental.

---

Unlisted classifications needed for work not included within the scope of the classifications listed may be added after award only as provided in the labor standards contract clauses (29 CFR 5.5(a)(1)(ii)).

---

In the listing above, the "SU" designation means that rates listed under the identifier do not reflect collectively bargained wage and fringe benefit rates. Other designations indicate unions whose rates have been determined to be prevailing.

---

WAGE DETERMINATION APPEALS PROCESS

1.) Has there been an initial decision in the matter? This can be:

* an existing published wage determination
* a survey underlying a wage determination
* a Wage and Hour Division letter setting forth a position on a wage determination matter
* a conformance (additional classification and rate) ruling

On survey related matters, initial contact, including requests for summaries of surveys, should be with the Wage and Hour Regional Office for the area in

which the survey was conducted because those Regional Offices have responsibility for the Davis-Bacon survey program. If the response from this initial contact is not satisfactory, then the process described in 2.) and 3.) should be followed.

With regard to any other matter not yet ripe for the formal process described here, initial contact should be with the Branch of Construction Wage Determinations. Write to:

Branch of Construction Wage Determinations

Wage and Hour Division

U.S. Department of Labor

200 Constitution Avenue, N.W.

Washington, DC 20210

2.) If the answer to the question in 1.) is yes, then an interested party (those affected by the action) can request review and reconsideration from the Wage and Hour Administrator (See 29 CFR Part 1.8 and 29 CFR Part 7). Write to:

Wage and Hour Administrator

U.S. Department of Labor

200 Constitution Avenue, N.W.

Washington, DC 20210

The request should be accompanied by a full statement of the interested party's position and by any information (wage payment data, project description, area practice material, etc.) that the requestor considers relevant to the issue.

3.) If the decision of the Administrator is not favorable, an interested party may appeal directly to the Administrative Review Board (formerly the Wage Appeals Board). Write to:

Administrative Review Board

U.S. Department of Labor

200 Constitution Avenue, N.W.

Washington, DC 20210

4.) All decisions by the Administrative Review Board are final.

================================================================

END OF GENERAL DECISION

ACCOUNTING AND APPROPRIATION DATA

AA: 96X31230000 082421 2530HD2D5B012550 NA 96303
AMOUNT: $945,000.00
CIN 000000000000000000000000000000: $945,000.00

# Exhibit 10

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| TDM AMERICA, LLC,<br><br>Plaintiff<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant,<br><br>and<br><br>DONJON MARINE COMPANY, INC.,<br><br>Third-Party Defendant. | ) | No. 06-472 C<br><br>Judge Thomas C. Wheeler |

**DECLARATION OF DANIEL INKELAS**

I, Daniel Inkelas, declare and state under penalty of perjury that:

1. I am currently employed as Assistant Counsel for Litigation in the Office of Chief Counsel for the U.S. Army Corps of Engineers ("USACE").

2. In my position, I am responsible for helping coordinate responses to discovery requests that are directed to the USACE. I have also been involved in responding to discovery requests in the present case, including responses to certain interrogatories served by TDM.

3. I have reviewed "Plaintiff TDM America LLC's ("TDM") Identification of the United States of America's ("US") Dredging Contracts Understood To Provide For the Treatment of Dredged Material," (hereafter, "TDM's Identification of Contracts") that was served on Defendant's counsel on or about January 14, 2007. Specifically, I have reviewed the memorandum and all attachments to that document.

4. "TDM's Identification of Contracts" in Exhibits A through F lists 657 entries that TDM contends represent contracts from 32 different districts of the USACE. These entries were prepared from information on the USACE's public website.

5. I also understand that TDM selected these entries "because the US categorized the disposal type for dredged material as: (i) <u>upland</u>; (ii) beach nourishment and <u>upland</u>; (iii) open water and <u>upland</u>; or (iv) undefined." TDM's Identification of Contracts

Memorandum (Mem.) at 4. TDM also selected additional entries for which no disposal type was provided on the website. *Id.* at 5.

6. I am also aware that "TDM requests that the US review the data in the exhibits provided by TDM and provide TDM with a statement admitting or denying the accuracy of each entry on the exhibits. . . . Any entry that the US does not deny, and also provide its own entry of what it believes is more accurate, shall be deemed uncontested."

7. Where the US disagrees, TDM also states that the government "should, for each contract listed, (i) admit the volume treated, deny the volume treated, and, if denied, provide what the US asserts to be the volume along with the documentation and other evidence upon which the US relies; (ii) admit the actual cost and/or price paid for treatment, and, if denied, provide what the US asserts to be the actual cost and/or price paid for treatment along with the documentation and other evidence upon which the US relies; and (iii) admit the method employed for treatment, deny the method and, if denied provide the method utilized along with the documentation and other evidence upon which the US relies." TDM Mem. at 6.

8. As described further herein, TDM's requests will require a substantial amount of time and effort by the USACE in order to respond accurately and fully in the manner that TDM seeks.

9. Specifically, the USACE must first determine the contract numbers, if any, for each of the 657 entries in TDM's Identification of Contracts. Since TDM has listed only job names and has not identified the contract numbers associated with each entry, the USACE must search its records to locate any executed contract or contracts that are associated with each of the 657 entries. It is important to note that some projects referenced by TDM likely involve multiple contracts. Because all of the entries allegedly refer to contracts administered entirely by individual USACE districts, the USACE must conduct this task on a district-by-district basis.

10. Second, the USACE must locate personnel most knowledgeable about the financial and technical aspects of each of 657 entries. At a minimum, this will require one or more interviews in each of the 32 districts. Conceivably, this could require hundreds of interviews with USACE personnel who are familiar with the activities and documents associated with individual contracts that are implicated by TDM's entries.

11. Third, the USACE must work with those individuals to locate relevant contract documents in each of the 32 districts implicated by TDM's 657 entries in response to TDM's requests for treatment and financial information. Some contract records would be in paper form and some would be in electronic form. In many cases, locating contract documents may entail retrieving a substantial number of records from remote storage facilities.

12. Fourth, according to TDM's requests, the relevant files must be searched for specific documents that establish (i) whether dredged material was treated, (ii) if material

was treated, the treatment method used, (iii) if material was treated, the amount of treated materials, and finally (iv) the amounts, if any, paid specifically for treating dredged materials. With regard to the contracts that do not involve the treatment of dredged material, the documents necessary to establish that such work was not performed under the contract are the main contract and the modifications to that contract.

13. Finally, once the relevant documents are located, personnel at each district would have to coordinate with counsel to have the documents copied or scanned so that they could eventually be provided to TDM counsel in an orderly manner.

14. Accordingly, I would estimate that fully responding to TDM's requests as set forth above would take at least one year. The USACE would require substantially more time to produce additional documentation in addition to the main contract and modifications, if that were deemed necessary by the Court.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on: 8 Feb 2008 [signature]

DANIEL INKELAS

# Exhibit 11

DAVIDOFF MALITO & HUTCHER LLP

ATTORNEYS AT LAW
605 THIRD AVENUE
NEW YORK, NEW YORK 10158

(212) 557-7200
FAX (212) 286-1884
WWW.DMLEGAL.COM

GARDEN CITY
200 GARDEN CITY PLAZA
GARDEN CITY, N.Y. 11530
(516) 248-6400

MELVILLE
105 MAXESS RD., SUITE 124S
MELVILLE, NY 11747
(631) 574-4510

ALBANY
150 STATE STREET
ALBANY, N.Y. 12207
(518) 465-8230

WASHINGTON, D.C.
444 NORTH CAPITOL STREET, N.W.
WASHINGTON, D.C. 20001
(202) 347-1117

WRITER'S DIRECT: 646-428-3283
E-MAIL: maa@dmlegal.com

February 5, 2008

**BY E-MAIL (Walter.Brown2@usdoj.gov)**
**AND FIRST CLASS MAIL**

Walter W. Brown, Esq.
U.S. Department of Justice
Civil Division
1100 L. Street, NW
Suite 1100
Washington, DC 20001

**Re: TDM America, LLC v. The United States of America, et al**
**<u>Case No. 06-472C (Judge Thomas C. Wheeler)/Our Ref: 7683.001</u>**

Dear Walter:

This letter follows yesterday's telephone discussion during which you advised that the US requires one (1) year to comply with paragraph 7(b) of the Court's December 17, 2007 Discovery Order (the "Order") in the above-referenced action. Based upon this, you proposed alternative methods for providing the required information to TDM. This office requested a written proposal to review and assess.

During the telephone discussion, you stated that TDM's chart, provided pursuant to paragraph 7(a) of the Order, did not include the eighteen (18) contracts that are at issue in the US' motion for partial summary judgment. Please note that pursuant to paragraph 6 of the Order, the US was required to identify, by bates numbers, the documents that comprise the eighteen (18) contracts, including amendments and contractor submittals relating to treatment methods or quantities of dredged materials or treated materials. This information should have been provided before January 15, 2008; it was not. This is now the subject of TDM's pending renewed motion for sanctions against the US.

00370410.2

TDM did not ask for redundant information by including these contracts in the chart. Rather, TDM expected the US to comply with paragraph 6 of the Order. It is inherent in the Order that TDM should not include this information in TDM's chart because by January 15, 2008, the US should have identified and/or provided contracts, amendments and submittals relating to treatment methods and volumes.

With respect to the Navy and Coast Guard contracts, the US produced the contract documents. Therefore, TDM did not include these. The only way for us to ascertain additional information is to conduct a deposition which the Court provided for in the Order at paragraph 7(c).

Thank you for your attention to this matter. If you have any questions, please do not hesitate to call me.

Very truly yours,

Michael A. Adler

MAA/taf

cc: John E. Flaherty, Esq. (by e-mail)
Gary J. Campbell, Esq. (by e-mail)
David W. Denenberg, Esq.

00370410.2

# Exhibit 12

**U.S. Department of Justice**

Civil Division

WWB
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

Telephone: (202) 307-0341
Facsimile: (202) 307-0345

*Washington, DC 20530*

February 6, 2008

**BY FACSIMILE AND E-MAIL**

David W. Denenberg, Esq.
Davidoff Malito & Hutcher LLP
605 Third Avenue, 34th Floor
New York, New York 10158

Re: *TDM America, LLC v. United States*
Court of Federal Claims No. 06-0472C

Dear Mr. Denenberg:

In accordance with our discussion Monday and further to Mr. Adler's letter of February 5, 2008, I write regarding the government's response to TDM's January 14, 2008, Submission under paragraph 7 of the Court's December 17, 2007, Discovery Order. TDM's Submission contains over 650 job/project names in 32 districts that were obtained from the USACE website, which TDM contends represent USACE contracts for the treatment of dredged materials. TDM has included the majority of the entries on the basis (1) that upland disposal was, or may have been, used and (2) that most, if not all, of upland disposed material was treated for those entries. The remaining entries do not disclose a disposal type as they are listed on the USACE website.

As I explained during our discussion, paragraph 7(b) of the Discovery Order requires the government to admit or deny the accuracy of each of TDM's entries and provide what it believes "is the accurate data along with the basis of its [the government's] understanding and the document(s) upon which it relies." The government, however, believes that the vast majority of TDM's entries do not relate to contracts involving the treatment of dredged material, and further, that its amended interrogatory response accurately identified the 20 USACE contracts that involved treatment at the time that response was made. Accordingly, the government believes that responding to TDM's entries would require the government to not only identify what contract numbers correspond to each entry, but also provide documentation to prove the negative--namely, that each identified contract does not involve the treatment of dredged materials.

We believe this would require the government to locate, copy, and produce the main contract and corresponding modifications for each contract implicated by each of TDM's 657 entries. The government believes this process would take at least one year to complete.

As an alternative to this lengthy process that may yield no relevant information, we propose that the government provide declarations from knowledgeable personnel in each of the 32 districts at issue. These declarations would either confirm that a particular district had executed no contracts (for a particular time period) involving the treatment of dredged materials or identify any contracts that involved treatment. You indicated that TDM could agree to such a procedure, provided that the declarations broadly addressed alleged treatment activities, and that the government could provide you with a written proposal specifying the contents of the declarations.

Accordingly, we propose that the government provide sworn declarations that include the following:

1) Declarants from each of the 32 districts implicated by TDM's Submission;

2) Statements that the declarant has considered all of the TDM entries relating to that district;

3) Statements identifying all of the contracts, by contract number, that are implicated by TDM's entries for that district (not including the 20 USACE contracts identified in the government's interrogatory responses);

4) Statements that confirm that no dredged material was treated under these contracts and/or identify contracts that, in fact, involved treatment activities as well as known information and documents regarding the volumes of treated materials, the amount paid for such treatment, and, if available, the methods of treatment (for those contracts not identified in the government's interrogatory responses); and

5) Statements that the declarant has investigated whether any other contracted dredging activities awarded from fiscal year 1999 to present involve the treatment of dredged material and the conclusions drawn from that investigation.

Completing this task will take approximately 3 months. If TDM agrees to this proposal, the government will inform the Court of our agreement in an unopposed motion. This motion will set forth our agreement on declarations and state that this procedure will constitute a complete response by the government under paragraph 7(b) of the Discovery Order. The motion will also extend the time for the government's response by 3 months. A draft of this motion will be provided to TDM counsel before filing.

In Mr. Adler's letter of yesterday, he indicated that TDM wished to conduct a deposition regarding the identified U.S. Navy and U.S. Coast Guard contracts involving treatment of dredged materials under paragraph 7(c) of the Court's order. While these contracts were not included in TDM's Submission under paragraph 7(a), the government will produce deponents from the Coast Guard and Navy for the topics of paragraph 7. Because two separate federal

agencies are involved, one deponent would not be a possibility. We would also request that these depositions occur after the completion of the government's submission under paragraph 7(b), and, further, that the Court also be informed of this agreement in the unopposed motion discussed above.

Let me know if you have any questions regarding this proposal and whether TDM agrees with it. In view of our February 13, 2007, deadline to respond to TDM's Submission, the government would like to reach an agreement with TDM and file an appropriate motion with the Court this week.

Very truly yours,

Walter W. Brown
Attorney
Commercial Litigation Branch
Civil Division

cc (by e-mail): John E. Flaherty, Esq.
Gary J. Campbell, Esq.

P.01

TRANSACTION REPORT

FEB-06-2008 WED 11:20 AM

FOR:

SEND

| DATE | START | RECEIVER | TX TIME | PAGES | TYPE | NOTE | M# | DP |
|---|---|---|---|---|---|---|---|---|
| FEB-06 | 11:19 AM | 912122861884 | 43" | 4 | FAX TX | OK | 467 | |

TOTAL : 43S PAGES: 4

February 6, 2008

DEPARTMENT OF JUSTICE
QUI PRO DOMINA JUSTITIA SEQUITUR

**IMPORTANT:** This facsimile is intended only for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected from disclosure under applicable law. If the reader of this transmission is not the intended recipient or the employee or agent responsible for delivering the transmission to the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this transmission or it's contents is strictly prohibited. If you have received this transmission in error, please notify us by telephoning and return the original transmission to us at the address given below.

**FROM:** Commercial Litigation Branch
Civil Division
U. S. Department of Justice
Washington, D.C. 20530

Fax No. (202) 307-0345
Voice No. (202) 307-0341

**SENT BY:** Walter W. Brown

**TO:** David W. Denenberg, Esq.
DAVIDOFF, MALITO, & HUTCHER LLP

**FAX No.** (212) 286-1884

**NUMBER OF PAGES SENT (INCLUDING COVER PAGE):** 4

**SPECIAL INSTRUCTIONS:**

# Exhibit 13

**Brown, Walter (CIV)**

**From:** Denenberg, David W. [dwd@dmlegal.com]

**Sent:** Friday, February 08, 2008 5:05 PM

**To:** Brown, Walter (CIV)

**Subject:** FW: Update

Wally:

This office cannot respond to your February 6 letter by the end of the week. I was out of the office today and both Ritch Studer and Rick Redle have had the flu. We will respond on Monday. Thank you.

Dave

***********************************************************************
STATEMENT OF CONFIDENTIALITY
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, please notify us immediately by email reply to sender or by telephone to Davidoff Malito & Hutcher LLP at (800) 793-2843, ext. 3281, and destroy all copies of this message and any attachments.
***********************************************************************

# Exhibit 14

DAVIDOFF MALITO & HUTCHER LLP

ATTORNEYS AT LAW
605 THIRD AVENUE
NEW YORK, NEW YORK 10158

(212) 557-7200
FAX (212) 286-1884
WWW.DMLEGAL.COM

GARDEN CITY
200 GARDEN CITY PLAZA
GARDEN CITY, N.Y. 11530
(516) 248-6400

MELVILLE
105 MAXESS RD., SUITE 124S
MELVILLE, NY 11747
(631) 574-4510

ALBANY
150 STATE STREET
ALBANY, N.Y. 12207
(518) 465-8230

WASHINGTON, D.C.
444 NORTH CAPITOL STREET, N.W.
WASHINGTON, D.C. 20001
(202) 347-1117

WRITER'S DIRECT: 646-428-3210
E-MAIL: dwd@dmlegal.com

February 11, 2008

**BY E-MAIL (Walter.Brown2@usdoj.gov)**
**AND FIRST CLASS MAIL**

Walter W. Brown, Esq.
United States Department of Justice
Civil Division
1100 L Street, NW
Suite 1100
Washington, D.C. 20001

**Re: TDM America, LLC v. The United States of America, et al**
**Case No. 06-472C (Judge Thomas C. Wheeler)/Our Ref: 7683.001**

Dear Mr. Brown:

I am writing in response to your letter dated February 6, 2008.

Your letter was requested at our insistence to assure a clear understanding and to avoid any mischaracterizations or ambiguities regarding our telephone conversation on February 4, 2008. This did not happen. For example, you state, in your proposal, that "TDM could agree" to a procedure wherein the US would provide declarations instead of the information required by paragraph 7.b. of the Court's December 17, 2007 Discovery Order (the "Discovery Order"). No such representation was made on behalf of TDM. TDM expects the US to provide the substantive information ordered by the Court, which TDM has requested since November 2006.

The US failed to fulfill its discovery obligations despite having information readily summarized on the U.S. Army Corps of Engineers' ("USACE's") websites as recently furnished to the US by TDM. One recent example is the US' failure to identify certain dredging contracts for one of the largest ports in North America -- San Francisco, which is a USACE district where the USACE participates in dredging contracts. In many instances,

00370651

information has been less than forthcoming. TDM has no confidence that the substantive information required in paragraph 7.b. of the Discovery Order will be provided under the guidelines of the US' proposal, especially without contract identification, data and documentation that must form the basis for any response by the US. The Discovery Order requires, *inter alia*, the US to identify and provide data and other substantive information to TDM by February 13, 2008; to wait another three (3) months for far less information or another year for the very information the Court ordered to be provided is unreasonable.

The Discovery Order is the result of the US' failure to identify and provide pertinent information after having more than fifteen (15) months to do so as well as TDM's motion to compel and, ultimately, TDM's motion for sanctions related to the US' initial disclosures and responses (or lack thereof) to TDM's interrogatories and document demands from November 2006. The US agreed to the requirements and time frames set forth in the Discovery Order. The Discovery Order specifically referred to, among other things, information provided by the USACE in its website. TDM has been consistent in arguing that, although the requested discovery should have been provided, it never was. TDM moved to compel this information and, by order dated April 30, 2007, the Court granted that motion and required complete responses to interrogatories and document demands within thirty (30) days of that order. For more than another six (6) months, TDM granted extensions to the US to provide this information to no avail. Thereafter, TDM moved for sanctions. In hearings before the Court a year ago and in correspondence, counsel for the US stated that it would take much time to get the information from each district. Now you state that the US cannot comply with paragraph 7.b. of the Discovery Order for another year.

Although TDM initially requested that the US identify the volumes, disposal and/or reuse thereof, and the processes employed throughout the United States for treatment of dredge material, TDM narrowed the information sought to instances in which a portion of the dredged material is categorized by the US as "upland disposal". TDM overlooked additional volumes that may have been treated. Based upon the US' own witnesses' testimony that "the majority of dredge sediments placed upland were treated," TDM agreed to have the US provide only those contracts and related information where a portion of the dredge materials was disposed upland. Then, even though TDM provided the US with this narrowed information from the USACE website, the US still wants another year to comply with the Discovery Order.

Your representation that the US was somehow surprised by TDM's charts is perplexing. As required by the Discovery Order, TDM summarized the existing USACE web page information in a manner to assist the US in focusing only on those contracts described by the USACE as having upland disposal. All along, and in all of TDM's discovery requests, including interrogatories, document demands and depositions, as well as the 30(b)(6) depositions, TDM focused on information provided by the USACE in its website. None of the entries in TDM's charts derive from any place other than the USACE website or other public information so there should be no surprise as to the magnitude of the contracts subject to review.

TDM is of the position that the Court acknowledged the discovery, number of extensions and the length of time already spent in the discovery process. The Court understood the costs to TDM involved in this protracted discovery period. It understood that the US had over a year, by that point, to provide this information and expected that the US had made efforts to comply with discovery. The Court also expected that the US had taken TDM's motion to compel and motion for sanctions seriously and was not simply ignoring the Court's discovery rules and orders. That is why the Court set February 13, 2008 as the date to comply with section 7.b. It is unreasonable for the US to now request another three (3) months to provide considerably less than what the Court ordered to be provided by February 13, 2008 in a time frame far less that the one year time frame the US has indicated is necessary to identify and review such documentation.

For all the above reasons, TDM does not accept the US' proposal.

Thank you for your attention to this matter. Please call me if you have any questions.

Very truly yours,

David W. Denenberg

DWD/lsh

cc: John E. Flaherty, Esq. (by e-mail)
Gary J. Campbell, Esq. (by e-mail)
Michael A. Adler, Esq. (by e-mail)
Dimitra Tzortzatos, Esq. (by e-mail)

00370651

**Brown, Walter (CIV)**

**From:** Denenberg, David W. [dwd@dmlegal.com]
**Sent:** Monday, February 11, 2008 2:34 PM
**To:** Brown, Walter (CIV)
**Cc:** Flaherty, John; Campbell, Gary; Adler, Michael A.; Tzortzatos, Dimitra
**Subject:** TDM v. US
**Attachments:** 1093_001.pdf

<<1093_001.pdf>>
Dear Mr. Brown:

Please see the attached letter.

Dave Denenberg

*****************************************************************
STATEMENT OF CONFIDENTIALITY
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, please notify us immediately by email reply to sender or by telephone to Davidoff Malito & Hutcher LLP at (800) 793-2843, ext. 3281, and destroy all copies of this message and any attachments.
*****************************************************************