**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| TDM America, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant.<br><br>and<br><br>Donjon Marine Company, Inc.,<br><br>Interested Party. | Civil Action No. 06-472 C<br>Judge Thomas C. Wheeler |

**TDM AMERICA LLC'S MEMORANDUM OF LAW IN OPPOSITION TO THE UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF TDM'S CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND TO STRIKE THE US' MOTION**

# TABLE OF CONTENTS

I. **PRELIMINARY STATEMENT** .......... 1

II. **THE FACTS** .......... 4

A. **Forming a Dredging Contract with the US** .......... 4

B. **The US' Contract Specifications** .......... 7

C. **The Authorization for the Processing Methods in the US' Contracts** .......... 12

Contract No. W912DS-07-C-0003 .......... 12
Contract No. W912DS-06-C-0018 .......... 17
Contract No. W912DS-05-C-0003 .......... 19
Contract No. W912DS-05-C-0004 .......... 20
Contract No. W912DS-05-C-0020 .......... 22
Contract No. W912DS-04-C-0008 .......... 23
Contract No. W912DS-04-C-0016 .......... 26
Contract No. DACW51-03-C-0001 .......... 29
Contract No. DACW51-03-C-0012 .......... 32
Contract No. DACW51-03-C-0014 .......... 33
Contract No. DACW51-03-C-0019 .......... 34
Contract No. W912DS-03-C-0021 .......... 36
Contract No. DACW51-02-C-0001 .......... 37
Contract No. DACW51-02-C-0002 .......... 39
Contract No. DACW51-02-C-0019 .......... 40
Contract No. DACW51-02-C-0022 .......... 41
Contract No. DACW51-01-C-0006 .......... 42
Contract No. DACW51-01-C-0023 .......... 43

D. **The US' Marketing of the Treatment of Dredged Materials for Beneficial Reuse** .......... 44

III. **APPLICABLE LAW** .......... 45

A. **The Summary Judgment Standard** .......... 45

B. **The US' Waiver of Immunity** .......... 46

C. **The Authorization Clause** .......... 46

D. **The US' Motion Should Be Stricken** .......... 49

IV. **CONCLUSION** .......... 50

# TABLE OF AUTHORITIES

Page No.

## Cases

*Advanced Software Design Corp. v. Federal Reserve Bank of St. Louis*
No. 4:07CV185 CDP, 2007 WL 3352365 at *4 (E.D. Mo. Nov. 9, 2007) .............................46

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242, 249 (1986) .............................45

*Carrier Corp. v. U.S.*
534 F.2d 244 (Ct. Cl. 1976).............................49

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986) .............................45

*Ledford v. US*
297 F.3d 1378, 1381 (Fed. Cir. 2002) .............................46

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*
475 U.S. 574, 587 (1986) .............................45

*Sevenson Envtl. Serv. v. Shaw Envtl., Inc.*
477 F.3d at 1361, 1366, 1367 (Fed. Cir. 2007) .............................46, 47, 48, 49

## Statutes

28 U.S.C. §1498 .............................46, 47

28 U.S.C.A. §1498(a) .............................2, 3

## Rules

RCFC 37 .............................40

RCFC 56(h)(1).............................49

RCFC 56(h)(2).............................1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TDM America, LLC,<br>Plaintiff,<br>v.<br>THE UNITED STATES OF AMERICA,<br>Defendant.<br>and<br>Donjon Marine Company, Inc.,<br>Interested Party. | Civil Action No. 06-472 C<br>Judge Thomas C. Wheeler |

**TDM AMERICA LLC'S MEMORANDUM OF LAW IN OPPOSITION TO THE UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF TDM'S CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND TO STRIKE THE US' MOTION**

Plaintiff TDM America, LLC ("TDM") respectfully submits this memorandum in opposition to the United States' (the "US") motion for partial summary judgment for lack of subject matter jurisdiction (the "US' motion") and in support of TDM's cross-motions for partial summary judgment and to strike the US' motion pursuant to RCFC 56(h). The US' motion is nothing more than a "shot in the dark." It is plainly preposterous and should be dismissed in its entirety.

## I. PRELIMINARY STATEMENT

In this patent infringement litigation, TDM charged the US with infringement of four United States patents that are directed to methods and processes for treating and/or processing[1]

[1] As used herein, the terms "treating" and "processing" dredged material are interchangeable.

dredged materials.[2] These methods and processes are generally directed to in-situ (in-barge) and land-based techniques for solidifying and stabilizing contaminated dredged materials with an additive, such as portland cement,[3] so that the treated end product can be beneficially reused and disposed upland in an environmentally safe manner. The end product of the treated dredged materials is important to the US because contaminated dredged materials removed from a US port, harbor or other location cannot be placed back into the ocean, at the mud dumps or at the Historic Area Remediation Site ("HARS")[4] because federal, state and other guidelines restrict such disposal of contaminated dredged materials. (Denenberg Dec., Ex. 1, pp. 34, 61-62). The end product of the treated dredged materials can, however, be placed upland for beneficial reuse as, *inter alia*, structural fill material. (Denenberg Dec., Ex. 1, pp. 59-67). As explained below, each US bid for a dredging contract contains separate line items for pricing and estimated amounts of materials to be dredged under a specific contract. Some of the contract line items are for dredged materials suitable for placement at HARS, and other contract line items are for dredged materials that are unsuitable for placement at HARS. Material unsuitable for placement at HARS requires treatment to decontaminate and solidify the dredged materials so that the end product can be placed upland for beneficial reuse. (Denenberg Dec., Ex. 1, pp. 34, 61-62, 59-67).

---

2 The four US patents-in-suit are: U.S. Patent No. 6,293,731, issued September 25, 2001 and entitled "Method for Treatment for Dredged Materials to Form a Structural Fill"; U.S. Patent No. 5,542,614, issued August 6, 1996 and entitled "Processing of Waste Material"; U.S. Patent No. 5,794,862, issued August 18, 1998 and entitled "Processing of Waste Material"; and U.S. Patent No. 5,007,590, issued April 16, 1991 and entitled "Apparatus and Method for Mixing Solid or Semi-Solid Wastes with Additives."

3 Portland cement is a type of cement with specific characteristics, but does not imply a specific manufacturer.

4 Historically, most of the dredged material was disposed in the Atlantic Ocean, in and around an area known as New York Bight Dredged Material Site, commonly referred to as the mud dumps. HARS is an ocean disposal site designated in September 1997 by the US Environmental Protection Agency for placement of non-contaminated dredged material from the ports of New York and New Jersey. (Denenberg Dec., Ex. 1 at p. 79).

TDM sued the US for infringement of the patents-in-suit because federal law prohibits directly suing each of the individual contractors in district court. 28 U.S.C.A. §1498(a). Had TDM brought an action against the individual contractors in US district courts, the contractors would have moved to dismiss under 28 U.S.C.A. §1498(a). Here, the US moves for summary judgment urging lack of jurisdiction. However, the US' argument is predicated on the misguided allegation that it did not authorize its dredging contractors to use infringing methods for treating dredged materials -- but nothing is further from the truth.

The US authorized, consented to and was fully aware of the processes for treatment of the dredged materials; and in many contracts, even dictated where the processing of dredged materials must occur. The US also actively oversaw its dredging contractor's processing of dredged materials with quality control experts and inspectors.[5] Beginning with the US' solicitation for bids on dredging projects, continuing through contract negotiation and award, and ending with contract completion, the US unequivocally authorized each and every contractor and/or processor and the respective method or process utilized to treat dredged materials. Notably, with respect to the eighteen (18) contracts subject to the US' motion (the "contracts at issue"), there are only three (3) processors - Donjon Marine Company, Inc. ("Donjon"), Clean Earth Dredging Technologies, Inc. ("Clean Earth"), and OENJ (Cherokee) Processing Group (EIC Associates, Inc.) ("OENJ") - and only three (3) processing facilities at issue.

As more fully set forth below, for each of the contracts at issue, US contractors and subcontractors used the processes and methods for treating dredged materials covered by claims in

[5] See February 28, 2008 Declaration of David W. Denenberg ("Denenberg Dec."), Ex. 1 at pp. 24, 43-44; Ex. 2 at pp. 36-37, Ex. 3 at pp. 59-60; See for examples, Ex. 4 at bates no. G010250 0069; Ex. 5 at bates no. G01010 05540; Ex. 6 at bates no. G01010 07402; Ex. 7 at bates no. G01010 06754; Ex. 8 at bates no. G01010 11582; Ex. 9 at bates no. G01010 06222; Ex. 10 at bates no. G01010 05935; Ex. 11 at bates no. G003269; Ex. 12 at bates no. G01010 03704.

the patents-in-suit to comply with the specifications and written provisions which are an integral part of their respective contracts. As will be shown herein, it is clear that the US authorized and consented to the use of the infringing methods for the treatment of dredged materials used in the performance of the contracts at issue.

## II. THE FACTS

### A. Forming a Dredging Contract with the US

The US' dredging contracts provide for treating dredged materials with an additive as contemplated by the patents-in-suit.[6] The amount of dredged materials for such contracts are in the hundred thousands of cubic yards and the dollar amounts allotted for treating dredged materials, generally, are in the millions -- even hundreds of millions.[7]

Dredging contracts are long and highly technical documents, the formation of which begins with the bid process and is a detailed and lengthy process. (For example, see Denenberg Dec., Ex. 7; Ex. 30; Ex. 31; Ex. 32; Ex. 33; Ex. 34). The US' procedure for awarding a dredging contract begins when the US releases an invitation for bid ("IFB"). (Denenberg Dec., Ex. 2 at

---

6 Denenberg Dec., Ex. 13 at bates nos. G01015 00428-G01015 00432; Ex. 14 at bates nos. G01010 504760-G01010 504763; Ex. 15 at bates nos. G01003 00229-G01003 00251; Ex. 16 at bates no. G01003 00467-G01003 00487; Ex. 17 at bates no. Donjon 006384; Ex. 18 at bates nos. Donjon 008608-Donjon 008610; Ex. 19 at bates nos. G01025 00996-G01025 01005; Ex. 20 at bates nos. G01025 00956-G01025 00962; Ex. 21 at bates nos. Donjon 008727-Donjon 008734; Ex. 22 at bates nos. G010125 01590-G010125 01594; Ex. 23 at bates nos. G01015 00003-G01015 00019; Ex. 24 at bates nos. G01014 07731-G01014 007749; Ex. 25 at bates nos. G01025 00243-G01025 00246; Ex. 26 at bates nos. G01025 00428-G01025 00448; Ex. 27 at bates nos. Donjon 007852-Donjon 007855; Ex. 28 at bates nos. Donjon 005436-Donjon 005439; Ex. 29 at bates nos. G01015 05150-G01015 05153 and G01015 05215-G01015 05312; Ex. 72; Ex. 73 at bates nos. G01005 05643-G01005 05645; Ex. 74; Ex. 75 at bates nos. G01006 00003-G01006 00012.

7 Denenberg Dec., Ex. 30 at bates no. G01005 07485; Ex. 35 at bates nos. G01004 00137-G01004 00139 and bates nos. G01004 00142-G01004 00149; Ex. 36 at bates nos. G01010 12837, G01010 12839, and G01010 12841-G01010 12843; Ex. 37 at bates nos. G01010 05260, G01010 05264, G01010 05266, and G01010 05270; Ex. 38 at bates no. G01013 11601; Ex. 39 at bates nos. G01010 12726-G01010 12732; Ex. 40 at bates nos. G01010 06793-G01010 06796; Ex. 41 at bates nos. G01010 06239-G01010 06241; Ex. 42 at bates no. G01010 05966; Ex. 43 at bates nos. G01010 04820 and G01010 04825; Ex. 44 at bates nos. G01004 00005-G01004 00009; Ex. 45 at bates nos. G01010 09500-G01010 09508; Ex. 46 at bates no. G01010 03155; Ex. 47 at bates no. G01013 02741; Ex. 48 at bates no. G0101009229; Ex. 50 at bates nos. G01014 01505-G01014 01599.

pp. 9-17). The IFB contains a bid template (which eventually becomes the base contract) that includes the line items for the contract. (*Id.*). For the contracts at issue, the bid template typically includes a specific line item for processing, disposal and dewatering of dredged materials for upland disposal. (See n.7). The IFBs also contain, *inter alia*, the specifications for every dredging contract. (Denenberg Dec., Ex. 2 at p. 11). In fact, the IFB, specifications, submittals and attachments thereto constitute the written provisions which form a part of the contract that contains the US' authorization. Of course, at times, such written authorization is further evidenced through amendments and/or written communication from US contract officers.

For each of the contracts at issue, the specifications incorporate section 00800 entitled "The Special Contract Requirements" (the "special contract requirements") and section 2900 (sometimes section 1200) entitled "The Technical Requirements Section," "The Technical Specifications Section" or "The Dredging and Disposal Section" (the "technical requirements"). The special contract requirements and the technical requirements require contractors to submit a proposed plan that describes, among other things, the processing/disposal facility, a detailed description of the methods and processes that will be used to treat the dredged materials, and copies of all applicable state regulatory permits for the processing of the dredged materials and for the processing/disposal sites (the "submittals").[8]

---

[8] Denenberg Dec., Ex. 2 at pp. 9-17; Ex. 4 at bates nos. G01025 00085-G01025 00090; Ex. 5 at bates nos. G01010 05393-G01010 05398; Ex. 6 at bates nos. G01010 07203-G01010 07207; Ex. 7 at bates nos. G01010 06644-G01010 06649 and G01010 06761-G01010 06762; Ex. 8 at bates nos. G01010 11499-G01010 11504 and G01010 11580-G01010 11582; Ex. 9 at bates nos. G01010 06065-G01010 06070; Ex. 10 at G01010 05780-G01010 05784 and G01010 05938; Ex. 11 at bates nos. G003272-G003275; Ex. 12 at bates nos. G01010 03535-G01010 03540 and G01010 03702-G01010 03705; Ex. 51 at bates nos. Donjon 007791-007800 and Donjon 007682-007686; Ex. 52 at bates nos. G01010 04650-G01010 04655 and G01010 04790; Ex. 53 at bates nos. G01010 11165-G01010 11167 and G01010 11270-G01010 11275; Ex. 54 at bates nos. G01010 09326-G01010-09328 and bates nos. G01010 09433-G01010 09436; Ex. 55 at bates nos. G009227-009238; Ex. 56 at G01010 07793-G01010 07799; Ex. 57 at bates nos. G009063-G009069; Ex. 58 at bates nos. G01010 03129-G01010 03136.

It is only after the US approves these submittals that a contract will be awarded to a bidder. (Denenberg Dec., Ex. 2 at pp. 9-17). The RCFC 30(b)(6) deposition of Donjon confirms this. Donjon's RCFC 30(b)(6) deponent, Kerri Mullins, testified, in relevant part:

> Q. In the event the IFB requires that certain material be treated with an additive for upland disposal, is Donjon required to submit a description of the processing of the dredge material in response to the IFB, via the 10-day submittal or the final submittal?
>
> A. Yes.
>
> * * *
>
> Q. No[w], do you have the right to change the process, if you want to, for the treatment of dredge material?
>
> A. Not that I know of.

(Denenberg Dec., Ex. 2 at pp. 11-18, 24, 28). Importantly, these submittals form a part of the contract to which contractors must comply. Even before a contract is awarded, the US is keenly aware of the processes for treatment of dredged materials and the disposal sites for same because a contractor selected as the apparent lowest bidder[9] is required to submit this information as part of a disposal/work plan pursuant to the contract specifications.[10] That is, the contract requires the contractor to provide the US with a detailed description of the process for treating dredged materials which is subject to US review, authorization, consent and approval prior to award of the contract. (*Id.*). Further, that process cannot be changed without US approval and consent. (*Id.*).

---

9 "Apparent lowest bidder" is the term used to refer to a winning bid by a contractor before that contractor is formally awarded the contract. This is because the contractor must submit additional information to the US, as required under the contract's special contract requirements and technical requirements.

10 See p. 5 n.8.

## B. <u>The US' Contract Specifications</u>

As explained above, the US' IFBs for the contracts at issue contain the specifications and plans for the contracts. (Denenberg Dec., Ex. 2 at pp. 9-17). For the years 2000-2003, the US' specifications for dredging contracts included a requirement that **all** dredged materials be processed and disposed at OENJ. (Denenberg Dec., Exs. 41, 45, 46, 48, 49 and 50). The technical requirements for these dredging contracts either (i) contractually authorize processing and disposal of dredged materials at OENJ or (ii) list OENJ as an approved site for processing and disposal. (*Id.*).

For example, section 2900 of the specifications for contract no. DACW51-C-02-0001 states in relevant part:

> **The Government has identified the following sites for the processing and disposal of "non-rock material that is unsuitable for placement at the HARS."** The Contractor shall coordinate with the operator of the disposal facility to ensure that the necessary facility requirements are included in the Contractor's bid price. **The Contractor is required to use the sites identified below.** The Contractor shall submit a schedule and the anticipated quantity to be disposed of at the disposal site at the pre-construction meeting.
>
> **1) The following site shall be the only upland site used for Item Number 001AC in the price schedule.**
>
> **Disposal Site: Bayonne Golf Course**
> **Operator: Cherokee/OENJ**
> **Location: 61 North Hook Road, Bayonne, NJ 07002**
> **Point of contact: Mr. Irving Cohen, President**
> **Phone number: 212 904-0705**
> **Location of Unloading Facility: Northeast corner of the property**

(Denenberg Dec., Ex. 58 at bates nos. G01010 03133-G01010 03134) (emphasis added). Thus, the US explicitly provided its written authorization to use OENJ as the processor.

In or about early 2004, OENJ shut down its processing plant. (Denenberg Dec., Ex. 59 at pp. 135-136; Ex. 60 at pp. 18-19). Thereafter, US contracts and specifications ceased to

authorize OENJ as an approved or designated processing site for the treatment of dredged materials. However, subsequent US contracts and specifications for dredging contracts required the contractors to identify a processing and disposal site for US approval.[11] These specifications contained the special contract requirements directing the potential bidder to submit for approval a plan describing in detail, *inter alia*, its proposed process for treating dredged materials. Specifically, a standard special contract requirements section states, in relevant part:

> 1.45 The Apparent low bidder must demonstrate to the Government within 70 calendar days from the date the Apparent low bidder is notified of being the low bidder; that the contractor identified offloading, **processing** and disposal site(s) is **operational, capable of processing and disposing of all the dredged material on that date for the in-situ quantity as per the Supplies/Services (Price) Schedule** and is in compliance with the New Jersey Department of Environmental Protection and/or with the New York State Department of State Coastal Zone Management Program Policies or other host state compliance as appropriate for the offloading, processing and disposal of dredged material.
>
> The contractor identified offloading, processing and disposal site(s) must have sufficient capacity to receive all the dredged material from the project site. **The apparent low bidder is required to perform all work to demonstrate that the contractor identified offloading, processing and disposal site(s) is permitted, operational, capable of processing and disposing of all dredged material on that date for the in-situ quantity as per the Supply/Service (Price) Schedule and is in compliance with the New Jersey Department of Environmental Protection** and/or with the New York State Department of State Coastal Zone Management Program Policies or other host state compliance as appropriate for the disposal of dredged material. Offloading, **processing** and disposal of **the dredged material shall be in a fully permitted facility that has been permitted by the host state, with beneficial reuse wherever possible.** Dredging, dewatering and/or **other processing (if any), transfer, transportation** and material disposal shall be performed in accordance with applicable laws and requirements of all associated permits, approvals and government authorities having jurisdiction.

[11] See p. 5 n.8.

The Apparent Low Bidder shall be officially notified by the contracting officer and instructed to submit the following information, within 5 Calendar days from the date the Apparent Low Bidder is notified of being the low bidder, for the site(s):

The Apparent Low Bidder must submit five (5) copies of:

a) Name of the contractor identified offloading, processing and disposal site(s).

Narrative of **no more than seven (7) pages** detailing the operation to move the dredged material from the dredging site to its final resting place that the apparent low bidder has identified. The synopsis shall provide suitable detail to adequately track the material from dredging, through offloading, transportation and processing to its ultimate placement. The information identified in paragraph 1A.1 shall be attached to the synopsis. The synopsis shall include the following:

1) Provide a list of the names, locations, and point of contact, telephone number, offloading and loading facilities for each processing and/or disposal facility including site capacity.

b) **Evidence Demonstrating that the contractor identified offloading, processing and disposal site(s) is Permitted, Operational**, Capable of Offloading, Processing and Disposing Dredged Material from the project site - The apparent low bidder must demonstrate to the Government **within 70 calendar days** from the date the Apparent low bidder is notified of being the low bidder that the contractor identified offloading, processing and disposal site(s) is permitted, operational, capable of processing and disposing of all the dredged material for the in-situ quantity as per the Price Schedule **by calendar day 70** from the date the Apparent low bidder is notified of being the low bidder and that the offloading, **processing and/or disposal site(s) is in compliance with the New Jersey Department of Environmental Protection** and/or with the New York State Department of State Coastal Zone Management Program Policies or other host state compliance as appropriate for the offloading, processing and disposal of dredged material. Any sampling and testing required for obtaining permits required for dredged material transportation, processing or placement will be at the cost of the Apparent Low Bidder. **The Apparent Low Bidder must provide to the Government proof that the material to be taken from the project site to the Apparent Low Bidder's upland site(s) meets any regulatory testing requirements.**

f) Processing Capabilities - **The Apparent Low Bidder must provide the following:**

1) **Provide detailed description of the proposed processing technology, including but not limited to, the following stages, if applicable:**

   a. **Dewatering, addressing retention time**, any limitations on return of effluent, limitations on location for effluent release, proposed method for effluent disposal, if applicable. Debris removal, addressing the methods of removal and disposal.

   b. **Material treatment, specifying the method of treatment, additives used during the processing, mechanical processing used, decontamination methods incorporated, stabilization methods incorporated, and chemical treatment (if any).**

   c. Interim storage, if required, identifying the method of storage, required and available storage capacity, and the time frame it will be used, if applicable.

2) **Provide any permits and/or licenses applicable to the proposed process, if any.**

3) **Provide any patented or proprietary permissions applicable to the proposed process, if any.**

(See, for example, Denenberg Dec., Ex. 8 at bates nos. G01010 11499-G01010 11504) (emphasis added). Further proof that a processing/disposal plan was submitted for US approval pursuant to the specifications can be found in the technical specifications, Section 01200, which states in relevant part:

> 6. SUBMITTALS: **The Contractor shall submit for approval, by the Contracting Officer and/or his Representative, his progress schedule and plans for dredging, offloading, transportation, dewatering, processing, and placement of dredged material in approved upland disposal site, as specified in the Technical Proposal** . . .

(See, for example, Denenberg Dec., Ex. 8 at bates nos. G01010 11580) (emphasis added). The contract specifications require that the apparent low bidders' submittal include, *inter alia*, a detailed description of the processes used for treating dredged materials for upland disposal, all

necessary permits, and proof that it has the ability to treat the dredged materials in accordance with the detailed description of the process submitted to the US. (Denenberg Dec., Ex. 8 at bates nos. G01010 11499-G01010 11504, G01010 11580). In most cases, the US even contractually designated a specific processing/disposal site for its contracts. (See, for example, Denenberg Dec., Ex. 58 at bates nos. G01010 03133-G01010 03134). In addition, each contractor must convince the US that it has appropriate experience and knowledge in treating dredged materials. (*Id.*).

As shown above, the specifications require the apparent low bidder to demonstrate to the US that it, or its subcontractors, obtained all requisite regulatory agency (i.e., the New Jersey Department of Environmental Protection (the "NJDEP")) permits before a contract is awarded. (Denenberg Dec., Ex. 1 at pp. 16, 133-137; Ex. 61 at pp. 55-56 and 66-67). (See, for example, Ex. 8 at bates nos. G01010 11499-G01010 11504). This is especially important because the permits describe the processing of dredged materials in detail, including processing requirements and equipment to be used therein. (See, for example, Denenberg Dec., Ex. 13). If the contractor fails to provide any part of the above information, it cannot be awarded the contracts, let alone commence work. (Denenberg Dec., Ex. 2 at pp. 24-25; Ex. 4 at bates no. G01025 00029). Moreover, after work commences, if the contractor fails to adhere to (i) the requirements accordant with the relevant regulatory agency permits and/or (ii) the required plans submitted for the processes for treating dredged materials, the contractor would be in breach. (Denenberg Dec., Ex. 1 at pp. 133-137). Even more damning, however, is that, for the years 2001-2003, the US contractually designated a specific processing/disposal site (i.e., OENJ) for its dredging contracts. (Denenberg Dec., Ex. 3 at p. 25; Ex. 62 at pp. 96-98; Exs. 41, 45, 46, 48, 49 and 50).

As will be shown below, for each of the contracts at issue, the base contract, the corresponding submittals and specifications, the US' requirement of submission of regulatory

agency permits, and the US' procedure for overseeing and enforcing contract provisions clearly indicate that the US considers the processing of dredged material an important part of the contract and authorized, approved and consented to the methods/processes used for treatment of dredged materials. Therefore, the US' motion should be denied and TDM's cross-motion granted.

### C. The Authorization for the Processing Methods in the US' Contracts

The US' motion admits that the controlling authorization clause for each of the contracts at issue is FAR 52.227-1 (the "Authorization Clause"), which states:

> The Government authorizes and consents to all use and manufacture, in performing this contract or any subcontract at any tier, of any invention described in and covered by a United States patent (1) embodied in the structure or composition of any article the delivery of which is accepted by the Government under this contract or (2) used in machinery, tools, **or methods whose use necessarily results from compliance by the Contractor or a subcontractor with (i) specifications or written provisions forming a part of this contract or (ii) specific written instructions given by the Contracting Officer directing the manner of performance.** The entire liability to the Government for infringement of a patent of the United States shall be determined solely by the provisions of the indemnity clause, if any, included in this contract or any subcontract hereunder (including any lower-tier subcontract), and the Government assumes liability for all other infringement to the extent of the authorization and consent hereinabove granted.

(emphasis added). It is beyond question that infringement of the patents-in-suit resulted from compliance with the base contract, the specifications and the written provisions (i.e., submittals) which are a part of the contracts at issue and are discussed below.[12]

#### 1. Contract No. W912DS-07-C-0003

Contract no. W912DS-07-C-0003 ("contract no. 7-C-0003") was awarded to Donjon for

[12] In Defendant United States' Responses to Plaintiff's Third Set of Interrogatories (nos. 17-26), the US responded to interrogatory no. 17, in part, with "Attachment C," a list of the contracts at issue and the corresponding contractor, location, processor and placement site for the dredged material. Attachment C is attached to the Denenberg Dec. as Ex. 63.

**SEALED PORTION**

page 13 to 14

(Denenberg Dec., Ex. 14 at bates nos. G0101505073-G0101505133). In this regard, the air pollution permit states, in relevant part:

> In-Situ Dredge Sediment (material) Processing Facility, consisting of Pneumatic Conveying System, a Screw Conveyor, an In-Situ Mixing Head, and Internal Combustion Engine and Cement Storage Blimps.
>
> * * *
>
> Portland cement, conveyed through a Screw Conveyor, will be injected, one-at-a-time, at a maximum rate of 150 tons per hour (tph), into slowing moving barges filled with dredge sediment. Portland cement will be mixed with the dredge sediment using a Lang Tool Co. (LTC) Series IV Mixing Head, or equal, attached to a Hydraulic Excavator. A "Water Spray System" installed on the totally enclosed discharge spout arrangement equipped with water sprays will control potential dust emissions at the discharge point from the Screw Conveyor onto the dredge-sediment filled barge.
>
> * * *
>
> At least two (2) spray nozzles shall be installed at the head end of the screw conveyor for injection of water at the point that the cement drops into an enclosed steel chute.
>
> * * *
>
> The facility shall install and operate a "Water Spray System" at the bottom cement discharge end of the totally enclosed telescopic steel tube. The "Water Spray System" shall be comprised of at least six (6) nozzle system, with each nozzle capable of handling 4-gpm. [N.J.A.C. 7:27-8]
>
> * * *
>
> The automatic water sprays shall be at all times applied at the cement discharge point, within the mixing point of cement with dredge sediment inside the barge, at a minimum total water flow rate of 6 gpm, through the use of the water spray system (CD2). [N.J.A.C. 7:27-8]
>
> * * *
>
> The permittee shall use water sprays at a rate greater than 2 gpm per nozzle, on as needed basis, if visible emissions are observed during the injection and/or mixing of cement with dredge sediment inside the barge. [N.J.A.C. 7:27-8]
>
> * * *

> The Screw Conveyor (E2) shall be installed and operated such that no visible emissions are emitted . . .
>
> * * *
>
> . . . A hood/enclosed discharge spout arrangement equipped with water sprays controls potential dust emissions at the Screw Conveyor discharge . . .
>
> * * *
>
> The cement shall be continuously sprayed with water as it is injected onto the dredge sediment so it is maintained damp at all times, at a minimum throughput of 2 gpm. [N.J.A.C. 7:27-8]

(Denenberg Dec., Ex. 14 at G0101505075, G0101505104, G0101505107-G0101505110).

Additional uses of water and cement are found throughout PCP02002. (Denenberg Dec., Ex. 14). Interestingly, this contract includes a notice provision asking all potential bidders to be aware of TDM's patents. Specifically, subsection 1.47 of the special contract requirements (the "TDM patent section") states:

> All potential bidders need to be aware of the following patents, which may be related to performance of this contract.
>
> **Patent 6,293,731** **Patent 5,542,614**
> **Patent 5,007,590** **Patent 5,794,862**
> Patent 5,028,010 Patent 5,931,605
> Patent 5,353,998 Patent 6,017,169
>
> The foregoing patents, and any others which may be applicable to activities performed under this contract, are neither required nor prohibited. However, if you use the methods or technology described in these or other patents, please factor license costs into your bid. The successful bidder needs obtain the proper license(s) if it wishes to use the methods, processes, or technology described in any applicable patents.

(Denenberg Dec., Ex. 35 at G01004 00197) (emphasis added). The fact that the US included this notice provision in its dredging contracts is further evidence that the US is the proper defendant. Indeed, if the US did not authorize or consent to the processes used to treat dredged

**SEALED PORTION**

page 17 to 37

contractors regarding the processing/disposal sites were unnecessary because the US identified OENJ as the only site for the processing of dredged materials under this contract. (Denenberg Dec., Ex. 46 at bates nos. G01010 03155). In this regard, James P. Thomas, Bean Stuyvesant's 30(b)(6) deponent, testified:

> Q. Just a couple of quick things. With respect to the time that you visited the OENJ facility, in a broad sense was it similar to the Clean Earth facility in the sense you had an homogenizer and a blender and a mixer?
> A. I would say it was similar, yes.
> Q. So, can you describe in a little more detail what you saw?
> A. I spent very little time at the processing area there at OENJ. It's a very busy place.
> Q. Did you see any diagrams of schematics of their operation?
> A. I can't recall.
> Q. Do you have any pictures of their operation?
> A. No.
> Q. Do you know if any diagrams of schematics of the operations were submitted to the Government, governing agencies?
> **A. Not that I know of. This site was unique in contrast to Clean Earth. This was actually a site provided for -- listed by the Government as permitted and operational.**
> **Q. And what did you mean by that?**
> **A. What I mean is that these contracts would list OENJ as the site of choice for disposal of upland material, and we would have the option of either going there or finding an alternate site.**
> **Q. Why did the Government this as the process of choice?**
> MS. SPRING: Objection; misstates the testimony.
> BY MR. ADLER:
> Q. You can answer the question.
> A. I'm sorry, did you say answer the question?
> Q. Yes.
> **A. Because it was their job to provide the disposal sites for this material.**
> **Q. You had mentioned that the OENJ -- the processing by OENJ for that contract was different than the contracts in which Clean Earth was the processor because with the OENJ facility OENJ was designated by the Government. So, why the difference?**
> A. Well, the --
> MS. SPRING: Same objection.

THE WITNESS: Clean Earth was an up and coming entity and they were getting into the business and they were providing, you know, an alternate service to OENJ. So, for business reasons it was less of a monopoly to give the contractors or give us or anybody I wanted to deal with Clean Earth a choice in where they sent this material.

BY MR. ADLER:

**Q. And did the Government have to approve the processors for each of these contracts that you had?**

**A. I guess what I'm alluding to is OENJ was preapproved by the Government. They didn't have to prove to us, a prime contractor, that it was an approved site. It was predetermined that it was approved.**

**Q. And the Clean Earth sites, they were approved after they went through a process?**

**A. Yes.**

(Denenberg Dec., Ex. 62 at pp. 96 through 98) (emphasis added). Significantly, this testimony shows that OENJ's site was specified and authorized by the US and that, for the contracts where the US did not designate a specific site for the processing of dredged materials, it nonetheless had to approve the processing site identified by its contractor. (*Id.*). The specifications discussed above comprise the written provisions which are a part of contract no. 2-C-0001 and confirm the US' authorization of, and consent to, the use of the OENJ facility and its specific process for treating dredged materials.

**14. <u>Contract No. DACW51-02-C-0002</u>**

Contract no. DACW51-02-C-0002 ("contract no. 02-C-0002") was awarded to Cruz Construction, Corp. for dredging of the Joseph G. Minish Passaic River Waterfront Park and Historic Area, Newark, New Jersey. (Denenberg Dec., Ex. 82). Although the US and TDM agree that contract no. 02-C-0002 includes the Authorization Clause (US' Motion, pp. 4 and 10), the US did not identify a processor for this contract. (Denenberg Dec., Ex. 63). In fact, the US could not even identify the project location or placement site for this contract, yet it still moved

for summary judgment. (*Id.*). Such conduct should be sanctioned.[17]

**15. Contract No. DACW51-02-C-0019**

Contract no. DACW51-02-C-0019 (contract no. 02-C-0019) was awarded to Bean Stuyvesant for dredging of the New York Harbor Kill Van Kull and Newark Bay channels, navigation improvement contract phase II, contract 7. (Denenberg Dec., Ex. 47). The US authorized and directed Clean Earth to be the processor for this contract. (Denenberg Dec., Ex. 63). The contract contains specific line items for the processing of dredged materials that identifies OENJ as the processing/disposal site or in the alternative asks the contractor to list another site. (Denenberg Dec., Ex. 47 at bates no. G0101302741).

The US and TDM agree that contract no. 02C-0019 includes the Authorization Clause. (US' motion, pp. 4 and 10). The specifications for this contract state in relevant part:

> 6.2 Disposal Facilities
>
> The Government has identified the following sites for the processing and disposal of non-rock dredged material . . . The Contractor is required to use the sites identified below . . .
>
> 1) The following site shall be the only upland site used for Item Number 0001AC in the price schedule.
>
> Disposal Site: Bayonne Landfill Remediation Site
> Operator: Cherokee/OENJ
> Location: 61 North Hook Road, Bayonne, NJ 07002
> Point of contact: Mr. Irving Cohen, President
> Phone Number: (212) 904-0705
> Location of Unloading Facility: Northeast corner of the property

(Denenberg Dec., Ex. 12 at bates no. G01010 03708). As mentioned above, if an alternate

[17] With respect to this contract, the US' motion for summary judgment should be denied because the US itself claims to be ignorant of who the processor was and what methods were used. With respect to TDM's cross-motion for summary judgment, it should be granted for this contract because the US is unable to provide information that was requested in interrogatories served over sixteen (16) months ago. Pursuant to RCFC 37, the Court may establish facts in favor of TDM based upon the US' conduct here.

processing site was proposed by the contractor, the contractor was required to submit information pursuant to the special contract requirements. In this case, Bean Stuyvesant proposed Consolidated Technologies Inc., now known as Clean Earth. In its submittals, Bean Stuyvesant included, *inter alia*, a description of Clean Earth's process and copies of NJDEP permits for Clean Earth's facility. (Denenberg Dec., Exs. 74 and 75 at bates nos. G01006 00011-G01006 00012; G01006 00018-G01006 00061). Ultimately, Clean Earth was used as the processor for this contract after US approval thereof. (Denenberg Dec., Ex. 63). The specifications and the submittals comprise the written provisions which are a part of contract no. 02-C-0019 and confirm the US' authorization of, and consent to, the use of Clean Earth and its specific process for treating dredged materials.

**16. <u>Contract No. DACW51-02-C-0022</u>**

Contract no. DACW51-02-C-0022 ("contract no. 02-C-0022") was awarded to Donjon for maintenance dredging of Newark Bay main channel and Port Newark channels, Newark Bay, New Jersey. (Denenberg Dec., Ex. 48). The US authorized and directed OENJ to be the processor for this contract. (Denenberg Dec., Ex. 63).

The US and TDM agree that contract no. 02-C-0022 includes the Authorization Clause. (US' motion pp. 4 and 10). The specifications for contract no. 02-C-0022 show that Donjon was required to use OENJ for the processing of dredged materials. (Denenberg Dec., Ex. 57). The US even admits that submittals under this contract were not required. (Denenberg Dec., Ex. 70 at p. 24). Section 1200 of the specifications for this contract state in relevant part:

TECHNICAL SPECIFICATIONS

1. WORK COVERED BY CONTRACT PRICE: The work consists of . . . performing all work in strict accordance with the specifications and drawings for . . . processing and disposal at the OENJC site in Bayonne, N.J.

* * *

6. SUBMITTALS: The contractor shall submit for approval, by the Contracting Officer and/or his Representative, his progress schedule and plans for **dredging, processing, and placement of dredged material in approved OENJC upland disposal site.**

* * *

j. Disposal Plan: The contractor shall submit for approval his disposal plan at the Pre-Construction Conference (Section 00800 – 35). The disposal plan shall include all special conditions (i.e. NJDEP CZM and WQC, etc.) specific to OENJC site being used . . . . Plan also shall include any **dewatering and/or processing of the dredged material that may be required before material will be brought to OENJC site for final disposal. . . . . Approval by the contracting officer or his representative is required prior to disposal site (s) preparation**.

(Ex. 57 at bates nos. G009063, G009066, G009068-G009069) (emphasis added). Importantly, the specifications prove that the US again designated OENJ as the approved processing site for processing contaminated dredged materials under this contract. Therefore, a contractor's compliance with the specifications and written documents forming the contract necessarily resulted in using OENJ's infringing process. The specifications comprise the written provisions which are a part of contract no. 2-C-0022 and confirm the US' authorization of, and consent to, the use of the OENJ facility and its specific process for treating dredged materials.

**17. <u>Contract No. DACW51-01-C-0006</u>**

Contract no. DACW51-01-C-0006 ("contract no. 01-C-0006") was awarded to Donjon for the dredging of the Kill Van Kull and Newark Bay channels navigation improvement project, phase II, area 7, contract 4, Elizabeth Channel, N.J. (Denenberg Dec., Ex. 49). The US

authorized and directed OENJ to be the processor for this contract. (Denenberg Dec., Ex. 63).

The US and TDM agree that contract no. 01-C-0006 includes the Authorization Clause. (US' motion, pp. 4 and 10). Modification number P00014 to the base contract requires Donjon to dispose of all dredged materials in accordance with section 02900. (Denenberg Dec., Ex. 77). Section 2900 of the specifications requires the contractor to use the OENJ disposal/processing site. (Denenberg Dec., Ex. 78 at bates no. Donjon 003360). The specifications and the modification comprise the written provisions/plans which are a part of contract no. 01-C-0006 and confirm the US' authorization of, and consent to, the use of the OENJ facility and its specific process for treating dredged materials.

**18. <u>Contract No. DACW51-01-C-0023</u>**

Contract no. DACW51-01-C-0023 ("contract no. 01-C-0023") was awarded to GLDD for the maintenance dredging of Elizabeth pierhead channel of Newark Bay, Hackensack and Passaic Rivers federal navigation project, N.J. (Denenberg Dec., Ex. 50). The US authorized and directed OENJ to be the processor for this contract. (Denenberg Dec., Ex. 63).

The US and TDM agree that contract no. 01-C-0023 includes the Authorization Clause. (US' motion, pp. 4 and 10). Again, under this contact, the contractor was required to use a site approved and designated by the US. Section 01200 of the specifications for contract no. 02-C-0022, entitled Technical Specifications, states, *inter alia*:

> 1. **Work Covered By Contract Price: The work consists of** furnishing all plant, labor, materials and equipment, and performing all work in strict accordance with the specifications and drawings for the dredging of material from Port Elizabeth Pierhead Channel of Newark Bay, Channel, its **processing and disposal at OENJC site in Bayonne, N.J. (G0101007793).**
>
> * * *
>
> 6. SUBMITTALS: The contractor shall submit for approval, by the Contracting Officer and/or his Representative, his progress

> schedule and plans for dredging, processing, and placement of dredged material in approved OENJC upland disposal site.

(Denenberg Dec., Ex. 56 at bates nos. G01010 07793, G01010 07795) (emphasis added). This clearly indicates that OENJ was the approved US processing site for this contract. For GLDD to comply with the written provisions forming the specifications and the contract, it had to process dredged materials at the OENJ site. The contract and the specifications all comprise the written provisions which are a part of contract no. 01-C-0023 and confirm the US' authorization of, and consent to, the use of the OENJ facility and its specific process for treating dredged materials.

### D. The US' Marketing of the Treatment of Dredged Materials for Beneficial Reuse

The US' intimate knowledge of the methods for processing dredged materials, especially Donjon's method, is shown in a publicly disseminated DVD entitled the "Beneficial Use of Dredging Materials, Harbor Programs Branch/US Army CoE" (the "DVD"). (Denenberg Dec., Ex. 79). This DVD proves the close nexus and exchange of information on the processing of dredged materials among the USACE, the NJDEP and the US' contractors. (*Id.*).

The DVD was produced by the New York District of USACE and scripted by Bryce Wisemiller - a fact proudly admitted to by Bryce Wisemiller, a project manager for the Programs and Project Management Division, Harbor Programs Branch of USACE, New York District. (Denenberg Dec., Ex. 1 at pp. 332-333). In fact, Mr. Wisemiller boldly stands in front of Donjon's processing site as he delineates the US' concern with the environmental repercussions of dredged materials and the need for treatment thereof. (Denenberg Dec., Ex. 79 at pp. 6-7, 13-14). Others from state and federal agencies also appear on the DVD to discuss the importance of the beneficial reuse of processed dredged materials. (Denenberg Dec., Ex. 79 at pp. 10-14). In particular, Scott

Douglas describes the barge-based process used by Donjon to treat dredged materials, whose dissertation was, as explained above, scripted by the US. (Denenberg Dec., Ex. 79 at pp. 7-9).

The US' denial of any involvement or knowledge of the processes and methods for the treatment of dredged materials utilized for its dredging contracts is only further undermined by this DVD. Indeed, the DVD shows that treatment of dredged materials is an integral part of the US' plan for maintenance of the federal navigation channels and the US allocates much cost and effort into determining what treatment processes should be used for contaminated dredged materials and the beneficial reuse thereof.

## III. APPLICABLE LAW

### A. The Summary Judgment Standard

Summary judgment is awarded only if the undisputed facts clearly show that it is impossible for one party to prevail if the case were to proceed to trial. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). In deciding such a motion, the court must consider all of the evidence in the light most favorable to the party opposing the motion for summary judgment. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The party seeking summary judgment always bears the responsibility of identifying the pleadings, depositions, answers to interrogatories, admissions and other evidence that demonstrates the complete absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 322. To defeat a motion for summary judgment, the non-moving party need only show that a *dispute* of material facts exists, regardless of the strength of that evidence. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). Therefore, summary judgment is only appropriate when, after viewing the evidence fully and most favorably to the non-moving party, it is clear that no reasonable jury could return a verdict for the non-moving party and a trial would, therefore, be needless. *Id.*

The US' motion fails to present any evidence that meets the summary judgment standard.

As shown so clearly and in such detail herein for each and every contract at issue, not only does the evidence demonstrate that the US' motion should be denied, but it also demonstrates that TDM's cross-motion for summary judgment should be granted instead. Based upon TDM's evidence, there is no genuine issue of material fact that for each of the contracts at issue, the US, indeed, authorized, consented to or explicitly required the methods or process for treating dredged materials for upland disposal.

**B. The US' Waiver of Immunity**

To establish jurisdiction over claims against the US, it is sufficient to point to a statute waiving immunity and/or conferring such jurisdiction. *Ledford v. US,* 297 F.3d 1378, 1381 (Fed. Cir. 2002). Here, that statute is 28 U.S.C. §1498. Where the US invites private companies to submit bids for contracts that benefit the US, the waiver of immunity of 28 U.S.C. §1498 applies. *Advanced Software Design Corp. v. Federal Reserve Bank of St. Louis,* No. 4:07CV185 CDP, 2007 WL 3352365 at *4 (E.D. Mo. Nov. 9, 2007). The rationale for such waiver of immunity is to expand the US' freedom to contract with third parties by relieving the third parties from any liability for patent infringement. *Id.* Specifically, it furthers the important government and public interest of enhancing the US government's ability to enter into such contracts by ensuring sufficient interested private contractors for competitive bidding. *Id.*

28 U.S.C. §1498 simply requires that what was done by the private entity be done at the request, and for the benefit, of the US, as is the case here. See *Sevenson Envtl. Serv. v. Shaw Envtl., Inc.*, 477 F.3d 1361, 1366 (Fed. Cir. 2007). Thus, here, there is no doubt that 28 U.S.C. §1498 acts as a waiver of the US' sovereign immunity.

**C. The Authorization Clause**

The US admits that the Authorization Clause is controlling for each of the contracts at issue. (US' motion, pp. 4 and 10). The Authorization Clause waives sovereign immunity for the

US where, as here, the use of the infringing methods was for the US and resulted from the contractors' and subcontractors' compliance with the (i) specifications or written provisions forming a part of the contract, or (ii) specific written instructions given by the contracting officer directing the manner of performance. FAR 52.227.

Recently, the Federal Circuit determined that the Authorization Clause is broad. *Sevenson,* 477 F.3d. at 1367. The Federal Circuit enunciated that the Authorization Clause extends broad authorization to US' contractors to perform and utilize particular methods and processes on behalf of the US. *Id.* at 1367. *Sevenson* also found that authorization and consent existed for the US' contractors because the US' contractors submit work plans pursuant to the contract specifications for a particular project. *Id.*

*Sevenson* involved US contracts for remediating a lead-contaminated parcel of land, owned and managed by the US, near Colonie, New York (the "Colonie site"). *Id.* at 1303. In 2002, defendant Shaw Environmental, Inc. ("Shaw"), a hazardous waste remediation firm, contracted with the US, specifically USACE, to remediate the Colonie site. *Id.* Plaintiff Sevenson Environmental Services, Inc. ("Sevenson") owned several US patents for treatment of hazardous waste, some of which claim methods for treating hazardous waste by applying an additive such as phosphoric acid. *Id.*

Sevenson filed a patent infringement suit against Shaw in the United States District Court for the Western District of New York alleging that Shaw was using Sevenson's patented processes in performing its contract with the US. *Id.* at 1364. Shaw moved for summary judgment on the ground that the US was the proper defendant pursuant to 28 U.S.C. §1498(a). *Id.* The district court entered judgment in favor of Shaw dismissing the complaint and Sevenson appealed. *Id.*

The Federal Circuit affirmed the district court's decision and held that the US, not the contractor, was the proper defendant. The Federal Circuit found that the Authorization Clause was broad because it explicitly encompassed "specifications" that are a part of the contract, as well as the base language of the contract itself. *Sevenson* at 1367. The court further held that Shaw's method for remediating hazardous waste was submitted to the US as part of its work plans, such that the US approved, authorized and consented to the use of the infringing methods. *Id.* The Federal Circuit emphasized that the US authorized and consented to Shaw's method for remediation of hazardous waste based on the broad scope of the Authorization Clause and the contract related documents detailing the methods of hazardous waste remediation. *Id.* at 1367.

The holding of *Sevenson* is wholly applicable to the contracts at issue. As discussed above, the Authorization Clause is exactly the same as in *Sevenson.* The contracts and the specifications referred to in the Authorization Clause explicitly required the contractors to either (i) use a specific site (i.e., OENJ); (ii) submit for approval plans identifying the processor and a description of the method for treating dredged materials; or (iii) attach all state and local regulatory permits which further detail the method for treating dredged materials. Therefore, for the US contractors to necessarily comply with the specifications and written provisions of their respective contracts, they were required to use the processes for the treatment of dredged materials described therein. If the contractor proposed another process, the contracts at issue required the US' approval, authorization and consent. Thus, as in *Sevenson*, where the Federal Circuit found authorization to exist based upon the contracts and submittals such as work plans, here authorization for the methods of treatment of dredged materials used by the US' contractors for the contracts at issue exists based upon the contracts and submittals such as specifications, including work plans and descriptions, and permits.

The US' reliance on the decision in *Carrier Corp. v. U.S.*, 534 F.2d 244 (Ct. Cl. 1976) is misplaced. In *Carrier*, the accused device was a spring on a dumpster. The accused spring was neither a product purchased nor required to be purchased under the contract. In fact, the Federal Circuit in *Sevenson* recognized the holding of *Carrier*, but limited *Carrier* to instances where "the use of infringing equipment was not necessary to the contract because neither the contract specifications nor any specific written instructions required [the contractor] to use any particular type of equipment." *Sevenson*, 477 F.3d at 1367. *Carrier* is inapplicable to the contracts at issue here because the US' contractors were contractually required to use specific methods for treating dredged materials authorized by the US. Therefore, based upon the above, it is clear that the US waived its sovereign immunity, pursuant to the Authorization Clause and the respective contracts, specifications and submittals thereunder, for each of the contracts at issue.

**D. <u>The US' Motion Should Be Stricken</u>**

Under RCFC 56(h)(1), a party moving for summary judgment must submit a proposed finding of uncontroverted facts. RCFC 56(h)(1) states:

> (1) The moving or cross-moving party shall file, together with its motion, a separate document titled Proposed Findings of Uncontroverted Fact. This document shall contain concise, separately numbered paragraphs setting forth all of the material facts upon which the party bases its motion and as to which the party believes there is no genuine dispute. Each paragraph shall contain citations to the opposing party's pleadings or to documentary evidence, such as affidavits or exhibits, filed with the motion or otherwise part of the record in the case.

The US failed to submit a proposed findings of uncontroverted fact pursuant to RCFC 56(h)(1). Accordingly, the US did not present this Court with a single proposed materials fact on which there is no controversy, and the US' motion must be denied on this basis alone. In contrast, TDM submits its proposed statement of findings of uncontroverted facts pursuant to RCFC 56(h)(1) contemporaneously herewith. TDM's RCFC 56(h)(1) statement supports a finding that the US

authorized, consented to and approved of all of the methods for treatment of dredged materials for the contracts at issue.

## IV. CONCLUSION

For the foregoing reasons, the US' motion should be denied with prejudice and TDM's cross-motions for partial summary judgment and to strike should be granted.

Respectfully submitted,

DAVIDOFF MALITO & HUTCHER LLP
*Attorneys for Plaintiff*

Dated: February 28, 2008

s/David W. Denenberg

David W. Denenberg
Michael A. Adler
605 Third Avenue – 34 Floor
New York, NY 10158
Tel: (212) 557-7200
Fax: (212) 286-1884