# EXHIBIT 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
-----------------------------------------)
TDM AMERICA, LLC                         )
                       Plaintiff,        )
              vs.                        )
                                         )
THE UNITED STATES                        )
                                         )
                        Defendant.       )
             and                         )
DONJON MARINE COMPANY, INC.,             )
                 Third-Party Defendant.  )
-----------------------------------------)
```

May 10, 2007

9:31 a.m.

**** C O N F I D E N T I A L *****

Contains PROPRIETARY INFORMATION. Designated parts not to be used, copied or disclosed except as authorized by Court Order or the party or parties whose PROPRIETARY INFORMATION is included.

***********************************

DEPOSITION of Defendant by BRYCE W. WISEMILLER, held at the offices of Davidoff, Malito & Hutcher, LLP, 605 Third Avenue, New York, New York, pursuant to Notice, before ELIZABETH SANTAMARIA, a Notary Public of the State of New York.

MR. ADLER: Yes.

Q. Did the contract include provisions or an accommodation for treating dredged material?

09:48:14 A. The contractor submitted, as part of the required documents necessary to form the recommendation for contract award, information indicating that they would be processing the dredged material in a manner which was acceptable to the involved regulatory agencies as part of that contract.

09:48:34

Q. And do you know if --

MR. ADLER: Read the last part back.

09:48:48 (Record read.)

Q. The submission that you are referring to with respect to the processing dredged material by Donjon, what form did it take?

A. Paper binders.

09:49:27 Q. And was that a supplemental submission or was it --

A. The submission was required within a specified time frame as part of the contract within, I believe, 70 days of the notification of them being the apparent low bidder on the contract.

09:49:47

Wisemiller - Proprietary

page TDM 006754, and there is an entry "New York."

A. Okay.

Q. Are you familiar with what "New York" refers to in this document?

MS. FRANKLIN: Objection.

A. This table is a summation of contracts. How the table is summarized and put together, you would have to ask the National Dredging Center. But my understanding of this table is that this is a summary of the contracts that the New York District had issued the amounts, the volumes of materials roughly total on those contracts over the years.

Q. And does the U.S. have an understanding of whether or not the entries under "New York" for the cubic yards as shown for the years 2001 through 2006 are accurate?

MS. FRANKLIN: Objection.

A. To the extent that the data provided from each of the individuals was accurate as it related to the bid volume and dollar amounts, yes.

A. Yes.

Q. What does it stand for?

A. Historic Area Remediation Site.

10:19:45 Q. Can you please explain that.

A. The HARS is an ocean disposal site designated in September of 1997 by the U.S. EPA Region 2 for the placement of suitable remediation material dredged from the Port of New York and

10:20:09 New Jersey. Material which has been found or is considered to be unsuitable for placement there is referred to as unsuitable HARS material.

Q. And is it -- do you have an understanding of whether or not material that's

10:20:34 suitable for placement at HARS, does it require treatment?

MS. FRANKLIN: Objection. Vague.

Q. Does it requiring processing of the dredged material with an additive?

10:20:45 A. No.

Q. The material that's not suitable for HARS, does it require processing of the material with an additive?

MS. FRANKLIN: Objection.

10:21:03 Ambiguous.

Wisemiller - Proprietary

Q. If the contract proposes that they're going to be treating some of the dredge material with an additive such as Portland cement and a permit is required for air quality control, that would also have to be provided to the U.S.; is that correct?

A. The contractor would have to demonstrate that, yes.

Q. And that's demonstrated by providing copies of the permits to the U.S.; isn't that correct?

A. Yes. I think I even just saw that as I was looking through Exhibit 53. It mentioned the requirement of the contractor to provide permits dealing with however they're proposing to deal with the material, using that one as an example.

Q. Right.

Could you point to where that is in that document?

A. Give me a minute. I happened on it before. I refer you to Bates number G012763, paragraph D, "The apparent low bidder must provide proof, proof of offloading, granting,

Wisemiller - Proprietary

proof of disposal site, certification of offloading, et cetera, approval by the appropriate regulatory agencies, et cetera."

Q. Not to be specific, this is a general requirement in all the contracts for processing; isn't that true?

MS. FRANKLIN: Objection.

A. If we have a line item in the contract that describes these types of activities, it would likely include these type of requirements.

Q. In fact, in some of the paper binders that have been submitted for 35-day or 70-day submittals, copy of the permits are included; isn't that true?

A. Yes.

Q. When those permits are included, typically are they accompanied by specifications, drawings?

MS. FRANKLIN: Objection, vague.

A. They may, but as I think I testified before, the key element that we have is to see that it has been -- whatever method they're proposing to utilize on the

the bar entitled "Upland Silt" do you know what percentage of that pertains to the Corps' dredging program?

11:06:00 A. I don't know the specific percentage but I would -- it's very likely the vast majority of it.

Q. Is it also likely the vast majority of that would have to be treated with an additive?

11:06:19 A. If it were to be taken upland, as it has been for beneficial reuse at various landfill or brownfields closure sites, very likely yes. However, that is typically part of -- determined by the contractors as part of our solicitation process 11:06:41 and it is also dependent upon what available options are in existence at the time of the solicitations.

Q. If you know, how are these estimates determined?

A. Yes.

11:07:08 We, as part of the Dredged Material Management Plant process that has been under development for the last approximately 10 years, have tried to track, keep updated a spreadsheet database which lists the various deepening 11:07:32 contracts; for example, Port Jersey 1, Port Jersey

11:07:49 2, other contracts from our deepening program maintenance activities which may occur within the port related to the three or so dozen existing federal maintenance channel projects, as well as deriving input from either the Port Authority directly or through our regulatory office, who also oversee non-federal dredging and construction activities within navigable waters of the port and

11:08:10 beyond.

Q. Where is this maintained?

A. New York District offices.

Q. Do you know whether that was produced to us?

11:08:19 A. I do not.

Q. Do you know whether or not there are estimated figures for the volume of dredged material that is estimated to be treated with an additive?

MS. FRANKLIN: Objection. Vague.

11:08:42 A. As I mentioned, there are volumes estimated for material that cannot be taken to the HARS site or that may not be useful at any other known permitted site. It is planned that that material may be processed and taken upland.

11:09:09 However, there are a variety of alternatives which

11:09:26 may be possible which are in existence, New York Bay's CDF being one. The material, the upland silt that is characterized on this bar chart, can in fact be taken straight to disposal at that permitted site in Newark Bay.

Q. What was the acronym -- what was the full name for that site again?

11:09:44 A. The Newark Bay confined disposal facility, which is in fact a contained aquatic disposal pit which was constructed by the Port Authority in 1997.

11:09:59 Q. Do you have an understanding of what types of dredged material have to be treated with an additive versus dredged material that does not have to be treated?

A. It is dependent -- yes. It is dependent upon the nature of the material and the selected ultimate placement site.

11:10:21 The processing of dredged material is done primarily for the purpose of solidification so that the material, instead of having a fluid liquid nature, can be readily applied as a more solid grading material or engineered fill type material at

11:10:39 the designated upland placement site. If the

material that's dredged, which may be silty, can be managed without processing at a lower cost and in a permitted environmental acceptable manner, that is something that is open to the contractor through the solicitation process or as a value engineering proposal subsequent to contract award to identify to the Corps.

11:11:01

Q. Now, with respect to dredged material that I believe you said has to be treated for solidification --

11:11:22

A. As opposed to --

May I clarify?

Q. Sure.

A. When cement, fly ash or other additives of that nature are added to dredged material it is typically done for one of two primary purposes, the solidification or stabilization.

11:11:35

The end result accomplishes both. However, solidification refers to trying to take the material from a fluid, soupy mud consistency to a more physically solid consistency, so it's primarily done for physical characteristics reasons. Stabilization, on the other hand, is done primarily for the purposes of encapsulating and containing

11:11:54

11:12:16

11:12:31 contaminants which may be within the material that is needed so that the material meets some type of an environmental condition. The material that we dredge is processed and taken upland, is done so predominantly -- solely for the purpose to make the material of an acceptable physical nature for the targeted upland placement site.

11:12:52 So if the material that we are dredging, which has happened, is already of a physical suitable nature, some of the material that would be included within this upland silt bar chart would be taken upland without processing. This has occurred on the Port Jersey 2 contract and may occur

11:13:17 on future contracts.

Q. Do you know the breakdown of the estimated amounts for material that has to be processed for upland disposal versus the silt material that would not have to be processed for

11:13:30 upland disposal?

MS. FRANKLIN: Objection. Vague and ambiguous.

Are you referring to this projection or for a particular project?

11:13:37 MR. ADLER: No. I am referring to

the projection in Exhibit 4.

A. The database that we have does not nor is it always possible to estimate this when material is sufficiently of --

11:13:55

It's dependent not only on what we encounter when we dredge or when the contractor dredges as to whether or not the material has to be processed, but it's also dependent upon the targeted placement site for the material.

11:14:11

Quite often material, predominantly through many areas of the country, similar silty material is taken to confined upland disposal facilities where the material is not processed at all and is simply allowed to air dry or some other type of active drying mechanism is used so that the material attains a solid, soil-like nature as part of disposal at those facilities.

11:14:24

So here we identified the volume of material that we plan to have processed and taken upland. The majority of what is shown on this bar is anticipated to be managed in that manner. However, there may be material encountered in any particular contract.

11:14:43

In 2012, for example, that may have a

11:14:59

11:15:14 physical nature such that it is acceptable without processing to be taken straight to the contractor's proposed identified and permitted upland placement sites.

Q. How about with respect to dredged material that's contaminated? Does all of that material have to be treated or is some of that taken to other sites for direct disposal?

11:15:30 MS. FRANKLIN: Objection. Vague and lacks foundation.

A. "Contamination" is a very generally used term and for purposes of this testimony it is worthwhile to distinguish that contaminants are 11:15:53 naturally occurring within the estuary, within the earth's crust or material. You can find arsenic, a known metal contaminant, in practically all natural crustal materials on the planet. So when the term "contaminated dredged material" is used, it is 11:16:17 always to the degree of contamination.

There are within what is shown on this figure as the upland silt material typically a variety of either naturally occurring or anthropogenic man-related contaminants of -- either 11:16:43 organic or metals. None of the material that is --

Wisemiller

that has been dredged for our navigation -- the Corps' navigation program has failed established criteria which would apply that would characterize it as hazardous radiological toxic waste. So while it is generally referred to as -- this upland silt as being contaminated material, it is not HTRW material by any of the existing applicable regulatory criteria for the contaminant listed.

11:17:12

That being said, can you please restate your question.

11:17:40

Q. I am trying to get at the USACE's estimate of the volume of the material that has to be treated with an additive for the period 2005 to 2014. I am simply asking, does USACE have such an estimate?

11:17:53

A. We have an estimate for how much material is not acceptable for placement at the HARS. The specific determination that processing is necessary for any of the silt is made as part of either the water quality certification process to us by the state regulatory agency prior to the solicitation or as part of the contractor in his submission or as part of the execution of that contract should there be a changed condition.

11:18:19

11:18:35

11:18:51 So there is a plan that we have developed in concert with the EPA, the two states, the Port Authority of New York and New Jersey and other involved stakeholders that anticipates this material shown on this bar chart labeled "Upland Silt" will in the next 10 years, approximately, need to be processed to be taken up for the upland placement sites that we have identified, but that is

11:19:11 in fact only a plan and must be determined through those steps that I laid out before.

MR. ADLER: Let's mark this as the next exhibit, please, Exhibit 5.

11:20:25 (Plaintiff's Exhibit 5, document bearing Bates numbers G0101704181 through G0101704343, marked for identification, as of this date.)

Q. Prior to looking at Exhibit 5 in preparation for today's deposition have you reviewed

11:21:25 any documents?

A. I have -- yes.

Q. Do you know if all those documents were produced to us?

A. Yes.

11:21:40 Sorry, I correct myself. I have

Wisemiller

Q. How about Jay Cashman?

A. Jay Cashman I know used Clean Earth. I'm not certain if they used any others.

02:04:58 Q. How about Bean Stuyvesant?

A. It may vary by the contract that they had with us, but I believe Bean Stuyvesant used OENJ Cherokee in Bayonne and I would want to check, again, the documents.

02:05:14 Q. You had mentioned before that there were various submissions that had to be provided within 70 days, I believe you said, of being awarded the contract and those submissions would contain a description of the process for treating dredged

02:05:34 material.

MS. FRANKLIN: Objection.

Misstates testimony.

Q. Could you clarify that? Is that correct?

02:05:43 A. The contractor is required to provide within a certain time frame -- on the older contracts it was 70 days, it has since changed to 35 days -- information and materials supporting the government's determination of whether or not to

02:06:02 award a contract to the contractor to demonstrate

02:06:16 their capability in terms of responsiveness and whether they are responsive to the requirements of the contract.

It's not necessarily a guarantee that if they give the materials, they're going to get the contract. The government does a review to ensure that they have the necessary equipment, resources, et cetera, permits in place so that they can perform

02:06:37 the duties required as part of the contract.

Q. Just to redirect, my question was directed to the process used for treating dredged material. Is that contained in those submissions, as far as you know?

.:06:51 A. Information on those facilities, the permits that they require to be in operation and that they are in existence and not expired and that those placement sites have indeed the sufficient capacity to take the material to be processed,

02:07:09 details of this nature are contained typically within those submissions and, again, to support the recommendation of the review team within the New York District as to whether or not the low bidder should be awarded the contract.

02:07:32 Q. From time to time have you read any

of those submissions?

A. Yes.

Q. What was the reason that you have reviewed them?

02:07:38

A. My expertise in terms of the different types of management of dredged material and of the dredging construction process.

Q. And with respect to the permits that have to be submitted, do you know whether or not any of those contain descriptions of the methods of processes used for treatment of the dredged materials?

02:07:53

MS. FRANKLIN: Objection. Vague.

A. The permits that are issued generally specify the required outputs of the processing and to my knowledge do not get into the niches of how the process -- the specifics of exactly how the processing is to be occurred. They issue to the contractor, or to the processing facility, acceptable use determinations in New Jersey, which is a type of permit. In New York it is called the beneficial use determination. And there may be paperwork associated with those permits that does go into more detail, because those are the permits that

02:08:05

02:08:29

02:08:47

the state issues that allows for the processing of material.

Q. How about the paper binders that you were referring to before?

A. That's the submission. Those documents are contained within those binders.

Q. Are the processes contained in those paper binders?

MS. FRANKLIN: Objection to form.

Q. Do you know whether or not the treatment -- whether the method or the descriptions for the treatment of dredged materials is contained in those paper binder submissions that you referred to before?

MS. FRANKLIN: Objection to form and lacks foundation.

A. The binders contain general descriptions of the contractors' proposed processing facilities as well as their placement sites and the permits associated with them as a requirement laid out in the specs for that submission. Whether those documents go into the level of detail related to the specifics of processing as it relates to this case, I do not

know.

Q. Is it a requirement of the government contracts for dredging that the contractors comply with the various requirements set forth in permits?

MS. FRANKLIN: Objection. Vague.

A. The contractor is expected to comply with the permits that they have or that they are given as our agent in the construction of the various contracts that they perform for us. Yes.

Q. Have you visited any processing facilities other than the OENJ facility that you referred to before?

A. I have also toured by land and water the Donjon facility in Port Newark, as well as the Clean Earth Technologies in Jersey City.

Q. The Donjon facility in Newark and the Clean Earth facility?

MS. TZORTZATOS: The Clean Earth facility in Claremont?

THE WITNESS: It's in Jersey City.

MR. ADLER: I ask that the court reporter mark this as the next exhibit, Exhibit 9.

(Plaintiff's Exhibit 9, document

DEPOSITION ERRATA SHEET

RE:
FILE NO.
CASE CAPTION: TDM AMERICA V. USA

DEPONENT: BRYCE W. WISEMILLER
DEPOSITION DATE: 5/10/07

To the Reporter:
I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me. I request for the following changes be entered upon the record for the reasons indicated.
I have signed my name to the Errata Sheet and the appropriate Certificate and authorize you to attach both to the original transcript.

SIGNATURE:______________________ DATE:__________________

BRYCE W. WISEMILLER

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - -x

TDM AMERICA, LLC, :

Plaintiff, :

:

-against- Index No. 06-472 C

THE UNITED STATES OF AMERICA,

Defendant,

- and - :

DONJON MARINE COMPANY, INC.,

:

Third-Party Defendant.

:

- - - - - - - - - - - - - - - - - - - - - -x

CONTINUED DEPOSITION of BRYCE W. WISEMILLER, taken by Plaintiff at the offices of Davidoff, Malito & Hutcher, 605 Third Avenue, New York, New York 10158, on Tuesday, May 22, 2007, commencing at 9:38 o'clock a.m., before Annette Forbes, a Certified Shorthand (Stenotype) Reporter and Notary Public within and for the State of New York.

Wisemiller

12:32:16

12:32:34

12:32:54

12:33:10

12:33:28

Q Did you participate in the development of the disk?

A Yes.

Q And specifically how?

A I gave portions of the interview.

I helped to draft the script.

I managed the funding of the effort out of the harbor deepening project, cost accounts.

It was through the efforts, the primary people that were involved within the Corps. There was a gentleman in our planning division, Darin Damani, who subsequently left and works in West Virginia.

And Carolyn Vadino, public affairs specialist, and the harbor programs branch who had left subsequently to work for the Department of State, right around here.

Q Which portions of the script did you have responsibilities for?

A I reviewed the, I did script the people's, what they said specifically. It was that we would have this topic and this type of video and that these would be the key points to

try to state in that message, the overall outline of that whole video, talking about the HARS, the different types of material processing, beneficial use.

12:33:42

Q In response to a prior question, you mentioned permit applicants?

A Yes.

Q Who are they?

12:33:50

A People that come to the Department of Environmental Conservation, New Jersey DEP, with some kind of an upland project of some kind where they may have need for some type of fill material.

12:34:07

I don't know any of them specifically.

It was just mentioned to us, a regulator, we want to promote dredging area, potential resources for upland placement, it would be a useful tool to give to them in the future to help facilitate that.

12:34:20

Q Do you know to which permit applicant this disk was given?

A I do not.

12:34:38

Q How would one get the disk?

## C E R T I F I C A T E

STATE OF______________________________:

COUNTY/CITY OF_____________________________:

Before me, this day, personally appeared BRYCE W. WISEMILLER, who, being duly sworn, states that the foregoing transcript of his/her Deposition, taken in the matter, on the date, and at the time and place set out on the title page hereof, constitutes a true and accurate transcript of said deposition.

_______________________

BRYCE W. WISEMILLER

SUBSCRIBED and SWORN to before me this__________

day of ____________, 2007, in the jurisdiction aforesaid.

______________________ ______________________

My Commission Expires Notary Public

# EXHIBIT 2

January 11, 2007

9:45 a.m.

Deposition of KERRI MULLINS, held at the offices of Davidoff, Malito & Hutcher, LLP, 605 Third Avenue, New York, New York, pursuant to 30(b)(6) notice, before Jennifer Ocampo-Guzman, a Certified Real-Time Reporter and a Notary Public of the State of New York.

Mullins

"Advertised Solicitations," that is the notice that is released publicly for anyone interested in pursuing work with the Corps of Engineers.

MR. FLAHERTY: Before we proceed the witness would like to read and sign the transcript.

Q. And how does the fact that it's on the website make Donjon aware that there's a solicitation?

A. Donjon, we review the web page on a regular basis to look for, you know, new potential work.

Q. And -- and -- and once Donjon sees that there is a potential solicitation for a dredging contract, what would be Donjon's next step if they were interested in taking a further look at whatever that solicitation is?

A. The process has varied over the course of these years. Originally a notice may have been sent to the Corps of Engineers requesting a copy of the solicitation with a check, and the Corps of Engineers would

Mullins

forward a set of the plans and specifications. Gradually that was modified such that you could directly download, the company Donjon, could download this information directly from the web page to our printers, our computers, to print them, review them, and make a determination as to whether we were interested in them or not.

At this point in time the notices still appear on the Corps' web page, but to review the documents it's now published on FedBizOpps, which is a Federal database that's maintained nationally that we also review with, you know, with some regularity to see if there's any additional work that we might be interested in pursuing.

Q. And what form would this solicitation take?

A. The solicitations that we have pursued have all been invitations for bid. They are IFBs.

Q. And what kind of information is contained in the IFBs?

A. The IFB is broken down into

Mullins

standard sections. It has the prevailing wage scales for the project, the location of the project, description of the work to be performed, bid schedules, reps and certs, which are standard to each of their contracts, and any new or developing things that they may have added as far as tracking requirements or other devices.

Q. Are there specifications in the IFB that, other specifications in the IFB that describe the precise scope of work that --

MR. FLAHERTY: Object.

Q. -- that describe the scope of work under the solicitation?

MR. FLAHERTY: Object to the form of the question.

A. The work is described in the specifications and is also detailed in the plan sets that are provided as well.

Q. What's the last word?

A. Plan sets.

Q. What are those?

A. The course of work is outlined on a series of drawings, they're engineering

drawings that indicate the location, the design, depth, et cetera, of the dredging work to be performed.

Q. And is that part of the IFB as it comes off the website?

A. Yes.

Q. Are there any type of technical requirements in the IFB?

MR. FLAHERTY: Objection to the form of the question.

A. I don't understand.

Q. Okay. Are there any specific requirements, let's say, with respect to the manner in which the, for example, with respect to a dredging contract, are there technical requirements with respect to either the manner of dredging or the process of dredging or the process of treatment and the like?

A. The specifications contain the permits for each project, incorporated in the permits from the various regulatory agencies it would stipulate, for instance, the requirement to utilize an environmental

bucket for the removal of silt materials. The location for dewatering operations, the placement location for rock or clay materials that might be removed.

Q. When you just referred to the specifications, is that after the IFB or is that part of the IFB; I just want to clarify that?

A. That is all one document.

Q. The permits are part of the IFB, is that what you're saying?

A. The permits from the Corps of Engineers --

Q. Okay.

A. Yes.

Q. From the Corps of Engineers permits?

A. Yes.

Q. Okay. At the time that Donjon reviews the website and it sees that there is an invitation for bid, and whatever, prints it out or reviews it, who at Donjon would make the decision that they were going to pursue it and perhaps submit a bid to the

United States?

A. The principal of the company.

Q. And --

A. That would be Arnold Witte, the owner.

Q. And what happens after that, should he decide that he wants to go ahead with it?

A. We begin to review the documents and to determine what cost factors need to be incorporated into the bid.

Q. And does there come a -- and in the event that Donjon decides that it wishes to submit a bid, is that submission formalized in any way?

A. It's done in accordance with the specifications. There is a series of documents that must be included with the bid package.

Q. And what are those documents?

A. That is the bid schedule, a bid bond and a reps and certs and if there's any other document that is required it may be a listing of the processing and placement facilities, if there is an upland component

for disposal in that particular bid.

Q. And is this a document that Donjon would, would compile, or is this a template that Donjon basically fills in?

A. It's a template that Donjon fills in.

Q. And where does that template come from?

A. The IFB.

Q. You had mentioned reps and certs, what are those?

A. They are a series of statements by -- and regulations from the Government that include labor practices, performance practices, and where you incorporate your tax ID number, where you certify that you have put this bid together without, you know, improper practices. That's what goes into -- that is standard set of pages. It's usually ten to 15 pages long.

Q. Does the, does the bid template before it's filled out by Donjon, in the event that there is a requirement in the contract for the processing of dredge

material, is there a description of the processing that's required in that template?

A. No.

Q. And if processing is required and Donjon does complete the template, does Donjon insert a description of the processing for the dredge material?

A. Not in the -- in the initial submittal of a bid, no.

Q. At some time later it would?

A. In the event Donjon is the apparent low bidder and receives a notice from the Corps of Engineers, as such it initiates a series of follow-on submittals.

Q. Does the bid template for the dredging contract have in it line items for specific activities such as transportation or dredging or processing and the like?

A. Yes.

MR. FLAHERTY: This is the blank template you are talking about?

Q. This is the blank template first; right?

A. Yes.

Mullins

Q. And can you generally describe those in a solicitation that would have, that would contemplate the processing of dredge material?

A. In that template there would be a line item that would indicate dredging, processing, disposal of, let's say, it's called non-HARS suitable material, and there would be a quantity listed beside that that would indicate how much material would be incorporated in that line.

Q. And that would be dewatering, let's say, as well?

A. Dewatering is typically a separate line.

Q. Who at Donjon coordinates the process, in other words, once a decision is made to go ahead with submitting -- you mentioned there are several things that have to be submitted, and I guess there is a procedure or process. Who at Donjon is involved in that process or oversees that process?

MR. FLAHERTY: Object to the form

of the question, but you can answer.

Q. Who at Donjon would coordinate the process of submitting a bid in response to the IFB and then from there on continue with it?

A. That typically is divided between two people. That would be between Thomas Witte and myself.

Q. And what are each of those persons' responsibilities?

A. The final pricing for the bid is performed by Thomas and reviewed with Mr. Witte and my input pertains to the processing segment of an upland management thereafter.

Q. In the event Donjon is the apparent low bidder, how is it advised of that?

A. There's a notice that is received from the Corps of Engineers. It comes by way of a letter.

Q. What is the next step that Donjon takes after receiving the letter that it is the apparent low bidder?

A. The -- within the IFB is a section that indicates in the event that the entity

Mullins

is the apparent low bidder and this project involves upland disposal, that sets off a sequence of, it sets off the completion of a document that is either generated five days or 10 days, that must be handed back in to the Corps of Engineers. There are a series of questions in that section that must be answered and go in with this initial document.

Q. And that particular section states which documents have to be submitted within that period, whether it be five days, 10 days?

A. Yes.

Q. And you are saying that is part of the original IFB?

A. It's included in the solicitation that goes to the street for all the bidders.

Q. And the, whatever, whatever submittal that is required, for example, let's say it's 10 days, how do you refer to that, is that referred to as the 10-day submittal?

A. Yes.

Q. And then with respect to that submittal, is that something that Donjon prepares and submits?

A. Yes.

Q. Are there times that the US will review that and come back with comments?

A. Yes.

Q. And would those comments sometimes be with respect to the description for the process, for the dredging process?

A. Sometimes, but not usually.

Q. But are there times that the representative of the US might actually go through the process for dredging or the description of the treatment of dredge material and actually hand write comments on it?

MR. FLAHERTY: Objection, foundation.

MR. ADLER: I'm asking if it happens.

MR. FLAHERTY: Well, you're asking whether the US does something. The foundation is whether she knows whether

Mullins

A. Probably about that number.

Q. With respect to the description for the process of dredging, does that include a description for the treatment of the dredge material?

MR. FLAHERTY: Objection to the form.

MR. ADLER: Let me try to rephrase it.

Q. In the event the IFB requires that certain material be treated with an additive for upland disposal, is Donjon required to submit a description of the processing of the dredge material in response to the IFB, via the 10-day submittal or the final submittal?

A. Yes.

Q. And do you have an understanding of why that's required?

A. No.

Q. If you don't have that, let's say for some reason you don't, you submitted a bid, but you don't supply a 10-day submittal, do you have an understanding of what would happen?

A. Yes.

Q. What would happen?

A. Your bid would be disqualified.

Q. And how about if you submitted the 10-day submittal, but you don't submit the 35 or the 70 final submittal, what would happen?

A. Your bid would be disqualified.

Q. And even though you were sent a letter that you were apparent low bidder, you would not get the contract; is that correct?

A. That is what is indicated in the specifications.

Q. So is it true then that the, in order -- is it true then that before the United States authorizes you to begin work on the contract it would not do so unless it has that 10-day submittal and the final submittal?

MR. FLAHERTY: Objection, foundation.

A. That would be an assumption, I don't, I don't know.

Q. Assume that you submit the 10-day and the final submittal to the United States,

correct?

A. They're the same.

Q. Right. Now with respect to that, if you decide to change the process, correct, do you have authority from the United States to change the processing if you want to after you submitted the submittals?

MR. FLAHERTY: Objection to form. Are you asking -- you used the word "authority," are you asking for some indication to her by way of specification authorization?

Q. No, do you have the right to change the process, if you want to, for the treatment of dredge material?

A. Not that I know of.

Q. Because the only one that was authorized by the United States Government is the process that you submitted to them in the permits; isn't that correct?

MR. FLAHERTY: Objection to the form.

MR. BROWN: I'll object to the extent it calls for legal conclusions.

Mullins

Q. Isn't it true that the contractual terms of the contract, that the contract requires you to use the processes that you describe in the submittals?

MR. BROWN: Same objection.

A. The process that is outlined in the IFB -- not in the IFB, in the submittal incorporates the permits that are secured for the project and the projects are performed in accordance with those permits. And I am not aware that this has changed.

Q. And do you have an understanding of why the process is done in accordance with those permits?

MR. FLAHERTY: Beg your pardon. I didn't understand that question.

Q. And you said that the process is done in accordance with those permits; correct?

A. Yes.

Q. Why can't you change that process, if you want to?

MR. FLAHERTY: Objection to the form of the question.

Q. In these submittals or any one of these submittals, either the 10-day or the final submittal, do you include permits for the processing, for the processing site as well?

A. Yes.

Q. And is there a summary or statement of Donjon's processing experience in the submittals?

A. Sometimes.

Q. Do you have an understanding of why this information is included in the submittals?

A. It's required in the submittals.

Q. It's required by the Government?

A. Yes.

Q. Do you know whether or not there's a process where the United States approves the submittals before it sends you an award letter?

A. I don't know.

Q. So, for example, let's say, you submit the 10-day submittal, does anything -- with respect to the 10-day submittal, do you

MR. FLAHERTY: Objection.

A. That's what is listed in the specification.

Q. After Donjon receives an award contract, that has been awarded that contract, what's Donjon's next step?

A. Following a notice of award, we then submit the appropriate bonds. Following that there are a series of meetings that are initiated.

Q. And what is the purpose of these meetings?

A. One is to review the QA/QC program for the project.

Q. And what is that?

A. Quarter assurance and quality control, which a series of reports and oversights that will be incorporated in the project. Another review pertains to the health and safety plan. And beyond that an establishment of the project schedule and an exchange of the before dredge surveys prior to initiating work.

Q. With respect to the QA/QC, how is

that -- how is that process undertaken? In other words, is there an inspector on the grounds or what's their day-to-day work function of the QA/QC?

A. The person is responsible for reviewing all of the items that are incorporated in the plan to make -- to -- making sure that things are being implemented, things are being recorded, that records are being maintained and transferred to the Corps.

Q. Is that a Government person or a Donjon person?

A. There are, there are several people incorporated in this. They're independent quality control inspectors that are hired to perform certain functions. There is a Donjon quality control manager and then the -- I don't know if the Corps of Engineers reflect, you know, designates their person as a quality control in their title, but there is a Corps of Engineers' person on the project every day.

Q. Every day. And that person would

Mullins

actually see the processing of dredge material?

A. Not necessarily.

Q. Where is that person located?

A. At the dredging location.

Q. And why wouldn't they see the processing?

A. We don't process at the dredging location.

Q. Only at the dredging location. Okay. Is there a Government person at the treatment location?

A. Occasionally somebody comes by. It has varied depending on the contract. Sometimes somebody comes by once a day; sometimes we don't see these people at all on some contracts.

Q. And from the time that Donjon is awarded the contract -- let me strike that.

Is there a contract officer or an assistant officer that kind of oversees the contract process on behalf of the Government for an IFB?

MR. FLAHERTY: Just so we're clear,

Mullins

C E R T I F I C A T E

STATE OF NEW YORK )
: ss.
COUNTY OF NEW YORK )

I, JENNIFER OCAMPO-GUZMAN, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That KERRI MULLINS, the witness whose deposition is hereinbefore set forth, was duly sworn and that such deposition is a true record of the testimony of such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 17th day of January 2008.

J. Ocampo-Guzman

JENNIFER OCAMPO-GUZMAN

# EXHIBIT 3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------x

TDM AMERICA, LLC,

Plaintiff,

vs. No. 06-472 C

THE UNITED STATES OF AMERICA,

Defendant.

and

DONJON MARINE COMPANY, INC.,

Interested Party.

------------------------------x

DEPOSITION OF THOMAS WITTE

New York, New York

Monday, July 2, 2007

Reported by:
Jennifer Ocampo-Guzman, RPR, CRR
JOB NO. 12861

David Feldman Worldwide

COPY

From File to Trial™

California | New York | Texas
www.david-feldman.com

T. Witte

relationship with EIC, I can't tell you what the relationship was, but EIC seemed to be doing most of the ground work when it came to process.

Q. During the 2003 or 2004 time frame that you mentioned OENJ was conducting this processing --

A. No, I'm sorry, I want to make it clear, OENJ we started using in 2001 because that's the contract, you had to use them, the Corps of Engineers said you had to use them and we started in 2001.

Q. Okay. So during that 2001 to 2003 or 4 time frame, about how often did you visit the facility?

A. I was there a lot.

Q. More than ten times?

A. Oh, yeah.

Q. How many times?

A. 80, 100.

Q. Why?

A. Because I had to keep an eye on the guys who were measuring the scows because we had to pay by the yard, and we didn't trust

T. Witte

Q. Were you involved in the bidding of this contract?

A. Yes.

Q. And about what year was this contract first awarded?

A. I'm not sure if it was awarded in 2000 or 2001. We had a lengthy protest that the Corps had to go through from the second bidder. I believe it was early '01.

Q. And is this the contract that you had to use OENJ to do the processing?

A. That's correct.

Q. And you had mentioned that the government oversaw or -- you really didn't get involved in determining whether or not or monitoring whether or not the specifics of -- how the specifics of the processing occurred in the sense of whether or not 8 percent or so of Portland cement or another additive was used because you mentioned the government had its own people monitoring those things?

MR. FLAHERTY: Objection to the form of the question. You can answer.

A. I believe what I said was I'm not

T. Witte

interested as it relates to what I have to do. When the facility is sole sourced I assume the government had done whatever due diligence they wanted to do to make sure that these guys were doing the right thing.

Q. And do you know whether or not the government did actually do such due diligence?

A. Well, I know they had inspectors periodically show up. That's the extent of my knowledge though.

Q. How did you know that?

A. I saw them.

Q. Did you speak to them?

A. Not really.

Q. Under this, under this contract, the KVK Area 4 contract, which is Exhibit No. 34, do you have any knowledge as to where the processed dredge material was disposed of upland?

A. Yes.

Q. Where?

A. On the OENJ facility itself.

Q. Do you know where that was located?

C E R T I F I C A T E

STATE OF NEW YORK )
: ss.
COUNTY OF NEW YORK )

I, JENNIFER OCAMPO-GUZMAN, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That THOMAS WITTE, the witness whose deposition is hereinbefore set forth, was duly sworn and that such deposition is a true record of the testimony of such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 16th day of July 2007.

J. Ocampo-Guzman

JENNIFER OCAMPO-GUZMAN