# EXHIBIT 16

**GREAT LAKES DREDGE & DOCK COMPANY, LLC**
2122 YORK ROAD
OAK BROOK, IL 60523-1981
Tel: 630-574-3000

July 31, 2006

Department of the Army
New York District, Corps of Engineers
26 Federal Plaza
Jacob K. Javits Federal Building
New York, New York 10278-0090

Attention: Mr. Kenneth Peterson
Project Engineer

RE: **MAINTENANCE DREDGING NEWARK BAY, NEW JERSEY VICINITY OF PORT NEWARK, AND PORT NEWARK PIERHEAD CHANNELS, NEW JERSEY IFB SOLICITATION NO. W912DS-06-B-0005**

Gentlemen:

In response to your notification to Great Lakes Dredge & Dock Company, LLC that we are the apparent low bidder for the above referenced project, enclosed please find the information to be submitted within 70 calendar days as required by Contract Specification Section 0800, paragraph 1A.2.

We trust this submittal fulfills your requirements but ask that you please contact us at (630) 574-3001 with any questions or comments.

Very truly yours,

**GREAT LAKES DREDGE & DOCK COMPANY, LLC**

for

Steven F. O'Hara
Vice President

SFO/ras

**GREAT LAKES**
**DREDGE & DOCK**
**COMPANY, LLC**
2122 YORK ROAD
OAK BROOK, IL 60523-1981
Tel: 630-574-3000

July 31, 2006

Department of the Army
New York District, Corps of Engineers
26 Federal Plaza
Jacob K. Javits Federal Building
New York, New York 10278-0090

Attention: Mr. Kenneth Peterson
Project Engineer

RE: **MAINTENANCE DREDGING NEWARK BAY, NEW JERSEY VICINITY OF PORT NEWARK, AND PORT NEWARK PIERHEAD CHANNELS, NEW JERSEY IFB SOLICITATION NO. W912DS-06-B-0005**

Gentlemen:

In response to your notification to Great Lakes Dredge & Dock Company, LLC that we are the apparent low bidder for the above referenced project, enclosed please find the information to be submitted within 70 calendar days as required by Contract Specification Section 0800, paragraph 1A.2.

We trust this submittal fulfills your requirements but ask that you please contact us at (630) 574-3001 with any questions or comments.

Very truly yours,

**GREAT LAKES DREDGE & DOCK COMPANY, LLC**

Steven F. O'Hara
Vice President

SFO/ras

**SOLICITATION W912DS-06-B-0005**
**MAINTENANCE DREDGING**
**NEWARK BAY, NEW JERSEY**
**INFORMATION TO BE SUBMITTED WITHIN 70 DAYS**

Included in its bid submission and in its required 5 day submission, Great Lakes listed five processing facilities and seven upland disposal sites. Since these submissions, we have narrowed our choices for processing facilities to two and upland disposal sites to three. This 70-day submission provides the required information for the Koppers Seaboard Site Processing Facility, the Claremont Dredged Material Processing Facility, the ENCAP Meadowlands Redevelopment Project Site, the FDP Enterprises Upland Disposal Site, and the Prologis Port Reading Business Park(formerly referred to as Koppers Woodbridge Site). The information follows the prescribed format for Section 0800 Paragraph 1A.2 of the Contract Specifications.

**1A.2 Information to be submitted by the Apparent Low Bidder within 70 calendar days.**

The Apparent Low Bidder shall submit the following information within 70 Calendar Days from the date the Apparent Low bidder is notified of being the low bidder.

*a)* *Information submitted as directed by Contracting Officer notification – All the information provided previously must also be included in the final package, revised as necessary.*

The information required to be submitted within 5 days of notification has been revised as follows:

1. The Acceptable Use Determination (AUD) required for processing material at the Clean Earth Dredging Technologies, Inc. Claremont Channel Dredged Material Processing Facility and at the Great Lakes Dredge & Dock Koppers Seabord Facility and disposal at the FDP Enterprises site, the ENCAP Site, and the Prologis Port Reading Site was issued by the New Jersey Department of Environmental Protection, Office of Dredging and Sediment Technology and is included.
2. Sites for processing and final disposal have been narrowed down as described above.
3. All permits for the remaining sites have been updated and included in this submittal.
4. The FDP Upland Facility has also been designated to receive dredge material processed at the Koppers Seaboard Site.
5. References to Koppers Woodbridge have been changed to Port Reading.

**GLDD Revised 5-Day Submittal**

**IFB NO. W912DS-06-B-0005**
**MAINTENANCE DREGDING**
**NEWARK BAY, NEW JERSEY**

Included in its bid submission, Great Lakes listed five processing facilities and seven upland disposal sites. The choices for upland processing and final disposal have been This submission provides the required information for each of the facilities and the information follows the prescribed format for Paragraph 0800-1A1.

**Section 0800 1A.1 Information Submitted by the Apparent Low Bidder**

The apparent low bidder shall be officially notified by the Contracting Officer and instructed to submit the following information for the site(s):

*a) Name of the contractor identified offloading, processing and disposal sites(s)*
*b) Location (street address, city, state) of contractor identified sites(s)*
*c) Point of Contact for the contractor identified site and telephone number*
*d) Total capacity available at the contract identified sites for offloading, processing and placement of dredge materials for this contract.*

**Offloading & Processing Sites**

| | | |
|---|---|---|
| 1. | Site Name: | Claremont Dredge Material Processing Facility (DMPF) |
| | Location: | One Linden Avenue East<br>Jersey City, NJ 07305 |
| | Owner/Operator: | Clean Earth Dredging Technologies, Inc. |
| | Contact: | Kenneth Sykes, Operations Manager |
| | Phone: | (215) 996-4172 |
| | Site Contact: | John Huhn, Facility Manager |
| | Site Phone: | (201)395-0040 |
| | Capacity: | 3,500+ cubic yards per day |
| 2. | Site Name: | Koppers Seaboard Site |
| | Location: | Hackensack River<br>Kearny, New Jersey |
| | Owner: | Hudson County Improvement Authority |
| | Contact: | Norman Guerra |
| | Phone: | (201) 975-4555 |

| | |
|---|---|
| Operator: | Great Lakes Dredge & Dock Company |
| Contact: | Steve O'Hara |
| Phone: | (630) 574-3001 |
| Capacity: | 3,500+ cubic yards per day |

**Disposal Sites:**

1. F.D.P. Enterprises Intermodal Container Facility
Improvement Project Secaucus Road
P.O. Box 1067
Jersey City, Hudson County, New Jersey

| | |
|---|---|
| Capacity: | 1,500,000 cubic yards |
| Owner: | F.D.P. Enterprises, LLC |
| Contractor: | Clean Earth Dredging Technologies, Inc. |
| Contact: | Steven C. Sands |
| Phone: | (215) 734-1400, Ext. 212 |

2. EnCap Meadowlands Redevelopment Project Site
c/o Decotiis, Fitzpatrick, Cole & Wisler, LLP
Glen Pointe Centre West
500 Frank W. Burr Blvd.
Teaneck, New Jersey 07666
NJMC Kingsland, Rutherford, and Lyndhurst Landfills

| | |
|---|---|
| Capacity: | 1,500,000 cubic yards |
| Owner: | EnCap Golf Holding, LLC |
| Contact: | James T. Hockensmith, Sr. VP |
| Phone: | (201) 907-5288 |

Referred to in this document as "ENCAP".

3. Port Reading Business Park (formerly called Koppers Woodbridge) Site
50 Middlesex Avenue/Industrial Road
Middlesex County, New Jersey

| | |
|---|---|
| Capacity: | 1,500,000 cubic yards |
| Owner: | Prologis |
| Contact: | Mr. Steven Sands |
| Phone: | (215) 734-1400 Ext. 212 |

Referred to in this document as "Port Reading Site".

e) *Detailed list of all permits and approvals that are required for the selected site to demonstrate that the site is legal to receive, operate, process, and/or dispose of dredged Material and their status. Permits and approvals that shall be provided by the Apparent Low Bidder to the Government include placement site permits as applicable and other as related to transportation, processing and placement of the dredged material, or any other aspects of the bidder's proposed disposition of the dredged material including any and all permits, authorizations, contracts, agreements, licenses, rights-of-entry.*
f) *Identification of Regulatory Agency required to issue/approve items listed in e) above.*

Included in this section are the permits applicable to the proposed processing, transportation and placement of the dredged material, in response to the two aforementioned subsections (e and f).

**Contractor Identified Processing Facilities**

Great Lakes intends to transport the raw dredged material to either or both of the above listed offloading and processing facilities (Claremont DMPF and Koppers Seaboard). The permitting, development and operation of these facilities is regulated by the New Jersey Department of Environmental Protection (NJDEP), Office of Dredging & Sediment Technology. In 1997, the NJDEP adopted a technical guidance manual for dredging and dredged material management activities. The "guidance manual" is titled, The Management and Regulations of Dredging Activities and Dredged Material in New Jersey's Tidal Waters, October 1997. The guidance manual includes provisions, specifications, permitting requirements for sampling and analysis of dredged materials (raw and amended), dredging activities, handling, transfer, processing and disposal/beneficial use of dredged materials. Ancillary permits, such as air quality protection, are also issued by the NJDEP. Authorization for processing materials at these sites are granted under the New Jersey DEP Office of Dredging and Sediment Technology Authorized Use Determination (AUD) which is included in this submittal as **Appendix #1**.

1. **Claremont Dredged Material Processing Facility (DMPF)**

Below is a list of all required permits or interim guideline approvals that the Claremont DMPF already possesses.

- Waterfront Development Permit/Water Quality Certificate (Re: costal zone construction and land uses): No. 0906-04-0004.1.
- NJ Pollution Discharge Elimination System / Discharge to Surface Waters (Re: discharge of dredging water contained in barges, to Claremont Channel): Permit No. NJ1034015.
- Treatment Works Approval (Re: operation of barge dewatering treatment system): No. 99-3155-4G.
- General Air Permit: No. GEN040001.
- E&S Permit: Hudson-Essex-Passaic Soil Conservation District 99-H-1386.

- Jersey City Plan Approval & Certificate of Occupancy.

**Appendix** #2 to this submittal contains copies of all permits listed above.

The Claremont DMPF is not subject to any USACOE permitting requirements.

**2. Koppers Seaboard Facility**

The Koppers Seaboard Facility has all necessary permits and approvals to operate as a processing facility for the Newark Bay contract. All required permits or approvals specific to the Koppers Seaboard Facility are as follows:

- NJDEP Stream Encroachment Permit No. 0907-02-0003.3 FHA 040001
- NJDEP Air Quality Permit - Permit Activity ID Number PCP040001
- NJDEP Acceptable Use Determination
- HEP Soil Conservation District Permit File No. 204H-1926
- Town of Kearny Construction Permit No. 20050778
- NJMC Coastal Zoning Permit #04-319

**Appendix** #3 to this submittal contains copies of all permits listed above.

- The Koppers Seaboard Processing Facility is not subject to any USACOE Permitting requirements.

**Contractor Identified Upland Disposal Sites:**

**1. FDP Intermodal Container Facility Improvement Project**

The development of the FDP Enterprises Site involves the enhancement and filling of in excess of 30 acres of uplands (including detention basins) and 52+ acres of wetlands, a respectively, on a parcel in Jersey City, New Jersey, adjacent to the Penhorn Creek, a tributary of the Hackensack River, Pursuant to permits and approvals form the New Jersey Meadowlands Commission ("NJMC"), the New Jersey Department of Environmental Protection ("NJDEP") and the U.S. Army Corp of Engineers, New York District ("USACE"), collectively the "Fill Materials Permits." As part of the project, FDP anticipates using grading fill materials in order to fill and develop the approximately 82 acres over an approximately three-year period, commencing in Fall 2003.

The project anticipates a requirement of 1,500,000 cubic yards of grading material for the fill and development project through Spring 2007. Based on discussions with the NJMC, Clean Earth Dredging Technologies, Inc. ("CEDT") proposed on behalf of FDP an Alternate Fill Criteria entitled "Categories of Acceptable Fill" for inclusion in the Fill/Stockpile Permit Application to the NJMC, issued to FDP on March 28, 2003. Amended dredge material is included as a listed category of accepted fill material in the

NJMC Fill Stockpile permit. On September 24, 2003, the NJDEP Division of Remediation Management & Response issued an interim approval of a Remedial Action Workplan (RAWP) to accept fill material meeting certain chemical criteria for use as grading fill at the FDP Site. CEDT is contracted to the owner as the exclusive supplier of grading fill material to the site, including clean fill, select fill, ADM, and non-hazardous recyclable fill material meeting the requirement of the Fill Material Approvals, as amended. CEDT will also complete the on-site construction activities, including the wetlands mitigation project and the installation of water quality basins, in conjunction with the fill project.

Below is a list of all required permits or interim guideline approvals that the FDP Site already possesses.

- NJMC Conditional Zoning Certificate, including Fill/Stockpile Operations Permit, dated March 28, 2003.
- USACE Permit No. 1993-00081 for mitigation and enhancement of wetlands and filling of wetlands.
- NJDEP Water Quality Certificate No. 0906-92-006.5 dated December 20, 2000.Note that this permit is superceded by the USACE Permit 1993-00081 and such is no longer required.
- NJDEP Stream Encroachment Permit no. 0906-92-0006.6 dated July 30, 2001
- Hudson-Passaic-Essex Soil conservation District approval No. 202-H-1722 dated February 6, 2003. Expires August 2006, extension has been filed for.
- NJDEP RAWP interim approval letter dated September 24, 2003.

**Appendix #4** to this submittal contains copies of all permits listed above.

2. **EnCap Golf, LLC Meadowlands Redevelopment Project Site**

The EnCap site involves capping and closure of significant landfill acreage in the NJMC Kingsland, Rutherford, and Lyndhurst Landfills, and therefore will require in excess of 3,000,000 cubic yards of suitable construction fill materials for completion. EnCap has completed their final submittals to all applicable state agencies and has received final written approval for the acceptance and placement of Stabilized Dredge Material (SDM), subject to certain operating and permit restrictions. The approvals allow in excess of 3,000,000 cubic yards of stabilized dredged material to be used at the EnCap Landfill Redevelopment as part of the final capping design for the landfill closure and redevelopment project and conversion of the site to a mixed-use commercial, residential and recreational area. The New Jersey Department of Environmental Protection (NJDEP) has notified Great Lakes that the EnCap site is fully permitted to accept PDM. EnCap has advised that they will be ready to accept SDM from this project in August 2006. Project specific approvals will be necessary after presentation of results of testing and analyses of

the sediment from the Newark Bay Contract.

A list of all required permits or interim guideline approvals that the EnCap project already possesses along with copies of permits required for upland dredge disposal are included as **Appendix #5** of this submittal.

3. **Prologis Port Reading Business Park**

The Port Reading Facility is located in Woodbridge, NJ along the Arthur Kill Waterway. Amended dredge material will be utilized to cap the site for future development. This facility is fully permitted and is currently receiving processed dredge material.

Below is a list of Permits in hand for the Port Reading facility relevant for the upland disposal of dredge material:

- NJDEP Waterfront Development Permit
- NJDEP Water Quality Certificate
- NJDEP Freshwater Watlands Statewide General Permit
- NJDEP Transition Area Averaging Plan
- NJDEP Special Activity Transition Area Waiver
- NJDEP Acceptable Use Determination
- Materials Acceptance Plan

All permits for this site are included as **Appendix #6** to this submittal.

*g) Timeline for obtaining the required permits – Bar Chart for Obtaining Permits and Approvals – A bar chart indicating time(s) required for obtaining all permits/approvals required by the bidder for each item of work as described by the bidder. The schedule will detain the major steps (such as time to prepare the permit requires, the date it will be submitted to the regulatory agency, time for agency review, public coordination, etc.).*

See attached Project Construction Schedule **(Appendix #7).**

*h) Evidence of Anticipated Daily Production Capability – Evidence of the anticipated daily production capability (CY/day) and throughput rates for their proposed integrated system of dredging, offloading, transportation, processing, and placement for each contractor identified site(s).*

*i) Offloading, processing and disposal Site Elements Information –*

*1) State the capacity of each element of the system. This should include both he total capacity and uncommitted capacity of the disposal site(s), as well as the average*

*daily production rate and workdays per week that the processing site will operate;*

2) *Time frame for availability for each element of the system: hours of operation in each day; days of operation in each week; months of operation in each year;*

3) *Location of each element of the system: Descriptions with reference maps; Distances between the elements, measured in miles;*

The following provided responses to subsections h) and i), respectively for each processing facility and each of the associated upland disposal facilities.

1) Processing: **Claremont DMPF**
Upland Disposal: **FDP Site/ EnCap Site / Port Reading Site**

Clean Earth Dredging Technologies, Inc.(CEDTI) has represented and certified its capability for processing, transportation, and disposal of up to 3,500 cubic yards per day to Great Lakes.

The maximum capacity of each element of the system is therefore as follows:

a) Dredging and Water Transportation: 6,000 CY/day
b) Processing: CEDTI Claremont DMPF can process up to 3,500 CY/day in a 2-shift operation
c) Transportation by truck from Claremont DMPF to the FDP Site: 4,000+ CY/day
Transportation by truck from Claremont to EnCap: 4,000+CY/day
Transportation by truck from Claremont to Port Reading Site: 4,000+CY/day
e) Placement at all disposal sites: 4,000+CY/day

The hours of operation at the processing and disposal facilities are as follows:

| | |
|---|---|
| Claremont DMPF: | 24 hours per day, 6 day per week |
| FDP: | 24 hours per day, 6 days per week, 12 hours (6:00 a.m. to 6:00 p.m.) Sunday |
| EnCap: | 24 hours per day, 6 days per week, Sunday to be determined |
| Port Reading: | 24 hours per day, 7 days per week |

Distances between elements of the system are detailed below. Figures and site maps for each disposal location are included in **Appendix #8.**

The Claremont DMP facility is located approximately eight (8) nautical miles from the Newark Bay Dredging Site.

The FDP Upland Disposal Site is located approximately seven (7) miles by road from the Claremont DMP facility.

The EnCap Upland Disposal Site is located approximately nine (9) miles by road from the Claremont DMP facility.

The Port Reading Site is located approximately eighteen (18) miles by road from the Claremont DMP facility.

**2.** Processing: **Koppers Seaboard Kearny Processing Facility**
Upland Disposal: **EnCap Site, FDP Site**

The Koppers Seaboard Kearny Processing Facility will be equipped to process up to 4,500 cubic yards per day for the Newark Bay Project.

The maximum capacity of each element of the system is therefore as follows:

a) Dredging and water transportation: 6,000 CY/day.
b) Processing: The Koppers Seaboard Facility can process up to 4,500 CY/day in a 2-shift operation.
c) Transportation by truck from the Koppers Seaboard Facility to the EnCap Site: 4,500 CY/day.
d) Transportation by truck from the Koppers Seaboard Facility to the FDP Site: 4,500 CY/day.

The hours of operation at the processing and disposal facilities are as follows:

| | |
|---|---|
| Koppers Seaboard Kearny: | 24 hours per day, 7 days per week |
| EnCap Site: | 24 hours per day, 6 days per week, 12 hour Sunday |
| FDP Site: | 24 hours per day, 6 days per week, 12 hours (6:00 a.m. to 6:00 p.m.) Sunday |

Distances between elements of the system are detailed below. Figures and site maps for each disposal location are included in **Appendix #8.**

The Koppers Seaboard Kearny Processing Facility is located approximately five (5) nautical miles from the Newark Bay Dredging Site.

The EnCap Upland Disposal Site is located approximately five (5) miles by road from the Koppers Seaboard Kearny Processing Facility.

The FDP Upland Disposal Site is located approximately five (5) miles by road from the Koppers Seaboard Kearny Processing Facility.

*k)* *Offloading, Processing and Disposal Site(s) Construction Activity Schedule and Project Construction Schedule - A schedule showing the order in which the apparent low bidder proposes to perform the work and the dates on which the apparent low bidder contemplates starting and completing the salient features of work (including acquiring materials, plant and equipment, and the completion of the major acceptance areas). The schedule shall indicate that the production rate of the facility is sufficient to ensure that the project will be complete within the contract's required completion date. The apparent low bidder shall consider its proposed integrated system of dredging, transportation, processing, and placement. The schedule shall be in the form of a progress chart of suitable scale to indicate approximately the percentage of work scheduled for completion by any given date during the period. The apparent low bidder must indicate on this schedule the salient features of work for the contractor identified off loading, processing and disposal site(s) that are needed to be completed within 70 calendar days from the date the Apparent Low Bidder is notified of being the Apparent Low Bidder so that the site(s) is operational, capable of processing and disposing of all the dredged material for the in-situ quantity identified in the price schedule.*

As previously referenced, we have included as **Appendix #7** a detailed Construction Schedule based on a Notice to Proceed dated August 19, 2006.

## 1A.1.a SYNOPSIS OF PROPOSED OPERATION

### DREDGING

Dredging will be accomplished using a large clamshell dredge equipped with an enclosed clamshell bucket. We anticipate using our Clamshell Dredge No. 51 for this portion of the dredging. This dredge is outfitted with clamshell buckets ranging from fourteen to eighteen cubic yards. The dredge has three spuds used for anchoring the dredge in position. The stern spud is operated by a hydraulic ram which moves the dredge from area to area.

This contract includes 1 base area plus 6 optional dredging areas which require removal of recent shoaled materials that have been deemed unsuitable for HARS disposal. This material will be dredged and then processed for disposal at one of our designated approved upland disposal facilities. The clamshell dredge will cover each of these areas using an enclosed clamshell bucket with spoils loaded into hopper barges of 3,000 to 5,500 cubic yard capacity. We will dedicate four to six hopper barges to the project. Our 2,000 horsepower tugboat "McCormack Boys" will be utilized to maneuver the barges at the dredge site and to transport the barges to and from the processing location. Prior to transport of a loaded barge from the project site to a processing location, excess ponded water will be pumped from the loaded barge into another hopper barge dedicated for storage of decanted water.



G0100300476

The Dredge No. 51 has been utilized on many projects in the New York Harbor Area requiring upland disposal of dredge material. These projects include Port Elizabeth Pierhead Channel, Port Newark Reaches B and C, IMTT Bayonne, and Citgo Linden Terminal. Based on an average bank of material of 3 to 4 feet, 75% bucket fill factor, an 18 c.y. bucket, and an operating time efficiency of 70%, the Dredge No. 51 is capable of dredging over 6,000 cubic yards per day. Our construction schedule is based on an average of 3,500 cubic yards per day due to the limitations of the upland disposal process.

Great Lakes owns and operates several other clamshell dredges in addition to the Dredge No. 51. The Dredge No. 131 operates using a 12 cubic yard enclosed bucket. Both the dredges No. 54 and No. 55 operate using 26 cubic yard environmental buckets. One or more of these clamshell dredges are typically assigned to projects in the New York Harbor Area and could be available to be used on this project. We have included as **Appendix #9** information sheets detailing the particulars of these clamshell dredges.

All dredging activities will be supervised by personnel experienced in this type of work. To ensure quality control, the project will be staffed with a full time survey crew and survey vessel. Dredging operations will be conducted 24 hours per day and 7 days per week.

## MATERIAL PROCESSING AND DISPOSAL

Great Lakes listed five processing facilities in its original bid submission for this contract. We anticipate using a combination of two of these facilities (Claremont DMPF of Koppers Seaboard) to accomplish the dredging and disposal of non-rock material unsuitable for HARS disposal. The following describes each of these processing facilities.

### 1. Clean Earth Dredging Technologies, Inc.

The Claremont Processing Facility is operated by Clean Earth Dredging Technologies, Inc. and has been used on various Corps and Port Authority projects over the past several years. This facility possesses all required federal, state and local permits to operate in this capacity. This facility can operate 24 hours per day and 7 days per week depending on the requirements of the project. In order to process approximately 4,000 cubic yards per day, the facility will operate two shifts per day.

Once a hopper barge is loaded with material and the barge is dewatered, the barge will then be transported using the McCormack Boys to the Clean Earth Processing Facility located along the Claremont Channel in Jersey City, NJ (approximately 8 nautical miles from the dredging site).

The loaded barge will be secured along the dock face to be unloaded. Existing water depth at the dock face is approximately 25 feet at Mean Low Water. Loaded barges will draft 15 feet. The barge will be positioned to be unloaded using a hydraulic excavator equipped with a clamshell

bucket. A small plate will be lowered between the dock face and the barge to catch any material which may spill from the bucket during unloading. The excavator will load dredged material into a large hopper which feeds a pug mill. The pug mill mixes the dredged material with stabilizing agents in preparation for transport to the designated upland disposal facility. Once the material is mixed in the pug mill, the material is stockpiled at the facility for curing. When curing is complete, the material is loaded using front end loaders or hydraulic excavators into dump trucks for shipment to either the FDP Site, Koppers Woodbridge, or the EnCap Site.

2. <u>Koppers Seaboard</u>

The Koppers Seaboard Processing Facility will be operated by Great Lakes Dredge & Dock Company. This facility possesses all required permits and approvals to operate as a dredge material processing facility and is in the assembly phase for the operating equipment. This facility can operate 24 hours per day and 7 days per week depending on the requirements of the project. In order to process approximately 4,500 cubic yards per day, the facility will operate two shifts per day.

Once a hopper barge is loaded with material and the barge is dewatered, the barge will then be transported using the tug McCormack Boys to the Koppers Seaboard Processing Facility located along the Hackensack River in Kearny, NJ (approximately 5 nautical miles from the dredging site).

The loaded barge will be secured along the dock face to be unloaded. Existing water depth at the dock face is approximately 30 feet at Mean Low Water. Loaded barges will draft 15 feet. The barge will be positioned to be unloaded using a hydraulic excavator equipped with a clamshell bucket. A small plate will be lowered between the dock face and the barge to catch any material which may spill from the bucket during unloading. The excavator will load dredged material into a large hopper which feeds a pug mill. The pug mill mixes the dredged material with stabilizing agents in preparation for transport to the designated upland disposal facility. Once the material is mixed in the pug mill, the material is stockpiled at the facility for curing. When curing is complete, the material is loaded using front end loaders or hydraulic excavators into dump trucks for shipment to either the EnCap Site of the FDP Site.

<u>Upland Disposal</u>

Great Lakes listed seven upland disposal facilities in its bid submission for this contract. We have since narrowed down the possibilities for final placement of materials from this project. We anticipate using one or a combination of the three remaining facilities to accomplish the dredging and disposal of non-rock material unsuitable for HARS disposal. The following describes each of these upland disposal facilities:

**1. FDP Site**

The FDP Upland Disposal Facility is located in Jersey City, NJ and is operated by Clean Earth Dredging Technologies, Inc. This facility possesses all required federal, state and local permits to operate as an upland disposal facility for dredge material. This facility has been used for the disposal of material unsuitable for disposal at the HARS from several projects in the New York Harbor area. All of the material disposed of at this facility has been processed at the Clean Earth Processing Facility located along the Claremont Channel in Jersey City, NJ. Delivery of processed dredge material is limited to truck delivery only.

After dredge material is processed and cured, the material is loaded into dump trucks for transport from the processing facility to the FDP Site. The dump trucks will travel an approved transportation route from the processing facility to the upland disposal site to avoid contact with residential areas. The distance from the processing facility at Claremont to the FDP Site is approximately seven miles. Upon arrival at the FDP Site, each truck will be directed to a specific location and the material dumped in a designated grid. The material will then be placed and compacted using standard earth moving equipment such as bulldozers and vibratory compactors to the required specifications of the FDP Facility. The FDP Facility can operate 24 hours per day Monday through Saturday and 12 hours on Sunday.

**2. EnCap Site**

The EnCap Site is located in Lyndhurst, NJ and is operated by a subcontractor to the Owner of the site. This facility possesses all required federal, state and local permits to operate as an upland disposal facility for dredge material. The site has been open and operational since July of 2004. This facility can still accommodate approximately 1,000,000 + cubic yards more of dredge material.

After dredge material is processed and cured, the material is loaded into dump trucks for transport from the processing facility to the EnCap Site. The dump trucks will travel an approved transportation route from the processing facility to the upland disposal site to avoid contact with residential areas. The distance from the Claremont Processing Facility to the EnCap Site is approximately nine miles and from the Koppers Seaboard Processing Facility to the EnCap Site is approximately five miles. Upon arrival at the EnCap site, each truck will be directed to a stockpile area and the material dumped there. EnCap's on site subcontractor will remove material from this stockpile for placement and compaction at the facility to the required specifications. The EnCap Site can operate 24 hours per day and six days per week.

**3. Port Reading Site**

The Port Reading Site is located in Woodbridge, NJ and is operated by Clean Earth Dredging Technologies, Inc.. This facility possesses all required federal, state and local permits to operate as an upland disposal facility for dredge material. The site has been operational since 2005 and

can accommodate approximately 1,500,000 cubic yards of additional dredge material.

After dredge material is processed and cured, the material is loaded into dump trucks for transport from the processing facility to the Port Reading Site. The dump trucks will travel an approved transportation route from the processing facility to the upland disposal site to avoid contact with residential areas. The distance from the Claremont Processing Facility to the Port Reading Site is approximately fifteen miles. Upon arrival at the Port Reading Site, each truck will be directed to a stockpile area and the material dumped there. Clean Earth Dredging Technology will remove material from this stockpile for placement and compaction at the facility to the required specifications. The Koppers Woodbridge Site can operate 24 hours per day and six days per week.

**(70-Day Submittal Resumed)**

b) *Evidence demonstrating that the contractor identified offloading, processing and disposal site(s) is Permitted, Operational, Capable of Offloading, Processing and Disposing Dredged Material from the project site - The apparent low bidder must demonstrate to the Government with **70 calendar days** from the date the Apparent low bidder is notified of being the low bidder that the contractor identified offloading, processing and disposal site(s) is permitted, operational, capable of processing and disposing of the Non-rock material unsuitable for placement at the HARS for the in-site quantity as per **line items 0002 thru 0009** by **calendar day 70** from date the Apparent low bidder is notified of being the low bidder that the offloading, processing and/or disposal site(s) is in compliance with the New Jersey Department of Environmental Protection and/or with the New York State Department of State Coastal Zone Management Program Policies or other host state compliance as appropriate for the offloading, processing and disposal of dredged material. Any sampling and testing required for obtaining permits required for dredged material transportation, processing or placement will be at the cost of the Apparent low bidder. The Apparent Low Bidder must provide to the Government proof that the material to be taken from the project site to the Apparent Low Bidder's upland site(s) meets any regulatory testing requirements.*

The contractor identified offloading and processing sites for this 70 day submittal are the Claremont Dredged Material Processing Facility (DMPF) located in Jersey City, NJ and the Koppers Seaboard Site located in Kearny, NJ. These facilities are operated by CleanEarth Dredging Technologies, Inc. (CEDTI) and Great Lakes Dredge & Dock Company, LLC (GLDD), respectively. Included as **Appendix #10** to this submittal is a commitment letter dated from CEDTI which addresses many of the issues for this and subsequent sections of this 70-day submittal.

The Claremont DMPF is fully permitted by all Federal, State and Local Authorities having jurisdiction for unloading and processing dredge material not suitable for HARS disposal. This facility is currently operational and has been utilized over the past 6 years

to process dredged taken from throughout the New York Harbor. CEDTI has certified to Great Lakes that this facility is available to unload and process the full volume of material unsuitable for HARS disposal for the duration of the contract period.

The Koppers Seaboard Site is also fully permitted by all Federal, State, and Local Authorities having jurisdiction for unloading and processing dredge material not suitable for HARS disposal. This facility has the required equipment in place and is ready to operate. The Port Newark and Pierhead Channels (PNPC) project will be the first to send dredge material to this site for processing and currently there are no other projects scheduled that would be in conflict at this site. All processing operations will be dedicated to the PNPC project during the required performance period. A commitment letter generated by Great Lakes Dredge & Dock Company, LLC for this project is attached as **Appendix #11.**

There are three contractor identified upland disposal sites for this submittal, the first of which is the FDP Enterprises Intermodal Container Facility Improvement Project located in Secaucus, NJ. This facility is operated by CEDTI. The FDP Facility is fully permitted by all Federal, State and Local Authorities having jurisdiction for disposal of dredged material not suitable for HARS disposal. This facility is currently operational and has received dredged material from other projects in the New York Harbor Area. Clean Earth has provided a letter of commitment, included as **Appendix #10.**

The second contractor identified upland disposal sites for this submittal is the EnCap Golf, LLC Meadowlands Redevelopment Project Site located in Lyndhurst, NJ. This facility is operated by subcontractors to EnCap Golf Holding, LLC . The ENCAP Facility is fully permitted by all Federal, State and Local Authorities having jurisdiction for disposal of dredged material not suitable for HARS disposal. This facility is currently operational and has received dredged material from numerous projects in the New York Harbor Area. Currently their remains 1,000,000+ cubic yards of capacity at this site, of which approximately 80,000 is available for use on this project. EnCap Golf Holding, LLC has provided a letter of commitment for this site which has been included as **Appendix #12.**

The third contractor identified upland disposal sites for this submittal is the Port Reading Business Park located in Middlesex County, NJ. This facility is operated by CEDTI. The Port Reading Facility is fully permitted by all Federal, State and Local Authorities having jurisdiction for disposal of dredged material not suitable for HARS disposal. This facility is currently operational and has already begun receiving dredged material from projects in the New York Harbor Area. CEDTI has provided a letter of commitment for this site and is included as **Appendix #10.**

No additional permits are required for dredging, offloading, processing or disposal of material dredged from this project.

c) *Copies of Required Permits - The Apparent low bidder shall provide copies of all required permits and approvals for dewatering and/or other processing (if any), the transfer, transportation and final disposal of all dredged materials, and shall submit evidence of such permits and approvals to the Government. Documentation of compliance with any other legal or regulatory requirement must be provided to the Government including Water Quality Certificates (WQC) in accordance with Section 401 of the Clean Water Act, Coastal Zone Management (CZM) consistency determinations, and State agreement pursuant to Section 307 of the Coastal Zone Management Act of 1972 as amended, for activities conducted in a state, which has a federally approved Coastal Zone Management program. WQC and CZM permits related to the dredging (as opposed to dredged material transport, disposal and placement) will be provided by the New York District U.S. Army Corps of Engineers; Section 00902 and Section 00903.*

1. Copies of all permits required to operate the Claremont Dredged Material Processing Facility are attached as **Appendix #2** to this submittal.
2. Copies of all permits required to operate the Koppers Seaboard Dredge Processing Facility are attached as **Appendix #3** to this submittal.
3. Copies of all permits required to operate the FDP Upland Disposal Facility are attached as **Appendix #4** to this submittal.
4. Copies of all permits required to operate the ENCAP Upland Disposal Facility are attached as **Appendix #5** to this submittal.
5. Copies of all permits required to operate the Port Reading Disposal Facility are attached as **Appendix #6** to this submittal.

d) *The Apparent Low Bidder must provide:*

1) *Proof of the contractor identified Offloading, Processing and/or Disposal Site(s) being licensed for acceptance of dredged material by all appropriate regulatory entities (permits for the site previously provided should be also included in this submission).*

As described above, Great Lakes intends to utilize both the Claremont Dredged Material Processing Facility and the Koppers Seaboard Dredged Material Processing Facility to offload and process material not suitable for HARS disposal. These facilities are fully permitted by all regulatory entities having jurisdiction. Copies of all permits have been included in this submission and have been referenced above.

Great Lakes also intends to utilize the FDP Facility, the ENCAP Facility, and the Port Reading Facility for disposal of all dredged material not suitable for HARS disposal. These facilities are fully permitted by all regulatory entities having jurisdiction. Copies of all permits are included in this submission and have been referenced above.

2) *Proof of Offloading, Processing and Disposal Site(s) Owner's approval granting the apparent low bidder the right to offload, process and/or dispose dredged material at that site.*

The Claremont Dredged Material Processing Facility, FDP Facility, and the Port Reading Facility are all operated by CEDTI. CEDTI has certified to Great Lakes by letter that these facilities are available for the entire contract duration for the entire volume of material not suitable for HARS disposal.

3) *Proof of Disposal Site(s) uncommitted capacity adequate for the project.*

The FDP Facility has a total capacity of 1,500,000 cubic yards. Approximately 144,000 cubic yards of capacity has been committed to other projects. By certification letter included as **Appendix #11**, CEDTI has committed capacity for the entire volume of material from the project.

The ENCAP Facility has a total remaining capacity of 1,000,000+ cubic yards, none of this which has been committed to other projects. By letter included as Appendix 12, EnCap Golf Holding, LLC has committed capacity of 88,000 cubic yards for material from this project.

The Port Reading Facility has a total capacity of 1,000,000+ cubic yards. By letter **(Appendix #11),** CEDTI has committed capacity sufficient for this project.

4) *Certification of the offloading, processing and/or disposal Site's availability corresponding to the current project schedule.*

CEDTI operates the Claremont Dredged Material Processing Facility, the FDP Facility, and the Port Reading Facility. CEDTI has certified to Great Lakes by letter (Appendix 11) that these facilities are available for the entire contract duration for the entire volume of material not suitable for HARS disposal.

Great Lakes Dredge & Dock Company operated the Koppers Seaboard Dredged Material Processing Facility. At this time there are no other projects slated for treatment at the Koppers Seaboard Site and by letter **(Appendix #10)** we confirm that the site will be available for processing material from the PNPC Project the entire contract duration.

EnCap Golf Holding, LLC operates the ENCAP Upland Disposal Facility. By letter **(Appendix #12)** EnCap Golf Holding, LLC has certified to Great Lakes that this facility will be available to received materials during the PNPC Project duration.

5) *Proof of approval by the appropriate regulatory agencies that the dredged material for this contract is compatible for processing and/or disposal at the proposed processing/and/or Disposal Site(s).*

On July 27, 2006, the New Jersey Department of Environmental Protection - Office of Dredging and Sediment Technology issued the Acceptable Use Determination (AUD) for this project. This AUD authorizes the offloading and processing of dredged material at the Claremont Dredged Material Processing Facility and the Koppers Seaboard Facility with disposal of the material at the FDP Enterprises Facility, ENCAP Facility, and the Port Reading Facility. A copy of this AUD is included as **Appendix #1** of this submission.

6) *Demonstrate minimum required offloading, processing and disposal Site(s) production capability to ensure that the project will be completed within the contract requirement. The Apparent low bidder shall provide the estimated daily production rates for processing and disposal for each contractor identified disposal site(s).*

Material dredged on this project will be offloaded and processed at either the Claremont Dredged Material Processing Facility or the Koppers Seaboard Facility. As listed before, disposal of material from the Claremont DMPF will occur at either the FDP or Koppers Woodbridge sites and disposal of material from the Koppers Seaboard Site will be disposed of at the ENCAP facility of the FDP facility. The Claremont DMPF, the FDP Site, and the Port Reading Site are all operated by Clean Earth Dredging Technologies, Inc. (CEDTI). These sites are all currently in use either processing or receiving dredge material and CEDTI has certified that these facilities can each handle a minimum of 3,500 cubic yards per day.

The Koppers Seaboard Facility will be operated by Great Lakes and has been designed to accept and treat over 4,000 cubic yards of dredge spoil a day. Our experience in working with upland disposal contractors over the years has proven that the limiting factors while processing are typically due to the size of the pug mills and the ability to store material short term on site. We have addressed each of these factors by the following:

- Pug Mill – Our mill is sized to handle up to 500 tons (300 cubic yards dredge spoil) per hour. We anticipate working 2 shifts (16 hours per day), with the ability to process 4,800 cubic yards per day.
- Our site covers 20 acres and has been laid out in a way to allow for up to 16,000 cubic yards (4 days capacity) to be stored on site, which is allowed by our permits. This way we can ride out the high and low periods of material

transportation and acceptance at the disposal sites (often due to weather) while not affecting the processing plant.

Material processed at the Koppers Site will be disposed of at the ENCAP facility or the FDP facility. EnCap Golf Holding, LLC has certified that it's disposal site can receive up to 3,000 cubic yards a day for this project.

The construction schedule previously submitted is based on an average daily production of 3,500 cubic yards for treatment and upland disposal of material. The contract allows for 65 days to complete the base work dredging (170,420 cubic yards) and one additional day for each 3,500 cubic yards awarded under the optional phase. In other words, the contract requires an average production rate of 2,621 cubic yards per day on the base work and 3,500 cubic yards per day for the optional work. Each of these facilities alone will be capable of meeting the required production rates on the base and the optional items. It is our intention to utilize both the Claremont and Kearny upland-processing facilities simultaneously and, on average, expect a daily production two times the minimum daily production required in order to complete this project within the time allowed.

7) *Proof of apparent low bidder's experience in the proposed offloading, processing and disposal Site(s) operations, or, provide supplemental information demonstrating ability to execute the proposed disposal method, if no direct experience is applicable.*

The Claremont DMPF is currently operational and has been used on several projects in the New York Harbor Area including the Kill Van Kull Contract 6 Area 8 Project. The FDP Enterprises Upland Disposal Site, ENCAP Disposal Site, and Port Reading Site are all also currently operational and have received dredged material not suitable for HARS disposal from other projects in the New York Harbor Area.

The Koppers Seaboard Site will be operated by Great Lakes Dredge & Dock Company. While GLDD has not solely operated an upland processing facility, we have over 100 years experience in the dredging industry and have intimate knowledge of what it takes to handle dredge spoils. Additionally, we have been involved with the processing and upland disposal of dredge materials in the New York since the first pilot projects in 1995 at Howland Hook Marine Terminal and 1996 at the Port of New York and New Jersey. While GLDD has been primarily tasked with the dredging on upland projects over the years, we have spent considerable time, effort, and finances involving ourselves in the processing and disposal end of each or these upland projects. Ensuring productivity on the disposal end was necessary to ensure that our dredges had the ability to remain productive. The experiences garnered while working with, and at times advising, our disposal subcontractors has put us in position to be qualified to operate the site at Kearny.

e) *Transportation Capabilities - The Apparent Low Bidder must provide the following:*

1) *Provide proof and certification that sufficient transportation capabilities are available to ensure that the project will be completed within the contract requirement. Provide proof that the proposed transportation equipment has current permits, licenses, registrations, or other required certifications.*

**Waterborne Transportation**

Great Lakes will commit a minimum of six barges for the transportation of dredged material from the Newark Bay and Pierhead Channels Project to the offloading and processing facilities specified above. The barges have a capacity of ranging from 3,000 to 5,500 cubic yards each. All of these hopper barges are owned by Great Lakes and have been utilized on other projects in New York Harbor in this same application.

Great Lakes will commit the Tug Boat McCormack Boys for the transport of barges from the dredge site to the upland disposal facilities. The McCormack Boys is a twin screw tug boat and is rated at 2,200 horsepower. This boat is owned by Great Lakes and has been used extensively in the transport of our hopper barge fleet in New York Harbor and Baltimore Harbor. The distance from the dredge site to the Claremont Facility is approximately eight nautical miles and approximately five nautical miles from the Dredge site to the Koppers Facility. Depending on ship traffic, the McCormack Boys will transport a loaded hopper barge from the dredge site to either the Claremont Facility or the Koppers Facility in approximately two hours. If production warrants additional tug capacity, Great Lakes can mobilize its Tug Lowry to the project site. The Tug Lowry is also owned by Great Lakes, is rated at 2,000 horsepower, and is twin screw.

All of the equipment utilized in the Waterborne transportation of material dredged on this project possess the required marine certifications to operate this equipment. Attached as **Appendix #13** are the required certifications for the equipment proposed for use on this project.

**Ground Transportation**

After dredge material is offloaded and processed at either the Claremont or Koppers Seaboard Facilities, the material will be loaded into tri-axle dump trucks for transport to the either the FDP Enterprises Site, the ENCAP Site, or the Port Reading Site. All dump trucks utilized will be equipped with sealed tailgates and tarp covers to prevent spillage of material during transport.

CEDTI operates the Claremont Processing Facility and both the FDP and Port Reading

Sites and will manage the ground transport between the these facilities. CEDTI maintains arrangements with local trucking firms to accommodate its transportation requirements. These local transporters either own or lease over 70 tri-axle dump trucks. Based on the distance from the Claremont Processing Facility to the FDP Site and a daily anticipated production of 3,500 to 4,000 cubic yards, up to 20 trucks will be used to transport the dredge material from the processing facility to the upland site. Due to the greater distance between the Claremont Processing Facility and the Port Reading Site, up to 25 trucks per day will be utilized to transport dredge material.

Great Lakes will manage the ground transport between the Koppers Seaboard Site and the ENCAP or FDP facilities. Great Lakes has been involved in dredging and transport of materials for over 100 years and has managed the trucking of spoils on numerous projects. For this project, we intend to utilize the services of local truckers that have extensive experience hauling dredge spoils to the ENCAP facility on other projects. Assuming an anticipated daily production rate of 3,500 to 4,000 cubic yards, up to 18 trucks will be used to transport the dredge material from the Koppers Seaboard Facility to ENCAP.

*2) Provide proof of the apparent low bidder's experience in the proposed dredged material transportation or provide supplemental information demonstrating the ability to execute the proposed transportation method, if no direct experience is applicable.*

Great Lakes has participated in several projects similar in nature to this project utilizing hopper barges and tug boats to transport dredge material not suitable for HARS disposal from the dredge site to an offloading and processing facility. Great Lakes has performed two contracts for the Corps in New York at Elizabeth Pierhead Channel in 2001 and at Kill Van Kull Contract No. 5 in 2002. In addition to these projects, Great Lakes has performed several contracts for the Port Authority of New York and New Jersey and for many private clients in the New York Harbor Area.

CEDTI will manage the ground transportation for material trucked from the Claremont Processing facility to both the FDP Upland Disposal Site and to the Port Reading Site. CEDTI has extensive experience transporting processed dredge material on previous projects in New York Harbor including Kill Van Kull Contract 6 Area 8.

Great Lakes will manage the ground transportation for material trucked from the Koppers Seaboard Site to the ENCAP or FDP facilities. Great Lakes has had numerous projects within the New York metro area, throughout the Unites States, and abroad where we have managed the trucking of both treated and untreated dredge spoils.

*f.) Processing Capabilities – The Apparent Low Bidder must provide the following:*

*I) Provide detailed description of the proposed processing technology, including but not limited to, the following stages, if applicable:*

*a) Dewatering, addressing retention time, any limitations on return of effluent, limitation on location for effluent release, proposed method for effluent disposal, if applicable. Debris removal, addressing the methods of removal and disposal.*

*b) Material treatment, specifying the method of treatment, additives used during the processing, mechanical processing used, decontamination methods incorporated, stabilization methods incorporated, and chemical treatment (if any).*

*c) Interim storage, if required, identifying the method of storage, required and available storage capacity, and the time frame it will be used, if applicable.*

*d) Rehandling of material (if any) used in the processing of dredged material affecting the project.*

After a hopper barge is loaded with dredged material unsuitable for HARS disposal, the Barge will be transported to a dewatering station located either at a berth in Port Newark, Port Elizabeth, or at the Great Lakes yard on Staten Island. Excess ponded water will be pumped from the loaded barge into a 3,000 cubic yard hopper barge dedicated to storage of decanted water. This dedicated water storage barge will be emptied periodically throughout the course of the project. Stored water will only be discharged back into the project area in accordance with the AUD, with the Water Quality Certificate, and after a minimum 24-hour settling period.

After dewatering, the decanted hopper barge loaded with dredged material will then be transported from the dewatering station to either the Claremont DMPF or to the Koppers Seaboard Facility. The hopper barge will be moored and any apparent oversize debris will be removed from the barges using a conventional hydraulic excavator. Debris separated either by the excavator or by screens in the loading hopper will be disposed of at a permitted disposal facility. In order to transport the dredged materials to either the FDP Enterprises, ENCAP, or Port Reading upland disposal facilities, the dredged material will be stabilized (i.e. solidified) as described below.

The raw dredged material will be stevedored from the hopper barge into a pug mill processing system utilizing a hydraulic excavator equipped with a hydraulic enclosed clamshell bucket. The bucket will be tightly sealed and fitted with a shroud to prevent the loss of the dredged material during stevedoring operations. The excavator will be positioned on land adjacent to the hopper barge. The hopper barge will be moored tightly to the dock to minimize the potential for the dredged material to be released to the channel. Additionally, a spill plate is permanently

positioned between the hopper barge and the dock to prevent any spillage of dredged material into the channel.

The dredged material will be stevedored directly into a scalping unit that will screen the debris to 4-inch minus. Materials greater than 4 inches shall be handled as debris. The screened dredged material falls directly into a receiving hopper that feeds a conveyor belt. The conveyor belt delivers dredged material directly to a twin-shaft pugmill. All conveyors are equipped with spill containment systems. In the pugmill, the dredged material is mixed with reagent admixtures, which are introduced to the pugmill chamber via an enclosed delivery system. Emissions from the pugmill and additive delivery systems are controlled by bag house dust-collection devices. The entire dredged material processing system is covered by a General Air Quality Permit. After mixing, the amended dredged material empties from the pug mill onto a radial stacking conveyor. The "radial stacker" can be positioned to load directly into trucks, or to stockpile the material for re-handling later to trucks.

After stabilization, the amended dredge material will be stockpiled in an on-site staging area for curing. The amended dredge material will then be loaded into trucks by end loaders or by excavators equipped with clamshell buckets for transport to either the FDP Enterprises, ENCAP, or Koppers Woodbridge upland disposal sites.

2) *Provide any permits and/or licenses applicable to the proposed process, if any.*

The Claremont Dredged Material Processing Facility is currently in operation processing dredged material from New York Harbor that is unsuitable for HARS disposal. This facility is fully permitted to operate in this capacity. All permits required to operate this facility are included in **Appendix** #2 of this submittal.

The Koppers Seaboard site is currently ready for operation to process dredge spoils and is fully permitted to operate in this capacity. All permits required to operate this facility are included in **Appendix** #3 of this submittal.

3) *Provide any patented or proprietary permissions applicable to the proposed process, if any.*

There are no patented or proprietary permissions applicable to either the Claremont Dredged Material Processing Facility or to the Koppers Seaboard Dredge Processing Facility.

4) *Provide proof of processing plant availability for use by apparent low bidder.*

Clean Earth Dredging Technologies, Inc. has certified by letter dated July 27, 2006 that the Claremont Dredged Material Facility is available for use on this contract for the entire duration and volume of material of the project.

Great Lakes has included pictures of its processing facility installed at the Koppers Seaboard Site in **Appendix #14**. We certify in the letter dated July 31, 2006 that the Koppers Seaboard Site is available for the entire duration and volume of material of the project.

5. *Certify processing plant's availability corresponding to the current project schedule.*

Clean Earth Dredging Technologies, Inc. has certified by letter dated July 27, 2006 that the Claremont Dredged Material Facility is available for use on this contract for the entire duration of the project entire volume of material.

Great Lakes has certified by letter dated July 31, 2006 that the Koppers Seaboard Facility is available for use on this contract for the entire duration of the project and entire volume of material.

6. *Provide proof of Apparent Low Bidder's experience in the proposed processing method or, provide supplemental information demonstrating ability to execute the proposed processing method, if no direct experience is applicable.*

Clean Earth Dredging Technologies, Inc. has been processing dredged material not suitable for HARS disposal for the past several years at its Claremont Dredged Material Processing Facility. This facility was used to process dredged material not suitable for HARS disposal on the Kill Van Kull Contract 6 Area 8 Project. In addition to this project, the facility has been used on many Port Authority of New York and New Jersey and other private projects in the New York Harbor Area.

The Koppers Seaboard Site will be operated by Great Lakes Dredge & Dock Company. While GLDD has not solely operated an upland processing facility, we have over 100 years experience in the dredging industry and have intimate knowledge of what it takes to handle dredge spoils. Additionally, we have been involved with the processing and upland disposal of dredge materials in the New York since the first pilot projects in 1995 at Howland Hook Marine Terminal and 1996 at the Port of New York and New Jersey. While GLDD has been primarily tasked with the dredging on upland projects over the years, we have spent considerable time, effort, and finances involving ourselves in the processing and disposal end of each or these upland projects. Ensuring productivity on the disposal end was necessary to ensure that our dredges had the ability to remain productive. The experiences garnered while working with, and at times advising, our disposal subcontractors has put us in position to be qualified to operate the site at Kearny.

# TABLE OF CONTENTS


| | |
|---|---|
| Appendix 1 - | NJDEP Acceptable Use Determination |
| Appendix 2 - | Permits for Claremont Dredged Material Processing Facility |
| Appendix 3 - | Permits for Kopper Seaboard Processing Facility |
| Appendix 4 - | FDP Permits |
| Appendix 5 - | Encap Golf Permits |
| Appendix 6 - | Prologis Port Reading Business Park Site Permits |
| Appendix 7 - | Product Construction Schedule |
| Appendix 8 - | Figures & Sight Maps |
| Appendix 9 - | Clamshell Dredge Particulars |
| Appendix 10 - | GLDD Letter of Commitment |
| Appendix 11 - | CEDTI Letter of Commitment |
| Appendix 12 - | Encap Golf Holding LLC Letter of Commitment |
| Appendix 13 - | Waterborn Equipment Certifications |
| Appendix 14 - | Koppers Seaboard Facility Pictures |

APPENDIX 1

# APPENDIX 1

## NJDEP ACCEPTABLE USE DETERMINATION

| Post-it® Fax Note 7671 | Date [redacted] |
|---|---|
| To [redacted] | From DBM |
| Co./Dept. GLDD | Co. JFK |
| Phone # | Phone |
| Fax # (630) 574-2909 | Fax |

State of
DEPARTMENT OF E

JON S. CORZINE
*Governor*

*Commissioner*

Office of Dredging and Sediment Technology
P.O. Box 028
Trenton, NJ 08625
(609) 292-1250
FAX (609) 777-1914

July 27, 2006

Mr. Art Fletcher, P.E.
Division Engineer
Great Lakes Dredge and Dock Company, LLC
2122 York Road
Oak Brook, Illinois 60523

RE: Acceptable Use Determination
Source: ACOE Newark Bay Federal Navigation Channels Maintenance Dredging Project

Dear Mr. Fletcher:

This letter is forwarded in response to your request, dated July 24, 2006, for an Acceptable Use Determination (AUD) to allow for the processing of approximately 383,695 cy of non-HARS suitable material from the ACOE Newark Bay Federal Navigation Channels Maintenance Dredging Project. It is understood the initial volume of material to be dredged in the area identified as "Basic Work" equates to approximately 170,420 cy (Shoal #1 located in Port Newark Pierhead Federal Navigation Channel) as provided in the contract specifications. Additional material may be removed via six options areas equating to approximately 213, 275 cy. These options areas are identified in plans and specifications as Shoal 1A through Shoal 6 and are located in the Port Newark Channel. The AUD application also requested authorization for placement of the dredged material from the contract at the FDP Enterprises Site in Jersey City, the Prologis Port Reading Business Park Site located in Woodbridge Township, or the EnCap site located in the NJ Meadowlands District. The material is to be processed at the CEDTI facility or the GLDD Koppers Processing Facility.

The Department has reviewed the information presented in the AUD application, and the analytical results provided for the material in the document entitled "Technical Report on the Sampling and Testing of Sediments from the Newark Bay Channels for Upland Beneficial Use in New Jersey or New York" (July 21, 2006).

A review of the analytical data indicates that all of the material meets the acceptance criteria for placement at the FDP Enterprises Site and the Prologis Port Reading Business Park Site. However, the Department has determined that the following areas of the dredging contract <u>do not</u> meet the Non-Residential Direct Contract Soil Cleanup Criteria established in the May 24, 2006 fill protocol as the placement criteria for the PDM Barrier Layer at the EnCap site:

Basic Work (Shoal 1)
Option 1 (Shoal 1A)
Option 5 and 6 (Shoal 5 and 6)

The results for these option areas reported elevated levels of Benzo (a) pyrene above the Non-Residential Direct Contact Soil Cleanup Criteria (NRDCSCC), and therefore the material from these option areas has been found unacceptable for placement at the EnCap site.

Accordingly, the following AUD conditions are imposed on the processing, transport and placement of the 383,695 cy of dredged material from this dredging contract:

**Acceptable Use Determination**

1. No dredged material shall be transported to the GLDD Koppers Processing Facility for processing until all conditions specified in the July 7, 2004 Acceptable Use Determination issued for the operation of the processing facility have been met. GLDD shall receive written authorization from the Office that all conditions have been met in the AUD prior to accepting any material from this contract at the facility

2. The dredged material from this contract shall be processed using a minimum of 8% Portland Cement at the designated processing facility as provided in the AUD application.

3. All of the material (383,695 cy) from this contract has been found acceptable for placement at the FDP site and the Prologis Port Reading Business Park Site provided the following conditions are met:

   **FDP Enterprises Site**

   The material shall be placed at the FDP site consistent with the Remedial Action Workplan approval dated September 24, 2003.

   The designated contractor shall comply with all conditions imposed in the NJDEP Water Quality Certificate (File No. 0906-92-0006.5) issued December 20, 2000, as modified on December 3, 2003, and Stream Encroachment Permit (File No. 0906-92-0006.6) issued July 20, 2001.

   **Prologis Port Reading Business Park Site**

   The designated contractor shall comply with all conditions specified in the Remedial Action Work Plan approved by the NJDEP on February 4, 1999 for the former Koppers/Beazer site, and the RAWP issued for the PSE&G site approved on March 10, 2005. For clarification purposes, the Prologis Port Reading Business Park Site involves the remediation of the three former industrial sites; the Koppers/Beazer site, the PSE&G site, and the Staflex site.

   The designated contractor shall comply with all conditions imposed in the Waterfront Development Permit/Water Quality Certificate/Freshwater Wetlands Statewide General Permit #6, 10B, 11, and 27/Transition Area Averaging Plan/Special Activity Transition Area Waiver and

Acceptable Use Determination issued for the site on January 7, 2004 (DEP File #1225-04-0008.1 and 1225-04-0008.2), and any modification thereto.

4. Option Areas 2, 3 and 4 which equates to approximately 81,725 cy have been found acceptable for placement at the EnCap site as PDM cap material. Placement of material at the site shall comply with the following conditions :

<u>EnCap Site</u>

The 81,725 cy material from the above referenced options areas is only acceptable for use as PDM cap material consistent with the fill protocol approvals issued for the EnCap site on November 7, 2002 (as amended on April 29, 2004, and May 24, 2006 (Protocol for PDM barrier layer).

The designated contractor shall comply with all conditions specified in the AUDs issued for the placement of processed dredged material (PDM) on the Avon, Lyndhurst and Rutherford Landfills dated January 17, 2003, and dated April 17, 2003 for the Kingsland Landfill.

The designated contractor shall comply with all conditions relating to processed dredged material placement as specified in the Remedial Action Workplan approvals and Closure Plan approvals issued for the Avon, Lydhurst and Rutherford landfills dated September 18, 2001, as modified on October 29, 2002, and all amendments thereto. Donjon Marine Co., Inc. shall comply with all conditions specified in the Closure Plan approval issued for the Kingsland Landfill on January 27, 2003 and all amendments thereto.

5. The designated processing facility shall comply with all conditions imposed in the WFD or operating AUD and any subsequent modifications or renewals thereto for facility. The identified processing facility shall comply with all conditions specified in the NJPDES/DSW permit issued to the facility, as applicable.

6. All trucks used to transport processed dredged material to the above referenced placement sites shall be tarped pursuant to the applicable State DOT requirements or applicable regulatory agency requirements.

If you have any questions regarding this letter, please feel free to contact me at (609) 292-8838.

Sincerely,

Suzanne U. Dietrick

Suzanne U. Dietrick, Chief
Office of Dredging and Sediment Technology
Site Remediation and Waste Management

C: Gary Greulich, SRWM, Bureau of Northern Field Operations
Maryanne Goldman, SRWM
Robert Hayton, SRWM

Mr. Thomas Moran
EnCap Golf Holdings, LLC
One Meadowlands Plaza
Suite 810
East Rutherford, NJ 07073

Mr. Daniel Morrow
Environmental Manager
Clean Earth Dredging Technologies, Inc.
334 South Warminster Road
Hatboro, PA 19040

APPENDIX 2

# APPENDIX 2

## PERMITS FOR CLAREMONT DREDGED MATERIAL PROCESSING FACILITY

04-007 permits

# State of New Jersey

Richard J. Codey
*Acting Governor*

Department of Environmental Protection

Division of Water Quality
P.O. Box 029 Trenton, NJ 08625-0029
Phone: (609) 633-3869
Fax: (609) 984-7938

Bradley M. Campbell
Commissioner

DEC 2 9 2004

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

DEC 2 3 2004

Daniel Morrow, Environmental Manager
Clean Earth Dredging Technologies Incorporated
334 South Warminster Road
Hatboro, PA 19040

Re: Final Surface Water Renewal Permit Action
Category: B - Industrial Wastewater
NJPDES Permit No. NJ0134015
CEDTI Dredged Material Recycling Facility
Jersey City, Hudson County

Dear Mr. Morrow:

Enclosed is a final New Jersey Pollutant Discharge Elimination System (NJPDES) permit action identified above which has been issued in accordance with N.J.A.C. 7:14A. The permit is for the discharge of approximately 60,000 GPD of barge decant and stormwater runoff via outfall DSN001A to the Claremont Channel (Upper New York Bay) classified as SE-2 waters.

No written comments were received on the draft action during the comment period, and no provisions of the draft permit have been changed in the final permit. Therefore, the right by you, or any third party, to contest the permit conditions in an adjudicatory hearing has been waived pursuant to N.J.A.C. 7:14A-15.13.

As per N.J.A.C. 7:14A-4.2(e)3, any person planning to continue discharging after the expiration date of an existing NJPDES permit shall file an application for renewal at least 180 calendar days prior to the expiration of the existing permit. Please note that as specified at N.J.A.C. 7:14A-4.4(b)3ii(1), this facility shall submit the results from a minimum of at least one acute and one chronic whole effluent toxicity test performed on the same sample(s) as part of the renewal application.

All monitoring shall be conducted in accordance with 1) the Department's "Field Sampling Procedures Manual" applicable at the time of sampling (N.J.A.C. 7:14A-6.5(b)4), and/or 2) the method approved by the Department in Part IV of the permit. The Field Sampling Procedures Manual is available through Maps and Publications Sales Office; Bureau of Revenue, PO Box 417, Trenton, New Jersey 08625, at (609) 777-1038.

As a result of this permit action, your monitoring report forms have been changed. Beginning the effective date of the permit, please use the new MRFs. Questions regarding the new forms shall be directed to this Bureau for further clarification.

For your convenience, a schedule of submittal requirements has been included with this permit package.

Questions or comments regarding the final action should be addressed to Jeff Thein at (609) 633-3869.

Sincerely,

Howard B. Tompkins, Chief
Bureau of Point Source Permitting Region I

Enclosures

cc: Permit Distribution List

Masterfile #: 18924; PI #: 49732

Fncv_dsw.rtf

# FACILITY SUBMITTALS

## DR - General Discharge Requirements

| Task Description | Actual Due Date |
|---|---|
| Submit a Complete Permit Renewal Application | 07/04/2009 |

## 2. B - Industrial Wastewater

| Task Description | Actual Due Date |
|---|---|
| Submit an Acute Methodology Questionnaire | 03/02/2005 |
| Certification of Operations and Maintenance (O&M) Manual Preparation | 04/01/2005 |
| Submit an Acute Whole Effluent Toxicity Test Report | 04/26/2005 |
| Submit an Acute Whole Effluent Toxicity Test Report | 07/26/2005 |
| Submit an Acute Whole Effluent Toxicity Test Report | 10/26/2005 |
| Submit an Acute Whole Effluent Toxicity Test Report | 01/26/2006 |
| Submit an Acute Whole Effluent Toxicity Test Report | 04/26/2006 |
| Submit an Acute Whole Effluent Toxicity Test Report | 07/26/2006 |
| Submit an Acute Whole Effluent Toxicity Test Report | 10/26/2006 |
| Submit an Acute Whole Effluent Toxicity Test Report | 01/26/2007 |
| Submit an Acute Whole Effluent Toxicity Test Report | 04/26/2007 |
| Submit an Acute Whole Effluent Toxicity Test Report | 07/26/2007 |
| mit an Acute Whole Effluent Toxicity Test Report | 10/26/2007 |
| Submit an Acute Whole Effluent Toxicity Test Report | 01/26/2008 |
| Submit an Acute Whole Effluent Toxicity Test Report | 04/26/2008 |
| Submit an Acute Whole Effluent Toxicity Test Report | 07/26/2008 |
| Submit an Acute Whole Effluent Toxicity Test Report | 10/26/2008 |
| Submit an Acute Whole Effluent Toxicity Test Report | 01/26/2009 |
| Submit an Acute Whole Effluent Toxicity Test Report | 04/26/2009 |
| Submit an Acute Whole Effluent Toxicity Test Report | 07/26/2009 |
| Submit an Acute Whole Effluent Toxicity Test Report | 10/26/2009 |

# Table of Contents

**This permit package contains the items checked below:**

1. **Cover Letter**
2. **Facility Submittals**
3. **Table of Contents**
4. **NJPDES Permit Authorization Page**
5. **Part I – General Requirements: NJPDES**
6. **Part II – General Requirements: Discharge Categories**
7. **Part III – Limits and Monitoring Requirements**
8. **Part IV – Specific Requirements: Narrative**

New Jersey Department of Environmental Protection

# NEW JERSEY POLLUTANT DISCHARGE ELIMINATION SYSTEM

The New Jersey Department of Environmental Protection hereby grants you a NJPDES permit for the facility/activity named in this document. This permit is the regulatory mechanism used by the Department to help ensure your discharge will not harm the environment. By complying with the terms and conditions specified, you are assuming an important role in protecting New Jersey's valuable water resources. Your acceptance of this permit is an agreement to conform with all of its provisions when constructing, installing, modifying, or operating any facility for the collection, treatment, or discharge of pollutants to waters of the state. If you have any questions about this document, please feel free to contact the Department representative listed in the permit cover letter. Your cooperation in helping us protect and safeguard our state's environment is appreciated.

**Permit Number: NJ0134015**

**Final: Surface Water Renewal Permit Action**

**Permittee:**
Clean Earth Dredging Technologies Incorporated
334 South Warminster Road
Hatboro, PA 19040

**Co-Permittee:**

**Property Owner:**
Hugo Neu Schnitzer East
1 Jersey Avenue
Jersey City, NJ 07302

**Location Of Activity:**
CEDTI Dredged Material Recycling Facility
1 Linden Avenue East
Jersey City, NJ 07305

| Authorization(s) Covered Under This Approval | Issuance Date | Effective Date | Expiration Date |
|---|---|---|---|
| B -Industrial Wastewater | 12/22/2004 | 01/01/2005 | 12/31/2009 |

**By Authority of:**
**Commissioner's Office**

**DEP AUTHORIZATION**
**Howard B. Tompkins, Chief**
**Bureau of Point Source Permitting – Region 1**
**Division of Water Quality**

(Terms, conditions and provisions attached hereto)

Division of Water Quality

fcp_sw.rtf

# PART I
# GENERAL REQUIREMENTS:
# NJPDES

**A. General Requirements of all NJPDES Permits**

**1. Requirements Incorporated by Reference**

a. The permittee shall comply with all conditions set forth in this permit and with all the applicable requirements incorporated into this permit by reference. The permittee is required to comply with the regulations, including those cited in paragraphs b. through e. following, which are in effect as of the effective date of the final permit.

| | |
|---|---|
| b. General Conditions | |
| Penalties for Violations | N.J.A.C. 7:14-8.1 et seq. |
| Incorporation by Reference | N.J.A.C. 7:14A-2.3 |
| Toxic Pollutants | N.J.A.C. 7:14A-6.2(a)4i |
| Duty to Comply | N.J.A.C. 7:14A-6.2(a)1 & 4 |
| Duty to Mitigate | N.J.A.C. 7:14A-6.2(a)5 & 11 |
| Inspection and Entry | N.J.A.C. 7:14A-2.11(e) |
| Enforcement Action | N.J.A.C. 7:14A-2.9 |
| Duty to Reapply | N.J.A.C. 7:14A-4.2(e)3 |
| Signatory Requirements for Applications and Reports | N.J.A.C. 7:14A-4.9 |
| Effect of Permit/Other Laws | N.J.A.C. 7:14A-6.2(a)6 & 7 & 2.9(c) |
| Severability | N.J.A.C. 7:14A-2.2 |
| Administrative Continuation of Permits | N.J.A.C. 7:14A-2.8 |
| Permit Actions | N.J.A.C. 7:14A-2.7(c) |
| Reopener Clause | N.J.A.C. 7:14A-6.2(a)10 |
| Permit Duration and Renewal | N.J.A.C. 7:14A-2.7(a) & (b) |
| Consolidation of Permit Process | N.J.A.C. 7:14A-15.5 |
| Confidentiality | N.J.A.C. 7:14A-18.2 & 2.11(g) |
| Fee Schedule | N.J.A.C. 7:14A-3.1 |
| Treatment Works Approval | N.J.A.C. 7:14A-22 & 23 |
| c. Operation And Maintenance | |
| Need to Halt or Reduce not a Defense | N.J.A.C. 7:14A-2.9(b) |
| Proper Operation and Maintenance | N.J.A.C. 7:14A-6.12 |
| d. Monitoring And Records | |
| Monitoring | N.J.A.C. 7:14A-6.5 |
| Recordkeeping | N.J.A.C. 7:14A-6.6 |
| Signatory Requirements for Monitoring Reports | N.J.A.C. 7:14A-6.9 |
| e. Reporting Requirements | |
| Planned Changes | N.J.A.C. 7:14A-6.7 |
| Reporting of Monitoring Results | N.J.A.C. 7:14A-6.8 |
| Noncompliance Reporting | N.J.A.C. 7:14A-6.10 & 6.8(h) |
| Hotline/Two Hour & Twenty-four Hour Reporting | N.J.A.C. 7:14A-6.10(c) & (d) |
| Written Reporting | N.J.A.C. 7:14A-6.10(e) &(f) & 6.8(h) |
| Duty to Provide Information | N.J.A.C. 7:14A-2.11, 6.2(a)14 & 18.1 |
| Schedules of Compliance | N.J.A.C. 7:14A-6.4 |
| Transfer | N.J.A.C. 7:14A-6.2(a)8 & 16.2 |

# PART II

# GENERAL REQUIREMENTS: DISCHARGE CATEGORIES

## A. Additional Requirements Incorporated By Reference

### 1. Requirements for Discharges to Surface Waters

a. In addition to conditions in Part I of this permit, the conditions in this section are applicable to activities at the permitted location and are incorporated by reference. The permittee is required to comply with the regulations which are in effect as of the effective date of the final permit.

i. Surface Water Quality Standards N.J.A.C. 7:9B-1

ii. Water Quality Management Planning Regulations N.J.A.C. 7:15

## B. General Conditions

### 1. Scope

a. The issuance of this permit shall not be considered as a waiver of any applicable federal, state, and local rules, regulations and ordinances.

### 2. Permit Renewal Requirement

a. Permit conditions remain in effect and enforceable until and unless the permit is modified, renewed or revoked by the Department.

b. Submit a complete permit renewal application: 180 days before the Expiration Date.

### 3. Notification of Non-Compliance

a. The permittee shall notify the Department of all non-compliance when required in accordance with N.J.A.C. 7:14A-6.10 by contacting the DEP HOTLINE at 1-877-WARNDEP (1-877-927-6337).

b. The permittee shall submit a written report as required by N.J.A.C. 7:14A-6.10 within five days.

### 4. Notification of Changes

a. The permittee shall give written notification to the Department of any planned physical or operational alterations or additions to the permitted facility when the alteration is expected to result in a significant change in the permittee's discharge and/or residuals use or disposal practices including the cessation of discharge in accordance with N.J.A.C. 7:14A-6.7.

b. Prior to any change in ownership, the current permittee shall comply with the requirements of N.J.A.C. 7:14A-16.2, pertaining to the notification of change in ownership.

### 5. Access to Information

a. The permittee shall allow an authorized representative of the Department, upon the presentation of credentials, to enter upon a person's premises, for purposes of inspection, and to access / copy any records that must be kept under the conditions of this permit.

6. **Operator Certification**

a. Pursuant to N.J.A.C. 7:10A-1.1 et seq. every wastewater system not exempt pursuant to N.J.A.C. 7:10A-1.1(b) requires a licensed operator. The operator of a system shall meet the Department's requirements pursuant to N.J.A.C. 7:10A-1.1 and any amendments. The name of the proposed operator, where required shall be submitted to the Department at the address below, in order that his/her qualifications may be determined prior to initiating operation of the treatment works.

i. Notifcations shall be submitted to:
NJDEP
Examination and Licensing Unit
P.O. Box 417
Trenton, New Jersey 08625
(609)777-1012

b. The permittee shall notify the Department of any changes in licensed operator within two weeks of the change.

7. **Operation Restrictions**

a. The operation of a waste treatment or disposal facility shall at no time create: (a) a discharge, except as authorized by the Department in the manner and location specified in Part III of this permit; (b) any discharge to the waters of the state or any standing or ponded condtion for water or waste, except as specifically authorized by a valid NJPDES permit.

8. **Residuals Management**

a. The permittee shall comply with land-based sludge management criteria and shall conform with the requirements for the management of residuals and grit and screenings under N.J.A.C. 7:14A-6.15(a), which includes:

i. Standards for the Use or Disposal of Residual, N.J.A.C. 7:14A-20;

ii. Section 405 of the Federal Act governing the disposal of sludge from treatment works treating domestic sewage;

iii. The Solid Waste Management Act, N.J.S.A. 13:1E-1 et seq., and the Solid Waste Management Rules, N.J.A.C. 7:26;

iv. The Sludge Quality Assurance Regulations, N.J.A.C. 7:14C;

v. The Statewide Sludge Management Plan promulgated pursuant to the Water Quality Planning Act, N.J.S.A. 58:11A-1 et seq., and the Solid Waste Management Act, N.J.S.A. 13:1E-1 et seq.; and

vi. The provisions concerning disposal of sewage sludge and septage in sanitary landfills set forth at N.J.S.A. 13:1E-42 and the Statewide Sludge Management Plan.

vii. Residual that is disposed in a municipal solid waste landfill unit shall meet the requirements in 40 CFR Part 258 and/or N.J.A.C. 7:26 concerning the quality of residual disposed in a municipal solid waste landfill unit. (That is, passes the Toxicity Characteristic Leaching Procedure and does not contain "free liquids" as defined at N.J.A.C. 7:14A-1.2.)

b. If any applicable standard for residual use or disposal is promulgated under section 405(d)of the Federal Act and Sections 4 and 6 of the State Act and that standard is more stringent than any limitation on the pollutant or practice in the permit, the Department may modify or revoke and reissue the permit to conform to the standard for residual use or disposal.

c. The permittee shall make provisions for storage, or some other approved alternative management strategy, for anticipated downtimes at a primary residual management alternative. The permittee shall not be permitted to store residual beyond the capacity of the structural treatment and storage components of the treatment works. N.J.A.C. 7:14A-20.8(a) and N.J.A.C. 7:26 provide for the temporary storage of residuals for periods not exceeding six months, provided such storage does not cause pollutants to enter surface or ground waters of the State. The storage of residual for more than six months is not authorized under this permit. However, this prohibition does not apply to residual that remains on the land for longer than six months when the person who prepares the residual demonstrates that the land on which the residual remains is not a surface disposal site or landfill. The demonstration shall explain why residual must remain on the land for longer than six months prior to final use or disposal, discuss the approximate time period during which the residual shall be used or disposed and provide documentation of ultimate residual management arrangements. Said demonstration shall be in writing, be kept on file by the person who prepares residual, and submitted to the Department upon request.

d. The permittee shall comply with the appropriate adopted District Solid Waste or Sludge Management Plan (which by definition in N.J.A.C. 7:14A-1.2 includes Generator Sludge Management Plans), unless otherwise specifically exempted by the Department.

e. The preparer must notify and provide information necessary to comply with the N.J.A.C. 7:14A-20 land application requirements to the person who applies bulk residual to the land. This shall include, but not be limited to, the applicable recordkeeping requirements and certification statements of 40 CFR 503.17 as referenced at N.J.A.C 7:14A-20.7(j).

f. The preparer who provides biosolids to another person who further prepares the biosolids for application to the land must provide this person with notification and information necessary to comply with the N.J.A.C. 7:14A-20 land application requirements.

g. Any person who prepares bulk residual in New Jersey that is applied to land in a State other than New Jersey shall comply with the requirement at N.J.A.C. 7:14A-20.7(b)1.ix and/or 20.7(b)1.x, as applicable, to provide written notice to the Department and to the permitting authority for the State in which the bulk residual is proposed to be applied.

# PART III
# LIMITS AND MONITORING REQUIREMENTS

| MONITORED LOCATION: | RECEIVING STREAM: | STREAM CLASSIFICATION: | DISCHARGE CATEGORY(IES): |
|---|---|---|---|
| 001A Dredging Outfall | Claremont Channel/Upper NY Bay | SE2(C2) | B - Industrial Wastewater |

**Location Description**

Sampling shall be conducted after treatment and prior to discharge to the Claremont Channel at Latitude 40 41' 14" and Longitude 74 04' 47".

**Contributing Waste Types**

Other Type of Process H2O, Storm Water Runoff

**Surface Water DMR Reporting Requirements:**

Submit a Monthly DMR: within twenty-five days after the end of every month beginning from the effective date of the permit (EDP).

**Table III - A - 1: Surface Water DMR Limits and Monitoring Requirements**

**PHASE:** Final **PHASE Start Date:** **PHASE End Date:**

| Parameter | Sample Point | Limit | Limit | Units | Limit | Limit | Limit | Units | Frequency | Sample Type |
|---|---|---|---|---|---|---|---|---|---|---|
| Flow, In Conduit or Thru Treatment Plant | Effluent Gross Value | REPORT Monthly Average | REPORT Daily Maximum | GPD | ***** | ***** | ***** | ***** | 1/Month | Metered |
| January thru December | QL | *** | *** | | *** | *** | *** | | | |
| pH | Rain | ***** | ***** | ***** | REPORT Monthly Minimum | ***** | ***** | SU | 1/Month | Grab |
| January thru December | QL | *** | *** | | *** | *** | *** | | | |
| pH | Effluent Gross Value | ***** | ***** | ***** | 6.5 Monthly Minimum | ***** | 8.5 Monthly Maximum | SU | 1/Month | Grab |
| January thru December | QL | *** | *** | | *** | *** | *** | | | |
| Solids, Total Suspended | Effluent Gross Value | ***** | ***** | ***** | ***** | 30 Monthly Average | 45 Weekly Average | MG/L | 1/Month | Grab |
| January thru December | QL | *** | *** | | *** | *** | *** | | | |
| LC50 Statre 96hr Acu Mysid Bahia | Effluent Gross Value | ***** | ***** | ***** | 50 Report Per Minimum | ***** | ***** | %EFFL | 1/Quarter | Check Requirements |
| January thru December | QL | *** | *** | | *** | *** | *** | | | |

**Surface Water DMR Reporting Requirements:**

Submit a Monthly DMR: within twenty-five days after the end of every month beginning from the effective date of the permit (EDP).

**Table III - A - 1: Surface Water DMR Limits and Monitoring Requirements**

**PHASE:** Final **PHASE Start Date:** **PHASE End Date:**

| Parameter | Sample Point | Limit | Limit | Units | Limit | Limit | Limit | Units | Frequency | Sample Type |
|---|---|---|---|---|---|---|---|---|---|---|
| Petroleum Hydrocarbons | Effluent Gross Value | ***** | ***** | ***** | ***** | 10 Monthly Average | 15 Instant Maximum | MG/L | 1/Month | Grab |
| January thru December | QL | *** | *** | | *** | *** | *** | | | |
| Carbon, Tot Organic (TOC) | Effluent Gross Value | ***** | ***** | ***** | ***** | REPORT Monthly Average | REPORT Daily Maximum | MG/L | 1/Month | Grab |
| January thru December | QL | *** | *** | | *** | *** | *** | | | |
| Lead, Total Recoverable | Effluent Gross Value | ***** | ***** | ***** | ***** | 50 Monthly Average | 100 Daily Maximum | UG/L | 1/Month | Composite |
| January thru December | RQL | *** | *** | | *** | 10 | 10 | | | |
| Mercury Total Recoverable | Effluent Gross Value | ***** | ***** | ***** | ***** | REPORT Monthly Average | 1 Daily Maximum | UG/L | 1/Month | Composite |
| January thru December | RQL | *** | *** | | *** | *** | 1 | | | |

# PART IV

# SPECIFIC REQUIREMENTS: NARRATIVE

## Industrial Wastewater

### A. MONITORING REQUIREMENTS

#### 1. Standard Monitoring Requirements

a. Each analysis required by this permit shall be performed by a New Jersey Certified Laboratory that is certified to perform that analysis.

b. The Permittee shall perform all water/wastewater analyses in accordance with the analytical test procedures specified in 40 CFR 136 unless other test procedures have been approved by the Department in writing or as otherwise specified in the permit.

c. The permittee shall utilize analytical methods that will ensure compliance with the Quantification Levels (QLs) listed in PART III. If the permittee and/or contract laboratory determines that the QLs achieved for any pollutant(s) generally will not be as sensitive as the QLs specified in PART III, the permittee must submit a justification of such to the Bureau of Point Source Permitting Region 1. Failure to submit a justification is a permit violation.

d. All sampling shall be conducted in accordance with the Department's Field Sampling Procedures Manual; or an alternate method approved by the Department in writing.

e. All monitoring shall be conducted as specified in Part III.

f. All sample frequencies expressed in Part III are minimum requirements. However, if additional samples are taken, analytical results shall be reported as appropriate.

g. The permittee shall perform all residual analyses in accordance with the analytical test procedures specified in 40 CFR 503.8 and the Sludge Quality Assurance Regulations (N.J.A.C. 7:14C) unless other test procedures have been approved by the Department in writing or as otherwise specified in the permit.

h. Flow shall be measured using a flow meter.

i. The pH shall not be less than 6.5 s.u. or the measured pH of the precipitation event at the time of monitoring. The pH of the precipitation event shall be reported as the influent pH on the DMR.

### B. RECORDKEEPING

#### 1. Standard Recordkeeping Requirements

a. The permittee shall retain records of all monitoring information including all calibration and maintenance records, all original strip chart recordings for continuous monitoring instrumentation, copies of all reports, and all data used to complete the application for this permit.

b. Records of monitoring information shall include the date, locations and time of sampling or measurements, the individual who performed the sampling or measurements, the date the samples were collected, the date the samples were analyzed, the individual who performed the analysis, the analytical method used, and the results.

c. The permittee shall retain copies of all reports required by a NJPDES permit and records of all data used to complete the application for a NJPDES permit for a period of at least 5 years unless otherwise required by 40 CFR Part 503.

d. The permittee shall allow an authorized representative of the Department, upon the presentation of credentials, to enter upon a person's premises, for purposes of inspection, and to access / copy any records that must be kept under the conditions of this permit.

## C. REPORTING

### 1. Standard Reporting Requirements

a. The permittee shall submit all required monitoring results to the DEP on the forms provided to the following addresses:

i. NJDEP
Division of Water Quality
Bureau of Permit Management
P.O. Box 029
Trenton, New Jersey 08625

b. If requested by the Water Compliance and Enforcement Bureau, please send the information requested to the following address:

i. Northern Bureau of Water Compliance and Enforcement
1259 Route 46 East
Parsippany, NJ 07054-4191

c. For submittal of paper monitoring report forms:

i. All monitoring reports shall be signed by the highest ranking official having day-to-day managerial and operational responsibilities for the discharging facility in accordance with N.J.A.C. 7:14A-6.9.

ii. The highest ranking official may delegate responsibility to sign in accordance with NJAC 7:14A-6.9(c).

d. For electronic submittal of monitoring report forms:

i. The permittee shall submit all monitoring results to the DEP in the approved electronic format. Paper copies must be available for on-site inspection by DEP personnel or provided to the DEP upon written request.

ii. All monitoring reports required by this permit shall be certified by the highest ranking official having day-to-day managerial and operational responsibility for the facility.

iii. The highest ranking official may delegate responsibility to certify in accordance with NJAC 7:14A-6.9(c).

e. Monitoring reports shall be completed in accordance with the current Discharge Monitoring Report Manual and any updates.

f. When quantification levels (QL) and effluent limits are both specified for a given parameter in Part III, effluent compliance will be determined by comparing the reported value against the QL.

g. If monitoring for a parameter is not required for that monitoring period, the permittee is required to report "CODE=N" on that Monitoring Report Form.

h. For intermittent discharges, the permittee shall obtain a sample during at least one of the discharge events occurring during a monitoring period. Report "NODI" only if there are no discharge events during the entire monitoring period.

## D. SUBMITTALS

### 1. Standard Submittal Requirements

a. The permittee shall prepare an Operation and Maintenance (O&M) Manual including an emergency plan in accordance with requirements of N.J.A.C. 7:14A-6.12(c).

b. Submit a certification that an Operations and Maintenance (O&M) Manual has been prepared: within 90 days from the effective date of the permit (EDP).

c. The permittee shall amend the Operation & Maintenance Manual whenever there is a change in the treatment works design, construction, operations or maintenance which substantially changes the treatment works operations and maintenance procedures.

## E. FACILITY MANAGEMENT

### 1. Discharge Requirements

a. The permittee shall discharge at the location(s) specified in PART III of this permit.

b. The permittee shall not discharge foam, or cause objectionable deposits, or foaming of the receiving water.

c. The permittee's discharge shall not produce objectionable color or odor in the receiving stream.

d. The discharge shall not exhibit a visible sheen.

### 2. Interstate Environmental Commission

a. The permittee shall comply with the Interstate Environmental Commission's (IEC) "Water Quality Regulations." Although no monitoring requirements specific to the IEC are included in this permit, compliance may be determined by the IEC based on its own sampling events. IEC effluent requirements shall not be considered effluent limitations for the purpose of mandatory penalties under N.J.S.A. 58:10A-10.1.

### 3. Applicability of Discharge Limitations and Effective Dates

a. The effluent limitations contained in PART III apply for the full term of this permit action.

### 4. Operation, Maintenance and Emergency conditions

a. The permittee shall operate and maintain treatment works and facilities which are installed or used by the permittee to achieve compliance with the terms and conditions of the permit as specified in the Operation & Maintenance Manual.

b. The permittee shall develop emergency procedures to ensure effective operation of the treatment works under emergency conditions in accordance with NJAC 7:14A-6.12(d).

### 5. Sludge Management

a. The permittee shall manage the residual generated at the facility in accordance with the Approved Sludge Management Plan.

6. **Toxicity Testing Requirements-Acute Whole Effluent Toxicity**

   a. The permittee shall conduct toxicity tests on its wastewater discharge in accordance with the provisions in this section. Such testing will determine if appropriately selected effluent concentrations adversely affect the test species.

   b. Acute toxicity tests shall be conducted using the test species and method identified in Part III of this permit.

   c. Any test that does not meet the specifications of N.J.A.C. 7:18, laboratory certification regulations, must be repeated within 30 days of the completion of the initial test. The repeat test shall not replace subsequent testing required in Part III.

   d. The permittee shall collect and analyze the concentration of ammonia-N in the effluent on the day a sample is collected for WET testing. This result is to be reported on the Biomonitoring Report Form.

   e. Submit an Acute Methodology Questionnaire: within 60 days from the effective date of the permit (EDP). The permittee shall resubmit after any change of laboratory occurs.

   f. Submit an acute whole effluent toxicity test report: within twenty-five days after the end of every quarterly monitoring period beginning from the effective date of the permit (EDP). The permittee shall submit toxicity test results on appropriate forms.

   g. Test reports shall be submitted to:
      New Jersey Department of Environmental Protection
      Division of Water Quality, Bureau of Point Source Permitting Region I
      P.O. Box 029
      Trenton, New Jersey 08625

7. **Toxicity Reduction Implementation Requirements (TRIR)**

   a. The permittee shall initiate a tiered toxicity investigation if two out of six consecutive WET tests demonstrate that the effluent does not comply or will not comply with the toxicity limit specified in Part III of this permit.

      i. If the exceedence of the toxicity limit is directly caused by a documented facility upset, or other unusual event which has been identified and appropriately remedied by the permittee, the toxicity test data collected during the event may be eliminated when determining the need for initiating a TRIR upon written Department approval.

   b. The permittee shall begin toxicity characterization within 30 days of the end of the monitoring period when the second toxicity test exceeds the toxicity limits in Part III. The monitoring frequency for toxicity testing shall be increased to semi-monthly (i.e. every two months). Up to 12 additional tests may be required.

      i. The permittee may return to the toxicity testing frequency specified in Part III if four consecutive toxicity tests conducted during the Toxicity Characterization do not exceed the toxicity limit.

      ii. If two out of any six consecutive, acceptable tests again exceed the toxicity limit in Part III, the permittee shall repeat Toxicity Reduction Implementation Requirements.

   c. The permittee shall initiate a preliminary toxicity identification (PTI) upon the fourth exceedence of the toxicity limit specified in Part III during toxicity characterization.

i. The permittee may return to the monitoring frequency specified in PART III while conducting the PTI. If more frequent WET testing is performed during the PTI, the permittee submit all biomonitoring reports to the DEP and report the results for the most sensitive species on the DMR.

ii. As appropriate, the PTI shall include:
(1) treatment plant performance evaluation,
(2) pretreatment program information,
(3) evaluation of ammonia and chlorine produced oxidants levels and their effect on the toxicity of the discharge,
(4) evaluation of chemical use and processes at the facility, and
(5) an evaluation of incidental facility procedures such as floor washing, and chemical spill disposal which may contribute to effluent toxicity.

iii. If the permittee demonstrates that the cause of toxicity is the chlorine added for disinfection or the ammonia concentration in the effluent and the chlorine and/or ammonia concentrations are below the established water quality based effluent limitation for chlorine and/or ammonia, the permittee shall identify the procedures to be used in future toxicity tests to account for chlorine and/or ammonia toxicity in their preliminary toxicity identification report.

iv. The permittee shall submit a Preliminary Toxicity Identification Notification within 15 months of triggering TRIR. This notification shall include a determination that the permittee intends to demonstrate compliance OR plans to initiate a CTI.

d. The permittee must demonstrate compliance with the WET limitation in four consecutive WET tests to satisfy the requirements of the Toxicity Reduction Investigation Requirements. After successful completion, the permittee may return to the WET monitoring frequency specified in PART III.

e. The permittee shall initiate a Comprehensive Toxicity Investigation (CTI) if the PTI does not identify the cause of toxicity and a demonstration of consistent compliance with the toxicity limit in Part III can not be made.

i. The permittee shall develop a project study plan identifying the party or parties responsible for conducting the comprehensive evaluation, establish a schedule for completing the study, and a description of the technical approach to be utilized.

ii. If the permittee determines that the PTI has failed to demonstrate consistent compliance with the toxicity limit in Part III , a Comprehensive Toxicity Investigation Workplan must be prepared and submitted within 90 days.

iii. The permittee shall summarize the data collected and the actions taken in CTI Quarterly Reports. The reports shall be submitted within 30 calendar days after the end of each quarter.

iv. The permittee shall submit a Final CTI Report 90 calendar days after the last quarterly report. The final CTI report shall include the corrective actions identified to reduce toxicity and a schedule for implementing these corrective actions.

f. Upon receipt of written approval from the Department of the corrective action schedule, the permittee shall implement those corrective actions consistent with that schedule.

i. The permittee shall satisfy the requirements of the Toxicity Reduction Implementation Requirements and return to the original toxicity monitoring frequency after corrective actions are implemented and the permittee demonstrates consistent compliance with the toxicity limit in Part III in four consecutive toxicity tests.

ii. If the implemented corrective measures do not result in consistent compliance with the toxicity limit in Part III, the permittee shall submit a plan for resuming the CTI.

## F. CONDITIONS FOR MODIFICATION

### 1. Causes for modification

a. Pursuant to N.J.A.C. 7:14A-6.2(a)(10)(iii), the Department may modify or revoke and reissue any permit to incorporate limitations or requirements to control the discharge of toxic pollutants, including whole effluent, chronic and acute toxicity requirements, chemical specific limitations or toxicity reduction requirements, as applicable.

b. The permittee may request a minor modification to eliminate the monitoring requirements associated with a discharge authorized by this permit when the discharge ceases due to changes at the facility.

STATE OF NEW JERSEY
DEPARTMENT OF ENVIRONMENTAL PROTECTION

*(See Issuing Division below)*

# PERMIT*

The New Jersey Department of Environmental Protection grants this permit in accordance with your application, attachments accompanying same application, and applicable laws and regulations. This permit is also subject to the further conditions and stipulations enumerated in the supporting documents which are agreed to by the permittee upon acceptance of the permit.

| | | |
|---|---|---|
| Permit No. 0906-04-0004.1 WFD 040001 | Application No. 0906-04-0004.1 WFD 040001 | |
| Issuance Date: July 8, 2004 | Effective Date: July 8, 2004 | Expiration Date: July 8, 2009 |
| Name and Address of Applicant<br>Clean Earth Dredging Technologies, Inc. (CEDTI)<br>334 South Warminster Road<br>Hatboro, Pa. 19040 | Name and Address of Owner<br>Hugo Neu Schnitzer East<br>One Jersey Avenue<br>Jersey City, NJ. 07302 | Name and Address of Operator<br>Clean Earth Dredging Technologies, Inc.<br>334 South Warminster Road<br>Hatboro, Pa. 19040 |
| Location of Activity/Facility *(Street Address)*<br>Clean Earth Dredging Technologies, Inc<br>Dredged Material Processing Facility<br>One Linden Avenue East<br>City of Jersey City, Hudson County<br>Lot: 10C Block: 1507 | Issuing Division<br><br>Office of Dredging and Sediment Technology | Statute(s)<br>NJSA 58:10A<br>NJSA 12:5-3 |
| Type of Permit: Waterfront Development Permit<br>Water Quality Certificate/Acceptable Use Determination (AUD) | Maximum Approved Capacity, if applicable | |

This permit grants permission to: On May 10, 1999, a Waterfront Development Permit, Water Quality Certificate and Acceptable Use Determination (AUD) was issued to the above referenced facility. This is a renewal of that permit action. CEDTI constructed and operates a dredged material off-loading and processing facility located on the Hugo Neu Schnitzer East (HNSE) property on Claremont Terminal Channel. The processing facility is located on the northwest corner of the HNSE property that is bisected by a rail line. The applicant constructed an approximately 1,200 feet of additional rail siding. The entire dredged material processing facility is contained within a bituminous concrete paved area surrounded by a minimum of 6" of rolled concrete curb. The permittee has the ability to utilize two types of dredged material processing operations depending on the volume of material to be processed at the facility. The 2 processes consist of the following:

- Barge mixing operations – The dredged material will be transported via scows to the off-loading platform. Oversized debris will be removed utilizing a long reach excavator with rake. The debris is placed directly into roll off containers, or on a temporary storage area for subsequent transport to an approved disposal or recycling facility. Decant water from within the scow is pumped via a dewatering sump to a series of portable frac tanks for settling. The decant water is then be discharged to either Claremont Channel under the terms of a NJDPES/DSW Permit, or into a return water scow for transport and discharge back at the dredging site under a Water Quality Certificate issued for the individual dredging project. The dewatered scow is then be moved down the platform to the mixing area consisting of up to a maximum of four low profile admixture storage silos, two vertical admixture storage silos, and two long reach excavators with mounted mixing units. The additive will be introduced into the dredged material using a radial stacking additive feed conveyor. After sufficient mixing, the stabilized dredged material will be off-loaded using a clamshell crane, and placed into a surge hopper and radial stacking conveyor which will transfer the stabilized material into rail cars or trucks for transport to the final use site. A temporary stockpile area for amended dredged material will be located adjacent to the off-loading crane conveyor. This area will be contained by jersey barriers.

(Project Description continued on page 3 of 7 pages)

Prepared By: Richard DeWan [signature] July 8, 2004
Richard DeWan Date
(See Page 7 of 7 pages for Chief's signature.)

| Revised Date | Approved by the Department of Environmental Protection |
|---|---|
| | Name (Print or Type) ____________ Title ____________ |
| | Signature ____________ Date |

*The word permit means "approval, certification, registration, etc."* *(General Conditions are on Page Two)*