# EXHIBIT 32

**DONJON MARINE CO.,INC**
1250 LIBERTY AVENUE
HILLSIDE, NEWJERSEY 07205 U.S.A.

PLAINTIFF'S EXHIBIT 1607 JD 1-11-08

June 16, 2004

Ella D. Snell
Contracting Officer
Department of the Army
New York District, Corps of Engineers
26 Federal Plaza
New York, New York 10278-0090

Subject: Response to Notice Dated June 8, 2004 regarding Contract No. W912DS-04-B-0008, Maintenance Dredging and Disposition of Dredged Material from Sequine Point Section of the Raritan Bay Reach of the New York and New Jersey Channels

Dear Ms. Snell,

The attached submittal documents are in response to the solicitation requirements referenced above. Donjon Marine Co., Inc. (Donjon) has organized the material in accordance with Section 00800-1, paragraph 1A.1.

Each section divided to allow easy reference. Permits, schedules and additional information for each facility are located in individual sections.

Thank you for your consideration. Should you have any questions, please contact me at (908) 964-8812.

Sincerely,

Kerri K. Mullins

PHONE (908) 964-8812 FACSIMILE (908) 964-7426 WEBSITE www.donjon.com

# DONJON MARINE CO., INC.

1250 LIBERTY AVE.
HILLSIDE, NEW JERSEY 07205
USA
Phone: 908 964-8812
Fax : 908 964-7426

DATE: June 18, 2004

## FACSIMILE TRANSMISSION SHEET

TO: Soon Lew Fax: 212 264-1463
COMPANY: Army Corps. of Engineers
FROM: Kerri Mullins
NUMBER OF PAGES INCLUDING COVER SHEET (3)

This communication is intended only for the use of the named addressee and may contain information which is privileged, confidential and exempt from disclosure under applicable law. If the reader of this communication is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original communication to us at the above address.

**DONJON MARINE CO.,INC**
1250 LIBERTY AVENUE
HILLSIDE, NEWJERSEY 07205 U.S.A.

June 18, 2004

To: Soon Lew

From: Kerri Mullins

Subject: Contract No. W912DS-04-B-0008, Maintenance Dredging and Disposition of Dredged Material from Sequine Point Section

The following map shows the location of the dredging site, location of processing, off-loading and placement. Both placement sites are shown. We are still awaiting the permits for the EnCap site which will be included in the 70 day submittal.

Please call me at (908) 964-8812 or (908) 482-4367 if you have any questions.

PHONE
(908) 964-8812

FACSIMILE
(908) 964-7426

WEBSITE
www.donjon.com


Sequine Point to Processing
Berth 36 Port Newark 18.4 miles
Berth 36 to Berth 32
Off Loading 700 Ft.
Off Loading to 1E 18.0 miles
Off Loading to EnCap 25.0 miles
(awaiting EnCap Permits)
Dredging Location
ESSEX
UNION
HUDSON
STATEN ISLAND
RARITAN BAY
Newark
Elizabeth
Bayonne
Kearny
Harrison
Belleville
Bloomfield
West Orange
Orange
East Orange
South Orange
Maplewood
Irvington
Livingston
Hanover
Florham Park
Madison
Chatham
Summit
Millburn
Springfield
New Providence
Union
Mountainside
Cranford
Roselle
Linden
Rahway
Iselin
Avenel
Woodbridge
Carteret
Metuchen
Fords
Edison
Highland Park
Perth Amboy
South Amboy
Sayreville
Laurence Harbor
South Plainfield
North Arlington
Lyndhurst
NEW YORK
NEW JERSEY

**DONJON MARINE CO.,INC**
1250 LIBERTY AVENUE
HILLSIDE, NEWJERSEY 07205 U.S.A.

# RESPONSE to W912DS-04-B-0008

## 1A Information Submitted by the Apparent Low Bidder within 10 Calendar Days

Donjon Marine Co., Inc. is providing the enclosed information to the Department of the Army, New York District, Corps of Engineers in response to the Solicitation No. W912-04-B-0008. This proposal contains trade secrets and other commercial and/or financial information which is privileged and/or confidential. The information will not be disclosed outside the government and will not be duplicated, used or disclosed, in whole or in part, for any purpose other than to evaluate this proposal. If, however, a contract is awarded to the offeror as a result of or in connection with the submission of the enclosed information, then the government will have the right to duplicate, use, or disclose the data to the extent provided in the resulting contract. This restriction does not limit the government's right to use information contained herein if it is obtained from another source without restriction. The information subject to this restriction is on all sheets within this volume.

PHONE (908) 964-8812 FACSIMILE (908) 964-7426 WEBSITE www.donjon.com



**Outside Attorneys Eyes**

Response 1A.1



Outside Attorneys Eyes

**1A.1. Information Submitted by the Apparent Low Bidder**

| | Site 1. | Site 2. | Site 3. |
|---|---|---|---|
| a) Name of the alternate site | Meadowlands Landfill 1E | Donjon Marine , Inc. | Metal Management |
| b) Location (street address, city, state) of the alternate site | 100 Baler Road<br>North Arlington, NJ | Berth 36<br>Port Newark, NJ | Berth 32<br>Port Newark, NJ |
| c) Point of Contact for the alternate site and telephone number | Thomas Marturano<br>(201) 460-1700 | Kerri Mullins<br>(908) 964-8812 | Warren Jennings<br>(973) 344-5575 |
| d) Total capacity available at the alternate site for placement of Dredge Material | 570,000 cyds currently | 1.6 million cyds/year | Unlimitted, Transfer Operation only |
| e) Detailed list of all permits and approvals that are required for the selected site to demonstrate that the site is legal to receive, operate, process and dispose of dredged Material and their status. Permits and approvals that shall be provided<br><br>by the Apparent Low Bidder to the Government include placement site permits as applicable and others as related to transportation, processing and placement of the dredged material, or any other aspects of the bidder's proposed disposition of the dredged material including any and all permits, authorizations, contracts, agreements, licenses, rights-of-entry. | NJDEP Permits:<br>**Acceptable Use Determination** | NJDEP Permits:<br>Processing Permits:<br>Waterfront Development Permit/<br>Water Quality Certificate Modification<br>Permit No.: 0714-98-0002.1<br>Air Permit, No. 07798 | Please see attached waterfront development permit. (Applicable to storage) |
| f) Copies of permits currently issued/approved at the time of submission. | See Attached | See Attached | See Attached |
| g) Identification of Regulatory Agency required to issue/approve items listed in e) above | NJDEP | Sample Results Review<br>NJDEP to issue an AUD | |
| h) Timeline for obtaining the required permits - Bar Chart for Obtaining Permits and Approvals - A bar chart indicating times) required for obtaining all permits/approvals required by the bidder for each item of work as described by the bidder. The schedule will detail the major steps (such as time to prepare the permit request, the date it will be submitted to the regulatory agency, time for agency review, public coordination, etc.) | See Attached | See Attached | See Attached |
| i) Evidence of Anticipated Daily Production Capability - Evidence | Site has received over | Donjon has dredged up to 8,000 cyds | MTLM routinely |



Outside Attorneys Eyes

| | | | |
|---|---|---|---|
| of the anticipated daily production capability (CY/day) and throughput rates for their proposed integrated system of dredging transportation, processing, and placement for each alternate site proposed. | 5,000 cyds in a 12 hr period from past projects. | per day of maintenance type material on various USACE projects. Dredging will sustain 4,000 to 5,000 cyds/day/ 7days per week to support processing, off-loading, transportation and placement at 1E. Donjon's system has capacity of 12-18,000cyd | discharges ships and stevedores salt at rates exceeding 18,000 tons per day. Past projects have achieved rates over 8,000 cyds/day. |
| J) Disposal Site Elements Information- | | | |
| 1) State capacity of each element of the system. This should include both the total capacity and uncommitted capacity of the disposal sites). | 6,000+ cyds/day/7dys/wk. 570,000 cyds open. | Dredging has 6,000 cyds per day capacity per dredge for maintenance material. Donjon has process capacity of 6,000 cyds per shift. All capacity uncommitted at the present. | MTLM has sized off-loading to meet 8,000 cyds per day with capacity to expand to 18,000 cyds. |
| 2) Time frame for availability for each element of the system: hours of operation in each day; days of operation in each week; months of operation in each year. | Site is open and available year round. | Operations are available 24hrs/day, 7 days per week. | MTLM is open as needed, generally 7 days per week. Shifts accommodate operations, 24hrs/7dys. |
| 3) Location of each element of the system: Descriptions with reference maps; Distances between the elements, measured in miles. | See attached maps. | See Attached Map. | See Attached Map. |
| K) Disposal Site(s) Construction Activity Schedule and Project Construction Schedule - A schedule showing the order in which the apparent low bidder proposed to perform the work and the dates on which the apparent low bidder contemplates starting and completing the salient features of work (including acquiring materials, plant and equipment, and the completion of major acceptance areas). The schedule shall indicate that the production rate of the facility is sufficient to ensure that the project will be completed within the contract's required completion date. The apparent low bidder shall consider its proposed integrated system of dredging, transportation, processing and placement. The schedule shall be in the form of a progress chart of suitable scale to indicate approximately the percentage of work scheduled for completion by any given date during the period. The apparent low bidder indicate on this schedule the salient features of work for the alternate disposal sites) that are needed to be completed within 70 calendar days from date the Apparent low bidder is notified of being the low bidder so that the site(s) is operational, capable of processing and disposing of all the dredged material for the in-situ quantity identified in the price schedule. | Site is ready. (AUD) | Processing is set up. (AUD) | Site is ready. (AUD) ? |

Outside Attorneys Eyes

G0100303977

CONTRACT NO. W912DS-04-B-0008
Maintenance Dredging of the Sequine Point Section of the Raritan Bay Reach of the New York and New Jersey Channels of the Federal Navigation Project
Project Schedule

| ID | Task Name | Duration | Start | Finish | May–December (chart) |
|---|---|---|---|---|---|
| 1 | **Start Project** | 0 days | Tue 6/8/04 | Tue 6/8/04 | 6/8 |
| 2 | "Notice of Apparent Low Bidder" Received | 0 days | Tue 6/8/04 | Tue 6/8/04 | 6/8 |
| 3 | **Submittal of Sampling Request to NJDEP and NYDEDC** | 7 days | Tue 6/8/04 | Tue 6/15/04 | |
| 4 | Sample Collection | 7 days | Wed 6/16/04 | Wed 6/23/04 | |
| 5 | Sample Analysis | 20.9 days | Thu 6/24/04 | Wed 7/14/04 | |
| 6 | Sample Report | 1.9 days | Thu 7/15/04 | Fri 7/16/04 | |
| 7 | **Submittal of Acceptable Use Determination (AUD) Request to NJDEP** | 13.9 days | Mon 7/19/04 | Sun 8/1/04 | |
| 8 | Approval of AUD Request | 0 days | Mon 8/2/04 | Mon 8/2/04 | 8/2 |
| 9 | **Submittal of Sampling Report & Analytical Data to USACE along with 70 Day Submittal Package** | 0 days | Mon 8/16/04 | Mon 8/16/04 | 8/16 |
| 10 | Notice of Award | 0 days | Mon 8/30/04 | Mon 8/30/04 | 8/30 |
| 11 | Notice To Proceed | 0 days | Fri 9/3/04 | Fri 9/3/04 | 9/3 |
| 12 | **Mobilization** | 0 days | Sat 9/4/04 | Sat 9/4/04 | 9/4 |
| 13 | **Start of PHASE I (Dredging, Dewatering, Processing, and Offloading/Trucking of Sequine Point Reach)** | 0 days | Sat 9/4/04 | Sat 9/4/04 | 9/4 |
| 14 | Dredging of Sequine Point Reach Material | 43 days | Sat 9/4/04 | Sun 10/17/04 | |
| 15 | Dewatering of Sequine Point Reach Material | 43 days | Sun 9/5/04 | Mon 10/18/04 | |
| 16 | Processing of Sequine Point Reach Material | 43 days | Mon 9/6/04 | Tue 10/19/04 | |
| 17 | Offloading & Trucking of Sequine Point Reach Material | 43 days | Tue 9/7/04 | Wed 10/20/04 | |
| 18 | **End of PHASE I (Dredging, Dewatering, Processing, and Offloading/Trucking of Sequine Point Reach)** | 0 days | Wed 10/20/04 | Wed 10/20/04 | 10/20 |
| 19 | **Demobilization** | 1 day | Wed 10/20/04 | Thu 10/21/04 | |
| 20 | USACE Survey | 13.9 days | Fri 10/22/04 | Thu 11/4/04 | |
| 21 | **End Project** | 0 days | Fri 11/5/04 | Fri 11/5/04 | 11/5 |

Dewatering approval (Plan) Where? NY OR NJ ?

15 June 2004

G0100303978

Outside Attorneys Eyes

CONTRACT NO. W912DS-04-B-0008
Maintenance Dredging of the Sequine Point Section of the Raritan Bay Reach of the New York and New Jersey Channels of the Federal Navigation Project
Project Schedule

| ID | Task Name | Duration | Start | Finish |
|---|---|---|---|---|
| 1 | **Start Project** | 0 days | Tue 6/8/04 | Tue 6/8/04 |
| 2 | "Notice of Apparent Low Bidder" Received | 0 days | Tue 6/8/04 | Tue 6/8/04 |
| 3 | **Submittal of Sampling Request to NJDEP and NYDEDC** | 7 days | Tue 6/8/04 | Tue 6/15/04 |
| 4 | Sample Collection | 7 days | Wed 6/16/04 | Wed 6/23/04 |
| 5 | Sample Analysis | 20.9 days | Thu 6/24/04 | Wed 7/14/04 |
| 6 | Sample Report | 1.9 days | Thu 7/15/04 | Fri 7/16/04 |
| 7 | **Submittal of Acceptable Use Determination (AUD) Request to NJDEP** | 13.9 days | Mon 7/19/04 | Sun 8/1/04 |
| 8 | Approval of AUD Request | 0 days | Mon 8/2/04 | Mon 8/2/04 |
| 9 | **Submittal of Sampling Report & Analytical Data to USACE along with 70 Day Submittal Package** | 0 days | Mon 8/16/04 | Mon 8/16/04 |
| 10 | Notice of Award | 0 days | Mon 8/30/04 | Mon 8/30/04 |
| 11 | Notice To Proceed | 0 days | Fri 9/3/04 | Fri 9/3/04 |
| 12 | **Mobilization** | 0 days | Sat 9/4/04 | Sat 9/4/04 |
| 13 | **Start of PHASE I (Dredging, Dewatering, Processing, and Offloading/Trucking of Sequine Point Reach)** | 0 days | Sat 9/4/04 | Sat 9/4/04 |
| 14 | Dredging of Sequine Point Reach Material | 43 days | Sat 9/4/04 | Sun 10/17/04 |
| 15 | Dewatering of Sequine Point Reach Material | 43 days | Sun 9/5/04 | Mon 10/18/04 |
| 16 | Processing of Sequine Point Reach Material | 43 days | Mon 9/6/04 | Tue 10/19/04 |
| 17 | Offloading & Trucking of Sequine Point Reach Material | 43 days | Tue 9/7/04 | Wed 10/20/04 |
| 18 | **End of PHASE I (Dredging, Dewatering, Processing, and Offloading/Trucking of Sequine Point Reach)** | 0 days | Wed 10/20/04 | Wed 10/20/04 |
| 19 | **Demobilization** | 1 day | Wed 10/20/04 | Thu 10/21/04 |
| 20 | USACE Survey | 13.9 days | Fri 10/22/04 | Thu 11/4/04 |
| 21 | **End Project** | 0 days | Fri 11/5/04 | Fri 11/5/04 |




15 June 2004

G0100303979

Outside Attorneys Eyes

Response 1A.1.a

G0100303980

1A.1a Synopsis of proposed operation – Narrative of no more than seven pages detailing the operation to move the dredged material from the dredging site to its final resting place that the apparent low bidder has identified. The synopsis shall provide suitable detail to adequately track the material from dredging, through offloading, transportation and processing to its ultimate placement. The synopsis shall include the following:

**1) Provide a list of names, locations, and point of contact, telephone number, loading and unloading facilities for each disposal facility including site capacity.**

Donjon Marine Co., Inc. (Donjon) reviewed two upland placement facilities for processed dredge material and one solid waste facility for dredge material. The facilities for processed dredge material are Landfill 1E (1E) located at 100 Baler Blvd., North Arlington, New Jersey. The 1E contact is Kerri Mullins at (908) 964-8812.

1E has a lease capacity of approximately 800,000 cubic yards. Donjon has leased the 1E site for placement of processed dredge material. Donjon has placed approximately 230,000 cubic yards of processed dredge material at the site from the Arthur Kill 1 Contract. The remaining capacity reflects volume of approximately 570,000 cubic yards.

Donjon is currently operates a dredge processing facility at Berth 36 in Port Newark, New Jersey. (A copy of the permit is among the attachments). Donjon has made arrangements with Metal Management Northeast Inc. (MTLM) to perform off-loading from the barge and loading into triaxle trucks of the processed dredge material at their permitted berth, Berth 32 Port Newark. MTLM will also provide transport and disposal of debris removed from the dredged material.

Commencing upon receipt of notice of award for this project, Donjon will mobilize appropriate earth-moving equipment (i.e. dozers, etc.) for receipt and placement of processed dredge material at the 1E site. MTLM will mobilize additional off-loading equipment as it deems necessary to support discharging, stockpiling (if needed) and re-loading operations at its berths 30/32. A sufficient number of Tri-axle trucks will be mobilized in order to transport the processed dredge material from the MTLM facility to 1E.

Upon receipt of Notice to Proceed, Donjon will mobilize its dredging equipment to the Seguine Point Channel. Dewatering equipment will be mobilized to the dredging area adjacent to the channel or at Berth 36. Discharge of decant water will be in accordance with the NYDEC permit stipulations. Appropriate scows, tugs and dredge plant will be available to immediately initiate dredging operations upon receipt of the notice to proceed and pre-dredge survey from the USACE.

Donjon will commence dredging utilizing an environmental bucket at the appropriate end of the channel in accordance with the actual date of commencement of dredging operations and the contract specifications.

AKI 566,000 cy 270,000 cy

? dewatering area AKI Not Seguine P.

G0100303981

1A.1a Synopsis of proposed operation – Narrative of no more than seven pages detailing the operation to move the dredged material from the dredging site to its final resting place that the apparent low bidder has identified. The synopsis shall provide suitable detail to adequately track the material from dredging, through offloading, transportation and processing to its ultimate placement. The synopsis shall include the following:

**1) Provide a list of names, locations, and point of contact, telephone number, loading and unloading facilities for each disposal facility including site capacity.**

Donjon Marine Co., Inc. (Donjon) reviewed two upland placement facilities for processed dredge material and one solid waste facility for dredge material. The facilities for processed dredge material are Landfill 1E (1E) located at 100 Baler Blvd., North Arlington, New Jersey. The 1E contact is Kerri Mullins at (908) 964-8812.

1E has a lease capacity of approximately 800,000 cubic yards. Donjon has leased the 1E site for placement of processed dredge material. Donjon has placed approximately 230,000 cubic yards of processed dredge material at the site from the Arthur Kill 1 Contract. The remaining capacity reflects volume of approximately 570,000 cubic yards.

AK I 566,000 CY 278,000 CY

Donjon is currently operates a dredge processing facility at Berth 36 in Port Newark, New Jersey. (A copy of the permit is among the attachments). Donjon has made arrangements with Metal Management Northeast Inc. (MTLM) to perform off-loading from the barge and loading into triaxle trucks of the processed dredge material at their permitted berth, Berth 32 Port Newark. MTLM will also provide transport and disposal of debris removed from the dredged material.

Commencing upon receipt of notice of award for this project, Donjon will mobilize appropriate earth-moving equipment (i.e. dozers, etc.) for receipt and placement of processed dredge material at the 1E site. MTLM will mobilize additional off-loading equipment as it deems necessary to support discharging, stockpiling (if needed) and re-loading operations at its berths 30/32. A sufficient number of Tri-axle trucks will be mobilized in order to transport the processed dredge material from the MTLM facility to 1E.

Upon receipt of Notice to Proceed, Donjon will mobilize its dredging equipment to the Seguine Point Channel. Dewatering equipment will be mobilized to the dredging area adjacent to the channel or at Berth 36. Discharge of decant water will be in accordance with the NYDEC permit stipulations. Appropriate scows, tugs and dredge plant will be available to immediately initiate dredging operations upon receipt of the notice to proceed and pre-dredge survey from the USACE.

? ?

Donjon will commence dredging utilizing an environmental bucket at the appropriate end of the channel in accordance with the actual date of commencement of dredging operations and the contract specifications.

G0100303982

Sign Here

Dredge material will be slowly and deliberately placed into hopper barges in accordance with the Water Quality Certificate specifications. Each scow will be deliberately tracked in accordance with contract specifications. After the barge has been filled, the barge will be towed to the Cory Warehouse pier to be dewatered in accordance with the Water Quality Certificate. Each de-watered scow of dredge material will then be towed to Donjon's processing facility at berths 20/22 in Port Newark. #36

#36

When dewater Berth 36 ? Cory Warehouse Pier

Processing operations will be in accordance with the Water Front Development permit, provided in this submittal. Each de-watered barge will be raked to remove debris. Debris encountered will be placed into pre-positioned roll-off boxes at berth 36. MTLM will transport the loaded roll-off boxes to their facility for certified weights. Debris will then be shipped by rail or truck to permitted solid waste facilities.

Each barge, upon completion of debris removal, will be advanced under the cement delivery system for addition of cement and appropriate mixing of the dredge material. Each barge, designated by name, date and barge load number, will be measured to determine the volume of dredge material in the barge prior to cement addition. This will be used to determine the appropriate volume of cement required for processing.

Processing Berth 36 NOT 20/22

At the conclusion of the cement addition and mixing operation, the barge will be towed to the MTLM berths 30/32 for offloading. Each barge will be off-loaded by MTLM after considering sufficient time for curing. Barges will be offloaded into the stockpile area or directly into tri-axle trucks. Material will be tracked as applicable. MTLM will load tri-axle trucks to transport the processed dredge material to the 1E site in the Meadowlands. Each truck will receive a bill of lading to track each individual load exiting the MTLM facility. Copies of each bill of lading will be given to Donjon personnel to track the placement of these loads within the 1E landfill site.

Upon arrival at the 1E site, each truck will be directed to the appropriate placement location within the permitted area (existing and pending permits supplied with this submittal). Loads will be tracked within the 1E site by Donjon in accordance with facility permit requirements.

**2) Provide a detailed map indicating locations of loading and unloading facilities or area within the proposed property to be utilized, for each disposal location, with a description of the material handling process at each disposal location.**

A map is provided for the operations described above. The 1E facility will receive processed dredge material by tri-axle trucks. Each truck load will be directed by the Donjon personnel to the off-loading location for discharge of the load. Earth moving equipment, i.e. dozers, etc. will grade the material as required. Each tri-axle will have its tires cleaned as required prior to exiting the site.

2



Outside Attorneys Eyes

Dredge material will be slowly and deliberately placed into hopper barges in accordance with the Water Quality Certificate specifications. Each scow will be deliberately tracked in accordance with contract specifications. After the barge has been filled, the barge will be towed to the Cory Warehouse pier to be dewatered in accordance with the Water Quality Certificate. Each de-watered scow of dredge material will then be towed to Donjon's processing facility at #36 berths 20/22 in Port Newark. #36

Processing operations will be in accordance with the Water Front Development permit, provided in this submittal. Each de-watered barge will be raked to remove debris. Debris encountered will be placed into pre-positioned roll-off boxes at berth 36. MTLM will transport the loaded roll-off boxes to their facility for certified weights. Debris will then be shipped by rail or truck to permitted solid waste facilities.

Each barge, upon completion of debris removal, will be advanced under the cement delivery system for addition of cement and appropriate mixing of the dredge material. Each barge, designated by name, date and barge load number, will be measured to determine the volume of dredge material in the barge prior to cement addition. This will be used to determine the appropriate volume of cement required for processing.

At the conclusion of the cement addition and mixing operation, the barge will be towed to the MTLM berths 30/32 for offloading. Each barge will be off-loaded by MTLM after considering sufficient time for curing. Barges will be offloaded into the stockpile area or directly into tri-axle trucks. Material will be tracked as applicable. MTLM will load tri-axle trucks to transport the processed dredge material to the 1E site in the Meadowlands. Each truck will receive a bill of lading to track each individual load exiting the MTLM facility. Copies of each bill of lading will be given to Donjon personnel to track the placement of these loads within the 1E landfill site.

Upon arrival at the 1E site, each truck will be directed to the appropriate placement location within the permitted area (existing and pending permits supplied with this submittal). Loads will be tracked within the 1E site by Donjon in accordance with facility permit requirements.

**2) Provide a detailed map indicating locations of loading and unloading facilities or area within the proposed property to be utilized, for each disposal location, with a description of the material handling process at each disposal location.**

A map is provided for the operations described above. The 1E facility will receive processed dredge material by tri-axle trucks. Each truck load will be directed by the Donjon personnel to the off-loading location for discharge of the load. Earth moving equipment, i.e. dozers, etc. will grade the material as required. Each tri-axle will have its tires cleaned as required prior to exiting the site.

2



**Outside Attorneys Eyes**

**3) Provide Hours of operation, transportation and operating procedures at unloading facilities.**

The hours of operation for the 1E site are 6 AM to 6PM, Monday through Sunday, twelve months per year.

Trucking operations will coincide with 1E facility hours. Barges will be discharged utilizing clamshells and the processed dredge material placed into a stockpile for re-loading into tri-axle trucks for transport to 1E. Debris material will be stockpiled for loading into rail cars or trucks for transport to a permitted solid waste facility.

**4) Provide Facilities information: Access to Unloading facilities, Acceptable scow size, Disposal Site O&M manual, demurrage time to unload scow or trucks, anticipated processing time and placement materials, and other facility restriction if any.**

MTLM is accessible via barge with vessels drafting 30 feet of water or less, length up to 600 feet, and width up to 150 feet (three barges wide per lease). MTLM is not a disposal facility and therefore does not have an O&M manual. There is no established demurrage period for off-loading the scows or barges of processed dredge material. Processing time per scow from the time of entering the Donjon berth 36 to complete discharge at MTLM at berths 30/32 will vary from 28 to 36 hours.

1E is not accessible via barge. Processed dredge material will be transported to the site via truck. Trucks are anticipated to enter and exit the 1E facility within standard trucking protocol, 60 minutes. O&M information is included in this submittal. Placement operations are expected to occur within hours of receipt and require limited equipment support for placement, i.e. grading and compacting.

**5) Provide a detailed description of the dredging procedure proposed to include the identification of dredges, buckets, scows, tugs and other salient equipments to be used for the project.**

Dredging of an estimated 140,800 cubic yards of maintenance material with upland disposal. Dredging of the upland material will be performed by Donjon's dredge "*Michigan*" or "*Newark Bay*" using a 16 cubic yard *Cable Arm* environmental bucket. Dredging will be performed by mechanical dredging with *Cable Arm* environmental buckets penetrating material down to refusal, or down to -42' to -43' MLW (depending on which contract area), whichever comes first. Positioning of the dredges will be performed by using the most recent version of Coastal Oceangraphics Hypack positioning software with DGPS positioning. The 140,800 cubic yards dredged will be placed in a series of eight (8) Donjon owned sealed hopper scows for transport to the dewatering area, then to Donjon's berth 36 processing facility for debris removal, processing, etc.

O&M info on 1E ? where ?

O&M Manual ?

35'+2'

dredge to 35'+2'

3

G0100303985

**3) Provide Hours of operation, transportation and operating procedures at unloading facilities.**

The hours of operation for the 1E site are 6 AM to 6PM, Monday through Sunday, twelve months per year.

Trucking operations will coincide with 1E facility hours. Barges will be discharged utilizing clamshells and the processed dredge material placed into a stockpile for re-loading into tri-axle trucks for transport to 1E. Debris material will be stockpiled for loading into rail cars or trucks for transport to a permitted solid waste facility.

**4) Provide Facilities information: Access to Unloading facilities, Acceptable scow size, Disposal Site O&M manual, demurrage time to unload scow or trucks, anticipated processing time and placement materials, and other facility restriction if any.**

MTLM is accessible via barge with vessels drafting 30 feet of water or less, length up to 600 feet, and width up to 150 feet (three barges wide per lease). MTLM is not a disposal facility and therefore does not have an O&M manual. There is no established demurrage period for off-loading the scows or barges of processed dredge material. Processing time per scow from the time of entering the Donjon berth 36 to complete discharge at MTLM at berths 30/32 will vary from 28 to 36 hours.

1E is not accessible via barge. Processed dredge material will be transported to the site via truck. Trucks are anticipated to enter and exit the 1E facility within standard trucking protocol, 60 minutes. O&M information is included in this submittal. Placement operations are expected to occur within hours of receipt and require limited equipment support for placement, i.e. grading and compacting.

O+M Manual ?

**5) Provide a detailed description of the dredging procedure proposed to include the identification of dredges, buckets, scows, tugs and other salient equipments to be used for the project.**

Dredging of an estimated 140,800 cubic yards of maintenance material with upland disposal. Dredging of the upland material will be performed by Donjon's dredge "*Michigan*" or "*Newark Bay*" using a 16 cubic yard *Cable Arm* environmental bucket. Dredging will be performed by mechanical dredging with *Cable Arm* environmental buckets penetrating material down to refusal, or down to -42' to -43' MLW (depending on which contract area), whichever comes first. Positioning of the dredges will be performed by using the most recent version of Coastal Oceangraphics Hypack positioning software with DGPS positioning. The 140,800 cubic yards dredged will be placed in a series of eight (8) Donjon owned sealed hopper scows for transport to the dewatering area, then to Donjon's berth 36 processing facility for debris removal, processing, etc.

35'+2'

3

G0100303986

Outside Attorneys Eyes

Scow movements of material for all phases will be performed with Donjon owned towing vessels "*Paul Andrew*", "*Mary Alice*", and "*Atlantic Salvor*", all of which will be equipped as required with SAIC ADISS systems in accordance with contract specifications.

**6) Submit a detailed description of the loading and transportation procedures to be utilized.**

Upon completion of processing at berths 20/22 and appropriate curing of the material, MTLM will off-load the processed dredge material into a stockpile or directly into tri-axle trucks. All processed dredge material will be tracked from initial loading into a barge to the final disposal site as outlined above.

The loading and transportation of the processed dredge material will occ over a twenty-hour period in accordance with the 1E operating hours. Each tri-axle truck will be loaded utilizing a 10 to 12 cubic yard capacity loader, the tailgate closed securely, the top of the cargo box covered by the tarp screen an have its tires inspected. The tires will be cleaned as required to prevent any substantial tracking of material onto local streets.

TRUCK Route in detail

Truck Route Permit ?

Upon completion of the loading operations, including inspection and/or cleaning of tires, each tri-axle load will be assigned a bill of lading. The truck wi exit MTLM's berth facilities, and proceed directly to the 1E site.

After arriving at the 1E site, the truck will provide a copy of the bill of lading to the Donjon facility personnel and proceed to the 1E placement location. At the placement location, the tri-axle will deposit its load and exit the site via the designated transport route. The tires of the vehicle will be cleaned as required to prevent any substantial tracking of material prior to exiting. Donjon anticipates transporting approximately 6,000 cubic yards per day.

4



Outside Attorneys Eyes

Scow movements of material for all phases will be performed with Donjon owned towing vessels "*Paul Andrew*", "*Mary Alice*", and "*Atlantic Salvor*", all of which will be equipped as required with SAIC ADISS systems in accordance with contract specifications.

**6) Submit a detailed description of the loading and transportation procedures to be utilized.**

Upon completion of processing at berths 20/22 and appropriate curing of the material, MTLM will off-load the processed dredge material into a stockpile or directly into tri-axle trucks. All processed dredge material will be tracked from initial loading into a barge to the final disposal site as outlined above.

The loading and transportation of the processed dredge material will occur over a twenty-hour period in accordance with the 1E operating hours. Each tri-axle truck will be loaded utilizing a 10 to 12 cubic yard capacity loader, the tailgate closed securely, the top of the cargo box covered by the tarp screen and have its tires inspected. The tires will be cleaned as required to prevent any substantial tracking of material onto local streets.

Upon completion of the loading operations, including inspection and/or cleaning of tires, each tri-axle load will be assigned a bill of lading. The truck will exit MTLM's berth facilities, and proceed directly to the 1E site.

After arriving at the 1E site, the truck will provide a copy of the bill of lading to the Donjon facility personnel and proceed to the 1E placement location. At the placement location, the tri-axle will deposit its load and exit the site via the designated transport route. The tires of the vehicle will be cleaned as required to prevent any substantial tracking of material prior to exiting. Donjon anticipates transporting approximately 6,000 cubic yards per day.

Landfill 1E (Lease)

# New Jersey Meadowlands Commission

## Landfill 1E

THIS LEASE AGREEMENT, made as of the 12th day of December, 2002, Between NEW JERSEY MEADOWLANDS COMMISSION, with an address One DeKorte Park Plaza, Lyndhurst, New Jersey 07071 herein designed as the "Landlord",

And DONJON MARINE CO., INC., a New Jersey Corporation, with offices located at 1250 Liberty Avenue, Hillside, New Jersey 07205, herein designed as the "Tenant";

WHEREAS, the Landlord owner of the property described below, does hereby lease to the Tenant and the Tenant intends to rent from the Landlord, for the purposes herein, the Property more particularly designated and described in Exhibit "A" attached hereto, and commonly known as a portion of Landfill 1E; and

WHEREAS, tenant has proposed to Landlord its desire to execute a lease in order to undertake the permanent placement of processed, dredge material and all uses reasonably related to the same, as described more fully herein below, ("Purpose" and "Permitted Use") on the premises; and

WHEREAS, this Lease is contingent upon Tenant obtaining all necessary approvals from the Department of Environmental Protection ("DEP") regarding the use of the dredge at the premises.

NOW THEREFORE, the parties agree to the following Conditions and Covenants:

1. <u>Term of Lease/Tenant's Right to Terminate</u>. The Term of this Lease (the "Lease") shall commence on date of full execution and shall terminate on December 31, 2006 (the "Term"), unless terminated earlier pursuant to paragraphs 3 or 22. In the event that no



Outside Attorneys Eyes

dredge material is received for a period of two (2) years, the NJMC has the option to cancel the lease, and return Donjon's security deposit minus $100,000, as a minimum rental fee.

2. Purpose.

A. Tenant shall not use or occupy the premises for any other purpose than for the permanent placement of processed dredge material and all uses reasonably related to the same in accordance with the DEP approvals for the capping of the Landfill 1E. The placement of the dredge material shall not commence until Tenant provides Landlord with proof of DEP approval to place the dredge materials.

B. Tenant shall not use or allow or permit others to use the premises for any purpose or in any manner other than as expressly provided herein. No use or manner of use shall be implied from the purposes expressed herein. If Tenant uses or permits or allows others to use the premises for any other purpose or any other manner than as expressly provided herein without first obtaining the express written approval thereof by Landlord, such use shall constitute grounds for termination of this Lease.

C. In the performance of the activities under this Lease and in the conduct of Tenant's internal affairs, Tenant shall not engage in, prosecute, endorse, sponsor or co-sponsor any activity or course of action which Landlord reasonably determines interferes with or is contrary to Landlord's control management, direction and policy over the Premises.

3. Lease Renewal. Provided Landlord or Tenant has not terminated this Lease, as hereafter provided, this Lease shall continue on a month-to-month basis following the expiration of their term above based on the terms and conditions provided herein until either party gives 30 days notice of termination.





Outside Attorneys Eyes

4. Resource for Operation. Nothing in this Lease shall be construed as creating any obligation on the part of the Landlord to provide any labor, materials, supplies, equipment or funds for the benefit of Tenant or for the purposes of this Lease.

5. Payment of Rent.

A. The rent to be paid by Tenant to Landlord shall be as follows: Tenant shall compensate Landlord seven dollars ($7.00) for each cubic yard of processed dredge material, which is placed by Tenant on the premises.

B. Payments by Tenant to Landlord in accordance with foregoing shall be made on a monthly basis on or before the fifth day of each month.

C. The number of cubic yards of such material shall be determined by reference to the hydrographic survey prepared by the Army Corps of Engineers for each site from which the processed dredge material is removed. The survey data and calculations upon which the number of cubic yards of such material and the corresponding payment owed by Tenant to Landlord hereunder will be provided in writing by Tenant to Landlord on a monthly basis prior to the payment.

D. In the event that the rent is not received by the 15th day of the month, NJMC has the unilateral right to deny access to the site and draw down the security deposit. In that event, access shall not be re-allowed until the security deposit is replenished. Prior to denying access, NJMC shall serve written notice of the payment default to Donjon and allow them three (3) business days to cure the default before access can be denied.

E. Upon the receipt of all necessary permits, the Tenant shall pay a security deposit of $280,000.00, to be placed in a separate NJMC account, and which will be applied to the last 40,000 cubic yards of dredge material placed on the premises.





Outside Attorneys Eyes

F. Donjon is entitled to the return of the $280,000 deposit in the event that any permits are cancelled. Such return of deposit may be reduced by the amount of any then currently outstanding obligation from Donjon to NJMC.

6. Anti-Discrimination. Tenant agrees not to discriminate in employment and agrees to abide by all anti-discrimination laws including those contained with N.J.S.A. 10:2-1 through N.J.S.A. 10:2-4, N.J.S.A. 10:5-1 et seq. and N.J.S.A. 10:5-31 through 10:5-38, and all rules and regulations issued thereunder.

7. Condition of Premises. The Premises are leased to and accepted by Tenant in their present condition and without representation or warranty of fitness for a particular purpose. Tenant represents that it has made a physical inspection of the Premises and has found same satisfactory for all purposes of this Lease.

8. Utilities. Tenant shall be responsible for the payment of any deposit or similar charges required to be paid by any utility company servicing the operation, and for the payment of all utilities used in the premises during the Term of the Lease including, but not limited to, water, gas and electric, and for the payment of any sewer or the utility assessment, charge or connection as required to be paid as a result of a change in the nature of a utility service to the premises after the delivery of possession of the premises by Landlord. This applies solely to utilities used by the Tenant for its operation. The entire amount of said utility cost shall be paid before the expiration of termination of the Lease. Unpaid charges shall remain a continuing obligation of the Tenant thereafter.

9. Compliance with Laws, etc.

A. The Tenant shall promptly comply with all laws, ordinances, rules, regulations, requirements and directives of the Federal, State and Municipal Governments or





Outside Attorneys Eyes

Public Authorities and of all their departments, bureaus and subdivision, applicable to and affecting the said premises, their use and occupancy, for the correction, prevention and abatement of nuisances, violations or other grievances in, upon or connected with the said premises caused by Tenant's use of the premises, during the term hereof; and shall promptly comply with all orders, regulations, requirements and directives of the Board of Fire Underwriters or similar authority and of any insurance companies which have issued or are about the issues policies of insurance covering the said premises, for the prevention of fire or other casualty damage or injury, at the Tenant's own cost and expense.

B. Tenant shall obtain and maintain all necessary licenses, permits and approvals required by the appropriate Federal and State authorities for the conduct of Tenant's activities on the premises. Landlord agrees to fully cooperate with Tenant in obtaining same. Tenant shall give Landlord satisfactory written evidence that all such licenses, permits and approvals have been obtained before commencement of the conduct of activities on the premises.

C. Tenant shall comply with the requirements of all policies of insurance required by this Lease, which may be in force with respect to the premises.

10. Independent Principle.

A. Landlord and Tenant hereby agree and confirm that the rights duties and obligations of Tenants hereunder shall not be deemed to construe Tenant as being the operator of a landfill or creating any duties or obligations on the part of Tenant which a landfill operator may have by law or otherwise.

B. Tenant shall have direct supervision of all its employees, agents, volunteers, contractors and subcontractors performing any activities for Tenant under this Lease.

Tenant shall assure compliance by its employees, agents, volunteers, contractors and subcontractors with the terms and conditions of this Lease.

11. Liability Insurance, Indemnification.

A. The Tenant, at Tenant's own cost and expense, shall obtain or provide and keep in full force for the benefit of the Landlord, during the Term hereof, general public liability insurance, insuring the Landlord against any and all liability or claims of liability arising out of, occasioned by or resulting from any accident or otherwise in or about the leased premises, for injuries to any person or persons, for limits of not less than $1,000,000.00 for injuries to one person and $3,000,000.00 for injuries to more than one person in any one accident or occurrence, and for loss or damage to the property of any person or persons, for not less than $500,000.00. The policy or policies of insurance shall be of a company or companies authorized to do business in this State and shall be delivered to the Landlord, together with evidence of the payment of the premiums therefore, not less than fifteen days prior to the commencement of the term hereof or the date when the Tenant shall enter into possession, whichever occurs sooner. At least thirty (30) days prior to the expiration, cancellation or termination date of any policy, the Tenant shall deliver a renewal or replacement policy cancellation or with proof of the payment of the premium therefore. The Tenant also agrees to and shall save, hold and keep harmless and indemnify the Landlord from and for any and all payments, expenses, costs, attorney fees and from and for any and all claims and liability for losses or damage to property or injuries to persons occasioned wholly or in part by or resulting from any acts or omissions by the Tenant or the Tenant's agents, employees, guests, licensees, invitees, subtenants, assignees or successors, or for any cause or reason whatsoever arising out of or by reason of the occupancy by the Tenant





Outside Attorneys Eyes

and the conduct of the Tenant's business. At all times, tenant shall maintain in full force workman's compensation insurance.

B. If Tenant fails to obtain such insurance (or certificate evidencing the same), then Landlord may procure and/or pay for the same, and the amounts so paid by Landlord with interest thereon at the rate of fifteen (15%) percent per annum from time of payment, shall be added to the installment of Rent becoming due on the first of the next succeeding month, and shall be collected as Additional Rent. If the Landlord elects not to obtain such insurance, the Tenant shall be in default.

C. Landlord and Tenant hereby release each other from any and all liability or responsibility (to the other or to anyone claiming through or under them by way of subrogation or otherwise) under fire and extended coverage or supplementary contract casualties, if such fire or other casualty shall have been caused by the fault or negligence of the other party or anyone for whom such party may be responsible; provided, however, that this release shall be applicable and in force and effect only with respect to loss or damage occurring during such time as the releaser's policies shall contain a clause or endorsement to the effect that any such release shall not adversely affect or impair said policies, or prejudice the right of the releaser to recover there under.

12. Assignment. The Tenant shall not, without the express written consent of the Landlord, assign, mortgage or hypothecate this Lease, nor sublet or sublease the premises or any part thereof.

13. No Third Party Beneficiaries. There shall be no third party beneficiaries of this Lease and no person, firm or entity nor a party to this Lease shall be entitled to claim any right, benefit or presumption from, or estoppel by this lease.

14. Use.

A. Tenant shall be permitted to place processed dredge material on the premises. Tenant shall place the processed dredge material in that area of the premises designated on Exhibit "A" attached hereto, Tenant shall use its best efforts to place such at a minimum depth of 30 inches or as required by the NJDEP approval over said de area. Tenant expects, but does not represent or warrant, that said material will ul consolidate, i.e. compress, by natural forces. The specific areas within which said mate be placed in the area designated on Exhibit "A" shall be at Tenant's sole discretion, p however, that Tenant shall use its best efforts to spread said material in compliance with the NJDEP approval and such a manner as to provide a relatively consistent cap of processed material over the area designated on Exhibit "A".

Where is "A" Disposal site

B. Tenant shall be responsible for sediment and erosion control in t designed on Exhibit "A". Landlord and Tenant will cooperate in their mutual interest to any and all soil erosion and control permits required by law, provided, however, that the such application and procurement shall be paid by Tenant. If, after exercise of all due diligence, the Parties are unable to obtain necessary permits, the security deposit will be returned in full. A copy of the approval shall be delivered to the Landlord prior to the commencement of the work.

Bergen Hudson, Essex & Passaic

C. During the course of Tenant placing the processed dredge material as referenced hereinabove; Tenant shall be responsible for the protection of all monitoring wells and equipment currently on the premises, the existing methane collection system and all swales





Outside Attorneys Eyes

13. No Third Party Beneficiaries. There shall be no third party beneficiaries of this Lease and no person, firm or entity nor a party to this Lease shall be entitled to claim any right, benefit or presumption from, or estoppel by this lease.

14. Use.

A. Tenant shall be permitted to place processed dredge material on the premises. Tenant shall place the processed dredge material in that area of the premises designated on Exhibit "A" attached hereto, Tenant shall use its best efforts to place such material at a minimum depth of 30 inches or as required by the NJDEP approval over said designated area. Tenant expects, but does not represent or warrant, that said material will ultimately consolidate, i.e. compress, by natural forces. The specific areas within which said material will be placed in the area designated on Exhibit "A" shall be at Tenant's sole discretion, provided however, that Tenant shall use its best efforts to spread said material in compliance with the NJDEP approval and such a manner as to provide a relatively consistent cap of processed dredge material over the area designated on Exhibit "A".

B. Tenant shall be responsible for sediment and erosion control in the area designed on Exhibit "A". Landlord and Tenant will cooperate in their mutual interest to obtain any and all soil erosion and control permits required by law, provided, however, that the cost of such application and procurement shall be paid by Tenant. If, after exercise of all due diligence, the Parties are unable to obtain necessary permits, the security deposit will be returned in full. A copy of the approval shall be delivered to the Landlord prior to the commencement of the work.

C. During the course of Tenant placing the processed dredge material as referenced hereinabove; Tenant shall be responsible for the protection of all monitoring wells and equipment currently on the premises, the existing methane collection system and all swales





Outside Attorneys Eyes

and detention basins throughout the premises in areas adjacent to that area designed on **Exhibit** **"A"**. The methane wells will be, as a minimum, protected through the use of concrete collars at least four (4) feet in diameter.

D. Tenant expects, but shall not be obligated to conduct operations twelve (12) hours per days up to seven (7) days a week during those times it is actively engaged in dredging projects. Work on Sundays must be pre-approved and shall be located on the eastern portion of the leased area. Tenant shall coordinate with Landlord the schedule of processed dredge material placement operations following Tenant's receipt of written notification that it has been awarded a contract for a dredging project and shall further provide Landlord with written notice of its operating schedule established pursuant to said coordinating efforts.

E. Tenant anticipates the ability to place a maximum of 800,000 cubic yards of processed dredge material at the site designated on Exhibit "A" (excluding the growth media referenced below, however, Tenant does not warrant or represent that 800,000 cubic yards or any other specific amount of processed dredge material will be placed at such site.

F. At the conclusion of placement operations, and during the appropriate growing season, Tenant, at its sole cost and expense, shall apply approximately six (6) inches of growth media (soil capable of sustaining vegetation) to the area designated on Exhibit "A", to cover the amended dredge. Landlord will make best endeavors to supply growth media from its current and future operations, but shall not be required to do so.

15. Condemnation, Eminent Domain. If the land and premises leased herein, or of which the leased premises are a part, or any portion thereof, sufficient, in Tenant's sole determination, to render the Premises unsuitable for Tenant's use, shall be taken under eminent domain or condemnation proceedings, or if suit or other action shall be instituted for the taking





Outside Attorneys Eyes

or condemnation thereof, or if in lieu of any formal condemnation proceedings or actions, the Landlord shall grant an option to purchase and or shall sell and convey the said premises or any portion thereof, to the governmental or other public authority, agency, body or public utility, seeking to take said land and premises or any portion thereof, then this lease, at the option of the Landlord shall terminate, as of the date title vests in the condemning authority. The Landlord shall provide notice of any such condemnation proceeding to Tenant within forty-eight hours of Landlord's receipt of same. The parties will be entitled to share in the condemnation proceedings in proportion to the values of their respective interests in the premises.

16. Damage to Property.

A. Tenant shall repair any damage caused by Tenant, its employees, agents, contractors or invitees, express or implied, to the premises or any other State owned property comprising part of the New Jersey Meadowlands District. If Tenant fails to so repair after written demand by Landlord, Landlord may, at its option, elect to make said repairs and/or terminate this lease and the cost thereof shall be paid by Tenant to Landlord within fifteen (15) days after demand therefor. All repairs by Tenant shall restore the affected property to the appearance, condition, and utility of said property immediately before the damage or destruction.

B. This Lease shall not be construed to require or obligate Landlord to cause any damage to or destruction of the premises to be repaired for the benefit of Tenant. Landlord shall not be liable to Tenant for any loss occasioned by the damage to or destruction of the premises and Landlord's declaration that this Lease is null and void.

17. Reimbursement of Landlord. If the Tenant shall fail or refuse to comply with and perform any conditions and covenants of the within Lease, the Landlord may, if the Landlord so elects, after written notice there of to Tenant and Tenant's failure within thirty (30) days





Outside Attorneys Eyes

following such notice (or a lesser time period in the event of an emergency), carry out and perform such conditions and covenants, at the cost and expense of the Tenant. The aforesaid cost and expense shall be payable on demand, or at the option of the Landlord shall be added to the installment of Base Rent due immediately thereafter but in no case later than one month after such demand, whichever occurs sooner, and shall be due and payable as such. This remedy shall be in addition to such other remedies at the Landlord may have hereunder by reason of the breach by the Tenant of any of the covenants and conditions in this Lease contained. A performance bond in the amount of one million ($1,000,000.00) dollars will be procured by the Tenant and delivered to the Landlord to cover placement and vegetation of process dredge material.

18. Access to Premises.

A. Landlord, its agents, employees and contractors, shall have the right of access to and egress and ingress on, over and across the Premises for purposes of maintenance, development, operation and administration of other State owned property comprising the New Jersey Meadowlands District. Landlord shall exercise its rights under this subparagraph in such a manner so as not to damage Tenant's property or unreasonably interfere with Tenant's use and occupancy of the premises considering the nature and extent of Landlord's necessary access.

B. An authorized representative of Landlord shall have the right to enter into and upon the premises for the purpose of examining the same or making such repairs or alterations as may be necessary for the safety and preservation thereof. This clause shall not be deemed to be a covenant by the Landlord nor be construed to create an obligation on the part of the Landlord to make such inspections or repairs.





Outside Attorneys Eyes

19. Signs. Tenant agrees that Tenant shall not paint or post or otherwise permit or allow temporary or permanent signs or advertisements of any description to be painted or posted on or about the premises without the prior express written approval of Landlord.

20. Removal of Tenant's Property. Any equipment, fixtures, goods or other property of the Tenant, not removed by the Tenant upon the termination of this Lease, or upon any quitting, vacating or abandonment of the premises by the Tenant, or upon Tenant's eviction, shall be considered as abandoned and the Landlord shall have the right, without any notice to the Tenant, to sell or otherwise dispose of the same, at the expense of the Tenant, and shall not be accountable to the Tenant for any part of the proceeds of such sale, if any. Notwithstanding the foregoing, Landlord hereby acknowledges that the processed dredge material to be placed on the premises is to be placed there on a permanent basis and Tenant shall have no obligation to remove same at the termination of the Term of this Lease.

21. Remedies Upon Tenant's Default. If there should occur any default on the part of the Tenant in the performance of any conditions and covenants herein contained, or if during the Term hereof the premises or any part thereof shall be or become abandoned or deserted, or should the Tenant be evicted by summary proceedings or otherwise, the Landlord in addition to any other remedies herein contained or as may be permitted by law, may either by force or otherwise, without being liable for prosecution therefore, or for damages, re-enter the said premises and the same have and again possess and enjoy; and as agent for the Tenant or otherwise, re-let the premises and receive the rents therefore and apply the same, first to the payment of such expenses, reasonable attorney fees and costs, as the Landlord may have been put to in re-entering and repossessing the same and in making such repairs and alterations as may be necessary; and second to the payment of the rent due hereunder. The Tenant shall remain





Outside Attorneys Eyes

liable for such rents as may be in arrears and also the rent as may accrue subsequent to the re-entry by the Landlord, to the extent of the difference between the rent reserved hereunder and the rent, if any, received by the Landlord during the remainder of the unexpired Term hereof, after deducting the aforementioned expenses, fees and costs; the same to be paid as such deficiencies arise and as ascertained each month.

22. Termination.

A. Upon the occurrence of any of the contingencies set forth in the preceding clause, or should the Tenant be adjudicated bankrupt, insolvent or placed in receivership, or should proceedings be instituted by or against the Tenant for bankruptcy, insolvency, receivership, agreement of composition or assignment for the benefit of creditors, or it this Lease or the estate of the Tenant hereunder shall pass to another by virtue of any court proceedings, writ of execution, levy, sale, or by operation of law, the Landlord may, if the Landlord so elects, at any time thereafter terminate this Lease and the term hereof, upon giving to the Tenant or to any trustee receiver, assignee or other person in charge of or acting as custodian of the assets or property of the Tenant, five (5) days notice in writing, of the Landlord's intention so to do. Upon the giving of such notice, this Lease and the term hereof shall end on the date fixed in such notice as if the said date was the date originally fixed in this Lease for the expiration hereof; and the Landlord shall have the right to remove all persons, goods, fixtures an chattels there from, by force or otherwise, without liability for damages. –

B. Termination of this Lease by either party as herein provided shall not release or discharge any payment, obligation or liability owed to the Landlord under the terms and conditions of this Lease as of the date of such termination.





Outside Attorneys Eyes

23. Validity of Lease. The terms, conditions, covenants and provisions of this Lease shall be deemed to be severable. If any clause or provision herein contained shall be adjudged to be invalid or unenforceable by a court of competent jurisdiction or by operation of any applicable law, it shall not affect the validity of any other clause or provision herein, but such other clauses or provisions shall remain in full force and effect.

24. Notices. All notices required under the terms of this Lease shall be given and shall be complete by mailing such notices by certified or registered mail, return receipt requested, to the address of the parties as shown at the head of this Lease, or by personal delivery, or to such other address as may be designated in writing, which notice of change of address shall be given in the same manner. Notices sent to the NJMC shall be addressed to the Executive Director, NJMC, One DeKorte Park Plaza, Lyndhurst, NJ 07071, and notices sent to Donjon Marine, 1250 Liberty Avenue, Hillside, NJ 07205, shall be addressed to the President.

25. Title and Quiet Enjoyment. The Landlord covenants and represents that the Landlord is the owner of the premises herein leased and has the right and authority to enter into, execute and deliver this Lease; and does further covenant that the Tenant on paying the rent and performing the conditions and covenants herein contained, shall and may peaceably and quietly have, hold and enjoy the leased premises for the term aforementioned.

26. Entire Contract. This Lease contains the entire agreement between the parties. No representative, agent or employee of the Landlord has been authorized to make any representations or promises with reference to the within letting or to vary, alter or modify the terms hereof. No additions, changes or modifications, renewals or extensions hereof, shall be binding unless reduced to writing and signed by the Landlord and the Tenant.

27. Real Estate Taxes. During the Term hereof, Landlord shall be responsible for the annual municipal taxes assessed against the land and improvements leased hereunder, or of which the Premises leased here are a part.

28. Indemnification. Tenant covenants and agrees to hold harmless and exculpate Landlord from any liability or responsibility arising from Tenant's occupancy, and from any claims relating to loss, injury, death or damage to persons or property which may at any time arise in connection with Tenant's occupancy of the Premises, or be sustained by Tenant or by any person whosoever may be using or visiting the Premises, whether such loss, injury, death or damage be caused by or arise out of any act or omission of Tenant or of any occupancy, subtenant, visitor or user of the Premises; and in the event of a claim exceeding the limits of any Tenant's insurance coverage which may result in a judgment or determination in excess thereof, the Tenant shall, at Tenant's sole cost and expense to provide for Landlord's defense. The covenants in the foregoing paragraphs shall not apply, however, to any acts of negligence committed by Landlord or its agents or employees.

29. Estoppel Certificates. Within ten (10) days after request by Landlord, mortgagee, trustee or purchaser, tenant shall provide to such requesting party an estopppel certificate certifying that this Lease is in full force and effect and that there are no defenses or offsets thereto or stating those claimed by Tenant, and such other information as may reasonably be requested. –

30. Brokerage. Landlord and Tenant each warrant and represent to the other that no broker or real estate agent has brought about this Lease and that neither party has had any dealings with any broker or real estate agent in connection with the same.

31. New Jersey Law. The laws of the State of New Jersey shall govern the validity, performance and enforcement of this Lease, irrespective of the application of any principle of conflict of laws. The invalidity or unenforceability of any provision hereof shall not affect or impair any other provision.

32. Environmental Law Compliance.

A. The parties acknowledge that there are certain Federal, State and local laws regulations and guidelines now in effect, or which may be enacted, relating to or affecting the Premises, concerning the impact on the environment of construction, land use, maintenance and operation of structures, and the conduct of business. Tenant agrees to comply at all times with the same and to be liable with regard to all of said laws, regulations and guidelines that are applicable to it and its business. Tenant shall not (either with or without negligence) cause or permit the escape, disposal or release of any biologically or chemically active or other hazardous substances or materials. Tenant shall not allow the storage or use of such substances or materials in any manner not sanctioned by law of the highest standards prevailing for the storage and use of such substances or materials, nor allow to be brought into the Premises or the building any such materials or substances. Without limitation, hazardous substances and materials shall include those described in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601 et. seq., the Resource Conservation and Recovery Act, as amended, 42 U.S.C. Section 6901 et. seq., any applicable state or local laws and the regulations adopted under these acts, as the same may be amended. Tenant shall execute affidavits at Landlord's request concerning Tenant's best knowledge and belief regarding the presence of hazardous substances or materials on the Premises during the Term. In all events, Tenant shall indemnify and hold harmless Landlord from any liability or





Outside Attorneys Eyes

responsibility as the result of the enforcement or requirements of such environmental laws for violations of the same by Tenant or persons acting under Tenant, including without by way of limitation any storage or release of hazardous materials on the Premises occurring while Tenant is in possession or elsewhere if caused by Tenant or persons acting under Tenant. Notwithstanding the foregoing, Tenant shall have no liability hereunder for any violations for which it is not directly or indirectly responsible. The within covenants shall survive the expiration or earlier termination of the Term of this Lease.

B. Landlord agrees that it shall at all times during the Term of this Lease comply with all such environmental laws and regulations regarding the premises and agrees that the Tenant will have no liability or responsibility as a result of the enforcement or requirements of such environmental laws or regulations for violations of same by Landlord or persons acting under or permission of Landlord including, without by way of limitation, any storage or release of hazardous materials on the Premises, or elsewhere if caused by Landlord or persons acting under or with the authority or permission of Landlord, whether such storage or release occurred before, during or after the Term of the Lease.

33. Miscellaneous.

A. In all references herein to any parties, persons, entities or corporations the use of any particular gender or the plural or singular number is intended to include either appropriate gender or number as the text of the within instrument may require. All the terms, covenants and conditions herein contained shall be for and shall insure to the benefit of and shall bind the respective parities hereto and their heirs, executors, administrators, personal or legal representatives, successors and assigns.





Outside Attorneys Eyes

B. This lease represents the entire agreement between Landlord and Tenant and supercedes all prior negotiations representations or agreements, either written or oral. Insofar as both parities have participated and engaged in negotiations with respect to the drafting of this Lease, any ambiguity herein shall not be construed against either party.

C. In the event that any part or provision of this Lease shall be deemed unenforceable, the remaining parts or provisions of this Lease shall survive and remain fully enforceable to the extent provided by law.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals, or caused these presents to be signed by their proper corporate officers and their proper corporate seal to be hereto affixed, the day and year first above written.

Witness:

Kevin Funabashi - Staff Attorney

Witness:

Kerri K. Mullins

New Jersey Meadowlands Commission

By

Robert Ceberio - Executive Director

Donjon Marine Co., Inc.

By

JOHN A. WITTE, PRESIDENT





Outside Attorneys Eyes

**New Jersey Department of Environmental Protection**

**Revised Grading Plan Approval**

**New Jersey Meadowlands Commission**

**Landfill 1E**

Post-it™ brand fax transmittal memo 7671 | # of pages ▸ 4
To Kerri Mullins | From Mary Ann
Co. Lynn Morris | Co. NJDEP
Dept. | Phone # 609-984-6650
Fax # 908-904-7426 | Fax #

...of New Jersey
...mental Protection
Hazardous Waste
P.O. Box 414
Trenton, NJ 08625-0414
Tel. #609-984-6650

Solid & Hazardous Waste Division

Bradley M. Campbell
Commissioner

Landfill & Recycling Mgmt Bureau

MAR 4 2003

Thomas Marturano, P.E., Director of Solid Waste
New Jersey Meadowlands Commission
One DeKorte Park Plaza
Lyndhurst, New Jersey 07072

Re: New Jersey Meadowlands Commission
1-E Landfill, Facility No. 0907W
**Revised Grading Plan Approval**

Dear Mr. Marturano:

The Bureau of Landfill and Recycling Management (Bureau) is in receipt of your application for a minor technical review for the referenced site dated February 2003. The application consists of a request to revise the existing final grading plan for the 1E Landfill in order to facilitate run-off and decrease stormwater infiltration into the site.

Your proposal calls for the placement of stabilized dredged material on three (3) specific areas of the 1-E Landfill. Initial construction would start on the eastern slope of the landfill, along the top bench and continuing upwards to the crest of the area commonly known as the 1-C portion of the site. The second area is located towards the center of the landfill, east of the Nature's Choice compost facility. The third area to be regraded is the top of the newly closed part of the landfill, also known as the North Area and North Area Extension.

Donjon Marine Co., Inc. (Donjon) is the exclusive contractor for this proposal. Under the terms of Contract No. 1 of the Arthur Kill Channel Deepening project with the U.S. Army Corps of Engineers (USACE), Donjon is responsible for complete management of the contract: dredging the material from the Channel, amending (stabilizing) the dredged material and placement/disposal of the stabilized dredged material in accordance with the approved contract documents.

As such, only material dredged in performance of this contract shall be placed at the 1-E Landfill. Before its use, the material shall be amended, in barge, with 8% Portland cement at Donjon's processing site in Port Newark, New Jersey. After processing, the stabilized dredged material shall be off-loaded at the Metal Management, Inc. facility. From there, the stockpiled material shall be transported to the 1-E Landfill via truck.

The Division approves this request. The analytical data associated with the Arthur Kill Contract No. 1 indicates that the material is acceptable for its intended specific use. All stabilized dredged material shall be placed in accordance with the provisions of the applicable New Jersey Solid Waste Management Regulations, the soil erosion control plans certified by the Bergen and Hudson Counties Soil Conservation Districts and the approved application documents. In addition, all filling/regrading activities shall be subject to the following specific conditions:

Seguin's DE material Permit

1. Approved Application Documents

This Approval is based on the following documents:

a. Solid Waste Facility Permit Application dated January 29, 2003, signed and submitted by Thomas Marturano, P.E., New Jersey Meadowlands Commission (NJMC);
b. Operations Plan dated January 16, 2003, prepared and submitted by Donjon Marine Co., Inc. on behalf of the NJMC;
c. Letter dated January 23, 2003, from Thomas Marturano, P.E., NJMC, attesting to the stability of the East Slope of the 1-E Landfill
d. Engineering drawings, eight (8) total, dated February 12, 2003, signed and sealed by Harry M. Betzig, P.E., B-V Associates;
e. Health and Safety Plan dated February 13, 2003, prepared and submitted by Donjon Marine Co., Inc. on behalf of NJMC; and
f. Supplemental information consisting of a Vicinity Map, Truck Routing Plan, and analytical results of laboratory sampling conducted on both raw and amended dredged material.

2. Stabilized Dredged Material

Need Seguin's Bene Mat'l Permit

Filling and grading material is restricted to dredged material obtained from the Arthur Kill Channel Deepening Contract No. 1 and stabilized with eight percent (8%) Portland cement. No other materials are permitted. The stabilized dredge delivered to the landfill shall not contain any free liquids as determined by the paint filter test.

3. Soil Erosion and Sediment Control

All activities shall be performed in accordance with the provisions of the soil erosion and sediment control plans certified by the Bergen County and Hudson County Soil Conservation Districts.

4. Health and Safety Program

The contractor shall follow provisions of the submitted Health and Safety Plan and the Occupational Safety and Health Administration (OSHA) standards during all on-site activities for the safety of employees and for others entering the site. A copy of the safety procedures shall be posted on-site.

5. Dust Control

Methods of effectively controlling dust shall be implemented in order to prevent offsite migration.

6. Noise Control

Noise control measures shall be implemented so that noise levels generated by site activities do not exceed the standards set forth by the New Jersey Noise Control Regulations under N.J.A.C. 7:29-1.2.

7. Odor Control

The grading activities shall be conducted in strict compliance with the air emission standards of the Department. The grading activities shall not result in air contaminants to be emitted in violation of N.J.A.C. 7:27-5.2(a).

8. Final Cover

Upon completion of all grading activities in a specific area, the contractor shall cover the amended dredged material with eighteen (18) inches of soil followed by a six (6) inch layer of topsoil. The area shall be vegetated in accordance with the approved documents.

9. Vehicle Decontamination

Before exiting the site, all trucks shall proceed to the decontamination area(s) for cleaning to prevent tracking of processed dredged material onto roadways. The washing method and location of the decontamination areas shall be in accordance with the approved documents.

10. Protection of Existing Facilities

All existing gas wells, monitoring wells and inclinometers shall be protected from damage. Before initiation of filling/grading operations, a 48 inch concrete collar shall be placed around each structure.

11. Compliance with other Laws and Regulations

The issuance of this Approval does not exempt the applicant from obtaining all other permits or approvals required by law or regulations.

If you should have any questions, please call Mary Anne Goldman of my staff at (609) 984-6650.

Sincerely,

Thomas Sherman
Assistant Director
Office of Permitting and
Technical Programs

C: Scott Brubaker, DEP
Kerri Mullins, Donjon Marine Co.

# State of New Jersey

James E. McGreevey
*Governor*

Department of Environmental Protection
Office of Dredging and Sediment Technology
Site Remediation Program
P.O. Box 028
Trenton, NJ 08625
(609) 292-1250
FAX (609) 777-1914

Bradley M. Campbell
Commissioner

March 5, 2003

Ms. Kerri K. Mullins
DonJon Marine Co., Inc.
125 Liberty Ave.
Hillside, N.J. 07205

RE: Acceptable Use Determination (AUD)
Applicant: DonJon Marine Co., Inc.
Project: Placement of Dredged Material and Processed Dredged Material (PDM) as part of the Final Grading Plan of the Hackensack Meadowlands 1-E Landfill

Dear Ms. Mullins:

The above referenced AUD dated January 30, 2003 was received by the New Jersey Department of Environmental Protection's (NJDEP or the Department) Office of Dredging and Sediment Technology (OD&ST or the Office) on January 31, 2003. Your application requests an approval to utilize dredged material (DM) and Processed Dredged Material (PDM) on the above referenced 1-E Landfill as part of the Final Grading Plan Approval (s) issued by the NJDEP on February 28, 2003. Your application is hereby approved subject to the conditions contained herein.

**Project Description**

Need Sayres Point AUD

This application requests authorization to utilize dredged material and processed dredged material from the Arthur Kill 1 Contract as part of the above described landfill final grading plan. This Acceptable Use Determination Approval (AUD Approval) is only for the placement of the DM and PDM pursuant to Appendix E of the NJDEP Technical Manual entitled *The Management and Regulation of Dredging Activities and Dredged Material in New Jersey's Tidal Waters*. DonJon Marine Co., Inc. (DonJon) has entered into a lease with the New Jersey Meadowlands Commission (NJMC) for the use of the 1-E landfill for the receipt of PDM. The PDM will be utilized to install a partial cap over selected portions of the site. The 1-E Landfill is a permitted solid waste facility that has ceased receipt of solid waste. The site is located in two townships and two counties; towns of North Arlington and Kearney and Bergen and Hudson counties. DonJon has been notified by the U.S. Army Corps of Engineers that it is the apparent low bidder for the Arthur Kill 1 project, Solicitation DACW51-03-B-0001. The Arthur Kill 1 project involves the removal and processing of approximately 566,000 $yd^3$ of sediments with the possibility of an additional 278,000 $yd^3$ of glacial till material. This glacial till material will not require processing.

DonJon owns the barges and scows which will be utilized to process the dredged material. The dredged material will be placed into hopper scows at the dredging site on the Arthur Kill. The scow will then be taken to the TOSCO Berthing Area B North to allow excess water to decant from the sediments pursuant to the Water Quality Certificate and Federal Consistency determination issued to the US Army Corps of Engineers for the Arthur Kill 1 contract. Decanted water is then transferred to a water holding scow. The de-watered scow of dredged material is then towed to DonJon's Port Newark facility. This dredged material processing facility is regulated under Waterfront Development Permit and AUD No. 0714-98-0002.1. The scow is then raked to remove debris which is to be placed in roll-off boxes staged in a containment area on the pier for proper disposal as solid waste. The dredged material is then ready for additive application.

*New Jersey is an Equal Opportunity Employer*
*Recycled Paper*

G0100304015

Portland Cement is added (8% by volume) to the scow. The Portland Cement is delivered via a screw conveyor through a metered flow rate providing steady delivery and accurate additive rates. A high-speed mixing head disperses the cement throughout the dredged material creating a homogenous blend of additives with the material. The processed scow of dredged material will then be allowed to cure for approximately 24 hours prior to off-loading. Off-loading is expected to occur at the Metals Management, Inc. facility that is permitted under Waterfront Development Permit and AUD No. 0714-01-0004.1. The material will be either stockpiled and then placed into tri-axle trucks or directly into tri-axle trucks for transport to 1-E Landfill.

The 1-E Landfill will utilize hay bales staked into the slopes down gradient of the PDM placement areas for erosion control. Placement operations will utilize lifts of eight inches to eighteen inches. Warmer weather will support the maximum lifts while colder weather will necessitate thinner lifts. During periods of storm events, processed dredged material will remain stockpiled to minimize the amount of surface area exposed to excessive moisture. As such, placement procedures may shift to other areas during storm events versus immediately returning to the lift placed one week earlier.

## ACCEPTABLE USE DETERMINATION CONDITIONS

1. This AUD Approval is only for the placement of processed dredged material from the Arthur Kill Contract No. 1. No other sources of dredged material shall be placed at the 1-E Landfill without first obtaining a separate AUD from this Office.

2. Prior to placing any (processed) dredged material at this Landfill, all appropriate Soil Erosion and Sediment Control permits/approvals shall be obtained.

3. Don Jon, Inc. shall comply with all conditions specified in the letter, dated March 4, 2003, from the NJDEP, Bureau of Landfill Recycling Management to the New Jersey Meadowlands Commission which approved a revision to the grading plan for the 1-E Landfill.

4. Any major accidental release of (processed) dredged material or end product in areas in non-placement areas (i.e. surface waters of the state, etc.) at this site shall be immediately reported to the NJDEP Emergency Response 24-Hour Hotline at (609) 292-7172. The report must specify the type of substance discharged in estimated quantity, the nature of the discharge, the location of the discharge, any action taken to mitigate the discharge and any other information the Department may request at the time of the notification.

Should you have any questions in this regard, please do not hesitate to contact Richard DeWan at (609) 984-4426.

Sincerely,

Suzanne U. Dietrick, Acting Chief
Office of Dredging and Sediment Technology
Site Remediation Program

C: Thomas Marturano, Director of Solid Waste, NJMC
Richard Gimello, Executive Director, NJMR
MaryAnne Goldman, NJDEP, DS&HW
Thomas Wakeman, General Manager, Port Authority, Waterways Development
Joseph Seebode, Harbor Programs Branch Chief, US Army Corps of Engineers

** TOTAL PAGE.02 **

## Soil Conservation Permits

- Bergen County
- Hudson-Essex-Passaic Counties

New Jersey Natural Resources Conservation Program

# BERGEN COUNTY SOIL CONSERVATION DISTRICT

Community Services Building
327 Ridgewood Avenue
Paramus, New Jersey 07652
Telephone (201) 261-4407
Fax (201) 261-7573

March 6, 2003

RE: Interim Cap 1E Landfill
Baler Boulevard
Blocks 175-183,183-189, Lots 1
North Arlington, NJ
Our File #03-B7373

DonJon Marine Co.
1250 Liberty Avenue
Hillside, NJ 07205

Dear Sir/Madam:

Pursuant to N.J.S.A. 4:24-39 et seq., the N.J. Soil Erosion and Sediment Control Act, the Bergen County Soil Conservation District hereby certifies the Soil Erosion and Sediment Control Plan for the above referenced project, subject to the following:

1. That the applicant carries out all land disturbance activities in accordance with the Standards for Soil Erosion and Sediment Control in New Jersey as promulgated by the State Soil Conservation Committee.
2. **The applicant must notify the District office, by mail, at least 48 hours prior to initial land disturbance.**
3. The owner/applicant must obtain a District-issued Report of Compliance prior to issuance of any Certificate of Occupancy by the municipality. The District requires advance notice of at least one week for the issuance of a Report of Compliance.
4. Changes in the certified plan relating to, or that will effect land disturbance on the site, must be submitted to the District office for reevaluation and approval.
5. A copy of the certified plan and a copy of these provisions must be kept on the job site at all times.

Failure to comply with any of the above conditions may result in the issuance of a Stop Work Order.

This approval is limited to the soil erosion, sedimentation and related stormwater management controls specified in the plan. It is not authorization to engage in the proposed land use unless such has been previously approved by the municipality or other controlling agency.

Sincerely yours,

Ronald E. Binaghi, Jr.
Ronald E. Binaghi, Jr.
District Supervisor

03/06/2003 11:47

# AUTHORIZATION TO DISCHARGE STORMWATER

N.J. Department of Environmental Protection
Bureau of Nonpoint Pollution Control
*in cooperation with the*
N.J. Department of Agriculture
State Soil Conservation Committee
and Soil Conservation Districts

NJPDES General Permit No. NJ0088323 (N.J.A.C. 7:14A-11 Appendix B)
Stormwater Discharge Associated with Construction Activity

Ch. 251 Appl. # 03-B7373 SCD RFA # 02-39-03-014

1. Project or Facility Name and Address:
NJMC Landfill 1E Interim Cap
Baler Boulevard/Belleville Turnpike
North Arlington, NJ

2. Permittee Name and Address:
DonJon Marine Co. Inc.
1250 Liberty Avenue
Hillside, NJ 07205

3. Project Description:
Interim Landfill Capping

**Effective Date** 3/6/03 **Expiration Date** 9/6/06

Your Request for Authorization under NJPDES General Permit No. NJ0088323 has been certified in accordance with the provisions of N.J.A.C. 7:14A and the New Jersey Stormwater Permitting Program in coordination with the New Jersey Department of Agriculture, the State Soil Conservation Committee and the Soil Conservation District. This Authorization is effective upon, and for the duration of, soil erosion and sediment control plan certification.

[signature]
Barry Chalofsky, P.P., Chief
Bureau of Nonpoint Pollution Control
New Jersey Department of Environmental Protection

CERTIFIED BY:
[signature] 3/6/03
Signature Date

Supervisor
Title

Bergen County
Soil Conservation District

**FOR DISTRICT USE ONLY**

**NJ Natural Resources Conservation Program**
**Expiration of Authorization to Discharge Stormwater**

Reason for Expiration:

- ☐ Project Completed (Final Report of Compliance Issued)
- ☐ Application Withdrawn by Applicant
- ☐ Application Denied by District or SSCC
- ☐ Project SESC Plan Certification Expired

Date of Expiration ______
Authorized by ______
District Official

CONSTAUTH.PUB 5/5/97

G0100304019