| | | |
|---|---|---|
| Line up Operator, End Prep. | $ 18.47 | 5.67+a+b |
| Rigger | $ 19.07 | 5.67+a+b |
| **Drill Boats** | | |
| Blaster | $ 23.81 | 6.45+a+b |
| Core Driller | $ 19.00 | 5.25+a+b |
| Driller | $ 23.55 | 6.45+a+b |
| Engineer | $ 23.54 | 6.45+a+b |
| Machinist | $ 23.30 | 5.85+a+b |
| Oiler | $ 20.46 | 5.25+a+b |
| Tug Captain | $ 19.53 | 5.85+a+b |
| Tug Deckhand | $ 15.97 | 5.25+a+b |
| Tug Master | $ 20.48 | 6.45+a+b |
| Welder | $ 23.30 | 5.85+a+b |
| **Engineer** | | |
| 1st | $ 25.55 | 6.87+a+b |
| 2nd, 3rd and 4th | $ 25.23 | 6.87+a+b |
| Electrician | $ 25.68 | 6.87+a+b |
| Electro Hydro Technician | $ 20.79 | 6.27+a+b |
| Tug Captain | $ 23.44 | 6.87+a+b |
| Tug Master | $ 26.80 | 6.87+a+b |
| **Hydraulic Dredge** | | |
| Asst. Fill Placer | $ 23.10 | 7.35+a+b |
| Boat Captain | $ 23.45 | 6.75+a+b |
| Boat Master | $ 24.53 | 7.35+a+b |
| Chief Mate | $ 25.12 | 7.35+a+b |
| Chief Welder | $ 25.78 | 7.35+a+b |
| Deckhand | $ 19.63 | 6.15+a+b |
| Engineer | $ 25.22 | 7.35+a+b |
| Fill Placer | $ 25.12 | 7.35+a+b |
| Janitor/Porter | $ 18.79 | 6.15+a+b |
| Leverman | $ 29.37 | 7.35+a+b |
| Maintenance Engineer | $ 24.89 | 6.75+a+b |
| Mate | $ 23.29 | 6.75+a+b |
| Messman | $ 18.79 | 6.15+a+b |
| Night Cook | $ 19.30 | 6.15+a+b |
| Oiler | $ 19.69 | 6.15+a+b |
| Shoreman | $ 19.20 | 6.15+a+b |
| Spider Barge Operator | $ 24.31 | 6.75+a+b |
| Steward | $ 23.24 | 7.35+a+b |
| Welder-Dredge | $ 24.51 | 6.75+a+b |
| **Tug Boats over 1000 H.P. with master or captain having license endorsed for 200 miles off shore** | | |
| Tug Captain | $ 24.99 | 7.35+a+b |
| Tug Chief Engineeer | $ 24.25 | 6.75+a+b |
| Tug Deckhand | $ 19.63 | 6.15+a+b |
| Tug Engineer | $ 23.78 | 6.75+a+b |

PREMIUMS: Additional 20% for hazardous material work

FOOTNOTES APPLICABLE TO ABOVE CRAFTS:

a. PAID HOLIDAYS: New Year's Day, Martin Luther King, Jr.'s Birthday, Memorial Day, Good Friday, Independence Day, Labor Day, Veterans' Day, Thanksgiving Day and Christmas Day

b. VACATION: Seven percent (7%) of the straight time rate multiplied by the total hours worked.

---

WELDERS - Receive rate prescribed for craft performing operation to which welding is incidental.

---

Unlisted classifications needed for work not included within the scope of the classifications listed may be added after award only as provided in the labor standards contract clauses (29CFR 5.5 (a) (1) (ii)).

---

In the listing above, the "SU" designation means that rates listed under the identifier do not reflect collectively bargained wage and fringe benefit rates. Other designations indicate unions whose rates have been determined to be prevailing.

---

WAGE DETERMINATION APPEALS PROCESS

1.) Has there been an initial decision in the matter? This can be:

* an existing published wage determination
* a survey underlying a wage determination
* a Wage and Hour Division letter setting forth a position on a wage determination matter
* a conformance (additional classification and rate) ruling

On survey related matters, initial contact, including requests for summaries of surveys, should be with the Wage and Hour Regional Office for the area in which the survey was conducted because those Regional Offices have responsibility for the Davis-Bacon survey program. If the response from this initial contact is not satisfactory, then the process described in 2.) and 3.) should be followed.

With regard to any other matter not yet ripe for the formal process described here, initial contact should be with the Branch of Construction Wage Determinations. Write to:

Branch of Construction Wage Determinations

Wage and Hour Division

U.S. Department of Labor

200 Constitution Avenue, N.W.

Washington, DC 20210

2.) If the answer to the question in 1.) is yes, then an

interested party (those affected by the action) can request review and reconsideration from the Wage and Hour Administrator (See 29 CFR Part 1.8 and 29 CFR Part 7). Write to:

Wage and Hour Administrator

U.S. Department of Labor

200 Constitution Avenue, N.W.

Washington, DC 20210

The request should be accompanied by a full statement of the interested party's position and by any information (wage payment data, project description, area practice material, etc.) that the requestor considers relevant to the issue.

3.) If the decision of the Administrator is not favorable, an interested party may appeal directly to the Administrative Review Board (formerly the Wage Appeals Board). Write to:

Administrative Review Board

U.S. Department of Labor

200 Constitution Avenue, N.W.

Washington, DC 20210

4.) All decisions by the Administrative Review Board are final.

================================================================

END OF GENERAL DECISION

# Sample

## CONTRACTOR'S DAILY CONSTRUCTION QUALITY CONTROL REPORT

CONTRACTOR'S NAME

(address)

DATE: REPORT NO:

Contract No.______________________________________

Description and Location of Work:

WEATHER: (clear) (Partly Cloudy)/(Cloudy)_____ Temperature: Max ___ Min___

| CONTRACTOR/SUBONTRACTORS AND AREA OF RESPONSIBILITY |
|---|
| a.______________________________________________ |
| b.______________________________________________ |
| c.______________________________________________ |
| d.______________________________________________ |

Equipment Data: (Indicate items of construction equipment, other than hand tools, at the job site, and whether or not used.)

1. Work Performed Today: (Indicate location and description of work performed. Refer to work performed by prime and/or subcontractor by letter in Table above.)

2. Results of Surveillance: (Include satisfactory work completed, or deficiencies with action to be taken.)

3. Tests Required by Plans and/or specifications performed and Results of Tests:

4. Verbal Instructions Received: (List any instructions given by Government personnel on construction deficiencies, retesting required, etc... With action to be taken.)

5. Job Safety: (Include deficiencies and corrective action taken.)

6. Indicate Equipment and materials Items arrivals at job site. Indicate the compliance or non-compliance of these items with approved shop drawings; the contract plans and specifications; and if storage of the item is required prior to the time of installation; indicate how this storage was provided and whether or not it is adequate.

7. Remarks: (cover any conflicts in plans, specifications, or instructions.)

8. CONTRACTOR'S VERIFICATION: the above report is complete and correct and all material and equipment used and word performed during this reporting period are in compliance with the contract pans and specifications except as noted above.

CONTRACTOR QUALITY CONTROL INSPECTOR

NEW YORK S[illegible]E DEPARTMENT OF ENVIRONMENTAL [illegible]NSERVATION

| DEC PERMIT NUMBER | | EFFECTIVE DATE |
|---|---|---|
| #2-6499-00001/00005 | PERMIT | June 23, 2003 |
| PROJECT NAME: USACE: Arthur Kill Reach Maintenance Dredging Outerbridge to Gulfport | Under the Environmental Conservation Law (ECL) | MODIFICATION DATE XXXXXXX |
| | | EXPIRATION DATE June 22, 2013 |

TYPE OF PERMIT ■ New ☐ Renewal ☐ Modification ☐ Permit to Construct ☐ Permit to Operate

- ☐ Article 15, Title 5: Protection of Waters
- ☐ Article 15, Title 15: Water Supply
- ☐ Article 15, Title 15: Water Transport
- ☐ Article 15, Title 15: Long Island Wells
- ■ 6NYCRR 608: Water Quality Certification
- ☐ Article 17, Titles 7, 8: SPDES
- ☐ Article 19: Air Pollution Control
- ☐ Article 24: Freshwater Wetlands
- ☐ Article 25: Tidal Wetlands
- ☐ Article 27, Title 7; 6NYCRR 360: Solid Waste Management
- ☐ Article 27, Title 9; 6NYCRR 373: Hazardous Waste Management
- ☐ Article 34: Coastal Erosion Management
- ☐ Article 36: Floodplain Management

| PERMIT ISSUED TO | TELEPHONE NUMBER |
|---|---|
| Department of the Army, New York District, Corps of Engineers | (212) 264-4260 |
| ADDRESS OF PERMITTEE | |
| Jacob K. Javits Federal Building, New York, NY 10278-0090 | |
| CONTACT PERSON FOR PERMITTED WORK | TELEPHONE NUMBER |
| Joseph Olha- Project Manager | (212) 264-9031 |
| NAME AND ADDRESS OF PROJECT/FACILITY | |
| Arthur Kill Maintenance Dredging: Outerbridge to Gulfport | |
| LOCATION OF PROJECT/FACILITY | |
| Arthur Kill starting at the Outerbridge and proceeding in a northeast direction to the Gulfport area. | |

| COUNTY | CITY | WATERCOURSE | NYTM COORDINATES |
|---|---|---|---|
| Richmond | Staten Island | Arthur Kill | Start: E 563.9 N 4486.3<br>End: E 567.5 N 4498.0 |

**DESCRIPTION OF AUTHORIZED ACTIVITY:**

- Dredge approximately 200,000 cubic yards of sediments from the federal navigation channel in the Arthur Kill.
  - Area permitted to be dredged is the NY portion of Arthur Kill Reach of the NY/NJ Federal navigation channel, starting at the Outerbridge Crossing (mile 14) and continuing in a northeasterly direction to the Gulfport Reach (mile 23) just north of Pralls River. See attached Map No.1.
  - The channel is to be dredged to a depth of -35 feet Mean Low Water with an over-depth of -2 feet.
- The dredged material is to be placed at the Newark Bay Confined Disposal Facility or other suitable, permitted upland placement location.

By acceptance of this permit, the Permittee agrees that the permit is contingent upon strict compliance with the ECL, all applicable regulations, the General Conditions specified (see page 2) and any Special Conditions included as part of this permit.

| REGIONAL PERMIT ADMINISTRATOR: | ADDRESS | |
|---|---|---|
| John F. Cryan | 47-40 21 Street, Long Island City, NY 11101 | |
| AUTHORIZED SIGNATURE John F. Cryan | DATE June 23, 2003 | Page 1 of 6 |

00900 D-1

NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION

## NOTIFICATION OF OTHER PERMITTEE OBLIGATIONS

**Item A: Permittee Accepts Legal Responsibility and Agrees to Indemnification**
The permittee has accepted expressly, by the execution of the application, the full legal responsibility for all damages and costs, direct or indirect, of whatever nature and by whomever suffered, for liability it incurs resulting from activity conducted pursuant to this permit or in noncompliance with this permit and has agreed to indemnify and save harmless the State from suits, actions, damages and costs of every name and description resulting from such activity.

**Item B: Permittee to Require it's Contractors to Comply with Permit**
The permittee shall require its independent contractors, employees, agents and assigns to read, understand and comply with this permit, including all special conditions, and such persons shall be subject to the same sanctions for violations of this permit as those prescribed for the permittee.

**Item C: Permittee Responsible for Obtaining Other Required Permits**
The permittee is responsible for obtaining any other permits, approvals, lands, easements and rights-of-way that may be required for this project.

**Item D: No Right to Trespass or Interfere with Riparian Rights**
This permit does not convey to the permittee any right to trespass upon the lands or interfere with the riparian rights of others in order to perform the permitted work nor does it authorize the impairment of any rights, title, or interest in real or personal property held or vested in a person not a party to the permit.

## GENERAL CONDITIONS

**General Condition #1: Facility Inspection by the Department**

The permitted site or facility, including relevant records, is subject to inspection at reasonable hours and intervals by an authorized representative of the Department of Environmental Conservation (the Department) to determine whether the permittee is complying with this permit and the ECL. Such representative may order the work suspended pursuant to ECL 71-0301 and SAPA 401(3).

The permittee shall provide a person to accompany the Department's representative during an inspection to the permit area when written or verbal notification is provided by the Department at least 24 hours prior to such inspection.

A copy of this permit, including all referenced maps, drawings and special conditions, must be available for inspection by the Department at all times at the project site. Failure to produce a copy of the permit upon request by a Department representative is a violation of this permit.

**General Condition #2: Relationship of this Permit to Other Department Orders and Determinations**

Unless expressly provided for by the Department, issuance of this permit does not modify, supersede or rescind any order or determination previously issued by the Department or any of the terms, conditions or requirements contained in such order or determination.

**General Condition #3: Request for Permit Renewals or Modifications**

The permittee must submit a separate written request to the Department for renewal, modification or transfer of this permit. Such request must include any forms or supplemental information the Department requires. Any renewal, modification or transfer granted by the Department must be in writing.

The permittee must submit a renewal request at least:

a) 180 days before expiration of permits for State Pollutant Discharge Elimination System (SPDES), Hazardous Waste Management Facilities (HWMF), major Air Pollution Control (APC) and Solid Waste Management Facilities (SWMF);
b) and, 30 days before expiration of all other permit types.

Request for permit renewal or modification are to be submitted to:

NYSDEC, Regional Permit Administrator, Region 2, 47-40 21[ST] Street, Long Island City, NY 11101

**General Condition #4: Permit Modifications, Suspensions and Revocations by the Department**

The Department reserves the right to modify, suspend or revoke this permit when:

a) the scope of the permitted activity is exceeded or a violation of any condition of the permit or provisions of the ECL and pertinent regulations is found;

| DEC PERMIT NUMBER | PROJECT NAME | |
|---|---|---|
| 2-6499-00001/00005 | USACE: AK Gulfport Reach - Maintenance Dredging | PAGE 2 OF 6 |

00900 D-2

D2

NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION

ADDITIONAL GENERAL CONDITIONS FOR ARTICLES 15,17, 24, 25, and 6 NYCRR Part 608

General Condition #4: (continued)

b) the permit was obtained by misrepresentation or failure to disclose relevant facts;

c) new material information is discovered; or

d) environmental conditions, relevant technology, or applicable law or regulation have materially changed since the permit was issued.

**General Condition #5:**

That if future operations by the State of New York require an alteration in the position of the structure or work herein authorized, or if, in the opinion of the Department of Environmental Conservation it shall cause unreasonable obstruction to the free navigation of said waters or flood flows or endanger the health, safety or welfare of the people of the State, or cause loss or destruction of the natural resources of the State, the owner may be ordered by the Department to remove or alter the structural work, obstructions, or hazards caused thereby without expense to the State, and if, upon the expiration or revocation of this permit, the structure, fill, excavation, or other modification of the watercourse hereby authorized shall not be completed, the owners, shall, without expense to the State, and to such extent and in such time and manner as the Department of Environmental Conservation may require, remove all or any portion of the uncompleted structure or fill and restore to its former condition the navigable and flood capacity of the watercourse. No claim shall be made against the State of New York on account of any such removal or alteration.

**General Condition #6:**

That the State of New York shall in no case be liable for any damage or injury to the structure or work herein authorized which may be caused by or result from future operations undertaken by the State for the conservation or improvement of navigation, or for other purposes, and no claim or right to compensation shall accrue from any such damage.

**General Condition #7:**

Granting of this permit does not relieve the applicant of the responsibility of obtaining any other permission, or approval from the U.S. Army Corps of Engineers, U.S. Coast Guard, New York State Office of General Services, or local government which may be required.

**General Condition #8:**

All necessary precautions shall be taken to preclude contamination of any wetland or waterway by suspended solids, sediments, fuels, solvents, lubricants, epoxy coatings, paints, concrete, leachate, or any other environmentally deleterious materials associated with the project.

**General Condition #9:**

Any material dredged in the conduct of the work herein permitted shall be removed evenly, without leaving large refuse piles, ridges across the bed of a waterway or floodplain or deep holes that may have a tendency to cause damage to navigable channels or to the banks of a waterway.

**General Condition #10:**

There shall be no unreasonable interference with navigation by the work herein authorized.

**General Condition #11:**

If upon the expiration or revocation of this permit, the project hereby authorized has not been completed, the applicant shall, without expense to the State, and to such extent and in such time and manner as the Department of Environmental Conservation may require, remove all or any portion of the uncompleted structure or fill and restore the site to its former condition. No claim shall be made against the State of New York on account of any such removal or alteration.

**General Condition #12:**

If granted under Article 36, this permit does not signify in any way that the project will be free from flooding.

**General Condition #13:**

If granted under 6 NYCRR Part 608, the NYS Department of Environmental Conservation hereby certifies that the subject project will not contravene effluent limitations or other limitations or standards under Sections 301, 302, 303, 306, and 307 of the Clean Water Act of 1977 (PL 95-217) provided that all of the conditions listed herein are met.

| DEC PERMIT NUMBER | PROJECT NAME | PAGE 3 OF 6 |
|---|---|---|
| 2-6499-00001/00005 | USACE: AK Gulfport Reach - Maintenance Dredging | |

00900 D-3

D3

NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION

SPECIAL CONDITIONS for DEC Permit No. 2-6499-00001/00005

Permit Documents

**Special Condition #1:**

The documents listed below are a part of this Water Quality Certificate:

1. US Army Corps of Engineers Public Notice No. Arthur Kill Reach 02, published November 13, 2001, and received by the Department on November 19, 2001.
2. Bathymetric surveys, dated 11 April 2002, titled Maintenance Dredging and Disposition of Dredged Material from Arthur Kill Reach of the New York and New Jersey Channels, sheets 3 through 18 of 18, showing shoaled areas to be dredged.

**Special Condition #2:**

A copy of this permit, including all maps and drawings mentioned in the special conditions, is to be available on the project site at all times. Failure to produce a copy of the permit upon request by a DEC representative is a violation of this permit and is sufficient ground for an order to immediately cease all work.

**Special Condition #3:**

A NYS DEC permit sign must be posted, protected from the weather, in a conspicuous outdoor location at the project site. This sign is to be posted for the duration of work authorized by this permit.

**Special Condition #4**

Within 10 DAYS of receipt of this WQ Certificate and no less than 15 DAYS PRIOR to the start of dredging, the Permittee must submit the updated Environmental Assessment.

Environmental Windows

**Special Condition #5:**

Dredging is prohibited from Feb 1 - May 31 to avoid disturbance during winter flounder spawning and nursery periods.

**Special Condition #6:**

Pralls Island: Between 1 April and the end of the first week of May or prior to the start of dredging activities, a qualified biologist, selected by the Permittee and agreed upon by the Department, shall inspect Prall's Island for the presence of nesting activity by herons or egrets. This inspection shall be conducted once each year that dredging is expected to occur within 1,000 feet of Prall's Island. Upon completion of the inspection, Permittee shall submit a written inspection report to Dawn McReynolds at the NYS DEC Region 2 office.

1. If no active nests are observed, avian protective measures will not be required.
2. If nesting is confirmed, the following protective measures shall be implemented:
   a. No dredging activity is to occur within 1,000 feet of Prall's Island from 1 April - 31 July.
   b. The Permittee shall use marker buoys every 200 feet or less (except within the existing federal channel) to indicate the 1,000 foot restricted area.

Island of Meadows: The following protective measures shall be implemented:

1. No dredging activity is to occur within 1,000 feet of island of Meadow from 1 April - 31 July.
2. The Permittee shall use marker buoys every 200 feet or less (except within the existing federal channel) to indicate the 1,000 foot restricted area.

**Special Condition #7:**

OuterBridge: No dredging activity is to occur under the bridge or within 1/4 mile of the bridge from 1 March - 31 July, for the protection of Peregrine Falcons.

| DEC PERMIT NUMBER | PROJECT NAME | PAGE 4 OF 6 |
|---|---|---|
| 2-6499-00001/00005 | USACE: AK Gulfport Reach - Maintenance Dredging | |

00900 D4

D4

NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION

Dredging and Placement of Sediments

PRIOR TO START OF WORK:

**Special Condition #8:**

Within 10 DAYS of receipt of this WQ Certificate and no less than 15 DAYS PRIOR to the start of dredging, the Permittee must submit bathymetric survey(s) of existing conditions with all dredging areas clearly depicted. The existing shoreline along the length of the project area must be clearly and accurately depicted on the bathymetric survey.

**Special Condition #9:**

Within 10 DAYS of receipt of this WQ Certificate and no less than 15 DAYS PRIOR to the start of dredging, the Permittee must submit the final estimate of the volume of material to be dredged.

**Special Condition #10:**

Within 10 DAYS of receipt of this WQ Certificate and no less than 15 DAYS PRIOR to the start of dredging, the Permittee must submit performance specifications and drawings of the dredging equipment to be used for this project. (See Special Condition #13).

**Special Condition #11:**

The attached "Notice of Intent to Commence Work" must be submitted to the DEC prior to the start of work and upon any resumption of work after more than six months of inactivity.

At the completion of the work allowed by this permit the attached "Notice of Completion of Work" is to be submitted.

DURING DREDGING OPERATIONS:

**Special Condition #12:**

A certified Army Corps of Engineers inspector shall monitor project operations regularly, and is responsible for ensuring that the project is being conducted in compliance with Special Conditions 13 - 15 of this Water Quality Certificate.

**Special Condition #13:**

1. The dredging method must minimize sediment resuspension no less efficiently than an environmental bucket with the following specifications and operational restrictions:
   a. The bucket shall be constructed with sealing gaskets or overlapping sealed design at the jaws, and seals or flaps positioned at locations of vent openings to minimize the loss of material during transport through the water column and into the barge.
   b. Any seals or flaps designed and/or installed at the jaws and locations of vent openings must tightly cover these openings while the bucket is lifted through the water column and into the barge. If excessive loss of water and/or sediments from the bucket is observed from the time of its breaking the water surface to crossing the barge gunwale, the inspector shall halt dredging operations and inspect the bucket for defects. Operations shall be suspended until all necessary repairs or replacements are made.
2. Bucket hoist speed shall be limited to approximately 2 feet per second.
   a. The bucket shall be lifted in a continuous motion through the water column and into the barge.
   b. The bucket shall be lowered to the level of the barge gunwales prior to the release of load.
3. There shall be no barge overflow.
4. Excavated sediments shall be placed directly into the approved disposal site or conveyance vehicle. No sidecasting of dredge material is authorized.

| DEC PERMIT NUMBER | PROJECT NAME | |
| --- | --- | --- |
| 2-6499-00001/00005 | USACE: AK Gulfport Reach - Maintenance Dredging | PAGE 5 OF 6 |

00900 D-5

D5

NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION

**Special Condition #14;**

1. Silt curtains must be deployed across the mouth of the following tidal creeks during flood tide events while dredging operations are being conducted within 1,500 feet of the mouth of the creek: Mill Creek, Little Fresh Kills, Neck Creek, Sawmill Creek, Old Place Creek, and Bridge Creek.
2. Silt curtains must be deployed throughout the tidal cycle on the seaward edge of the Gulfport wetlands located along the Arthur Kill between GATX and Howland Hook facilities while dredging is being conducted within 1,500 feet of the shoreline.
3. All silt curtains must be properly anchored and maintained to minimize resuspended sediments from entering the creeks and/or wetlands.

**Special Condition #15:**

All side slopes of the dredged channel will have a maximum 1:3 slope.

**Post-Dredging/Placement**

**Special Condition #16:**

All debris shall be disposed at an approved, state permitted upland site and be retained so as to not re-enter any water body, tidal wetland, or protected buffer area.

**Special Condition #17:**

1. Dredged material is to be disposed at the Newark Bay Confined Disposal Facility or other state approved and permitted upland placement location.
2. The Department is to be notified in writing if an upland placement location other than or in addition to the Newark Bay Confined Disposal Facility is to be used. Written notice is to be received by the Department at least 15days prior to use of proposed location.
   a. If the additional/alternative placement location is in the State of New York, the Permittee is to submit to the Department a letter of dredged material acceptance from the owner/operator of the proposed location.
   b. The proposed additional/alternative location is not to be used until the Permittee has received written notice from the Department as to whether the proposed location is authorized to accept dredged material. The Department will issue said notice within 15 days of receipt of the Permittee's written request.
   c. If the additional/alternative placement location is outside the State of New York, the Permittee's notice must be accompanied by: 1) a letter of dredged material acceptance from the owner/operator of the proposed location, and 2) a letter from the state regulatory authority stating that the proposed location is authorized to accept dredged material.

**Special Condition #18:**

Within 90 days of the completion of dredging the Permittee must submit a post-dredge bathymetric survey to the Department at 47-40 21st Street, Long Island City, NY 11101, Attention Kathryn D. McGuckin.

| DEC PERMIT NUMBER | PROJECT NAME | |
|---|---|---|
| 2-6499-00001/00005 | USACE: AK Gulfport Reach - Maintenance Dredging | PAGE 6 OF 6 |

00900 D-6

D 6




MAP No. 1 00900-D-7

95-20-1 (8/87)—9d

# New York State
## Department of Environmental Conservation

# NOTICE

The Department of Environmental Conservation (DEC) has issued permit(s) pursuant to the Environmental Conservation Law for work being conducted at this site. For further information regarding the nature and extent of work approved and any Departmental conditions on it, contact the Regional Permit Administrator listed below. Please refer to the permit number shown when contacting the DEC.

John F. Cryan

Regional Permit Administrator
John F. Cryan
47-40 21st Street
LIC, NY 11101

Permit Number 2-6499-00001/00005
United States Army Corps of Engineers, NY District
Arthur Kill reach, Outerbridge to Gulfport Maintenance Dredging

Expiration Date June 22, 2013

NOTE: This notice is **NOT** a permit (718) 482-4997

00900 D-8

D8

STATE OF NEW YORK
DEPARTMENT OF STATE
41 STATE STREET
ALBANY, NY 12231-0001

GEORGE E. PATAKI
GOVERNOR

RANDY A. DANIELS
SECRETARY OF STATE

Postmark on envelope 2/19/2005

Mr. John F. Tavolaro
Chief, Operations Support Branch
U.S. Army Corps of Engineers
New York District
Jacob K. Javits Federal Building
New York, NY 10278-0090

Re: F-2001-0948(DA)
*U.S. Army Corps of Engineers/NY District*
Maintenance Dredging - Arthur Kill
City of New York, Richmond County

Dear Mr. Tavolaro:

This letter is in response to yours, dated February 14, 2005, regarding the completion of maintenance dredging of the Arthur Kill Reach of the New York and New Jersey Channels.

Work remains to be completed for the maintenance dredging of the Arthur Kill reach, and that work was covered by the Corps' original consistency determination for that maintenance dredging. Your letter dated February 14, 2005 indicates there are no significant changes to the original project. Therefore, this Department's concurrence with the Corps' original consistency determination remains valid, until that work is completed, in the manner described and included in the Corps' original consistency determination.

If there are any questions regarding this matter please contact Jeff Zappierri, Supervisor of our Consistency Review Unit, at (518) 473-2476, or me, at (518) 474-5290.

Sincerely,

Steven C. Resler
Deputy Bureau Chief
Division of Coastal Resources

scr/bms

00900 D-9

D9

State of New Jersey
Department of Environmental Protection
Site Remediation Program
Office of Dredging and Sediment Technology
P.O. Box 028
Trenton, NJ 08625
(609) 292-1250
FAX (609) 777-1914

Richard J. Codey
*Acting Governor*

Bradley M. Campbell
Commissioner

April 14, 2005

Mr. John Tavolaro, Chief
Operations Support Branch
Department of the Army
New York District, Corps of Engineers
Jacob K. Javits Building
Federal Building
New York, New York 10278-0090

RE: **AMENDMENT** Federal Consistency Determination / Water Quality Certification
File: 0000-01-1003.1 (CDT 050001)
Project: Maintenance Dredging of the Arthur Kill Reach

Dear Mr. Tavolaro:

This letter is forwarded in response to your February 14, 2005 request for an amendment to the Federal Consistency (FC), as required by Section 307 of the federal Coastal Zone Management Act (16 USC 1451 et seq.) and Water Quality Certification (WQC) as required by Section 401 of the federal Clean Water Act (33 USC 1251 et seq.) for the maintenance dredging of the Arthur Kill Reach. The Department issued a FC/WQC for the maintenance dredging of this reach of the Arthur Kill on August 1, 2003 (DEP File No. 0000-01-1003.1 (CDT 010001)). However, only portions of the contract were dredged in 2003 due to limited funding for the project. Therefore, this amendment to the FC/WQC serves to authorize the maintenance dredging of the remaining shoals of the Arthur Kill Reach during the calendar year 2005.

The 2005 dredging cycle involves the maintenance dredging of the Arthur Kill Reach of the New York and New Jersey Channels to maintain a channel depth of –35 below mean low water (MLW) plus 2 feet overdredge. The maximum volume of material to be removed (including overdredge) as part of this dredging cycle is approximately 298,110 cubic yards (cy) of material. It is understood the initial volume of material to be dredged in the area identified as "Shoals A, B, C" equates to approximately 101,965 cy as provided in the contract specifications. An additional 196,145 cy of material may be removed via 15 option areas depending on project funds. These options areas are referred to on the plans as Option A1 through Option N.

Sediment sampling data for the material to be removed under the 2005 dredging cycle was previously provided for the Arthur Kill Reach as part of the 2003 dredging cycle contract procurement process. The majority of the shoals identified for dredging during the 2003 cycle were not dredged under this contract. As a result, the Department does not anticipate that the sediment characteristics of these shoals have changed significantly since 2003. Therefore, the Department anticipates that sediment sampling for this dredging cycle will be limited to those areas which area not previously sampled during the 2003 dredging cycle (see attached Table). However, the Department reserves the right to require sampling in all areas of shoaling to be removed during the 2005 dredging cycle based on historic spills, past sediment sampling data, etc. It is understood that the NY District will require the apparent low bidder identified for this contract to coordinate with the Department on obtaining the necessary sediment sampling data for the material to be removed during this contract. The bidder will also be required to secure all necessary permits and approvals for the proposed upland placement site for the material. This information would

00900 D-10

then be submitted to the NY District as part of the contract procurement procedure. The Department finds this process acceptable provided the NY District submits a request for an amendment to this federal consistency determination once an acceptable permitted upland site is identified for this contract by the apparent low bidder.

The Rules on Coastal Zone Management (N.J.A.C. 7:7E) constitute New Jersey's enforceable policies under its federally approved Coastal Zone Management Program. The Arthur Kill Reach Maintenance Dredging Project has been reviewed under the following Rules on Coastal Zone Management: Navigation Channels (7:7E-3.7), Ports (7:7E-3.11), Endangered or Threatened Wildlife or Plant Species Habitat (7:7E-3.38), Maintenance Dredging (7:7E-4.6), Dredged Material Disposal (7:7E-4.8), Dredged Material Disposal on Land (7:7E-7.12), Marine Fish and Fisheries (7:7E-8.2) and Water Quality (7:7-8.4). Based on the above summary of details of the project as presented in the February 14, 2005 request for a FC/WQC and supporting information, I have **CONDITIONALLY determined that Arthur Kill Reach Maintenance Dredging Project is consistent with the Rules on Coastal Zone Management and New Jersey's federally approved Coastal Management Program provided the NY District submits the required request for an amendment to this federal consistency, as identified in Paragraph 3 of this letter. A written response from the Department on the request for an amendment to this federal consistency must be received by the NY District prior issuance of the Notice To Proceed (NTP) to the contractor.**

I have also reviewed this project for potential water quality impacts. Provided that the following conditions are met, I have determined that this project is not likely to cause a violation of New Jersey's Surface Water Quality Standards (N.J.A.C. 7:9B-1.1 et seq.). **Therefore, this determination includes the State's Water Quality Certification pursuant to Section 401 of the federal Water Pollution Control Act (33 USC 1251 et seq.) subject to the following conditions:**

1. Dredging is prohibited between February 1st and May 31st of any given year in order to protect the early life stages of winter flounder.

2. The Corps, or designated dredging contractor, shall comply with all conditions related to environmental windows imposed in the New York State Department of Environmental Conservation Water Quality Certificate issued June 23, 2003, and any amendment thereto.

3. All dredging of material removed during this project shall be accomplished using a closed clamshell "environmental" bucket dredge.

4. Dredged material shall be placed deliberately in the barge in order to prevent spillage of material overboard.

5. The dredge shall be operated so as to maximize the bite of the clamshell. This will reduce the amount of free water in the dredged material and the number of bites required to complete the job.

6. The clamshell shall lifted slowly through the water column, generally 2 feet per second or less.

7. All barges or scows used to transport sediment shall be of solid hull construction or be sealed with concrete.

8. The gunwales of the dredge scows shall not be rinsed or hosed during dredging.

9. All decant water holding scows shall be water tight and of solid hull construction.

10. Decant water from this project may only be discharged within the Arthur Kill Reach in close proximity to the dredging contract area. Discharge to another receiving waterbody requires prior approval from the Department, and may require a NJDPES/DSW permit.

11. All decant water shall be held in the decant holding scow a minimum of 24 hours after the last addition of water to the decant holding scow. Said water contained in the decant holding scow may only be discharge after this mandatory 24 hour retention time.

    Should the contractor wish to reduce the required holding time, the contractor shall demonstrate that the reduced holding time is sufficient to meet a total suspended solids (TSS) background value of 30 mg/L. This TSS action level is consistent with the ambient TSS results presented in the NY District study entitled "2001 Total Suspended Solids and Turbidity Monitoring for Newark Bay, Kill Van Kull and Port Jersey" (September 2002). The total suspended solids shall be determined through gravimetric analysis. No discharge shall be permitted from the decant holding scow until the results of the gravimetric analysis have confirmed that the 30 mg/L background level has been achieved. No additional water shall be added to the decant holding scow between the time of sample acquisition and discharge. Upon successful demonstration that the reduced holding time is sufficient to meet the TSS background level of 30 mg/L, the monitoring of TSS may be suspended and the demonstrated settling time shall replace the 24 hour minimum. A successful demonstration of the reduced holding time efficiency shall be determined once three consecutive TSS analyses have confirmed that the 30 mg/L action level has been achieved by the reduced holding time.

    Should the contractor wish to demonstrate this reduced holding time, all records including time of last addition of decant water into the scow, time of TSS sampling and the results of TSS sampling shall be submitted to the NJDEP as soon as they become available, together with a request for a reduced holding time.

12. During pumping of the decant water from the holding scow, great care shall be taken to avoid resuspending or pumping sediment which has settled in the decant holding scow.

13. The dredging contractor shall complete and submit the attached Dewatering Form to the ACOE Operations Branch on a weekly basis as part of the Quality Control Report provided to the NY District: Said Dewatering form shall be certified by the ACOE Operations Branch that they have witnessed the dewatering process during the preceding week. The ACOE Operations Branch shall submit the completed Dewatering form with appropriate certifications to the appropriate state agency the Monday after the end of the preceding week.

14. During pumping of the decant water from the holding scow, great care shall be taken to avoid resuspending or pumping sediment which has settled in the decant holding scow.

15. REPORTING REQUIREMENTS: At the completion of each individual dredging contract, the NY District shall submit the following information to the Department. This information shall be submitted within six months of contract completion.

- Start and finish date of contract
- Post-dredge hydrographic survey
- Completed "Notice of Completion of Work" attached.

Should you have any questions regarding this determination and certification, please do not hesitate to contact me at (609) 292-8838.

Sincerely,

Suzanne U. Dietrick

Suzanne U. Dietrick, Chief
Office of Dredging and Sediment Technology

C: Richard Gimello, Executive Director, Office of Maritime Resources
Thomas Wakeman, Port Authority NY/NJ

Kathryn D. McGuckin
NY Department of Environmental Conservation
Division of Environmental Permits, Region 2
47-40 21st Street
Long Island City, NY 11101-5407

00900 D-13

# DEWATERING FORM

**Week of __________________________ (Sunday to Saturday) (SEE NOTE BELOW)**

**USACE Contract:______________________________**

**Contract Reach:_____________________________**

Decant Scow Identification ________ Capacity________ gallons/______ cubic yards

Volume Calculation:______ Estimated _______Measured (check one) (If measured, provide calculation procedure)

| Dredge Scow Identification # | Date of discharge into decant scow | Time of initiation of discharge into decant scow | Time of cessation of discharge into decant scow | Rate of pump used to discharge into decant scow | Volume of Discharge into decant scow |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Last addition of decant water into decant scow:
Date:_____
Time:_____

Discharge of decant water to surface waterbody
Date:_____
Time:_____
Volume: ________ gallons

**NOTE: Should more than one decant barge be used during a given week, a new dewatering form should be utilized and submitted to the ACOE Operations Branch.**

**CERTIFICATIONS:**

**I,______________________, as Quality Control Officer for ________________________(Company) for the above ACOE Dredging Contract, do hereby certify that the information provided in this document is true and accurate, and that I have personally observed the dewatering procedure recorded herein during the timeframe specified above. Signature:_____________________________**

**I, ______________________, as ACOE Project Engineer for the above referenced contract have personally observed the dewatering procedure recorded herein during the timeframe specified above. Said procedure has complied with the conditions specified in the Federal Consistency Determination/Water Quality Certificate issued by the NJDEP for the project.**
**Signature:_____________________________**

# NOTICE OF COMPLETION OF DREDGING

Date: ______________________________

New Jersey Department of Environmental Protection
Office of Dredging and Sediment Technology
P.O. Box 028
401 East State Street
Trenton, NJ 08625

Attn: NJDEP, ODST, Project Manager FAX: (609) 777-1914

**Re: NJDEP Permit No.**
**Insert project title:** ____________________
**Location of Dredging:** ____________________

Dear Sir/Madam:

I hereby serve notice that the DREDGING allowed by the above referenced permit has been completed as of ____________________, 200__.

The dredged material was removed via mechanical_____ or hydraulic____ dredging (check one).

The dredged material was/is being dewatered with discharge into ____________________.

The actual quantity of material dredged was _________cys. The dredged material was taken to:

1. _________ cys was taken to the Historic Area Remediation Site.
2. _________ cys used on site as per NJDEP Permit(s) #____________________ ____________________(specify the type of permit(s)).
3. _________ cys was taken to ____________________ for beneficial reuse.
4. _________ cys was taken to____________________ for disposal.
5. _________ cys was taken to____________________ for beach nourishment.

| | |
|---|---|
| **Signature of the Permittee** | **Signature of the Contractor (if any)** |
| **Permittee's Name (Printed)** | **Contractor's Name (Printed)** |
| Name of Permitted Agency/Entity | Name of Company |
| Street Address | Street Address |
| City State ZIP | City State ZIP |
| Telephone | Telephone |

00900 D-15

SHOALS LOCATIONS ARTHUR KILL (2003/2005)

| FY-2003 | FY-2005 |
| --- | --- |
| Basic 1 | A1 |
| Basic 2 | clear |
| Basic 3 | clear |
| Opt 5 | F1 |
| Opt 1 | clear |
| Opt 2 | A |
| Opt 3 | A |
| Opt 4 | D |
| Opt 6 | F |
| Opt 7 | I |
| Opt 8 | A |
| Opt 9 | E |
| Opt 10 | G |
| Opt 11 | H |
| Opt 12 | B |
| Opt 13 | J |
| Opt 14 | M |
| Opt 15 | L |
| Opt 16 | K |
| Minor shoals (not on 2003 dredging agenda) | C |
| clear | B1 (small volume - 570CY) |
| clear | G1 (small volume - 655CY) |
| Minor shoal (not on 2003 dredging agenda) | N |

Basic 1, Basic 2, Basic 3 and Option 5 were dredged in 2003.

Basic work for 2005 are Shoals A, B and C.

00900 D-16

## PROJECT IDENTIFICATION SIGN
## CIVIL PROJECT

The graphic format for this 4' x 6' sign panel follows the legend guidelines and layout as specified below. The large 4' x 4' section of the panel in the right is to be white with black legend. The 2' x 4' section of the sign on the left with the full corps Signature (reverse version) is to be screen printed Communications White on the Red background. The castle insignia will be furnished by the Government in pressure sensitive vinyl for affixing by the Contractor. See attached sheet for fabrication and mounting guidelines.

Legend Group 1: One to two-line description of Corps relationship to project
Color: white
Typeface: 1.25" Helvetica Regular
Maximum line length: 19"

Legend Group 2: Division or District Name (optional, Place below 10.5" Reverse Signature (6" Castle)
Color: white
Typeface: 1.25" Helvetica Regular

Legend Group 3: One-to three-line project title legend describes the work being done under this contract.
Color: Black
Typeface: 3" Helvetica Bold
Maximum line length: 42"

Legend Group 4: One-to two-line identification of project or facility (civil works) or name of sponsoring department (military).
Color: Black
Typeface: 1.5" Helvetica Regular
Maximum line length: 42"

Cross-align the first of Legend Group 4 with the first line of the Corps Signature (US Army Corps) as shown.

Legend Group 5a-b: One-to-five line identification of prime contractors including: type (architect, general contractor, etc.), corporate or firm name, city, state. Use of Legend Group 5 is optional.
Color: Black
Typeface: 1.25" Helvetica Regular
Maximum line length: 21"

All typography is flush left and rag right upper and lower case with initial capitals only as shown. Letter and word spacing to follow Corps standards.

SAMPLE:




(Dimensions are in inches)

| Sign Type | Legend | Panel Size | Post Size | Specification Code | Mounting Height | Color Bkg/Lgd |
|---|---|---|---|---|---|---|
| CID-01 | various | 4' x 6' | 4' x 4' | HDO-3 | 48" | WH-RD/BK |

Show non-Federal local partner's name and logo - Port Authority of New York and New Jersey

* Refers to the U.S. Army Corps of Engineers, "Sign Standards Manual", EPS-310-1-6.
00900 ATT. E-1

## Fabrication and Mounting Guidelines

As Construction Project Identification signs and Safety Performance signs are to be fabricated and installed as described below. The signs are to be erected at a location deignated by the contracting officer and shall conform to the size, format, and typographic standards.

The sign panels are to be fabricated from .75" High Density Overlay Plywood. Panel preparation to follow HDO specifications.

Sign graphics to be prepared on a white non-reflective vinyl film with positionable adhesive backing.

All graphics except for the Communications Red background with Corps signature on the project sign are to be die-cut or computer-cut non-reflective vinyl, pre-spaced legends prepared in the sizes and typefaces specified and applied to the background panel following the graphic formats shown on the attached sheets.

The 2x4' Communications Red panel (to match PMS-032) with full Corps signature (reverse version) is to be screen printed on the white background. Identification of the District or Division may be applied under the signature with white cut vinyl letters prepared to Corps standards. Large scale reproduction artwork for the signature is provided on page 4.8 (photographically enlarge from 6.875" to 10.5"). **

Drill and insert six (6) .375" T-nuts from the front face of the HDO sign panel. Position holes as shown. Flange of T-nut to be flush with sign face.

Apply graphic panel to prepared HDO plywood panel following manufacturers' instructions.

Sign uprights to be structural grade 4"x4" treated Douglas Fir or Southern Yellow Pine. No.1 or better. Post to be 12" long. Drill six (6) .375" mounting holes in uprights to align with T-nuts in sign panel. Countersink (.5") back of hole to accept socket head cap screw (4"X.375").

Assemble sign panel and uprights. Imbed assembled sign panel and uprights in 4" hole. Local soil conditions and/or wind loading may require bolting additional 2"x4" struts on inside face of uprights to reinforce installation as shown.

Detailed specifications for HDO plywood panel preparation are provided in Appendix B.**

Shown below the mounting diagram is a panel layout grid with spaces provided for project information. Photocopy this page and use as a worksheet when preparing sign legend orders.




(Dimensions in inches)

** Refers to the U.S. Army Corps of Engineers, "Sign Standards Manual", EP-310-1-6.

Construction Project Sign
Legend Group 1: Corps Relationship

1.
2.

Legend Group 2: Divison/District Name

1.
2.

Legend Group 3: Project Title

1.
2.
3.

Legend Group 4: Facility Name

1.
2.

Legend Group 5a: Contractor/A&E

1.
2.
3.
4.
5.

Legend Group 5b: Contractor /A&E

1.
2.
3.
4.
5.

Safety Performance Sign
Legend Group 1: Project Title

1.
2.

Legend Group 2: Contractor/A&E

1.
2.

00900 ATT. E-2

# SAFETY PERFORMANCE SIGN

The graphic format, color, size and type-faces used on the sign are to be reproduced exactly as specified below. The title with First Aid logo in the top section of the sign, and the performance record captions are standard for all signs of this type. Legend Group 2 and 3 below identify the project and the contractor and are to be placed on the sign as shown. Safety record numbers are mounted on individual metal plates and are screw-mounted to the background to allow for daily revisions to posted safety performance record.

Legend Group1: Standard two-line title "Safety is a Job Requirement", with (8" od.) Safety Green First Aid logo. Color: To match PMS 347 Typeface: 3" Helvetica Bold Color: Black

Legend Group 2: One- to two-line project title legend describes the work being done under this contract and name of host project. Color: Black Typeface: 1.5" Helvetica Regular Maximum line length: 42"

Legend Group 3: One - to two-line identification: name of prime contractor and city, state address. Color: Black Typeface: 1.5" Helvetica Regular Maximum line length: 42"

Legend Group 4: Standard safety record captions as shown. Color: Black

Typeface: 1.25" Helvetica Regular

Replaceable numbers are to be mounted on white .060: aluminum plates and screw-mounted to background. Color: Black Typeface: 3" Helvetica Regular Plate size: 2.5"x.5"

All typography is flush left and rag right, upper and lower case with initial capitals only as shown. Letter- and word-spacing to follow Corps standards.




Dimensions inches.
See attached sheet for fabrication and mounting guidelines.

* Refer to the U.S. Army Corps of Engineers, "Sign Standards Manual", EPS-310-1-6.

| Sign Type | Legend Size | Panel Size | Post Size | Specifications Code | Mounting Height | Color Bkg/Lgd |
|---|---|---|---|---|---|---|
| CID-02 | various | 4"x4" | 4"x4" | HDO-3 | 48" | WH/BK-GR |




00900 ATT. E-3

[Code of Federal Regulations]
[Title 33, Volume 2, Parts 120 to 199]
[Revised as of July 1, 2000]
From the U.S. Government Printing Office via GPO Access
[CITE: 33CFR154.105]

[Page 295-296]

NAVIGABLE WATERS

CHAPTER I--COAST GUARD, DEPARTMENT OF TRANSPORTATION (CONTINUED)

PART 154--FACILITIES TRANSFERRING OIL OR HAZARDOUS MATERIAL IN BULK--Table of Contents

Subpart A--General

Sec. 154.105 Definitions.

As used in this part:

Barrel means a quantity of liquid equal to 42 U.S. gallons.

Boundary Line means any of the lines described in 46 CFR part 7.

Captain of the Port (COTP) means the U.S. Coast Guard officer commanding a Captain of the Port Zone described in Part 3 of this chapter, or that person's authorized representative.

Caretaker Status denotes a facility where all piping, hoses, loading arms, storage tanks, and related equipment in the marine transfer area are completely free of oil or hazardous materials, where these components have been certified as being gas free, where piping, hoses, and loading arms terminating near any body of water have been blanked, and where the facility operator has notified the COTP that the facility will be in caretaker status.

Commandant means the Commandant of the Coast Guard or an authorized representative.

Contiguous Zone means the entire zone established by the United States under Article 24 of the Convention on the Territorial Sea and the Contiguous Zone, but not extending beyond 12 miles from the baseline from which the breadth of the territorial sea is measured.

District Commander means the officer of the Coast Guard designated by the Commandant to command a Coast Guard District, as described in Part 3 of this chapter or an authorized representative.

Facility means either an onshore or offshore facility, except for an offshore facility operating under the jurisdiction of the Secretary of the Department of Interior, and includes, but is not limited to, structure, equipment, and appurtenances thereto, used or capable of being used to transfer oil or hazardous materials to or from a vessel or public vessel. Also included are facilities that tank clean or strip and any floating structure that is used to support an integral part of the facility's operation. A facility includes federal, state, municipal, and private facilities.

00900 F 1

Facility operator means the person who owns, operates, or is responsible for the operation of the facility.

Hazardous material means a liquid material or substance, other than oil or liquefied gases, listed under 46 CFR 153.40 (a), (b), (c), or (e).

Marine transfer area means that part of a waterfront facility handling oil or hazardous materials in bulk between the vessel, or where the vessel moors, and the first manifold or shutoff valve on the pipeline encountered after the pipeline enters the secondary containment required under 40 CFR 112.7 or 49 CFR 195.264 inland of the terminal manifold or loading arm, or, in the absence of secondary containment, to the valve or manifold adjacent to the bulk storage tank, including the entire pier or wharf to which a vessel transferring oil or hazardous materials is moored.

MARPOL 73/78 means the International Convention for the Prevention of Pollution from Ships, 1973 (done at London, November 2, 1973) as modified by the Protocol of 1978 relating to the International Convention for the Prevention of Pollution from Ships, 1973 (done at London, February 17, 1978).

Mobile facility means any facility that can readily change location, such as a tank truck or tank car, other than a vessel or public vessel.

Monitoring device means any fixed or portable sensing device used to monitor for a discharge of oil or hazardous material onto the water, within or around a facility, and designed to notify operating personnel of a discharge of oil or hazardous material.

Officer in Charge, Marine Inspection (OCMI) means the U.S. Coast Guard officer commanding a Marine Inspection Zone described in Part 3 of this chapter, or an authorized representative.

Offshore facility means any facility of any kind located in, on, or under, any of the navigable waters of the United States, and any facility of any kind which is subject to the jurisdiction of the United States and is located in, on, or under any other waters, other than a vessel or a public vessel.

Oil means oil of any kind or in any form, including but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil.

Onshore facility means any facility (including, but not limited to, motor vehicles and rolling stock) of any kind located in, on, or under any land within the United States other than submerged land.

Person in charge means an individual designated as a person in charge of transfer operations under Sec. 154.710 (for facilities) or Sec. 155.700 (for vessels) of this chapter.

STCW means the International Convention on Standards of Training, Certification, and Watchkeeping for Seafarers, 1978.

Self-propelled tank vessel means a self-propelled tank vessel other than a tankship.

Tank barge means a non-self-propelled tank vessel.

Tankship means a self-propelled tank vessel constructed or adapted primarily to carry oil or hazardous material in bulk in the cargo

00900 F2

spaces.

Tank vessel means a vessel that is constructed or adapted to carry, or that carries, oil or hazardous material in bulk as cargo or cargo residue, and that--

(a) Is a vessel of the United States;

(b) Operates on the navigable waters of the United States; or

(c) Transfers oil or hazardous material in a port or place subject to the jurisdiction of the United States.

Transfer means any movement of oil or hazardous material to, from, or within a vessel by means of pumping, gravitation, or displacement. A transfer is considered to begin when the person in charge on the transferring vessel or facility and the person in charge on the receiving facility or vessel first meet to begin completing the declaration of inspection as required by Sec. 156.150 of this chapter. A transfer is considered to be complete when all the connections for the transfer have been uncoupled and secured with blanks or other closure devices and both of the persons in charge have completed the declaration of inspection to include the date and time the transfer was complete.

Vessel operator means a person who owns, operates, or is responsible for the operation of a vessel.

[CGD 75-124, 45 FR 7169, Jan. 31, 1980, as amended by CGD 86-034, 55 FR 36252, Sept. 4, 1990; CGD 79-116, 60 FR 17141, Apr. 4, 1995; CGD 93-056, 61 FR 41458, Aug. 8, 1996; 62 FR 3610, Jan. 24, 1997; CGD 79-116, 62 FR 25125, May 8, 1997]

[Code of Federal Regulations]
[Title 33, Volume 2, Parts 120 to 199]
[Revised as of July 1, 2000]
From the U.S. Government Printing Office via GPO Access
[CITE: 33CFR156]

[Page 435-442]

NAVIGABLE WATERS

CHAPTER I--COAST GUARD, DEPARTMENT OF TRANSPORTATION (CONTINUED)

PART 156--OIL AND HAZARDOUS MATERIAL TRANSFER OPERATIONS--Table of Contents

Subpart A--Oil and Hazardous Material Transfer Operations

Sec. 156.100 Applicability.

This subpart applies to the transfer of oil or hazardous material on the navigable waters or contiguous zone of the United States to, from, or within each vessel with a capacity of 250 barrels or more; except that, this subpart does not apply to transfer operations within a public vessel.

00900 F3

[CGD 86-034, 55 FR 36255, Sept. 4, 1990]

Sec. 156.105 Definitions.

Except as specifically stated in a section, the definitions in Sec. 154.105 of this chapter apply to this subpart.

[CGD 90-071a, 59 FR 53291, Oct. 21, 1994]

Sec. 156.107 Alternatives.

(a) The COTP may consider and approve alternative procedures, methods, or equipment standards to be used by a vessel or facility operator in lieu of any requirements in this part if:

(1) Compliance with the requirement is economically or physically impractical;

(2) The vessel or facility operator submits a written request for the alternative at least 30 days before operations under the alternative are proposed, unless the COTP authorizes a shorter time; and

(3) The alternative provides an equivalent level of safety and protection from pollution by oil or hazardous material, which is documented in the request.

(b) The COTP takes final approval or disapproval action on any alternative requested, in writing, within 30 days of receipt of the request.

[CGD 75-124, 45 FR 7177, Jan. 31, 1980, as amended by CGD 86-034, 55 FR 36255, Sept. 4, 1990]

Sec. 156.110 Exemptions.

(a) The Assistant Commandant for Marine Safety and Environmental Protection, acting for the Commandant, may grant an exemption or partial exemption from compliance with any requirement in this part, and the District Commander may grant an exemption or partial exemption from compliance with any operating condition or requirement in subpart C of this part, if:

(1) The vessel or facility operator submits an application for exemption via the COTP at least 30 days before operations under the exemption are proposed, unless the COTP authorizes a shorter time; and

(2) It is determined, from the application, that:

(i) Compliance with a specific requirement is economically or physically impractical;

(ii) No alternative procedures, methods, or equipment standards exist that would provide an equivalent level of safety and protection from pollution by oil or hazardous material; and

(iii) The likelihood of oil or hazardous material being discharged as a result of the exemption is minimal.

(b) If requested, the applicant must submit any appropriate information, including an environmental and economic assessment of the effects of and reasons for the exemption and proposed procedures, methods or equipment standards.

(c) The exemption may specify the procedures, methods, or equipment standards that will apply.

00900 F4

(d) An exemption is granted or denied in writing. The decision of the Assistant Commandant for Marine Safety and Environmental Protection is a final agency action.

[CGD 75-124, 45 FR 7177, Jan. 31, 1980, as amended by CGD 88-052, 53 FR 25122, July 1, 1988; CGD 86-034, 55 FR 36255, Sept. 4, 1990; CGD 93-081, 60 FR 45017, Aug. 29, 1995; CGD 96-026, 61 FR 33666, June 28, 1996; CGD 93-056, 61 FR 41461, Aug. 8, 1996; CGD0 97-023, 62 FR 33364, June 19, 1997]

---

Sec. 156.111 Incorporation by reference.

(a) Certain material is incorporated by reference into this part with the approval of the Director of the Federal Register under 5 U.S.C. 552(a) and 1 CFR part 51. To enforce any edition other than that specified in paragraph (b) of this section, the Coast Guard must publish notice of the change in the Federal Register; and the material must be available to the public. All approved material is available for inspection at the Office of the Federal Register, 800 North Capitol Street, NW., suite 700, Washington, DC, and at the U.S. Coast Guard, Office of Compliance (G-MOC), 2100 Second Street, SW, Washington, DC 20593-0001 and is available from the sources indicated in paragraph (b) of this section.

(b) The material approved for incorporation by reference in this part and the sections affected are as follows:

Oil Companies International Marine Forum (OCIMF)

15th Floor, 96 Victoria Street, London SW1E 5JW, England.

Ship to Ship Transfer Guide (Petroleum), Second Edition, 1988--156.330.

International Chamber of Shipping

12 Carthusian Street, London EC1M 6EB, England.

Guide to Helicopter/Ship Operations, Third Edition, 1989--156.330.

[CGD 93-081, 60 FR 45017, Aug. 29, 1995, as amended by CGD 96-026, 61 FR 33666, June 28, 1996]

Sec. 156.112 Suspension order.

The COTP or OCMI may issue a suspension order to suspend transfer operations to the vessel or facility operator when the COTP or OCMI finds there is a condition requiring action to prevent the discharge or threat of discharge of oil or hazardous material, or when the COTP or OCMI is unable to verify compliance with the regulations through an inspection. A suspension order:

(a) May be effective immediately;

(b) Is issued in writing unless it is effective immediately and then it may be issued orally and followed up in writing;

00900 F5

(c) Includes a statement of each condition requiring correction to-
-

(1) Prevent the discharge of oil or hazardous material; or
(2) Comply with Sec. 154.735 of this chapter; and
(d) Is withdrawn when the COTP, OCMI, or District Commander, as applicable, determines that the condition requiring action to prevent the discharge or threat of discharge of oil or hazardous material has been corrected or no longer exists.

[CGD 75-124, 45 FR 7177, Jan. 31, 1980, as amended by CGD 86-034, 55 FR 36255, Sept. 4, 1990]

Sec. 156.113 Compliance with suspension order.

(a) No vessel or facility operator to whom a suspension order has been issued may conduct transfer operations from the time the order is effective until that order is withdrawn by the applicable COTP, OCMI, or by the District Commander.
(b) The vessel or facility operator may request reconsideration of the suspension order either orally or in writing to the COTP or OCMI who issued it. The request may contain supporting documentation and evidence that the vessel or facility operator wishes to have considered.
(c) Any person not satisfied with a ruling made under the procedure contained in paragraph (b) of this section may appeal that ruling in writing, except as allowed under paragraph (e) of this section, to the Coast Guard District Commander of the district in which the suspension order was issued. The appeal may contain supporting documentation and evidence that the appellant wishes to have considered. The appeal does not stay the effect of the suspension order while the COTP or OCMI ruling is being reviewed. The District Commander issues a ruling after reviewing the appeal.
(d) The ruling by the District Commander is final agency action.
(e) If the delay in presenting a written appeal under paragraph (c) of this section would have a significant adverse impact on the appellant, the appeal may initially be presented orally. If an initial presentation of the appeal is made orally, the appellant must submit the appeal in writing within five days of the oral presentation to the District Commander to whom the oral appeal was made, containing, at a minimum the basis for the appeal and a summary of the material presented orally.

[CGD 75-124, 45 FR 7177, Jan. 31, 1980, as amended by CGD 86-034, 55 FR 36255, Sept. 4, 1990]

Sec. 156.115 Person in charge: Limitations.

(a) No person may serve as the person in charge of transfer operations on more than one vessel at a time during transfers between vessels or between two or more vessels and a facility unless authorized by the COTP.
(b) No person may serve as the person in charge of both a vessel and

00900 F6

a facility during transfer operations unless authorized by the COTP.

[CGD 75-124, 45 FR 7177, Jan. 31, 1980, as amended by CGD 86-034, 55 FR 36255, Sept. 4, 1990]

Sec. 156.118 Advance notice of transfer.

(a) The COTP may require a facility operator to notify the COTP of the time and place of each transfer operation at least 4 hours before it begins for facilities that:

(1) Are mobile;
(2) Are in a remote location;
(3) Have a prior history of oil or hazardous material spills; or
(4) Conduct infrequent transfer operations.

(b) In the case of a vessel to vessel transfer, the COTP may require a vessel operator of a lightering or fueling vessel to notify the COTP of the time and place of each transfer operation, as specified by the COTP, at least 4 hours before it begins.

(c) No person may conduct such transfer operations until advance notice has been given as specified by the COTP.

Note: The notification may be accomplished by submitting a written schedule, periodically updated to be current.

[CGD 75-124, 45 FR 7177, Jan. 31, 1980, as amended by CGD 86-034, 55 FR 36255, Sept. 4, 1990]

Sec. 156.120 Requirements for transfer.

A transfer is considered to begin when the person in charge on the transferring vessel or facility and the person in charge on the receiving facility or vessel first meet to begin completing the declaration of inspection, as required by Sec. 156.150 of this part. No person shall conduct an oil or hazardous material transfer operation unless:

(a) The vessel's moorings are strong enough to hold during all expected conditions of surge, current, and weather and are long enough to allow adjustment for changes in draft, drift, and tide during the transfer operation;

(b) Transfer hoses and loading arms are long enough to allow the vessel to move to the limits of its moorings without placing strain on the hose, loading arm, or transfer piping system;

(c) Each hose is supported to prevent kinking or other damage to the hose and strain on its coupling.

(d) Each part of the transfer system is aligned to allow the flow of oil or hazardous material;

(e) Each part of the transfer system not necessary for the transfer operation is securely blanked or shut off;

(f) The end of each hose and loading arm that is not connected for the transfer of oil or hazardous material is blanked off using the closure devices required by Secs. 154.520 and 155.805 of this chapter;

(g) The transfer system is attached to a fixed connection on the vessel and the facility except that when a vessel is receiving fuel, an automatic back pressure shutoff nozzle may be used;

00900 F7

(h) Each overboard discharge or sea suction valve that is connected to the vessel's transfer or cargo tank system is sealed or lashed in the closed position; except when used to receive or discharge ballast in compliance with 33 CFR Part 157;

(i) Each transfer hose has no unrepaired loose covers, kinks, bulges, soft spots, or any other defect which would permit the discharge of oil or hazardous material through the hose material and no gouges, cuts, or slashes that penetrate the first layer of hose reinforcement (''reinforcement'' means the strength members of the hose, consisting of fabric, cord and/or metal);

(j) Each hose or loading arm in use meets Secs. 154.500 and 154.510 of this chapter, respectively;

(k) Each connection meets Sec. 156.130;

(l) Any monitoring devices required by Sec. 154.525 of this chapter are installed and operating properly;

(m) The discharge containment equipment required by Sec. 154.545 of this chapter is readily accessible or deployed as applicable;

(n) The discharge containment required by Secs. 154.530, 155.310, and 155.320 of this chapter, as applicable, is in place and periodically drained to provide the required capacity;

(o) Each drain and scupper is closed by the mechanical means required by Sec. 155.310;

(p) All connections in the transfer system are leak free except that a component in the transfer system, such as the packing glands of a pump, may leak at a rate that does not exceed the capacity of the discharge containment provided during the transfer operation;

(q) The communications required by Secs. 154.560 and 155.785 of this chapter are operable for the transfer operation;

(r) The emergency means of shutdown required by Secs. 154.550 and 155.780 of this chapter, as applicable, is in position and operable;

(s) There is a person in charge on the transferring vessel or facility and the receiving vessel or facility except as otherwise authorized under Sec. 156.115;

(t) Each person in charge required by paragraph (s) of this section:

(1) Is at the site of the transfer operation and immediately available to the transfer personnel;

(2) Has in his or her possession a copy of the facility operations manual or vessel transfer procedures, as appropriate; and

(3) Conducts the transfer operation in accordance with the facility operations manual or vessel transfer procedures, as appropriate;

(u) The personnel required, under the facility operations manual and the vessel transfer procedures, to conduct the transfer operation:

(1) Are on duty; and

(2) Conduct the transfer operation in accordance with the facility operations manual or vessel transfer procedures, as appropriate;

(v) At least one person is at the site of the transfer operation who fluently speaks the language or languages spoken by both persons in charge;

00900 FB

(w) The person in charge of the transfer on the transferring vessel or facility and the person in charge of it on the receiving vessel or facility have held a conference, to ensure that each person in charge understands--

(1) The identity of the product to be transferred;

(2) The sequence of transfer operations;

(3) The transfer rate;

(4) The name or title and location of each person participating in the transfer operation;

(5) Details of the transferring and receiving systems including procedures to ensure that the transfer pressure does not exceed the maximum allowable working pressure (MAWP) for each hose assembly, loading arm and/or transfer pipe system;

(6) Critical stages of the transfer operation;

(7) Federal, state, and local rules that apply to the transfer of oil or hazardous material;

(8) Emergency procedures;

(9) Discharge containment procedures;

(10) Discharge reporting procedures;

(11) Watch or shift arrangement;

(12) Transfer shutdown procedures; and,

(13) If the persons use radios, a predetermined frequency for communications during the transfer, agreed upon by both.

(x) The person in charge of transfer operations on the transferring vessel or facility and the person in charge of transfer operations on the receiving vessel or facility agree to begin the transfer operation;

(y) Between sunset and sunrise the lighting required by Secs. 154.570 and 155.790 of this chapter is provided; and

(z) For transfer operations between tank barges from sunset to sunrise, lighting is provided as described in Sec. 155.790 of this chapter.

(aa) A transfer operation which includes collection of vapor emitted
from a vessel's cargo tanks through a venting system not located on the vessel must have the following verified by the person in charge:

(1) Each manual valve in the vapor collection system is correctly positioned to allow the collection of cargo vapor;

(2) A vapor collection hose or arm is connected to the vessel's vapor connection;

(3) The electrical insulating device required by Sec. 154.810(g) of this chapter or 46 CFR 39.40-3(c) is fitted between the facility vapor connection and the vessel vapor connection;

(4) The initial loading rate and the maximum transfer rate are determined;

(5) The maximum and minimum operating pressures at the facility vapor connection are determined;

(6) The tank barge overfill control system, if installed, is connected to the facility, tested, and operating properly;

(7) The following have been performed not more than 24 hours prior to the start of the transfer operation:

(i) Each alarm and automatic shutdown system required by subpart E of part 154 of this chapter and 46 CFR part 39 has been tested and found
to be operating properly, and

(ii) Analyzers required by Sec. 154.820(a), Sec. 154.824 (d) and (e)
of this chapter or 46 CFR 39.40-3(a) have been checked for calibration

00900 F9

by use of a span gas;

(8) Each vapor recovery hose has no unrepaired loose covers, kinks, bulges, soft spots, or any other defect which would permit the discharge of vapor through the hose material, and no external gouges, cuts, or slashes that penetrate the first layer of hose reinforcement; and

(9) The oxygen content of the vessel's cargo tanks, if inerted, is at or below 8 percent by volume.

[[Page 440]]

---

(bb) If the transfer operation involves loading oil, as defined in Sec. 151.05 of this chapter, into a cargo tank, the overfill device required by Sec. 155.480 of this chapter is installed and operating properly.

(cc) Smoking is not permitted in the facilities marine transfer area except in designated smoking areas.

(dd) Welding, hot work operations and smoking are prohibited on vessels during the transfer of flammable or combustible materials, except that smoking may be permitted in accommodation areas designated by the master.

(Approved by the Office of Management and Budget under control number 2115-0506)

[CGD 75-124, 45 FR 7177, Jan. 31, 1980, as amended by CGD 88-102, 55 FR 25445, June 21, 1990; CGD 86-034, 55 FR 36255, Sept. 4, 1990; CGD 90-071a, 59 FR 53291, Oct. 21, 1994; CGD 93-056, 61 FR 41461, Aug. 8, 1996; CGD 79-116, 62 FR 25127, May 8, 1997]

Sec. 156.125 Discharge cleanup.

(a) Each person conducting the transfer operation shall stop the transfer operation whenever oil or hazardous material from any source is discharged:

(1) In the transfer operation work area; or

(2) Into the water or upon the adjoining shoreline in the transfer area.

(b) Except as permitted under paragraph (c) of this section, no person may resume the transfer operation after it has been stopped under paragraph (a) of this section, unless:

(1) Oil or hazardous material discharged in the transfer operation work area is cleaned up; and

(2) Oil or hazardous material discharged into the water or upon the adjoining shoreline is cleaned up, or is contained and being cleaned up.

(c) The COTP may authorize resuming the transfer operation if it is deemed appropriate.

[CGD 75-124, 45 FR 7177, Jan. 31, 1980, as amended by CGD 86-034, 55 FR 36255, Sept. 4, 1990]

Sec. 156.130 Connection.

00900 F10

(a) Each person who makes a connection for transfer operations shall:

(1) Use suitable material in joints and couplings to ensure a leak-free seal;

(2) Use a bolt in at least every other hole, and in no case less than four bolts, in each temporary bolted connection that uses a flange that meets American National Standards Institute (ANSI) standard flange requirements under Sec. 154.500(d)(2) of this chapter;

(3) Use a bolt in each hole in each temporary bolted connection that uses a flange other than one that meets ANSI standards;

(4) Use a bolt in each hole of each permanently connected flange;

(5) Use bolts of the correct size in each bolted connection; and

(6) Tighten each bolt and nut uniformly to distribute the load and sufficiently to ensure a leak free seal.

(b) A person who makes a connection for transfer operations must not use any bolt that shows signs of strain or is elongated or deteriorated.

(c) Except as provided in paragraph (d) of this section, no person may use a connection for transfer operations unless it is:

(1) A bolted or full threaded connection; or

(2) A quick-connect coupling acceptable to the Commandant.

(d) No person may transfer oil or hazardous material to a vessel that has a fill pipe for which containment cannot practically be provided unless an automatic back pressure shutoff nozzle is used.

[CGD 75-124, 45 FR 7177, Jan. 31, 1980, as amended by CGD 86-034, 55 FR 36256, Sept. 4, 1990]

Sec. 156.150 Declaration of inspection.

(a) No person may transfer oil or hazardous material to or from a vessel unless each person in charge, designated under Secs. 154.710 and 155.700 of this chapter, has filled out and signed the declaration of inspection form described in paragraph (c) of this section.

(b) No person in charge may sign the declaration of inspection unless he or she has determined by inspection, and indicated by initialling in the appropriate space on the declaration of inspection form, that the facility or vessel, as appropriate, meets Sec. 156.120.

(c) The declaration of inspection may be in any form but must contain at least:

(1) The name or other identification of the transferring vessel or facility and the receiving vessel or facility;

(2) The address of the facility or location of the transfer operation if not at a facility;

(3) The date and time the transfer operation is started;

(4) A list of the requirements in Sec. 156.120 with spaces on the form following each requirement for the person in charge of the vessel or facility to indicate by initialling that the requirement is met for the transfer operation; and

(5) A space for the date, time of signing, signature, and title of each person in charge during transfer operations on the transferring vessel or facility and a space for the date, time of signing, signature, and title of each person in charge during transfer operations on the

00900 F11

receiving facility or vessel certifying that all tests and inspections have been completed and that they are both ready to begin transferring product; and

(6) The date and time the transfer operation is completed.

(d) The form for the declaration of inspection may incorporate the declaration-of-inspection requirements under 46 CFR 35.35-30.

(e) The vessel and facility persons in charge shall each have a signed copy of the declaration of inspection available for inspection by the COTP during the transfer operation.

(f) The operators of each vessel and facility engaged in the transfer operation shall retain a signed copy of the declaration of inspection on board the vessel or at the facility for at least 1 month from the date of signature.

[CGD 75-124, 45 FR 7177, Jan. 31, 1980, as amended by CGD 86-034, 55 FR 36256, Sept. 4, 1990; CGD 93-056, 61 FR 41461, Aug. 8, 1996]

Sec. 156.160 Supervision by person in charge.

(a) No person may connect or disconnect a hose, top off a tank, or engage in any other critical procedures during the transfer operation unless the person in charge, required by Sec. 156.120(s), supervises that procedure.

(b) No person may start the flow of oil or hazardous material to or from a vessel unless instructed to do so by either person in charge.

(c) No person may transfer oil or hazardous material to or from a vessel unless each person in charge is in the immediate vicinity and immediately available to the transfer personnel.

[CGD 75-124, 45 FR 7177, Jan. 31, 1980, as amended by CGD 86-034, 55 FR 36256, Sept. 4, 1990]

Sec. 156.170 Equipment tests and inspections.

(a) Except as provided in paragraph (d) of this section, no person may use any equipment listed in paragraph (c) of this section for transfer operations unless the vessel or facility operator, as appropriate, tests and inspects the equipment in accordance with paragraphs (b), (c) and (f) of this section and the equipment is in the condition specified in paragraph (c) of this section.

(b) During any test or inspection required by this section, the entire external surface of the hose must be accessible.

(c) For the purpose of paragraph (a) of this section:

(1) Each nonmetallic transfer hose must:

(i) Have no unrepaired loose covers, kinks, bulges, soft spots or any other defect which would permit the discharge of oil or hazardous material through the hose material, and no gouges, cuts or slashes that penetrate the first layer of hose reinforcement as defined in Sec. 156.120(i).

(ii) Have no external deterioration and, to the extent internal inspection is possible with both ends of the hose open, no internal deterioration;

(iii) Not burst, bulge, leak, or abnormally distort under static liquid pressure at least 1\1/2\ times the maximum allowable working pressure; and

(iv) Hoses not meeting the requirements of paragraph (c)(1)(i) of

00900 F12

definitions in
Sec. 154.105 of this chapter apply to this subpart and to subpart C.

(b) As used in this subpart and subpart C:

Lightering or Lightering operation means the transfer of a cargo of oil or a hazardous material in bulk from one vessel to another, including all phases of the operation from the beginning of the mooring operation to the departure of the service vessel from the vessel to be lightered, except when that cargo is intended only for use as fuel or lubricant aboard the receiving vessel.

Marine environment means--

~~(1) The navigable waters of the United States;~~

(2) The waters of an area over which the United States asserts exclusive fishery management authority; and

(3) The waters superadjacent to the Outer Continental Shelf of the United States.

Service vessel means the vessel which receives a cargo of oil or a hazardous material from another vessel in a lightering operation.

Vessel to be lightered means the vessel which transports a cargo of oil or a hazardous material to a place within the marine environment for transfer of that cargo to another vessel for further transport to a port or place subject to the jurisdiction of the United States. The term ``vessel to be lightered'' does not include drilling rigs, or offshore supply vessels transferring cargo intended for use as fuel or lubricant aboard the receiving vessel.

Work includes any administrative duties associated with the vessel whether performed on board the vessel or onshore.

[CGD 78-180, 49 FR 11172, Mar. 26, 1984, as amended by CGD 86-034, 55 FR 36256, Sept. 4, 1990; CGD 90-052, 58 FR 48436, Sept. 15, 1993; CGD 93-081, 60 FR 45017, Aug. 29, 1995]

Sec. 156.210 General.

(a) No vessel may transfer oil or hazardous materials in a port or place subject to the jurisdiction of the United States, if the cargo has been lightered from another vessel, unless:

(1) The regulations in this subpart have been complied with;

(2) Both the vessel to be lightered and service vessel have, on board, at the time of transfer, a valid Certificate of Inspection, Certificate of Compliance, or a Tank Vessel Examination Letter, as would have been required under 46 U.S.C. 3710 or 3711, had the transfer taken place in a port or place subject to the jurisdiction of the United States; and

(3) The delivering and receiving vessels have on board at the time of transfer, evidence that each vessel is operating in compliance with section 311(j) of the Federal Water Pollution Control Act (33 U.S.C. 1321(j)) and applicable regulations issued under the authority of section 311(j) in the form of a Declaration of Inspection as required by Sec. 156.150 and a vessel response plan if required under part 155 of this chapter.

Note: Under 46 U.S.C. 3715, the delivering and receiving vessels

00900 F15

must have on board at the time of transfer, a Certificate of Financial Responsibility that would be required if the transfer had taken place in
a location subject to the jurisdiction of the U.S. Regulations concerning Certificates of Financial Responsibility for vessels using the navigable waters of the U.S. are in part 130 of this chapter.

(4) The vessel to be lightered has on board, at the time of transfer, an International Oil Pollution Prevention (IOPP) Certificate or equivalent documentation of compliance with Annex I of the International Convention for the Prevention of Pollution from Ships, 1973, as modified by the Protocol of 1978 relating thereto (MARPOL 73/78), as would be required by Part 151 of this chapter for vessels in navigable waters of the United States. The IOPP Certificate or documentation of compliance shall be that prescribed by Secs. 151.19 and
151.21 of this chapter, and shall be effective under the same timetable as specified in Sec. 151.19.

(b) Lightering operations involving hazardous materials, other than oil, may be conducted only with the specific approval of the Commandant.
A request to lighter hazardous materials, other than oil, must be submitted to Commandant (G-M) prior to the planned beginning of lightering operations. The request must include the information described in Sec. 156.215(a) to the extent known, for the initial transfer, and the estimated frequency of subsequent lightering operations. After the entry into force of Annex II to

[[Page 439]]

MARPOL 73/78, vessels lightering hazardous materials shall carry an International Pollution Prevention Certificate for the Carriage of Noxious Liquid Substances in Bulk (1973), if required by Annex II to MARPOL 73/78, or equivalent documentation of compliance with the annex.

(c) In an emergency, the COTP, upon request, may authorize a deviation from any rule in this part if the COTP determines that its application will endanger persons, property, or the environment.

(d) On vessels conducting lightering operations in a designated lightering zone, a licensed individual or seaman may not work, except in
an emergency or a drill, more than 15 hours in any 24-hour period, or more than 36 hours in any 72-hour period, including the 24-hour and 72-hour periods prior to commencing lightering operations.

[CGD 78-180, 49 FR 11172, Mar. 29, 1984, as amended by CGD 88-052, 53 FR
25122, July 1, 1988; CGD 90-052, 58 FR 48436, Sept. 15, 1993; CGD 93-081, 60 FR 45017, Aug. 29, 1995]

Sec. 156.215 Pre-arrival notices.

(a) The master, owner or agent of each vessel to be lightered must give at least 24 hours advance notice to the Captain of the Port nearest
the lightering location or zone, prior to arrival in the lightering location or zone. This advance notice must include:

(1) The vessel's name, call sign or official number, and registry:

00900 F16

(2) The cargo type (if oil) or shipping name (if hazardous material) and approximate amount on board;

(3) The number of transfers expected and the amount of cargo expected to be transferred during each transfer;

(4) The lightering location or zone to be used;

(5) The estimated time of arrival in the lightering location or zone;

(6) The estimated duration of transfer operations; and

(7) The name and destination of service vessel(s).

(b) In the event the estimated time of arrival in the lightering location or zone changes by more than six hours, the Master, owner or agent of each vessel to be lightered must advise the Captain of the Port of this change as soon as possible.

(c) Where lightering is conducted as a result of collision, grounding, tank rupture or any similar emergency, immediate notice must be given to the Captain of the Port.

(d) In addition to the other requirements in this section, the master, owner, or agent of a vessel that requires a Tank Vessel Examination (TVE) or other special Coast Guard inspection in order to lighter in a designated lightering zone must request the TVE or other inspection from the cognizant Captain of the Port at least 72 hours prior to commencement of lightering operations.

[CGD 78-180, 49 FR 11172, Mar. 26, 1984, as amended by CGD 90-052, 58 FR 48437, Sept. 15, 1993; CGD 93-081, 60 FR 45017, Aug. 29, 1995]

Sec. 156.220 Reporting of incidents.

(a) An immediate report must be made to the nearest Captain of the Port, by the service vessel, if fire, explosion, collision, grounding or any similar emergency, which poses a threat to the vessels involved, occurs during lightering.

(b) Any discharge of oil or hazardous material into the water shall be reported, by the service vessel, in accordance with the procedures specified in Sec. 151.15 of this chapter.

Sec. 156.225 Designation of lightering zones.

The District Commander is delegated the authority to designate lightering zones and their operating requirements, where they are necessary for safety or environmental protection. When a lightering zone has been designated, lightering operations in a given geographic area may only be conducted within the designated lightering zone.

Sec. 156.230 Factors considered in designating lightering zones.

The following factors are considered in designating a lightering zone:

(a) The findings of the environmental analysis or, if prepared, the Environmental Impact Statement;

(b) The proximity of the zone to:

(1) Shipping lanes;

00900 F 17

(2) Vessel traffic schemes or vessel separation systems;
(3) Anchorages;
(4) Fixed structures;
(5) Designated marine sanctuaries;
(6) Commercial and recreational fishing areas;
(7) Environmentally sensitive areas; and
(8) Designated units of the National Park System, National Wild and Scenic Rivers System, National Wilderness Preservation System, properties included on the National Register of Historic Places and National Registry of Natural Landmarks, and National Wildlife Refuge System.

(c) The traditional use of areas for lightering operations;

(d) The normal weather and sea conditions in the areas, and their effect on lightering operations, and the fate of possible cargo discharges;

(e) The depth of water and underwater obstructions that may adversely impact anchorages and clearance of vessels;

(f) Other relevant safety, environmental, or economic data.

00900 F18

SUBMITTAL REGISTER
(ER 415 1-10)

CONTRACT NO.
W912DS-05-B-0010

TITLE AND LOCATION
Maintenance Dredging, Arthur Kill Reach of the New York and New jersey Channels

CONTRACTOR

SPECIFICATION SECTION

| ACTIVITY NO | TRANS-MITTAL NO. | ITEM NO | SPECIFICATION PARAGRAPH NUMBER | DESCRIPTION OF ITEM SUBMITTED | TYPE OF SUBMITTAL: DATA | DRAWINGS | INSTRUCTIONS | SCHEDULES | STATEMENTS | REPORTS | CERTIFICATES | SAMPLES | RECORDS | O & M MANUALS | CLASSIFICATION: INFORMATION ONLY | GOVERNMENT APPROVED | REVIEWER | CONTRACTOR SCHEDULE DATES: SUBMIT | APPROVAL NEEDED BY | MATERIAL NEEDED BY | CONTRACTOR ACTION: CODE | DATE | SUBMIT TO GOVERNMENT | GOVERNMENT ACTION: CODE | DATE | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| a. | b. | c. | d. | e. | f. | g. | h. | i. | j. | k. | l. | m. | n. | o. | p. | q. | r. | s. | t. | u. | v. | w. | x. | y. | z. | aa. |
| | | | 01525 #1.2 | Accident Prevention Plan - APP | | | | | | X | | | | | | X | | | | | | | | | | |
| | | | 01525 #1.2 | Activity Hazard Analysis | | | | | | X | | | | | | X | | | | | | | | | | |
| | | | 01525 #1.2 | Crane Critical Lift Plan | | | | | | X | | | | | | X | | | | | | | | | | |
| | | | 01525 #1.2 | Proof of Qualification for Crane | | | | | | | X | | | | | X | | | | | | | | | | |
| | | | 01451 #3 | Quality Control Plan | | | | | | X | | | | | | X | | | | | | | | | | |
| | | | 01200 #6 | Contractor's Progress Schedule | | | | X | | | | | | | | X | | | | | | | | | | |
| | | | 01200 #6 | Plans for dredging, offloading, transp., dewatering, processing and placement | | | | | | X | | | | | | X | | | | | | | | | | |
| | | | 01355 #4.1 | Environmental Protection Plan | | | | | | X | | | | | | X | | | | | | | | | | |

00900 ATT.G

ENG FORM 38-R, JAN 97 EDITION OF MAR 95 IS OBSOLETE. PAGE ___ O ___ PAGES (Proponent:

Landing area: (1) the primary surfaces, comprising the surface of the runway, runway shoulders, and lateral safety zones, (2) the "clear zone" beyond the ends of each runway (i.e., the extension of the primary surface), (3) all taxiways, and the lateral clearance zones along each side for the length of the taxiways), and (4) all aircraft parking aprons plus the area extending beyond each edge all around the aprons.

Safety precaution area: those portions of approach-departure clearance zones and transitional zones where placement of objects incident to contract performance might result in vertical projections at or above the approach-departure clearance, or the transitional surface.

Transitional surface: a sideways extension of all primary surfaces, clear zones, and approach-departure clearance surfaces along inclined planes.

Transitional zone: the ground area under the transitional surface (and adjoining the primary surface, clear zone, and approach-departure clearance zone).





**APPENDIX A**

**MINIMUM BASIC OUTLINE FOR ACCIDENT PREVENTION PLAN**

An accident prevention plan is, in essence, a safety and health policy and program document. The following areas are typically addressed in an accident prevention plan, but a plan shall be job-specific and shall also address any unusual or unique aspects of the project or activity for which it is written.
The accident prevention plan shall interface with the employer's overall safety and health program. Any portions of the overall safety and health program that are referenced in the accident prevention plan shall be included as appropriate.

1. SIGNATURE SHEET. Title, signature, and phone number of the following:
   a. plan preparer (corporate safety staff person, QC);
   b. plan approval, e.g., owner, company president, regional vice president (HTRW activities require approval of a Certified Industrial Hygienist (or qualified Industrial Hygiene personnel for in-house USACE activities; a Certified Safety Professional (or qualified USACE safety personnel for in-house work) may approve the plan for operations involving UST removal where contaminants are known to be petroleum, oils, or lubricants);
   c. plan concurrence (provide concurrence of other applicable corporate and project personnel (contractor)), e.g., Chief of Operations, Corporate Chief of Safety, Corporate Industrial Hygienist, project manager or superintendent, project safety professional, project QC.

2. BACKGROUND INFORMATION. List the following:
   a. contractor;
   b. contract number;
   c. project name;
   d. brief project description, description of work to be performed, and location (map);
   e. contractor accident experience (provide information such

as EMR, OSHA 200 Forms, corporate safety trend analyses);
f. listing of phases of work and hazardous activities requiring activity hazards analyses.

3. STATEMENT OF SAFETY AND HEALTH POLICY. (In addition to the corporate policy statement, a copy of the corporate safety program may provide a significant portion of the information required by the accident prevention plan.)

4. RESPONSIBILITIES AND LINES OF AUTHORITIES.
a. Identification and accountability of personnel responsible for safety - at both corporate and project level (contracts specifically requiring safety or industrial hygiene personnel should include a copy of their resume - the District Safety and Occupational Health Office will review the qualifications for acceptance)
b. Lines of authority

5. SUBCONTRACTORS AND SUPPLIERS. Provide the following:
a. identification of subcontractors and suppliers (if known);
b. means for controlling and coordinating subcontractors and suppliers;
c. safety responsibilities of subcontractors and suppliers.

6. TRAINING.
a. List subjects to be discussed with employees in safety indoctrination.
b. List mandatory training and certifications which are applicable to this project (e.g., explosive actuated tools, confined space entry, crane operator, diver, vehicle operator, HAZWOPER training and certification, personal protective equipment) and any requirements for periodic retraining/recertification.
c. Identify requirements for emergency response training.
d. Outline requirements (who attends, when given, who will conduct etc.) for supervisory and employee safety meetings.





7. SAFETY AND HEALTH INSPECTIONS. Provide details on:
a. who will conduct safety inspections (e.g., project manager, safety professional, QC, supervisors, employees, etc.), when inspections will be conducted, how the inspections will be recorded, deficiency tracking system, follow-up procedures, etc;
b. any external inspections/certifications which may be required (e.g., Coast Guard).

8. SAFETY AND HEALTH EXPECTATIONS, INCENTIVE PROGRAMS, AND COMPLIANCE.
a. The company's written safety program goals, objectives, and accident experience goals for this contract should be provided.
b. A brief description of the company's safety incentive programs (if any) should be provided.
c. Policies and procedures regarding noncompliance with safety requirements (to include disciplinary actions for violation of safety requirements) should be identified.
d. Provide written company procedures for holding managers and supervisors accountable for safety.

9. ACCIDENT REPORTING. The contractor shall identify who shall complete the following, how, and when:
a. exposure data (man-hours worked);
b. accident investigations, reports and logs;
c. immediate notification of major accidents.

10. MEDICAL SUPPORT. Outline on-site medical support and off-site medical arrangements.

11. PERSONAL PROTECTIVE EQUIPMENT. Outline procedures (who, when, how) for conducting hazard assessments and written certifications for use of personal protective equipment.

12. PLANS (PROGRAMS, PROCEDURES) REQUIRED BY THE SAFETY MANUAL (as applicable).
a. hazard communication program (01.B.04);

b. emergency response plans:
- procedures and tests (01.E.01)
- spill plans (01.E.01, 06.A.02)
- firefighting plan (01.E.01, 19.A.04)
- posting of emergency telephone numbers (01.E.04)
- wildfire prevention plan (09.K.01)
- man overboard/abandon ship (19.A.04)

c. layout plans (04.A.01);
d. respiratory protection plan (05.E.01);
e. health hazard control program (06.A.02);
f. lead abatement plan (06.B.05 & specifications);
g. asbestos abatement plan (06.B.05 & specifications);
h. abrasive blasting (06.H.01);
i. confined space (06.I);
j. hazardous energy control plan (12.A.07);
k. critical lift procedures (16.C.17);
l. contingency plan for severe weather (19.A.03);
m. access and haul road plan (22.I.10);
n. demolition plan (engineering and asbestos surveys) (23.A.01);
o. emergency rescue (tunneling) (26.A.05);
p. underground construction fire prevention and protection plan (26.D.01)
q. compressed air plan (26.I.01)
r. formwork and shoring erection and removal plans (27.B.02)
s. lift slab plans (27.D.01)
t. SHP and SSHP (for HTRW work an SSHP must be submitted and shall contain all information required by the accident prevention plan - two documents are not required (28.B.01);
u. blasting plan (29.A.01);
v. diving plan (30.A.13);
w. plan for prevention of alcohol and drug abuse (Defense Federal Acquisition Regulation Supplement Subpart 252.223-7004, Drug-Free Work Force);

13. The contractor shall provide information on how they will meet the requirements of major sections of EM 385-1-1 in the





accident prevention plan. Particular attention shall be paid to excavations, scaffolding, medical and first aid requirements, sanitation, personal protective equipment, fire prevention, machinery and mechanized equipment, electrical safety, public safety requirements, and chemical, physical agent, and biological occupational exposure prevention requirements. Detailed site specific hazards and controls shall be provided in the activity hazard analysis for each phase of the operation.

## APPENDIX B

## EMERGENCY OPERATIONS

1. During emergency operations and recovery assistance activities it is extremely important that safety and health requirements are implemented. Personnel often perform unusual, difficult, hazardous tasks while in a challenging environment, and these conditions increase the risk of accident. Additionally, resources are in short supply, and the loss of any resource to an accident indicates poor management. Safety and occupational health of Corps of Engineers employees, contractors, and members of the public exposed to Corps activities will be a primary concern during all Corps emergency operations and recovery assistance. Safety and Occupational Health Offices shall provide the necessary input to their Emergency Management counterparts to ensure that planning for safety and health concerns (including risk and hazard analysis) is addressed prior to, during, and following disasters and disaster response.

2. Safety and occupational health program requirements shall be included in all Government and contract operations. Federal Acquisition Clause 52.236-13, Accident Prevention, shall be included in contracts and MOAs/MOUs for emergency operations and recovery assistance.

3. Initial response. A qualified safety and health professional shall be immediately alerted of the disaster and shall be included in the planning and execution of response and recovery efforts. This individual shall assess safety and health issues and assure precautions are taken prior to deployment of personnel (items to consider include sanitation, drinking water, power supply, living quarters, driving conditions, environmental conditions, and health issues).

4. Staffing. Safety and Occupational Health Offices in the Geographic District experiencing the disaster will be temporarily staffed with additional safety, industrial hygiene, and medical

# REPORT OF OPERATIONS—PIPELINE, DIPPER OR BUCKET DREDGES

REPORTS CONTROL SYMBOL ENGCW-0-13

| THRU: | TO: | FROM: | REPORT NO. |
|---|---|---|---|
| | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| CHARACTER OF REPORT | ☐ MAINTENANCE | ☐ NEW WORK | ☐ DAILY | ☐ STATUS | ☐ COMPLETION | ☐ ANNUAL | DATE OR PERIOD |
| DREDGE | NAME AND TYPE | | SIZE → | PIPELINE *in. dia. disch.* | | | DIPPER OR BUCKET *cu. yds. cap.* |
| | HORSEPOWER OF → | DREDGE PUMP | SUCTION PIPE JET | CUTTER OR BUCKET | | | PROPULSION |
| | NUMBER OF CREW MEMBERS → | DREDGE | SHORE | OTHER PLANT | TOTAL | WORK SCHEDULE → SHIFTS PER DAY | DAYS PER WEEK |
| PROJECT AND BAR | NAME | | AUTH DIMENSIONS → | WIDTH | DEPTH | | OVERDEPTH |
| | LOCATION *(include station numbers)* | | | | | | |
| CHARACTER OF MATERIAL | ABSOLUTE DENSITY *GMS/liter* | | IN PLACE DENSITY *GMS/liter* | | VOIDS RATIO | | |
| | GRAIN SIZE $D_{\cdot}$ MM $D_{\cdot\cdot}$ MM $D_{\cdot\cdot}$ MM | | | | GEOLOGICAL CLASSIFICATION | | |
| CONTRACT OR DREDGING ORDER | NUMBER | | ☐ CONTRACTOR | ☐ HIRED LABOR | | | TOTAL NO. OF DAYS ON WHICH WORK WAS DONE |
| CHANNEL CONDITION | AVERAGE DEPTH → BEFORE DREDGING | AFTER DREDGING | MINIMUM SOUNDING → BEFORE DREDGING | | AFTER DREDGING | | |
| RIVER STAGE | MINIMUM | TIME | MAXIMUM | TIME | GAGE LOCATION | | |
| WEATHER CONDITION | *(clear, cloudy, rain, snow, and fog)* | | VISIBILITY *miles* | | WIND *(maximum velocity & direction)* | | |

## WORK PERFORMED

| ITEM | UNIT | QUANTITY |
|---|---|---|
| AVERAGE WIDTH OF CUT | FEET | |
| TOTAL ADVANCE THIS PERIOD | FEET | |
| TOTAL ADV. PREVIOUS TO THIS PERIOD | FEET | |
| TOTAL ADVANCE TO DATE | FEET | |
| FLOATING PIPE: SHORE PIPE: | | |
| TOTAL LENGTH OF DISCHARGE PIPE | FEET | |
| AVERAGE LIFT | FEET | |
| AVERAGE PUMP SPEED | R.P.M. | |
| AVG. DREDGED PER PUMP. HR. GROSS | CU.YDS. | |
| SCOWS LOADED | NUMBER | |
| AVERAGE LOAD PER SCOW | CU.YDS. | |

## CUBIC YARDS REMOVED

| | |
|---|---|
| AMOUNT DREDGED THIS PERIOD: (1) GROSS *(computed amount)* | |
| (2) CREDITED *(pay place)* | |
| AMOUNT PREVIOUSLY REPORTED: (1) GROSS *(computed amount)* | |
| (2) CREDITED *(pay place)* | |
| TOTAL AMOUNT DREDGED TO DATE: (1) GROSS *(computed amount)* | |
| (2) CREDITED *(pay place)* | |

## ATTENDANT PLANT

| ITEM | NAME OR NUMBER | HOURS |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

## DISTRIBUTION OF TIME

| EFFECTIVE WORKING TIME *(chargeable to cost of work)* | HOURS | MIN. |
|---|---|---|
| PUMPING OR DREDGING | | |
| PCT. OF EFFECTIVE RENTAL TIME % | | |
| BOOSTER *(in line)* Hrs. Min. | | |
| **NON-EFFECTIVE WORKING TIME** *(chargeable to cost of work)* | | |
| HANDLING PIPE LINES | | |
| HANDLING ANCHOR LINES | | |
| CLEARING PUMP AND PIPE LINE | | |
| CLEARING CUTTER OR SUCTION HEAD | | |
| WAITING FOR SCOWS | | |
| TO AND FROM WHARF OR ANCHORAGE | | |
| CHANGING LOCATION OF PLANT ON JOB | | |
| LOSS DUE TO OPPOSING NATURAL ELEMENTS | | |
| LOSS DUE TO PASSING VESSELS | | |
| SHORE LINE AND SHORE WORK | | |
| WAITING FOR BOOSTER | | |
| MINOR OPER. REPAIRS *(explain in remarks)* | | |
| WAITING FOR ATTENDANT PLANT | | |
| PREPARATION AND MAKING UP TOW | | |
| TRANSFERRING PLANT BETWEEN WORKS | | |
| LAY TIME OFF SHIFT AND SATURDAYS | | |
| SUNDAYS AND HOLIDAYS | | |
| FIRE DRILL | | |
| MISCELLANEOUS *(explain in remarks)* | | |
| TOTAL NON-EFFECTIVE WORKING TIME | | |
| PCT. OF NON-EFFECTIVE RENTAL TIME % | | |
| **TOTAL EFFECTIVE AND NON-EFFECTIVE TIME** *(chargeable to cost of work)* | | |
| PCT. OF TOTAL TIME IN PERIOD % | | |
| **LOST TIME** *(not chargeable to cost of work)* | | |
| MAJOR REPAIRS AND ALTERATIONS | | |
| CESSATION | | |
| COLLISIONS | | |
| MISCELLANEOUS *(explain in remarks)* | | |
| TOTAL LOST TIME | | |
| PERCENTAGE OF TOTAL TIME % | | |
| **TOTAL TIME IN PERIOD** | | |

| | | |
|---|---|---|
| NUMBER OF INSPECTIONS | BY DISTRICT PERSONNEL | BY DIV & OCE PERSONNEL |
| CONTRACT USE ONLY | HAS ANYTHING DEVELOPED WHICH MIGHT LEAD TO A CHANGE ORDER OR CLAIM? ☐ NO ☐ YES *(If "YES", explain under remarks on back)* | |

ENG FORM 4267 JAN 70 — REPLACES ENG FORM 28 (Cont.), 1 MAR 53, AND ENG FORM 29 (Cont.), 1 JAN 62, WHICH ARE OBSOLETE. (ER 1125-2-304) — *(Signature and Remarks required on reverse side.)*

00900 ATT. I-1

## SUMMARY OF COSTS

| ITEMS | COST |
|---|---|
| **DIRECT PLANT OPERATING COSTS** | |
| UNIFORM DAILY RATE BASIS *(To be completed when submitting Status and Completion reports.)* | |
| CHARGES: ______ DAYS AT $______ PER DAY *(Item 19, ENG Form 22 (Costs)—adjusted to exclude plant increment cost.)* | |
| ►OR◄ | |
| ACTUAL PLANT COSTS *(To be completed when submitting Annual report.)* | |
| PAYROLLS *(gross)* ........ $ | |
| SUBSISTENCE & QUARTERS OR PER DIEM & MILEAGE ........ $ | |
| FUEL ______ BARRELS AT $______ PER BARREL ........ $ | |
| WATER ........ $ | |
| LUBRICANTS ........ $ | |
| PLANT OWNERSHIP COSTS *(as computed below)* ........ $ | |
| INSURANCE ........ $ | |
| ATTENDANT PLANT ........ $ | |
| MISCELLANEOUS ........ $ | |
| SUBTOTAL—UNIFORM DAILY RATE OR ACTUAL COSTS ........ | $ |
| SUBTOTAL—PLANT UNIT COST $ ______ PER CUBIC YARD. | |
| **SHORE WORK** | |
| SUBTOTAL—SHORE WORK COSTS ........ | $ |
| SUBTOTAL—SHORE WORK UNIT COSTS $ ______ PER CUBIC YARD. | |
| **OTHER COSTS** | |
| SURVEYS ........ $ | |
| INSPECTION AND SUPERVISION ........ $ | |
| OVERHEAD ........ $ | |
| OTHER INDIRECT COSTS ........ $ | |
| SUBTOTAL—OTHER COSTS ........ | $ |
| SUBTOTAL—OTHER UNIT COST $ ______ PER CUBIC YARD. | |
| GRAND TOTAL—ALL COSTS ........ | $ |
| GRAND TOTAL—ALL UNIT COSTS $ ______ PER CUBIC YARD. | |

### OPERATING SUPPLIES

| COMMODITIES | CONSUMED | | INVENTORY | |
|---|---|---|---|---|
| | UNIT | QUANTITY | QUANTITY | VALUE |
| FUEL *(oil)* | BBLS | | | |
| LUBRICANT *(oil)* | GAL | | | |
| LUBRICANT *(grease)* | LBS | | | |
| WATER | GAL | | | |
| | | | | |
| | | | | |
| SUBSISTENCE SUPPLIES ........ | | | | |
| MISCELLANEOUS SUPPLIES ........ | | | | |
| TOTAL ........ | | | | $ |

### ANNUAL REPORT DATA
*(complete when submitting Annual report)*

| | |
|---|---|
| COST PER RENTAL MINUTE *(Based on total operating cost)* ........ | $ ______ per min. |
| TOTAL COST OF PLANT *(End of F.Y. reporting period)* ........ | $ |
| BOOK VALUE *(End of F.Y. reporting period)* ........ | $ |
| BALANCE IN PLANT ACCOUNT *(End of F.Y. reporting period)* ........ | $ |
| PLANT OWNERSHIP COSTS *(Actual for F.Y. reporting period):* | |
| DEPRECIATION ........ | $ |
| REPAIRS *(Adjusted)* ........ | $ |
| CESSATION OF WORK ........ | $ |
| SMALL TOOLS, ETC. ........ | $ |
| TOTAL ........ | $ |

REMARKS

| SUBMITTED BY *(Name, title, and signature)* | RECOMMENDED BY *(Name, title, and signature)* | APPROVED BY *(Name, title, and signature)* |
|---|---|---|
| | | |

☆U.S. G.P.O. 1960-610-640/112

**TRANSPORTATION AND PLACEMENT LOG**
**CONTRACT NUMBER**
**PROJECT NAME**

**DATE:** _______

**LOAD NUMBER:** ________

**INSPECTOR:** _____________

**WEATHER CONDITIONS:** _______ **WIND SPEED:** _____ **VISIBILITY:** ______

**TUG NAME:** ________________ **SCOW NAME:** ________________

**DESCRIPTION OF MATERIAL:** ____________________________________

| | Date | Time |
|---|---|---|
| LOADING STARTED: | ________ | ___________ |
| LOADING COMPLETED: | ________ | ___________ |
| SCOW DEPARTED DREDGING SITE: | ________ | ___________ |
| SCOW ARRIVED DEWATERING SITE: | ________ | ___________ |
| SCOW DEPARTED DEWATERING SITE: | ________ | ___________ |
| SCOW ARRIVED PROCESSING SITE: | ________ | ___________ |
| SCOW DEPARTED PROCESSING SITE: | ________ | ___________ |

COMMENTS: ____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________

____________________
Inspector Signature/date

# DAILY SITE SAFETY & HEALTH INSPECTION LOG

**Project:** Maintenance Dredging – Arthur Kill Reach of the NY & NJ Channels

**Date:** ____________

Dredges, Scows, and other Work Areas Checked:

______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________

Names of All Employees in the Work area

| | |
|---|---|
| ______________ | ______________ |
| ______________ | ______________ |
| ______________ | ______________ |
| ______________ | ______________ |

Personal Protective Equipment and Work Equipment in Use

______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________

Special Safety and Health Issues & Notes

______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________

| | |
|---|---|
| ______________________ | ______________________ |
| Name of Safety Personnel | Signature of Safety Personnel |

# SECTION 01200 TECHNICAL SPECIFICATIONS

## TABLE OF CONTENTS


| PARAGRAPH | TITLE | PAGE |
|---|---|---|
| 1. | WORK COVERED BY CONTRACT PRICE: | 1 |
| 2. | ORDER OF WORK: (Not Applicable for this project) | 2 |
| 3. | CHARACTER OF MATERIALS: | 2 |
| 4. | SITE CONDITIONS: | 3 |
| 5. | PERMITS: | 3 |
| 6. | SUBMITTALS: | 3 |
| 7. | PLANT: | 3 |
| 8. | PLACEMENT OF DREDGED MATERIAL | 4 |
| 9. | OVERDEPTH AND SIDE SLOPES: | 7 |
| 10. | LIMIT OF DREDGING: | 8 |
| 11. | REPORTING REQUIREMENTS: | 8 |
| 12. | MEASUREMENT AND PAYMENT: | 8 |
| 13. | BUOY REMOVAL: | 10 |
| 14. | COORDINATION WITH THE U.S. COAST GUARD | 10 |

## TECHNICAL SPECIFICATIONS

1. **WORK COVERED BY CONTRACT PRICE:** The work consists of furnishing all plant, labor, materials and equipment, sampling/testing and performing all work in strict accordance with the specifications and drawings for the dredging of material from the Arthur Kill Reach of the New York and New Jersey Channels, Federal Navigation Project, its transportation, offloading, dewatering, processing, preparation of any specified upland disposal sites, and placement of the dredged material at an approved/permitted upland disposal site furnished by the contractor. The contractor will be solely responsible for coordination and compliance with the transportation, offloading, dewatering, processing and disposal site requirements.

Approximately 298,065 cubic yards (basic 101,965 CY and 196,100 CY for options) of material, above the grade of 35 feet MLW plus a two (2) feet vertically applied overdepth are presently available at the Arthur Kill Reach of the New York and New Jersey Channels. This work is subject to the availability of funds.

Forty-five (45) calendar days have been allowed to complete the basic work. The time for contract completion of each option will be determined by allowing a rate of one (1) calendar day for each 3,500 cubic yards removed. Options will range from one (1) calendar day to twenty-three (23) calendar days, if exercised.

The work is anticipated to be performed within the approximate time period of October 2005 to January 2006.

**a. Mobilization and Demobilization:**

1) Mobilization shall include all costs for operations accomplished prior to commencement of actual dredging operations, such as, transfer of the dredge and attendant plant and equipment to the site, preparation of processing and placement areas, preparation of required project signs (Section 00900 E), and/or incidentals in advance of this actual dredging. Demobilization shall include general preparation for transfer of plant to its home base, cleanup of dredging and disposal areas, and transfer of plant to its home base. All costs connected with the mobilization and demobilization of all of the contractor's dredging plant and other marine and land equipment will be paid for at the contract lump sum price for this item. Sixty percent (60%) of the lump sum price will be paid to the Contractor upon completion of his mobilization to the work site. The remaining forty percent (40%) will be included in the final payment for work under the contract. The cost of work other than mobilization and demobilization of the Contractor's dredging plant and equipment shall not be included in this item.

2) In the event the Contracting Officer and/or his Representative considers that the amount in this item (60%), which represents mobilization, does not bear a reasonable relation to the cost of the work in this contract, the Contracting Officer and/or his Representative may require the Contractor to justify this portion of the bid. Failure to justify such price to the satisfaction of the Contracting Officer and/or his Representative will result in payment of actual mobilization costs as determined by the Contracting Officer and/or his Representative, at the completion of mobilization and payment of the remainder of this item in the final payment under this contract. The determination of the Contracting Officer and/or his Representative is not subject to appeal.

b. **Dredging, Transportation, Offloading, Dewatering, Processing and Placement of Dredged Material**: The contract price per cubic yard for dredging shall include the cost of removal, transportation, offloading, processing, and placement of all materials at an approved/permitted, contractor-furnished upland disposal site(s), with the exception of ledge rock, large boulders, large rock fragments, wrecks, snags, stumps, and piles which cannot be removed or buried below project depth without blasting. Should ledge rock or other material which cannot be removed without blasting be encountered, the Contractor shall remove all overlying material which in the judgment of the Contracting Officer and/or his Representative can be removed and report the location. Nothing in this paragraph shall be construed as prohibiting the removal of excepted material by special means at prices agreed upon and approved in accordance with Contract Clause entitled: "DIFFERING SITE CONDITIONS" (FAR 52.236-2).

2. **ORDER OF WORK**: (NOT APPLICABLE FOR THIS PROJECT)

3. **CHARACTER OF MATERIALS:**

a. The material to be removed to gain the depth within the limits called for in these specifications and drawings is material that has shoaled in the area since it was dredged to authorize dimensions in 1998 and in 2003.

b. Results of grain size analyses performed on 8 samples collected within the project area are averaged to be 66% sand, 20% silt and 14% clay.

c. Based on the testing data analysis by the U.S. Army Engineer District, New York, it was determined that the dredged material from this project is not suitable for ocean disposal. Therefore, the dredged material will be transported, processed and placed at an approved/permitted upland disposal site furnished by the contractor.

d. The contractor will be solely responsible for coordinating and complying with all the processing requirements of identified disposal site. Disposal shall be in a fully permitted facility that has been permitted by the host state to accept material as

dredged under Work of this Contract, with beneficial reuse wherever possible. Dredging, dewatering and/or other processing (if any), offloading, transfer, transportation and material disposal shall be performed in accordance with applicable law and requirements of all associated permits and approvals and government authorities having jurisdiction.

4. **SITE CONDITIONS:**Bidders are expected to examine the site of the work, including the placement areas and decide for themselves the conditions affecting their operations prior to submitting their bids. Records of previous dredging operations are available at the U.S. Army Engineer District, New York, Operations Division, Support Branch, Technical Support Section, Room 1937, 26 Federal Plaza, New York, N.Y. 10278-0090. See Contract Clause entitled: "SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK" (FAR 52.236-3).

5. **PERMITS:**

a. The contractor is required to comply with the New York State and the State of New Jersey Water Quality Certifications for all dredging in the Federal Channel. Copies of 2003 dredging cycle WQCs are attached in Section 00900. The permits for the current 2005 dredging cycle will be provided by the Government.

b. **The contractor shall obtain and possess all permits (as applicable), as required in accordance with Contract Clause entitled: "PERMITS AND RESPONSIBILITIES" (FAR 52.236-7), for dewatering and/or other processing (if any), the offload, transfer, transportation and final disposal of all dredged materials, and shall submit evidence of such permits and approvals to the Government. Disposal shall be in a fully permitted facility that has been permitted by the host state to accept material as dredged under work of this contract.**

6. **SUBMITTALS:** The Contractor shall submit for approval, by the Contracting Officer and/or his Representative, his progress schedule and plans for dredging, offloading, transportation, dewatering, processing, and placement of dredged material in approved upland disposal site, as specified in the Technical Proposal. The plan shall also show the manner in which dredged material will be distributed in the disposal area. The contractor shall submit any proposed modifications to the placement area. This plan shall show areas or portions thereof to be used. Such plans shall be provided by the contractor at the Preconstruction Conference (Section 00800 - Special Contract Requirements, paragraph 34). Nevertheless, such modification, if any, may not affect the bid price.

7. **PLANT:** The Contractor agrees to keep on the job sufficient plant to meet the requirements of the work. The plant shall be in a satisfactory operating condition and capable of safely and efficiently performing the work as set forth in the specifications. The plant shall be subject to the inspection of the Contracting Officer and/or his Representative at all times. No reduction in the capacity of the plant employed on the work shall be made except by written permission of the Contracting Officer and/or his

Representative. The measure of the "capacity of the plant" shall be its actual performance on the work to which these specifications apply.

All hopper exits shall be kept in good condition to prevent leakage of material.

All scows must be kept in good condition, the coamings repaired and the pockets provided with proper doors or appliances to prevent leakage of material.

All pipelines for hydraulic dredging plant must be kept in good condition at all times and any leaks or breaks along their length shall be promptly repaired.

## 8. PLACEMENT OF DREDGED MATERIAL

a. **General:** The material dredged from the dredging site shall be disposed of at an approved/permitted contractor furnished placement site. After the bid opening and **within seventy (70) calendar days** from the date the Apparent low bidder is notified of being the low bidder, the Apparent Low Bidder must provide proof of approval including permits by the appropriate regulatory agencies of the dredged material for this contract for compatibility with the proposed Disposal Site, with their concurrence for material offloading, transportation, dewatering, processing and placement there. Any sampling and testing required for obtaining permits required for dredged material placement shall also be provided. The procedure used to obtain samples shall be detailed. These test results will be used by the Government as part of the request for a Water Quality Certificate for the dredging.

b. The prime contractor is solely responsible for all financial, technical, and logistical coordination, which would allow dredged material to be offloaded, transported, dewatered, processed and placed at the disposal site.

c. All floatable material excavated shall be disposed of at an existing approved upland disposal area. Should the Contractor encounter floatable material, a copy of a letter granting the permission of appropriate authorities to use an existing approved upland disposal area shall be submitted to the Contracting Officer and/or his representative.

d. Any material that is deposited in areas, which were not intended to be used as disposal areas in this contract, will not be paid for and may be required to be removed and deposited at a location designated by the Contracting Officer or his representative at no additional expense to the Government.

e. Placement of dredged material shall be subject to the following conditions:

    1) The material placed shall be free of debris.

    2) The Contractor shall be solely responsible for any damage caused by him to buildings, pavement, curbs, signs, lawns, bulkheads, beach grass, or any other property adjacent to the disposal areas, and shall be required to repair at his own expense any such damage caused during the performance of work under this