# EXHIBIT 53

US Army Corps
of Engineers.
New York District

THIS IS AN UNRESTRICTED PROCUREMENT AISC CODE 234990

# MAINTENANCE DREDGING AND DISPOSTION OF DREDGED MATERIAL FROM

# FLUSHING BAY AND CREEK,

# FEDERAL NAVIGATION CHANNEL

# NEW YORK

Solicitations &

Specifications

## IFB No. DACW51-02-B-0001

G011162

G01010 11162

# SECTION 00800
## SPECIAL CONTRACT REQUIREMENTS
## TABLE OF CONTENTS

PARAGRAPH TITLE PAGE

1. COMMENCEMENT, PROSECUTION, AND COMPLETION OF WORK (1965 APRIL OCE) ... 1
2. PERFORMANCE OF WORK BY THE CONTRACTOR (APR 1984) ... 3
3. SUBMITTAL OF WORK TO BE PERFORMED BY THE CONTRACTOR ... 4
4. LIQUIDATED DAMAGES - CONSTRUCTION (Sept 2000) ... 4
5. CONTRACT DRAWINGS, MAPS AND SPECIFICATIONS (aug 2000) ... 4
6. PHYSICAL CONDITIONS ... 6
7. TIME EXTENSIONS (Sept 2000) ... 15
8. LAYOUT OF WORK (APRIL 1984) ... 16
9. DATUM AND BENCH MARKS ... 16
10. ESTIMATED QUANTITIES ... 17
11. VARIATION IN ESTIMATED QUANTITIES - DREDGING (JAN 1985) ... 19
12. HEAD PROTECTION (HARD HATS) ... 19
13. Signal lights (Feb 1983) ... 19
14. REVERSE SIGNAL ALARM ... 20
15. FLOATING PIPELINES ... 21
16. MISPLACED MATERIAL (JAN 1965) ... 21
17. CONTINUITY OF WORK (APR 1965) ... 22
18. FINAL EXAMINATION AND ACCEPTANCE (APR. 1965) ... 22
19. SHOALING (APR 1965) ... 23
20. INSPECTION (APR 1965) ... 23
21. ACCOMMODATIONS FOR GOVERNMENT INSPECTORS ... 24
22. EQUIPMENT OWNERSHIP AND OPERATING EXPENSE SCHEDULE (1985 JAN OCE) 25
23. FUEL USAGE ... 26
24. OIL TRANSFER OPERATIONS ... 26
25. WAGE RATES ... 26
26. LABOR-ADDITIONAL REQUIREMENTS ... 27
27. NOTICE TO MARINERS ... 27
28. ENVIRONMENTAL LITIGATION (1974 NOV OCE) ... 27
29. NOISE LEVEL CRITERIA ... 28
30. CERF IMPLEMENTATION (83 Jun 1 OCE) ... 29
31. THE SEAGOING BARGE ACT (46 USC 395 ET SEQ.) ... 30
32. PERFORMANCE EVALUATION OF CONTRACTOR (APR 1984) ... 30
33. PRICING OF ADJUSTMENTS (APR 1984) ... 31
34. PRECONSTRUCTION CONFERENCE ... 31
35. BID GUARANTEE ... 32
36. QUANTITY SURVEYS ... 32

37. SAFETY SIGN ..... 34
38. PROJECT SIGN ..... 35
39. EQUAL OPPORTUNITY PREAWARD CLEARANCE OF SUBCONTRACTS ..... 35
40. SCHEDULING AND DETERMINATION OF PROGRESS ..... 35
41 SPECIAL PROHIBITION ON EMPLOYMENT ..... 37
42. SUPERINTENDENCE OF SUBCONTRACTS (JAN 1965) ..... 38
43. PROCEDURES FOR SUBMISSION AND PAYMENT OF ALL CONTRACT PAYMENTS ..... 39
44. SUBMISSION OF CLAIMS ..... 42
45. SAFETY REQUIREMENTS FOR OPERATIONS ADJACENT TO POWER LINES ..... 42
46. CRANE AND DRAGLINE SAFETY REQUIREMENTS ..... 43
47. Operator Qualifications for Floating Cranes and Floating Derricks (Safety and Health Requirement, EM385-1-1, Section 16.C) ..... 43
48. ACCIDENT PREVENTION PLAN ..... 43
49. ALTERATIONS IN CONTRACT (APR 1984) ..... 44
50. CONTINUING CONTRACTS (1985 JAN HQ USACE) ..... 44

# SECTION 00800

## SPECIAL CONTRACT REQUIREMENTS

### 1. COMMENCEMENT, PROSECUTION, AND COMPLETION OF WORK (1965 APRIL OCE)

a. At the conclusion of Step Two of the Two Step Procurement process, the Apparent Low Bidder must provide proof of approval including permits by the appropriate regulatory agencies of the dredged material for this contract for compatibility with the proposed Disposal Site, with their concurrence for material placement there.

1. Information required to be submitted by the Apparent Low Bidder **within 3 days** shall include:

   a) Timeline for obtaining the required permits - A bar chart indicating time(s) required for obtaining all permits/approvals required by the bidder for each item of work as described by the bidder. The schedule will detail the major steps (such as time to prepare the permit request, the date it will be submitted to the regulatory agency, time for agency review, public coordination, etc.

2. Information required to be submitted by the Apparent Low Bidder **within 70 days** shall include:

   a) Placement site permits as applicable and others as related to transportation, processing and placement of the dredged material, or any other aspects of the bidder's proposed disposition of the dredged material including any and all permits, authorizations, contracts, agreements, licenses, and rights-of-entry.

   b) The results of any sampling and testing required for obtaining permits for dredged material transportation, processing, and placement shall also be provided. The procedure used to obtain samples shall be detailed. These test results will be used by the Government as part of the request for a Water Quality Certificate for the dredging.

c) A list of the names, locations, point of contact, and telephone number, for loading and unloading facilities for each disposal facility including current site capacity.

d) A detailed map indicating locations of loading and unloading facilities or area within the proposed property to be utilized, for each disposal location, with a description of the material handling process at each disposal location.

e) Hours of operation, transportation and operating procedures at unloading facilities.

f) Facilities information: Access to Unloading facilities, acceptable scow size, Disposal Site O&M manual, demurrage time to unload scow or trucks, anticipated processing time and placement materials, and other facility restrictions, if any.

g) A detailed description of the loading and transportation procedures to be utilized.

b. The Contractor will be required to commence operations under this contract within **five (5)** calendar days after the date of receipt by him of the notice to proceed, to prosecute said work diligently and to complete the basic contract work of approximately 45,000 CY ready for use not later than **twenty-two (22)** calendar days after the date of receipt by him of the notice to proceed. There are **eleven (11)** options to the contract ranging from approximately **4,325** cubic yards to **29,970** cubic yards. The time for contract completion of each additional option will be determined by allowing a rate of **one (1)** calendar day for each **4,000** cubic yards removed. Options will range from **one (1)** calendar day to **eight (8)** calendar days, if exercised. Should the total quantity of material to be paid for and actually removed under the contract exceed the limit established in the clause entitled "Variations in Estimated Quantities," additional time will be allowed at the rate of **one (1)** calendar day for each **4,000** cubic yards in excess of the established limit. The time stated for completion shall include final cleanup. (EFARS 52.2/9110 (a))

The work is estimated to cost between **$2,000,000.00 and $15,500,000.00.** The estimated volume to be dredged is 229,275 cubic yards including options, if exercised.

c. **THE CONTRACTOR IS REQUIRED TO COMPLY WITH THE FOLLOWING DREDGING/PLACEMENT RESTRICTIONS AND MONITORING REQUIREMENTS:**

1. DREDGING/PLACEMENT RESTRICTIONS IMPOSED BY THE NEW YORK STATE WATER QUALITY CERTIFICATE (See Section 00900, Attachment D).

2 DREDGING/PLACEMENT RESTRICTIONS IMPOSED BY THE STATE REGULATORY AGENCY OF THE DISPOSAL SITE LOCATION WATER QUALITY CERTIFICATE AND ALL PERMITS OBTAINED OR NEEDED AS DESCRIBED IN THE SELECTED OFFERORS PROPOSAL.

3. FEDERAL AVIATION ADMINISTRATION (FAA) RESTRICTIONS (See section 0900 K,L & M).

**The contractor will be solely responsible for coordinating and complying with all the processing requirements of the identified disposal site. Dredging, dewatering and/or other processing (if any), transfer, transportation and material disposal shall be performed in accordance with applicable law and requirements of all associated permits and approvals and government authorities having jurisdiction.**

**2. PERFORMANCE OF WORK BY THE CONTRACTOR (APR 1984)**

The Contractor shall perform on the site, and with its own organization and equipment, work equivalent to at least forty (40) percent of the total amount of work to be performed under the contract. This percentage may be reduced by a supplemental agreement to this contract if, during performance of the work, the Contractor requests a reduction and the Contracting Officer and/or his Representative determines that the reduction would be to the advantage of the Government. (FAR 52.236-01)

**3. SUBMITTAL OF WORK TO BE PERFORMED BY THE CONTRACTOR**

The Contractor shall furnish the Contracting Officer and/or his Representative, within ten (10) days after award, items of work he will perform with his own forces and the estimated cost of those items. The percentage of work that must be performed by the Contractor is stated in paragraph 2, entitled: "PERFORMANCE OF WORK BY THE CONTRACTOR."

**4. LIQUIDATED DAMAGES - CONSTRUCTION (SEPT 2000)**

a. If the Contractor fails to complete the work within the time specified in the contract, the Contractor shall pay liquidated damages to the Government in the amount of **$1,449.83** for each calendar day of delay until the work is completed or accepted.

b. If the Government terminates the Contractor's right to proceed, liquidated damages will continue to accrue until the work is completed. These liquidated damages are in addition to excess costs of repurchase under the Termination clause.

**5. CONTRACT DRAWINGS, MAPS AND SPECIFICATIONS (AUG 2000)**

(a.) The Government will provide to the Contractor, without charge, one set of contract drawings and specifications, except publications incorporated into the technical provisions by reference, in electronic or paper media as chosen by the Contracting Officer.

(b.) The Contractor shall-

(1) Check all drawings furnished immediately upon receipt;

(2) Compare all drawings and verify the figures before laying out the work;

(3) Promptly notify the Contracting Officer or Contracting Officer's Representative of any discrepancies;

(4) Be responsible for any errors that might have been avoided by complying with this paragraph (b); and

(5) Reproduce and print contract drawings and specifications as needed.

(c.) In general-

(1) Large-scale drawings shall govern small-scale drawings; and

(2) The Contractor shall follow figures marked on drawings in preference to scale measurements.

(d.) Omissions from the drawings or specifications or the misdescription of details of work which are manifestly necessary to carry out the intent of the drawings and specifications, or that are customarily performed, shall not relieve the Contractor from performing such omitted or misdescribed details of work. The Contractor shall perform such details as if fully and correctly set forth and described in the drawings and specifications.

(e.) The work shall conform to the following contract drawings and maps, all of which form a part of these specifications and are available in the office of the District Engineer, U.S. Army Corps of Engineers, New York District, 26 Federal Plaza, New York, N.Y. 10278-0090:

| **CONTRACT DRAWING** | **DESCRIPTION** |
|---|---|
| File Number 2284 | Maintenance Dredging of Flushing Bay and Creek |
| 1 | Index |
| 2 | General Location Map |
| 3 | Channel Coordinates |
| 4-8 | Condition Survey and Option areas |
| 9 | Typical Channel Cross Sections & Benchmarks |

(f.) The Contractor shall check all drawings furnished him immediately upon their receipt and shall promptly notify the Contracting Officer or Contracting Officer's Representative of any discrepancies. Figures marked on drawings shall in general be followed in preference to scale measurements unless dimensions are specified. Large-scale drawings shall in general govern over small-

scale drawings. Information and data provided in contract specifications shall govern over similar information and data specified in contract drawings. The Contractor shall compare all drawings and verify the figures before laying out the work and will be responsible for any errors which might have thereby been avoided (DOD FAR Suppl. 52.236-7002).

**6. PHYSICAL CONDITIONS**

The information and data furnished or referred to below are not intended as representations or warranties but are furnished for information only. It is expressly understood that the Government will not be responsible for the accuracy thereof or for any deduction, interpretation or conclusion drawn by the Contractor.

a. WEATHER CONDITIONS. The site of the work is not exposed to severe wind and wave action and the Contractor's operations are not likely to be affected by ordinary storms.

(1) Fog. An examination of the records of the U.S. Weather Bureau at John F. Kennedy International Airport, New York, discloses an average of 31 days per year on which dense fog (visibility of 1/4 mile or less) occurs in the New York Harbor area. The maximum number of days in which dense fog occurred in any year was 45 in 1959. The maximum number of days in which dense fog occurred in any month was 4 days in June.

(2) Winds. Wind conditions in the New York harbor areas, based on the records of the U. S. Weather Bureau at John F. Kennedy International Airport, New York, are given below:

| MONTH | Average Wind Speed (MPH) | Maximum 3 hour wind velocity (MPH) | Maximum hours in which wind velocity exceeded: 30 MPH | 35MPH |
|---|---|---|---|---|
| JAN | 13 | 52 | 9 | 3 |
| FEB | 14 | 41 | 18 | 6 |
| MAR | 14 | 40 | 12 | 6 |
| APR | 13 | 44 | 6 | 6 |
| MAY | 12 | 35 | 3 | 0 |
| JUN | 11 | 29 | 0 | 0 |
| JUL | 11 | 28 | 0 | 0 |
| AUG | 10 | 31 | 0 | 0 |
| SEP | 11 | 31 | 3 | 0 |
| OCT | 11 | 37 | 3 | 3 |
| NOV | 12 | 40 | 12 | 6 |
| DEC | 13 | 44 | 18 | 15 |

Weather conditions exceeding in severity the fog conditions described above or average wind speeds over 35 knots per hour will be considered unusually severe weather if delays are caused thereby to operations under the contract.

b. ICE. Icing within the project vicinity is not anticipated. However, in the event that icing does occur, this will be considered to be unusually severe weather.

c. TIDES. The mean tide, mean range of tides, and mean range of spring tides, are listed below:

1. Tides, Based on Northern Boulevard Bridge, Flushing Creek, NY, from 2002 Tide Tables

| | | |
|---|---|---|
| Mean Tide Level | 3.7 | ft |
| Mean Range | 6.8 | ft |
| Spring Range | 8.0 | ft |

2. Tides, Based on College Point, Flushing Bay, NY, from 2002 Tide Tables

| | | |
|---|---|---|
| Mean Tide Level | 3.7 | ft |
| Mean Range | 6.8 | ft |
| Spring Range | 7.9 | ft |

3. Tides, Based on Whitestone, NY from 2002 Tide Tables

| | |
|---|---|
| Mean Tide Table | 3.80 ft |
| Mean Range | 7.10 ft |
| Spring Range | 8.30 ft |

Irregular fluctuations due to wind and atmospheric pressure have varied from about 14.4 feet above mean low water to about 3.9 feet below mean low water. (ref. River and harbor Project Maps- New York District, Dept. of the Army, Sept. 30, 1986, p.9)

**Tidal Currents** based on Flushing Creek entrance from 2002 Tidal Current Tables

| | |
|---|---|
| Max. Flood | current weak and variable |
| Max Ebb | current weak and variable |

**Tidal Currents** based on 0.25 NW of College Point Reef, NY- from 2002 Tidal Current Tables

| | |
|---|---|
| Max. Flood | 1.5 kts |
| Max Ebb | 1.4 kts |

**Tidal Currents** based on East of Whitestone Bridge, Bronx, NY from 2002 Tidal Current Tables

| | |
|---|---|
| Max. Flood | 1.7 kts |
| Max. Ebb | 1.0 kts |

d. TRANSPORTATION FACILITIES A controlling depth in the channel of at least 9.2 feet at mean low water is accessible to the project site. The maneuvering area controlling depth is 7.7 feet and the anchorage basin is 4.0. A copy of the controlling depth report can be obtained from the New York District web page at www.nan.usace.army.mil/business/buslinks/navig/index.htm. Several highways serve the locality as shown on the site plan.

e. BIRDGE AND UTILITY CROSSINGS. A search of the regulatory files within New York District, Corps of Engineers disclosed the existence of the following submarine pipelines and/or structures within or in the vicinity of the project area:

**UTILITY CROSSINGS IN FLUSHING BAY CREEK as**

**extracted from a file search of permits in the NYD-USACE**

| Permit No. | Applicant. | DESCRIPTION |
|---|---|---|
| 92-11400 | Port Authority of NY & NJ | Construction of a safety overrun at the southeast end of LGA runway 13-31 (see diagram of proposed construction in section 00900 A) |
| 2769 | Civil Aeronautics Administration | A submarine cable on the natural bottom of Rikers Island channel near the head of Flushing Bay. |
| 4224 | Flushing Bay-Edo-Corporation | A submarine cable located in anchorage area near college point. |
| 873/3 | NY Queens Electric Light & Power Co. | One submarine light and power cable in the bed of Flushing Creek at Strong's Causeway, Corona, NY-proposed to be buried at least 10 feet below MLW in an 8' deep channel. |
| 1912/8 | Brooklyn Ash Removal Company | 2 armored submarine cables in a trench in the Flushing Creek about 0.36 miles south of the Main Street bridge of the Long island Railroad |
| 2190/4 | New York Queens Electric Light & Power Co. | 6 submarine cables laid in a trench in the Flushing River just north of the Roosevelt Avenue Bridge |
| 3119/5 | New York Telephone Comp. | A submarine cable on the natural bottom in Flushing Creek at Strongs Causeway, Corona, NY |
| 14259 | NYC Dept. of Environmental. Protection | Sewer outfall pipe latitude 40 ,46', 27", Longitude 73 , 52', 27". |

| Permit No. | Applicant. | DESCRIPTION |
|---|---|---|
| 2876 | NY & Queens Electric Light & Power Co. | Six (6) submarine cables at a depth of 18' below MLW crossing the Federal Channel at approx 90' south of the Northern Blvd. Bridge. |
| 6489 | Con Edison Co. of New York | Five (5) 8-5/8 inch pressure cable pipes at a depth of 23' below MLW crossing the channel at approximately 150' north of the Northern Blvd. Bridge. . |
| 1403 | NY & Queens Electric Light & Power Co. | Gas main tunnel at a depth of 33' below MLW located at approximately 600' north of Northern Blvd. Bridge. |
| 2876 | NY & Queens Electric Light & Power Co | Six (6) submarine cables at a depth of 18' below MLW crossing the Federal Channel 90' south of the Northern Blvd. Bridge. |
| 1664 | NYC Dept. of Plant & Structures (now Dept. of Highways) | Six (6) submarine cables at a depth of 15' below MLW crossing the Federal Channel at the center of the Northern Blvd. Bridge. Contact 555-5760 or 2624 |
| NA | Triboro Bridge Authority of the City of New York. | Two set of three (3) submarine cables at a depth of 25' below MLW crossing the Channel at the westerly and easterly fender tips of the Whitestone Expressway Bridge. |
| NA- Under the Corps' permits | issued to the New York Telephone Company | Twenty five (25) submarine cables at a depth of 19' below MLW Crossing the Channel at approx. 50' south of the Northern Blvd. Bridge. . |

| Permit No. | Applicant. | DESCRIPTION |
|---|---|---|
| 5187-800.6 | New York Telephone Co. | Four (4) submarine cables in a trench 19 ft. below MLW located near the south side of the Northern Blvd. Bridge |
| 5406-800.6 | New York Telephone Co. | One (1) submarine cables in a trench 19 ft. below MLW located near the south side of the Northern Blvd. Bridge |
| 5177-800.6 | Consolidated Edison Co. of N.Y. | One (1) Submarine cable on the natural bottom, north side of Northern Boulevard. |
| 5691-285/70a' | Consolidated Edison Co. of N.Y. | One (1) Submarine cable on the natural bottom, north side of Northern Boulevard. |
| 5863-285/70a | Consolidated Edison Co. of N.Y. | One (1) Submarine cable on the natural bottom, north side of Northern Boulevard. |
| 1682-823 | Long Island Railroad | Causeway and culverts on the L.I.R.R. Causeway. |
| 3179/12-d | New York City Dept. of Parks | Dam and tide gates upstream of the L.I.R.R. Causeway. |
| 2190/4 | New York & Queens Electric Light & Power Co. | Six (6) submarine cables in a trench 18 ft. below MLW near the north side of Roosevelt Bridge |
| 110/57 | NYC Dept. of Plant & Structures | Five (5) submarine cables in a trench 15 ft. below MLW near the North side of Roosevelt Bridge |

| Permit No. | Applicant. | DESCRIPTION |
|---|---|---|
| 110/59-i | NYC Dept. of Plant and Structures | Two (2) Submarine cables in a trench 15 ft. below MLW near the North side of Roosevelt Bridge |
| 1767/9-a | New York & Queens Electric Light & Power Co | Six (6) submarine cables in a trench 18 ft. below MLW near the south side of the Northern Blvd. Bridge |
| 129/55 | New York City Dept. of Plant Structures | Six (6) submarine cables in a trench 15' below MLW near the Northern Blvd. Bridge. |
| 225/23 | Triborough Bridge & Tunnel Authority | Six (6) submarine cables in a trench 18 ft. below MLW near the Whitestone Parkway Bridge. |
| 3433-800.6 | New York Telephone Co. | One (1) Submarine cable in a trench 19 ft. below MLW near the south side of the Northern Blvd. Bridge. |
| 4155-800.6 | New York Telephone CO. | Two (2) submarine cables in a trench 19 ft. below MLW near the south side of the Northern Blvd. Bridge. |
| 458/6 | New York & Queens Electric Light & Power CO. | Seven (7) submarine cables on the natural bottom near the north side of the Northern Blvd. Bridge. |
| 795/3 | New York Telephone Col. | One (1) submarine cable on the natural bottom near the north side of the Northern Blvd. Bridge. |
| 795/10 | New York Telephone CO. | Two (2) submarine cables on the natural bottom near the north side of the Northern Blvd. Bridge. |

| Permit No. | Applicant. | DESCRIPTION |
|---|---|---|
| 795/24 | New York Telephone Co. | Two (2) submarine cables on the natural bottom near the north side of the Northern Blvd. Bridge. |
| 795/44 | New York Telephone Co. | Nine submarine cables in a trench 10 ft. below the bottom of waterway (18'ft. below MLW) near the Northern blvd. Bridge. |
| 1396/3 | Interborough Rapid Transit Co. | Twelve (12) Submarine cables and two (2) lead air lines on the natural bottom near the Roosevelt Ave. Bridge. |
| 1938/3-a | New York & Queens Gas co. | A tunnel 33 ft. below MLW approximately 540 ft. north of Northern Blvd. Bridge. |
| | | |

In addition, the following bridges cross or are in the vicinity of the project area:

Whitestone Parkway Bridge - fixed type highway bridge with a horizontal clearance of 140' and vertical clearance of 34' above MHW.

Northern Boulevard Bridge - Bascule type highway bridge with a horizontal clearance of 80' and a vertical clearance of 25' above MHW.

Copies of permits listed above are available for viewing at 26 Federal Plaza, room 1937 New York, NY. Call (212) 264-9032.

f. CHANNEL TRAFFIC. Vessel traffic in the Flushing Bay and Creek project vicinity is heavy. Traffic consists of bulk and general cargo freighters, tank vessels, tows of scows and barges, and miscellaneous small craft. Vessel traffic may cause some delay to the dredging required in these specifications.

g. OBSTRUCTION OF CHANNEL. The Government will not undertake to keep the area free from vessels or other obstructions except to the extent of such regulations, if any, as may be prescribed by the secretary of the army in accordance with the provisions of section 7 of the Rivers and Harbors Act in such manner as to obstruct navigation as little as possible, and in case the contractor's plant so obstructs the channel as to make difficult or endanger the passage of vessels, said plant shall be promptly moved on the approach of any vessel to such an extent as may be necessary to afford a practicable passage. Upon the completion of the work the Contractor shall promptly remove his plant, including ranges, buoys, piles and other marks placed by him under the contract in navigable waters or on shore.

h. NAVIGATION AIDS. The Contractor shall not relocate or move any aids to navigation that have been established by the U.S. Coast Guard. If it becomes necessary to have any aids to navigation moved in order to complete dredging operations under this contract, the Contractor shall notify the appropriate Coast Guard Office, with a copy to the Contracting Officer and/or his Representative, not less than 15 days prior to the need for movement. The Contractor shall notify the appropriate Coast Guard Office of the approximate time of completion of dredging.

i. LOCATION. The site of the work to be performed under these specifications is the Flushing Bay and Creek, Federal Navigation Channel, New York located adjacent to La Guardia Airport in Queens County.

j. LAYING OF SUBMERGED PIPELINES AND OBSTRUCTIONS OF CHANNEL. Should it become necessary in the performance of this contract to close a channel to lay submerged pipeline across a navigable channel, the Contractor shall notify the Contracting Officer or Contracting Officer's Representative in writing to be received in the District office at least ten working days prior to the desired closure date. This notification shall furnish the following:

(1) Location (Channel Centerline Stationing) and depth (above the top of the pipeline) at which the submerged line will be placed;

(2) The desired length of time the channel is to be closed for installation of the pipeline;

(3) The date and hour placement or removal will commence;

(4) The date and hour of anticipated completion; and

(5) The name and telephone number of the person to be contacted for information and response to any emergency condition.

The Coast Guard has indicated that the requirements of navigation may make it necessary to establish times other than those requested. IT SHALL BE THE CONTRACTOR'S RESPONSIBILITY TO COORDINATE HIS PLANS WITH THE COAST GUARD SUFFICIENTLY IN ADVANCE OF THE PLANNED CLOSING TO PREVENT DELAY TO THE DREDGING OPERATIONS AND COMPLY WITH THE COAST GUARD REQUIREMENTS.

k. BRIDGE-TO-BRIDGE RADIO-TELEPHONE EQUIPMENT. In order that radio-telephone communication may be made with passing vessels, all dredges engaged in work under the contract shall be equipped with and operate bridge-to-bridge radio-telephone equipment on VHF Channel 13 (156.65 MHz with low power output having a communication range of approximately ten (10) miles). The Federal Communication Commission has approved the frequency.

**7. TIME EXTENSIONS (SEPT 2000)**

Time extensions for contract changes will depend upon the extent, if any, by which the changes cause delay in completion of the various elements of construction. The change order granting the time extension may provide that the contract completion date will be extended only for those specific elements related to the changed work and that the remaining contract completion dates for all other portions of the work will not be altered. The change order also may provide an equitable readjustment of liquidated damages under the new completion schedule.

**8. LAYOUT OF WORK (APRIL 1984)**

The Government will provide the basic horizontal control data (coordinated triangulation stations) in the area. The Contractor shall compute and establish in the field all range points required for the proper discharge of his functions. The Contractor shall be responsible for the accuracy of the range points and its computations. The Contractor shall furnish, at his own expense, all stakes, templates, platforms, equipment, range markers, tide staffs and labor as may be required in laying out any part of the work. The Contractor will be held responsible for the execution of the work to such lines and grades as required or indicated by the Contracting Officer or his representative. It shall be the responsibility of the Contractor to maintain and preserve all established stakes, markers...etc.

**Contractor shall contact the New York District Survey Section at (212) 264-0180 or at (212) 264-0181 for any future reference to horizontal control data.**

**9. DATUM AND BENCH MARKS**

The plane of reference of mean low water as used in these specifications is that determined by the following benchmark and tide gauges:

1. **DESIGNATION:** W 341
   **PID:** KU1097
   **STATE/COUNTY:** NY/QUEENS
   **USGS QUAD:** Flushing (1986)
   **HORIZONTAL DATUM:** NAD83
   **POSITION:** 40° 46′ 00″ North 73° 50′18″ West
   **ELEVATION:** 13.163 NGVD
   **ESTABLSIHED BY:** U.S.C. & G.S.

   **DESCRIPTION:** A Bench Mark Disk stamped W 341 1952 set in the overpass of Whitestone Parkway over College Point Causeway and Flushing River, 29 feet southwest of southwest lane of College Point Causeway, 2-1/2 feet southeast of southeast edge of overpass, set vertically in the northwest face of the northwest leg of the first pier southwest of College Point Causeway, and 2.3 feet above the side walk.

2. **DESIGNATION:** TIDAL 4 STA II 5
**PID:** KU1109
**STATE/COUNTY:** NY/QUEENS
**USGS QUAD:** Flushing (1986)
**HORIZONTAL DATUM:** NAD 83
**POSITION:** 40° 47′ 01″ North 73° 51′24″ West
**ELEVATION:** 9.455 NGVD 1929

**DESCRIPTION:** Described by national geodetic survey 1952 at New York, in borough of Queens, at intersection of 15th Avenue and 110th Street, at college point, 8 feet east of extended east curb line of 110th street, 4.8 feet south of south curb of 15th Avenue, 30 ½ feet north of northeast corner of Walter Kraemer service station, a 1-inch outlined square in the top of northeast corner of granite post which projects and is incorporated in concrete side walk or drive to service station and about level with side walk.

The horizontal coordinates for the benchmarks were scaled from a topographic map and have an estimated accuracy of +/- 6 seconds. The orthometric height was determined by differential leveling and adjusted by the National Geodetic Survey in June 1991.

The orthometric height for benchmarks were determined by differential leveling and adjusted by the National Geodetic Survey in June 1991.

The contractor may contact the New York District Survey Section at (212) 264-0180/0181 for assistance in establishing the location of the bench marks and the tide gages.

## 10. ESTIMATED QUANTITIES

The total estimated quantities of material necessary to be removed from the specified limits to complete the work described in this specifications are computed from the volume computations of the condition survey performed in the project area in April 2002.

These volumes were computed as follows:

| | |
|---|---|
| Channel to Grade | 113,790 |
| Channel Overdepth | 89,310 |
| Slope to Grade | 19,000 |
| Slope Overdepth | 7,175 |

Total Available 229,275 CY

Estimated Contract Quantity: 229,275 CY including options if exercised.

Distribution of Base and Optional volumes:

| | **CHANNEL TO GRADE AND SIDE SLOPES CY** (APPROX.) | **OVERDEPTH CY** Channel plus side slopes | Dredge segment areas included in option |
|---|---|---|---|
| BASE VOLUME | 32,500 | 12,500 | 1B, 1C, 1G, 1H, 1I, 1K, 1L |
| OPTION-1 - | 5,050 | 1,930 | 1A |
| Option 2 | 3,320 | 1,005 | 1J |
| Option 3 | 7,500 | 2,210 | 1M& 1N |
| Option 4 | 5,290 | 2,580 | 1F |
| Option 5 | 9,640 | 6,160 | 1D & 2A |
| Option 6 | 13,920 | 9,200 | 1E & 2B & 2C |
| Option 7 | 9,760 | 11,280 | 2D & 2E & 2G |
| Option 8 | 10,500 | 12,320 | 2F &3A & 4E |
| Option 9 | 10,650 | 9,600 | 4A &4B &4C & 4D |
| Option 10 | 11,070 | 11,150 | 3B & 3C & 3D |
| Option 11 | 10,450 | 19,520 | 3E &3F & 3G |

**The Government will survey the project prior to starting work.** Above estimated quantities were computed from the data shown on the contract drawings. The quantities that may be removed and paid for will be computed by the Triangulated Irregular Network (TIN) method or average end area method as indicated in the

Technical Specifications Section 01200, paragraph 12, entitled "Measurement and Payment."

**11. VARIATION IN ESTIMATED QUANTITIES - DREDGING (JAN 1985)**

Where the quantity of a pay item in this contract is an estimated quantity and where the actual quantity of material within the required dredging prism varies more than fifteen percent (15%) above or below the stated estimated quantity within the required dredging prism, an equitable adjustment in the contract unit price will be made upon the demand of either party. The equitable adjustment will be based upon any increase or decrease in costs due solely to the variations above one-hundred fifteen percent (115%) or below eighty-five percent (85%) of the estimated quantity. An adjustment in the contract unit price will also apply to that part of the actual quantity of allowable overdepth material above one-hundred fifteen percent (115%) or below eighty-five percent (85%) of the estimated quantity. (EFARS 52.2/9110(1))

**12. HEAD PROTECTION (HARD HATS)**

**THE ENTIRE WORK SITE UNDER THIS CONTRACT IS DESIGNATED AS A HARD HAT AREA.** The Contractor shall post the area in accordance with the requirements of paragraph 07.C.03, EM 325-1-1, and shall ensure that all prime and subcontractor personnel, vendors, and visitors utilize hard hats while within the project area. (DO 385-1-3 4 Nov. 77)

**13. SIGNAL LIGHTS (FEB 1983)**

SIGNAL LIGHTS (FEB 1983) The Contractor shall display signal lights and conduct his operations in accordance with the General Regulations of the Coast Guard governing lights and day signals to be displayed by towing vessels with tows on which no light signals can be displayed. Vessels working on wrecks, dredges, and vessels engaged in laying cables or pipe or in submarine or bank protection operations, lights to be displayed on dredge pipelines, and day signals to be displayed by vessels of more than 65 feet in length moored or anchored in a fairway or

channel, and the passing by other vessels of floating plant working in navigable channels, as approved by the Commandant, U.S. Coast Guard with respect to vessels on the high seas (33 CAR 81 App. A-72 COLREGS, Part C), vessels in inland waters (33-CFR 93.18 - 93.31a), and vessels in western rivers (33 CFR 95.5.51 - 95.70)), as applicable. (DAEN-PRP Ind dtd. 12 Sep. 83)

**14. REVERSE SIGNAL ALARM**

a. All construction equipment, except light service trucks, panels, pickup trucks, station wagons, crawler-type cranes, power shovels and draglines, whether moving alone or in combination shall be equipped with reverse signal alarms. The alarm shall be mounted on the rear of the equipment and shall be protected or constructed as to withstand severe wear and tear, adverse weather and unfavorable environmental working conditions and shall be certified by the manufacturer to fully meet the following performance standards.

b. The alarm shall produce a relatively pure tone which shall peak within the American National Stds. Inst. standard octave pass band of 600 to 2400 cycles per second and shall produce a 0.2 to 0.5 second audible warning within the initial three (3) feet of backward movement of the vehicle on which it is mounted and at regular intervals, not to exceed three (3) seconds throughout the backward movement. The alarm shall automatically stop when backward movement ceases. The sound intensity of the alarm shall range from and not exceed 90-100 db (decibels) at a horizontal distance of five feet from the alarm.

c. Actuation of the alarm shall be automatic by direct connections to any part of the equipment that moves or acts in a manner distinctive only to the rearward movement of the vehicle with no manual controls of any kind between the source of actuation and the alarm. Where application of this requirement to specific types of the equipment has impractical application, other means of actuation may be used upon written approval of the Contracting Officer and/or his Representative or his representative.

d. The use of the alarm shall be in the addition to prescribed requirements for signalmen.

**15. FLOATING PIPELINES**

Floating pipelines, used as access ways, shall be equipped with walkways and guardrails. In accordance with EM 385-1-1, the walkway shall be securely anchored to the pipeline and a guardrail equivalent in strength to a wood rail 2 in. x 4 in. shall be provided on at least one side of the walkway and shall be secured to uprights at intervals of not more then 8 feet and of not less than 36 inches, nor more than 42 inches in height above the walkway. Floating pipelines not equipped with walkways shall be barricaded to positively prevent personal access.

**16. MISPLACED MATERIAL (JAN 1965)**

Should the Contractor during the progress of the work, lose, dump, throw overboard, sink, or misplace any material, plant, machinery, or appliance, which in the opinion of the Contracting Officer and/or his Representative may be dangerous to or obstruct navigation, the Contractor shall recover and remove the same with the utmost dispatch. The Contractor shall give immediate notice, with description and location of such obstructions, to the Contracting Officer and/or his Representative or inspector, and when required shall mark or buoy such obstruction until the same are removed. Should he refuse, neglect, or delay compliance with the above requirements, such obstructions may be removed by the Contracting Officer and/or his Representative, and the cost of such removal may be deducted from any money due or to become due to the Contractor, or may be recovered under his bond. The liability of the Contractor for the removal of a vessel wrecked or sunk without fault or negligence shall be limited to that provided in Sections 15, 19, and 20 of the Rivers and Harbors Act of March 3, 1899 (33 USC. 410 et seq.) (DOD FARS SUPPL. 52.236-7006).

**17. CONTINUITY OF WORK (APR 1965)**

No payment will be made for work done in any area designated by the Contracting Officer and/or his Representative until the full depth required under the contract is secured in the whole of such area, unless prevented by ledge rock; nor will payment be made for excavation in any area not adjacent to and in prolongation of areas where full depth has been secured except by decision of the Contracting Officer or Contracting Officer's Representative. Should any such nonadjacent area be excavated to full depth during the operations carried on under the contract, payment for all work therein may be deferred until the required depth has been made in the area intervening. The Contractor may be required to suspend dredging at any time when for any reason the gauges or ranges cannot be seen or properly followed. (EFARS 52.2/9110(C)

**18. FINAL EXAMINATION AND ACCEPTANCE (APR. 1965)**

a. As soon as practicable after the completion of the entire work area (Basic area and options exercised), such work will be thoroughly examined at the cost and expense of the Government by sounding or by sweeping, or both, as determined by the Contracting Officer and/or his Representative. Should any shoals, lumps, or other lack of contract depth be disclosed by this examination the Contractor will be required to remove same by dredging at the contract rate for dredging or by other method approved by the contracting officer, but if the bottom is soft and the shoal areas are small and form no material obstruction to navigation, the removal of such shoal may be waived by the discretion of the Contracting Officer and/or his Representative. The Contractor or his authorized representative will be notified when soundings and/or sweepings are to be made, and will be required to accompany the survey party. When the area is found to be in a satisfactory condition, it will be accepted finally. Should more than two soundings or sweeping operations by the Government over an area be necessary by reason of work for the removal of shoals disclosed at a prior sounding or sweeping operations, this work will be charged against the Contractor. The rate for each day in which the Government plant is engaged in such sounding or sweeping operations and/or is en route to or from the site or held, for the

Contractor's convenience, at or near the site for these operations shall be $1,850 except on Saturday, Sunday and Holidays when the rate shall be $2,125.

b. Final acceptance of the whole or a part of the work areas and the deductions or corrections of deductions made thereon will not be reopened after having once been made, except on evidence of collusion, fraud, or obvious error, and the acceptance of a completed section shall not change the time of payment of the retained percentages of the whole or any part of the work.

c. The area within the contract limits will be surveyed for final examination and acceptance.

**19. SHOALING (APR 1965)**

If, before the contract is completed, shoaling occurs in any section previously accepted, including shoaling in the finished channel, because of the natural lowering of the side slopes, re-dredging at the contract price, within the limit of available funds, may be done if agreeable to both the Contractor and the Contracting Officer and/or his Representative.

**20. INSPECTION (APR 1965)**

The inspectors will assess whether the gauges, ranges, location marks and limit marks are maintained in proper order; but the presence of the inspector shall not relieve the Contractor of the responsibility for the proper execution of the work in accordance with the specifications. The Contractor will be required:

a. To furnish, on the request of the Contracting Officer and/or his Representative or any inspector, the use of such boats, boatmen, laborers, a part of the ordinary and usual equipment and crew of the dredging plant as may be reasonably necessary in inspecting and supervising the work. However, the Contractor will not be required to furnish such facilities for the surveys prescribed in the clause H-18, entitled: "Final Examination and Acceptance."

b. To furnish, on the request of the Contracting Officer or the Contracting Officer's Representative or any inspector, suitable transportation from all points on shore designated by the Contracting Officer and/or his Representative to and from the various pieces of plant and to and from the placement area. Should the Contractor refuse, neglect, or delay compliance with these requirements, the specific facilities may be furnished and maintained by the Contracting Officer or Contracting Officer Representative, and the cost thereof will be deducted from any amounts due or to become due to the Contractor.

## 21. ACCOMMODATIONS FOR GOVERNMENT INSPECTORS

The Contractor shall furnish regularly to Government inspectors onboard the dredge or other craft upon which they are employed a suitable separate room for an office. The room shall be fully equipped and maintained to the satisfaction of the Contracting Officer and/or his Representative; it shall be properly heated, ventilated, and lighted, and shall have a desk which can be locked, and a chair for each inspector, and washing conveniences. In addition, the Contractor shall provide a suitable sleeping area for use by the Government inspector when weather or sea conditions preclude safe transfer to shore. The entire cost to the Contractor for furnishing, equipping and maintaining the foregoing accommodations shall be included in the contract price. If the Contractor fails to meet these requirements, the Contracting Officer and/or his Representative will secure the facilities referred to above, and the cost thereof will be deducted from payments to the Contractor.

## 22. EQUIPMENT OWNERSHIP AND OPERATING EXPENSE SCHEDULE (1985 JAN OCE)

a. Allowable costs for construction of marine plant and equipment in sound workable condition owned or controlled and furnished by a contractor or subcontractor at any tier shall be based on actual cost data when the Government can determine both ownership and operating costs for each piece of equipment or equipment groups of similar serial and series from the contractor's accounting records. When both ownership and operating costs cannot be determined from the contractor's accounting records, equipment costs shall be based upon the applicable provision of EP 1110-1-8, "Construction Equipment Ownership and Operating Expense Schedule," Region I.

Working conditions shall be considered to be average for determining equipment rates using the schedule unless specified otherwise by the contracting officer. For equipment not included in the schedule, rates for comparable pieces of equipment may be used or a rate may be developed using the formula provided in the schedule. For forward pricing, the schedule effect at the time of negotiations shall apply. For retrospective pricing, the schedule in effect at the time the work was performed shall apply.

b. Equipment rental costs are allowable, subject to the provisions of FAR 31.105(d)(ii) and FAR 31.205-36 substantiated by certified copies of paid invoices. Rates for equipment rented from an organization under common control, lease-purchase or sale-leaseback arrangements will be determined using the schedule except that rental costs leased from an organization under common control that has an established practice of leasing the same or similar equipment to unaffiliated leases are allowable. Costs for major repairs and overhaul are unallowable.

c. When actual equipment costs are proposed and the total amount of the pricing action is over $25,000, cost or pricing data shall be submitted on Standard Form 1411, "Contract Pricing Proposal Cover Sheet." By submitting cost or pricing data, the contractor grants to the contracting officer or an authorizing representative the right to examine those books, records, documents and other supporting data that will permit evaluation of the proposed equipment costs. After price agreement the contractor shall certify that the equipment costs or pricing data submitted are accurate, complete and current. (EFARS 52.2/9108(f))

**23. FUEL USAGE**

The Contractor shall furnish the Contracting Officer and/or his Representative a report, to be received on or before the last day of the calendar month, listing the totals of fuels consumed by the dredging plant, supporting vessels, and other construction equipments. The report shall list the quantities of different fuels separately. The report shall cover the period from the 25th of the preceding month to the 25th of the current month.

**24. OIL TRANSFER OPERATIONS**

The Contractor shall assure that oil transfer operations to or from his plant comply with all Federal, state, municipal laws, codes and regulations (See attachment I of Section 00900 for regulation on "Oil and Hazardous Material Transfer Operations" - 33 CFR 156). Particular attention is invited to 33 CFR Subchapter O, Pollution. The Contractor shall incorporate in the accident prevention program (Section 00800 S-3), submitted in compliance with Section 00700, contract clause "ACCIDENT PREVENTION," sufficient information to demonstrate that all fuel transfers will be made in compliance with 33 CFR 156 and any other applicable laws, codes and regulations. (NAP-1/81)

**25. WAGE RATES**

The attached schedule of wage rates contains rates applicable to all work under this contract (see Section 00900, Attachment B).

**26. LABOR-ADDITIONAL REQUIREMENTS**

Fringe benefits statement: The method of payment of applicable fringe benefits will be indicated on DD From 879, Statement of Compliance, and attached to each weekly payroll.

**27. NOTICE TO MARINERS**

The Contractor shall, prior to commencement of work, notify the 3rd Coast Guard District, Aids to Navigation Officer, of his proposed operations including location and duration of operations and request that the information be published in the "Notice to Mariners." This notification must be in sufficient time so that it appears in the Notice at least **15 days** prior to the commencement of the dredging operation.

**28. ENVIRONMENTAL LITIGATION (1974 NOV OCE)**

a. If the performance of all or any part of the work is suspended, delayed, or interrupted due to an order of a court of competent jurisdiction as a result of environmental litigation, as defined below, the Contracting Officer and/or his Representative, at the request of the Contractor, shall determine whether the order is due in any part to the acts or omissions of the Contractor or a Subcontractor at any tier not required by the terms of this contract. If it is determined that the order is not due in any part to acts or omissions of the Contractor or a Subcontractor at any tier other than as required by the terms of this contract, such suspension, delay, or interruption shall be considered as if ordered by the Contracting Officer and/or his Representative in the administration of this contract under the terms of Section I, contract clause entitled "SUSPENSION OF WORK." The period of such suspension, delay or interruption shall be considered unreasonable, and an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) as provided in that clause, subject to all the provisions thereof.

b. The term "environmental litigation," as used herein, means a lawsuit alleging that the work will have an adverse effect on the environment or that the Government has not duly

considered, either substantively or procedurally, the effect of the work on the environment. (EFARS 52.2/9109 (j))

**29. NOISE LEVEL CRITERIA**

Maximum sound pressure levels measured at the booster pumps, engine generators and vehicles including muffler and exhaust components, shall not exceed decibel values prescribed by Federal, State and local codes and regulations. The foregoing applies with the pumps under normal operating conditions at not less than 50% full rated load. Test will be performed at no additional cost to the Government by the Contractor, or the pump engine and generator manufacturer or by an approved testing agency having proven capability in noise measurements and using approved measurement equipment and acceptable measurement procedures. Test data will be submitted to the Contracting Officer for approval 5 days after the commencement of dredging operations. Should the sound pressure (noise) level test data indicate a need for sound reduction, the Contractor will provide necessary enclosures, baffles or any other appropriate means around booster pumps and engine generators including muffler and exhaust components, so as to attain noise levels which do not exceed those prescribed by aforementioned regulations. Details of the proposed enclosure or baffling arrangement shall be submitted to the Contracting Officer for approval. Such details will be accomplished by calculations, which indicate anticipated compliance of sound pressure (noise) levels with codes and regulations noted herein before. All this is especially enforceable where these booster and engine generators locations are in bathing areas.

30. **CERF IMPLEMENTATION (83 JUN 1 OCE)**

If the work specified in this contract is performed by a hopper dredge(s), the owner must have an active Basic Ordering Agreement (BOA) for the hopper dredge(s) on file with the Corps of Engineers. The Contractor shall be obligated to make the hopper dredge(s) available to serve in the Corps of Engineers Reserve Fleet (CERF) at any time that the hopper dredge(s) is performing work under this contract. When the Contracting Officer and/or his Representative is notified of the decision to activate the dredge(s) into the CERF, he shall take appropriate action to release the dredge(s). He may then extend or terminate the contract to implement whichever action is in the best interest of the Government. The CERF contract shall also be subject to the following condition:

a. The Director of Civil Works may require the contractor to perform emergency dredging at another CONUS (48 contiguous states) site for a period of time equal to the remaining time under this contract at the date of notification plus up to ninety (90) days at the previously negotiated rate which appears on the schedule of prices in the BOA.

b. The Chief of Engineers may require the contractor to perform emergency dredging at an OCONUS (Outside CONUS which includes Alaska, Hawaii, Puerto Rico, the Virgin Islands, or U.S. Trust Territories) site for a period of time equal to the time remaining under this contract at the date of notification plus up to one hundred eighty (180) days at the negotiated rate which appears on the schedule of prices in the BOA.

c. The CERF shall be activated by the Chief of Engineers or the Director of Civil Works; then the Ordering Contracting Officer and/or his Representative will notify the contractor. From the time of notification, the selected hopper dredge(s) must depart for the emergency assignment within seventy-two (72) hours for CONUS or ten (10) days for OCONUS assignments.

d. A confirming delivery order will be issued pursuant to the Basic Ordering Agreement (BOA) by the Ordering Contracting Officer and/or his Representative. Such delivery order

shall utilize the schedule of rates in the BOA for the specific hopper dredges(s).

e. If during the time period specified in a, b, or c, above, a CERF vessel(s) is still required, the contract performance may be continued for additional time by mutual agreement. (EFARS 52.2/9112)

**31. THE SEAGOING BARGE ACT (46 USC 395 ET SEQ.)**

The Seagoing Barge Act applies to this project. In the event the low bidder contemplates using plant that requires U.S. Coast Guard certification to comply with this Act, the low bidder shall within five (5) calendar days after bid opening submit a copy of said certificate to the Contracting Officer and/or his Representative. Failure to produce the certificate within the required time shall subject the bidder to a determination of nonresponsibility.

**32. PERFORMANCE EVALUATION OF CONTRACTOR (APR 1984)**

a. As a minimum, the Contractor's performance will be evaluated upon final acceptance of the work. However, interim evaluation may be prepared at any time during contract performance when determined to be in the best interest of the Government.

b. The format for the evaluation will be DD Form 2626, and the Contractor will be rated either outstanding, satisfactory, or unsatisfactory in the areas of Contractor Quality Control, Timely Performance, Effectiveness of Management, Compliance with Labor Standards, and Compliance with Safety Standards. The Contractor will be advised of any unsatisfactory rating, either in an individual element or in the overall rating, prior to completing the evaluation, and all Contractor comments will be maintained as part of the official record. Performance Evaluation Reports will be available to all DOD contracting offices for their future use in determining Contractor responsibility, in compliance with FAR 36.201 (c). (DEAN-PRP Ltr dtd 30 Apr 84)

**33. PRICING OF ADJUSTMENTS (APR 1984)**

When costs are a factor in any determination of a contract price adjustment pursuant to the Changes clause or any other clause of this contract, such costs shall be in accordance with Part 31 of the Federal Acquisition Regulation and the DOD FAR Supplement in effect on the date of this contract (DOD FAR SUPP 52.243.7001) costs shall be in accordance with Part 31 of the Federal Acquisition Regulation.

**34. PRECONSTRUCTION CONFERENCE**

A preconstruction conference will be arranged by the Contracting Officer and/or his Representative after award of contract and before commencement of work. The Contracting Officer's representative will notify the Contractor of the time and date set for the meeting. At this conference, the Contractor shall be oriented with respect to Government procedures and line of authority, contractual, administrative, and construction matters. Additionally, a schedule of required submittals will be discussed (see Section 00900, Attachment G).

The contractor shall bring to this conference the following items in either completed or draft form:

a. The Contractor's order of work for dredging and performing other work, including disposal area plan.

b. Accident Prevention Plan (advance copies required, see Section 01351) including the Hazard Analysis as per Section 01351.

c. Quality Control Plan (see Section 01451).

d. Letter appointing Superintendent.

e. List of subcontractors

35. **BID GUARANTEE**

a. The offeror (bidder) shall furnish a separate bid bond, or United States bonds, Treasury notes or other public debt obligation of the United States, in the proper amount, by the time set for opening of bids. Failure to do so may be cause for rejection of the bid. The Contracting Officer and/or his Representative will return bid guarantees, other than bid bonds, (1) to unsuccessful bidders as soon as practicable after the opening of bids, and (2) to the successful bidder upon execution of contractual documents and bonds (including any necessary coinsurance or reinsurance agreements), as required by the bid as accepted.

b. If the successful bidder, upon acceptance of its bid by the Government within the period specified for acceptance, fails to execute all contractual documents or give a bond(s) as required by the solicitation within the time specified, the Contracting Officer and/or his Representative may terminate the contract for default.

c. Unless otherwise specified in the bid, the bidder will (1) allow the number of days as indicated in paragraph 13D of Standard Form 1442 for acceptance of its bid and (2) give bond within 5 days after receipt of the forms by the bidder.

d. In the event the contract is terminated for default, the bidder is liable for any cost of acquiring the work that exceeds the amount of its bid. The bid bond, or bonds or notes of the United States, is available to offset the difference.

36. **QUANTITY SURVEYS**

a. Quantity surveys shall be conducted, and the data derived from these surveys shall be used in computing the quantities of work performed and the actual construction completed and in place.

b. The Government shall conduct the original and final surveys and make the computations based on them. The Contractor shall conduct the survey for any periods for which progress payments are requested and shall make the computations based

on these surveys. These surveys conducted by the Contractor shall be conducted under the direction of a representative of the Contracting Officer, unless the Contracting Officer waives this requirement in a specific instance.

c. Promptly upon completing a survey, the Contractor shall furnish the originals of all field notes and all other records relating to the survey or to the layout of the work to the Contracting Officer and/or his Representative, who shall use them as necessary to determine the amount of progress payments. The Contractor shall retain copies of all such material furnished to the Contracting Officer and/or his Representative. (FAR 52.236-16)

d. Contractor's participation in surveys: In accordance with agency policy guidance, the preferred methods of performance of all hydrographic quantity surveys shall be (in descending order):

(1) The Government will perform quantity surveys by using qualified in-house crews, if available.

(2) The Government will provide quantity surveys by contracting directly with qualified independent hydrographic survey contractors.

(3) The Government will permit, only in exceptional circumstances, the use of dredging contractor's surveys if the Contracting Officer and/or his Representative determine that such surveys are adequate and reasonable for payment purposes.

If it is determined by the Contracting Officer that it is impractical for Government personnel to perform the original and final surveys and the Government wishes the Contractor's surveys to be used, the following will be required from the Contractor:

(a) Acceptance of all monumentation and transponder locations.

(b) Witness by a Corps of Engineers representative of all calibration procedures such as vertical and horizontal control.

(c) Corps of Engineers observation of raw data collection.

(d) Submittal of both unedited as well as edited versions of survey maps.

(e) Subsequent acceptance of edited survey map after determination by Corps survey personnel that editing was conducted in accordance with U.S. Army Corps of Engineers specifications and guidelines. (FAR 52.236-16 - ALTERNATE I, APR 1984)

e. The Contractor is obligated to participate in all stages of data collection during the performance of Before and After Dredge Surveys. Any disagreements with the data collection process shall immediately be brought to the attention of the Contracting Officer or his representative who will determine the necessary corrective measures, if any. **Failure to be present during the survey data collection disqualifies the Contractor from any such related claims.**

**37. SAFETY SIGN**

The Contractor shall construct a safety sign at a location directed by the Contracting Officer and/or his Representative. The sign shall be 6 feet by 4 feet and shall conform to the requirements as specified in Section 00900, Attachment E, Project Identification and Safety Signs. The Corps of Engineers castle logo (an 8.5" x 11" red decal) to be used on the sign will be Government furnished. **The Contractor will be given this logo at the time of the preconstruction conference.**

The decal shall receive a thin coat of clear spar varnish after application. The sign shall be erected as soon as possible and within 5 calendar days after the date of the receipt of the Notice to Proceed. The data required by the sign shall be corrected daily. No separate payment will be made for erecting and maintaining the safety sign and all costs in connection therewith will be considered the obligation of the contractor. Upon completion of the project, the Contractor shall remove the sign from the work site.

**38. PROJECT SIGN**

The Contractor shall furnish and erect a project sign at a location directed by the Contracting Officer or Contracting Officer's Representative. The project sign shall conform with all requirements as specified in Section 00900, Attachment E, Project Identification and Safety Signs. The Corps of Engineers' castle logo and other logos (8.5" x 11") to be used on the sign will be Government furnished. **The Contractor will be given these logos at the time of the preconstruction conference.**

The decal(s) shall receive a thin coat of clear spar varnish after application. The Contractor shall maintain the sign in good condition throughout the construction period. No separate payment will be made for erecting and maintaining the project sign, and all costs in connection therewith will be considered the obligation of the Contractor. Upon completion of the project, the Contractor shall remove the sign from the work site.

**39. EQUAL OPPORTUNITY PREAWARD CLEARANCE OF SUBCONTRACTS**

Notwithstanding the clause of this contract entitled "Subcontracts," the Contractor shall not enter into a first-tier subcontract for an estimated or actual amount of $1 million or more without obtaining in writing from the Contracting Officer and/or his Representative a clearance that the proposed subcontractor is in compliance with the equal opportunity requirements and therefore is eligible for award.

**40. SCHEDULING AND DETERMINATION OF PROGRESS** In accordance with the contract provisions, the Contractor shall, within five (5) days after receipt of Notice to Proceed by him or as otherwise determined by the Contracting Officer and/or his Representative, submit for approval a practicable progress schedule. The progress schedule shall be in the form of a chart graphically indicating the sequence proposed to accomplish each work feature of operation (Eng. Form 2454 or an acceptable equivalent -e.g., computer-generated from a commercially-available project management software package). The chart shall be prepared to show the starting and completion dates of all work features on a linear horizontal time scale beginning with date of the receipt

of the Notice to Proceed and indicating calendar days to completion. Each activity in construction shall be represented by an arrow. The head to tail arrangement of arrows shall flow from left to right. Each arrow representing an activity shall be annotated to show the activity description and duration. Contractor shall indicate on the chart the important work features or operations that are critical to the timely overall completion of the project. Key dates for such important work features and portions of work features are milestone dates and shall be so indicated on the chart. This schedule will be the medium through which the timeliness of the Contractor's construction effort is appraised. When changes are authorized that result in contract time extensions, the Contractor shall submit a modified chart for approval by the Contracting Officer and/or his Representative. The terms of Section 00700, Contract Clause entitled: SCHEDULES FOR CONSTRUCTION CONTRACTS, with reference to overtime, extra shifts, etc., may be invoked when the Contractor fails to start or complete work features or portions of same by the time indicated by the milestone dates on the approved progress chart, or when it is apparent to the Contracting Officer from the Contractor's actual progress that these dates will not be met. Neither on the chart nor on the periodic charts which the Contractor is required to prepare and submit, as described in paragraph, SCHEDULES FOR CONSTRUCTION CONTRACTS of the Contract Clauses, shall the actual progress to be entered include or reflect any materials which may be on the site, but are not yet installed or incorporated in the work. For payment purposes only, an allowance will be made by the Contracting Officer and/or his Representative of up to 100 percent of the invoiced cost of materials or equipment delivered to the site but not incorporated into the construction, pursuant to Section 00700, Contract Clause entitled: "PAYMENT UNDER FIXED-PRICE CONSTRUCTION CONTRACTS." The making of such an allowance will be contingent upon a determination by the Contracting Officer and/or his Representative that the Contractor's compliance with the quality control requirements of the contract is more than satisfactory.

When the contractor submits his progress schedule, he will include in the submission a progress curve reflecting the intended schedule for completing the work. The progress curve (S-Curve) will be plotted to reflect Cumulative Progress (Percent) based on placement along the y-axis and Time along the x-axis. The progress curve will be furnished at the same time the progress schedule is submitted for approval and updated monthly by the Contractor.

**41. SPECIAL PROHIBITION ON EMPLOYMENT**

a. Definitions: "Arising out of a contract with the Department of Defense," as used in this clause, means any act in connection with (1) attempting to obtain, (2) obtaining, or (3) performing a contract or subcontract of any agency, department or component of the Department of Defense.

b. "Convictions of fraud or any other felony," as used in this clause, means any conviction for fraud or a felony in violation of state or Federal criminal statutes, whether entered on a verdict or plea, including a plea of nolo contendere, for which sentence has been imposed.

c. Section 941, Title IX, Pub. L. 99-500 (10 U.S.C. 2408) prohibits a person who is convicted of fraud or any other felony arising out of a contract with the Department of Defense from working in a management or supervisory capacity on any defense contract, or serving on the board of directors of any defense contractor, for a period, as determined by the Secretary of Defense, of not less than one (1) year from the date of conviction. Defense contractors are subject to a criminal penalty of not more than $500,000 if they are convicted of knowingly employing a person under a prohibition or allowing such person to serve on their board of directors.

d. The Contractor agrees not to knowingly employ any person, convicted of fraud or any other felony arising out of a contract with the Department of Defense contract or subcontract or allow such person to serve on its board of directors from the date the Contractor learns of the conviction until one (1) year has expired from the date of conviction. However, if the person has also been debarred

pursuant to FAR subpart 9.4, the above prohibition shall extend for the period of debarment, but in no event shall the prohibition be less than (1) year from the date of conviction.

e. If the Contractor knowingly employs a convicted person in a management or supervisory capacity on any defense contract or subcontract or knowingly allows such person to serve on its board of directors within the prohibited period, the Government may consider, in addition to the criminal penalties contained in Section 941 of Pub. L. 99-500, other available remedies, such as suspension or debarment and may direct the cancellation of this contract at no cost to the Government, or terminate this contract for default.

f. The Contractor agrees to include the substance of this clause, including this paragraph (e), appropriately modified to reflect the identity and relationship of the parties, in all subcontracts exceeding $25,000.

**42. SUPERINTENDENCE OF SUBCONTRACTS (JAN 1965)**

a. The Contractor shall be required to furnish the following, in addition to the superintendence required by the Contract Clauses entitled: "Superintendence by the Contractor."

(1) If more than 50% and less than 70% of the value of the contract work is subcontracted, one superintendent shall be provided at the site and on the Contractor's payroll to be responsible for coordinating, directing, inspecting and expediting the subcontract work.

(2) If 70% or more of the value of the work is subcontracted, the Contractor shall be required to furnish two such superintendents to be responsible for coordinating, directing, inspecting and expediting the subcontract work.

b. If the Contracting Officer, at any time after 50% of the subcontracted work has been completed, finds that satisfactory progress is being made, he may waive all or part of the above requirement for additional superintendence subject to the right of the Contracting Officer to reinstate

such requirement if at any time during the progress of the remaining work he finds that satisfactory progress is not being made. (DOD FAR Supplement 52.236-7008)

## 43. PROCEDURES FOR SUBMISSION AND PAYMENT OF ALL CONTRACT PAYMENTS

In addition to the requirements contained in the Contract Clause entitled "Payments Under Fixed-Price Construction Contracts" and to implement the requirements of the Prompt Payment Act Amendments of 1988, P.L. 100-496, the following shall apply to all payments made under this contract:

a. At the time of submission of the progress chart, the contractor shall submit for approval by the Contracting Officer or his authorized representative a breakdown of the contract work which shall be to the degree of detail required by the Contracting Officer or his representative to effect reasonable progress payments. The Contracting Officer or his representative shall review this breakdown within 30 calendar days after receipt and either advise the contractor that it is approved or disapproved, and if disapproved the reasons for disapproval. Only after the breakdown is approved shall any payment invoice be accepted from the contractor and any payment made to him. The Contracting Officer can determine it is in the best interest of the Government to make payment without an approved breakdown, however, in no case shall more than 10% of the contract amount be paid unless the breakdown is approved.

b. The contractor shall submit his request for payment by submission of a proper invoice to the office or person(s) designated in paragraph "c". For purposes of payment a "proper invoice" is defined as the following:

(1) An estimate of the work completed in accordance with the approved breakdown indicating the percentage of work of each item and the associated costs.

(2) A properly completed ENG Form 93 and 93a (where required).

(3) All contractual submissions indicated elsewhere in this contract to be submitted with payment, such as updated progress schedules, updated submittal registers, etc.

The following certification executed by a responsible official of the organization authorized to bind the firm. A "responsible official" would be either a corporate officer, partner, or owner, in the case of a sole proprietorship:

I hereby certify, to the best of my knowledge and belief, that:

(1) The amounts requested are only for performance in accordance with the specifications, terms and conditions of the contract;

(2) Payments to subcontractors and suppliers have been made from previous payments received under the contract and timely payments will be made from the proceeds of the payment covered by this certification, in accordance with subcontract requirements and the requirements of Chapter 39 of Title 31, United States Code; and

(3) This request for progress payments does not include any amounts, which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract.

(4) All required prime and subcontractor payrolls have been submitted.

________________________________________
(Name)

________________________________________
(Title)

receiving facility or vessel certifying that all tests and inspections have been completed and that they are both ready to begin transferring product; and

(6) The date and time the transfer operation is completed.

(d) The form for the declaration of inspection may incorporate the declaration-of-inspection requirements under 46 CFR 35.35-30.

(e) The vessel and facility persons in charge shall each have a signed copy of the declaration of inspection available for inspection by the COTP during the transfer operation.

(f) The operators of each vessel and facility engaged in the transfer operation shall retain a signed copy of the declaration of inspection on board the vessel or at the facility for at least 1 month from the date of signature.

[CGD 75-124, 45 FR 7177, Jan. 31, 1980, as amended by CGD 86-034, 55 FR 36256, Sept. 4, 1990; CGD 93-056, 61 FR 41461, Aug. 8, 1996]

Sec. 156.160 Supervision by person in charge.

(a) No person may connect or disconnect a hose, top off a tank, or engage in any other critical procedures during the transfer operation unless the person in charge, required by Sec. 156.120(s), supervises that procedure.

(b) No person may start the flow of oil or hazardous material to or from a vessel unless instructed to do so by either person in charge.

(c) No person may transfer oil or hazardous material to or from a vessel unless each person in charge is in the immediate vicinity and immediately available to the transfer personnel.

[CGD 75-124, 45 FR 7177, Jan. 31, 1980, as amended by CGD 86-034, 55 FR 36256, Sept. 4, 1990]

Sec. 156.170 Equipment tests and inspections.

(a) Except as provided in paragraph (d) of this section, no person may use any equipment listed in paragraph (c) of this section for transfer operations unless the vessel or facility operator, as appropriate, tests and inspects the equipment in accordance with paragraphs (b), (c) and (f) of this section and the equipment is in the condition specified in paragraph (c) of this section.

(b) During any test or inspection required by this section, the entire external surface of the hose must be accessible.

(c) For the purpose of paragraph (a) of this section:

(1) Each nonmetallic transfer hose must:

(i) Have no unrepaired loose covers, kinks, bulges, soft spots or any other defect which would permit the discharge of oil or hazardous material through the hose material, and no gouges, cuts or slashes that penetrate the first layer of hose reinforcement as defined in Sec. 156.120(i).

(ii) Have no external deterioration and, to the extent internal inspection is possible with both ends of the hose open, no internal deterioration;

(iii) Not burst, bulge, leak, or abnormally distort under static liquid pressure at least 1\1/2\ times the maximum allowable working pressure; and

(iv) Hoses not meeting the requirements of paragraph (c)(1)(i) of

this section may be acceptable after a static liquid pressure test is successfully completed in the presence of the COTP. The test medium is not required to be water.

(2) Each transfer system relief valve must open at or below the pressure at which it is set to open;

(3) Each pressure gauge must show pressure within 10 percent of the actual pressure;

(4) Each loading arm and each transfer pipe system, including each metallic hose, must not leak under static liquid pressure at least 1\1/2\ times the maximum allowable working pressure; and

(5) Each item of remote operating or indicating equipment, such as a
remotely operated valve, tank level alarm, or emergency shutdown device,
must perform its intended function.

(d) No person may use any hose in underwater service for transfer operations unless the operator of the vessel or facility has tested and inspected it in accordance with paragraph (c)(1) or (c)(4) of this section, as applicable.

(e) The test fluid used for the testing required by this section is limited to liquids that are compatible with the hose tube as recommended
by the hose manufacturer.

(f) The frequency of the tests and inspections required by this section must be:

(1) For facilities, annually or not less than 30 days prior to the first transfer conducted past one year from the date of the last tests and inspections;

(2) For a facility in caretaker status, not less than 30 days prior to the first transfer after the facility is removed from caretaker status; and

(3) For vessels, annually or as part of the biennial and mid-period inspections.

(g) If a facility or vessel collects vapor emitted from a vessel cargo tank with a vapor control system, the system must not be used unless the following tests and inspections are satisfactorily completed:

(1) Each vapor hose, vapor collection arm, pressure or vacuum relief
valve, and pressure sensor is tested and inspected in accordance with paragraphs (b), (c), and (f) of this section;

(2) Each remote operating or indicating device is tested for proper operation in accordance with paragraph (f) of this section;

(3) Each detonation arrester required by Sec. 154.820, Sec. 154.826(a), and Sec. 154.828(a) of this chapter or 46 CFR 39.40-3(d), and each flame arrester required by Sec. 154.826(a), Sec. 154.828 (a) and (c) of this chapter has been inspected internally within the last year, or sooner if operational experience has shown that frequent clogging or rapid deterioration is likely; and

(4) Each hydrocarbon and oxygen analyzer required by Sec. 154.820(a)
and Sec. 154.824 (d) and (e) of this chapter or 46 CFR 39.40-3(a) is calibrated:

(i) Within the previous two weeks, or

(ii) Within 24 hours prior to operation when the vapor control system is operated less frequently than once a week.

(h) Upon the request of the owner or operator, the COTP may approve

alternative methods of compliance to the testing requirements of paragraph (c) of this section if the COTP determines that the alternative methods provide an equal level of protection.

(Approved by the Office of Management and Budget under control number 2115-0096)

[CGD 75-124, 45 FR 7177, Jan. 31, 1980, as amended by CGD 88-102, 55 FR 25445, June 21, 1990; CGD 86-034, 55 FR 36256, Sept. 4, 1990; CGD 93-056, 61 FR 41461, Aug. 8, 1996]

[Code of Federal Regulations]
[Title 33, Volume 2, Parts 125 to 199]
[Revised as of July 1, 1999]
From the U.S. Government Printing Office via GPO Access
[CITE: 33CFR156]

[Page 437-440]

NAVIGABLE WATERS

CHAPTER I--COAST GUARD, DEPARTMENT OF TRANSPORTATION (CONTINUED)

PART 156--OIL AND HAZARDOUS MATERIAL TRANSFER OPERATIONS--Table of Contents

Subpart B--Special Requirements for Lightering of Oil and Hazardous Material Cargoes

Source: CGD 78-180, 49 FR 11172, Mar. 26, 1984, unless otherwise noted.

Sec. 156.200 Applicability.

This subpart applies to each vessel to be lightered and each service vessel engaged in a lightering operation in the marine environment beyond the baseline from which the territorial sea is measured when the oil or hazardous material lightered is destined for a port or place subject to the jurisdiction of the U.S. This subpart does not apply to lightering operations involving public vessels, or to the dedicated response vessels and vessels of opportunity in accordance with the National Contingency Plan (40 CFR parts 9 and 300) when conducting response activities. These rules are in addition to the rules of subpart A of this part, as well as the rules in the applicable sections of parts 151, 153, 155, 156, and 157 of this chapter.

[CGD 93-081, 60 FR 45017, Aug. 29, 1995]

Sec. 156.205 Definitions.

(a) In addition to the terms defined in this section, the

definitions in
Sec. 154.105 of this chapter apply to this subpart and to subpart C.

(b) As used in this subpart and subpart C:

Lightering or Lightering operation means the transfer of a cargo of oil or a hazardous material in bulk from one vessel to another, including all phases of the operation from the beginning of the mooring operation to the departure of the service vessel from the vessel to be lightered, except when that cargo is intended only for use as fuel or lubricant aboard the receiving vessel.

Marine environment means--

(1) The navigable waters of the United States;

(2) The waters of an area over which the United States asserts exclusive fishery management authority; and

(3) The waters superadjacent to the Outer Continental Shelf of the United States.

Service vessel means the vessel which receives a cargo of oil or a hazardous material from another vessel in a lightering operation.

Vessel to be lightered means the vessel which transports a cargo of oil or a hazardous material to a place within the marine environment for
transfer of that cargo to another vessel for further transport to a port
or place subject to the jurisdiction of the United States. The term ``vessel to be lightered'' does not include drilling rigs, or offshore supply vessels transferring cargo intended for use as fuel or lubricant aboard the receiving vessel.

Work includes any administrative duties associated with the vessel whether performed on board the vessel or onshore.

[CGD 78-180, 49 FR 11172, Mar. 26, 1984, as amended by CGD 86-034, 55 FR
36256, Sept. 4, 1990; CGD 90-052, 58 FR 48436, Sept. 15, 1993; CGD 93-081, 60 FR 45017, Aug. 29, 1995]

Sec. 156.210 General.

(a) No vessel may transfer oil or hazardous materials in a port or place subject to the jurisdiction of the United States, if the cargo has
been lightered from another vessel, unless:

(1) The regulations in this subpart have been complied with;

(2) Both the vessel to be lightered and service vessel have, on board, at the time of transfer, a valid Certificate of Inspection, Certificate of Compliance, or a Tank Vessel Examination Letter, as would
have been required under 46 U.S.C. 3710 or 3711, had the transfer taken place in a port or place subject to the jurisdiction of the United States; and

(3) The delivering and receiving vessels have on board at the time of transfer, evidence that each vessel is operating in compliance with section 311(j) of the Federal Water Pollution Control Act (33 U.S.C. 1321(j)) and applicable regulations issued under the authority of section 311(j) in the form of a Declaration of Inspection as required by
Sec. 156.150 and a vessel response plan if required under part 155 of this chapter.

Note: Under 46 U.S.C. 3715, the delivering and receiving vessels

must have on board at the time of transfer, a Certificate of Financial Responsibility that would be required if the transfer had taken place in
a location subject to the jurisdiction of the U.S. Regulations concerning Certificates of Financial Responsibility for vessels using the navigable waters of the U.S. are in part 130 of this chapter.

(4) The vessel to be lightered has on board, at the time of transfer, an International Oil Pollution Prevention (IOPP) Certificate or equivalent documentation of compliance with Annex I of the International Convention for the Prevention of Pollution from Ships, 1973, as modified by the Protocol of 1978 relating thereto (MARPOL 73/78), as would be required by Part 151 of this chapter for vessels in navigable waters of the United States. The IOPP Certificate or documentation of compliance shall be that prescribed by Secs. 151.19 and
151.21 of this chapter, and shall be effective under the same timetable as specified in Sec. 151.19.

(b) Lightering operations involving hazardous materials, other than oil, may be conducted only with the specific approval of the Commandant.
A request to lighter hazardous materials, other than oil, must be submitted to Commandant (G-M) prior to the planned beginning of lightering operations. The request must include the information described in Sec. 156.215(a) to the extent known, for the initial transfer, and the estimated frequency of subsequent lightering operations. After the entry into force of Annex II to

[[Page 439]]

MARPOL 73/78, vessels lightering hazardous materials shall carry an International Pollution Prevention Certificate for the Carriage of Noxious Liquid Substances in Bulk (1973), if required by Annex II to MARPOL 73/78, or equivalent documentation of compliance with the annex.

(c) In an emergency, the COTP, upon request, may authorize a deviation from any rule in this part if the COTP determines that its application will endanger persons, property, or the environment.

(d) On vessels conducting lightering operations in a designated lightering zone, a licensed individual or seaman may not work, except in
an emergency or a drill, more than 15 hours in any 24-hour period, or more than 36 hours in any 72-hour period, including the 24-hour and 72-hour periods prior to commencing lightering operations.

[CGD 78-180, 49 FR 11172, Mar. 29, 1984, as amended by CGD 88-052, 53 FR
25122, July 1, 1988; CGD 90-052, 58 FR 48436, Sept. 15, 1993; CGD 93-081, 60 FR 45017, Aug. 29, 1995]

Sec. 156.215 Pre-arrival notices.

(a) The master, owner or agent of each vessel to be lightered must give at least 24 hours advance notice to the Captain of the Port nearest
the lightering location or zone, prior to arrival in the lightering location or zone. This advance notice must include:

(1) The vessel's name, call sign or official number, and registry:

(2) The cargo type (if oil) or shipping name (if hazardous material)
and approximate amount on board;

(3) The number of transfers expected and the amount of cargo expected to be transferred during each transfer;

(4) The lightering location or zone to be used;

(5) The estimated time of arrival in the lightering location or zone;

(6) The estimated duration of transfer operations; and

(7) The name and destination of service vessel(s).

(b) In the event the estimated time of arrival in the lightering location or zone changes by more than six hours, the Master, owner or agent of each vessel to be lightered must advise the Captain of the Port
of this change as soon as possible.

(c) Where lightering is conducted as a result of collision, grounding, tank rupture or any similar emergency, immediate notice must be given to the Captain of the Port.

(d) In addition to the other requirements in this section, the master, owner, or agent of a vessel that requires a Tank Vessel Examination (TVE) or other special Coast Guard inspection in order to lighter in a designated lightering zone must request the TVE or other inspection from the cognizant Captain of the Port at least 72 hours prior to commencement of lightering operations.

[CGD 78-180, 49 FR 11172, Mar. 26, 1984, as amended by CGD 90-052, 58 FR
48437, Sept. 15, 1993; CGD 93-081, 60 FR 45017, Aug. 29, 1995]

Sec. 156.220 Reporting of incidents.

(a) An immediate report must be made to the nearest Captain of the Port, by the service vessel, if fire, explosion, collision, grounding or
any similar emergency, which poses a threat to the vessels involved, occurs during lightering.

(b) Any discharge of oil or hazardous material into the water shall be reported, by the service vessel, in accordance with the procedures specified in Sec. 151.15 of this chapter.

Sec. 156.225 Designation of lightering zones.

The District Commander is delegated the authority to designate lightering zones and their operating requirements, where they are necessary for safety or environmental protection. When a lightering zone
has been designated, lightering operations in a given geographic area may only be conducted within the designated lightering zone.

Sec. 156.230 Factors considered in designating lightering zones.

The following factors are considered in designating a lightering zone:

(a) The findings of the environmental analysis or, if prepared, the Environmental Impact Statement;

(b) The proximity of the zone to:

(1) Shipping lanes;

(2) Vessel traffic schemes or vessel separation systems;
(3) Anchorages;
(4) Fixed structures;
(5) Designated marine sanctuaries;
(6) Commercial and recreational fishing areas;
(7) Environmentally sensitive areas; and
(8) Designated units of the National Park System, National Wild and Scenic Rivers System, National Wilderness Preservation System, properties included on the National Register of Historic Places and National Registry of Natural Landmarks, and National Wildlife Refuge System.

(c) The traditional use of areas for lightering operations;

(d) The normal weather and sea conditions in the areas, and their effect on lightering operations, and the fate of possible cargo discharges;

(e) The depth of water and underwater obstructions that may adversely impact anchorages and clearance of vessels;

(f) Other relevant safety, environmental, or economic data.

# SUBMITTAL REGISTER
(ER 415 1-10)

CONTRACT NO.

TITLE AND LOCATION

CONTRACTOR

SPECIFICATION SECTION

| | | | | | TYPE OF SUBMITTAL | | | | | | | | | CLASSIFICATION | | | CONTRACTOR SCHEDULE DATES | | | CONTRACTOR ACTION | | | GOVERNMENT ACTION | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ACTIVITY NO | TRANSMITTAL NO. | ITEM NO | SPECIFICATION PARAGRAPH NUMBER | DESCRIPTION OF ITEM SUBMITTED | DATA | DRAWINGS | INSTRUCTIONS | SCHEDULES | STATEMENTS | REPORTS | CERTIFICATES | SAMPLES | RECORDS | INFORMATION ONLY | GOVERNMENT APPROVED | REVIEWER | SUBMIT | APPROVAL NEEDED BY | MATERIAL NEEDED BY | CODE | DATE | SUBMIT TO GOVERNMENT | CODE | DATE | REMARKS |
| a. | b. | c. | d. | e. | f. | g. | h. | i. | j. | k. | l. | m. | n. | o. | p. | q. | r. | s. | t. | u. | v. | w. | x. | y. | z. |

ENG FORM 4288-R, MAR 95 EDITION OF SEP 93 IS OBSOLETE. PAGE 1 OF____ PAGES (Proponent: CEMP-CE)

G011212

G01010 11212

# SUBMITTAL REGISTER
(ER 415 1-10)

CONTRACT NO.

TITLE AND LOCATION

CONTRACTOR

SPECIFICATION SECTION

| ACTIVITY NO | TRANSMITTAL NO. | ITEM NO | SPECIFICATION PARAGRAPH NUMBER | DESCRIPTION OF ITEM SUBMITTED | TYPE OF SUBMITTAL: DATA | DRAWINGS | INSTRUCTIONS | SCHEDULES | STATEMENTS | REPORTS | CERTIFICATES | SAMPLES | RECORDS | CLASSIFICATION: INFORMATION ONLY | GOVERNMENT APPROVED | REVIEWER | CONTRACTOR SCHEDULE DATES: SUBMIT | APPROVAL NEEDED BY | MATERIAL NEEDED BY | CONTRACTOR ACTION: CODE | DATE | SUBMIT TO GOVERNMENT | GOVERNMENT ACTION: CODE | DATE | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| a. | b. | c. | d. | e. | f. | g. | h. | i. | j. | k. | l. | m. | n. | o. | p. | q. | r. | s. | t. | u. | v. | w. | x. | y. | z. |

ENG FORM 4288-R, MAR 95 EDITION OF SEP 93 IS OBSOLETE. PAGE 1 OF____ PAGES (Proponent: CEMP-CE)

00900 ATT G

G011213

G01010 11213

U.S. Department of Transportation
Federal Aviation Administration

# ADVISORY CIRCULAR

Subject: PROPOSED CONSTRUCTION OR ALTERATION OF OBJECTS THAT MAY AFFECT THE NAVIGABLE AIRSPACE

Date: 3/1/00

AC No: 70/7460.2K

Initiated by: ATA-400

## 1. PURPOSE.

This Advisory Circular (AC) provides information to persons proposing to erect or alter an object that may affect the navigable airspace. The AC also explains the requirement to notify the Federal Aviation Administration (FAA) before construction begins and FAA's responsibility to respond to these notices in accordance with Title 14 Code of Federal Regulations (14 CFR) part 77, Objects Affecting Navigable Airspace. Additionally, the AC explains the process by which to petition the FAA's Administrator for discretionary review of the determinations issued by the FAA.

## 2. CANCELLATION.

AC 70/7460-2J, Proposed Construction or Alteration of Objects That May Affect the Navigable Airspace, dated 11/29/95, is cancelled.

## 3. BACKGROUND/AUTHORITY.

a. 49 U.S.C. Section 44718 mandates, in pertinent part, that "The Secretary of Transportation shall require a person to give adequate public notice...of the construction or alteration, establishment or extension, or the proposed construction, alteration, establishment, or expansion, of any structure...when the notice will promote:

(1) safety in air commerce, and

(2) the efficient use and preservation of the navigable airspace and of airport traffic capacity at public-use airports."

b. To this end, 14 CFR Part 77 was issued prescribing that notice shall be given to the Administrator of certain proposed construction or alteration.

## 4. EFFECTIVE DATE.

This advisory circular becomes effective March 1, 2000.

## 5. NOTICES.

**a. WHY IS NOTIFICATION REQUIRED?**

In administering 14 CFR Part 77, the FAA's prime objectives are to ensure the safe and efficient use of the navigable airspace. The FAA recognizes that there are varied demands for the use of airspace, both by aviation and nonaviation interests. When conflicts arise out of construction proposals, the FAA emphasizes the need for conserving the navigable airspace. Therefore, early notice of proposed construction or alteration provides the FAA the opportunity to:

(1) Recognize potential aeronautical hazards to minimize the adverse effects to aviation.

(2) Revise published data or issue a Notice to Airmen (NOTAM) to alert pilots to airspace or procedural changes made as a result of the structure.

(3) Recommend appropriate marking and lighting to make objects visible to pilots. Before filing FAA Form 7460-1, Notice of Proposed Construction or Alteration, construction sponsors should become knowledgeable in the different types of obstruction marking and lighting systems that meet FAA standards. Information about these systems can be obtained from the manufacturers. Proponents can then determine which system best meets their needs based on purchase, installation, and maintenance costs. The FAA will make every effort to accommodate the request.

(4) Depict obstacles on aeronautical charts for pilotage and safety.

**b. WHO MUST FILE NOTICE?**

Any person or an agent who intends to sponsor construction is required to submit notice to the Administrator if the proposed construction or alteration falls within any of the following categories:

(1) *Greater than 200 feet in height.* The proposed object would be more than 200 feet above ground level (AGL) at its location.

*NOTE-*
*See FIG 1 and FIG 2.*

U.S. Department
of Transportation
Federal Aviation
Administration

# ADVISORY CIRCULAR

AC 70/7460-2K

# Proposed Construction or Alteration of Objects that May Affect the Navigable Airspace



Effective: March 1, 2000

Prepared by the Air Traffic
Airspace Management Program




ATTACHMENT L (4 OF 4)

G011216

ATTACHMENT

| | | |
|---|---|---|
| Point 1 = | 40-46-36.8 | 73-51-20.8 |
| Point 2 = | 40-46-33.8 | 73-51-23.6 |
| Point 3 = | 40-46-27 | 73-51-15.2 |
| Point 4 = | 40-46-23.8 | 73-51-17.8 |
| Point 5 = | 40-46-20.5 | 73-51-11.3 |
| Point 6 = | 40-46-17.2 | 73-51-14 |
| Point 7 = | 40-46-03.5 | 73-51-01.5 |
| Point 8 = | 40-46-00.2 | 73-51-04 |

ATTACHMENT L (3 OF 4)

If you can comply with the above mentioned conditions p advise us at your earliest convenience. It will be necessa have a coordination meeting between the Army Corps, contractor, Port Authority and the FAA prior to commen operations.

Sincerely,

Robert P. Alexander
Robert P. Alexander
Airspace Specialist
System Management Branch

Attachments

ATTACHMENT L (2 OF 4)

U.S. Department of Transportation
Federal Aviation Administration

Fitzgerald Federal Building
John F. Kennedy International Airport
Jamaica, New York 11430

October 21, 1991

Mr. John Hartmann
Chief, Operations Division
Department of the Army
New York District Corps of Engineers
Jacob K. Javits Federal Building
New York, NY 10278-0090

Dear Mr. Hartmann:

We have reviewed your proposed maintenance dredging project of Flushing Bay and Creek, in the vicinity of Runway 13-31 at LaGuardia Airport, New York. The Federal Aviation Administration (FAA) has no objections to this proposal provided the following conditions are met:

ALLOWABLE HEIGHTS WITHIN THE CRITICAL AREA

height of 132 ft. AMSL (average mean sea level) would be permissible for dredging equipment starting at the northern end of the job site and extending south to a line described by points 1 and 2 (see attachment). Following line 1-2, a height of 55 ft. AMSL would be allowed to line 3-4. From line 3-4 to line 5-6, a height of 45 ft. AMSL is permissible. Following line 5-6, a height of 55 ft. AMSL is allowed to line 7-8. Following line 7-8, a height of 110 AMSL is allowed southward.

The dredge shall be remove from the critical area any when not operational.

2. OBSTRUCTION MARKING AND LIGHTING

The dredging equipment shall be obstruction marked and lighted in accordance with FAA Advisory Circular 70/7460-1H, chapters three, four, five and thirteen.

3. COORDINATION

Crane operations shall be coordinated with Mr. George Conners, Airport Operations Manager, (718-476-5072) for Notice to Airman (NOTAM) issuance prior to raising the crane. A telephone number to allow communications with the site shall be provided.

ATTACHMENT L (1 OF 4)

G011219

INSTRUCTIONS FOR COMPLETING FAA FORM 7460-1

*PLEASE TYPE or PRINT*

**ITEM #1.** Please include the name, address, and phone number of a personal contact point as well as the company name.

**#2.** Please include the name, address, and phone number of a personal contact point as well as the company name.

**#3.** New Construction would be a structure that has not yet been built.

.ation is a change to an existing structure such as the addition of a side mounted antenna, a change to the marking and lighting, a change to power and/or frequency, or a change to the height. The nature of the alternation shall be included in **ITEM #21** "Complete Description of Proposal".

Existing would be a correction to the latitude and/or longitude, a correction to the height, or if filing on an existing structure which has never been studied by the FAA. The reason for the notice shall be included in **ITEM #21** "Complete Description of Proposal".

**ITEM #4.** If Permanent, so indicate. If Temporary, such as a crane or drilling derrick, enter the estimated length of time the temporary structure will be up.

**ITEM #5.** Enter the date that construction is expected to start and the date that construction should be completed.

**ITEM #6.** Please indicate the type of structure. **DO NOT LEAVE BLANK.**

**ITEM #7.** In the event that obstruction marking and lighting is required, please indicate type desired. If no preference, check "other' and indicate "no preference'. **DO NOT LEAVE BLANK.** *NOTE: High intensity lighting shall be used only for structures over 500'AGL.* In the absence of high intensity lighting for structures over 500' AGL, marking is also required.

**ITEM #8.** If this is an existing tower that has been registered with the FCC, enter the FCC Antenna Structure Registration number here.

**ITEM #9.** and **#10.** Latitude and longitude must be geographic coordinates, accurate to within the nearest second or to the nearest hundredth of a second if known. Latitude and longitude derived solely from a **hand-held GPS instrument is NOT acceptable.** A hand-held GPS is only accurate to within 100 meters *(328 feet)* 95 per cent of the time. This data, when plotted, should match the site depiction submitted under **ITEM #20.**

**ITEM #11.** NAD 83 is preferred; however, latitude/longitude may be submitted in NAD 27. Also, in some geographic areas where NAD 27 and NAD 83 are not available other datums may be used. It is important to know which datum is used. **DO NOT LEAVE BLANK.**

**ITEM #12.** Enter the name of the nearest city/state to the site. If the structure is or will be in a city, enter the name of that city/state.

**ITEM#13.** Enter the full name of the nearest public-use (not private-use) airport (or heliport) or military airport (or heliport) to the site.

**ITEM #14.** Enter the distance **from** the airport or heliport listed in **#13 to the structure.**

**IT... #15.** Enter the direction **from** the airport or heliport listed **in #13 to the structure.**

**I... #16.** Enter the site elevation above mean sea level and expressed in **whole feet** rounded to the nearest foot (e.g. 17' 3" rounds to 17', 17'6" to 18'). This data should match the ground contour elevations for site depiction submitted under **ITEM #20.**

**I... #17.** Enter the total structure height **above ground level** in **whole feet** rounded to the **next highest foot** (e.g. 17'3" rounds to 18'). **The total structure height shall include anything mounted on top of the structure, such as antennas, obstruction lights, lightning rods, etc.**

**ITEM #18.** Enter the overall height above mean sea level and expressed in **whole feet.** This will be the total of **ITEM #16 + ITEM #17.**

**ITEM #19.** If an FAA aeronautical study was previously conducted, enter the previous study number.

**ITEM #20.** Enter the relationship of the structure to roads, airports, prominent terrain, existing structures, etc. Attach an 8-1/2" X 11" non-reduced copy of the appropriate 7.5 minute U.S. Geological Survey (USGS) Quadrangle Map MARKED WITH A PRECISE INDICATION OF THE SITE LOCATION. To obtain maps, Contact USGC at 1-800-435-7627 or via Internet at "http://mapping.usgs.gov". If available, attach a copy of a documented site survey with the surveyor's certification stating the amount of vertical and horizontal accuracy in feet.

**ITEM #21.**

- For transmitting stations, include maximum effective radiated power (ERP) and all frequencies.
- For antennas, include the type of antenna and center of radiation *(Attach the antenna pattern, if available).*
- For microwave, include azimuth relative to true north.
- For overhead wires or transmission lines, include size and configuration of wires and their supporting structures *(Attach depiction).*
- For **each** pole/support, include coordinates, site elevation, and structure height above ground level or water.
- For buildings, include site orientation, coordinates of **each** corner, dimensions, and construction materials,
- For alterations, explain the alteration thoroughly,
- For existing structures, thoroughly explain the reason for notifying the FAA *(e.g. corrections, no record of previous study, etc.).*

---

**Filing this information with the FAA does not relieve the sponsor of this construction or alteration from complying with any other federal state or local rules or regulations. If you are not sure what other rules or regulations apply to your proposal, contact local/state aviation and zoning authorities.**

---

Please Type or Print on This Form

Form Approved OMB No. 2120-0001

Failure ovide All Requested Information May Delay Pr ing of Your Notice

FOR FAA USE ONLY
Aeronautical Study Number
- - -

U.S. Department of Transportation
Federal Aviation Administration

# Notice of Proposed Construction or Alteration

onsor (person, company, etc. proposing this action) :
of: ______
e: ______
Address: ______
City: ______ State: ______ Zip: ______
Telephone: ______ Fax: ______

2. Sponsor's Representative (if other than #1) :
Attn. of: ______
Name: ______
Address: ______
City: ______ State: ______ Zip: ______
Telephone: ______ Fax: ______

3. Notice of: ☐ New Construction ☐ Alteration ☐ Existing

4. Duration: ☐ Permanent ☐ Temporary ( months, days)

5. Work Schedule: Beginning ______ End ______

6. Type: ☐ Antenna Tower ☐ Crane ☐ Building ☐ Power Line ☐ Landfill ☐ Water Tank ☐ Other ______

7. Marking/Painting and/or Lighting Preferred:
☐ Red Lights and Paint
☐ Dual - Red and Medium Intensity White
☐ ite - Medium Intensity
☐ Dual - Red and High Intensity White
e - High Intensity
☐ Other ______

Antenna Structure Registration Number (if applicable):
______

9. Latitude: ______ ° ______ ' ______ . ______ "

10. Longitude: ______ ° ______ ' ______ . ______ "

11. Datum: ☐ NAD 83 ☐ NAD 27 ☐ Other ______

12. Nearest: City: ______ State: ______

13. Nearest Public-use (not private-use) or Military Airport or Heliport:
______

14. Distance from #13. to Structure: ______

15. Direction from #13. to Structure: ______

16. Site Elevation (AMSL): ______ ft.

17. Total Structure Height (AGL): ______ ft.

18. Overall height (#16. + #17.) (AMSL): ______ ft.

19. Previous FAA Aeronautical Study Number (if applicable):
______ - OE

20. Description of Location: (Attach a USGS 7.5 minute Quadrangle Map with the precise site marked and any certified survey.)

21. Complete Description of Proposal:

| Frequency/Power (kW) | |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Notice is required by 14 Code of Federal Regulations, part 77 pursuant to 49 U.S.C., Section 44718. Persons who knowingly and willingly violate the notice requirements of part 77 are subject to a civil penalty of $1,000 per day until the notice is received, pursuant to 49 U.S.C., section 46301 (a).

I h certify that all of the above statements made by me are true, complete, and correct to the best of my knowledge. In addition, I agree t m /or light the structure in accordance with established marking and lighting standards as necessary.

| D | Typed or Printed name and Title of Person Filing Notice | Signature |
|---|---|---|
| | | |



G011221

G01010 11221

## §77.13 Construction or alteration req' 'g notice.

(a) Except as provided in §77.15, each sponsor who , oposes any of the following constructic., or alteration shall notify the Administrator in the form and manner presc'ibed in §77.17:

y construction or alteration of more than 200 feet in height above the g' vel at its site.

\ny construction or alteration of greater height than an imaginary surface .ing outward and upward at one of the following slopes:

(i) 100 to 1 for a horizontal distance of 20,000 feet from the nearest point of the nearest runway of each airport specified in paragraph (a) (5) of this section with at least one runway more than 3,200 feet in actual length, excluding heliports.

(ii) 50 to 1 for a horizontal distance of 10,000 feet from the nearest point of the nearest runway of each airport specified in paragraph (a) (5) of this section with its longest runway no more than 3,200 feet in actual length, excluding heliports.

(iii) 25 to 1 for a horizontal distance of 5,000 feet from the nearest point of the nearest landing and takeoff area of each heliport specified in paragraph (a) (5) of this section.

(3) Any highway, railroad, or other traverse way for mobile objects, of a height which, if adjusted upward 17 feet for an Interstate Highway that is part of the National System of Military and Interstate Highways where overcrossings are designed for a minimum of 17 feet vertical distance, 15 feet for any other public roadway, 10 feet or the height of the highest mobile object that would normally traverse the road, whichever is greater, for a private road, 23 feet for a railroad, and for a waterway or any other traverse way not previously mentioned, an amount equal to the height of the highest mobile object that would normally traverse it, would exceed a standard of paragraph (a) (1) or (2) of this section.

(4) When requested by the FAA, any construction or alteration that would be in an instrument approach area (defined in the FAA standards governing instrument approach procedures) and available information indicates it might exceed a standard of Subpart C of this part.

(5) Any construction or alteration on any of the following airports (including heliports):

(i) An airport that is available for public use and is listed in the Airport Directory of the current Airman's Information Manual or in either the Alaska or Pacific Airman's Guide and Chart Supplement.

(ii) An airport under construction, that is the subject of a notice or proposal on file e Federal Aviation Administration, and except for military airports, is .ndicated that that airport will be available for public use.

ı airport that is operated by an armed force of the United States.

(b, . sponsor who proposes construction or alteration that is the subject of a notice under paragraph (a) of this section and is advised by an FAA regional office that a supplemental notice is required shall submit that notice on a prescribed form to be received by the FAA regional office at least 48 hours before the start of construction or alteration.

(c) Each sponsor who undertakes construction or alteration that is the subject of a notice under paragraph (a) of this section shall, within 5 days after that construction or alteration reaches its greatest height, submit a supplemental notice on a prescribed form to the FAA regional office having jurisdiction over the region involved, if -

(1) The construction or alteration is more than 200 feet above the surface level of its site; or

(2) An FAA regional office advises him that submission of the form is required.

## §77.15 Construc' or alteration not requiring notice.

No person is required tu ..otify the Administrator for any of the following constru or alteration:

(a) Any object that would be shielded by existing structures of a permanent and substantial character or by natural terrain or topographic features of equal or gr height, and would be located in the congested area of a city, town, or settlemen where it is evident beyond all reasonable doubt that the structure so shielded w adversely affect safety in air navigation.

(b) Any antenna structure of 20 feet or less in height except one that would inc the height of another antenna structure.

(c) Any air navigation facility, airport visual approach or landing aid, aircraft arre device, or meteorological device, of a type approved by the Administrator, or an appropriate military service on military airports, the location and height of which fixed by its functional purpose.

(d) Any construction or alteration for which notice is required by any other FAA regulation.

## §77.17 Form and time of notice.

(a) Each person who is required to notify the Administrator under §77.13 (a) sha send one executed form set of FAA Form 7460-1, Notice of Proposed Constructi or Alteration, to the Manager, Air Traffic Division, FAA Regional Office having jurisdiction over the area within which the construction or alteration will be locate Copies of FAA Form 7460-1 may be obtained from the headquarters of the Fede Aviation Administration and the regional offices.

(b) The notice required under §77.13 (a) (1) through (4) must be submitted at lea 30 days before the earlier of the following dates -

(1) The date the proposed construction or alteration is to begin.

(2) The date an application for a construction permit is to be filed.

However, a notice relating to proposed construction or alteration that is subject t licensing requirements of the Federal Communications Act may be sent to the F/ at the same time the application for construction is filed with the Federal Communications Commission, or at any time before that filing.

(c) A proposed structure or an alteration to an existing structure that exceeds 2, feet in height above the ground will be presumed to be a hazard to air navigal and to result in an inefficient utilization of airspace and the applicant has the bur of overcoming that presumption. Each notice submitted under the pertin provisions of this part 77 proposing a structure in excess of 2,000 feet ab ground, or an alteration that will make an existing structure exceed that height, n contain a detailed showing, directed to meeting this burden. Only in exceptio cases, where the FAA concludes that a clear and compelling showing has be made that it would not result in an inefficient utilization of the airspace and wo not result in a hazard to air navigation, will a determination of no hazard be issue

(d) In the case of an emergency involving essential public services, public health public safety that requires immediate construction or alteration, the 30 requirement in paragraph (b) of this section does not apply and the notice may sent by telephone, telegraph, or other expeditious means, with an executed F. Form 7460-1 submitted within five (5) days thereafter. Outside normal busine hours, emergency notices by telephone or telegraph may be submitted to nearest FAA Flight Service Station.

(e) Each person who is required to notify the Administrator by paragraph (b) or of §77.13, or both, shall send an executed copy of FAA Form 7460-2, Notice Actual Construction or Alteration, to the Manager, Air Traffic Division, FAA Regio Office having jurisdiction over the area involved.

## ADDRESSES OF THE REGIONAL OFFICES

### Alaska Region
**AK**
Alaskan Regional Office
Air Traffic Division, AAL-530
222 West 7th Avenue
Anchorage, AK 99513
Tel: 907-271-5893

### Central Region
**IA, KS, MO, NE**
Central Regional Office
Air Traffic Division, ACE-520
501 East 12th Street
Kansas City, MO 64106
Tel: 816-426-3408 or 3409

### Eastern Region
**DC, DE, MD, NJ, NY, PA, VA, WV**
Eastern Regional Office
Air Traffic Division, AEA-520
JFK International Airport
Fitzgerald Federal Building
Jamaica, NY 11430
Tel: 718-553-2616

### Great Lakes Region
**IL, IN, MI, MN, ND, OH, SD, WI**
Great Lakes Regional Office
Air Traffic Division, AGL-520
2300 East Devon Avenue
Des Plaines, IL 60018
Tel: 847-294-7568

### New England Region
**CT, MA, ME, NH, RI, VT**
New England Regional Office
Air Traffic Division, ANE-520
12 New England Executive Park
Burlington, MA 01803-5299
Tel: 781-238-7520

### Northwest Mountain Region
**CO, ID, MT, OR, UT, WA, WY**
Northwest Mountain Regional Office
Air Traffic Division, ANM-520
1601 Lind Avenue, SW
Renton, WA 98055-4056
Tel: 425-227-2520

### Southern Region
**AL, FL, GA, KY, MS, NC, PR, SC, TN, VI**
Southern Regional Office
Air Traffic Division, ASO-520
1701 Columbia Avenue
College Park, GA 30337
Tel: 404-305-5585

### Southwest Region
**AR, LA, NM, OK, TX**
Southwest Regional Office
Air Traffic Division, ASW-520
2601 Meacham Boulevard
Fort Worth, TX 76137-0520

### Western Pacific Region
**HI, CA, NY, AZ, GU**
Western-Pacific Regional Office
Air Traffic Division, AWP-520
15000 Aviation Boulevard
Hawthorne, CA 90260
Tel: 310-725-6557

SENT BY:SAIC : 4-19- 0 ; 13:46 : NEWPORT, RI.→ 212-264-4260;# 2/ 2

# USACE TRANSPORTATION AND PLACEMENT LOG

Log Number: Date (yy:mm:dd)

**Project Information:**
Trip Number: Tow Owner:
Permit Number: Inspector's Name:
Project Name: Tug's Navigational Unit:

**Tug and Scow Information**
Tug Name: Scow Name/Number:
Tug Captain: Scowman's Name:

**Loading Information:**
Volume of Material (Cubic yds) Scow Draft Forward (ft)
Time Loading is Complete (hh:mm:ss): Scow Draft Aft (ft):
Description of Material: Percent Rock:

**Placement Site Weather Conditions:**
Wind Direction (from): Wind Speed (mph)
Weather Conditions:
Observed Water Depth (ft): Wave Swell Height (ft):
Visibility (n miles):
Marine Mammals/Sea Turtles Sighted (Yes/No)

**Transit/Placement Information:**
Time Scow Departed Dredge Site Tug Position Determined By (GPS/DGPS
Approximate Distance from Scow to Target at time of Discharge (f
Time Scow Arrives at Project Placement Area
Length of Towline at Time of Discharge (ft
Scow Heading (Degrees): Estimated Scow Speed (kts):
Distance from Tug Navigational Antenna to Tugs Towing Bit (ft
Direction of Scow Relative to Tugs Towing Bit (Degrees)

Start Time (DOORS OPEN
Tug Speed (kts):
Tug Heading (Degrees): GPS/DGPS: Latitud Longitude -

End Time (Placement is Complete)
Tug Speed (kts):
Tug Heading (Degrees): GPS/DGPS: Latitud Longitude -

Post Placement Time (DOORS CLOSED
Tug Speed (kts):
Tug Heading (Degrees): GPS/DGPS: Latitud Longitude -

Comments:

00900 ATT. J

## SUMMARY OF COSTS

| ITEMS | COST |
|---|---|
| **DIRECT PLANT OPERATING COSTS** | |
| UNIFORM DAILY RATE BASIS *(To be completed when submitting Status and Completion reports.)* | |
| CHARGES: ______ DAYS AT $ ______ PER DAY *(Item 19, ENG Form 22 (Costs)—adjusted to exclude plant increment cost.)* | |
| ►OR◄ | |
| ACTUAL PLANT COSTS *(To be completed when submitting Annual report.)* | |
| PAYROLLS *(gross)* ........ $ | |
| SUBSISTENCE & QUARTERS OR PER DIEM & MILEAGE ........ $ | |
| FUEL ______ BARRELS AT $ ______ PER BARREL ........ $ | |
| WATER ........ $ | |
| LUBRICANTS ........ $ | |
| PLANT OWNERSHIP COSTS *(as computed below)* ........ $ | |
| INSURANCE ........ $ | |
| ATTENDANT PLANT ........ $ | |
| MISCELLANEOUS ........ $ | |
| SUBTOTAL—UNIFORM DAILY RATE OR ACTUAL COSTS ........ | $ |
| SUBTOTAL—PLANT UNIT COST $ ______ PER CUBIC YARD. | |
| **SHORE WORK** | |
| SUBTOTAL—SHORE WORK COSTS ........ | $ |
| SUBTOTAL—SHORE WORK UNIT COSTS $ ______ PER CUBIC YARD. | |
| **OTHER COSTS** | |
| SURVEYS ........ $ | |
| INSPECTION AND SUPERVISION ........ $ | |
| OVERHEAD ........ $ | |
| OTHER INDIRECT COSTS ........ $ | |
| SUBTOTAL—OTHER COSTS ........ | $ |
| SUBTOTAL—OTHER UNIT COST $ ______ PER CUBIC YARD. | |
| **GRAND TOTAL—ALL COSTS** ........ | $ |
| **GRAND TOTAL—ALL UNIT COSTS** $ ______ **PER CUBIC YARD.** | |

### OPERATING SUPPLIES

| COMMODITIES | CONSUMED | | INVENTORY | |
|---|---|---|---|---|
| | UNIT | QUANTITY | QUANTITY | VALUE |
| FUEL *(oil)* | BBLS | | | |
| LUBRICANT *(oil)* | GAL | | | |
| LUBRICANT *(grease)* | LBS | | | |
| WATER | GAL | | | |
| | | | | |
| | | | | |
| SUBSISTENCE SUPPLIES ........ | | | | |
| MISCELLANEOUS SUPPLIES ........ | | | | |
| **TOTAL** ........ | | | | $ |

### ANNUAL REPORT DATA

*(complete when submitting Annual report)*

| | |
|---|---|
| COST PER RENTAL MINUTE *(Based on total operating cost)* ..... | $ ______ per min. |
| TOTAL COST OF PLANT *(End of F.Y. reporting period)* ..... | $ |
| BOOK VALUE *(End of F.Y. reporting period)* ..... | $ |
| BALANCE IN PLANT ACCOUNT *(End of F.Y. reporting period)* ..... | $ |
| PLANT OWNERSHIP COSTS *(Actual for F.Y. reporting period):* | |
| DEPRECIATION ........ | $ |
| REPAIRS *(Adjusted)* ........ | $ |
| CESSATION OF WORK ........ | $ |
| SMALL TOOLS, ETC. ........ | $ |
| **TOTAL** ........ | $ |

REMARKS

| SUBMITTED BY *(Name, title, and signature)* | RECOMMENDED BY *(Name, title, and signature)* | APPROVED BY *(Name, title, and signature)* |
|---|---|---|
| | | |

☆U.S. G.P.O. 1980—620-849/572

# REPORT OF OPERATIONS—PIPELINE, DIPPER OR BUCKET DREDGES

REPORTS CONTROL SYMBOL ENGCW-0-13

| THRU: | TO: | FROM: | REPORT NO. |
|---|---|---|---|

| | | |
|---|---|---|
| CHARACTER OF REPORT | ☐ MAINTENANCE ☐ NEW WORK ☐ DAILY ☐ STATUS ☐ COMPLETION ☐ ANNUAL | DATE OR PERIOD |
| DREDGE | NAME AND TYPE; SIZE: PIPELINE (in. dia. disch.); DIPPER OR BUCKET (cu. yds. cap.) | |
| | HORSEPOWER OF: DREDGE PUMP; SUCTION PIPE JET; CUTTER OR SUCKET; PROPULSION | |
| | NUMBER OF CREW MEMBERS: DREDGE; SHORE; OTHER PLANT; TOTAL; WORK SCHEDULE: SHIFTS PER DAY; DAYS PER WEEK | |
| PROJECT AND BAR | NAME; AUTH DIMENSIONS: WIDTH; DEPTH; OVERDEPTH | |
| | LOCATION (include station numbers) | |
| CHARACTER OF MATERIAL | ABSOLUTE DENSITY GMS/liter; IN PLACE DENSITY GMS/liter; VOIDS RATIO | |
| | GRAIN SIZE D.. MM D.. MM D.. MM; GEOLOGICAL CLASSIFICATION | |
| CONTRACT OR DREDGING ORDER | NUMBER; ☐ CONTRACTOR ☐ HIRED LABOR | TOTAL NO. OF DAYS ON WHICH WORK WAS DONE |
| CHANNEL CONDITION | AVERAGE DEPTH: BEFORE DREDGING; AFTER DREDGING; MINIMUM SOUNDING: BEFORE DREDGING; AFTER DREDGING | |
| RIVER STAGE | MINIMUM; TIME; MAXIMUM; TIME; GAGE LOCATION | |
| WEATHER CONDITION | (clear, cloudy, rain, snow, and fog); VISIBILITY miles; WIND (maximum velocity & direction) | |

## WORK PERFORMED

| ITEM | UNIT | QUANTITY |
|---|---|---|
| AVERAGE WIDTH OF CUT | FEET | |
| TOTAL ADVANCE THIS PERIOD | FEET | |
| TOTAL ADV. PREVIOUS TO THIS PERIOD | FEET | |
| TOTAL ADVANCE TO DATE | FEET | |
| FLOATING PIPE: SHORE PIPE: | | |
| TOTAL LENGTH OF DISCHARGE PIPE | FEET | |
| AVERAGE LIFT | FEET | |
| AVERAGE PUMP SPEED | R.P.M. | |
| AVG. DREDGED PER PUMP. HR, GROSS | CU.YDS. | |
| SCOWS LOADED | NUMBER | |
| AVERAGE LOAD PER SCOW | CU.YDS. | |

## CUBIC YARDS REMOVED

| | |
|---|---|
| AMOUNT DREDGED THIS PERIOD: (1) GROSS (computed amount) | |
| (2) CREDITED (pay place) | |
| AMOUNT PREVIOUSLY REPORTED: (1) GROSS (computed amount) | |
| (2) CREDITED (pay place) | |
| TOTAL AMOUNT DREDGED TO DATE: (1) GROSS (computed amount) | |
| (2) CREDITED (pay place) | |

## ATTENDANT PLANT

| ITEM | NAME OR NUMBER | HOURS |
|---|---|---|
| | | |

| | | |
|---|---|---|
| NUMBER OF INSPECTIONS | BY DISTRICT PERSONNEL | BY DIV & OCE PERSONNEL |
| CONTRACT USE ONLY | HAS ANYTHING DEVELOPED WHICH MIGHT LEAD TO A CHANGE ORDER OR CLAIM? ☐ NO ☐ YES (If "YES", explain under remarks on back) | |

## DISTRIBUTION OF TIME

| EFFECTIVE WORKING TIME (chargeable to cost of work) | HOURS | MIN. |
|---|---|---|
| PUMPING OR DREDGING | | |
| PCT. OF EFFECTIVE RENTAL TIME % | | |
| BOOSTER (in line) Hrs. Min. | | |
| **NON-EFFECTIVE WORKING TIME (chargeable to cost of work)** | | |
| HANDLING PIPE LINES | | |
| HANDLING ANCHOR LINES | | |
| CLEARING PUMP AND PIPE LINE | | |
| CLEARING CUTTER OR SUCTION HEAD | | |
| WAITING FOR SCOWS | | |
| TO AND FROM WHARF OR ANCHORAGE | | |
| CHANGING LOCATION OF PLANT ON JOB | | |
| LOSS DUE TO OPPOSING NATURAL ELEMENTS | | |
| LOSS DUE TO PASSING VESSELS | | |
| SHORE LINE AND SHORE WORK | | |
| WAITING FOR BOOSTER | | |
| MINOR OPER. REPAIRS (explain in remarks) | | |
| WAITING FOR ATTENDANT PLANT | | |
| PREPARATION AND MAKING UP TOW | | |
| TRANSFERRING PLANT BETWEEN WORKS | | |
| LAY TIME OFF SHIFT AND SATURDAYS | | |
| SUNDAYS AND HOLIDAYS | | |
| FIRE DRILL | | |
| MISCELLANEOUS (explain in remarks) | | |
| TOTAL NON-EFFECTIVE WORKING TIME | | |
| PCT. OF NON-EFFECTIVE RENTAL TIME % | | |
| **TOTAL EFFECTIVE AND NON-EFFECTIVE TIME (chargeable to cost of work)** | | |
| PCT. OF TOTAL TIME IN PERIOD % | | |
| **LOST TIME (not chargeable to cost of work)** | | |
| MAJOR REPAIRS AND ALTERATIONS | | |
| CESSATION | | |
| COLLISIONS | | |
| MISCELLANEOUS (explain in remarks) | | |
| TOTAL LOST TIME | | |
| PERCENTAGE OF TOTAL TIME % | | |
| **TOTAL TIME IN PERIOD** | | |

ENG FORM 4267 JAN 70 — REPLACES ENG FORM 28 (Cont.), 1 MAR 52, AND ENG FORM 29 (Cont.), 1 JAN 62, WHICH ARE OBSOLETE. (ER1125-2-304) (Signature and Remarks required on reverse side.)

00900 ATT. I-1

G011225

G01010 11225

# APPENDIX B

## EMERGENCY OPERATIONS

1. During emergency operations and recovery assistance activities it is extremely important that safety and health requirements are implemented. Personnel often perform unusual, difficult, hazardous tasks while in a challenging environment, and these conditions increase the risk of accident. Additionally, resources are in short supply, and the loss of any resource to an accident indicates poor management. Safety and occupational health of Corps of Engineers employees, contractors, and members of the public exposed to Corps activities will be a primary concern during all Corps emergency operations and recovery assistance. Safety and Occupational Health Offices shall provide the necessary input to their Emergency Management counterparts to ensure that planning for safety and health concerns (including risk and hazard analysis) is addressed prior to, during, and following disasters and disaster response.

2. Safety and occupational health program requirements shall be included in all Government and contract operations. Federal Acquisition Clause 52.236-13, Accident Prevention, shall be included in contracts and MOAs/MOUs for emergency operations and recovery assistance.

3. Initial response. A qualified safety and health professional shall be immediately alerted of the disaster and shall be included in the planning and execution of response and recovery efforts. This individual shall assess safety and health issues and assure precautions are taken prior to deployment of personnel (items to consider include sanitation, drinking water, power supply, living quarters, driving conditions, environmental conditions, and health issues).

4. Staffing. Safety and Occupational Health Offices in the Geographic District experiencing the disaster will be temporarily staffed with additional safety, industrial hygiene, and medical

b. emergency response plans:
- procedures and tests (01.E.01)
- spill plans (01.E.01, 06.A.02)
- firefighting plan (01.E.01, 19.A.04)
- posting of emergency telephone numbers (01.E.04)
- wildfire prevention plan (09.K.01)
- man overboard/abandon ship (19.A.04)

c. layout plans (04.A.01);
d. respiratory protection plan (05.E.01);
e. health hazard control program (06.A.02);
f. lead abatement plan (06.B.05 & specifications);
g. asbestos abatement plan (06.B.05 & specifications);
h. abrasive blasting (06.H.01);
i. confined space (06.I);
j. hazardous energy control plan (12.A.07);
k. critical lift procedures (16.C.17);
l. contingency plan for severe weather (19.A.03);
m. access and haul road plan (22.I.10);
n. demolition plan (engineering and asbestos surveys) (23.A.01);
o. emergency rescue (tunneling) (26.A.05);
p. underground construction fire prevention and protection plan (26.D.01)
q. compressed air plan (26.I.01)
r. formwork and shoring erection and removal plans (27.B.02)
s. lift slab plans (27.D.01)
t. SHP and SSHP (for HTRW work an SSHP must be submitted and shall contain all information required by the accident prevention plan - two documents are not required (28.B.01);
u. blasting plan (29.A.01);
v. diving plan (30.A.13);
w. plan for prevention of alcohol and drug abuse (Defense Federal Acquisition Regulation Supplement Subpart 252.223-7004, Drug-Free Work Force);

13. The contractor shall provide information on how they will meet the requirements of major sections of EM 385-1-1 in the





accident prevention plan. Particular attention shall be paid to excavations, scaffolding, medical and first aid requirements, sanitation, personal protective equipment, fire prevention, machinery and mechanized equipment, electrical safety, public safety requirements, and chemical, physical agent, and biological occupational exposure prevention requirements. Detailed site specific hazards and controls shall be provided in the activity hazard analysis for each phase of the operation.

as EMR, OSHA 200 Forms, corporate safety trend analyses);
f. listing of phases of work and hazardous activities requiring activity hazards analyses.

3. STATEMENT OF SAFETY AND HEALTH POLICY. (In addition to the corporate policy statement, a copy of the corporate safety program may provide a significant portion of the information required by the accident prevention plan.)

4. RESPONSIBILITIES AND LINES OF AUTHORITIES.
a. Identification and accountability of personnel responsible for safety - at both corporate and project level (contracts specifically requiring safety or industrial hygiene personnel should include a copy of their resume - the District Safety and Occupational Health Office will review the qualifications for acceptance).
b. Lines of authority

5. SUBCONTRACTORS AND SUPPLIERS. Provide the following:
a. identification of subcontractors and suppliers (if known);
b. means for controlling and coordinating subcontractors and suppliers;
c. safety responsibilities of subcontractors and suppliers.

6. TRAINING.
a. List subjects to be discussed with employees in safety indoctrination.
b. List mandatory training and certifications which are applicable to this project (e. g., explosive actuated tools, confined space entry, crane operator, diver, vehicle operator, HAZWOPER training and certification, personal protective equipment) and any requirements for periodic retraining/recertification.
c. Identify requirements for emergency response training.
d. Outline requirements (who attends, when given, who will conduct etc.) for supervisory and employee safety meetings.





7. SAFETY AND HEALTH INSPECTIONS. Provide details on:
a. who will conduct safety inspections (e.g., project manager, safety professional, QC, supervisors, employees, etc.), when inspections will be conducted, how the inspections will be recorded, deficiency tracking system, follow-up procedures, etc;
b. any external inspections/certifications which may be required (e.g., Coast Guard).

8. SAFETY AND HEALTH EXPECTATIONS, INCENTIVE PROGRAMS, AND COMPLIANCE.
a. The company's written safety program goals, objectives, and accident experience goals for this contract should be provided.
b. A brief description of the company's safety incentive programs (if any) should be provided.
c. Policies and procedures regarding noncompliance with safety requirements (to include disciplinary actions for violation of safety requirements) should be identified.
d. Provide written company procedures for holding managers and supervisors accountable for safety.

9. ACCIDENT REPORTING. The contractor shall identify who shall complete the following, how, and when:
a. exposure data (man-hours worked);
b. accident investigations, reports and logs;
c. immediate notification of major accidents.

10. MEDICAL SUPPORT. Outline on-site medical support and off-site medical arrangements.

11. PERSONAL PROTECTIVE EQUIPMENT. Outline procedures (who, when, how) for conducting hazard assessments and written certifications for use of personal protective equipment.

12. PLANS (PROGRAMS, PROCEDURES) REQUIRED BY THE SAFETY MANUAL (as applicable).
a. hazard communication program (01.B.04);

Landing area: (1) the primary surfaces, comprising the surface of the runway, runway shoulders, and lateral safety zones, (2) the "clear zone" beyond the ends of each runway (i.e., the extension of the primary surface), (3) all taxiways, and the lateral clearance zones along each side for the length of the taxiways), and (4) all aircraft parking aprons plus the area extending beyond each edge all around the aprons.

Safety precaution area: those portions of approach-departure clearance zones and transitional zones where placement of objects incident to contract performance might result in vertical projections at or above the approach-departure clearance, or the transitional surface.

Transitional surface: a sideways extension of all primary surfaces, clear zones, and approach-departure clearance surfaces along inclined planes.

Transitional zone: the ground area under the transitional surface (and adjoining the primary surface, clear zone, and approach-departure clearance zone).





## APPENDIX A

## MINIMUM BASIC OUTLINE FOR ACCIDENT PREVENTION PLAN

An accident prevention plan is, in essence, a safety and health policy and program document. The following areas are typically addressed in an accident prevention plan, but a plan shall be job-specific and shall also address any unusual or unique aspects of the project or activity for which it is written.
The accident prevention plan shall interface with the employer's overall safety and health program. Any portions of the overall safety and health program that are referenced in the accident prevention plan shall be included as appropriate.

1. SIGNATURE SHEET. Title, signature, and phone number of the following:
 a. plan preparer (corporate safety staff person, QC);
 b. plan approval, e.g., owner, company president, regional vice president (HTRW activities require approval of a Certified Industrial Hygienist (or qualified Industrial Hygiene personnel for in-house USACE activities; a Certified Safety Professional (or qualified USACE safety personnel for in-house work) may approve the plan for operations involving UST removal where contaminants are known to be petroleum, oils, or lubricants);
 c. plan concurrence (provide concurrence of other applicable corporate and project personnel (contractor)), e.g., Chief of Operations, Corporate Chief of Safety, Corporate Industrial Hygienist, project manager or superintendent, project safety professional, project QC.

2. BACKGROUND INFORMATION. List the following:
 a. contractor;
 b. contract number;
 c. project name;
 d. brief project description, description of work to be performed, and location (map);
 e. contractor accident experience (provide information such





G011229
G01010 11229

| | | |
|---|---|---|
| HYDRAULIC DREDGES: | | |
| Leverman | 26.95 | 6.20+a+b |
| Engineer; Derrick Operator | 23.64 | 6.20+a+b |
| Chief Mate | 23.29 | 6.20+a+b |
| Chief Welder | 23.94 | 6.20+a+b |
| Maintenance Engineer | 23.07 | 5.60+a+b |
| Electrician | 22.92 | 6.20+a+b |
| Welder Dredge | 22.70 | 5.60+a+b |
| Spider Barge Operator | 22.50 | 5.60+a+b |
| Mate | 21.51 | 5.60+a+b |
| Boat Master | 22.72 | 6.20+a+b |
| Boat Captain | 21.66 | 5.60+a+b |
| Steward | 21.49 | 6.20+a+b |
| Oiler | 18.18 | 5.00+a+b |
| Deckhand | 17.50 | 5.00+a+b |
| Tug Deckhand | 17.73 | 5.00+a+b |
| Shoreman | 17.50 | 5.00+a+b |
| Assistant Cook | 17.61 | 5.00+a+b |
| Night Cook | 17.61 | 5.00+a+b |
| Messman | 17.10 | 5.00+a+b |
| Janitor/Porter | 17.10 | 5.00+a+b |
| Fill Placer | 23.29 | 6.20+a+b |
| Assistant Fill Placer | 21.32 | 6.20+a+b |
| COMPANY LEAD DREDGEMAN: | | |
| Lead Dredgeman | 26.95 | 6.20+a+b |
| TUG BOATS over 1,000 H.P. (with Master or captain having license endorsed for 200 miles off shore): | | |
| Tug Master | 24.14 | 6.20+a+b |
| Tug Captain | 23.17 | 6.20+a+b |
| Tug Chief Engineer | 22.45 | 5.60+a+b |
| Tug Engineer | 21.99 | 5.60+a+b |
| Tug Deckhand | 17.73 | 5.00+a+b |
| TUG BOATS over 1,000 H.P. (without Master or captain having license endorsed for 200 miles off shore): | | |
| Tug Master | 22.72 | 6.20+a+b |
| Tug Captain | 21.66 | 5.60+a+b |
| Tug Engineer | 21.99 | 5.60+a+b |
| Tug Deckhand | 17.73 | 5.00+a+b |
| DRILL BOATS: | | |
| Engineer | 23.54 | 6.20+a+b |
| Blaster | 23.81 | 6.20+a+b |
| Driller | 23.55 | 6.20+a+b |
| Welder | 23.30 | 5.60+a+b |
| Machinist | 23.30 | 5.60+a+b |
| Tug Master | 20.48 | 6.20+a+b |
| Tug Captain | 19.53 | 5.60+a+b |
| Oiler | 20.46 | 5.00+a+b |
| Tug Deckhand | 15.97 | 5.00+a+b |
| Core Driller | 18.56 | 5.00+a+b |

**Solicitation DACW51-02-B-0001**
**Maintenance Dredging, Flushing Bay & Creek**
**Wage Rates**

**NY020001 - Dredging** (New York Statewide)
Modification 0
Publication Date: 3/01/02

## General Decision Number NY020001

General Decision Number NY020001 sg
Superseded General Decision No. NY010001

State: New York

Construction Type:
DREDGING

County(ies):
STATEWIDE

New York

All dredging, except self-propelled hopper dredges, on the Atlantic Coast and tributary waters emptying into the Atlantic Ocean.

| Modification Number | Publication Date |
|---|---|
| 0 | 03/01/2002 |

COUNTY(ies):
STATEWIDE

ENGI0025D 10/01/2001

| | Rates | Fringes |
|---|---|---|
| DIPPER & CLAMSHELL DREDGE: | | |
| Operator | 27.45 | 6.20+a+b |
| Engineer | 24.17 | 6.20+a+b |
| Maintenance Engineer | 23.07 | 5.60+a+b |
| Welder | 22.71 | 5.60+a+b |
| Mate | 21.51 | 5.60+a+b |
| Boat Master | 22.73 | 6.20+a+b |
| Boat Captain | 21.66 | 5.60+a+b |
| Oiler | 18.18 | 5.00+a+b |
| Deckhand; Tug Deckhand | 17.73 | 5.00+a+b |
| Scowman | 17.49 | 5.00+a+b |
| DRAG BUCKET DREDGE: | | |
| Operator | 25.09 | 6.20+a+b |
| Engineer | 21.41 | 6.20+a+b |
| Maintenance Engineer | 21.21 | 5.60+a+b |
| Mate | 19.82 | 5.60+a+b |
| Deckhand | 16.17 | 5.00+a+b |