the dredging.

c) A list of the names, locations, point of contact, and telephone number, for loading and unloading facilities for each disposal facility including current site capacity.

d) A detailed map indicating locations of loading and unloading facilities or area within the proposed property to be utilized, for each disposal location, with a description of the material handling process at each disposal location.

e) Hours of operation, transportation and operating procedures at unloading facilities.

f) Facilities information: Access to Unloading facilities, acceptable scow size, Disposal Site O&M manual, demurrage time to unload scow or trucks, anticipated processing time and placement materials, and other facility restrictions, if any.

g) A detailed description of the loading and transportation procedures to be utilized.

**b.** The Contractor will be required to commence operations under this contract within **five (5)** calendar days after the date of receipt by him of the notice to proceed, to prosecute said work diligently and to complete the basic contract work of approximately 45,000 CY ready for use not later than **twenty-two (22)** calendar days after the date of receipt by him of the notice to proceed. There are **sixteen (16)** options to the contract ranging from approximately **1,245** cubic yards to **42,470** cubic yards. The time for contract completion of each additional option will be determined by allowing a rate of **one (1)** calendar day for each **4,000** cubic yards removed. Options will range from **one (1)** calendar day to **eleven (11)** calendar days, if exercised. Should the total quantity of material to be paid for and actually removed under the contract exceed the limit established in the clause entitled "Variations in Estimated Quantities," additional time will be allowed at the rate of **one (1)** calendar day for each **4,000** cubic yards in excess of the established limit. The time stated for completion shall include final cleanup. (EFARS 52.2/9110 (a))

The work is estimated to cost between **$2,000,000.00 and $13,500,000.00.** The estimated volume to be dredged is 204,015 cubic yards including options, if exercised.

**c. THE CONTRACTOR IS REQUIRED TO COMPLY WITH THE FOLLOWING DREDGING/PLACEMENT RESTRICTIONS AND MONITORING REQUIREMENTS:**

1. DREDGING/PLACEMENT RESTRICTIONS IMPOSED BY THE NEW YORK STATE AND THE STATE OF NEW JERSEY WATER QUALITY CERTIFICATES (See Section 00900, Attachment D).

2. DREDGING/PLACEMENT RESTRICTIONS IMPOSED BY THE STATE REGULATORY AGENCY OF THE DISPOSAL SITE LOCATION WATER QUALITY CERTIFICATE AND ALL PERMITS OBTAINED OR NEEDED AS DESCRIBED IN THE SELECTED OFFERORS PROPOSAL.

**The contractor will be solely responsible for coordinating and complying with all the processing requirements of the identified disposal site. Dredging, dewatering and/or other processing (if any), transfer, transportation and material disposal shall be performed in accordance with applicable law and requirements of all associated permits and approvals and government authorities having jurisdiction.**

**2. PERFORMANCE OF WORK BY THE CONTRACTOR (APR 1984)**

The Contractor shall perform on the site, and with its own organization and equipment, work equivalent to at least forty (40) percent of the total amount of work to be performed under the contract. This percentage may be reduced by a supplemental agreement to this contract if, during performance of the work, the Contractor requests a reduction and the Contracting Officer and/or his Representative determines that the reduction would be to the advantage of the Government. (FAR 52.236-01)

**3. SUBMITTAL OF WORK TO BE PERFORMED BY THE CONTRACTOR**

The Contractor shall furnish the Contracting Officer and/or his Representative, within ten (10) days after award, items of work he will perform with his own forces and the estimated cost of

those items. The percentage of work that must be performed by the Contractor is stated in paragraph 2, entitled: "PERFORMANCE OF WORK BY THE CONTRACTOR."

**4. LIQUIDATED DAMAGES - CONSTRUCTION (SEPT 2000)**

a. If the Contractor fails to complete the work within the time specified in the contract, the Contractor shall pay liquidated damages to the Government in the amount of **$1,468.00** for each calendar day of delay until the work is completed or accepted.

b. If the Government terminates the Contractor's right to proceed, liquidated damages will continue to accrue until the work is completed. These liquidated damages are in addition to excess costs of repurchase under the Termination clause.

**5. CONTRACT DRAWINGS, MAPS AND SPECIFICATIONS (AUG 2000)**

(a.) The Government will provide to the Contractor, without charge, one set of contract drawings and specifications, except publications incorporated into the technical provisions by reference, in electronic or paper media as chosen by the Contracting Officer.

(b.) The Contractor shall-

(1) Check all drawings furnished immediately upon receipt;

(2) Compare all drawings and verify the figures before laying out the work;

(3) Promptly notify the Contracting Officer or Contracting Officer's Representative of any discrepancies;

(4) Be responsible for any errors that might have been avoided by complying with this paragraph (b); and

(5) Reproduce and print contract drawings and specifications as needed.

(c.) In general-

(1) Large-scale drawings shall govern small-scale drawings; and

(2) The Contractor shall follow figures marked on drawings in preference to scale measurements.

(d.) Omissions from the drawings or specifications or the misdescription of details of work which are manifestly necessary to carry out the intent of the drawings and specifications, or that are customarily performed, shall not relieve the Contractor from performing such omitted or misdescribed details of work. The Contractor shall perform such details as if fully and correctly set forth and described in the drawings and specifications.

(e.) The work shall conform to the following contract drawings and maps, all of which form a part of these specifications and are available in the office of the District Engineer, U.S. Army Corps of Engineers, New York District, 26 Federal Plaza, New York, N.Y. 10278-0090:

| CONTRACT DRAWING | DESCRIPTION |
|---|---|
| File Number 1225 (Sheets 1A, 1B and 1 - 18) | Maintenance Dredging and Disposition of Dredged Material from Arthur Kill Reach of the New York and New Jersey Channels |
| 1A | Index |
| 1B | General Location Map |
| 1-2 | Benchmark Descriptions, Channel Coordinates and Layout |
| 3-18 | Sounding Maps |
| 6 | Channel Cross Sections |

(f.) The Contractor shall check all drawings furnished him immediately upon their receipt and shall promptly notify the Contracting Officer or Contracting Officer's Representative of any discrepancies. Figures marked on drawings shall in general be followed in preference to scale measurements unless dimensions are specified. Large-scale drawings shall in general govern over small-scale drawings. Information and data provided in contract specifications shall govern over similar information and data specified in contract drawings. The Contractor shall compare all drawings and verify the

figures before laying out the work and will be responsible for any errors which might have thereby been avoided (DOD FAR Suppl. 52.236-7002).

**6. PHYSICAL CONDITIONS**

The information and data furnished or referred to below are not intended as representations or warranties but are furnished for information only. It is expressly understood that the Government will not be responsible for the accuracy thereof or for any deduction, interpretation or conclusion drawn by the Contractor.

a. WEATHER CONDITIONS. The site of the work is not exposed to severe wind and wave action and the Contractor's operations are not likely to be affected by ordinary storms. Real-time data are available on the World Wide Web at http://www.nws.fsu.edu/B/buoy?station=45N.

(1) Fog. An examination of the records of the U.S. Weather Bureau at Newark International Airport, New Jersey, discloses an average of 31 days per year on which dense fog (visibility of 1/4 mile or less) occurs in the New York Harbor area. The maximum number of days in which dense fog occurred in any year was 45 in 1959. The maximum number of days in which dense fog occurred in any month was 4 days in June.

Fog Information for 1999 from Port Series, based on Newark

| Month | Heavy Fog Days (visibility < 1.4 mile) |
|---|---|
| JAN | 2.1 |
| FEB | 1.6 |
| MAR | 1.4 |
| APR | 1.1 |
| MAY | 1.6 |
| JUN | 1.1 |
| JUL | 0.4 |
| AUG | 0.5 |
| SEP | 0.8 |
| OCT | 1.9 |
| NOV | 1.7 |
| DEC | 1.7 |

(2) Winds. Wind conditions for Newark International Airport, based on historical data maintained by the National Weather Service's National Buoy Center[1] (http://www.ndbc.noaa.gov/station_page.phtml?$station=44025) are as follows:

Wind conditions for Newark International Airport, based on 55 years of data.[1]

| Month | Average Wind Speed (MPH) | Peak One-Minute Wind Gust (MPH) |
|---|---|---|
| JAN | 11.2 | 52 |
| FEB | 11.5 | 46 |
| MAR | 11.9 | 45 |
| APR | 11.2 | 50 |
| MAY | 10 | 50 |
| JUN | 9.5 | 58 |
| JUL | 8.9 | 52 |
| AUG | 8.7 | 46 |
| SEP | 9 | 51 |
| OCT | 9.4 | 48 |
| NOV | 10.2 | 82 |
| DEC | 10.8 | 55 |

Weather conditions exceeding in severity the conditions described above or average wind speeds over 30 miles per hour (26 kts) will be considered unusually severe weather if delays are caused thereby to operations under the contract.

b. ICE. Icing within the project vicinity is not anticipated. However, in the event that icing does occur, this will be considered to be unusually severe weather.

c. TIDES. The mean range of tides, mean range of spring tides, and irregular fluctuations due to wind and atmospheric pressure for the dredging area are listed below:

1. Tides, Based on Woodbridge Creek, NJ, 0.8 n.mi. above entrance, from 2002 Tide Tables

| | |
|---|---|
| Mean Tide Level | 2.78 ft |
| Mean Range | 5.15 ft |

[1] Based on NDBC Buoy 44025, which is 33 nm south of Islip, NY.

| | |
|---|---|
| Spring Range | 6.18 ft |

2. Tides, Based on Rossville, Staten Island, NY, from 2002 Tide Tables

| | |
|---|---|
| Mean Tide Level | 2.89 ft |
| Mean Range | 5.22 ft |
| Spring Range | 6.26 ft |

3. Tides, Based on Carteret, NJ from 2002 Tide Tables

| | |
|---|---|
| Mean Tide Table | 2.80 ft |
| Mean Range | 5.10 ft |
| Spring Range | 6.20 ft |

4. Tides, Based on Chelsea, Staten Island, NY from 2002 Tide Tables

| | |
|---|---|
| Mean Tide Table | 2.70 ft |
| Mean Range | 5.00 ft |
| Spring Range | 6.00 ft |

5. Tides, Based on Rahway River, RR, Bridge from 2002 Tide Tables

| | |
|---|---|
| Mean Tide Table | 2.89 ft |
| Mean Range | 5.32 ft |
| Spring Range | 6.38 ft |

6. Tides, Based on Port Ivory, Howland Hook, NY from 2002 Tide Tables

| | |
|---|---|
| Mean Tide Table | 2.78 ft |
| Mean Range | 5.10 ft |
| Spring Range | 6.12 ft |

Irregular fluctuations due to wind and atmospheric pressure have varied from about 11.3 ft. above mean low water to about 3.4 feet below low water. (ref. River and Harbor Project Maps-New York District, Dept. of the Army, Sept. 30, 1986, page 63A.)

**Tidal Currents** based on Tottenville, Staten Island, NY from 2002 Tidal Current Tables

| | |
|---|---|
| Max. Flood | 1.0 kts |
| Max. Ebb | 1.1 kts |

**Tidal Currents** based on Tuffs Point-Smoking Point from 2002 Tidal Current Tables

| | | |
|---|---|---|
| Max. Flood | 1.2 | kts |
| Max Ebb | 1.2 | kts |

**Tidal Currents** based on Trembley Point Reach from 2002 Tidal Current Tables

| | | |
|---|---|---|
| Max. Flood | 0.9 | kts |
| Max Ebb | 0.8 | kts |

d. TRANSPORTATION FACILITIES. A controlling depth of at least 30 feet at mean low water is accessible to the project site. Highways that serve the localities are the Garden State Parkway, New Jersey Turnpike (I-95) from Linden, New Jersey to Perth Amboy, New Jersey and Highway 278 (I-278) and Highway 440 throughout Staten Island, NY.

e. BRIDGE AND UTILITY CROSSINGS. A search of the regulatory files within New York District, Corps of Engineers disclosed the existence of the following submarine pipelines and/or structures:

| **ITEM NO.** | **PERMIT NO.** | **DESCRIPTION** |
|---|---|---|
| 1 | 4129/5 (NYE 3) | Install a submarine oil pipeline, Arthur Kill, between Kreischerville, Staten Island, New York, and Port Reading, New Jersey. Permit issued to: Defense Plant Corporation, c/o War Emergency Pipelines, Inc., 70 Pine Street, New York, N.Y. All assets of D.P.C. in big and little inch pipe lines transferred and sold to Texas Eastern Transmission Corp. on 19 Nov 47 Shreveport, LA.<br><br>Date: 06/2/1943 |

| | | |
|---|---|---|
| 2 | 4705A | A temporary submarine pipe line on the natural bottom in Arthur Kill between Gulfport, Staten Island, New York, and Linden, Union County, New Jersey, is hereby revised to "to lay and maintain until 30 June 1955, two (2) temporary submarine pipe lines on the natural bottom in Arthur Kill, between Gulfport, Staten Island, New York, and Linden, Union County, New Jersey." Permit issued to The Arundel Corporation, Pier 3 Foot Fulton Street, Brooklyn 1, N.Y.<br><br>Date: 01/14/1955 |
| 3 | 4705 | To lay and maintain until 30 June 1955, a temporary submarine pipe line on the natural bottom, Arthur Kill, between Gulfport, Staten Island, New York, and Linden, Union County, New Jersey, and marked, 800.6 (Arthur Kill-Arundel Corp-Submerged Dredge Pipeline. Permit issued to: The Arundel Corporation, Pier 3, Foot Fulton Street, Brooklyn 1, N.Y.<br><br>Date: 10/29/1954 |
| 4 | 6863 | Install three (3) submarine pipelines not less than 52 feet below mean low water, Arthur Kill, between Linden, Union County, New Jersey and Staten Island, Richmond County, New York, and marked: 1507-24 (Arthur Kill - Colonial Pipeline Co. - Submarine Pipe line between Linden & Staten Island. Permit issued to: Colonial Pipeline Company, 3390 Peachtree Road, N.E., Atlanta, GA 30326<br><br>Date: 07/30/1964 |

| | | |
|---|---|---|
| 5 | 6890 | Richmond Creek, Arthur Kill, Richmond Avenue, Staten Island, New York, Brooklyn Union Gas Co. - Submarine pipeline in Richmond Creek. Permit issued to: Brooklyn Union Gas Company, 195 Montague Street, Brooklyn 1, New York.<br><br>Date: 09/18/1964 |
| 6 | | Install two (2) 30-inch-diameter steel submarine pipelines at a depth of forty-seven (47) feet below mean low water. Between Linden, Union County, N.J. and Staten Island, Richmond County, N.Y., - 285/70a (Arthur Kill - Texas Eastern Transmission Corp-2 Subm Gas Pipelines. Permit issued to: Texas Eastern Transmission Corporation, P. O. Box 1612, Shreveport, Louisiana.<br><br>Date: 08/03/1959 |
| 7 | 9402 | 16" petroleum product pipeline and placement of rip-rap over exposed sections of the pipe between Union County, N.J. & Richmond County, N.Y. Permit issued to: Texas Eastern Transmission Corporation, P. O. Box 1612, Shreveport, LA 71130<br><br>Date: 08/29/1975 |

| | | |
|---|---|---|
| 8 | | Install two (2) submarine pipelines not less than 52 feet below mean low water, - Arthur Kill, near the mouth of Piles Creek, between Linden, Union County, New Jersey, and Staten Island, Richmond County, New York, and marked 1507-24 (Arthur Kill - Long Island Pipe Line Corp. - Submarine Pipelines between Linden & Staten Island). Permit issued to: Long Island Pipe Line Corporation, 30 Rockefeller Plaza, New York, N.Y. 10020<br><br>Date: 07/30/1964 |
| 9 | 4127/5 (NYE 3) | Install two (2) submarine oil pipe lines, Arthur Kill and Piles Creek, between Linden, New Jersey, and Gulfport, Staten Island, New York, and file marked Permits 4127/2. Permit issued to: Defense Plant Corporation, c/o War Emergency Pipelines, Inc., 70 Pine Street, New York, N.Y. All assets of Defense Plant Corp. sold to Texas Eastern Transmission Corp., Shreveport, Louisiana on 19 Nov. 1947.<br><br>Date: 06/03/1943 |
| 10 | 180/111 | Relay your submarine oil pipe lines, across Arthur Kill, New York and New Jersey Channels, Linden, New Jersey, at a point 11.5 miles above the mouth, file marked U.S. Engineer Office, Second Dist., New York, Oct. 6, 1936, A.K. 180/105", perform the necessary dredging operations in connection therewith, and during such operations maintain five temporary pipe lines on the natural bottom of the existing channel. Permit issued to: Standard Oil Company of New Jersey, 26 Broadway, New York, N.Y.<br><br>Date: 10/31/1936 |

| | | |
|---|---|---|
| 11 | 2476 | Relocate nine (9) submarine cables in a trench, between Carteret, New Jersey and Travis, Staten Island, New York, and file marked 800.6 (A.K.-NJ Bell Tp Co.-Subm.Cables-Btwn S.I. & Carteret, NJ)2. Permit issued to: New Jersey Bell Telephone Company, 540 Broad Street, Newark 1, New Jersey.<br><br>Date: 04/25/1946 |
| 12 | | Install submarine pipe line on the natural bottom in Pikes Creek, Grasselli, NJ. Permit issued to:<br><br>Date: 07/1949 |
| 13 | Arthur Kill 166/15 | Lay five submarine telephone cables at Arthur Kill, N.Y. Elizabeth, N.J. Permit issued to New York Telephone Co., 15 Dey Street, New York City.<br><br>Date: 03/24/1924 |
| 14 | | Proposed submerged pipe across Arthur Kill, NY at Grasselli, NJ, counties of Union, Richmond, states of New Jersey and New York. Application by American Shipyard Company.<br><br>Date: 09/08/1964 |
| 15 | Arthur Kill 130/2 and 130/3 | Lay a submarine cable, at a depth of 27 feet below Arthur Kill, between Bayway, N.J. and Steep Point, N.Y. in the Baltimore & Ohio Railroad Bridge. Permit issued to: Staten Island Rapid Transit Co., 295 Broadway, New York, N.Y.<br><br>Date: 05/10/1917 |

| | | |
|---|---|---|
| 16 | Arthur Kill 179/3 | Lay one (1) 8-inch wrought steel pipe in a trench at a depth of not less than 40 feet below the plane of mean low water in the natural and dredged channels of Arthur Kill from a point about 1300 feet below or south of the mouth of Old Place Creek, Old Place, S.I., N.Y., to a point 300 feet south of or below the mouth of Morses Creek, Bayway, N.J., marked Arthur Kill 179/3. Permit issued to: The Tide-Water Pipe Company, Limited, 11 Broadway, New York.<br><br>Date: 05/29/1919 |
| 17 | | Install a temporary bridge to be removed entirely from the waterway. Staten Island, Borough of Richmond, New York, N.Y. Permit issued to: Island Corporation.<br><br>Date: 09/29/1960 |
| 18 | | Install burial cables over Piles Creek, Arthur Kill to Linden, Union County, NJ. Permit issued to: Public Service Electric & Gas.<br><br>Date: 07/02/1962 |
| 19 | 41 7 | Install eleven (11) submarine cables in a trench, Arthur Kill, between the Borough of Carteret, Middlesex County, New Jersey, and Travisville, Staten Island, New York, 800.6 (Arthur Kill-N.J. BELL Telephone Co-11 Subcables). Permit issued to: New Jersey Bell Telephone Company, 540 Broad Street, Newark 1, N.J.<br><br>Date: 11/21/1955 |

| | | |
|---|---|---|
| 20 | | Install a 30-inch diameter submarine gas pipe line five (5) feet below existing creek bottom at two (2) locations Piles Creek, City of Linden, Union County, New Jersey, and marked: 285/70a (Arthur Kill-Texas Eastern Transmission Corp-Sub'm Oil Pipe line). Permit issued to: Texas Eastern Transmission Corporation, P. O. Box 1612, Shreveport 94, Louisiana.<br><br>Date: 07/06/1959 |
| 21 | | Fill over the pipeline across Arthur Kill, between Woodbridge Township, Middlesex County, New Jersey and Kreischerville, Richmond County, Staten Island, New York. Permit issued to: Socony Mobil Oil Company, Inc., P. O. Box 989, Plainfield, N.J.<br><br>Date: 06/26/1959 |
| 22 | | Relocate the northerly end of 12-inch diameter submarine pipe line; Arthur Kill, between Woodbridge Township, Middlesex County, New Jersey, and Kreischerville, Richmond County, Staten Island, New York. Permit issued to: Socony Mobil Oil Company, Inc., 1024 South Avenue, Plainfield, N.J.<br><br>Date: 03/20/1958 |

| | | |
|---|---|---|
| 23 | 414 | Install a 12-inch diameter submarine pipe line, Arthur Kill, between Woodbridge Township, Middlesex County, New Jersey, and Kreischerville, Richmond County, Staten Island, N.Y., and marked 800.6 (Arthur Kill - Socony Mobile Oil Co., Inc. - Subm Pipe Line), subject to the following conditions. Permit issued to: Socony Mobil Oil Company, Inc., 26 Broadway, New York 4, N.Y.<br><br>Date: 05/25/1955 |
| 24 | 750 | Lay five submarine telephone cables of about 3½ inches diameter each on the bottom after the projected 30-foot channel is completed in Arthur Kill, N.Y. and N.J. at Elizabeth, N.J. from the foot of Marshall Street, City of Elizabeth, N.J., practically at right angles to the channel, to Howland Hook, Borough of Richmond, City of New York, Arthur Kill 166/15. Permit issued to: New York Telephone Co., 15 Dey Street, New York City.<br><br>Date: 03/14/1924 |

| | | |
|---|---|---|
| 25 | 9208 | Inspect and repair two known sections of its 12¾ inch diameter pipe. Additional areas requiring replacements may also be discovered during inspection. Existing pipeline supports will also be rehabilitated. The purpose is to avoid rupture of the pipeline in Arthur Kill at Staten Island, Richmond County, NY to Linden, Union County, NJ 1522-15 (Sohio Pipe Line Co.-Arthur Kill-repair of existing pipeline-between Staten Island, New York and Linden, New Jersey. Permit issued to: Sohio Pipe Line Company, P. O. Box 188, Vandalia, Ohio 45377.<br><br>Date: 04/10/1975 |
| 26 | 4073 | Install a 24-inch diameter submarine gas pipe line in a trench at a minimum depth of forty-seven (47) feet below mean low water between the United States Pierhead and Bulkhead Lines; in Arthur Kill, at a point approximately 1.2 miles south of Goethals Bridge between Linden, New Jersey, and Gulfport, Staten Island, New York, and marked 800.6 (Arthur Kill-Transcontinental Gas Pipe Line Corp.-24" gas pipe line). Permit issued to: Transcontinental Gas Pipe Line Corporation, 2100 Niels Esperson Building, Houston 2, Texas.<br><br>Date: 07/06/1951 |

| | | |
|---|---|---|
| 27 | 4651 | Install two (2) temporary submarine cables; across Arthur Kill, between the Borough of Carteret, Middlesex County, New Jersey, and Travis, Staten Island, New York, and marked: 800-6 (Arthur Kill, N.J.-Bell Telephone Co. Subm. Cable). Permit issued to: New Jersey Bell Telephone Company, 540 Broad Street, Newark 1, N.J.<br><br>Date: 07/22/1954 |
| 28 | 351 | Lay a submarine cable at a depth of 27 feet below mean low water in Arthur Kill, between Bayway, N.J. and Steep Point, S.I., under the draw of the Baltimore & Ohio Railroad Bridge marked Arthur Kill 130/2 and 130/3. Permit issued to: Staten Island Rapid Transit Co., 295 Broadway, New York, N. Y.<br><br>Date: 05/10/1917 |
| 29 | | Replace an existing 12-inch pipe line with a 16-inch, in Arthur Kill, between Linden, N.J. and Gulfport, Staten Island, N.Y., and titled "Proposed Replacement Pipeline Crossing of Arthur Kill at Piles Creek." Permit issued to: Texas Eastern Transmission Corporation, P. O. Box 1612, Shreveport 94, Louisiana.<br><br>Date: 06/09/1950 |

| | | |
|---|---|---|
| 30 | 8861 | Install four 10" submarine pipelines and to dredge approximately 30,000 cubic yards. Which is to be disposed of in accordance with condition in and across the Rahway River and Arthur Kill across the Federal Project Channel at Middlesex and Union Counties, New Jersey and Richmond County, New York in accordance with the plans and drawings attached hereto and marked 1522-15. Permit issued to: Northville Industries Corp., 425 Broad Hollow Road, Melville, New York 11746 |
| 31 | 4317 | Install a 12-inch diameter pipe line; in Arthur Kill, between Staten Island, New York, and Elizabeth, New Jersey, and marked 800.6 (Arthur Kill-Esso Standard Oil Co.-Pipe line). Permit issued to: Esso Standard Oil Company, 15 West 51st Street, New York 19, N.Y.<br><br>Date: 10/06/1952 |
| 32 | Arthur Kill 141/53 | Relay a section of submarine telephone cable in a trench at a depth of five (5) feet below the dredged bottom, in Arthur Kill, adjacent to the General American Tank and Storage Terminal, at Carteret, Middlesex County, New Jersey, in accordance with the plans shown on the drawing attached hereto and file marked Arthur Kill 141/51. Permit issued to: New Jersey Bell Telephone Company, 540 Broad Street, Newark, New Jersey.<br><br>Date: 11/7/1941 |

| | | |
|---|---|---|
| 33 | Arthur Kill 141/37 | Lay and maintain nine armored submarine telephone cables each about 3¾ inches in diameter in Arthur Kill or Staten Island Sound, N.Y. and N.J. between Carteret, N.J. and Linelenville, Borough of Richmond, City of New York, at a point about 900 feet northerly of the ferry slip at Carteret, N.J. Permit issued to: New York Telephone Company, 1060 Broad Street, Newark, N.J.<br><br>Date: 07/21/1927 |
| 34 | 2685 | Install a submarine oil pipe line in Arthur Kill and Piles Creek, between Linden, New Jersey and Gulfport, Staten Island, New York, 800.6 (A.K.-Defense Plant Op-halfport-Pipelines). Permit issued to: Defense Plant Corporation c/o War Emergency Pipelines, Inc., P.O. Box 271, Plainfield, New Jersey. All assets of Defense Plant Corp. sold to Texas Eastern Transmission Corp. Shreveport, Louisiana on 19 Nov. 1947 (See letter dated 27 Feb. 1948 from Ballard, Spahr, Andrews & Ingersoll.<br><br>Date: 3/2/1944 |
| 35 | 2879 | Install a 6-inch pipe line in a trench with top of pipe at a minimum depth of 42 feet below mean low water between channel lines, in Arthur Kill and Piles Creek, between Gulfport, Staten Island, New York, and the City of Linden, Union County, New Jersey. Permit issued to: The Tide-Water Pipe Company, Ltd., 54 Boylston Street, Bradford, PA.<br><br>Date: 9/24/1946 |

| | | |
|---|---|---|
| 36 | 5795 | Install two (2) 30-inch diameter steel submarine pipelines at a depth of forty-seven (47) feet below mean low water, in Arthur Kill, between Linden, Union County, N.J., and Staten Island, Richmond County, N.Y. Permit issued to: Texas Eastern Transmission Corporation, P. O. Box 1612, Shreveport, Louisiana<br><br>Date: 8/3/1959 |
| 37 | 6813 | Authorized by the Secretary of the Army to install a temporary submerged pipeline at a minimum depth of thirty-five (35) feet below mean low water in Arthur Kill, between Linden, New Jersey and Staten Island, New York, in accordance with the attached plans. Permit issued to: American Shipyard Company, 12 South Twelfth Street, Philadelphia, PA 19107.<br><br>Date: 9/15/1964 |
| 38 | 8875 | Install two power cables and one hose on the existing river bottom; under Arthur Kill, at the Outerbridge Crossing, Staten Island, N.Y., in accordance with the plans and drawings attached hereto and marked 1522-15 (Arthur Kill - Interstate Sanitation Commission - submarine cables and hose @ Outerbridge Crossing. Permit issued to: Interstate Sanitation Commission, 10 Columbus Circle, Room 1620, New York, New York 10019.<br><br>Date: 6/29/1973 |
| 39 | | Install two (2) temporary submarine cables across Arthur Kill, between the Borough of Carteret, Middlesex County, New Jersey and Travis, Staten Island, New York. Permit issued to: New Jersey Bell Telephone Company, 510 Broad Street, Newark 1, N.J. |

| | | |
|---|---|---|
| 40 | | Install a 24-inch diameter submarine gas pipe line in a trench at a minimum depth of forty-seven (47) feet below mean low water between the United States Pierhead and Bulkhead Lines, in Arthur Kill, at a point approximately 1.2 miles south of Goethals Bridge between Linden, New Jersey, and Gulfport, Staten Island, New York. Permit issued to: Transcontinental Gas Pipe Line Corporation, 2100 Niels Laperson Building, Houston 2, Texas.<br><br>Date: 07/06/1951 |
| 41 | 8861 | Install four 10" submarine pipelines and to dredge approximately 33,000 cubic yds. Which is to be disposed of in accordance with condition (as) in and across the Rahway River and Arthur Hill across the Federal Project Channel at Middlesex and Union Counties, New Jersey and Richmond County, New York in accordance with the plans and drawings attached hereto and marked 5522-15 (Arthur Kill and Rahway River - submarine Pipelines across Federal Channel - Northville Industries Corp.). Permit issued to: Northville Industries Corp., 425 Broad Hollow Road, Melville, New York 11746.<br><br>Date: 02/12/1973 |
| 42 | 2603A | Install two (2) submarine oil pipe lines in Arthur Kill between Kreischerville, Staten Island, New York and Port Reading, New Jersey. Permit issued to: Defense Plant Corporation, c/o War Emergency Pipeline, Inc., P. O. Box 271, Plainfield, New Jersey.<br><br>Date: 03/02/1944 |

| | | |
|---|---|---|
| 43 | Arthur Kill 180/111<br><br>180-1-114 | Relay your submarine oil pipe lines, across Arthur Kill, New York and New Jersey Channels, at Linden, New Jersey, at a point 11.5 miles above the mouth,U.S. Engineer Office, Second Dist., New York, Oct. 6, 1936, A.K. 180/105. Permit issued to: Standard Oil Company of New Jersey, 26 Broadway, New York, N.Y.<br><br>Date: 10/31/1936 |
| 44 | | Install a 6-inch pipe line in a trench with top of pipe at a minimum depth of 42 feet below mean low water between channel lines in Arthur Kill and Piles Creek, between Gulfport, Staten Island, New York, and the City of Linden, Union County, and file marked 800.6 (Arthur Kill-Tide-Water Pipe Co., Ltd.-Sub.Pipe Line). Permit issued to: The Tide-Water Pipe Company, Ltd., 54 Boylston Street, Bradford, PA.<br><br>Date: 09/24/1945 |
| 45 | | Dredge to a depth of twelve (12) feet below mean low water; the dredged material to be disposed of at an approved Government dumping ground under a permit to be obtained from the Supervisor of New York Harbor; in Arthur Kill, at Richmond County, Staten Island, N.Y., 1507-24 (Arthur Kill-Texas Eastern Cryogenic, Inc.-dredge @ Prall's Island). Permit issued to: Texas Eastern Cryogenic, Inc., P.O. Box 1612, Texas Eastern Building, Shreveport, Louisiana 71102.<br><br>Date: 07/18/1968 |

| | | |
|---|---|---|
| 46 | | Install eleven (11) submarine cables in a trench, in Arthur Kill, between the Borough of Carteret, Middlesex County, New Jersey, and Travis, Staten Island, New York, 800.6 (Arthur Kill-N.J. Bell Telephone C-11 Subcables). Permit issued to: New Jersey Bell Telephone Company, 540 Broad Street, Newark 1, N.J.<br><br>Date: 11/21/1955 |
| 47 | 16017 | Install two steel pipelines, each 30 inches in diameter at a depth of approximately 20 feet below the bottom of the federal channel in the Arthur Kill at Linden, Union County, N.J. Permit issued to: Cogen Technologies Linden Ventures LTD. Partnership, 1600 Smith St., Suite 5000, Houston, TX 77002.<br><br>Date: 02/08/1994 |
| 48 | 402 | War Emergency Pipe Lines in Arthur Kill between Kreischerville and Port Reading. Install a submarine oil pipe line in Arthur Kill between Kreischerville, Staten Island, New York, and Port Reading, New Jersey. The file number of the permit is: Permits 4129/5.<br><br>Date: 05/22/1945 |

| | | |
|---|---|---|
| 49 | | Install an 8" submarine pipe line at a depth of 47 feet below mean low water, within the Federal project channel limit lines; across Arthur Kill, approximately 1,000 feet downstream of Goethals Bridge, between Staten Island, New York, and the City of Linden, Union County, New Jersey, 800.6 (Arthur Kill-TIDE-WATER PIPE CO., LTD-Sub pipe line @ Staten Island, N.Y. & Linden, N.J.). Permit issued to: The Tide-Water Pipe Company, Limited, 17 Battery Place, New York 4, N.Y.<br><br>Date: 02/01/1957 |
| 50 | | Install two (2) 8-inch and one (1) 12-inch permanent pipe lines in an existing trench at a depth of forth-seven (47) feet below mean low water, and to install two (2) temporary 8-inch pipe lines, to be removed when the permanent lines have been installed, in Arthur Kill, between Bayway, County of Union, New Jersey, and the Borough of Richmond, Staten Island, N.Y., 800-6 (Arthur Kill-Esso Standard Oil Co-Pipe lines @ Staten Island, N.Y. Elizabeth, N.J.<br><br>Date: 11/26/1956 |
| 51 | 2603 | Laying of a 10-inch pipe line parallel to and on the west side of the existing pipe line in Arthur Kill at a point near Port Reading, New Jersey, was completed on 21 April 1944. Permit issued to: War Emergency Pipelines, Inc., P. O. Box 271, Plainfield, N.J.<br><br>Date: 04/28/1944 |

| | | |
|---|---|---|
| 52 | 95-04860 | Install approximately 5,500 linear feet of buried 12-inch diameter petroleum products pipeline to replace an existing pipeline which will be abandoned in-place in Arthur Kill between Township of Woodbridge, Middlesex County, New Jersey and Borough of Staten Island, Richmond County, New York, 1145-2-303b (Arthur Kill - Colonial Pipeline Company - Pipeline). Permit issued to: Colonial Pipeline Company, P. O. Box 18855, Atlanta, GA 31126-0855.<br><br>Date: 07/18/1995 |
| 53 | | Install a 12-inch diameter pipe line, in Arthur Kill, between Staten Island, New York, and Elizabeth, New Jersey, and marked: 800.6 (Arthur Kill-Esso Standard Oil Co.-Pipe line). Permit issued to: Esso Standard Oil Company, 15 West 51st Street, New York 19, N.Y.<br><br>Date: 10/06/1952 |
| 54 | 7436 | Install three (3) aerial cables Piles Creek, Arthur Kill Linden Union County, NJ. Permit issued to: Public Service Electric & Gas. |
| 55 | | 12 inch diameter petroleum pipeline, Arthur Kill across Piles/Winans Creek near Linden, Union County, N.J. Permit issued to: Sohio Pipe Line Company. |
| 56 | 176 | 5-8 inch pipelines from Morses Creek, Linden, Union County, NJ to Gulfport Reach, Staten Island. Permit issued to: Standard Oil Company.<br><br>Date: 12/20/1912 |

| | | |
|---|---|---|
| 57 | | Replace existing 12 inch pipe with a 16 inch pipe 42 feet below mean water in Arthur Kill, between Linden, N.J. and Gulfport, Staten Island. Permit issued to: Texas Eastern Transmission Corporation.<br><br>Date: 06/09/1950 |
| 58 | | 26 inch diameter pipeline installed 29 feet below mean water between Linden, N.J. and Merrill's Creek, Staten Island in the vicinity of Prall's Island. Permit issued to: Construction Aggregates Corporation.<br><br>Date: 11/02/1967 |
| 59 | | 6-8 inch diameter pipelines installed between Morse Creek, Linden, N.J., and Gulfport Reach, Staten Island, NY. Permit issued to: The Tide-Water Pipe Company, Ltd.<br><br>Date: 8/15/1913 |
| 60 | | 1-12-3/4 inch diameter pipeline extending from a point near Linden, New Jersey, designated as Woods Avenue Junction across to Gulfport, Staten Island, NY including a crossing of the Arthur Kill, to the Gulf Refining Company. Permit issued to: The Texas Pipeline Company.<br><br>Date: 4/26/1955 |

| | | |
|---|---|---|
| 61 | 8881 | An outfall sewer extending 300 feet offshore of the mean high water line terminating as a 11'6" by 9'4" box culvert with an invert elevation of 1.57 ft. above mean low water in Arthur Kill at Arthur Kill Road, Rossville, Staten Island, Richmond County, New York. Permit issued to: Kaufman & Broad Homes, Inc.<br><br>Date: 7/10/1973 |
| 62 | 79-277 | Install a 6 inch thick concrete filled nylon tube mat over in existing 12 inch diameter petroleum pipeline crossing at a minimum depth of 39 feet below the plans of Mean Low Water to maintain adequate cover over the common carrier pipe at one mile south of the Goethals Bridge, Gulfport, Staten Island, N.Y. to Linden, N.J. Permit issued to: Sohio Pipe Line Company.<br><br>Date: 7/17/1981 |
| 63 | 9236 | Install steel reinforcement of an existing pipeway at Sewaren plant, Middlesex County, New jersey, 23 new concrete filled pilings. Permit issued to: Shell Oil Company.<br><br>Date: 4/29/1978 |
| 64 | | One (1) 26 inch high pressure natural gas pipeline that crosses the Arthur Kill at a location of 600 feet north of the northern bank of Piles Creek, Union County, New Jersey at an approximate depth of 50 feet below MLW to Staten Island, Richmond County, NY. Owner: Williams-Transco. |

f. CHANNEL TRAFFIC. Vessel traffic in the Arthur Kill Reach of the New York and New Jersey Channels project vicinity is heavy. Traffic consists of bulk and general cargo

freighters, tank vessels, tows of scows and barges, and miscellaneous small craft. Vessel traffic may cause some delay to the dredging required in these specifications.

g. OBSTRUCTION OF CHANNEL. The Government will not undertake to keep the area free from vessels or other obstructions except to the extent of such regulations, if any, as may be prescribed by the secretary of the army in accordance with the provisions of section 7 of the Rivers and Harbors Act in such manner as to obstruct navigation as little as possible, and in case the contractor's plant so obstructs the channel as to make difficult or endanger the passage of vessels, said plant shall be promptly moved on the approach of any vessel to such an extent as may be necessary to afford a practicable passage. Upon the completion of the work the Contractor shall promptly remove his plant, including ranges, buoys, piles and other marks placed by him under the contract in navigable waters or on shore.

h. NAVIGATION AIDS. The Contractor shall not relocate or move any aids to navigation that have been established by the U.S. Coast Guard. If it becomes necessary to have any aids to navigation moved in order to complete dredging operations under this contract, the Contractor shall notify the appropriate Coast Guard Office, with a copy to the Contracting Officer and/or his Representative, not less than 15 days prior to the need for movement. The Contractor shall notify the appropriate Coast Guard Office of the approximate time of completion of dredging.

i. LOCATION. The site of the work to be performed under these specifications is the Arthur Kill Reach of the New York and New Jersey Channels located between the Outerbridge Crossing, river mile 14, extending to the Gulfport Reach, river mile 23.

j. LAYING OF SUBMERGED PIPELINES AND OBSTRUCTIONS OF CHANNEL. Should it become necessary in the performance of this contract to close a channel to lay submerged pipeline across a navigable channel, the Contractor shall notify the Contracting Officer or Contracting Officer's Representative in writing to be received in the District office at least ten working days prior to the desired closure date. This notification shall furnish the following:

(1) Location (Channel Centerline Stationing) and depth (above the top of the pipeline) at which the submerged line will be placed;

(2) The desired length of time the channel is to be closed for installation of the pipeline;

(3) The date and hour placement or removal will commence;

(4) The date and hour of anticipated completion; and

(5) The name and telephone number of the person to be contacted for information and response to any emergency condition.

The Coast Guard has indicated that the requirements of navigation may make it necessary to establish times other than those requested. IT SHALL BE THE CONTRACTOR'S RESPONSIBILITY TO COORDINATE HIS PLANS WITH THE COAST GUARD SUFFICIENTLY IN ADVANCE OF THE PLANNED CLOSING TO PREVENT DELAY TO THE DREDGING OPERATIONS AND COMPLY WITH THE COAST GUARD REQUIREMENTS.

k. BRIDGE-TO-BRIDGE RADIO-TELEPHONE EQUIPMENT. In order that radio-telephone communication may be made with passing vessels, all dredges engaged in work under the contract shall be equipped with and operate bridge-to-bridge radio-telephone equipment on VHF Channel 13 (156.65 MHz with low power output having a communication range of approximately ten (10) miles). The Federal Communication Commission has approved the frequency.

**7. TIME EXTENSIONS (SEPT 2000)**
Time extensions for contract changes will depend upon the extent, if any, by which the changes cause delay in completion of the various elements of construction. The change order granting the time extension may provide that the contract completion date will be extended only for those specific elements related to the changed work and that the remaining contract completion dates for all other portions of the work will not be altered. The change order also may provide an equitable readjustment of liquidated damages under the new completion schedule.

**8. LAYOUT OF WORK (APRIL 1984)**

The Government will provide the basic horizontal control data (coordinated triangulation stations) in the area. The Contractor shall compute and establish in the field all range points required for the proper discharge of his functions. The Contractor shall be responsible for the accuracy of the range points and its computations. The Contractor shall furnish, at his own expense, all stakes, templates, platforms, equipment, range markers, tide staffs and labor as may be required in laying out any part of the work. The Contractor will be held responsible for the execution of the work to such lines and grades as required or indicated by the Contracting Officer or his representative. It shall be the responsibility of the Contractor to maintain and preserve all established stakes, markers...etc.

**Contractor shall contact the New York District Survey Section at (212) 264-0180 or at (212) 264-0181 for any future reference to horizontal control data.**

**9. DATUM AND BENCH MARKS** The plane of reference of mean low water as used in these specifications is that determined by the following benchmark and tide gauges:

1. **DESIGNATION:** D 37
   **PID:** KV0199
   **STATE/COUNTY:** NJ/MIDDLESEX
   **USGS QUAD:** PERTH AMBOY (1982)
   **HORIZONTAL DATUM:** NAD 83
   **POSITION:** 40 ° 32′ 51″ North, 74° 15′ 34″ West
   **ELEVATION:** 40.23 NGVD 1929
   **BENCH MARK STAMPING/CLASSIFICATION:** D 37 1952 is a Bench Mark Disk set in a massive structure 1.6 miles north from Perth Amboy, about 1.65 miles north along State Street from its underpass under Outer Bridge at Perth Amboy, in the top of the northeast end of the State Street overpass over the New York and Long Branch Railroad, 30 feet east of center line of street and about 4 feet below level of street.
   **AGENCY:** Described by Coast and Geodetic Survey in 1952

2. **DESIGNATION:** J 37
**PID:** KV0210
**STATE/COUNTY:** NJ/MIDDLESEX
**USGS QUAD:** ARTHUR KILL (1982)
**HORIZONTAL DATUM:** NAD 83
**POSITION:** 40 ° 34′ 42″ North, 74° 12′ 51″ West
**ELEVATION:** 12.81 NGVD 1929
**BENCH MARK STAMPING/CLASSIFICATION:** J 37 1952 is a Bench Mark Disk set in a massive structure at Carteret, about 0.5 mile northeast along Roosevelt Avenue from the Columbus School, set vertically in the southeast face at east corner of Benjamin Moore warehouse, 1 foot southwest of east corner of building, 54 feet northwest of center line of Roosevelt Avenue and about 2 feet above black top apron around building.
**AGENCY:** Described by Coast and Geodetic Survey in 1952

3. **DESIGNATION:** L 37
**PID:** KV0223
**STATE/COUNTY:** NJ/UNION
**USGS QUAD:** ARTHUR KILL (1982)
**HORIZONTAL DATUM:** NAD 83
**POSITION:** 40 ° 36′ 17″ North, 74° 12′ 31″ West
**ELEVATION:** 8.37 NGVD 1929
**BENCH MARK STAMPING/CLASSIFICATION:** L 37 1952 is a Bench Mark Disk set in a light structure, about 0.7 mile south along the Sound Shore Railroad from the Post Office at Grasselli, about 0.7 mile north of a bridge over Rahway River and the Union-Middlesex County Line, at a private road crossing, at the Sinclair Oil Company Storage Tanks, set in the top of the northeast corner of a 6 by 10-foot concrete slab, 72 feet west of west rail of main track, 13 feet northwest of center line of private road which crosses track, 75 northeast and across a black top road from the northeast face of storage tank No. 8, 33 feet north of center line of black top road, about level with track.
**AGENCY:** Described by Coast and Geodetic Survey in 1952

4. **DESIGNATION:** P 37
**PID:** KV0227
**STATE/COUNTY:** NJ/UNION
**USGS QUAD:** Elizabeth (1982)

**HORIZONTAL DATUM:** NAD 83
**POSITION:** 40 ° 38′ 16″ North, 74° 12′ 01″ West
**ELEVATION:** 12.10 NGVD 1929

**BENCH MARK STAMPING/CLASSIFICATION:** P 37 1952 is a Bench Mark Disk set in a massive structure, at Elizabethport, along South Front Street, in the top of the concrete foundation of the southwest column of the first Goethals Bridge pier northwest of South Front Street, 1 1/2 Feet north of the corner of the foundation and 3 feet above the ground.
**AGENCY:** Described by Coast and Geodetic Survey in 1952

The horizontal coordinates for all four (4) benchmarks were scaled from a topographic map and have an estimated accuracy of +/- 6 seconds. The orthometric height was determined by differential leveling and adjusted by the National Geodetic Survey in June 1991.

The orthometric height for all (4) benchmarks were determined by differential leveling and adjusted by the National Geodetic Survey in June 1991.

The contractor may contact the New York District Survey Section at (212) 264-0180/0181 for assistance in establishing the location of the bench marks and the tide gages.

**10. ESTIMATED QUANTITIES**

The total estimated quantities of material necessary to be removed from the specified limits to complete the work described in this specifications are computed from the volume computations of the condition survey performed in the project area in March 2002.

These volumes were computed as follows:

| | |
|---|---|
| Channel to Grade | 62,540 |
| Channel Overdepth | 40,275 |
| Slope to Grade | 74,795 |
| Slope Overdepth | 26,405 |

Total Available 204,015 CY

Estimated Contract Quantity: 204,015 CY including options if exercised.

Distribution of Base Work and Optional Areas:

| SECTION | GRADE (CHANNEL PLUS SIDE SLOPES) | OVERDEPTH (CHANNEL PLUS SIDE SLOPES) |
|---|---|---|
| BASE WORK** | 33,290 CY | 11,545 CY |
| OPTION 1 | 1,760 CY | 6,365 CY |
| OPTION 2 | 1,645 CY | 5,965 CY |
| OPTION 3 | 3,575 CY | 220 CY |
| OPTION 4 | 34,645 CY | 6,120 CY |
| OPTION 5 | 28,995 CY | 13,475 CY |
| OPTION 6 | 980 CY | 1,630 CY |
| OPTION 7 | 2,315 CY | 1,360 CY |
| OPTION 8 | 420 CY | 825 CY |
| OPTION 9 | 4,690 CY | 1,480 CY |
| OPTION 10 | 2,760 CY | 3,325 CY |
| OPTION 11 | 1,405 CY | 1,060 CY |
| OPTION 12 | 1,865 CY | 3,785 CY |
| OPTION 13 | 13,070 CY | 2,750 CY |
| OPTION 14 | 1,605 CY | 5,630 CY |
| OPTION 15 | 1,770 CY | 1,590 CY |
| OPTION 16 | 1,250 CY | 850 CY |

**BASE WORK - See Contract Drawings (pages 6, 14 and 16).

**The Government will survey the project prior to starting work.**

Above estimated quantities were computed from the data shown on the contract drawings. The quantities that may be removed and paid for will be computed by the Triangulated Irregular Network (TIN) method or average end area method as indicated in the Technical Specifications, Section 01200, paragraph 12 entitled "MEASUREMENT AND PAYMENT."

**11. VARIATION IN ESTIMATED QUANTITIES - DREDGING (JAN 1985)**

Where the quantity of a pay item in this contract is an estimated quantity and where the actual quantity of material within the

required dredging prism varies more than fifteen percent (15%) above or below the stated estimated quantity within the required dredging prism, an equitable adjustment in the contract unit price will be made upon the demand of either party. The equitable adjustment will be based upon any increase or decrease in costs due solely to the variations above one-hundred fifteen percent (115%) or below eighty-five percent (85%) of the estimated quantity. An adjustment in the contract unit price will also apply to that part of the actual quantity of allowable overdepth material above one-hundred fifteen percent (115%) or below eighty-five percent (85%) of the estimated quantity. (EFARS 52.2/9110(1))

**12. HEAD PROTECTION (HARD HATS)**

**THE ENTIRE WORK SITE UNDER THIS CONTRACT IS DESIGNATED AS A HARD HAT AREA.** The Contractor shall post the area in accordance with the requirements of paragraph 07.C.03, EM 325-1-1, and shall ensure that all prime and subcontractor personnel, vendors, and visitors utilize hard hats while within the project area. (DO 385-1-3 4 Nov. 77)

**13. SIGNAL LIGHTS (FEB 1983)**

The Contractor shall display signal lights and conduct his operations in accordance with the General Regulations of the Coast Guard governing lights and day signals to be displayed by towing vessels with tows on which no light signals can be displayed. Vessels working on wrecks, dredges, and vessels engaged in laying cables or pipe or in submarine or bank protection operations, lights to be displayed on dredge pipelines, and day signals to be displayed by vessels of more than 65 feet in length moored or anchored in a fairway or channel, and the passing by other vessels of floating plant working in navigable channels, as approved by the Commandant, U.S. Coast Guard with respect to vessels on the high seas (33 CAR 81 App. A-72 COLREGS, Part C), vessels in inland waters (33-CFR 93.18 - 93.31a), and vessels in western rivers (33 CFR 95.5.51 - 95.70)), as applicable. (DAEN-PRP Ind dtd. 12 Sep. 83)

**14. REVERSE SIGNAL ALARM**

a. All construction equipment, except light service trucks, panels, pickup trucks, station wagons, crawler-type cranes,

power shovels and draglines, whether moving alone or in combination shall be equipped with reverse signal alarms. The alarm shall be mounted on the rear of the equipment and shall be protected or constructed as to withstand severe wear and tear, adverse weather and unfavorable environmental working conditions and shall be certified by the manufacturer to fully meet the following performance standards.

b. The alarm shall produce a relatively pure tone which shall peak within the American National Stds. Inst. standard octave pass band of 600 to 2400 cycles per second and shall produce a 0.2 to 0.5 second audible warning within the initial three (3) feet of backward movement of the vehicle on which it is mounted and at regular intervals, not to exceed three (3) seconds throughout the backward movement. The alarm shall automatically stop when backward movement ceases. The sound intensity of the alarm shall range from and not exceed 90-100 db (decibels) at a horizontal distance of five feet from the alarm.

c. Actuation of the alarm shall be automatic by direct connections to any part of the equipment that moves or acts in a manner distinctive only to the rearward movement of the vehicle with no manual controls of any kind between the source of actuation and the alarm. Where application of this requirement to specific types of the equipment has impractical application, other means of actuation may be used upon written approval of the Contracting Officer and/or his Representative or his representative.

d. The use of the alarm shall be in the addition to prescribed requirements for signalmen.

**15. FLOATING PIPELINES**

Floating pipelines, used as access ways, shall be equipped with walkways and guardrails. In accordance with EM 385-1-1, the walkway shall be securely anchored to the pipeline and a guardrail equivalent in strength to a wood rail 2 in. x 4 in. shall be provided on at least one side of the walkway and shall be secured to uprights at intervals of not more then 8 feet and

of not less than 36 inches, nor more than 42 inches in height above the walkway. Floating pipelines not equipped with walkways shall be barricaded to positively prevent personal access.

**16. MISPLACED MATERIAL (JAN 1965)**

Should the Contractor during the progress of the work, lose, dump, throw overboard, sink, or misplace any material, plant, machinery, or appliance, which in the opinion of the Contracting Officer and/or his Representative may be dangerous to or obstruct navigation, the Contractor shall recover and remove the same with the utmost dispatch. The Contractor shall give immediate notice, with description and location of such obstructions, to the Contracting Officer and/or his Representative or inspector, and when required shall mark or buoy such obstruction until the same are removed. Should he refuse, neglect, or delay compliance with the above requirements, such obstructions may be removed by the Contracting Officer and/or his Representative, and the cost of such removal may be deducted from any money due or to become due to the Contractor, or may be recovered under his bond. The liability of the Contractor for the removal of a vessel wrecked or sunk without fault or negligence shall be limited to that provided in Sections 15, 19, and 20 of the Rivers and Harbors Act of March 3, 1899 (33 USC. 410 et seq.) (DOD FARS SUPPL. 52.236-7006).

**17. CONTINUITY OF WORK (APR 1965)**

No payment will be made for work done in any area designated by the Contracting Officer and/or his Representative until the full depth required under the contract is secured in the whole of such area, unless prevented by ledge rock; nor will payment be made for excavation in any area not adjacent to and in prolongation of areas where full depth has been secured except by decision of the Contracting Officer or Contracting Officer's Representative. Should any such nonadjacent area be excavated to full depth during the operations carried on under the contract, payment for all work therein may be deferred until the required depth has been made in the area intervening. The Contractor may be required to suspend dredging at any time when for any reason the gauges or ranges cannot be seen or properly followed. (EFARS 52.2/9110(C)

**18. FINAL EXAMINATION AND ACCEPTANCE (APR. 1965)**

a. As soon as practicable after the completion of the Basic Work area, such work will be thoroughly examined at the cost and expense of the Government by sounding or by sweeping, or both, as determined by the Contracting Officer and/or his Representative. Should any shoals, lumps, or other lack of contract depth be disclosed by this examination the Contractor will be required to remove same by dredging at the contract rate for dredging or by other method approved by the contracting officer, but if the bottom is soft and the shoal areas are small and form no material obstruction to navigation, the removal of such shoal may be waived by the discretion of the Contracting Officer and/or his Representative. The Contractor or his authorized representative will be notified when soundings and/or sweepings are to be made, and will be required to accompany the survey party. When the area is found to be in a satisfactory condition, it will be accepted finally. Should more than two soundings or sweeping operations by the Government over an area be necessary by reason of work for the removal of shoals disclosed at a prior sounding or sweeping operations, this work will be charged against the Contractor. The rate for each day in which the Government plant is engaged in such sounding or sweeping operations and/or is en route to or from the site or held, for the Contractor's convenience, at or near the site for these operations shall be $1,850 except on Saturday, Sunday and Holidays when the rate shall be $2,125.

b. As soon as practicable after the completion of additional Option areas, if exercised, in increments when the additional quantity removed from Options Work has reached approximately 50,000 cubic yards and dredging of the shoals involved in the incremental 50,000 cubic yards has been completed, such work will be thoroughly examined at the cost and expense of the Government by sounding or by sweeping, or both, as determined by the Contracting Officer and/or his Representative. Should any shoals, lumps, or other lack of contract depth be disclosed by this examination the Contractor will be required to remove same by dredging at the contract rate for dredging or by other method approved by the contracting officer, but if the bottom is soft and the shoal areas are small and form no material obstruction to navigation, the removal of such shoal may be waived by

the discretion of the Contracting Officer and/or his Representative. The Contractor or his authorized representative will be notified when soundings and/or sweepings are to be made, and will be required to accompany the survey party. When the area is found to be in a satisfactory condition, it will be accepted finally. Should more than two soundings or sweeping operations by the Government over an area be necessary by reason of work for the removal of shoals disclosed at a prior sounding or sweeping operations, this work will be charged against the Contractor. The rate for each day in which the Government plant is engaged in such sounding or sweeping operations and/or is en route to or from the site or held, for the Contractor's convenience, at or near the site for these operations shall be $1,850 except on Saturday, Sunday and Holidays when the rate shall be $2,125.

c. Final acceptance of the whole or a part of the Basic Work area and each additional Option area and the deductions or corrections of deductions made thereon will not be reopened after having once been made, except on evidence of collusion, fraud, or obvious error, and the acceptance of a completed section shall not change the time of payment of the retained percentages of the whole or any part of the work.

d. The area within the contract limits of the Basic Contract Work and each additional Option Area will be surveyed for final examination and acceptance.

**19. SHOALING (APR 1965)**

If, before the contract is completed, shoaling occurs in any section previously accepted, including shoaling in the finished channel, because of the natural lowering of the side slopes, re-dredging at the contract price, within the limit of available funds, may be done if agreeable to both the Contractor and the Contracting Officer and/or his Representative.

**20. INSPECTION (APR 1965)**

The inspectors will assess whether the gauges, ranges, location marks and limit marks are maintained in proper order; but the presence of the inspector shall not relieve the Contractor of the responsibility for the proper execution of the work in accordance with the specifications. The Contractor will be required:

a. To furnish, on the request of the Contracting Officer and/or his Representative or any inspector, the use of such boats, boatmen, laborers, a part of the ordinary and usual equipment and crew of the dredging plant as may be reasonably necessary in inspecting and supervising the work. However, the Contractor will not be required to furnish such facilities for the surveys prescribed in the clause H-18, entitled: "Final Examination and Acceptance."

b. To furnish, on the request of the Contracting Officer or the Contracting Officer's Representative or any inspector, suitable transportation from all points on shore designated by the Contracting Officer and/or his Representative to and from the various pieces of plant and to and from the placement area. Should the Contractor refuse, neglect, or delay compliance with these requirements, the specific facilities may be furnished and maintained by the Contracting Officer or Contracting Officer Representative, and the cost thereof will be deducted from any amounts due or to become due to the Contractor.

**21. ACCOMMODATIONS FOR GOVERNMENT INSPECTORS**

The Contractor shall furnish regularly to Government inspectors onboard the dredge or other craft upon which they are employed a suitable separate room for an office. The room shall be fully equipped and maintained to the satisfaction of the Contracting Officer and/or his Representative; it shall be properly heated, ventilated, and lighted, and shall have a desk which can be locked, and a chair for each inspector, and washing conveniences. In addition, the Contractor shall provide a suitable sleeping area for use by the Government inspector when weather or sea conditions preclude safe transfer to shore. The entire cost to the Contractor for furnishing, equipping and maintaining the foregoing accommodations shall be included in the contract price. If the Contractor fails to meet these requirements, the

Contracting Officer and/or his Representative will secure the facilities referred to above, and the cost thereof will be deducted from payments to the Contractor.

## 22. EQUIPMENT OWNERSHIP AND OPERATING EXPENSE SCHEDULE (1985 JAN OCE)

a. Allowable costs for construction of marine plant and equipment in sound workable condition owned or controlled and furnished by a contractor or subcontractor at any tier shall be based on actual cost data when the Government can determine both ownership and operating costs for each piece of equipment or equipment groups of similar serial and series from the contractor's accounting records. When both ownership and operating costs cannot be determined from the contractor's accounting records, equipment costs shall be based upon the applicable provision of EP 1110-1-8, "Construction Equipment Ownership and Operating Expense Schedule," Region I.

Working conditions shall be considered to be average for determining equipment rates using the schedule unless specified otherwise by the contracting officer. For equipment not included in the schedule, rates for comparable pieces of equipment may be used or a rate may be developed using the formula provided in the schedule. For forward pricing, the schedule effect at the time of negotiations shall apply. For retrospective pricing, the schedule in effect at the time the work was performed shall apply.

b. Equipment rental costs are allowable, subject to the provisions of FAR 31.105(d)(ii) and FAR 31.205-36 substantiated by certified copies of paid invoices. Rates for equipment rented from an organization under common control, lease-purchase or sale-leaseback arrangements will be determined using the schedule except that rental costs leased from an organization under common control that has an established practice of leasing the same or similar equipment to unaffiliated leases are allowable. Costs for major repairs and overhaul are unallowable.

c. When actual equipment costs are proposed and the total amount of the pricing action is over $25,000, cost or pricing data shall be submitted on Standard Form 1411, "Contract Pricing Proposal Cover Sheet." By submitting cost or pricing data, the contractor grants to the contracting officer or an authorizing representative the right to examine those books, records, documents and other supporting data that will permit evaluation of the proposed equipment costs. After price agreement the contractor shall certify that the equipment costs or pricing data submitted are accurate, complete and current. (EFARS 52.2/9108(f))

**23. FUEL USAGE**

The Contractor shall furnish the Contracting Officer and/or his Representative a report, to be received on or before the last day of the calendar month, listing the totals of fuels consumed by the dredging plant, supporting vessels, and other construction equipments. The report shall list the quantities of different fuels separately. The report shall cover the period from the 25th of the preceding month to the 25th of the current month.

**24. OIL TRANSFER OPERATIONS**

The Contractor shall assure that oil transfer operations to or from his plant comply with all Federal, state, municipal laws, codes and regulations (See Attachment F of Section 00900 for regulation on "Oil and Hazardous Material Transfer Operations" - 33 CFR 156). Particular attention is invited to 33 CFR Subchapter O, Pollution. The Contractor shall incorporate in the accident prevention program (Section 01351, paragraph 3), submitted in compliance with Section 00700, contract clause "ACCIDENT PREVENTION," sufficient information to demonstrate that all fuel transfers will be made in compliance with 33 CFR 156 and any other applicable laws, codes and regulations. (NAP-1/81)

**25. WAGE RATES**

The attached schedule of wage rates contains rates applicable to all work under this contract (see Section 00900, Attachment B).

**26. LABOR-ADDITIONAL REQUIREMENTS**

Fringe benefits statement: The method of payment of applicable fringe benefits will be indicated on DD From 879, Statement of Compliance, and attached to each weekly payroll.

**27. NOTICE TO MARINERS**

The Contractor shall, prior to commencement of work, notify the 3rd Coast Guard District, Aids to Navigation Officer, of his proposed operations including location and duration of operations and request that the information be published in the "Notice to Mariners." This notification must be in sufficient time so that it appears in the Notice at least **15 days** prior to the commencement of the dredging operation.

**28. ENVIRONMENTAL LITIGATION (1974 NOV OCE)**

a. If the performance of all or any part of the work is suspended, delayed, or interrupted due to an order of a court of competent jurisdiction as a result of environmental litigation, as defined below, the Contracting Officer and/or his Representative, at the request of the Contractor, shall determine whether the order is due in any part to the acts or omissions of the Contractor or a Subcontractor at any tier not required by the terms of this contract. If it is determined that the order is not due in any part to acts or omissions of the Contractor or a Subcontractor at any tier other than as required by the terms of this contract, such suspension, delay, or interruption shall be considered as if ordered by the Contracting Officer and/or his Representative in the administration of this contract under the terms of Section I, contract clause entitled "SUSPENSION OF WORK." The period of such suspension, delay or interruption shall be considered unreasonable, and an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) as provided in that clause, subject to all the provisions thereof.

b. The term "environmental litigation," as used herein, means a lawsuit alleging that the work will have an adverse effect on the environment or that the Government has not duly

considered, either substantively or procedurally, the effect of the work on the environment. (EFARS 52.2/9109 (j))

**29. NOISE LEVEL CRITERIA**

Maximum sound pressure levels measured at the booster pumps, engine generators and vehicles including muffler and exhaust components, shall not exceed decibel values prescribed by Federal, State and local codes and regulations. The foregoing applies with the pumps under normal operating conditions at not less than 50% full rated load. Test will be performed at no additional cost to the Government by the Contractor, or the pump engine and generator manufacturer or by an approved testing agency having proven capability in noise measurements and using approved measurement equipment and acceptable measurement procedures. Test data will be submitted to the Contracting Officer for approval 5 days after the commencement of dredging operations. Should the sound pressure (noise) level test data indicate a need for sound reduction, the Contractor will provide necessary enclosures, baffles or any other appropriate means around booster pumps and engine generators including muffler and exhaust components, so as to attain noise levels which do not exceed those prescribed by aforementioned regulations. Details of the proposed enclosure or baffling arrangement shall be submitted to the Contracting Officer for approval. Such details will be accomplished by calculations, which indicate anticipated compliance of sound pressure (noise) levels with codes and regulations noted herein before. All this is especially enforceable where these booster and engine generators locations are in bathing areas.

**30. CERF IMPLEMENTATION (83 JUN 1 OCE)**

If the work specified in this contract is performed by a hopper dredge(s), the owner must have an active Basic Ordering Agreement (BOA) for the hopper dredge(s) on file with the Corps of Engineers. The Contractor shall be obligated to make the hopper dredge(s) available to serve in the Corps of Engineers Reserve Fleet (CERF) at any time that the hopper dredge(s) is performing work under this contract. When the Contracting Officer and/or his Representative is notified of the decision to activate the dredge(s) into the CERF, he shall take appropriate action to

release the dredge(s). He may then extend or terminate the contract to implement whichever action is in the best interest of the Government. The CERF contract shall also be subject to the following condition:

a. The Director of Civil Works may require the contractor to perform emergency dredging at another CONUS (48 contiguous states) site for a period of time equal to the remaining time under this contract at the date of notification plus up to ninety (90) days at the previously negotiated rate which appears on the schedule of prices in the BOA.

b. The Chief of Engineers may require the contractor to perform emergency dredging at an OCONUS (Outside CONUS which includes Alaska, Hawaii, Puerto Rico, the Virgin Islands, or U.S. Trust Territories) site for a period of time equal to the time remaining under this contract at the date of notification plus up to one hundred eighty (180) days at the negotiated rate which appears on the schedule of prices in the BOA.

c. The CERF shall be activated by the Chief of Engineers or the Director of Civil Works; then the Ordering Contracting Officer and/or his Representative will notify the contractor. From the time of notification, the selected hopper dredge(s) must depart for the emergency assignment within seventy-two (72) hours for CONUS or ten (10) days for OCONUS assignments.

d. A confirming delivery order will be issued pursuant to the Basic Ordering Agreement (BOA) by the Ordering Contracting Officer and/or his Representative. Such delivery order shall utilize the schedule of rates in the BOA for the specific hopper dredges(s).

e. If during the time period specified in a, b, or c, above, a CERF vessel(s) is still required, the contract performance may be continued for additional time by mutual agreement. (EFARS 52.2/9112)

**31. THE SEAGOING BARGE ACT (46 USC 395 ET SEQ.)**

The Seagoing Barge Act applies to this project. In the event the low bidder contemplates using plant that requires U.S. Coast

Guard certification to comply with this Act, the low bidder shall within five (5) calendar days after bid opening submit a copy of said certificate to the Contracting Officer and/or his Representative. Failure to produce the certificate within the required time shall subject the bidder to a determination of nonresponsibility.

## 32. PERFORMANCE EVALUATION OF CONTRACTOR (APR 1984)

a. As a minimum, the Contractor's performance will be evaluated upon final acceptance of the work. However, interim evaluation may be prepared at any time during contract performance when determined to be in the best interest of the Government.

b. The format for the evaluation will be DD Form 2626, and the Contractor will be rated either outstanding, satisfactory, or unsatisfactory in the areas of Contractor Quality Control, Timely Performance, Effectiveness of Management, Compliance with Labor Standards, and Compliance with Safety Standards. The Contractor will be advised of any unsatisfactory rating, either in an individual element or in the overall rating, prior to completing the evaluation, and all Contractor comments will be maintained as part of the official record. Performance Evaluation Reports will be available to all DOD contracting offices for their future use in determining Contractor responsibility, in compliance with FAR 36.201 (c). (DEAN-PRP Ltr dtd 30 Apr 84)

## 33. PRICING OF ADJUSTMENTS (APR 1984)

When costs are a factor in any determination of a contract price adjustment pursuant to the Changes clause or any other clause of this contract, such costs shall be in accordance with Part 31 of the Federal Acquisition Regulation and the DOD FAR Supplement in effect on the date of this contract (DOD FAR SUPP 52.243.7001) costs shall be in accordance with Part 31 of the Federal Acquisition Regulation.

**34. PRECONSTRUCTION CONFERENCE**

A preconstruction conference will be arranged by the Contracting Officer and/or his Representative after award of contract and before commencement of work. The Contracting Officer's representative will notify the Contractor of the time and date set for the meeting. At this conference, the Contractor shall be oriented with respect to Government procedures and line of authority, contractual, administrative, and construction matters. Additionally, a schedule of required submittals will be discussed (see Section 00900, Attachment G).

The contractor shall bring to this conference the following items in either completed or draft form:

a. The Contractor's order of work for dredging and performing other work, including disposal area plan.

b. Accident Prevention Plan (advance copies required, see Section 01351) including the Hazard Analysis as per Section 01351.

c. Quality Control Plan (see Section 01451).

d. Letter appointing Superintendent.

e. List of subcontractors

**35. BID GUARANTEE**

a. The offeror (bidder) shall furnish a separate bid bond, or United States bonds, Treasury notes or other public debt obligation of the United States, in the proper amount, by the time set for opening of bids. Failure to do so may be cause for rejection of the bid. The Contracting Officer and/or his Representative will return bid guarantees, other than bid bonds, (1) to unsuccessful bidders as soon as practicable after the opening of bids, and (2) to the successful bidder upon execution of contractual documents and bonds (including any necessary coinsurance or reinsurance agreements), as required by the bid as accepted.

b. If the successful bidder, upon acceptance of its bid by the Government within the period specified for acceptance, fails to execute all contractual documents or give a bond(s) as

required by the solicitation within the time specified, the Contracting Officer and/or his Representative may terminate the contract for default.

c. Unless otherwise specified in the bid, the bidder will (1) allow the number of days as indicated in paragraph 13D of Standard Form 1442 for acceptance of its bid and (2) give bond within 5 days after receipt of the forms by the bidder.

d. In the event the contract is terminated for default, the bidder is liable for any cost of acquiring the work that exceeds the amount of its bid. The bid bond, or bonds or notes of the United States, is available to offset the difference.

**36. QUANTITY SURVEYS**

a. Quantity surveys shall be conducted, and the data derived from these surveys shall be used in computing the quantities of work performed and the actual construction completed and in place.

b. The Government shall conduct the original and final surveys and make the computations based on them. The Contractor shall conduct the survey for any periods for which progress payments are requested and shall make the computations based on these surveys. These surveys conducted by the Contractor shall be conducted under the direction of a representative of the Contracting Officer, unless the Contracting Officer waives this requirement in a specific instance.

c. Promptly upon completing a survey, the Contractor shall furnish the originals of all field notes and all other records relating to the survey or to the layout of the work to the Contracting Officer and/or his Representative, who shall use them as necessary to determine the amount of progress payments. The Contractor shall retain copies of all such material furnished to the Contracting Officer and/or his Representative. (FAR 52.236-16)

d. Contractor's participation in surveys: In accordance with agency policy guidance, the preferred methods of performance of all hydrographic quantity surveys shall be (in descending order):

(1) The Government will perform quantity surveys by using qualified in-house crews, if available.

(2) The Government will provide quantity surveys by contracting directly with qualified independent hydrographic survey contractors.

(3) The Government will permit, only in exceptional circumstances, the use of dredging contractor's surveys if the Contracting Officer and/or his Representative determine that such surveys are adequate and reasonable for payment purposes.

If it is determined by the Contracting Officer that it is impractical for Government personnel to perform the original and final surveys and the Government wishes the Contractor's surveys to be used, the following will be required from the Contractor:

(a) Acceptance of all monumentation and transponder locations.

(b) Witness by a Corps of Engineers representative of all calibration procedures such as vertical and horizontal control.

(c) Corps of Engineers observation of raw data collection.

(d) Submittal of both unedited as well as edited versions of survey maps.

(e) Subsequent acceptance of edited survey map after determination by Corps survey personnel that editing was conducted in accordance with U.S. Army Corps of Engineers specifications and guidelines. (FAR 52.236-16 - ALTERNATE I, APR 1984)

e. The Contractor is obligated to participate in all stages of data collection during the performance of Before and After Dredge Surveys. Any disagreements with the data collection process shall immediately be brought to the attention of the Contracting Officer or his representative who will determine the necessary corrective measures, if any. **Failure to be**

**present during the survey data collection disqualifies the Contractor from any such related claims.**

**37. SAFETY SIGN**

The Contractor shall construct a safety sign at a location directed by the Contracting Officer and/or his Representative. The sign shall be 6 feet by 4 feet and shall conform to the requirements as specified in Section 00900, Attachment E, Project Identification and Safety Signs. The Corps of Engineers castle logo (an 8.5" x 11" red decal) to be used on the sign will be Government furnished. **The Contractor will be given this logo at the time of the preconstruction conference.**

The decal shall receive a thin coat of clear spar varnish after application. The sign shall be erected as soon as possible and within 5 calendar days after the date of the receipt of the Notice to Proceed. The data required by the sign shall be corrected daily. No separate payment will be made for erecting and maintaining the safety sign and all costs in connection therewith will be considered the obligation of the contractor. Upon completion of the project, the Contractor shall remove the sign from the work site.

**38. PROJECT SIGN**

The Contractor shall furnish and erect a project sign at a location directed by the Contracting Officer or Contracting Officer's Representative. The project sign shall conform with all requirements as specified in Section 00900, Attachment E, Project Identification and Safety Signs. The Corps of Engineers' castle logo and other logos (8.5" x 11") to be used on the sign will be Government furnished. **The Contractor will be given these logos at the time of the preconstruction conference.**

The decal(s) shall receive a thin coat of clear spar varnish after application. The Contractor shall maintain the sign in good condition throughout the construction period. No separate payment will be made for erecting and maintaining the project sign, and all costs in connection therewith will be considered the obligation of the Contractor. Upon completion of the project, the Contractor shall remove the sign from the work site.

**39. EQUAL OPPORTUNITY PREAWARD CLEARANCE OF SUBCONTRACTS**

Notwithstanding the clause of this contract entitled "Subcontracts," the Contractor shall not enter into a first-tier subcontract for an estimated or actual amount of $1 million or more without obtaining in writing from the Contracting Officer and/or his Representative a clearance that the proposed subcontractor is in compliance with the equal opportunity requirements and therefore is eligible for award.

**40. SCHEDULING AND DETERMINATION OF PROGRESS**

In accordance with the contract provisions, the Contractor shall, within five (5) days after receipt of Notice to Proceed by him or as otherwise determined by the Contracting Officer and/or his Representative, submit for approval a practicable progress schedule. The progress schedule shall be in the form of a chart graphically indicating the sequence proposed to accomplish each work feature of operation (Eng. Form 2454 or an acceptable equivalent -e.g., computer-generated from a commercially-available project management software package). The chart shall be prepared to show the starting and completion dates of all work features on a linear horizontal time scale beginning with date of the receipt of the Notice to Proceed and indicating calendar days to completion. Each activity in construction shall be represented by an arrow. The head to tail arrangement of arrows shall flow from left to right. Each arrow representing an activity shall be annotated to show the activity description and duration. Contractor shall indicate on the chart the important work features or operations that are critical to the timely overall completion of the project. Key dates for such important work features and portions of work features are milestone dates and shall be so indicated on the chart. This schedule will be the medium through which the timeliness of the Contractor's construction effort is appraised. When changes are authorized that result in contract time extensions, the Contractor shall submit a modified chart for approval by the Contracting Officer and/or his Representative. The terms of Section 00700, Contract Clause entitled: SCHEDULES FOR CONSTRUCTION CONTRACTS, with reference to overtime, extra shifts, etc., may be invoked when the Contractor fails to start or complete work features or portions of same by the time indicated by the milestone dates on the approved progress chart, or when it is apparent to the Contracting Officer from the Contractor's actual progress that

these dates will not be met. Neither on the chart nor on the periodic charts which the Contractor is required to prepare and submit, as described in paragraph, SCHEDULES FOR CONSTRUCTION CONTRACTS of the Contract Clauses, shall the actual progress to be entered include or reflect any materials which may be on the site, but are not yet installed or incorporated in the work. For payment purposes only, an allowance will be made by the Contracting Officer and/or his Representative of up to 100 percent of the invoiced cost of materials or equipment delivered to the site but not incorporated into the construction, pursuant to Section 00700, Contract Clause entitled: "PAYMENT UNDER FIXED-PRICE CONSTRUCTION CONTRACTS." The making of such an allowance will be contingent upon a determination by the Contracting Officer and/or his Representative that the Contractor's compliance with the quality control requirements of the contract is more than satisfactory.

When the contractor submits his progress schedule, he will include in the submission a progress curve reflecting the intended schedule for completing the work. The progress curve (S-Curve) will be plotted to reflect Cumulative Progress (Percent) based on placement along the y-axis and Time along the x-axis. The progress curve will be furnished at the same time the progress schedule is submitted for approval and updated monthly by the Contractor.

**41. SPECIAL PROHIBITION ON EMPLOYMENT**

a. Definitions: "Arising out of a contract with the Department of Defense," as used in this clause, means any act in connection with (1) attempting to obtain, (2) obtaining, or (3) performing a contract or subcontract of any agency, department or component of the Department of Defense.

b. "Convictions of fraud or any other felony," as used in this clause, means any conviction for fraud or a felony in violation of state or Federal criminal statutes, whether entered on a verdict or plea, including a plea of nolo contendere, for which sentence has been imposed.

c. Section 941, Title IX, Pub. L. 99-500 (10 U.S.C. 2408) prohibits a person who is convicted of fraud or any other

felony arising out of a contract with the Department of Defense from working in a management or supervisory capacity on any defense contract, or serving on the board of directors of any defense contractor, for a period, as determined by the Secretary of Defense, of not less than one (1) year from the date of conviction. Defense contractors are subject to a criminal penalty of not more than $500,000 if they are convicted of knowingly employing a person under a prohibition or allowing such person to serve on their board of directors.

d. The Contractor agrees not to knowingly employ any person, convicted of fraud or any other felony arising out of a contract with the Department of Defense contract or subcontract or allow such person to serve on its board of directors from the date the Contractor learns of the conviction until one (1) year has expired from the date of conviction. However, if the person has also been debarred pursuant to FAR subpart 9.4, the above prohibition shall extend for the period of debarment, but in no event shall the prohibition be less than (1) year from the date of conviction.

e. If the Contractor knowingly employs a convicted person in a management or supervisory capacity on any defense contract or subcontract or knowingly allows such person to serve on its board of directors within the prohibited period, the Government may consider, in addition to the criminal penalties contained in Section 941 of Pub. L. 99-500, other available remedies, such as suspension or debarment and may direct the cancellation of this contract at no cost to the Government, or terminate this contract for default.

f. The Contractor agrees to include the substance of this clause, including this paragraph (e), appropriately modified to reflect the identity and relationship of the parties, in all subcontracts exceeding $25,000.

**42. SUPERINTENDENCE OF SUBCONTRACTS (JAN 1965)**

a. The Contractor shall be required to furnish the following, in addition to the superintendence required by the Contract Clauses entitled: "Superintendence by the Contractor."

(1) If more than 50% and less than 70% of the value of the contract work is subcontracted, one superintendent shall be provided at the site and on the Contractor's payroll to be responsible for coordinating, directing, inspecting and expediting the subcontract work.

(2) If 70% or more of the value of the work is subcontracted, the Contractor shall be required to furnish two such superintendents to be responsible for coordinating, directing, inspecting and expediting the subcontract work.

b. If the Contracting Officer, at any time after 50% of the subcontracted work has been completed, finds that satisfactory progress is being made, he may waive all or part of the above requirement for additional superintendence subject to the right of the Contracting Officer to reinstate such requirement if at any time during the progress of the remaining work he finds that satisfactory progress is not being made. (DOD FAR Supplement 52.236-7008)

**43. PROCEDURES FOR SUBMISSION AND PAYMENT OF ALL CONTRACT PAYMENTS**

In addition to the requirements contained in the Contract Clause entitled "Payments Under Fixed-Price Construction Contracts" and to implement the requirements of the Prompt Payment Act Amendments of 1988, P.L. 100-496, the following shall apply to all payments made under this contract:

a. At the time of submission of the progress chart, the contractor shall submit for approval by the Contracting Officer or his authorized representative a breakdown of the contract work which shall be to the degree of detail required by the Contracting Officer or his representative to effect reasonable progress payments. The Contracting Officer or his representative shall review this breakdown within 30 calendar days after receipt and either advise the contractor that it is approved or disapproved, and if disapproved the reasons for disapproval. Only after the breakdown is approved shall any payment invoice be accepted from the contractor and any payment made to him. The Contracting Officer can determine it is in the best interest of the Government to make payment without an approved

breakdown, however, in no case shall more than 10% of the contract amount be paid unless the breakdown is approved.

b. The contractor shall submit his request for payment by submission of a proper invoice to the office or person(s) designated in paragraph "c". For purposes of payment a "proper invoice" is defined as the following:

(1) An estimate of the work completed in accordance with the approved breakdown indicating the percentage of work of each item and the associated costs.

(2) A properly completed ENG Form 93 and 93a (where required).

(3) All contractual submissions indicated elsewhere in this contract to be submitted with payment, such as updated progress schedules, updated submittal registers, etc.

The following certification executed by a responsible official of the organization authorized to bind the firm. A "responsible official" would be either a corporate officer, partner, or owner, in the case of a sole proprietorship:

I hereby certify, to the best of my knowledge and belief, that:

(1) The amounts requested are only for performance in accordance with the specifications, terms and conditions of the contract;

(2) Payments to subcontractors and suppliers have been made from previous payments received under the contract and timely payments will be made from the proceeds of the payment covered by this certification, in accordance with subcontract requirements and the requirements of Chapter 39 of Title 31, United States Code; and

(3) This request for progress payments does not include any amounts, which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract.

(4) All required prime and subcontractor payrolls have been submitted.

________________________________________

(Name)

________________________________________

(Title)

________________________________________

(Date)

c. The Government shall designate the office or person(s) who shall first receive the invoice submissions and the Contractor shall be notified at the preconstruction conference. In addition, the contractor shall at the same time submit one copy of the detailed breakdown and the ENG Form 93 and 93a Form to the Project Engineer.

d. The Government representative shall return any request for payment, which is deemed defective within 7 days of receipt and shall specify the defects. Telephone calls with MFR or E-mail notification of the Contractor about the defective invoice shall be considered sufficient notice to the Contractor. If the defect concerns a disagreement as to the amount of work performed and or the amount of the payment being submitted, the Government and the contractor's representative should meet to resolve the differences and reach agreement. Upon agreement, the contractor shall submit a new breakdown and ENG Form 93 (and 93a) and any other submissions requiring correction. These will be incorporated with the previous submittal and will then constitute a proper invoice.

e. If agreement cannot be reached, the Government shall determine the proper amount per Contract Clause entitled: "Payments Under Fixed-Price Construction Contracts" and process the payment accordingly. In this event, "a proper

invoice" for Prompt Payment Act purposes will not have been submitted to the Government.

f. The Government shall pay the contractor in accordance with the following time frames:

(1) Progress Payments. From the date a "Proper invoice" is received, in accordance with subparagraphs "b" and "d" of this clause, the Government will issue a check within 14 calendar days.

(2) Reduction in Retaining Payment. If during the course of the contract, a reduction in retainage payment is required, the Government shall issue a check within 30 calendar days after the approval of the release to the contractor by the Contracting Officer or his authorized representative.

(3) Final Payment. A final payment request shall not be considered valid until the contractor has fulfilled all contract requirements including all administrative items, payrolls, warranties, etc. and has submitted a release of claims. When the contractor has fulfilled all contract requirements and a "proper invoice" has been submitted, the Government shall issue a check within 30 days from the date of acceptance of the project by the Contracting Officer.

**44. SUBMISSION OF CLAIMS**

The following shall be submitted to the Contracting Officer at the following address: U.S. Army Corps of Engineers, New York District, 26 Federal Plaza, New York, New York 10278-0090:

a. Claims referencing or mentioning the Contact Disputes Act of 1978.

b. Requests for a written decision by the Contracting Officer.

c. Claims certified in accordance with the Contract Disputes Act of 1978.

No other Government representative is authorized to accept such requests. A copy shall also be provided to the Authorized Representative of the Contracting Officer.

The Contractor shall also provide The Contracting Officer with a copy of any requests for additional time, money or interpretation of contract requirements which were provided to the Authorized Representative of the Contracting Officer and which have not been resolved after 90 days.

**45. SAFETY REQUIREMENTS FOR OPERATIONS ADJACENT TO POWER LINES.**

When it is necessary to transport or operate machinery or equipment under or adjacent to overhead power lines, the requirements of paragraph 11.E - OPERATING ADJACENT TO OVERHEAD LINES, in the Corps of Engineers Manual, EM 385-1-1, dated 3 September 1996, entitled "Safety & Health Requirements Manual" and referred to in the Accident Prevention Provision of General Provisions, shall govern.

**46. CRANE AND DRAGLINE SAFETY REQUIREMENTS**

In addition to meeting all applicable requirements of OSHA standards and Section 16 of the Corps of Engineers Manual, EM 385-1-1, dated 3 September 1996, all cranes used in performing the work set forth in these specifications shall be equipped with geared boom hoists or otherwise provided with mechanisms which will prevent the booms from falling free. Cranes that are equipped with booms that can be lowered either by gravity or by power shall have the mechanisms for operating the booms by gravity made inoperative so that the booms cannot be lowered by gravity. The booms of all cranes and draglines shall also be equipped with shock absorbing type back stops to prevent them from overtopping.

All crane operators must meet the EM 385-1-1 qualification requirements.

**47. OPERATOR QUALIFICATIONS FOR FLOATING CRANES AND FLOATING DERRICKS (SAFETY AND HEALTH REQUIREMENT, EM385-1-1, SECTION 16.C)**

All floating cranes and floating derricks may be only operated by qualified operators. Operators shall be designated as qualified by a source which qualifies crane and derrick operators (e.g. an independent testing and qualifying company, a union, a

governmental agency, a qualified consultant (can be an in-house resource)). Qualification shall be written (or oral) and practical operating examination unless the operator is licensed by a state or city licensing agency for the particular type of crane or derrick. Proof of qualification of crane and derrick operators shall be provided to the Contracting Officer's representative prior to the start of work.

**48. ACCIDENT PREVENTION PLAN**

The Contractor is required to submit to the Contracting Officer or Contracting Officer Representative an accident prevention plan at the preconstruction conference. The accident prevention plan must be in accordance with all federal safety standards as specified in EM 385-1-1, dated 3 September 1996, entitled "Safety & Health Requirements Manual". Guidelines For Preparation Of The Accident Prevention Plan are located in Section 0900, Attachment H.

**49. ALTERATIONS IN CONTRACT (APR 1984)**

Portions of the contract are altered as follows:

a. Add the following sentence to paragraph "a" of Section 00700, Contract Clause: Insurance - Work on a Government Installation: "Insurance Coverage shall be as specified in 28.307 of the Federal Acquisition Regulation".

b. The following clause is incorporated as part of the contract: "By entering into this contract, the Contractor certifies that neither it, nor any person or firm who has an interest in the Contractor's firm, is a person, or firm ineligible in accordance with FAR subpart "9.4" (DEAN-PRP EFAR Acquisition Letter 85-1 dated 11 Sept 85)

**50. CONTINUING CONTRACTS (1985 JAN HQ USACE)**

a. This is a continuing contract, as authorized by Section 10 of the Rivers and Harbors Act of September 22, 1922 (33 U.S. Code 621). The payment of some portion of the contract price is dependent upon reservation of funds from future appropriations. The responsibilities of the Government are limited by this clause notwithstanding any contract provisions of the "Payments to Contractor" clause or any other clause of this contract.

b. (1) The sum of **$100.00** has been reserved for this contract and will be obligated as needed to the Contractor for payments during the 2002 fiscal year. It is expected that Congress will make appropriations for the 2003 fiscal year from which additional funds will be reserved for this contract.

(2) Failure to make payments in excess of the amount currently reserved, or that may be reserved from time to time, shall not entitle the Contractor to a price adjustment under terms of this contract except as specifically provided in paragraphs (d) and (e) below. No such failure shall constitute a breach of this contract, except that this provision shall not bar a breach-of-contract action if an amount finally determined to be due as a termination allowance remains unpaid for one year due to a failure to reserve sufficient additional funds therefore.

c. (1) The Government may at any time reserve additional funds for payments under the contract if there are available funds for such a purpose. The Contracting Officer will promptly notify the Contractor of any change order to the contract.

(2) If earnings will be such that funds reserved for the contract will be exhausted before the end of any fiscal year, the Contractor shall give written notice to the Contracting Officer of the estimated date of exhaustion and the amount of additional funds which will be needed to meet payments due or to become due under the contract during that fiscal year. This notice shall be given not less than 45 days or more than 60 days prior to the estimated date of exhaustion.

d. (1) No payments will be made after exhaustion of funds except to the extent that additional funds are reserved for the contract. The Contractor shall be entitled to simple interest on any payment that the Contracting Officer determines was actually earned under the terms of the contract and would have been made except for exhaustion of funds. Interest shall be computed for the time such payment would otherwise have been made until actually or constructively made, and shall be at the rate established by the Secretary of the Treasury pursuant to Public Law 92-41, 83 STAT 97, for the

Renegotiation Board, as in effect on the first day of the delay in such payment.

(2) Any suspension, delay, or interruption of work arising from exhaustion or anticipated exhaustion of funds shall not constitute a breach of this contract and shall not entitle the Contractor to any price adjustment under the "Suspension of Work" clause or in any other manner under this contract.

(3) An equitable adjustment in performance time shall be made for any increase in the time required for performance of any part of the work arising from exhaustion of funds of the reasonable anticipation of exhaustion of funds.

e. If, upon the expiration of sixty (60) days after the beginning of the fiscal year following an exhaustion of funds, the Government has failed to reserve sufficient additional funds to cover payments otherwise due, the Contractor, by written notice delivered to the Contracting Officer at any time before such additional funds are reserved, may elect to treat his right to proceed with the work as having terminated. Such a termination shall be considered a termination for the convenience of the Government.

f. If at any time it becomes apparent that the funds reserved for any fiscal year are in excess of the funds required to meet all payments due or to become due to the Contractor because of work performed and to be performed under this contract during the fiscal year, the Government reserves the right, after notice to the Contractor, to reduce said reservation by the amount of such excess.

## SECTION 00900

## LIST OF DOCUMENTS, EXHIBITS, AND OTHER ATTACHMENTS

## TABLE OF CONTENTS

| ATTACHMENT | TITLE |
|---|---|
| A | REFERENCE MAP AND DRAWINGS |
| B | WAGE RATES |
| C | DAILY CONSTRUCTION QUALITY CONTROL REPORT |
| D | PERMITS:<br>NEW YORK STATE WATER QUALITY CERTIFICATE (TO BE PROVIDED)<br>NEW JERSEY STATE WATER QUALITY CERTIFICATION (TO BE PROVIDED) |
| E | PROJECT IDENTIFICATION AND SAFETY SIGNS |
| F | 33 CFR 156, OIL AND HAZARDOUS MATERIAL TRANSFER OPERATIONS |
| G | SUBMITTAL REGISTER (ENG. FORM 4288) |
| H | GUIDELINES FOR PREPARING THE ACCIDENT PREVENTION PLAN |
| I | DAILY REPORT OF OPERATIONS (ENG. FORM 4267) |
| J | USACE TRANSPORTATION AND PLACEMENT LOG |


63
NEW
JERSEY
STATEN
ISLAND
BROOKLYN
ELIZABETH
LINDEN
CHELSEA
CARTERET
FRESH KILLS
KREISCHERVILLE
PERTH AMBOY
TOTTENVILLE
STAPLETON
BAY RIDGE
FORT HAMILTON
CONEY ISLAND
GREAT KILLS
KILL VAN KULL
ARTHUR
BAYONNE
LAURENCE HARBOR
KEYPORT
KEANSBURG
PORT MONMOUTH
PORT RICHMOND
SANDY HOOK
NOTE
For Existing Project See Sheets No. 2 & 3
N. Y. AND N. J. CHANNELS
GENERAL MAP
30 SEPTEMBER 1986
SCALE OF FEET
5000 0 5000
DEPARTMENT OF THE ARMY
NEW YORK DISTRICT, CORPS OF ENGINEERS
NEW YORK, NEW YORK
(SHEET NO. 1 OF 3 SHEETS)

00900 ATT. A-1


LIMITS OF DREDGING
STATEN ISLAND
NEW JERSEY
ARTHUR KILL
LIMITS OF DREDGING
DATUM PLANES
M.L.W. (FROM PORT READING TO RAHWAY RIVER) 2.4 FT. BELOW M.S.L.
M.L.W. (FROM RAHWAY RIVER TO ST. GEORGE) 2.3 FT. BELOW M.S.L.

00900 ATT. A-2

General Decision No: NJ010006 ( (Dredging, Statewide)

Modification Number 0

Publication Date: 03/01/02

General Decision No: N020001 ( (Dredging, Statewide)

Modification Number 0

Publication Date: 03/01/02

Labor Surplus Area:

Union County, Middlesex Counties - No

Richmond County - Yes

Affirmative Action Requirements:

Female: 6.9%

Minority: 17.3% Union County
5.8 Middlesex County

**Richmond County:**

| For Women | |
|---|---|
| All | 6.9% |
| Trade | For Minorities |
| Electricians | 9.0% - 10.2% |
| Carpenters | 27.6% - 32.0% |
| Steamfitters | 12.2% - 13.5% |
| Metal Lathers | 24.6% - 25.6% |
| Painters | 22.8% - 26.0% |
| Operating Engineers | 25.6% - 26.0% |

| | |
|---|---|
| Plumbers | 12.0% - 14.5% |
| Iron Workers (Structural) | 25.9% - 32.0% |
| Elevator Constructors | 5.5% - 6.5% |
| Bricklayers | 13.4% - 15.5% |
| Asbestos Workers | 22.8% - 28.0% |
| Roofers | 6.3% - 7.5% |
| Iron Workers (Ornamental) | 22.4% - 23.0% |
| Cement Masons | 23.0% - 27.0% |
| Glaziers | 16.0% - 20.0% |
| Plasterers | 5.8% - 18.0% |
| Teamsters | 22.0% - 22.5% |
| Boilermakers | 3.0% - 15.5% |
| All Other | 16.4% - 17.5% |

---

General Decision Number NY020001
Superseded General Decision No. NY010001
State: New York Construction Type:
DREDGING County(ies):
STATEWIDE
New York All dredging, excpt self-propelled hopper dredges, on the Atlantic Coast and tributary waters emptying into ther Atlantic Ocean.

Modification Number Publication Date
03/01/2002

COUNTY(ies):
STATEWIDE
ENGI0025D 10/01/2001

| | Rates | Fringes |
|---|---|---|
| DIPPER & CLAMSHELL DREDGE: | | |
| Operator | 27.45 | 6.20+a+b |
| Engineer | 24.17 | 6.20+a+b |
| Maintenance Engineer | 23.07 | 5.60+a+b |

| | | |
|---|---|---|
| Welder | 22.71 | 5.60+a+b |
| Mate | 21.51 | 5.60+a+b |
| Boat Master | 22.73 | 6.20+a+b |
| Boat Captain | 21.66 | 5.60+a+b |
| Oiler | 18.18 | 5.00+a+b |
| Deckhand; Tug Deckhand | 17.73 | 5.00+a+b |
| Scowman | 17.49 | 5.00+a+b |
| DRAG BUCKET DREDGE: | | |
| Operator | 25.09 | 6.20+a+b |
| Engineer | 21.41 | 6.20+a+b |
| Maintenance Engineer | 21.21 | 5.60+a+b |
| Mate | 19.82 | 5.60+a+b |
| Deckhand | 16.17 | 5.00+a+b |
| HYDRAULIC DREDGES: | | |
| Leverman | 26.95 | 6.20+a+b |
| Engineer; Derrick Operator | 23.64 | 6.20+a+b |
| Chief Mate | 23.29 | 6.20+a+b |
| Chief Welder | 23.94 | 6.20+a+b |
| Maintenance Engineer | 23.07 | 5.60+a+b |
| Electrician | 22.92 | 6.20+a+b |
| Welder Dredge | 22.70 | 5.60+a+b |
| Spider Barge Operator | 22.50 | 5.60+a+b |
| Mate | 21.51 | 5.60+a+b |
| Boat Master | 22.72 | 6.20+a+b |
| Boat Captain | 21.66 | 5.60+a+b |
| Steward | 21.49 | 6.20+a+b |
| Oiler | 18.18 | 5.00+a+b |
| Deckhand | 17.50 | 5.00+a+b |
| Tug Deckhand | 17.73 | 5.00+a+b |
| Shoreman | 17.50 | 5.00+a+b |
| Assistant Cook | 17.61 | 5.00+a+b |
| Night Cook | 17.61 | 5.00+a+b |
| Messman | 17.10 | 5.00+a+b |
| Janitor/Porter | 17.10 | 5.00+a+b |
| Fill Placer | 23.29 | 6.20+a+b |
| Assistant Fill Placer | 21.32 | 6.20+a+b |
| COMPANY LEAD DREDGEMAN: | | |
| Lead Dredgeman | 26.95 | 6.20+a+b |
| TUG BOATS over 1,000 H.P. (with master or captain having license endorsed for 200 miles off shore): | | |
| Tug Master | 24.14 | 6.20+a+b |
| Tug Captain | 23.17 | 6.20+a+b |
| Tug Chief Engineer | 22.45 | 5.60+a+b |
| Tug Engineer | 21.99 | 5.60+a+b |
| Tug Deckhand | 17.73 | 5.00+a+b |
| TUG BOATS over 1,000 H.P. (without | | |

| | | |
|---|---|---|
| master or captain having license endorsed for 200 miles off shore): | | |
| Tug Master | 22.72 | 6.20+a+b |
| Tug Captain | 21.66 | 5.60+a+b |
| Tug Engineer | 21.99 | 5.60+a+b |
| Tug Deckhand | 17.73 | 5.00+a+b |
| DRILL BOATS: | | |
| Engineer | 23.54 | 6.20+a+b |
| Blaster | 23.81 | 6.20+a+b |
| Driller | 23.55 | 6.20+a+b |
| Welder | 23.30 | 5.60+a+b |
| Machinist | 23.30 | 5.60+a+b |
| Tug Master | 20.48 | 6.20+a+b |
| Tug Captain | 19.53 | 5.60+a+b |
| Oiler | 20.46 | 5.00+a+b |
| Tug Deckhand | 15.97 | 5.00+a+b |
| Core Driller | 18.56 | 5.00+a+b |
| DIVERS: | | |
| Diver | 39.98 | 6.20+a+b |
| Standby Diver | 26.60 | 6.20+a+b |
| Tender | 30.77 | 6.20+a+b |
| Standby Tender | 22.11 | 5.60+a+b |
| DREDGING PIPELINE CABLE-LAYING: | | |
| Leverman | 27.56 | 6.20+a+b |
| Control Tower Operator | 24.35 | 6.20+a+b |
| Rigger | 18.01 | 5.00+a+b |
| Line up Operator, End Prep. | 17.43 | 5.00+a+b |
| Diver | 40.85 | 6.20+a+b |
| Diver Tender | 25.36 | 6.20+a+b |
| ENGINEER: | | |
| 1st | 24.35 | 6.20+a+b |
| 2nd, 3rd & 4th | 24.04 | 6.20+a+b |
| Electrician | 24.48 | 6.20+a+b |
| Electro Hydro Tech. | 19.70 | 5.60+a+b |
| Tug Master | 25.57 | 6.20+a+b |
| Tug Captain | 22.29 | 6.20+a+b |

PREMIUMS: Additional 20% for hazardous material work

FOOTNOTES APPLICABLE TO ABOVE CRAFTS:

a. PAID HOLIDAYS: New Year's Day, Martin Luther King Day, Memorial Day, Good Friday, Independence Day, Labor Day, Veterans' Day, Thanksgiving Day, and Christmas Day

b. VACATION: Seven percent (7%) of the straight time rate multiplied by the total hours worked.

---

WELDERS - Receive rate prescribed for craft performing operation to which welding is incidental.

================================================================

Unlisted classifications needed for work not included within the scope of the classifications listed may be added after award only as provided in the labor standards contract clauses (29 CFR 5.5(a)(1)(v)).

----------------------------------------------------------------

In the listing above, the "SU" designation means that rates listed under that identifier do not reflect collectively bargained wage and fringe benefit rates. Other designations indicate unions whose rates have been determined to be prevailing.

WAGE DETERMINATION APPEALS PROCESS

1.) Has there been an initial decision in the matter? This can be:

* an existing published wage determination
* a survey underlying a wage determination
* a Wage and Hour Division letter setting forth a position on a wage determination matter
* a conformance (additional classification and rate) ruling

On survey related matters, initial contact, including requests for summaries of surveys, should be with the Wage and Hour Regional Office for the area in which the survey was conducted because those Regional Offices have responsibility for the Davis-Bacon survey program. If the response from this initial contact is not satisfactory, then the process described in 2.) and 3.) should be followed.

With regard to any other matter not yet ripe for the formal process described here, initial contact should be with the Branch of Construction Wage Determinations. Write to:

Branch of Construction Wage Determinations
Wage and Hour Division
U. S. Department of Labor
200 Constitution Avenue, N. W.
Washington, D. C. 20210

2.) If the answer to the question in 1.) is yes, then an interested party (those affected by the action) can request review and reconsideration from the Wage and Hour Administrator (See 29 CFR Part 1.8 and 29 CFR Part 7). Write to:

Wage and Hour Administrator
U.S. Department of Labor
200 Constitution Avenue, N. W.
Washington, D. C. 20210

The request should be accompanied by a full statement of the interested party's position and by any information (wage payment data, project description, area practice material, etc.) that the requestor considers relevant to the issue.

3.) If the decision of the Administrator is not favorable, an interested party may appeal directly to the Administrative Review Board (formerly the Wage Appeals Board). Write to:

Administrative Review Board
U. S. Department of Labor
200 Constitution Avenue, N. W.
Washington, D. C. 20210

4.) All decisions by the Administrative Review Board are final.

END OF GENERAL DECISION

*****************************************************************

* General Decision Number NJ020006-------------------------------
-------------------------------------------- General Decision Number NJ020006

Superseded General Decision No. NJ010006
State: New Jersey Construction Type:
DREDGING County(ies):
STATEWIDE
All Dredging except self propelled hopper dredges, on the Atlantic Coast & tributary waters emptying into the Atlantic Ocean.

| Modification Number | Publication Date |
|---|---|
| 0 | 03/01/2002 |

COUNTY(ies):
STATEWIDE
ENGI0025D 10/01/2001

| | Rates | Fringes |
|---|---|---|
| DIPPER & CLAMSHELL DREDGE: | | |
| Operator | 27.45 | 6.20+a+b |
| Engineer | 24.17 | 6.20+a+b |
| Maintenance Engineer | 23.07 | 5.60+a+b |
| Welder | 22.71 | 5.60+a+b |
| Mate | 21.51 | 5.60+a+b |
| Boat Master | 22.73 | 6.20+a+b |
| Boat Captain | 21.66 | 5.60+a+b |
| Oiler | 18.18 | 5.00+a+b |
| Deckhand; Tug Deckhand | 17.73 | 5.00+a+b |
| Scowman | 17.49 | 5.00+a+b |
| DRAG BUCKET DREDGE: | | |
| Operator | 25.09 | 6.20+a+b |
| Engineer | 21.41 | 6.20+a+b |
| Maintenance Engineer | 21.21 | 5.60+a+b |
| Mate | 19.82 | 5.60+a+b |
| Deckhand | 16.17 | 5.00+a+b |
| HYDRAULIC DREDGES: | | |
| Leverman | 26.95 | 6.20+a+b |
| Engineer; Derrick Operator | 23.64 | 6.20+a+b |
| Chief Mate | 23.29 | 6.20+a+b |

| | | |
|---|---|---|
| Chief Welder | 23.94 | 6.20+a+b |
| Maintenance Engineer | 23.07 | 5.60+a+b |
| Electrician | 22.92 | 6.20+a+b |
| Welder Dredge | 22.70 | 5.60+a+b |
| Spider Barge Operator | 22.50 | 5.60+a+b |
| Mate | 21.51 | 5.60+a+b |
| Boat Master | 22.72 | 6.20+a+b |
| Boat Captain | 21.66 | 5.60+a+b |
| Steward | 21.49 | 6.20+a+b |
| Oiler | 18.18 | 5.00+a+b |
| Deckhand | 17.50 | 5.00+a+b |
| Tug Deckhand | 17.73 | 5.00+a+b |
| Shoreman | 17.50 | 5.00+a+b |
| Assistant Cook | 17.61 | 5.00+a+b |
| Night Cook | 17.61 | 5.00+a+b |
| Messman | 17.10 | 5.00+a+b |
| Janitor/Porter | 17.10 | 5.00+a+b |
| Fill Placer | 23.29 | 6.20+a+b |
| Assistant Fill Placer | 21.32 | 6.20+a+b |
| COMPANY LEAD DREDGEMAN: | | |
| Lead Dredgeman | 26.95 | 6.20+a+b |
| TUG BOATS over 1,000 H.P. (with master or captain having license endorsed for 200 miles off shore): | | |
| Tug Master | 24.14 | 6.20+a+b |
| Tug Captain | 23.17 | 6.20+a+b |
| Tug Chief Engineer | 22.45 | 5.60+a+b |
| Tug Engineer | 21.99 | 5.60+a+b |
| Tug Deckhand | 17.73 | 5.00+a+b |
| TUG BOATS over 1,000 H.P. (without master or captain having license endorsed for 200 miles off shore): | | |
| Tug Master | 22.72 | 6.20+a+b |
| Tug Captain | 21.66 | 5.60+a+b |
| Tug Engineer | 21.99 | 5.60+a+b |
| Tug Deckhand | 17.73 | 5.00+a+b |
| DRILL BOATS: | | |
| Engineer | 23.54 | 6.20+a+b |
| Blaster | 23.81 | 6.20+a+b |
| Driller | 23.55 | 6.20+a+b |
| Welder | 23.30 | 5.60+a+b |
| Machinist | 23.30 | 5.60+a+b |
| Tug Master | 20.48 | 6.20+a+b |
| Tug Captain | 19.53 | 5.60+a+b |
| Oiler | 20.46 | 5.00+a+b |
| Tug Deckhand | 15.97 | 5.00+a+b |
| Core Driller | 18.56 | 5.00+a+b |