# EXHIBIT 5

***Harold Hawkins - Proprietary***

vague — a vague understanding as an engineer would of reading, you know, the document.

**Q:** In your responsibilities for the Army Corps, do you, from time to time, review documents such as these permits?

**A:** We basically see that they have such a document.

The enforcement of this document is not so much with us as it is with the state. If the state has a problem with the facility and complying with their permit, and they need our assistance in bringing the facility into compliance, we will basically get involved.

But other than them having a problem with compliance with their requirements, we don't get involved and we have never gotten involved in any of these permits with regard to violating — you know, violation of them. That would be totally, you know, when we would get involved with this document.

**Q:** And have you gotten involved with respect to —

**A:** No.

**Q:** No?



***Harold Hawkins - Proprietary***

**A:** They have complied, as far as I know, completely with all their requirements.

**Q:** I'm going to show you an exhibit that has been previously marked as Plaintiff's Exhibit 7.

**A:** Okay.

**MR. ADLER:** Let the record reflect that the witness has been provided with Plaintiff's Exhibit 7.

**Q:** Do you recognize this?

**A:** This is our website. Corps' website.

**Q:** And I'd like to turn your attention to the page numbered — well, has been Bates-numbered TDM006585.

**A:** Eighty-five?

**Q:** Yes, it's about maybe ten pages in or something. It look likes this (indicating).

**A:** All right. Your first documents were — they threw me off, the numbers.

Yes.

**Q:** Actually, excuse me, I'm going to refer you, first, to TDM006578.



***Harold Hawkins - Proprietary***

**A:** Okay.

**Q:** The third row from the wider row from the bottom says — first off, do you recognize this page?

**A:** Not offhand.

**Q:** Do you have an understanding of what under — under the column marked — under the column titled "DISPTYPE," if you go down — eight boxes down, it says "Upland."

**A:** Upland. Okay. Oh. Saying bid? Are you referring to the cubic yards bid?

**Q:** Well, I'm referring, first of all, to this row (indicating).

**MS. FRANKLIN:** He hasn't asked a question yet.

**Q:** I just want to point you to where my question might be directed to.

Do you understand what these entries are on this row?

**A:** Yes.

**Q:** What are they?

**A:** They're — the top line with regard to upland, is the number of contracts that were



***Harold Hawkins - Proprietary***

issued. And then, the second line is the cubic yards that were bid for those contracts, and the approximate dollar value.

**Q:** Do you have an understanding of what upland means?

**A:** Upland is base clay, the material that cannot go out to the ocean.

**Q:** Is that mostly treated dredged material?

**A:** Mostly, yes.

**Q:** Do you have idea if it's more than like 75 percent?

**A:** I have no idea of the percentage.

**Q:** You think it's a majority or more than 50 percent?

**A:** I would say so. I mean, most of the material that we dredge is silt which is usually treated.

We have as I said, in the past, you know, had some contracts that were sand and because it was not tested, ended up being brought upland and we did have sometimes some clay-ish material that also had to go upland that didn't need to be treated as well.

# EXHIBIT 6

T. Witte

deleted the cement supply, no one could process in the area for a while.

Q. And so Donjon is responsible for those delays?

A. I tried to argue otherwise, but they didn't want to hear it.

Q. Can you tell from this document the total volume of dredged material that was processed for upland disposal?

A. Yes.

Q. How much?

A. 140,840 cubic yards.

Q. As a general rule with respect to your contracts with the US, was all upland disposal material processed?

A. Say that again, I'm sorry.

Q. Was all material that was disposed upland processed?

A. With the caveat that OENJ had some difficulty processing.

Q. As you mentioned earlier?

A. Yes, right.

Q. That should have been processed?

A. Right, I don't know how that was

T. Witte

resolved.

Q. I am going show you what was previously marked as Plaintiff's Exhibit No. 53, and ask you whether or not you recognize it, and just for the sake of reference, I'm sure your attorney won't mind, I will just guide you that this Box 4 on top that says contract number W912DS-05-C-0020.

A. 0020?

Q. Correct.

A. Maintenance of Arthur Kill, yes.

Q. Do you recognize this document, or similar one, because this was produced by the US?

A. The same thing, the government has filled it in. So I recognize the bid information below it, but the numbers had been typed in and the names have been typed in by the government.

Q. Are you familiar with John Tavolaro?

A. Yes.

Q. How are you familiar?

A. He was head of operations for the

# EXHIBIT 7

# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TDM AMERICA, LLC, | ) | |
| Plaintiff, | ) | |
| v. | ) | Docket No. 06-472 |
| UNITED STATES, | ) | |
| Defendant. | ) | |

Pages: 1 through 85

Place: Washington, D.C.

Date: December 13, 2007

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TDM AMERICA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 06-472 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Courtroom 7
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Thursday,
December 13, 2007

The parties met, pursuant to notice of the Court, at 10:00 a.m.

BEFORE: HONORABLE THOMAS C. WHEELER
Judge

APPEARANCES:

For the Plaintiff:

DAVID. W. DENENBERG, Esquire
MICHAEL ADLER, Esquire
Davidoff Malito & Hutcher LLP
605 Third Avenue
New York, New York 10158
(212) 557-7200

APPEARANCES: (Cont'd)

For the Defendant:

WALTER W. BROWN, Esquire
GARY L. HAUSKEN, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W., Room 11128
Washington, D.C. 20005
(202) 307-0341

For the Intervenor:

GARY J. CAMPBELL, Esquire
McCarter English
265 Franklin Street
Boston, Massachusetts 02110
(617) 449-6500

P R O C E E D I N G S

(10:00 a.m.)

THE CLERK: All rise. The United States Court of Federal Claims is now in session, the Honorable Thomas Wheeler presiding.

THE COURT: Good morning.

ALL: Good morning.

THE COURT: You may be seated. We're on the record this morning in the case of TDM America, LLC v. United States, Docket No. 06-472C.

Let's begin with the introductions of counsel for the benefit of our court reporter. And I guess I've never actually met you all in person, although we've spoken on the telephone a few times.

So for the Plaintiff?

MR. DENENBERG: Yes, sir. Is it okay if I speak from here, Your Honor?

THE COURT: Yes.

MR. DENENBERG: Thank you. Dave Denenberg and Mike Adler from the firm Davidoff Malito & Hutcher for Plaintiff, TDM America.

THE COURT: Thank you, and welcome.

MR. DENENBERG: Thank you.

MR. ADLER: Thank you.

THE COURT: And for the Defendant?

MR. BROWN: Yes, Your Honor. This is Walter Brown from Department of Justice on behalf of the government. I'm joined today to my right here by Gary Hausken, Assistant Director of the Intellectual Property staff.

THE COURT: Welcome to you gentlemen. Good to have you.

And for the Intervenor, Donjon?

MR. CAMPBELL: Your Honor, I'm Gary Campbell from McCarter & English, and with me is John Flaherty from the Newark office of McCarter & English.

THE COURT: Welcome to you also. Thank you all for coming here today for this discovery hearing.

A couple of preliminary matters. First of all, it occurred to me that we might have potentially protective order issues regarding the proceedings. And my preference would be to have everything on the public record, but if we hit something during the discussion today that you think should be covered by the protective order, I think the best thing to do is just to let me know, and then we can advise the reporter just to seal that particular portion. But otherwise, the entire proceeding will be on the public record. Is that acceptable?

MR. BROWN: Yes, sir.

MR. DENENBERG: Yes, Your Honor.

THE COURT: Okay. Well, that's the way we'll do it. Also as a preliminary matter, I think in any discovery proceeding, under Rule 37, I have to first determine whether we have satisfied the meet-and-confer requirement of Rule 37 before bringing the matter before the Court.

And I've read the arguments and the proceedings on that, and although there might be some gray areas about whether you really did your best to try to work this out, I'm willing to go forward and I find that the meet-and-confer requirement has been satisfied. So that's the way we'll -- just a minute.

(Whereupon, a short recess was taken.)

THE COURT: Are you ready? Okay. I think our problem is resolved, so we're back on the record.

I'd like to take the issues that you've raised one at a time today and kind of work through them rather than trying to give you each an opportunity to address all the issues. It will be easier for me to deal with them on an individual basis.

And I'd like to start with the issue of the Defendant's objection to Mr. Chapman, an expert witness that the Plaintiff has retained. As I

understand the situation here, Plaintiff retained Mr. Chapman as potentially an expert witness to assist them in the case, and then thereafter, the Defendant retained a different expert on a totally different and unrelated case from the same company or firm that Mr. Chapman works for. Is that the situation?

MR. BROWN: I believe that's correct, Your Honor. Mr. Chapman was retained by TDM counsel. Subsequent to that, in an unrelated case, Department of Justice or the government retained John Gerros, who also works at Analysis Group for, like I said, an unrelated case. So I believe you have the facts correct.

THE COURT: Okay. And by the way, each of you can just remain at your table and speak from there. Just make sure that you speak clearly into a microphone. If you have a longer presentation that you want to make at any time, you're welcome to come up to the podium. But for the kind of give-and-take that I anticipate, you can just stay where you are.

Mr. Denenberg, do you want to begin on this question of Mr. Chapman?

MR. DENENBERG: Yes, sir. In order to prepare this case, the Plaintiff, TDM, hired Analysis Group and particularly Michael Chapman. Subsequent to

that date, the United States hired Analysis Group and a different person, John Gerros, on an unrelated matter.

Plaintiff intends to use Mr. Chapman. They're working with Mr. Chapman, who is our damages expert. It's Defendant U.S. that raised an objection over a conflict issue. We need it resolved because if it's resolved later on, we're really going to be prejudiced to the extent of preparing our damages case. And if there is indeed a conflict, that conflict would have been created by the U.S. or Analysis Group by hiring John Gerros from Analysis Group after TDM had already hired Mr. Chapman of Analysis Group.

THE COURT: And I think you represented in one of your filings that the Analysis Group has established a firewall, is that correct?

MR. DENENBERG: That is correct. And we put in, we submitted to the Court declarations to that effect.

THE COURT: All right. Does the government have any problem with this arrangement?

MR. BROWN: No, Your Honor. I just want to make a couple comments. I think we can resolve this.

On September 13, we did write a letter

disclosing a potential conflict between Mr. Chapman and Mr. Gerros. At that time, we made clear in the letter that we were not objecting. So it remains our contention that we've never objected to Mr. Chapman, although we did make clear in our briefing for this motion that just because a motion to compel has been brought, we weren't waiving any objections we would have in the future.

But I think the bottom line here is that Mr. Chapman's submitted an undertaking, and we've seen that. We've also seen the declarations that were submitted with the TDM briefing, and we understand what Mr. Chapman is representing and what Mr. Gerros is representing. So assuming that there's no disclosure to Mr. Chapman of any information from the Boeing case or anything of that nature, I would anticipate that we would not have an objection in the future.

You mentioned the firewall. Should there be some breach of that firewall, we certainly reserve the right to object later. But assuming that what TDM is representing continues to be the case with Mr. Chapman, I don't foresee us ever having an objection.

THE COURT: All right. Well, I will consider that matter as being resolved based on your

representations, and the Plaintiff can proceed with Mr. Chapman as planned.

MR. DENENBERG: Thank you, Your Honor.

THE COURT: All right. The next item has to do with the designations of deposition testimony. Here I understand that there are some nine depositions that have been taken of various persons, and the Defendant has apparently made them all subject to the protective order in this case in their entirety, and the Plaintiff wants the government to designate those specific portions that are proprietary rather than just considering them as a blanket document subject to the protective order. Is that the situation?

MR. DENENBERG: Yes, Your Honor. And I would add again, similar to the situation of Mr. Chapman, both telephone calls and letters have been exchanged. And similar to our concern with Mr. Chapman here, we weren't provided with a date or a date certain as to when these designations would be made, which makes it very difficult to prepare the case if everything that's an answer in the deposition is subject to the most highly confidential designation under the protective order.

THE COURT: What's the current status? How much has the Defendant reviewed and identified for

you?

MR. DENENBERG: Parts of one of the nine depositions.

THE COURT: And when were the depositions taken?

MR. DENENBERG: And I believe that was in response to a specific request, because we wanted to use portions of that deposition.

THE COURT: When were the depositions taken?

MR. DENENBERG: The nine depositions in question were taken in May, June and July.

THE COURT: All right. Mr. Brown, feel free to comment, but my real question is, when do you think you can go through these depositions and limit the amount of protected information?

MR. BROWN: If I could clarify one thing before, I will answer your question. I believe Mr. Denenberg's disclosed there was one excerpt that was de-designated. In addition to that, during the briefing of this motion, I know that I sent a letter where we basically de-designated entire transcripts for two of the nine depositions. So as I understand, there are seven remaining transcripts, and we have been working on those.

To answer your question, TDM says they want

it in 14 days. I don't think that's possible. I think if I was given something along the lines of 45 days, I think that's a possibility.

In the same vein, I would say that their particular transcripts that they are particularly interested in, as we mentioned in our correspondence, we'd certainly take those up first. I know they mentioned Mr. Weissmiller's deposition, and his was taken over two days. It's actually two of the seven remaining transcripts that was mentioned in the reply brief. I wasn't aware of that, but we certainly have undertaken to start de-designating that one.

So if there are additional portions or specific transcripts they are more interested in, we could do those first. But I think in terms of timing overall, I think we would need along the lines of 45 days.

THE COURT: Okay. Well, I think that's excessive. I'd like to see you do it within 30 days.

MR. BROWN: Okay.

THE COURT: And I'll allow the Plaintiff to give you a priority list if they desire. They can tell you those that they would like to see first.

MR. DENENBERG: Your Honor, I can state on the record right now that in conversations and letter

correspondence to try to work out this situation with Mr. Brown's predecessor, Ms. Franklin, we made it clear to Ms. Franklin and actually received a representation that Mr. Bryce Weissmiller was the first deposition that we wanted de-designation of. And that was, I'm okay with it. Obviously the Bench has already rule. But she had agreed that that would be de-designated first within two weeks, but that was back in I believe September.

THE COURT: Well, we'll do them all within 30 days.

MR. DENENBERG: Okay. But I would like Mr. Bryce Weissmiller first.

THE COURT: All right. And then after that, do you have any preference?

MR. DENENBERG: We would send that -- do we?

MR. ADLER: I can tell you.

MR. DENENBERG: Can I have Mr. Adler from my office speak, Your Honor?

THE COURT: Sure. Go ahead, Mr. Adler.

MR. ADLER: After Hawkins, Snell, Didato, then Tavolaro and then whatever else is remaining.

THE COURT: Okay. All right. And don't wait until the 29th day to start sending these in. Let's do this in a good faith way.

MR. BROWN: Well, I have one that's near completion. Unfortunately, it was near the bottom of the list. But certainly we'll go in order from here with that.

THE COURT: Well, that's okay. Go ahead and finish that one up and send it off, but you have the list of priority.

MR. BROWN: Okay. I understand, Your Honor. I will say in reference to my former colleague, my understanding is that was an oral conversation where Weissmiller was discussed, so I can't verify what was said in that regard. But in terms of the written correspondence, the first time I was aware of that was in the briefing.

THE COURT: I understand.

MR. BROWN: But nonetheless, it's issues settled now.

THE COURT: We've had a change in counsel for the government. What was the date of that, September?

MR. BROWN: September 26 I believe.

THE COURT: All right, which is not a totally uncommon experience within the Department of Justice. And so you get a little leeway in that regard but not too much. So that's the way we'll go

forward. So the 30 days from today would be January 12, and we'll double-check our calendar to make sure that's not a Saturday. And if it is a weekend, we'll give you the next business day, but that's the time period that we'll work to.

Okay. The next item, apparently there are four interrogatories that the Defendant has failed to answer because they say that those four now exceed the maximum number of interrogatories that have been served upon them. Would you like to be heard on that, Mr. Denenberg? This seems like something that ought to be worked out, but maybe not.

MR. DENENBERG: We did both with Ms. Franklin as well as Mr. Brown try to work this out through meet-and-confers. Unfortunately, the response, which was actually a written one from Ms. Franklin, was to the extent that they'll choose which interrogatories, the U.S. will choose which interrogatories to answer. The essence of these interrogatories had been asked previously in other interrogatories, but these go to the new patents in suit which had been added in the early part of this year by leave to amend the complaint.

And I don't think that there's an added burden or element of surprise that we would want

information with respect to the new patents in suit.

We did try to work it out, and we were willing to give time to get a response. But we think that it's within the number, which is 40. We don't really understand the methodology that the U.S. is using to count. I believe the precise numbers are 23, 24, 25 and 26 as far as interrogatories go. And to the extent that the U.S. is trying to add up subparts, this would just match subparts that were asked of the original two patents in suit with respect to the two additional patents in suit.

THE COURT: Okay. Mr. Brown, what is your response?

MR. BROWN: Well, Your Honor, I think that Mr. Denenberg correctly notes that we calculate the numbers very differently. I think our calculation totals up to 123, because several of these due interrogatories ask to supplement all the previous interrogatories, and we consider those each to be due interrogatories.

THE COURT: Let me understand. So you say that if there's an additional Interrogatory No. 23 that says please supplement all of your prior answers, you would count that as -- let's say there were 22 earlier ones -- that's really 23 new interrogatories?

MR. BROWN: I believe, yes, Your Honor, that was our position.

THE COURT: I just want to understand.

MR. BROWN: No, that's our position.

THE COURT: Okay.

MR. BROWN: That being said, in my October 16 letter, which I sent four hours before this motion was filed, we noted that we would work out a reasonable compromise with TDM counsel if we could limit the scope in certain ways.

I understand there are these additional patents and there are certain contention interrogatories they consider crucial, but I think in other regards, some of the other interrogatories are not affected that much by new patents. And I don't think necessarily that given the number that we're having to essentially respond to that it makes sense. I think it's a bit burdensome for us to respond in the entirety to all the previous interrogatories. So we proposed a compromise in the October 16 letter, and I haven't received a response to that.

With regard to Ms. Franklin, I think he made a comment about her saying that she wrote that she was going to pick and choose which interrogatories she was going to respond to. I'm not aware of that in any

writing, and I wasn't present for that conversation, so I can't verify the truth or untruth of that.

THE COURT: Well, here's what I'd like to do, and this kind of leads into the next subject, which may be really the heart of the problem here. I think for four additional interrogatories, my general feeling about that would be to say yes, go ahead and answer those four. I don't know whose calculation method might be the correct one, but I would say for four questions, let's go ahead and do it.

MR. BROWN: I will say for those four questions, we're talking about a very, very long interrogatory. I mean, we're talking about 30-plus pages perhaps.

THE COURT: I understand, but that really leads into the next sort of problem we have regarding the interrogatories which the Plaintiff says have not been fully answered. And as I understand the problem here, the Plaintiff is trying to determine really the quantities and the prices paid for dredged material under the contracts that have been identified, and then I guess there is a subpiece of that. They really want to find out how much dredged material has been treated with processes that may allegedly be in violation, be infringements of the patents here.

That's really what we're talking about here.

And to me, there's got to be a way to do this in a more simplified way than you've been trying to accomplish it. I want to try to explore some way of just identifying the contracts and then having a method of identifying the quantities and the amounts, I mean quantities, prices and then treated amounts, as best we can. And it may not be down to the exact dollar or the very precise amount of dredged material, but there ought to be a way to work this so that it's acceptable to both parties. And I'm willing to hear your propositions for this.

MR. DENENBERG: Your Honor, the Plaintiff's position on this and the reason why we approached Your Honor back in February, again in March and then of course by motion to compel or for sanctions in April and then received a ruling that the interrogatories and document demand should be fully responded to in 30 days is because I think this goes into what we thought was information that we could get.

So there's different ways to understand what the total amount of dredging and processing of dredged materials was in terms of volumes, in terms of total amounts paid and the contracts that relate to those volumes of treated dredge material.

So there were questions in the form of interrogatories for the U.S. to identify the contract documents. The response unfortunately, and maybe it's too hard to do it, but the response was Schedule A or Attachment A to interrogatories that listed contracts by contract number, then a reference to documents produced in the ordinary course and a wide range of Bates numbers that really didn't correspond to the entire contract or even necessarily the contract at all.

So, for example, we would get hundreds of pages of designations which included and was testified to by the U.S. noncontractual documents: weather reports, transportation logs, quality assurance reports. So another way to go about this is just give us the total volumes that were treated and/or the process for treatment and the total amounts paid, Interrogatories 15 and 16, which was the subject of the April motion.

The response to Interrogatory 15 and 16, which has never been supplemented, nor the response to the contract question that I just mentioned, was, look at Attachment B, which had some payment estimates. If you look at Attachment B, you couldn't possibly figure out the total volumes or the total amounts paid. But

the government through the U.S. Army Corps of Engineers has a website which shows by district, by year and by disposal location if you will total amounts of dredged materials.

THE COURT: Not by contract, though?

MR. DENENBERG: It states the number of contracts as well. So one would think that the U.S. Army Corps of Engineers has the number of contracts district by district, because they say they do. They have the amounts of dredged material district by district in accordance with the method of disposal.

When you look at the disposal method, and you have to remember that -- you don't have to remember, I'm sorry. The patents go to a process for treating dredged materials. Dredged materials need to be treated when they're contaminated. The treatment methodology stabilizes or solidifies the contaminants in the dredged material, which then allows that dredged material to be disposed upland for a beneficial reuse that could be capping, fill material, supermarket-type buildings afterwards.

If the dredge material is clean, noncontaminated, then typically it could be put back into the ocean or used for beach nourishment if it were sand that didn't need to be treated.

So you have areas in this U.S. Army Corps of Engineers website that say open-water disposal, say beach nourishment disposal, as opposed to upland. So another logical way to try to get those total volumes was to inquire into the U.S. Army Corps of Engineers website and make that a topic of the 30(b)(6) deposition, thinking that if we can't get the written answers in interrogatory form, a witness who can at least explain this website.

The only person we received with respect to the website was not someone who was familiar with what is treated and what isn't but just a data entry person, Virginia Pankow, who said, yes, I enter the data. Each district gives numbers, I enter the data.

We had asked again and again, give us the person who can explain the numbers district by district, can explain why since 2000 we're seeing 133 million cubic yards disposed upland. Mr. Hawkins testified as well as others that at least most of what's disposed upland would be treated. So explain why there's 133 million cubic yards and there's over almost 140 contracts noted for the upland disposal materials and we only have identification of 18 contracts. That's it.

And the inaccuracy of the 18 contracts

became clear just a few months ago when a nonparty, Clean Earth Dredging Technologies, testified to at least three other contracts where they were the processor for treating dredged materials that had not been identified by the U.S.

And certainly the interrogatories and the document requests went to identify all the contracts, give us the contract documents, identify the total volumes and provide what those are. Or, even in a 30(b)(6), explain, give us how the U.S. Army Corps of Engineers got these numbers. There is a summary which in our motion we believe we're entitled to rely on that U.S. Army Corps of Engineers information at this point, because the 30(b)(6) witness that we were given ended up just being a data entry person.

And as we sit here right now, if you asked the U.S. to identify by Bates numbers complete contracts, not just the contract number, they couldn't do it. But they're telling us, here, find the contracts. Every witness that we had, which included contracting officers that were identified in initial disclosures or from other depositions, the project managers, looked at the contractual documents and said, oh, this is not part of the contract or this is part of the contract, but you don't have the whole

contract.

So we can't authenticate what these contracts are, and then we can't learn what the total volumes are, which is something that just is clearly incomplete, because the U.S. Army Corps website is showing it's incomplete, and testimony from nonparties helped us learn that there were at least three more contracts that we didn't get. And it's sort of like trying to catch the U.S. in not full disclosure, which shouldn't be the way this is working.

And we did advise the U.S. as well as the Court that there was something not congruous about this early on. And despite the court order in April that we should get full and complete responses in 30 days to the volume and the contractual documents, we've never received any supplement whatsoever. And now we know it's wrong. We know the U.S. Army Corps of Engineers has different numbers. We have witnesses that said upland, yes, most of that would be treated, and yet we have a small fraction of the 133 million cubic yards and 140 contracts actually produced.

THE COURT: All right. Here's what I'd like to suggest, and I'll hear from Mr. Brown in a second, but before he responds, I want to throw out an idea that might be workable for you all here. I've used a

similar procedure when I have lots of damages issues confronting me in a spent nuclear fuel case or in a Winstar case. It's a way to narrow down the number of issues we have for trial.

MR. DENENBERG: Your Honor?

THE COURT: Yes?

MR. DENENBERG: Since you're addressing that, let me just say that this ends up being a liability issue as well, because part of the contract documents are the 30- and 70-day submittal requirements, which include the processes and permits that a contractor would be operating under for the treatment of the dredged materials.

THE COURT: All right. But here's what I'd like to propose. It sounds as if the Plaintiff has enough information right now to be able to identify the contracts by contract number that they have an interest in in this litigation. And it sounds also like from the Corps of Engineers website that you have information about the quantities of dredged materials. And do you have payment information also?

MR. DENENBERG: No. The Army Corps of Engineers website, which is included in the motion, would show in total and district by district the volume in cubic yards and the number of contracts in

total as opposed to identifying each specific contract number and each specific volume per contract. But it does have also total dollar amounts, yes, sir.

THE COURT: All right.

MR. DENENBERG: So it's total dollar amount, total volumes district by district and total number of contracts.

THE COURT: What I'm looking to here is a way for the Plaintiff to submit to the government perhaps in a chart form or a column-type presentation the contracts that it has an interest in. And then, based upon the information that they already have either from the Corps of Engineers website or whatever other source they may have, you can go ahead and identify your understanding of what the amounts may be for dredged materials and for treated dredged materials.

You send it to the counsel for the Defendant and have them review it and either confirm or deny that those numbers are accurate. And if they believe for any reason that it's not accurate, the Defendant will be instructed to tell you what they believe are the accurate amounts. And in that way, we'll either reach agreement on each contract or we'll at least know what the disagreement is. And it may be after

you receive the government's response, you may be willing to accept their number if it differs in some way with your understanding.

And it should be certified like a 30(b)(6) response as being the position of the government in response to the Plaintiff's information. Is that going to work for you?

MR. DENENBERG: I think it works if the total volumes, total dollars and total number of contracts were given from the U.S. Army Corps of Engineers website district by district, in other words, for each district.

THE COURT: Mr. Brown?

MR. BROWN: Well, Your Honor, we're kind of getting into the territory of our response to Interrogatory No. 10, which essentially asks for information on particular contracts and particular districts which are responsive to the issues here.

And again, the only dredged material that could possibly infringe the TDM patents, and I think this is not disputed, is treated dredged material. The contract does not involve the treatment of dredged material. I think we can all agree there's no potential liability or infringement with regard to those contracts.

THE COURT: But just the total amount of dredged material is not particularly relevant?

MR. BROWN: Correct. And the other point I would make about the website and the total figures is they rely on the upland disposal category. And I think the contention at least in the reply brief is that all of that upland disposal number is treated dredged material. I think that's been refuted by government witnesses, and I think also Ms. Pankow explained that they don't keep data on treated dredged material in the government. So that's a general concern I have is that we're asked for information that we just don't have.

The treatment of dredged material was never performed by the government. It's performed by contractors and subcontractors in some cases, and our involvement is very, very limited.

With that in mind, I think TDM has wisely taken extensive discovery of nonparty contractors as well as Donjon, which they could speak to. With that in mind, I think they've gotten valuable information about the volumes of treated material from those depositions. So if we're going to do this sort of submission, what I would ask is if they give a figure, give me the information you're relying upon, because

I'm sure they're looking at something, whether it be from government documents but also contractor information.

If a contractor gives you a clear answer and it's information that we don't have, and I look and see there's been clear documentation by the subcontractor of a volume figure for a particular contract, I think that we would probably not have an issue with that. But if you ask for the government to give a representation of what the government totals treated dredged material as, I think we're getting into information we do not have within our document or knowledge base.

THE COURT: The way this should work is that the Plaintiff's submission would indicate the basis for their number, whether it's the Corps of Engineers's website or some other information you may have. Just indicate what it is that you're relying upon.

MR. DENENBERG: Your Honor, hearing what Mr. Brown just said, I do think this brings us right back to the essence of the problem again.

Yes, TDM has taken extensive discovery of nonparties and processors based on the contractual information that we did get. Again, only 18 contracts

by contract number were identified. When we asked for the full contracts by Bates numbers, including the essence of those contracts, which are the submittals which describe the process, the U.S. can't do it, haven't done it and refuse to do it.

When we look for total volumes, the U.S. can't give it to us, not even for any specific contracts. They give documents which if you look at those documents, you can't ascertain what the volume is for that contract from those documents.

It's all well and good to say go ahead and get it from the contractor, but without the submittals and without the contracts that the U.S. clearly has, and in the bid requirements, the U.S. requires those submittals that would say what the process is that would also say what the total volumes are, it's an answer saying, yes, we have it, but it's too hard for us to get it, so go find it from someone else, but we're not telling you if you even have all the contracts.

THE COURT: Excuse me.

MR. DENENBERG: I'm sorry.

THE COURT: Do the submittals that you're speaking of tell you what actually is treated, or is it an estimate done ahead of time?

MR. DENENBERG: The submittals would say both how the dredged material will be treated, and the submittals would also include not just payment estimates but billing information that would show how much is going to be treated. And the government pays separately for the dredging, the physical dredging activity versus payment for processing of dredged material. And to say the U.S. has nothing to do with its contract is just not accurate. Of course it does.

THE COURT: Well, they should know what they paid for I presume.

MR. DENENBERG: You would think that they know how much they paid and that they're looking at how much they paid, because how much is being billed and how much material is being treated will determine how much is paid.

And with respect to the U.S. Army Corps of Engineers website, the problem we have is that we've never gotten someone who could even say district by district these are all the contracts for treating dredged materials. And we know that the numbers and the identification previously given to us, the current answers to interrogatories, are inaccurate, because at least three more contracts exist. And according to the U.S. Army Corps of Engineers website, the category

upland disposal would have 140 contracts, of which we only know of 21 right now. And I would beg to differ, and we submitted the testimony to Your Honor, Mr. Hawkins, who is a project manager, clearly testified that at least most of the upland disposal category from the U.S. Army Corps of Engineers website would be treated dredged material.

And for the Plaintiff now to have to prove what that number is between 51 percent and 100 percent when it's the U.S.'s website and they can explain it one would think because they post it, I don't understand why we're not entitled to that answer and if we don't get it, we're not entitled to the inference at some point.

THE COURT: Well, I think you are entitled to the information, and I really think that the Corps of Engineers and the other entities involved ought to have this information. I think it's probably just a matter of finding the right person and finding the right --

MR. BROWN: Well, Ms. Pankow if I may addressed this question, and she basically said that the information on the total figures are contained in each individual district. And there are 40-some-odd districts spread amongst the United States and overseas.

And she was asked how would she find out this information in the deposition, and she was like, you would have to call the individual person at the individual district who could provide this or speak to this. In that regard, we're willing to put up deponents in individual districts. I think they would agree that certain districts probably aren't implicated, but that's what our witness indicated.

And we've talked to the people who run the website, and essentially they do compilation. There's no centralized base of knowledge for this information. And again, there is no information kept specifically on treated dredged material. I agree, Mr. Hawkins testified that most of upland disposal is treated dredged material, but you're not going to get any more detail than that from these figures if you go to individual districts. They do not keep data on such treated dredged material was placed here. They keep data on dredged material, period.

And that's sort of the issue with a lot of these contracts is you're talking about you should know what you pay for. I think a lot of these contracts are set up such that they pay per volume of dredged material. And you may be required to treat that dredged material. You may be required to do

something else to the treated dredged material. But the contracts are generally set up as I understand it that you pay a flat fee per volume of dredged material.

And again, that doesn't get you any closer to determining the volumes of dredged material. I think that information has come out more clearly from subcontractors and contractors who run the processing plants and keep track of how they process or not process the material they're actually digging up. They're actually holding the material.

THE COURT: But if the government is paying for the treatment of dredged material, there has to be some information about that I would think.

MR. BROWN: In a contract, yes. And they've deposed the contracting officers for all the Army Corps contracts we've identified. And we attached pay estimates, which is what our witnesses referred to in Attachment B to the interrogatory responses. I'm not sure what part of that is not sufficient for the purposes. I don't think that's been discussed.

So if you're talking about specific contracts, yes, we can tell you what we paid for and how it was set up and what the total volumes were of dredged material generally. And I think they've

gotten a lot of that information. I think they've deposed contracting officers for every district that's been implicated.

So the additional three contracts that have come up recently, and these are non-Army Corps agencies, which we were not aware of were even involved in dredged activities, and we are going to take that discovery, so that's something that can be addressed presently, but I think a lot of these questions have been addressed in terms of the Army Corps contracts by the Plaintiffs already.

If there are particular documents they feel like they're missing like submittals or what-not, obviously we can provide those, particularly if they're identified by contract. But if you open this up to the entire Army Corps, you're talking about plodding through 40 different districts, and I don't know if that gets us closer.

THE COURT: What I'm doing here is I'm offering you a concept that I think ought to work, and I'm trying not just to get information from the Defendant to the Plaintiff but to reach an agreement as much as we can so that we don't have to try all this stuff at the Court and take weeks and weeks to do so. It ought to be within the capability of both

sides here to come up with the listing of the contracts and the information you want about each contract, provide what your understanding is as to any of that information that you have.

There may be certain blanks that need to be filled in by the government, but you give that to the government, and then they will respond to it as best they can. And if they disagree with your numbers, as I say, then the expectation is that they would say what they think the number is, and then we can work forward in that manner. I mean, that's the only thing I know to do here.

MR. DENENBERG: Your Honor, some of the issue here is to actually find out what's done in each district, we need to consult with 40 different districts. These requests went out a year ago. And I would submit respectfully that a year was enough time to inquire of 40 different districts, and if a district was willing to certify that they've never treated dredged materials, that would be fine.

But some of what's inconsistent here is, for example, if you take the district that would have Puget Sound or the Gulf of Mexico or Hawaii where there's large numbers for total volumes and contracts of upland disposed dredged materials, it would not

seem possible that none of that dredged material would have been contaminated and required treatment. It just would not. And it's down on the Army Corps of Engineers' website as upland disposal.

And even accepting Mr. Hawkins, a project manager's, testimony that most of upland disposal is treated to meet 50.1 percent, that would be approximately 68 million cubic yards since 2000, not even including 2007, and most of 140 contracts, which would be settling. All we've gotten is 18 contracts, of which to identify the submittals or to identify the full contractual documents, Mr. Brown can't even do right now despite the year.

And we know it's inaccurate because Clean Earth, a nonparty, said that there were at least three more contracts, which now the U.S. is agreeing that they will provide what they can get and I believe they're saying will provide a 30(b)(6) witness on those three contracts.

All of our discovery requests under this Court's scheduling order had to be complete before the end of May, and these basic questions in terms of total volumes and in terms of the contracts weren't deposed back in December.

THE COURT: Well, I hear what you're saying,

and I have to look at this matter from the standpoint of where are we today. And certainly it hasn't been a perfect process to say the least. If I put myself in the position of a Corps of Engineers representative who receives a mountainous task from an attorney at the Department of Justice, they probably think of 10 different reasons why they're not able to do it today, and time marches on. Nevertheless, that's not an excuse. I think the information ought to be provided. And I want to go forward in the best way we can starting today.

So I think the concept I'm suggesting to you ought to work. So just to recap this, and we'll put this in a written order for you, is that I want the Plaintiff to identify by contract number and provide as much other identifying information as you may have regarding the district involved, maybe the date of the contract, if you know the contracting officer, that may help, if you know the time period. You understand what I'm saying, all of the identifying information.

And then you can provide to the government the information that you have right now, what you understand to be the case, whether it's from the website or some other resource. And you provide that to the Defendant, and I'll expect the government to

respond to that. We're kind of blending different discovery methods here, but I want to get away from the need to run up further expense through depositions and so forth. It should be done more informally.

Maybe you want to consider talking on the telephone to just a government person that Mr. Brown identifies regarding these contracts, A, B and C, what can you tell me about them, just so that we're getting information that might be useful for the later resolution of the case.

MR. BROWN: I agree with that approach, Your Honor. I think the bottom line here is we have identified 20 I believe Army Corps contracts, and then there's three additional contracts. There's no dispute from the parties that these are at issue. If there's information we have, we want to get it to the Plaintiff, so I definitely agree with the approach.

The only other thing I would note in this regard is the 18 contracts that you mentioned are subject to our motion for partial summary judgment. I think we're preparing a section (b) notice as well. But I would think we have no problem with the type of order that you're suggesting.

THE COURT: Well, and do understand I don't want to stop everything because there's a motion for

partial summary judgment. That will proceed concurrently, and I think the Plaintiff has a response date in January as extended, so we'll go ahead and brief that issue while we're doing these other things as well.

MR. DENENBERG: Your Honor, if I could have Mr. Adler mention one thing on this issue, and then I just wanted to add something.

THE COURT: Sure. Mr. Adler?

MR. ADLER: Thank you. I just wanted to present to the Court one slight modification, and then I will explain why that modification is important -- and that is that we would -- the 18 contracts that are mentioned or are at issue in the motion for summary judgment are simply, very simply -- let the United States identify the Bates number for the entire contract, the Bates number for the -- the Bates number for the -- so that at least we don't have to rely on the few pages of excerpts that are in that motion for summary judgment. It should be a very simple task because that's the motion for summary judgment the United States made and very concretely handled the 18 contracts and covered them.

And then it is a lot easier to -- look through the -- and perhaps be able to -- that

information is essential, especially for them to identify the submittals to us which contain the details of the processing which we believe are part of this -- and the reason why I think it's simple is because to have these three great big contracts is very defined and very concrete. That would be the path to open up the building as quickly as possible --

(Away from microphone.)

MR. ADLER: Even that is contradicted by government testimony of the actual witnesses. And I was the one who took all the depositions, so I'm clearly familiar with it, Your Honor.

THE COURT: But what you're really suggesting is what is embodied in Rule 56(f) of our Court, which would allow a party limited discovery before responding to a motion for summary judgment. Can you do that, Mr. Brown? Is that a problem?

MR. BROWN: I think -- if I understand it, but that's sort of the issue. We say, give us the official contract, the actual contract, and what does that mean exactly, because we've identified contract documents, and I'm not sure exactly what that term means. If you're talking about the official contract file, we offered that for inspection and then they chose to reduce it to certain categories.

We certainly could offer that for inspection again at the various locations. I mean, I think all these are in New York in one place in one district. We could certainly do that. But I think we produced all the documents, and I'm just not certain what I'm being asked to do, because if we don't do it to their satisfaction for what they're really looking for, this could go on for quite some time I would think.

But if there are specific documents they're looking for, specific aspects of the contract, first of all, we faxed I think a 50-page excerpt with the actual -- consent clauses and associated clauses. Those are I consider the relevant aspects of the contract for the motion. Those were all attached to the motion, so I'm not even sure what I'm being asked to do, and I perceive something that would be a mammoth project that wouldn't really get us to where we want to be, which is the ultimate fact of the matter at hand.

MR. ADLER: Your Honor?

THE COURT: Yes.

MR. ADLER: What I'm hearing is that the United States prepared a motion that included 18 -- contracts. There are submittal papers. There's a contract that goes out. There's a submittal that

usually one or more tabs goes by the 70 bases, and those are very concrete things. There's no issue as to what a 35 -- is because that's required in Section 800 of the contract. That is a submittal that we apparently -- to the United States -- responses to various questions which asks for very detailed information with respect to maybe a five- or a seven-page summary of a process that we do.

It required identification on weird placing of the treated dredged material -- and at least that's important because each of those sites has reload requirements -- and it also very importantly asks the -- bidder to pay to each of those submittals the appropriate credits which are issued by the regulatory agencies. Now those credits typically -- they themselves, those would contain details of deposits. That was not included in any of their excerpts. That's what I'm asking for, the submittals, identification of contracts, additional bidding, and just give us the Bates numbers. It's not that difficult.

MR. DENENBERG: And I would just submit to the Court that if you can make a motion for summary judgment on a contract and then tell the Court we gave you all the important aspects, that's some statement

if you can't say what the entire contract was.

THE COURT: Well, you get into gray areas, though, Mr. Denenberg, as to whether a submittal, for example, is strictly a part of the contract or not. You're really getting into something that the contract may require the contractor to do. And I would raise the question, well, is the contractor's compliance with a requirement, is that part of the contract or not? It's really performance.

MR. DENENBERG: The answers we got, though, as to what a contract was included weather reports that every witness said that's not part of the contract. They include transportation logs. That's not part of the contract. In other words, the answers we got is just here, here's everything we produce, here's your contracts. So, I mean, I think that it's reasonable for the U.S. to specify at least with respect to the contracts that it has identified by contract number what the entire contract is.

And with respect to what you requested that we provide total volumes of treated dredged material, total volume requests, total contract requests, the best way we can do that and the best way we can identify the contracts beyond those which we haven't done before because the U.S. or a contractor gave us

the number is to go district by district in the form that was presented by the U.S. Army Corps of Engineers.

THE COURT: So, Mr. Adler, you're talking about the 18 contracts that have been identified as part of the motion for partial summary judgment?

MR. ADLER: Correct.

THE COURT: All right. I think that's a fair request is to go ahead and have you identify what the government says are the documents comprising each contract, including the submittals.

MR. BROWN: Well, we attempted to do that in our response interrogatory and explain because they claimed it's too voluminous. If they requested for us to pare that down somehow, I would ask for what aspects do you specifically want us to identify. I think the arrangements are correct. I think they view that as being too expansive. But we could pare that down based on submittals or certain types of documents. I think that's the best approach. I don't know of another approach.

MR. ADLER: Well, I think I could probably make it very simple. How about just a draft with the contract number, the contract, each of the submittals and the --

(Electronic interference.)

MR. ADLER: -- in a draft. That's concrete, simple and --

MR. HAUSKEN: Your Honor, may I be heard?

THE COURT: Yes.

MR. HAUSKEN: I think this has become kind of ridiculous at some point. Plaintiffs also have a burden under the rules to evaluate any information that they receive. One of the options that we have as the government is to make records available for inspection and copying by plaintiffs. That was the option that we chose with regard to these contracts. That was apparently unacceptable. We came back and tried to provide numbers. Yes, they are broad ranges of numbers relating to those contracts, but that is because there's a number of things in contract files. Some things are contracts. Some are not.

If we're going to start going back and having to identify specific documents for the Plaintiff, then the Plaintiff should undertake part of the burden, and the part of the burden that they should undertake is that which is required by the rules, which is inspection and copying of documents. And if that's the way we're going to have to do it, then they should have to live by the rules.

If we want to try and accommodate the Plaintiff, then rather than having us do all the work while they sit back and just relax and kick back and come up with new motions, then they need to participate in the proceeding. And the way they participate in our mind is to inspect and identify documents for copying.

MR. ADLER: Your Honor, may I address that? I will first address the most recent comment. Then I'll go backwards. I've taken their motion for summary judgment. I've looked at those excerpts myself. I've also had some of my staff look at the documents that were identified in the interrogatories, and not only that but look at the documents that are reasonably perceived and we agree are subsequent to the range of -- and you will see -- those documents have nothing to do with the contracts. That's what we want.

Number two is my colleague I think is confusing a motion request for documents with a response interrogatory. We have a right to ask what are the contract numbers -- this defines the event between proposed documents in response to interrogatories -- and his answers, of which we want the interrogatories to ascertain some of the

documents. The reason we're having this contention at this point is because the U.S. can't even do it, and that's exactly what the rule of the interrogatory is. If the discloser can't do it, you can't expect the disclosee to do it.

THE COURT: Well, I think the principal you suggest on behalf of Defendant is correct. But as I understand it, it sounds like the government turned over a contract file in its entirety with whatever it may contain in there, to include weather reports, which obviously are not part of the contract. I think under the circumstances, somebody from the government's side ought to go back and say, these are what we consider to be the contract documents and the submittals so that the Plaintiff can go from there in responding to the motion.

MR. BROWN: I would only ask that they identify specifically what is necessary. I mean, when they say is it submittals, make clear which submittals they're talking about. I mean, some of this is obvious.

THE COURT: One at a time. One at a time.

MR. ADLER: Sorry.

THE COURT: Go ahead, Mr. Brown.

MR. BROWN: I just want to be crystal-clear

in what we're being asked to do. I think we've identified the ranges that include other things they're not interested in, and we can pare those down. I don't think it's an issue of having not produced something. So as long as it's clear what specific attachment they consider to be a contract or they consider relevant to a motion, I just want to make sure that's clear to me. Otherwise, we'll just go in circles with this.

THE COURT: No, I understand. I think the approach Mr. Adler suggests is maybe the best one. You identify for each of the 18 contracts what categories you're looking for, contracts, submittals, amendments, and then the Defendant will fill in the blanks. Rather than giving some kind of an omnibus response, I think this is the method that will best serve the parties.

MR. ADLER: Can I just add one quick note, Your Honor? That indeed with the four or five or six -- identified, we're the ones who did the work at least in part.

THE COURT: That's fine. So that's what we'll do on that subject.

So where are we? I think to summarize, the Plaintiff should submit that request forthwith so that

it doesn't impact too greatly the response to the motion for summary judgment. I'll consider it to be a Rule 56(f) request for additional information before you respond to the motion for summary judgment.

And then as to the interrogatories that the Plaintiff says have not been answered, we're going to use this procedure that I suggested to you, and I will encompass that in an order. And basically that's where the Plaintiff will provide the information as best it understands it. It can ask for any missing information by contract that you deem important, and then we'll get the official position from the government.

And each side should identify the basis for their position, I think that's important, so that if the Plaintiff says it's 10,000 cubic yards, you have to say where you got that from so the government can pin it down. And inevitably it will involve discussion between counsel and perhaps even representatives, again not in a deposition or anything. Just get them on the phone and try to answer questions and get this worked out. That's what I'd like to see happen.

MR. BROWN: Yes, I understand.

THE COURT: Okay? Is that clear?

MR. DENENBERG: Yes, sir.

THE COURT: All right.

MR. DENENBERG: Wait one second, though. Is there a time limit, for example, for the response to what you deemed I think appropriately a 56(f) request when we would get that additional information? Because obviously that puts us into the June 15 opposition -- I'm sorry, January 15 opposition date. I don't need six months. But then that would play into the January 15 opposition date. I think you might want to put a schedule as to when my office or TDM will put together a request, contracts, dollars, volumes, districts, where we have to put questions regarding those contracts.

THE COURT: Well, at this point, I don't know what a reasonable time period would be because I'm not entirely sure of the effort that's going to be required to complete this. I'm happy to hear your suggestions, and I want to do whatever's reasonable. It serves no purpose for me to issue an order than nobody can meet. So I'm happy --

MR. DENENBERG: I'm trying to advise the Court, and I don't want to speak on behalf of the Defendant or the Intervenor, but right now defined consent in Court because of the three additional

contracts that TDM wanted to depose the U.S. on as well as to complete depositions of TDM as well as depositions of Donjon and the NJDT, we were agreeing to an extension to the end of January for the argument on behalf of Plaintiff. Obviously we want that discovery done and go onto the later phases of certain courts, Martin and et cetera, but I don't know if that's reasonable to get done by the end of January at this point.

THE COURT: Well, and I don't know if the procedures that we'll be following will obviate your depositions requests or not. I can't speak to that.

MR. DENENBERG: The only issue with the depositions right now, and I'm only talking with respect to the U.S., because I don't think it would be fair to discuss Donjon and TDM right now, myself and Mr. Brown agree that the overall scope of the prior Rule 30(b)(6) was to inquire into the contracts, and Mr. Brown wanted to know what topics it would be for these three contracts.

Obviously some contractual documents would be provided to us, and we would like to take a deposition about that contract basically to get to what the total volumes were, what the procedure was for treating the dredged material and any other

information that might be relevant to the process and the treatment as well as the contractual procedure in terms of even issues relating to the summary judgment authorization consent.

THE COURT: Well, any information relating to quantities or payments or dollars, I really don't see the need for further depositions on this point if we follow the procedure I'm suggesting to you. I want you to try to work that out using the method we've been discussing. As to other matters, you can certainly take whatever depositions you want to.

Now we have to recognize too we can't do everything by tomorrow. There's a lot on the table here in terms of information that's going to be provided in the briefing on the motion for partial summary judgment, so we have to do what's reasonable and recognize the time that's going to be required to do that. And I'm just going to hear from the parties how much time they would like. We're talking about first the Rule 56(f) responses, I'll call it the contract information, and then we have this information about the data contract by contract. When do you think you can get that out, Mr. Denenberg?

MR. DENENBERG: I think that we can get that out certainly by the end of next week.

THE COURT: Okay. And how much time would you --

MR. DENENBERG: Except for Christmas of course.

THE COURT: Well, we're not going to work through Christmas. Don't worry.

MR. BROWN: I appreciate that sentiment, Your Honor, very much.

(Laughter.)

MR. BROWN: I think with regard to the 56(f) topic, that's where I have the least amount of grasp of what the point was to do. Once I have their request on that topic, on that chart or what Mr. Adler was talking about, we'll certainly move to sort of get a hold on how long this is going to take. I think once I've had a little bit of time to sort of grapple with what's being asked and what our documents are, I haven't reviewed all 150,000 pages as yet. I've been on the case since September, but --

THE COURT: Well, if you have a good motion here, it's in your interest to get them the information as promptly as you can.

MR. BROWN: Right. Absolutely, Your Honor. That point is not lost on me at all.

THE COURT: All right.

MR. BROWN: I think if I've given a little bit of time after receiving the materials from Mr. Adler, I think I'll have a good idea. Maybe we want to have a quick status conference on that sometime after I receive that information. I simply don't know how long it's going to last, although I would agree. I think we're all staring at an extension of discovery generally past January 31.

THE COURT: How about the information on the contract data?

MR. BROWN: On the three additional contracts? I think there's been some confusion here because this deals with additional agencies. There's really discovery 30(b)(6) notices under the rules. I know they wanted basically the format of their initial 30(b)(6) notice, which was to the entire government but which we interpreted as being to the Army Corps. I don't know if they want to just resubmit that to us, but I need some indication in writing as to which topics they want to cover.

I get the impression from talking to Mr. Denenberg and Mr. Adler that with regard to these three additional contracts that they have sort of a narrow focus of things they want to cover. So under the topics, the sooner I know the specific topics the

quicker I can designate witnesses for the Navy and the Coast Guard. Two of these contracts essentially belong to the Navy, and I think we've identified a witness who can handle the types of questions they're going to ask the Army Corps witnesses, but I need some sort of written confirmation of exactly what they'll be addressing at the -- proceeding.

In regard to the Coast Guard, I've asked about that. I think there's been some confusion. I wasn't aware that they sought to -- on that contract. However, since dealing with the joint status report, I have a call into the Coast Guard to address that, but again, I need some indication as to the topics before we submit a --

THE COURT: Excuse me. Can't these three contracts be included in the chart we're talking about? Just list these three additional contracts even though they involve different agencies. Why don't you approach it that way and see if you can get the information you need.

MR. DENENBERG: It was my understanding, and correct me if I'm wrong, that the contract itself -- I'm sorry, that the request would seek volumes, dollars, identification of the contract. Should we also be seeking the processing method in that request?

Because that was something that often you get from the 30(b)(6) or from the submittal if we can get the submittal. Then we could get the processing information as Your Honor states without a deposition. I don't disagree, but sometimes the submittals were not complete or incomplete, either because they loaded it incomplete or that information just wasn't available to the U.S., and the 30(b)(6) deposition was necessary in order to inquire into the processing methodology, which is the essence of the infringement issues.

THE COURT: Well, if there's a document that is intended to indicate the method used for treating the material, that seems to be the simplest way to get at it. So I think it would be appropriate for the government to identify the method used just by providing a copy of the submittal if they have it. Then you'll know. And if you hit a situation --

MR. DENENBERG: As long as we get total volumes, total dollars, the contract submittals and identification, Your Honor may be correct that a deposition is not necessary.

THE COURT: Yes. And if there's a small number of instances where the government is not sure because they can't find the right document or

something, you'll have to deal with that otherwise. But I think as a first cut here --

MR. BROWN: I'm sorry. If I can add one thing, I think it would help. I know they've taken a deposition of Clean Earth -- three additional contracts. If it turns out there's certain information that they contend is still void from that, the deposition of Clean Earth, it may very well be that I don't dispute that. So that also is another avenue to sort of get into the same information. If our contractor has more information and they want it restated a certain way, then I don't see in that scenario how we would dispute it. So that's another avenue here I think to work with these three additional contracts.

THE COURT: All right. Well, why don't you include the submittal method in the information you'd like about each contract, and we can see what you get on that. I think, though, the best thing I can do here is that in the order that I'm going to give you, I will include some numbers of days that I think are reasonable, and then of course as in anything we do, if any party thinks they need more time, they can say so.

MR. DENENBERG: Thank you, Your Honor.

THE COURT: I don't think we're going to hit January 28 to complete discovery given everything we have to do.

MR. DENENBERG: With respect to the 56(f) request and then response, the opposition I would just ask, Your Honor, if you're setting dates for getting proposed dates, the opposition would need to be keyed off of whatever date we get the information with respect to those contracts.

THE COURT: Well, what I'm thinking about just is in terms of maybe 30 days for you to get them the contract information by Bates numbers. That seems reasonable. Maybe, I don't know, 45 or 60 days on the data that I'm talking about, the longer list of contracts. I'll say 60 days for that.

MR. BROWN: As long as our 30 days starts once we receive exactly what we're --

THE COURT: Sure. I'll include a date when the Plaintiff will be expected to provide that information, probably 10 days from now given the time of year we're in, and then you'll have 30 days from receipt of that information or 60 as it may be. So that's the way we'll do that.

Now I want to turn to the issues that exist between the Plaintiff and Donjon. You're going to get

your chance now for the Intervenor and work through some of those issues. I don't think it will take very long. I guess the first one is the allegedly incomplete document production.

MR. FLAHERTY: Your Honor, if I may speak to that?

THE COURT: Yes. Do you have a microphone nearby?

MR. FLAHERTY: I think I do.

THE COURT: Okay.

MR. FLAHERTY: Does this one pick up okay?

THE COURT: Yes.

MR. FLAHERTY: Okay. I spoke with Mr. Adler before we began today, and I told him that we would be producing the document that Mr. Tom Witty had in mind when he testified. And I was hoping I would then produce that yesterday, but things being what they are, if not, they should be produced today.

THE COURT: Okay.

MR. FLAHERTY: I'm going to be just aware that I'm going to be producing it for attorneys' eyes only. It's a list dealing with categories of documents that have been taken by the Department of Justice and of course the investigation of an entirely separate entity from Donjon. It's a list of file

types that -- the information disclosed by us -- it will be marked attorney confidential.

THE COURT: All right.

MR. DENENBERG: If I may inquire, Mr. Flaherty, I understand that this was a list just to be sure of documents that were taken by the Department of Justice, and it was Tom Witty you had spoken of?

MR. FLAHERTY: Tom Witty, yes. I went back and read Tom Witty's testimony. And what he basically was talking about was documents that we didn't have because they'd been taken by the Department of Justice. And he said that he believed that a list had been prepared, and after some talking around that -- and after in-house counsel returned from Jamaica last week, we were able to get the -- so it is going to be produced.

MR. DENENBERG: My only other inquiry would be if this is the list of documents that was given to Department of Justice or taken by the Department of Justice, obviously to the extent they're copies, those have been produced already or will be produced?

MR. FLAHERTY: Subject to the objections and other things we made at the time of the productions, our understanding is that the documents we had that were responsive and not subject to our objections were

produced. And again, this is probably a good time if I could, Your Honor, to address what I think was the --

(Away from microphone.)

MR. FLAHERTY: We have produced to the Plaintiffs the 70 or 3- or 5-day submittals as far as I know for all of the contracts but perhaps certainly for the vast majority of contracts that we were involved with. So they do have those submittals.

We have provided them with the actual treatment records, the log records, for all of the Corps contracts. Now I know they're not identified by contract number. We don't do that. But for every barge that came up to our treatment facility that was an Army Corps contract, I had Carrie Mullens review the logs, and she assured me that the logs for each of those barges has been identified, and we've supplied copies of those to the Plaintiffs.

And they go so far as to identify the barge number, the date, the measurements of the barge that were taken as to quantity and the quantity of cement added. This is dry cement that is added to the dredged material to basically make it into a soil consistency so it can actually go into a truck. If you don't do that, it dribbles out the back of the

truck as you try to transport it. So those records have been supplied.

My understanding is we've also supplied all of the trucking records for the trucking from the site out to the various landfills, et cetera, et cetera. I may be a little bit off in some of these descriptions, but that's my understanding.

So in terms of the raw materials, we've certainly provided, I believe, all of that. At the deposition of Tom Witty, I think he went over the pay requests. And as Your Honor may know, there are line items in these government contracts, and there was some discussion about those line items that dealt with dredging, transport treatment and upland disposal versus dredging, transport and disposal at the HARS, which is an offshore site.

So there's really two classes that goes on. There's the class that gets deposited offsite, the class that goes upland. I think Tom Witty identified those prices that we were paid or at least that we requested to be paid for upland disposal. And I believe he testified that most, if not all -- and I think he may have even said all -- he would characterize it all as having been treated, but I'll go by whatever is said.

MR. DENENBERG: I agree since you're looking at me that Tom Witty did testify that all, just about all upland disposal was treated.

MR. FLAHERTY: Right. So I'm just trying to address the fact that Your Honor is working on with the government and the Plaintiffs that we have attempted to provide all of that Corps information to the Plaintiffs so they have it available to them. That's a long way I think to get to the second issue, which has to do with 30(b)(6) depositions.

MR. ADLER: I just want to address this for a moment.

THE COURT: Just hang on one second. As to the first question about the document production, is the Plaintiff satisfied with the representations?

MR. ADLER: I just want to first address the comment made by Mr. Flaherty regarding the submittals.

I don't have an indication that Mr. Flaherty didn't produce everything that he said he produced, but I just wanted to fine-tune that. I'm pretty much aware of what these submittals are, and I think some of it may not be completely accurate in the sense that, as far as Donjon is concerned, we don't have all the submittals for each of the contracts.

And what may be the point of confusion is he

has for one contract, I believe it's Contract No. 20 in particular, we have two or three submittals for that one; I think we do have the 10-day, 35-day and 70-day submittal. But match for match, we don't have all of them. And I'm not saying that Mr. Flaherty is the one that has them or not, but I don't think that we have all of them.

But be that as it may, I don't have a problem with Mr. Flaherty's representation that as far as his client is concerned, he produced whatever they had. That doesn't mean we have all the information.

The other thing --

MR. DENENBERG: Let me just interrupt for a second. Dave Denenberg interrupting Mike Adler.

MR. ADLER: Happens all the time.

MR. DENENBERG: Our concern, and this is in the submittal to the Court, part of the submissions would be these 30-, 70-day submissions but would also be the permit that an operator or a contractor I should say secures from their requisite regulatory authority for the processing of the dredged material if that would be the case. And of course, with the Donjon contracts, that would be the case.

Now Mr. Flaherty said, well, we gave an earlier version of the permit. The truth is that the

permit, 03001, which is the 2003 permit that was in effect until 2008, although it was modified in 2006, that permit was the permit in effect for four years of Donjon's contracting, was actually never produced to us by the U.S. or by Donjon, which perhaps it wasn't produced, and I have no way of knowing aside from taking Mr. Flaherty or Mr. Brown at their word that they don't have it or that they couldn't find it.

But it stands out because that is the permit that they operated under, that was in effect for four years of this period. So to give a 2002 permit that was modified by the 2003 permit or amended by the 2003 permit just stands out as something that one would have expected to have been produced and certainly was required under those contracts.

THE COURT: Well, the Intervenor I guess is going to give you a list relating to this investigative matter. And then these other matters, I would expect Donjon to give the Plaintiff what they have. And if they don't have it, what can you do?

MR. FLAHERTY: We've endeavored in good faith to identify the materials that are responsive to the requests, subject to the burdens and other objections we made at the time. I recall specifically talking to Mr. Adler and others about, you know, tell

me what you need; what do you want to know. Do you want to know how much cement we used, what our volume was? Because, as Your Honor may recall from our very diverse talk on this case, we feel quite strongly that we don't infringe this patent, the 731 patent in particular. And apropos of that, we invited both Mr. Adler and Mr. Denenberg out very early in this process without any requests by them to come and observe our process. And they came and they took photographs of the process.

And frankly, the case has now boiled down to -- well, from my view has now boiled down to the fact that dry cement goes from storage containers over there, through a rotary auger and drops down on the dredged material as dry cement. And after it hits the dredged material, there's a spray of water that sprays out to suppress dust. There's also a guy with a fire hose that if the dust gets significant puts out a spray to suppress dust.

Their patent talks about the creation of a slurry in a mixing container that gets pumped to a mixing head disposed inside the barge. Their assertion as far as I know is that the use of that spray ring -- and he has two assertions -- that the use of that spray ring constitutes the creation of a

slurry in a mixing container, and transfer it to a pumping, to a mixing head.

Where the bone of contention is is that these permits that he's talking about have an error in the permit. Deep within the permit, there's a reference to two nozzles that spray as the dry cement comes down the chute onto the dredged material. All of the testimony in the case so far is that the cement that is falling onto the dredged material is dry. All of the testimony in the case so far, certainly from Carrie Mullens, our operator, is that there have never been any nozzles in there. So that's what the case boils down to in terms of Donjon and the alleged infringement.

The permit that he's talking about is a permit that upon review has reference to these two nozzles in it. It also has reference to the ring of course, but it has reference to these two nozzles. The first permit that he talks about had referenced these two nozzles. And, of course, the third permit does not have reference to these two nozzles. So that's what the case is about in terms of Donjon.

MR. DENENBERG: Your Honor?

MR. FLAHERTY: And by the way, just so we're clear, I have told Mr. Adler that he can have another

half-day with Carrie Mullens. And again, I'm jumping the gun a little bit. He can have another half-day with Carrie Mullens. And one of my complaints was based upon the documents that he listed that it's going to be another half-day of showing her a reference to two nozzles and having her say yes, that's what that says; I didn't notice that at the time; our equipment doesn't have two nozzles.

MR. DENENBERG: Your Honor?

MR. FLAHERTY: So that's what I'm concerned about.

MR. DENENBERG: Your Honor?

THE COURT: Yes.

MR. DENENBERG: Mr. Flaherty may want to try the case right now before you. I don't think you want to.

THE COURT: We're not going to get into it today I assure you.

MR. DENENBERG: But within what he just said was that they say they didn't follow their permit despite the fact that that permit was in effect for five out of the six years that we're talking about.

And a permit is a state regulatory item. Anything that reduces pollution is the whole reason why you get that permit. And Mr. Flaherty just told

you that his process is dry. Obviously, we contest that. He says every witness says it was dry. Obviously, we contest that. And let me assure you that these permits that somehow were not produced to us that do speak of adding water to the process also state specifically that at all times, what Mr. Flaherty is calling dry cement must be maintained wet. So there's issues.

THE COURT: Well, we'll get to that.

MR. DENENBERG: Yes. And I don't want to try the case right now. But I don't see any reason why after the last discussion with the Court that the Plaintiff, who never had an opportunity to conduct a 30(b)(6) deposition and then was only told months after conducting 30(b)(1) depositions that Donjon may want to designate those depositions as 30(b)(6), can't conduct a 30(b)(6) deposition. We did provide listings of documents, as Your Honor required. Your Honor did not say that topics would be restricted.

We certainly will not get into items previously asked and answered. And if that objection wants to be raised at the time and we're just repeating questions, I would agree with Mr. Flaherty. But there are items that we may not have inquired of the 30(b)(1) strategically. And that's part of our

strategy that we would save for a 30(b)(6) and we're not able to conduct because we were not told that it was a 30(b)(6) deposition until afterwards.

Your Honor made it very clear on the record when this issue came up that we're entitled to conduct a 30(b)(6) deposition. You ordered that the Plaintiff supply a list of documents that it would use. As far as topics go, we're not going to get into questions that were already asked, but there might be among almost every subject matter items that we didn't ask because we were saving it for a 30(b)(6).

And as far as what testimony was designated by Donjon as 30(b)(6) testimony, we were only told by Donjon two days ago as to what will be designated from prior 30(b)(1)s as a 30(b)(6).

I am stating on the record that we will not repeat questions. We provided what documents would be covered -- may be marked I should say in this 30(b)(6) deposition. But we don't think we should be further restricted on a 30(b)(6) deposition. Donjon represented that it was a small family company, so we shouldn't be able to conduct a 30(b)(6). The truth of the matter, it has over 200 employees.

THE COURT: Let me hang on. I understand a lot of this is in your briefs. I just want to be

clear about where we are. As to the document production issues, are we okay with that, that Donjon is going to supplement with whatever they have?

MR. DENENBERG: We're okay with that.

MR. FLAHERTY: I'm producing the list that was referred to by Mr. Witty, which I think was the only outstanding piece.

THE COURT: Yes. Now, as to the 30(b)(6) deposition issues.

MR. DENENBERG: Well, wait a second. You said you're producing a list.

MR. FLAHERTY: I'm producing the list that Mr. Witty referred to in his deposition.

MR. DENENBERG: But if that includes documents that weren't produced, you're not producing those documents?

MR. FLAHERTY: Those documents are gone. The list you're getting is of the documents, the classes of documents that went with the Department of Justice as far as I understand.

MR. CAMPBELL: Your Honor, I think I can answer Mr. Denenberg's question. The list is a list of documents for which Donjon did not retain a copy. It is not a complete list of what the Department of Justice took. So to the extent that we had a copy

that has been produced in response to the deposition request --

MR. FLAHERTY: If it was responsive and if it was not subject to objections that were made at the time.

MR. DENENBERG: Mr. Campbell?

THE COURT: It seems to me that's all you can do. I mean, I don't know what more they can do.

MR. DENENBERG: I would assume that if it's a list of documents that you didn't retain, obviously you don't have them, so I have no objection to that. But if you also have a list of everything that was given to the Department of Justice, why wouldn't that be given?

MR. FLAHERTY: I'm not sure first of all why that would be relevant. Our obligation is to respond to appropriate requests and to respond either by way of objection or production, and we have done that.

MR. DENENBERG: If it's related to the contracted for dredged material, it would be relevant.

MR. FLAHERTY: We have many things that may be related to the contracts. But I think, as Your Honor pointed out, we have many things that are probably related to contracts. We probably have labor agreements with the local, from which we get our 200

employees. We probably have many things that may be related to the contracts.

But as Your Honor pointed out, the things that the Plaintiff has a reasonable expectation, a reasonable need for would be those things relating to our treatment process, our contracts with the government in terms of quantities, the actual contracts themselves to the extent they can identify contracts separate from what the government may have. And we have done all that. We have provided all that information.

And the point I made very early on in this case and have made repeatedly to Mr. Adler and Mr. Denenberg is that, notwithstanding that we may employ tugboat captains and stevedores and longshoremen and truck drivers for purposes of our dredging operation, we are controlled by three people: Arnold Witty, who founded the company some years ago; Tom Witty, his son, who manages the dredging operations and is familiar with the contracts; and Carrie Mullens, who operates our treatment process. Those are the three people who run this business for all intents and purposes relevant to the issues in this case.

THE COURT: I'm going to treat the document production issue as resolved by a discussion here on

the record today. And if you hit further snags that you can't resolve -- I hope you will. But if you have to come back on some other day, just let me know.

Now, as to the 30(b)(6) depositions, what do we have there? What are the problems we're dealing with?

MR. FLAHERTY: Well, perhaps I think what went on was a little bit of tit-for-tat, Your Honor. We had some issues with their effort to redepose Carrie Mullens, and I will represent it was a little bit not in keeping with normal practice to designate somebody after the fact. But we had talked early on that just as they now argue that Radle and Studer are clearly the ones that knew the business, they knew early on that it was Carrie Mullens and Tom Witty who would know the business.

And as Your Honor said at the time of the hearing, the telephone conversation, for which I only got the transcript yesterday, it's pretty clear to see when you've got three people in charge of the business who the 30(b)(6) witnesses are going to be.

But having said all that, the representation that I'm willing to accept is this. Your Honor, based upon what we thought we heard at the argument, we thought that Mr. Denenberg had said that there's this

new permit that came up that they'd like to examine Carrie Mullens about. And I questioned him about what that permit could be, and he said basically the upshot was, send the documents to Mr. Flaherty that you want to examine the person on.

Instead I got a list of 65 documents. And then it sort of ended with, plus any document produced by any other treater, like Clean Earth, OENJ, anything about any of the cement companies. And frankly, I thought that was well beyond the spirit of what we had been talking about, so I objected.

Now I guess going forward, it should just be clear I'm going to object again if they start getting into that area. I think it's quite broad, and I don't think I can prepare anybody to talk on the 30(b)(6) basis about some document supplied by Hercules. But I can certainly let them answer the question to the best of their ability. I can certainly do that.

THE COURT: Mr. Flaherty, do you have 30(b)(6) depositions that you want to take of TDM's personnel?

MR. FLAHERTY: I do.

THE COURT: What is the situation there?

MR. FLAHERTY: The situation there, Your Honor, is we scheduled a fellow by the name of Rick

Radle, R-A-D-L-E, and Richie Studer. Mr. Studer is not only I'm just going to say a company official with the holding company that controls TDM, but he's also one of the inventors.

Mr. Studer is also along with Mr. Radle someone who prior to instituting the lawsuit came onto the ground either on or near our premises and took photographs, which were then relied upon by Plaintiff's counsel in sending its claim to the U.S. And Mr. Studer is also the one who labeled certain things on the photographs, presumably in an effort to suggest where the patent might be being infringed.

So we noticed Mr. Studer and Mr. Radle. And on the day of those depositions, in fact, I was beginning my introductory remarks, and Mr. Denenberg identified that Mr. Radle and/or Mr. Studer was going to testify on certain areas within our 30(b)(6) notice as well. I didn't object at that time because frankly, as Your Honor knows, there's only two guys in charge; they're probably the ones who know.

But obviously, when you're dealing with an inventory, or in Mr. Radle's case, the one who was the intermediary between the inventory and the lawyer, there's a significant volume of basic testimony you want to get. Plus there was testimony that we wanted

to get about these photographs that were taken prior to instituting the lawsuit, because we have very real concerns about the quality of that investigation. So yes, I do want to take continued 30(b)(6) and probably 30(b)(1)s of Radle and Studer, and I thought that was set.

THE COURT: Radle and Studer was agreed.

MR. FLAHERTY: Now here is the tit for tat. Your Honor ordered that counsel provide me with a list of the documents they were going to use.

THE COURT: Which isn't required necessarily by Rule 30(b)(6), but we did it in this case as an accommodation.

MR. FLAHERTY: And I certainly appreciate that accommodation. And I believe that was in the context of the clear suggestion that some additional documents had come up that warranted that additional.

At the conclusion of the first days of Mr. Radle and Mr. Studer, there was an agreement on the record that they would come back for another half-day. In fact, Mr. Denenberg suggested that they come back on the same day, so one would be in the morning and one would be in the afternoon, to which I said okay if they can both be away from their company at the same time. So that's what it was set at. There was no

suggestion I had to supply a list of topics or anything along those lines.

Now the topics that immediately come to mind are those that would relate to the subject matters that were designated by Mr. Denenberg at the beginning. And I in the conversation with Mr. Adler, which I know has not been raised, but I know he was quite concerned and upset about it because he thought I had made a representation, I suggested to him that well, you know, I'd be talking with both of them about prior art, I'd be talking with them about the invention, their work history, all those things.

And I took that to be a casual comment, and Mr. Adler took that as a limitation. And I regret any confusion we may have had on that.

THE COURT: Mr. Denenberg, I have just a few more minutes available today, but go ahead if you have a response.

MR. DENENBERG: Oh, I'm sorry.

THE COURT: That's all right.

MR. DENENBERG: I would note that Mr. Flaherty and Donjon have deposed as a 30(b)(1) Arfontor Scott Crawford. Arfontor as an accommodation stayed up until I think it was 6:00 or 6:30 that day. The days with Radle and Studer, both went to 5:00, and

I did agree that they would come back on the same day, one in the morning, one in the afternoon. But I did state on the record that the accommodation should be the same as what was going with the 30(b)(6) of Donjon.

Now Donjon's 3(b)(6), as an accommodation, there was a list of documents. I don't see why Plaintiff, which is truly a small company and has less than 10 employees, most on a part-time basis, shouldn't at least get a list of what this 30(b)(6) is being continued on in terms of the documents.

And I don't see any reason why since essentially it's another full day, half of Studer, half of Radle, which I've already offered, I've already granted, and we've already given a date. You know, that's a full day. That's Studer in the morning, Radle in the afternoon, whatever it is. I don't understand why the 30(b)(6) of Donjon, which this Court ordered, should not be a day. Why is it now Mr. Flaherty is trying to limit it to four hours and trying to limit the topics?

THE COURT: Well, here's what we're going to do. I've heard what both of you had to say. For each of the completion needed for the Rule 30(b)(6) deposition, I'll give four hours for the completion of

each deposition, so four hours for Mullens and four hours each for the TDM representatives. And since we have the identification of documents --

MR. DENENBERG: Does that mean four hours for Studer and four hours for Radle or four hours total?

THE COURT: Four hours for each. The accommodation of identifying documents on which examination will be carried out to complete the deposition, let's do that so that the witnesses presumably can be prepared to say what they know about them in advance. That should help you to be able to complete them within the four hours if they have that advance notice. And you can set that up on any schedule that is convenient for both parties, all right? And we'll include that in our order.

One question I wanted to raise before we close today unless there's something else. I noticed that we have built into our schedule, following the completion of discovery, we have various expert report dates and presumably depositions built into that.

At the current state of the case, do you anticipate the need for expert testimony at the Markman claim construction hearing or not?

MR. DENENBERG: Your Honor, obviously expert

testimony would be extrinsic.

THE COURT: That's correct.

MR. DENENBERG: But at this time, my answer would be yes.

THE COURT: All right. What I was trying to do here, since it is considered as extrinsic evidence and I won't say less important, but it's got I'll say an inferior weight versus intrinsic evidence, I was trying to see a way that we could maybe expedite things even though we're going to have to --

MR. DENENBERG: We would have to do the expert discovery at some point anyway.

THE COURT: We're going to have to extend the discovery cutoff date. I was trying to find a way to give you an earlier Markman hearing. But if you want to do the expert testimony, I guess we have no choice.

MR. FLAHERTY: My view, Your Honor, on the 731 patent, I think it's a very basic patent. The terms I described I believe are the only terms that anybody would really be talking about in the case. I'm not sure expert testimony would be required to assist the Court in understanding what that patent is about.

In fact, I know there has been some

discussion that we may want to make a summary judgment motion at the end of all fact discovery, whenever that occurs, and that that would obviously put in play the issue of the proper construction of the term slurry and mixing container and things like that. But I think those terms are readily understandable from a review of the patent and the file wrapper.

THE COURT: Mr. Brown, I saw you were moving the microphone over into your general direction.

MR. BROWN: I take the opportunity when I can, Your Honor. This seems important.

So let me just say I don't think that, first of all with respect to Donjon, we're talking about one patent. Unfortunately, the scope of my case involves other contractors and other patents, so I did want to make that point. That being said, I think that we probably could consider an arrangement with Miller expert testimony for the reasons you stated about intrinsic/extrinsic evidence.

Beyond that, I have certain questions about under the present schedule what is covered in the expert reports, because I believe it states something to the effect of always use for which a party has a burden of proof. And it doesn't seem like it's limited strictly to claim construction issues. In

other words, the expert will speak to --

THE COURT: No, I don't think it was intended to be limited to the claim. It was liability issues as going and then rebuttal on liability. For the Defendants, it was invalidity issues and then the rebuttal from the Plaintiff on invalidity issues.

MR. BROWN: So I just want to make clear your view of the present schedule is that the expert would not just opine about what different claims would mean.

THE COURT: No. With the complete expert reports.

MR. BROWN: Right. I would consider a limitation on that as well.

THE COURT: I'm just looking for ways to give you an efficient and timely disposition as we go along here, and I'm suggesting that maybe you want to consider putting off your expert effort until you see how you fare at other stages of the case. We have summary judgment issues, we have claim construction issues.

MR. DENENBERG: Perhaps that's something I can confer with opposing counsel within the confines of what's coming up as the next order and then maybe speak to the Court about having a conference on it?

THE COURT: Yes. Sure. This doesn't have to be the last time we speak, and I'm sure it won't be.

MR. DENENBERG: Unfortunately for you, right?

(Laughter.)

THE COURT: What I'm envisioning here is in the order that we'll prepare and issue following this hearing, I'll give you an extended discovery date, because I see that that's inevitable. But I probably will not incorporate at this point anything beyond the discovery end date. And then you all can get back to me on how much more you see before we do a Markman claim construction hearing.

MR. DENENBERG: Thank you, Your Honor.

THE COURT: All right. Is there anything else today?

MR. FLAHERTY: No, Your Honor, I don't think so.

MR. BROWN: I have nothing further. Thank you very much.

THE COURT: We'll stand adjourned.

(Whereupon, at 11:55 a.m., the hearing in the above-entitled matter was concluded.)

//

REPORTER'S CERTIFICATE

DOCKET NO.: 06-472

CASE TITLE: TDM America v. U.S.

HEARING DATE: December 13, 2007

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: December 13, 2007

Thomas Fernanders, III
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4018