# EXHIBIT 13

U.S. Department of Justice

Civil Division

JBB
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

Telephone: (202) 307-0285
Facsimile: (202) 307-0345

*Washington, DC 20530*

February 6, 2008

**BY FEDEX AND E-MAIL**

David W. Denenberg, Esq.
Davidoff Malito & Hutcher LLP
605 Third Avenue, 34th Floor
New York, New York 10158

John E. Flaherty, Esq.
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102

Gary J. Campbell, Esq.
McCarter & English, LLP
226 Franklin Street
Boston, Massachusetts 02110

Re: *TDM America, LLC v. United States*
Court of Federal Claims No. 06-0472C

Counsel:

Attached are documents bearing Bates nos. G01025 01759 to G01025 1847, and Revised Attachment 1. This document production includes the following documents:

| | |
|---|---|
| G01025 01759 | E-mail regarding 70-day Submittal for DACW51-03-C-0001 |
| G01025 01760 – 01821 | Additional permit for 3-Day Submittal related to DACW51-03-C-0001 |
| G01025 01822 – 01823 | P00007 for W912DS-05-C-0004 (mistakenly omitted from Attachment 2) |
| G01025 01824 – 01847 | Section 800 for DACW51-01-B-0028 |

Please note that Revised Attachment 1 includes our identification of solicitation and specification documents, although the Court's order does not require the government to identify the solicitation and specification documents. *See* Discovery Order ¶ 6. We are providing our identification of these documents in an effort to move this matter forward. Revised Attachment 1 also includes citation to certain documents we located in a cursory review of document production from other parties. We did not perform an exhaustive search of other parties' document production for the entries in Revised Attachment 1. Finally, with respect to Revised Attachment 1, there is one correction we wish to bring to your attention. The original Attachment 1 included an erroneous entry for the 70-Day Submittal for DAC51-02-B-0002 as G01006 06190 – G01006 06230. Revised Attachment 1 includes the correct entry, G0100<u>5</u> 06190 – G0100<u>5</u> 06230. If you believe that any of the entries on Revised Attachment 1 are erroneous, I encourage you to call me to discuss the issue.

The government believes that it has fully met its obligations under paragraph 6 of the Court's order. If TDM requires an additional extension of time to respond to the government's motion for partial summary judgment, in order to review the recently identified and produced documents, the government will not oppose a reasonable extension of time.

In the same vein, we ask TDM to withdraw its motion filed on January 24–25, 2008. The government has now identified and provided all documents called for by paragraph 6. In light of our willingness not to oppose an extension of time sufficient for TDM to review the documents we have recently identified and produced, we believe that withdrawing the aforementioned motion is both reasonable and proper.

Very truly yours,

Joshua B. Brady
Attorney
Commercial Litigation Branch
Civil Division

Enclosures

# EXHIBIT 14

**U.S. Department of Justice**

Civil Division

EAF
154-06-472

Telephone: (202) 353-0517
Facsimile: (202) 307-0345

*Washington, D.C. 20530*

January 16, 2007

**VIA E-MAIL & FIRST CLASS MAIL**

David W. Denenberg, Esq.
Michael A. Adler, Esq.
DAVIDOFF MALITO & HUTCHER LLP
605 Third Avenue - 34 Fl
New York, New York 10158

Re: *TDM v. UNITED STATES,*
Court of Federal Claims No. 06-472

Dear Counsel:

This letter is to memorialize our discussions during our telephone conference on Friday, January 12, 2007. That conference was scheduled to address concerns relating to the United States' responses to interrogatories, as set forth in your letter dated December 27, 2007, and the United States' responses to document requests, as set forth in your letter dated January 5, 2007.

During the conference, you agreed that discovery in this case should be limited to dredging activity that involves treatment/processing of dredged material. Also during this teleconference, I clarified that the United States did not refuse to produce non-privileged documents relating to the contracts listed in Attachment A of the Defendant's Responses to Plaintiff's First Set of Interrogatories (Nos. 1-14). The United States is working to provide or otherwise make available for inspection, such documents, with the exception of documents relating to unsuccessful bidders. You stated some concern that the list in Attachment A was incomplete. You specifically questioned dredging activity in Seattle and Los Angeles. I agreed to share your concern with our client agency. We additionally discussed providing declaratory or testimonial confirmation that the contracts listed in Attachment A represent all relevant USACE dredging contracts that involve processing dredged material.

I also agreed to provide copies of the publicly available documents listed at numbers 7-11 in category B of the United States' Initial Disclosures and the two additional documents listed in response to Interrogatory No. 7.

We discussed the depositions noticed for the end of the month and early February. I explained that Mr. Thomas Shea is serving in Iraq and provided the name of a witness that will likely be able to address the topic of information for which Mr. Shea was listed in the United States' Initial Disclosures. I also provided dates that the named deponents are available for deposition. You indicated that you would inform me this week whether you intend to go forward with the noticed 30(b)(1) depositions prior to the Status Conference scheduled for February 13, 2007. You agreed to postpone the 30(b)(6) depositions until after the Status Conference to allow time to gather and review documents relevant the depositions.

In discussing document production, deposition notices and the addition of Donjon Marine Company, Inc. as a third party, we discussed my interest in revising the scheduling order. You stated that you were amenable to this request and suggested the possibility of submitting a joint request for revision of the order prior to the upcoming Status Conference. We may find it efficient to discuss proposed revisions with counsel for Donjon, as they have a JPSR and proposed schedule due one day prior to our scheduled Status Conference.

You mentioned that you will amend your complaint to include one or two additional patents that should not extend the scope of discovery beyond dredging contracts that involve processing dredged material. Your plan is to forward a draft amended complaint for my review and comment as to whether I will oppose the filing. You also indicated that you will be filing a second motion to substitute counsel that will name Mr. David Denenberg as counsel of record. I stated that I would not oppose this motion to substitute counsel.

We also discussed the draft protective order that I forwarded to you and that you have returned with your edits. I have reviewed your edits and have will forward my concerns relating to a few of your edits today. The revised draft should be ready to circulate to counsel for Donjon this week.

I agree with your assertion during the call that the key to productive discovery in this case will require on-going communication between counsel for the parties. Please keep in mind that if you are not able to reach my by telephone, I am readily available via e-mail.

Very truly yours,

Erica A. Franklin

ERICA A. FRANKLIN
Attorney
Commercial Litigation Branch
Civil Division

# EXHIBIT 15

**U.S. Department of Justice**

Civil Division

EAF
154-06-472

Telephone: (202) 353-0517
Facsimile: (202) 307-0345

February 28, 2007

**VIA FACSIMILE TRANSMISSION**

David W. Denenberg, Esq.
Michael A. Adler, Esq.
DAVIDOFF MALITO & HUTCHER LLP
605 Third Avenue - 34 Fl
New York, New York 10158

Re: TDM v. UNITED STATES,
Court of Federal Claims No. 06-472

Dear Counsel:

I am in receipt of your letter dated February 27, 2007, in which you assert that I represented that the government would provide documents described in you February 13, 2007 within two weeks. Your assertion is unfounded: such a representation was never made. As you will recall, in response to your requests for production, the government elected to make available for your inspection the documents of the New York District United States Army Corps. Counsel from your office inspected the documents at Caven Point on February 6 and February 7, 2007. Subsequently, you requested the government to review its collection and produce to plaintiff specific documents. Accordingly, you and I agreed that you would prepare a list of documents that plaintiff sought and would allow the government sufficient time to review New York's significant document collection. You agreed to both of these requirements and a two week deadline was neither discussed nor agreed upon. No specific time frame was discussed, let alone was an agreement reached.

On February 13, 2007, you provided the list, as we had agreed. The government is now conducting its search for the documents described in the list and will produce those documents on a rolling basis, as the documents are received and processed. As you are aware from my previous letter, the records at the New York District offices are contained in over 70 boxes of documents. Since you did not want to review those boxes,

we will obtain the records that you have requested as expeditiously as we can. It is, however, unrealistic to expect us to produce all of the requested documents in two weeks

The only agreement made regarding a two week time frame related to a different matter: I agreed to provide you with a copy of the publicly available documents listed in the government's initial disclosures and another production of a small number of documents (contract files) from districts other than New York. As promised, the copies of the publicly available documents listed in the government's initial disclosures were produced by Federal Express on February 15, 2007. Similarly, the government produced promised contract file documents from the Los Angeles District United States Army Corps on February 23, 2007. As explained previously, additional documents from districts other than New York will be produced on a rolling basis, as the documents are received and processed.

In addition to these productions, I have been engaged in a number of anticipated litigation activities relating to this case. As you are well aware, these activities have included coordinating the revision of a joint motion and proposed protective order that government counsel drafted; filing this joint motion and proposed order on February 16, 2007; facilitating the parties' preparation and filing of the court ordered Revised Schedule on February 22, 2007; and filing a Motion to Notify Interested Parties on February 23, 2007.

A motion to compel in this situation is inappropriate as (1) the government has not refused to produce the requested documents, insofar as such documents exist, and (2) the government did not indicate that it would be able to identify and produce the documents in a two week time period. However, if TDM wishes to go forward with an unsupported motion to compel, responding to the filing will necessarily delay the government's production efforts. If you wish to discuss this matter, I will be available on Friday, March 2, 2007. Contact me by e-mail, if you would like to schedule a time on Friday to discuss this issue.

You also mention in your letter that you would like to reschedule the depositions of Bryce Wisemiller, Ella Snell and Harold Hawkins, currently scheduled for March 7, 8 and 9 respectfully. You would also like to reschedule the 30(b)(6) depositions scheduled for March 15, 2007. The government consents to rescheduling these depositions. Please advise me as to when you prefer to conduct those depositions.

Very truly yours,

Erica A. Franklin

ERICA A. FRANKLIN
Attorney
Commercial Litigation Branch
Civil Division

cc: Gary J. Campbell, Esq.
McCarter & English, LLP
225 Franklin Street
Boston, Massachusetts 02110

Counsel for Donjon Marine Company, LLC

# EXHIBIT 16

DAVIDOFF MALITO & HUTCHER LLP

ATTORNEYS AT LAW
605 THIRD AVENUE
NEW YORK, NEW YORK 10158

(212) 557-7200
FAX (212) 286-1884
WWW.DMLEGAL.COM

GARDEN CITY
200 GARDEN CITY PLAZA
GARDEN CITY, N.Y. 11530
(516) 248-6400

MELVILLE
105 MAXESS RD., SUITE 124S
MELVILLE, NY 11747
(631) 574-4510

ALBANY
150 STATE STREET
ALBANY, N.Y. 12207
(518) 465-8230

WASHINGTON, D.C.
444 NORTH CAPITOL STREET, N.W.
WASHINGTON, D.C. 20001
(202) 347-1117

WRITER'S DIRECT: 646-428-3283
E-MAIL: maa@dmlegal.com

September 17, 2007

**BY E-MAIL and**
**FIRST CLASS MAIL**

Erica A. Franklin, Esq.
U.S. Department of Justice
Civil Division
1100 L Street NW - Suite 1100
Washington, D.C. 20001

**Re: Omnibus Issues Relating to Discovery**

Dear Erica:

This letter follows up on my letter dated August 13, 2007, responds to your letter dated August 15, 2007 and also discusses additional outstanding discovery issues.

## I. THE US' CONTINUED WHOLESALE AND INDISCRIMINATORY DESIGNATION OF TRANSCRIPT TESTIMONY AS PROPRIETARY WITHOUT ANY JUSTIFICATION

TDM repeats its request that the US redesignate transcript testimony that the US has designated as proprietary. As the US acknowledges, it has yet to modify any of the previously designated transcripts. The US claims that it is working to review each transcript designation to determine which portions of the testimony may be redesignated. However, as shown from the listing below, the first deposition of Bryce Wisemiller was conducted over four (4) months ago and additional US witnesses were also deposed about four (4) months ago.

| **Date** | **Deponent** |
|---|---|
| May 10, 2007 | Bryce Wisemiller |
| May 16, 2007 | Harold Hawkins |
| May 18, 2007 | Ella Snell |
| May 22, 2007 | Bryce Wisemiller |
| May 31, 2007 | John Bearse |
| June 6, 2007 | James Fields |
| July 10, 2007 | John Tavolaro |
| July 11, 2007 | Salvatore Didato |
| July 27, 2007 | Virginia Pankow |

While the US asserts that it needs certain approvals from other parties in order to redesignate these deposition transcripts, it is clear that any such approvals could have been obtained months ago. Further, the US fails to provide any reason why deposition testimony not concerning other parties has not yet been redesignated. If we do not receive a date certain before the US' 30(b)(6) deposition by which all US transcripts will be appropriately redesignated, TDM will have no choice but to seek court intervention to resolve this issue.

## II. THE US' INACCURATE AND MISLEADING RESPONSES TO TDM'S DISCOVERY REQUESTS AND THE US' DEFICIENT RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES

On numerous occasions, TDM requested the identification of the specific US contracts with subcontractors that included the processing of dredged material. However, to date, the US has failed to specify which documents constitute the actual contracts and the amendments thereto. The US has refused to identify these contracts by alleging that such documents are as easy for TDM to identify as they are for the US to identify. This is simply untrue because the US is the only party capable of identifying which documents constitute its own official contracts. Further the US' glib response that the US should not act as a paralegal for TDM is similarly unavailing given that, as the US is well aware, its own witnesses were unable to agree as to the description and nature of the very same documents presented to them. Additionally, it is very clear that the US has this information, but refuses to furnish it to TDM.

More recently, the US' interrogatory responses referenced Attachment D as a list that specified records from which answers may be derived or ascertained for each contract in response to TDM's interrogatory requesting identification of the actual contract documents and amendments thereto. Attachment D included a fifty-one page list of documents by bates range classified by contract number. Hundreds of documents were listed under each contract and TDM's counsel expended much time and effort sorting through the US' production using this list to locate actual contracts. However, many of the documents identified by the US were in fact daily quarterly assurance reports, daily weather reports, and transportation and placement logs. Moreover, the few contract documents that were located were in fact the very same documents refuted by US witnesses. It seems that the US has engaged in an effort to divert TDM's attention by identifying

irrelevant and unresponsive documents by representing them as being relevant to the contracts for which TDM sought an identification.

## III. INTERROGATORY NOS. 23, 24, 25 AND 26

As stated in my letter dated August 13, 2007, the US refuses to respond to these interrogatories on the grounds that they exceed the number of interrogatories under RCFC Rule 33(a). As discussed during our recent telephone conversation, TDM advised the Court that the parties agreed upon forty (40) interrogatories to be served by each party. In addition, TDM disagrees with the arbitrary and self-serving numbering system employed by the US. Thus, with respect to interrogatory no. 23, TDM expects a full and complete answer, as it does with respect to interrogatory no. 26.

With respect to the intervening interrogatories, TDM is willing to entertain a reasonable compromise and awaits to hear the US' proposal. In the event none is forthcoming within a short period of time, TDM will bring this issue to the court's attention as well.

## IV. THE US' FAILURE TO EXPLAIN THE INSIGNIFICANT AMOUNT OF TREATED DREDGED MATERIAL IN PROPORTION TO THE TOTAL VOLUME OF DREDGED MATERIAL

We reiterate our request for an explanation of the disparity between volumes of dredged material reported on US websites and volumes of treated dredged material identified by the US in this litigation. Since the inception of this lawsuit TDM has expended significant discovery time and invested other resources to obtain the precise volumes of dredged material that have been treated with an additive by the US' contractors. It appears from the gross numbers on the US' websites and in other sources that only a small percentage of dredged material is actually treated with an additive. TDM has requested an explanation why the percentage of treated dredged material is indeed so low, especially with the general knowledge that significant contamination exists in the larger ports, such as in the major eastern and major western areas of the US. TDM also requested a 30(b)(6) witness who would be able to testify on this topic with respect to the entire United States. To date, the US has not provided a single witness who can explain this disparity.

## V. THE US' RENEGING ON ITS AGREEMENT TO PAY FOR COPYING EXPENSES

We have reviewed the US' letter regarding their position for the payment of copying expenses. TDM believes that it is entitled to be paid for the copying expenses incurred from third parties, as well as for the US' portion of the conference calls, saving the US the expense for personally appearing at the depositions. If the US is not amenable to reimbursing these costs, then TDM will seek court intervention. Moreover, TDM has in accordance with RCFC Rules 45 (b)(1) and 5(b) served copies of all non-party subpoenas upon the US. Despite this, the US has never made any arrangements to obtain discovery from those non-parties. Nonetheless, TDM has in good

faith produced copies of discovery received by non-parties at its sole expense. There is simply no reasonable or logical basis why TDM should have to bear the cost of producing same to the US.

## VI. THE US' INCOMPLETE RESPONSE TO INTERROGATORY NO. 10

The US' First Amended Response to interrogatory no. 10, included a list of contracts that the US represents as being a complete list of all contracts where dredged material was treated with an additive. However, a witness recently testified that Clean Earth Dredging Technologies, Inc. processed dredged material for contractors working on behalf of the US under three contracts never identified by the US. These contracts were not identified in the US' list or in any of its interrogatory responses. If the US does not produce all relevant documents pertaining to these contracts and any other relevant contracts not previously identified immediately, TDM will be forced to seek the Court's intervention on this matter as well, especially in view of this week's 30(b)(6) deposition.

Very truly yours,

Michael A. Adler

MAA/taf/lsh

cc: David W. Denenberg, Esq.
John E. Flaherty, Esq.

# EXHIBIT 17

BY MR. ADLER:
Q I'm making a statement for the record.
Let's go to the disposal type beach nourishment for a moment.
**A Okay.**
Q Do you have a knowledge whether or not that's generally sand?
**A It is generally sand.**
Q Okay. Do you have knowledge as to what material would be disposed upland?
**A No, I do not.**
Q Beach nourishment and upland, that category, at this point all you know is that beach nourishment is sand, but you don't have any idea what material upland is if it's beach nourishment and upland?
**A I would assume they would both be sand, because they come from the same location.**
Q How about open water and upland?
**A That would be wherever the dredging takes place. It would be site specific from the dredge site.**
Q Do you know whether or not it would be sand or other material?
**A It could be sand with silt.**
Q Okay. And then do you know whether or not silt generally has to be treated?



**A I do not know.**
Q And how about with respect to upland? Is that generally silt?
MS. FRANKLIN: I'm going to object to the extent that question has been asked several times and answered.
THE WITNESS: I do not know what the material is for upland disposal.
BY MR. ADLER:
Q Now, with respect to TDM006754, the form that says New York, right?
**A Yes.**
Q I'm just asking from your experience and your knowledge of dealing with the database, the numbers for New York for years 2001 through 2006 as shown here, are, compared to the other districts, fairly large. Do you have an understanding of whether most of that material represents dredge material that was disposed upland and that was treated?
MS. FRANKLIN: Objection. Vague to the extent that you're representing that the numbers in the New York column are larger.
MR. ADLER: They are what they are.
BY MR. ADLER:
Q But do have an understanding that most of that material was treated for upland disposal?



MS. FRANKLIN: And I also object you're asking questions outside the scope for which this witness was designated.
BY MR. ADLER:
Q You can answer the question.
**A I have no knowledge if any of that material was treated.**
MR. ADLER: Just one second, please.
All right, so at this point I have no further questions for the witness, though I will say that TDM still expects to have a witness from the United States that will be able to testify regarding the amounts of material that were not treated, were treated, so these numbers can be explained.
MS. FRANKLIN: I can't hear you. I hear air.
MR. ADLER: I want to make a statement on the record that the United States has asked on several occasions for a knowledgeable witness that can explain -- TDM has explained -- sorry, that TDM has requested on numerous occasions for a witness that would have knowledge that would explain the numbers that the U.S. provided to us that were represented as representing or that are the quantities of dredge material that were treated for upland disposal versus the amounts of material that are shown in the Web site and for someone



to say that with respect to any information, quantities that were not -- with respect to any quantities that were given to us regarding dredge material that was treated for upland disposal, to testify that all other quantities shown in this Web site have not been treated for upland disposal.
I have no further questions for this witness.
MS. FRANKLIN: I just have one or two questions for this witness, then I'll make my statement for the record.
EXAMINATION BY COUNSEL FOR THE DEFENDANT
BY MS. FRANKLIN:
Q My first question is, you indicated previously that this database contains information independently entered by someone at each district; is that correct?
**A That's correct.**
Q Is this database, any portion of the database that you have been asked to look at today, does it provide information relating to processing or treatment of dredged material?
**A No, it does not.**
MR. ADLER: Asked and answered.
BY MS. FRANKLIN:
Q And is it part of your function with the

physical model of the Chesapeake Bay, and I was a civil engineering technician on that project. I was working in that facility for about nine years, and in that time I went from civil engineering tech to oceanographer to project manager.

When that facility closed, I moved to Vicksburg, Mississippi, and I worked on numerical modeling of the Chesapeake and San Francisco Bays. I also worked in the dredging research program, dealing with instrumentation on dredges and the technique and technology of dredging activities.

In 1991 I had the opportunity to come to my present position here in Alexandria, as a project manager for the dredging information system. Currently, I manage the dredging information system. I also manage the lock performance monitoring system and am a senior manager in the navigation data center part of the Institute for Water Resources.

Q And how long have you been employed by the Army Corps of Engineers?

A Excuse me? How many years have I been employed?

Q With the Army Corps --

A Army Corps of Engineers, 32.

Q Okay. What are your current duties?



A My current duties involve the project management of the lock and dredging database systems, and this involves seeing that the systems stay up and running; meeting headquarters' needs if databases have to be modified to capture information that we don't currently capture; developing reports for users answering requests from Corps, federal government, academia, the public. As a senior manager in the navigation data center, I have input into the strategic plans for the organization, our directions, our budget, our funding, our long-term plans. I have responsibilities for the Institute for Water Resources, which is the parent organization, as to the knowledge and the function of the institute and to be a public relations person, basically, to inform and educate others as to what our capabilities are.

Q I believe that you mentioned your responsibilities for the lock and dredging system?

A Yes. They are two separate databases. It's a navigation system.

Q Could you explain what each of them are to someone that would be considered a novice.

A Okay. The dredging information system collects information on all Corps-performed and contracted dredging information -- dredging jobs from



prebid estimate through completion. It consists of information on where the dredging is being done, what district; the government estimate; the winning bid; the winning bidder; the number of bids; equipment used in the dredging process; placement of the material; pay, how the pay is calculated; and information like that.

The information is entered by the district person. The district person is responsible for the completeness and accuracy of the database. My responsibility is to be sure the database is up and running, that I answer their questions if they have questions, and give them assistance if they need it.

The lock performance monitoring system gathers information on every lockage that is performed that the Corps locks. The vessels, the commodity, the time of arrival, the time it takes to lock through, information like that. Again, my responsibility is to be sure the database is up and running and that there's user support, that there are modifications made, if necessary, due to proponent's requests, and the accuracy and completeness of the database is the responsibility of the lock operator.

Q Now, with respect to the dredging information database, you had mentioned that it has information regarding the placement of material?



A Yes.

Q And what did you mean by the placement of material?

A These are just broad categories of information, beach nourishment, overboard and open water, upland, confined disposal, to just give us a general idea of where the material is going.

Q Now, I'd like the court reporter to mark that second amended notice as plaintiff's Exhibit No. 150.

(Thereafter Exhibit 150 was marked for identification.)

BY MR. ADLER:

Q Ms. Pankow -- let the record reflect that Ms. Pankow has been given Exhibit No. 150.

Have you seen it before?

A Yes, I have.

Q And other than today, when did you last see it?

A Yesterday.

Q And do you know what this document is? Do you have an understanding of what this document is?

A A general understanding, yes.

Q And this is a notice to appear for a deposition, correct?

**A Yes.**
Q And are you here today pursuant to this notice?
**A Yes, I am.**
Q As Exhibit A, which is the third page of this document, until the end of the document, there are a number of categories listed. Are you here with respect to testifying today to any of these categories?
**A To any of these categories?**
Q Correct.
**A Yes.**
Q Which ones are they?
MS. FRANKLIN: Michael, you have several. I mean, there are 59 categories. Why don't you just direct the witness to the two categories that the government has identified this witness for. We provided you that in an e-mail.
MR. ADLER: Okay. Then I'll direct --
BY MR. ADLER:
Q Well, first of all, do you know which category, before I direct you, do you know which categories in this document you're going to be testifying about?
**A I'd have to look for them. It has to do with the dredging database.**



Q All right. Then I'll turn your attention to categories Nos. 35 and 37.
**A Okay.**
Q Are those the two categories?
**A Yes, they are.**
Q Okay.
MS. FRANKLIN: I'm going to object, because I believe we limited that to the dredging information system.
BY MR. ADLER:
Q Now, getting back to -- with respect to the various -- you are here today to testify with respect to the notice with respect to categories 35 and 37 as it relates to the dredging system; is that correct?
MS. FRANKLIN: I'm going to object to the extent that the government had also served objections to this notice for 30(b)(6) witnesses that apply to this witness also.
BY MR. ADLER:
Q All right. But is that your understanding?
**A Yes, it is.**
Q Now, you had mentioned the various broad categories, you mentioned one was beach nourishment?
**A Yes.**
Q What is that?



**A That is material placed on the beach to renourish the beach, especially after storms when the sand has been removed by storm waves, material is placed on the beach to reestablish that profile.**
Q Okay. Is another one of those broad categories confined?
**A Yes. There are constructed facilities, holes in the ground, basically, either on land or under water, where material is placed because it is considered potentially hazardous and does not want to be released into the environment, and these facilities can be capped, they can have clay layers underneath them. They can be contained. The material is usually contained in the confined area.**
Q Do you know whether or not the material that goes into these areas is treated, such as with cement or an additive?
**A No.**
MS. FRANKLIN: Objection. Vague.
Sorry, go ahead.
THE WITNESS: No. I do not know that.
BY MR. ADLER:
Q You don't know if it's treated, is that what your answer is?
**A Correct. I do not know if the material is**



**treated.**
Q Is another one of those broad categories underwater confined?
**A Yes, it is.**
Q What is that?
**A That is the same as the confined facility, only it is underwater. It is usually a hole in the excavated area in the bottom of -- underwater. Material is put in that and then is generally capped with clean material.**
Q And again, do you know whether or not that material is treated with an additive such as cement?
MS. FRANKLIN: Objection, vague.
THE WITNESS: I do not know if it is treated or not.
BY MR. ADLER:
Q Now, when I say treated, do you have an understanding that some dredged material is processed and treated with an additive?
**A Yes, I understand that that does happen.**
Q Do you have an understanding that often that occurs with material that is disposed of upland?
**A I understand that it can be, yes.**
Q Now, is another one of those broad categories mixed modes?

BY MR. ADLER:
Q I'm making a statement for the record.
Let's go to the disposal type beach nourishment for a moment.
**A Okay.**
Q Do you have a knowledge whether or not that's generally sand?
**A It is generally sand.**
Q Okay. Do you have knowledge as to what material would be disposed upland?
**A No, I do not.**
Q Beach nourishment and upland, that category, at this point all you know is that beach nourishment is sand, but you don't have any idea what material upland is if it's beach nourishment and upland?
**A I would assume they would both be sand, because they come from the same location.**
Q How about open water and upland?
**A That would be wherever the dredging takes place. It would be site specific from the dredge site.**
Q Do you know whether or not it would be sand or other material?
**A It could be sand with silt.**
Q Okay. And then do you know whether or not silt generally has to be treated?



**A I do not know.**
Q And how about with respect to upland? Is that generally silt?
MS. FRANKLIN: I'm going to object to the extent that question has been asked several times and answered.
THE WITNESS: I do not know what the material is for upland disposal.
BY MR. ADLER:
Q Now, with respect to TDM006754, the form that says New York, right?
**A Yes.**
Q I'm just asking from your experience and your knowledge of dealing with the database, the numbers for New York for years 2001 through 2006 as shown here, are, compared to the other districts, fairly large. Do you have an understanding of whether most of that material represents dredge material that was disposed upland and that was treated?
MS. FRANKLIN: Objection. Vague to the extent that you're representing that the numbers in the New York column are larger.
MR. ADLER: They are what they are.
BY MR. ADLER:
Q But do have an understanding that most of that material was treated for upland disposal?



MS. FRANKLIN: And I also object you're asking questions outside the scope for which this witness was designated.
BY MR. ADLER:
Q You can answer the question.
**A I have no knowledge if any of that material was treated.**
MR. ADLER: Just one second, please.
All right, so at this point I have no further questions for the witness, though I will say that TDM still expects to have a witness from the United States that will be able to testify regarding the amounts of material that were not treated, were treated, so these numbers can be explained.
MS. FRANKLIN: I can't hear you. I hear air.
MR. ADLER: I want to make a statement on the record that the United States has asked on several occasions for a knowledgeable witness that can explain -- TDM has explained -- sorry, that TDM has requested on numerous occasions for a witness that would have knowledge that would explain the numbers that the U.S. provided to us that were represented as representing or that are the quantities of dredge material that were treated for upland disposal versus the amounts of material that are shown in the Web site and for someone



to say that with respect to any information, quantities that were not -- with respect to any quantities that were given to us regarding dredge material that was treated for upland disposal, to testify that all other quantities shown in this Web site have not been treated for upland disposal.
I have no further questions for this witness.
MS. FRANKLIN: I just have one or two questions for this witness, then I'll make my statement for the record.
EXAMINATION BY COUNSEL FOR THE DEFENDANT
BY MS. FRANKLIN:
Q My first question is, you indicated previously that this database contains information independently entered by someone at each district; is that correct?
**A That's correct.**
Q Is this database, any portion of the database that you have been asked to look at today, does it provide information relating to processing or treatment of dredged material?
**A No, it does not.**
MR. ADLER: Asked and answered.
BY MS. FRANKLIN:
Q And is it part of your function with the

# EXHIBIT 18

but which ones --

Q. This is processing with an additive, such as Portland cement, for upland disposal?

A. I don't see that paperwork in this --

Q. I am asking if the U.S. knows. You don't have to look at the papers. You're here to represent the U.S.

A. The U.S. knows.

Q. Who is it?

A. You would have to refer to the -- I'm not an encyclopedia for everything the New York District knows. You would have to refer to the permits that were provided to us from the contractor, from the involved state agencies that oversee the placement of material in an upland environment, to what they required of the contractor and what they -- and where they allowed the contractor to take the material to, and if that then involved subcontractors.

Q. As you're here sitting today, you don't know the subcontractor on this

Wisemiller - Proprietary

with counsel. If your answer requires
you to do so, just say "I cannot answer."

THE WITNESS: Thank you.

A. That's it. I cannot answer.

Q. Because of attorney-client
privilege; is that it?

A. That, yes.

Q. Does the United States contend that
any of the patents-in-suit are invalid?

MS. FRANKLIN: Same objections.

Q. I am just asking whether or not.

A. The New York District does not
speak for the United States. That is not the
capacity in which I am here for.

Q. Do you know who would speak for the
United States?

MS. FRANKLIN: I will answer that.
Counsel for the United States.

MR. ADLER: I will just make the
observations for the record that the ploy
of producing 30(b)(6) witnesses directed
to specific districts in order to evade
the plaintiff from inquiring and delving
into the factual basis for the defenses

# EXHIBIT 19

DAVIDOFF MALITO & HUTCHER LLP

GARDEN CITY
200 GARDEN CITY PLAZA
GARDEN CITY, N.Y. 11530
(516) 248-6400

ATTORNEYS AT LAW
605 THIRD AVENUE
NEW YORK, NEW YORK 10158

(212) 557-7200
FAX (212) 286-1884
WWW.DMLEGAL.COM

ALBANY
150 STATE STREET
ALBANY, N.Y. 12207
(518) 465-8230

MELVILLE
105 MAXESS RD., SUITE 124S
MELVILLE, NY 11747
(631) 574-4510

WASHINGTON, D.C.
444 NORTH CAPITOL STREET, N.W.
WASHINGTON, D.C. 20001
(202) 347-1117

WRITER'S DIRECT: 646-428-3283
E-MAIL: maa@dmlegal.com

February 5, 2008

**BY E-MAIL (Walter.Brown2@usdoj.gov)**
**AND FIRST CLASS MAIL**

Walter W. Brown, Esq.
U.S. Department of Justice
Civil Division
1100 L. Street, NW
Suite 1100
Washington, DC 20001

**Re: TDM America, LLC v. The United States of America, et al**
**Case No. 06-472C (Judge Thomas C. Wheeler)/Our Ref: 7683.001**

Dear Walter:

This letter follows yesterday's telephone discussion during which you advised that the US requires one (1) year to comply with paragraph 7(b) of the Court's December 17, 2007 Discovery Order (the "Order") in the above-referenced action. Based upon this, you proposed alternative methods for providing the required information to TDM. This office requested a written proposal to review and assess.

During the telephone discussion, you stated that TDM's chart, provided pursuant to paragraph 7(a) of the Order, did not include the eighteen (18) contracts that are at issue in the US' motion for partial summary judgment. Please note that pursuant to paragraph 6 of the Order, the US was required to identify, by bates numbers, the documents that comprise the eighteen (18) contracts, including amendments and contractor submittals relating to treatment methods or quantities of dredged materials or treated materials. This information should have been provided before January 15, 2008; it was not. This is now the subject of TDM's pending renewed motion for sanctions against the US.

TDM did not ask for redundant information by including these contracts in the chart. Rather, TDM expected the US to comply with paragraph 6 of the Order. It is inherent in the Order that TDM should not include this information in TDM's chart because by January 15, 2008, the US should have identified and/or provided contracts, amendments and submittals relating to treatment methods and volumes.

With respect to the Navy and Coast Guard contracts, the US produced the contract documents. Therefore, TDM did not include these. The only way for us to ascertain additional information is to conduct a deposition which the Court provided for in the Order at paragraph 7(c).

Thank you for your attention to this matter. If you have any questions, please do not hesitate to call me.

Very truly yours,

Michael A. Adler

MAA/taf

cc: John E. Flaherty, Esq. (by e-mail)
Gary J. Campbell, Esq. (by e-mail)
David W. Denenberg, Esq.

# EXHIBIT 20

**U.S. Department of Justice**

Civil Division

WWB
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

Telephone: (202) 307-0341
Facsimile: (202) 307-0345

*Washington, DC 20530*

February 6, 2008

**BY FACSIMILE AND E-MAIL**

David W. Denenberg, Esq.
Davidoff Malito & Hutcher LLP
605 Third Avenue, 34th Floor
New York, New York 10158

Re: *TDM America, LLC v. United States*
Court of Federal Claims No. 06-0472C

Dear Mr. Denenberg:

In accordance with our discussion Monday and further to Mr. Adler's letter of February 5, 2008, I write regarding the government's response to TDM's January 14, 2008, Submission under paragraph 7 of the Court's December 17, 2007, Discovery Order. TDM's Submission contains over 650 job/project names in 32 districts that were obtained from the USACE website, which TDM contends represent USACE contracts for the treatment of dredged materials. TDM has included the majority of the entries on the basis (1) that upland disposal was, or may have been, used and (2) that most, if not all, of upland disposed material was treated for those entries. The remaining entries do not disclose a disposal type as they are listed on the USACE website.

As I explained during our discussion, paragraph 7(b) of the Discovery Order requires the government to admit or deny the accuracy of each of TDM's entries and provide what it believes "is the accurate data along with the basis of its [the government's] understanding and the document(s) upon which it relies." The government, however, believes that the vast majority of TDM's entries do not relate to contracts involving the treatment of dredged material, and further, that its amended interrogatory response accurately identified the 20 USACE contracts that involved treatment at the time that response was made. Accordingly, the government believes that responding to TDM's entries would require the government to not only identify what contract numbers correspond to each entry, but also provide documentation to prove the negative--namely, that each identified contract does not involve the treatment of dredged materials.

We believe this would require the government to locate, copy, and produce the main contract and corresponding modifications for each contract implicated by each of TDM's 657 entries. The government believes this process would take at least one year to complete.

As an alternative to this lengthy process that may yield no relevant information, we propose that the government provide declarations from knowledgeable personnel in each of the 32 districts at issue. These declarations would either confirm that a particular district had executed no contracts (for a particular time period) involving the treatment of dredged materials or identify any contracts that involved treatment. You indicated that TDM could agree to such a procedure, provided that the declarations broadly addressed alleged treatment activities, and that the government could provide you with a written proposal specifying the contents of the declarations.

Accordingly, we propose that the government provide sworn declarations that include the following:

1) Declarants from each of the 32 districts implicated by TDM's Submission;

2) Statements that the declarant has considered all of the TDM entries relating to that district;

3) Statements identifying all of the contracts, by contract number, that are implicated by TDM's entries for that district (not including the 20 USACE contracts identified in the government's interrogatory responses);

4) Statements that confirm that no dredged material was treated under these contracts and/or identify contracts that, in fact, involved treatment activities as well as known information and documents regarding the volumes of treated materials, the amount paid for such treatment, and, if available, the methods of treatment (for those contracts not identified in the government's interrogatory responses); and

5) Statements that the declarant has investigated whether any other contracted dredging activities awarded from fiscal year 1999 to present involve the treatment of dredged material and the conclusions drawn from that investigation.

Completing this task will take approximately 3 months. If TDM agrees to this proposal, the government will inform the Court of our agreement in an unopposed motion. This motion will set forth our agreement on declarations and state that this procedure will constitute a complete response by the government under paragraph 7(b) of the Discovery Order. The motion will also extend the time for the government's response by 3 months. A draft of this motion will be provided to TDM counsel before filing.

In Mr. Adler's letter of yesterday, he indicated that TDM wished to conduct a deposition regarding the identified U.S. Navy and U.S. Coast Guard contracts involving treatment of dredged materials under paragraph 7(c) of the Court's order. While these contracts were not included in TDM's Submission under paragraph 7(a), the government will produce deponents from the Coast Guard and Navy for the topics of paragraph 7. Because two separate federal

agencies are involved, one deponent would not be a possibility. We would also request that these depositions occur after the completion of the government's submission under paragraph 7(b), and, further, that the Court also be informed of this agreement in the unopposed motion discussed above.

Let me know if you have any questions regarding this proposal and whether TDM agrees with it. In view of our February 13, 2007, deadline to respond to TDM's Submission, the government would like to reach an agreement with TDM and file an appropriate motion with the Court this week.

Very truly yours,

Walter W. Brown

Walter W. Brown
Attorney
Commercial Litigation Branch
Civil Division

cc (by e-mail): John E. Flaherty, Esq.
Gary J. Campbell, Esq.

# EXHIBIT 21

DAVIDOFF MALITO & HUTCHER LLP

ATTORNEYS AT LAW
605 THIRD AVENUE
NEW YORK, NEW YORK 10158

(212) 557-7200
FAX (212) 286-1884
WWW.DMLEGAL.COM

GARDEN CITY
200 GARDEN CITY PLAZA
GARDEN CITY, N.Y. 11530
(516) 248-6400

MELVILLE
105 MAXESS RD., SUITE 124S
MELVILLE, NY 11747
(631) 574-4510

ALBANY
150 STATE STREET
ALBANY, N.Y. 12207
(518) 465-8230

WASHINGTON, D.C.
444 NORTH CAPITOL STREET, N.W.
WASHINGTON, D.C. 20001
(202) 347-1117

WRITER'S DIRECT: 646-428-3210
E-MAIL: dwd@dmlegal.com

February 11, 2008

**BY E-MAIL (Walter.Brown2@usdoj.gov)**
**AND FIRST CLASS MAIL**

Walter W. Brown, Esq.
United States Department of Justice
Civil Division
1100 L Street, NW
Suite 1100
Washington, D.C. 20001

Re: **TDM America, LLC v. The United States of America, et al**
**Case No. 06-472C (Judge Thomas C. Wheeler)/Our Ref: 7683.001**

Dear Mr. Brown:

I am writing in response to your letter dated February 6, 2008.

Your letter was requested at our insistence to assure a clear understanding and to avoid any mischaracterizations or ambiguities regarding our telephone conversation on February 4, 2008. This did not happen. For example, you state, in your proposal, that "TDM could agree" to a procedure wherein the US would provide declarations instead of the information required by paragraph 7.b. of the Court's December 17, 2007 Discovery Order (the "Discovery Order"). No such representation was made on behalf of TDM. TDM expects the US to provide the substantive information ordered by the Court, which TDM has requested since November 2006.

The US failed to fulfill its discovery obligations despite having information readily summarized on the U.S. Army Corps of Engineers' ("USACE's") websites as recently furnished to the US by TDM. One recent example is the US' failure to identify certain dredging contracts for one of the largest ports in North America -- San Francisco, which is a USACE district where the USACE participates in dredging contracts. In many instances,

information has been less than forthcoming. TDM has no confidence that the substantive information required in paragraph 7.b. of the Discovery Order will be provided under the guidelines of the US' proposal, especially without contract identification, data and documentation that must form the basis for any response by the US. The Discovery Order requires, *inter alia*, the US to identify and provide data and other substantive information to TDM by February 13, 2008; to wait another three (3) months for far less information or another year for the very information the Court ordered to be provided is unreasonable.

The Discovery Order is the result of the US' failure to identify and provide pertinent information after having more than fifteen (15) months to do so as well as TDM's motion to compel and, ultimately, TDM's motion for sanctions related to the US' initial disclosures and responses (or lack thereof) to TDM's interrogatories and document demands from November 2006. The US agreed to the requirements and time frames set forth in the Discovery Order. The Discovery Order specifically referred to, among other things, information provided by the USACE in its website. TDM has been consistent in arguing that, although the requested discovery should have been provided, it never was. TDM moved to compel this information and, by order dated April 30, 2007, the Court granted that motion and required complete responses to interrogatories and document demands within thirty (30) days of that order. For more than another six (6) months, TDM granted extensions to the US to provide this information to no avail. Thereafter, TDM moved for sanctions. In hearings before the Court a year ago and in correspondence, counsel for the US stated that it would take much time to get the information from each district. Now you state that the US cannot comply with paragraph 7.b. of the Discovery Order for another year.

Although TDM initially requested that the US identify the volumes, disposal and/or reuse thereof, and the processes employed throughout the United States for treatment of dredge material, TDM narrowed the information sought to instances in which a portion of the dredged material is categorized by the US as "upland disposal". TDM overlooked additional volumes that may have been treated. Based upon the US' own witnesses' testimony that "the majority of dredge sediments placed upland were treated," TDM agreed to have the US provide only those contracts and related information where a portion of the dredge materials was disposed upland. Then, even though TDM provided the US with this narrowed information from the USACE website, the US still wants another year to comply with the Discovery Order.

Your representation that the US was somehow surprised by TDM's charts is perplexing. As required by the Discovery Order, TDM summarized the existing USACE web page information in a manner to assist the US in focusing only on those contracts described by the USACE as having upland disposal. All along, and in all of TDM's discovery requests, including interrogatories, document demands and depositions, as well as the 30(b)(6) depositions, TDM focused on information provided by the USACE in its website. None of the entries in TDM's charts derive from any place other than the USACE website or other public information so there should be no surprise as to the magnitude of the contracts subject to review.

TDM is of the position that the Court acknowledged the discovery, number of extensions and the length of time already spent in the discovery process. The Court understood the costs to TDM involved in this protracted discovery period. It understood that the US had over a year, by that point, to provide this information and expected that the US had made efforts to comply with discovery. The Court also expected that the US had taken TDM's motion to compel and motion for sanctions seriously and was not simply ignoring the Court's discovery rules and orders. That is why the Court set February 13, 2008 as the date to comply with section 7.b. It is unreasonable for the US to now request another three (3) months to provide considerably less than what the Court ordered to be provided by February 13, 2008 in a time frame far less that the one year time frame the US has indicated is necessary to identify and review such documentation.

For all the above reasons, TDM does not accept the US' proposal.

Thank you for your attention to this matter. Please call me if you have any questions.

Very truly yours,

David W. Denenberg

DWD/lsh

cc: John E. Flaherty, Esq. (by e-mail)
Gary J. Campbell, Esq. (by e-mail)
Michael A. Adler, Esq. (by e-mail)
Dimitra Tzortzatos, Esq. (by e-mail)