**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| TDM America, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant.<br><br>and<br><br>Donjon Marine Company, Inc.,<br><br>Interested Party. | Civil Action No. 06-472 C<br>Judge Thomas C. Wheeler |

**TDM AMERICA, LLC'S OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO COMPEL PLAINTIFF'S COMPLIANCE WITH THE COURT'S DECEMBER 17, 2007 DISCOVERY ORDER, OR, IN THE ALTERNATIVE, AN EXTENSION OF TIME FOR THE GOVERNMENT TO RESPOND**

# TABLE OF CONTENTS

**PAGE**


**I. Preliminary Statement** ........ 1

**II. The US' Motion to Compel TDM Should Be Denied** ........ 3

**A. The US' Motion Merely Reargues Positions Rejected by This Court In Conferences, in the April 2007 Order and in the Discovery Order** ........ 3

**B. TDM Complied With the Discovery Order** ........ 8

**III. The US' Request For A Twelve Month Extension Should Be Denied** ........ 17

**A. No Undue Burden Has Been Placed on the US** ........ 17

**B. The US Was Long Aware of TDM's Requests and of the USACE Website Information, But Failed to Properly Respond** ........ 20

**C. The US' Bad Faith** ........ 23

**D. The US Did Not Comply With The Discovery Order** ........ 25

# TABLE OF AUTHORITIES

**PAGE**

## Cases

*Coleman Holdings, Inc. v. Morgan Stanley & Co., Inc.* 2005 WL 679071 (Fla. Cir. March 1, 2005) ........ 27

*Evergreen Trading, LLC, v. The United States*, 80 Fed. Cl. 122, 145 (Fed. Cl. 2007) (internal citations omitted) ........ 18

*Micro Motion, Inc. v. Kane Steel Co., Inc.* 894 F.2d 1318, (Fed. Cir. 1990) ........ 20

*Wingnut Films, Ltd. v. Katja Motion Pictures Corp.*, 2007 WL 2758571 (C.D. Cal. September 18, 2007) ........ 27

## Rules

RCFC 26 ........ 3, 18

RCFC 26(b)(1) ........ 18

RCFC 34 ........ 27

RCFC 37 ........ 2, 3, 18, 24

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| TDM America, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant.<br><br>and<br><br>Donjon Marine Company, Inc.,<br><br>Interested Party. | Civil Action No. 06-472 C<br>Judge Thomas C. Wheeler |

**TDM AMERICA, LLC'S OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO COMPEL PLAINTIFF'S COMPLIANCE WITH THE COURT'S DECEMBER 17, 2007[1] DISCOVERY ORDER, OR, IN THE ALTERNATIVE, AN EXTENSION OF TIME FOR THE GOVERNMENT TO RESPOND**

Plaintiff TDM America, LLC ("TDM") respectfully submits this memorandum in opposition to the motion filed by defendant United States (the "US") to compel plaintiff's compliance with the Court's December 17, 2007 discovery order (the "Discovery Order") or, in the alternative, an extension of time for the government to respond (the "US' motion").

## I. Preliminary Statement

The US' ulterior motive is apparent from the outset of its motion; namely, to extract yet another year for discovery in addition to the year and a half the US already had to provide discovery. After TDM explained to the US' counsel that the request for another year of discovery was outrageous, the filing of the US' motion followed. (See the Declaration of David

[1] In its moving papers the US mistakenly refers to the date as December 13, 2007.

Denenberg dated March 17, 2008 (the "Denenberg Dec."), ¶¶3-4). Despite the US' diversionary arguments, TDM and the Court should see this motion for what it is – (i) a blatant attempt for this Court to reconsider the Discovery Order that resulted from TDM's second motion pursuant to RCFC 37 due to the US' failure to provide adequate discovery, and (ii) a delay tactic designed to extend discovery in this case for at least another year.[2] Undoubtedly, the very filing of the US' motion attests to the fact that the US is unable to identify which US contracts provided for treatment of dredged material across the nation and that the US does not have a clue as to the volumes of treated dredged materials for any dredging contracts other than the seventeen (17) New York contracts already provided, albeit that it is over sixteen (16) months since such information was first requested.[3]

The US failed to meet and confer with TDM in good faith before filing the instant motion. TDM fully complied with paragraph 7.a. of the Discovery Order by furnishing to the US on January 15, 2007 a document entitled Plaintiff TDM America LLC's Identification of the United States of America's Dredging Contracts Understood to Provide for Treatment of Dredged Material ("TDM's submission"). (Denenberg Dec., Ex. 4). The US now seeks to avoid providing the discovery requested in November 2006, ordered on April 30, 2007 and, again, specifically required by paragraph 7.b. of the Discovery Order by resorting to arguments that are unreasonable, meritless and rife with inaccuracies. (Denenberg Dec., Exs. 1, 2 and 9). The US'

---

[2] By filing the instant motion, the US already has arrogated an 11 month extension to comply with the Court's April 30, 2007 Discovery Order (the "April 2007 Order") and over a month extension to comply with the Discovery Order. (Denenberg Dec., Exs. 1 and 2).

[3] The US identified 18 New York district contracts. However, the US never identified the processor for contract no. DACW51-02-C002. Therefore, TDM is still unable to ascertain any information with respect to the volumes and treatment method of dredged material for this contract, leaving only 17 contracts for which such volumes are known. (Denenberg Dec., Ex. 3).

motion to compel TDM to comply with the Discovery Order is baseless and should be denied outright.

It is beyond cavil that (i) the Court ordered the US to respond to TDM's submission by providing a statement admitting or denying the accuracy of TDM's entries and by providing the basis of its understanding along with the documents it relied upon and (ii) the US failed to comply with the Discovery Order. As a result, TDM requests that the Court deny the US' request for an extension and deem TDM's submission uncontested in all respects pursuant to paragraph 7.b. of the Discovery Order.

## II. The US' Motion to Compel TDM Should Be Denied

### A. The US' Motion Merely Reargues Positions Rejected by This Court In Conferences, in the April 2007 Order and in the Discovery Order

The US' motion is predicated upon the assumption that it is TDM's responsibility to identify, with particularity, all aspects of each and every US dredging contract on which TDM seeks information. (US' motion, pp. 1, 4, 9-11, 16-22). However, the US conveniently ignores the Court's Discovery Order which is a result of two previous RCFC 37 motions TDM filed against the US in this litigation. (Docket Nos. 50 and 78). The Court's discovery rules allow requests for any information reasonably likely to lead to the discovery of admissible evidence. RCFC 26. Therefore, the US loses sight of the most critical aspect of why it is now faced with the Discovery Order -- the US' failure to produce discoverable information to TDM for over 16 months now. (Docket Nos. 50 and 78). The US' motion is a prolonged argument on whether the U.S. Army Corps of Engineers' ("USACE") designations for "upland" disposal is for all, part or no treated dredged material. However, it is clear from testimony that TDM's very tailored requests regarding contracts which include "upland" disposal is reasonably likely to lead to the discovery of admissible evidence. (Denenberg Dec., Ex. 5 at p. 92; Ex. 6 at pp. 108-109).

Moreover, the issue of whether or not TDM was entitled to this information was already resolved by the Court at the December 13, 2007 hearing resulting in the Discovery Order.[4] (Denenberg Dec., Exs. 2 and 7).

Based upon the USACE website, TDM's submission identified 677 US dredging contracts believed to include the treatment of dredged material across the nation. (Denenberg Dec., Ex. 4). TDM's submission showed each contract by district, quantity, disposal type, etc. (*Id.*). TDM showed precisely how the information was extracted from the USACE website and TDM only included those contracts which provided that dredged materials were disposed upland, in whole or in part. (*Id.*).[5] This is based upon testimony and facts showing that treated dredged material is disposed upland. (Denenberg Dec., Ex. 5 at p. 92; Ex. 6 at pp. 108-109).

TDM served its first interrogatory on this subject matter more than 16 months ago. Interrogatory no. 10 states:

> Identify each and every specific contract, and identify each and every contractor retained by the US for dredging activities at any port, harbor and/or waterway since 1997 to the present and for each such contract specify all contract information and processing information relevant to those contracts and the dredging activities, including specifically the treatment, processing, stabilization, retention, staging, handling, curing, reuse, remediation, solidification and/or disposal of the dredged materials.

(Denenberg Dec., Ex. 9). Early on, in good faith, and before this Court during discovery conferences, TDM confirmed that this request seeks identification and production of those contracts that included treatment/processing of dredged material. (Denenberg Dec., Ex. 7 at pp. 18-23, Ex. 8 at p. 12 and Ex. 10 at p. 4). The US objected to this interrogatory on several

---

[4] In fact, over a year ago, the US' counsel represented to TDM and the Court that this very information would be forthcoming. (Denenberg Dec., Ex. 8 at pp. 31-32).

[5] TDM also included the jobs/projects where the disposal type was identified in the USACE website as "undefined" because TDM cannot ascertain whether or not those volumes were treated based upon the disposal type. Therefore, TDM appropriately seeks such information from the US.

grounds including the ground that the interrogatory was "premature in that the Government has not completed its investigation of the facts and identification and review of documents in this case." (US' Ex. 2 at p. A146).[6] The US also objected to this interrogatory on the ground that "processing information relevant to those contracts and the dredging activities" is not in the possession of the Government and such request is best directed to the contractors." (*Id.*). This Court rejected these very objections during these discovery conferences, stating that a party must produce responsive documents in its possession. (Denenberg Dec., Ex. 9 at pp. 34-35). Moreover, as this Court recognized during the December 13, 2007 hearing, the US, as the party paying for these contracts, is uniquely in the position of having the knowledge and capability to provide the contracts and contract-related information regarding quantities of dredged materials that were treated and disposed upland for all dredging contracts it has across the United States. (Denenberg Dec., Ex. 7 at p. 31).

Indeed, in arguing that TDM somehow shifted the burden, the US ignores the discovery rules, the Court's statements in the conferences, the April 2007 Order and the Discovery Order, and merely repeats the same position it expressed again and again. (Denenberg Dec., Exs. 1, 2, 7, 8 and 10). The US is keenly aware of this because it initially attempted to shift the burden of providing such responses onto the contractors. (See US' Ex. 2 at p. A146). But that did not work because it was a position criticized by this Court early on. (Denenberg Dec., Ex. 9 at pp. 34-35). In the March 6, 2007 telephone conference, the Court stated that:

> Well, I think that documents should be produced by anybody who has them. If it's the same documents - - if the government has the, if the contractor has them - - the Plaintiff is within its rights to request those documents from the parties.
>
> If you end up with duplicates so be it, but you're entitled to documents from whomever possesses them.

---

[6] Exhibits to the US' motion are referred to as "US' Exs."

(*Id.*). The US' motion now attempts to make this argument yet again by alleging that TDM did not comply with the Discovery Order when in reality it is the US that did not and cannot comply.

The US' motion continues to rely on its response to interrogatory no. 10 despite the fact that Daniel Inkelas' March 23, 2007 verification confirms that the US' interrogatory response was based only upon limited information and even such limited information was merely upon "information and belief." Mr. Inkelas' states, in relevant part:

> The foregoing responses to Interrogatory Numbers 1, 5, 6, 8 and 10-13 are based upon such information as is presently available to the United States Army Corps of Engineers and was derived from sources available to me in the course of my duties that I deem to be reliable. Upon information and belief, I declare under perjury that these responses are true and accurate.

(See US' Ex. 2 at p. A152). Yet, the US actually cites to this verification as proof that it has already provided TDM with all US contracts involving the treatment of dredged material and therefore fully responded to interrogatory no. 10. (US' motion, p. 6). A review of the US' actual response to interrogatory no. 10 shows that Daniel Inkelas limited his response to the information that the US reviewed at that time (admittedly, only a partial and incomplete review) and whatever he was verifying was merely upon "information and belief." (See US' Ex. 2 at p. A152). Thus, the US' argument that Daniel Inkelas verified the completeness of the government's response is belied by Mr. Inkelas' own verification. (*Id.*). It is also belied by the US' designation of RCFC 30(b)(6) witnesses which did not include Mr. Inkelas nor anyone who could testify regarding the information contained on the USACE website, treatment of dredged material and the upland disposal categories contained therein, or about any USACE district other than New York.

Of course, the insufficiency of the US' interrogatory responses and RCFC 30(b)(6) designations is old news and was the subject of court hearings and discovery orders. (Denenberg

Dec., Exs. 1, 2, 7, 9-10). It is surprising that the US continues to rely on its insufficient interrogatory response as a basis to compel information from TDM. More incredible, however, is that, in the US' motion, the US admits that it is not able to timely respond to TDM's submission because it needs at least one year to investigate all of its nationwide dredging contracts to determine whether or not they involved treatment of dredged material. (US' motion, pp. 2, 24; US' Ex. 2 at p. A152). But the US cannot have it both ways - - it cannot on the one hand admit that it does not know whether or not the 677 contracts identified by TDM's submission included the treatment of dredged material, and on the other hand allege that its response to interrogatory no. 10 is complete. (US' motion at pp. 2, 6, 24). It also cannot argue that these contracts are not discoverable and do not involve treatment, but needs a year to confirm that claim.

The US was confronted with this very issue in a status conference over one year ago and the US' counsel answered then as it does now, that it would take time to gather the information from all these districts. (Denenberg Dec., Ex. 8 at pp. 31-32). In fact, during the March 6, 2007 status conference, counsel for the US acknowledged before the Court that the US would begin sending out documents from districts other than New York that very week and that the US would complete its production within two and four weeks. The transcript of the March 6, 2007 status conference reads, in relevant part:

> THE COURT: Well, let me just recap this with Ms. Franklin.
>
> I think I understood, Ms. Franklin, that documents from districts other than New York will start being sent out this week and that as to the New York District you thought that as many as 80,000 pages would start being produced to Plaintiff within three weeks.
> Do you have any idea at this point how long that process may take until the production is completed?

> MS. FRANKLIN: I wish I did, Your Honor. I'm very hesitant to make an estimate because there are a couple of factors at play, and that is that the New York vendor does continue, as they had promised, to submit the scanned documents back to D.C.
>
> I know that people here in this office are quick. The contractor here is very quick to place Bates stamps and provide me blow-backs of documents, but those are two steps that you're asking me to estimate. I've done my best with the first step.
>
> I can tell you as soon as documents come into my office I begin to review them, pull privilege and start privilege logs for those, but it's hard to say when that production will end. It's hard to say.
>
> THE COURT: Are we talking a matter of a couple of weeks or do you think a couple of months or what?
>
> MS. FRANKLIN: I would hope not a couple of months. I would say between two and four weeks.
>
> THE COURT: Okay.

(Denenberg Dec., Ex. 8 at pp. 31-32). Yet, despite the US' representations to the Court on March 6, 2007 - - over one year ago - - the US now asserts that TDM is not entitled to this information and that the US needs at least another year to produce it.

**B. <u>TDM Complied With the Discovery Order</u>**

TDM fully complied with the Discovery Order. (Denenberg Dec., Ex. 4). TDM identified 677 dredging contracts that it believes involve the treatment of dredged material out of several thousands of dredging projects that the USACE lists in its website. (*Id.*). TDM's submission was compiled in good faith and was deliberately prepared in a clear and coherent manner so that the information that TDM relied upon could be easily located by the US.

Denenberg Dec., Ex. 4). In that regard, TDM included with its submission "walk throughs" depicting exactly how this information was ascertained.[7] (Denenberg Dec., Ex. 4 at Exs. G-I).

TDM's submission included six charts produced in spreadsheets. (Denenberg Dec., Ex. 4). Each chart related to particular USACE or US website designations for dredging contracts where dredged materials were disposed "upland" in whole or in part or, in one chart, where the disposal was designated as "undefined."[8] TDM identified dredging projects by fiscal year, USACE district, job name, estimated quantity, actual quantity, disposal type, winning bidder, actual cost, and job status in accordance with the Discovery Order.[9] (*Id.*).

TDM's basis for selecting these particular contracts from among the thousands of US dredging contracts on the USACE website was because they are all included within a disposal type category that included the description "upland" -- denoting upland disposal. (Denenberg Dec., Ex. 4). For dredged material to be disposed upland, it must be treated. (Denenberg Dec., Ex. 5 at p. 92; Ex. 6 at pp. 108-109). Specifically, contaminated dredged material is treated with an additive, such as portland cement, to stabilize the contaminants so that the treated end product can be beneficially reused and disposed upland in an environmentally safe manner.[10] (Denenberg Dec., Ex. 11 at pp. 58-67). The end product of the treated dredged materials is important to the US because contaminated dredged materials removed from a US port, harbor or other location cannot be placed back into the ocean, at the mud dumps or at the Historic Area

---

[7] As used herein "walk through" means a synopsis of the precise steps used by TDM to extract the US' information from the USACE and other US websites. TDM went above and beyond what was required by the Discovery Order.

[8] See fn. 5. above.

[9] For some chart entries, not all of the categories of information were available from the USACE website and, therefore, were not included in TDM's submission. (Denenberg Dec., Ex. 4).

[10] Portland cement is a type of cement with specific characteristics, but does not imply a specific manufacturer.

Remediation Site ("HARS") because federal, state and other guidelines restrict such disposal of contaminated dredged materials.[11] (Denenberg Dec., Ex. 11 at p. 79). The end product of the treated dredged materials can, however, be placed upland for beneficial reuse as, *inter alia*, structural fill material. (Denenberg Dec., Ex. 11 at pp. 58-67). Additionally, US bids for dredging contracts that include treatment of dredged material contain separate contract line items for pricing and estimated quantities of materials to be dredged under a specific contract. (See for example, Denenberg Dec., Ex. 12). Some of the contract line items are for dredged materials suitable for placement at HARS, and other contract line items are specifically for dredged materials that are unsuitable for placement at HARS. (*Id.*). The US must pay additional charges for treatment and upland disposal. (*Id.*).

That dredged material disposed upland is treated is a point explicitly solicited from numerous sources. Harold Hawkins, a project manager for the harbor deepening program of the New York District, USACE, testified that "a majority or more than 50 percent" of material placed upland is treated because "most of the material we dredge is silt which is usually treated." (Denenberg Dec., Ex. 5 at p. 92). Thereafter, Thomas Witte, vice president of Donjon Marine Co. ("Donjon"), confirmed that treated dredged materials is disposed upland. (Denenberg Dec., Ex. 6 at pp. 108-109). This understanding was confirmed by Donjon's counsel during the oral argument on December 13, 2007:

> MR. FLAHERTY: So there's really two classes that goes on. There's the class that gets deposited offsite, the class that goes upland. I think Tom Witty [sic] identified those prices that we were paid or at least that we requested to be paid for upland disposal. **And I believe he testified that most, if not all -- and I think he may have even said**

---

[11] Historically, most of the dredged material was disposed in the Atlantic Ocean, in and around an area known as New York Bight Dredged Material Site, commonly referred to as the mud dumps. HARS is an ocean disposal site designated in September 1997 by the US Environmental Protection Agency for placement of non-contaminated dredged material from the ports of New York and New Jersey. (Denenberg Dec., Ex. 11 at p. 79).

> **all -- he would characterize it all as having been treated, but I'll go by whatever is said.**
>
> MR. DENENBERG: I agree since you're looking at me that Tom Witty did testify that all, just about all upland disposal was treated.

(Denenberg Dec., Ex. 7 at pp. 62–63) (emphasis added). There is no reason why Mr. Hawkins', Mr. Witte's and, arguably, Mr. Flaherty's understandings of what dredged materials are disposed "upland" should suddenly be different in another state or in another USACE district. Even the USACE's project manager, Bryce Wisemiller, testified that the vast majority of upland silt from the USACE dredging program would very likely have to be treated with an additive. (Denenberg Dec., Ex. 11 at pp. 58-59). The 17 contracts produced thus far show that the US paid additional amounts to treat and dispose upland dredged material, whereas the US paid less for dredged material that did not have to be treated and could be disposed at HARS. (See for example Denenberg Dec., Ex. 12). Further, the contracts show that what was treated was disposed upland, and what was not treated was disposed at HARS. (*Id.*). Thus, TDM's understanding that dredged material disposed "upland" is treated is reasonable and logical in contrast to the US' assertion that the term "upland" might mean something different for each USACE district or for each US dredging contract.

According to the US, TDM included in its identification projects from the following categories: "beach nourishment" and "open water." (US' motion, p. 9). The opposite is true. The USACE website has categories for beach nourishment and open water, which include thousands of contracts. (Denenberg Dec., Ex. 4). TDM did not include these contracts. The US fails to state, and acknowledge, that TDM only included categories for "upland" disposal, in whole or in part. (US' motion, p. 9). That is, the US miscontextualizes the categories identified by TDM namely (i) upland; (ii) beach nourishment and upland; (iii) open water and upland; or

(iv) undefined. (Denenberg Dec., Ex. 4) (emphasis in original). TDM's submission only included projects by district from the disposal type that included an upland component and TDM explicitly set forth the basis of its understanding and the documents upon which it relies for identifying these 677 dredging projects. (Denenberg Dec., Ex. 4).

As explained above, the bases of TDM's assertions was the testimony of US witnesses Harold Hawkins and Bryce Wisemiller, the testimony of Donjon's witness, Thomas Witte, the contract documents produced thus far, and the USACE website itself. (Denenberg Dec., Exs. 5, 6 and 18). In this regard, TDM's identification stated:

> The specific contracts identified and listed in the exhibits represent only a small percentage of all USACE dredging contracts. The US testified that most, if not all, dredged material disposed "upland" was treated. Therefore, the contracts identified and listed in these exhibits were selected by TDM because the US categorized the disposal type for dredged material as: (i) upland; (ii) beach nourishment and upland; (iii) open water and upland; or (iv) undefined. Where no disposal type was provided, and for Exhibit F (San Francisco district), all of the contracts were selected.
>
> TDM understands that most, if not all, of the dredged material categorized as being disposed "upland" was treated. TDM further believes that the majority of the volumes of dredged material which was placed upland for the contracts categorized as being disposed for "beach nourishment and upland" and for "open water and upland" was treated. TDM bases its contention on the testimony of Harold Hawkins and the documents and websites identified herein. (See pp. 90-92 of the Hawkins transcript, contracts produced, exhibits hereto and USACE website). With respect to the contracts categorized as "undefined disposal," there is insufficient information from which TDM could ascertain the volume of dredged material that was treated.

(*Id.* at p. 4-5).

The US wrongfully argues that TDM did not comply with the Discovery Order because TDM (i) allegedly did not provide the basis of its understanding and the documents upon which it relies to support its assertions that each entry constitutes treated dredged material and (ii) did

not identify any information on the 18 contracts the US identified in its amended response to interrogatory 10. (US' motion, pp. 13-18). However, nothing is further from the truth.

TDM not only identified the basis of its understanding and identified the sources, but also provided walk throughs of precisely how the information was ascertained and derived from the USACE and US websites. (Denenberg Dec., Ex. 4 at Exs. G-I). In this regard, paragraph 7.a. of the Discovery Order states, in relevant part:

> 7. Plaintiff has been attempting to compile information through discovery on the extent of the Government's treatment of dredged materials, principally by the U.S. Army Corps of Engineers, since early in this case. Through interrogatories, requests for production of documents, and Rule 30(b)(6) depositions, Plaintiff has achieved only limited and mixed success, and it complains that Defendant has not fully and completely responded to Plaintiff's discovery requests. Although Defendant perhaps could have responded on a more timely and complete basis, the tasks presented by Plaintiff's requests were daunting to say the least. Since serving its requests and receiving what it regards as incomplete responses, Plaintiff has learned of information on the Corps of Engineers' internet web site that it believes may be useful. Whereas Plaintiff has received some information on a contract-by-contract basis, the information on the Corps of Engineers' web site apparently is organized on a district-by-district basis. After a thorough discussion at the hearing, and for the purpose of narrowing the issues in controversy, the parties agreed to adhere to the following procedure:
>
> a. On or before January 15, 2008, Plaintiff shall provide to Defendant a list or chart identifying by either contract number or Corps of Engineers District what Plaintiff understands to be the volume of treated dredged material, the price paid by the United States for the treatment of dredged material, and if available, the method of treatment employed. Plaintiff also shall identify for each entry the basis of its understanding and the document(s) upon which it relies.

(Denenberg Dec., Ex. 2 at p. 3). TDM clearly set forth its bases for including the 677 projects from the USACE website. (Denenberg Dec., Ex. 4). In fact, the Discovery Order specifically contemplated TDM's use of the USACE website to garner information for its submission. (See Denenberg Dec., Ex. 2 at ¶ 7). Moreover, significant time was spent at the December 13, 2007

hearing arguing the merits of TDM's reliance on USACE website information and the testimony of Mr. Hawkins as a basis for requesting discovery from the US and the Court found such basis to be sufficient. (Denenberg Dec., Ex. 7 at p. 31). The transcript of the December 13, 2007 hearing reads, in relevant part:

> MR. DENENBERG: ...And I would beg to differ, and we submitted the testimony to Your Honor, Mr. Hawkins, who is a project manager, clearly testified that at least most of the upland disposed category from the U.S. Army Corps of Engineers website would be treated dredged material. And for the Plaintiff now to have to prove what that number is between 51 percent and 100 percent when it's the US' website and they can explain it one would think because they post it, I don't understand why we're not entitled to that answer and if we don't get it, we're not entitled to the inference at some point.
>
> THE COURT: Well, I think you are entitled to the information, and I really think that the Corps of Engineers and the other entities involved ought to have this information. I think it's probably just a matter of finding the right person and finding the right –

(*Id.*).

TDM's basis for identifying the 677 dredging projects is further supported by Bryce Wisemiller's testimony, Tom Witte's testimony, comments by Donjon's counsel and by the contracts produced to date. (Denenberg Dec., Ex. 5 at p. 92; Ex. 6 at 108-109; Ex. 7 at pp. 62-63; Ex. 11 at pp. 58-59). The bottom line is if dredged material was not contaminated, it was not treated and could be disposed at HARS; if dredged material was contaminated, it would have to be treated and then disposed upland for beneficial use. (Denenberg Dec., Ex. 11 at pp. 58-67, 79).

The US' attempt to discount TDM's submission simply because it does not agree that Mr. Hawkins' testimony constitutes a sufficient basis to conclude "upland" disposed materials were treated and/or for TDM to seek such information has absolutely no bearing on whether or not TDM complied with the Discovery Order. This Court already ordered that TDM is entitled to

seek this discovery. (Denenberg Dec., Ex. 2). The issue should not be reargued. TDM clearly has a reasonable basis for asserting that all projects on the USACE website classified using the term "upland" were treated and that was all that TDM was required to do by the Discovery Order. (Denenberg Dec., Ex. 5 at p. 92; Ex. 6 at pp. 108-109; Ex. 7 at p. 62-63; Ex. 11 at pp. 58-59). Moreover, the US tries to turn justice on its head by arguing that TDM should know more about the US' dredging contracts than does the US.

The US goes on and on trying to discredit its own witness, Hal Hawkins, and trying to argue that TDM cannot assume certain treatment methodologies. (US' motion, pp. 7-13, 15). Yet, TDM's basis for identifying USACE projects it believes involved treatment of dredged material are not in any way subject to US approval. If the US does not agree with TDM's assertions, it should clarify the actual treatment amounts and methods used for processing dredged material by responding to the Discovery Order with the appropriate documentation. In that regard the Court stated the following at the December 13, 2007 hearing:

> THE COURT: What I'm looking to here is a way for the Plaintiff to submit to the government perhaps in a chart form or a column-type presentation the contracts that it has an interest in. And then, based upon the information that they already have either from the Corps of Engineers website or whatever other source they may have, you can go ahead and identify your understanding of what the amounts may be for dredged materials and for treated dredged materials.
>
> You send it to the counsel for the Defendant and have them review it and either confirm or deny that those numbers are accurate. And if they believe for any reason that it's not accurate, the Defendant will be instructed to tell you what they believe are the accurate amounts. And in that way, we'll either reach agreement on each contract or we'll at least know what the disagreement is. And it may be after you receive the government's response, you may be willing to accept their number if it differs in some way with your understanding.
>
> And it should be certified like a 30(b)(6) response as being the position of the government in response to the Plaintiff's information. Is that going to work for you?

(Denenberg Dec., Ex. 7 at p. 35-37) (emphasis added). But because the US is unable to fulfill its obligations under the Discovery Order, it now seeks to excuse its failure by accusing TDM of noncompliance, discrediting its own witnesses, and asking for at least another year to comply with the Discovery Order.

Similarly, the US' allegations that TDM should have provided information on the 18 contracts the US identified in its amended response to interrogatory no. 10 simply makes no sense. (US' motion, p. 18-22). The Discovery Order explicitly required the US to produce information for those contracts by January 15, 2008 -- the very same day that TDM was required to produce its submission to the US. (Denenberg Dec., Ex. 2). If that information was timely produced, TDM required nothing further with respect to those contracts. The US' assertion that it was TDM's burden to provide the very same information (i.e., information for a chart for the 18 contracts) on the very same day that it was receiving information from the US regarding those 18 contracts is unsupported, as such an exercise would have been a waste of time. (Denenberg Dec., Ex. 2 at ¶6). Further, the US failed to comply with the Discovery Order regarding the New York district contracts by producing required information several weeks after the Court ordered deadline rendering the US' argument here specious.

It is rather ironic that the US now accuses TDM of not complying with the Discovery Order because TDM's submission did not include the 18 contracts that paragraph 6 of the order specifically addressed. In that regard, the Court stated:

> THE COURT: That's fine. So that's what we'll do on that subject.
>
> So where are we? I think to summarize, the Plaintiff should submit that request forthwith so that it doesn't impact too greatly the response to the motion for summary judgment. I'll consider it to be a Rule 56(f) request for additional information before you respond to the motion for summary judgment.

> And then as to the interrogatories that the Plaintiff says have not been answered, we're going to use this procedure that I suggested to you, and I will encompass that in an order. And basically that's where the Plaintiff will provide the information as best it understands it. It can ask for any missing information by contract that you deem important, and then we'll get the official position from the government.

(Denenberg Dec., Ex. 7 at pp. 48-49). Thus, the Court itself distinguished all other US contracts from the New York district contracts for which TDM was seeking identification and/or production of submittals, specifications and amendments so that TDM would be able to respond to the US' motion for partial summary judgment regarding authorization and consent. (*Id.*). Moreover, as stated above, for the US to argue that TDM should have requested information regarding the 18 contracts again, despite paragraph 6 of the Order, misinterprets the Discovery Order. Clearly, the US' argument regarding the 18 contracts is indicative of bad faith and is being used by the US as a ruse to befuddle the only underlying issue here. That issue is whether the US is entitled to at least another full year of discovery to provide information that should have been produced a year ago.

## III. The US' Request For A Twelve Month Extension Should Be Denied

### A. No Undue Burden Has Been Placed on the US

Although the US argues that TDM tries to place an undue discovery burden on the US, the reasoning proffered by the US is wrong. As discussed above in Section II A, the Discovery Order resulted from the US' continued failure to provide TDM with full and complete responses to TDM's discovery requests. Specifically, the issue of the US' identifying and providing information on contracts which include treatment of dredged material, and the USACE website information, was raised with and addressed by this Court numerous times from the outset of this litigation:

- February 6, 2007 telephone status conference.[12]
- March 6, 2007 telephone status conference.[13]
- TDM's April 23, 2007 motion to compel the US pursuant to RCFC 37.[14]
- April 30, 2007 Discovery Order.[15]
- TDM's October 16, 2007 motion for sanctions against the US pursuant to RCFC 37.[16]
- December 13, 2007 hearing.[17]
- December 17, 2007 Discovery Order.[18]

RCFC 26(b)(1) emphasizes that relevant information for purposes of discovery is information reasonably calculated to lead to the discovery of admissible evidence. *Evergreen Trading, LLC, v. The United States,* 80 Fed. Cl. 122, 145 (Fed. Cl. 2007) (internal citations omitted). The US' consistent attempt to evade discovery in this case forced TDM to incur substantial expenses in making motions against the US. The US is again forcing TDM to incur a substantial expense to defend the US' baseless motion now. The constant extensions in discovery deadlines force TDM to incur further expenses.

At the December 13, 2007 hearing, the Court recommended that TDM identify dredging contracts by USACE district so that the US would respond and provide documentation on these contracts. (Denenberg Dec., Ex. 7 at pp. 25-26). In recommending this option, the Court noted that the US should have an idea of the services for which the US pays its dredging contractors. (Denenberg Dec., Ex. 7 at pp. 31-33). In fact, the US provided such payment and treatment/disposal information, albeit untimely, with respect to 17 contracts in the US' motion for summary judgment. (Denenberg Dec., Ex. 13). Thus, providing such information for the

---

12 (Denenberg Dec., Ex. 10).
13 (Denenberg Dec., Ex. 9).
14 (Docket no. 50).
15 (Denenberg Dec., Ex. 1).
16 (Docket no. 78).
17 (Denenberg Dec., Ex. 7).
18 (Denenberg Dec., Ex. 2).

other USACE districts is clearly possible and is not any different from conventional discovery in any other patent litigation.

The information sought by TDM through its submission does not constitute a question of proving a negative; it is merely a directive to produce information likely to lead to discovery of admissible evidence. Such information will either support or refute TDM's contention that the dredging contracts listed by the USACE and identified by TDM in its submission included the treatment of dredged material. If the US is so adamant in its position, one would expect to be flooded with documents on the treatment and/or non-treatment of dredged material for the contracts identified by TDM. However, this did not occur even though the US had over 16 months to provide such documents and/or information.

The US should not be permitted to mask its ineptitude in gathering and collating responsive documents with "proving a negative." The information sought by TDM is discoverable evidence that either supports or contradicts TDM's assertion that dredged material was treated pursuant to US dredging contracts identified in its submission. (Denenberg Dec., Ex. 4). Indeed, in any patent action, a defendant alleged infringer must identify all products or services incorporating the infringing apparatus and/or method and all sales thereof. After identification and production, the alleged infringer must confirm, typically through an RCFC 30(b)(6) witness with first-hand knowledge of the facts, that all products and sales were identified and quantified. In this regard, there is no basis to treat the US any differently. The US' argument that TDM is seeking to have the US "prove the negative" is merely an excuse for the US' refusal to obtain this information from the various USACE districts and produce an

RCFC 30(b)(6) witness who would confirm the completeness of discovery for all districts.[19] What TDM seeks is simple and straightforward; namely, to provide information and contract-related documents for the contracts identified in TDM's submission.

**B. The US Was Long Aware of TDM's Requests and of the USACE Website Information, But Failed to Properly Respond**

The US further confuses the notion of burdensome discovery with the responsibilities of providing proper discovery responses in a large case. The US is a big place and it has thousands of past and present dredging contracts. TDM identified about 677 contracts from the many thousands of these contracts listed on the USACE website and categorically identified and presented them in spreadsheets with all the information that TDM had for each of the entries. (Denenberg Dec., Ex. 4). Seeking information for contracts that derived from the US' own website is not only reasonable, but is a request that the US always knew about and should have complied with long ago. (Denenberg Dec., Exs. 8-9 and 14-16).

In fact, Erica Franklin, the US' former lead counsel on this case, acknowledged over 13 months ago that TDM's scope of discovery was reasonably narrowed to dredging activities that included treatment/processing. She further acknowledged that information from all USACE districts would be forthcoming, and declaratory or testimonial confirmation from the US was appropriate. In this regard, Ms. Franklin's letter to counsel for TDM, dated January 16, 2007, states:

> During the conference, you agreed that discovery in this case should be limited to dredging activity that involves treatment/processing of

[19] *Micro Motion, Inc. v. Kane Steel Co., Inc.*, 894 F.2d 1318, (Fed. Cir. 1990) cited by the US is inapposite here. *Micro Motion* involved a dispute where damages discovery was complete and the patent infringement case had already been tried once. *Id.* at 1320. Following the court's order for a new trial and the parties' agreement to conduct only updated discovery, plaintiff served subpoenas on five non-parties. *Id.* at 1320-1321. Conversely, TDM seeks information that this Court has already deemed TDM is entitled to and information that this Court has also deemed the US should have. (Denenberg Dec., Ex. 8 at pp. 31, 33). TDM has not found a single case where a party is excused from providing discovery on the very issue of patent infringement. Therefore, the US' reliance on *Micro Motion* is misplaced.

> dredged material . . . You stated some concern that the list in Attachment A was incomplete. You specifically questioned dredging activity in Seattle and Los Angeles. I agreed to share your concern with our client agency. We additionally discussed providing declaratory or testimonial confirmation that the contracts listed in Attachment A represent all relevant USACE dredging contracts that involve processing dredged material.

(Denenberg Dec., Ex. 14). Ms. Franklin's letter to counsel for TDM, dated February 28, 2007, states:

> Similarly, the government produced promised contract file documents from the Los Angeles District United States Army Corps on February 23, 2007. As explained previously, additional documents from districts other than New York will be produced on a rolling basis, as the documents are received and produced.

(Denenberg Dec., Ex. 15). To date, TDM has not received either the documents or an appropriate RCFC 30(b)(6) witness from any district other than New York, despite TDM's outstanding and repeated request for same. For example, TDM counsel's letter to Ms. Franklin, dated September 17, 2007, states:

> We reiterate our request for an explanation of the disparity between volumes of dredged material reported on US websites and volumes of treated dredged material identified by the US in this litigation. Since the inception of this lawsuit, TDM has expended significant discovery time and invested other resources to obtain the precise volumes of dredged material that have been treated with an additive by the US' contractors. It appears from the gross numbers on the US' websites and in other sources that only a small percentage of dredged material is actually treated with an additive. TDM has requested an explanation why the percentage of treated dredged material is indeed so low, as in the major eastern and major western areas of the US. TDM also requested a 30(b)(6) witness who would be able to testify on this topic with respect to the entire United States. To date, the US has not provided a single witness who can explain this disparity.

(Denenberg Dec., Ex 16). These letters clearly show that TDM has been requesting an RCFC 30(b)(6) witness to explain the disparity between the amount of dredged material listed as disposed "upland" in the USACE website and the number of contracts produced by the US. The

letters also show that TDM has been requesting an RCFC 30(b)(6) witness who could confirm that there were, or were not, other US dredging contracts involving the treatment of dredged material outside of the New York district. (Denenberg Dec., Exs. 14-16).

The US provided Virginia Pankow as the appropriate RCFC 30(b)(6) witness to testify regarding this topic and the USACE website. However, Ms. Pankow's testimony did not explain why the disparity exists or the source of information listed on the USACE website. (Denenberg Dec., Ex. 17 at pp. 39-40). Nor could Ms. Pankow answer questions regarding nationwide US contracts for the treatment of dredged material. (*Id.*). She could only confirm that the USACE website contains information that is provided to her for input. (Denenberg Dec., Ex. 17 at pp. 7, 8 and 20).

Another example of the US' inability to provide an appropriate RCFC 30(b)(6) witness was Bryce Wisemiller who testified on behalf of the US as an RCFC 30(b)(6) witness. During his deposition, he stated "[t]he New York District does not speak for the United States. That is not the capacity in which I am here for." (Denenberg Dec., Ex. 18 at p. 45). But even in his capacity as an RCFC 30(b)(6) witness for the New York District of USACE, Mr. Wisemiller was admittedly ill prepared:

> Q. I am asking if the U.S. knows. You don't have to look at the papers. You're here to represent the US.
>
> A. **The U.S. knows.**
>
> Q. Who is it?
>
> A. You would have to refer to the – I'm not an encyclopedia for everything the New York District knows. . . .

(Denenberg Dec., Ex. 18 at p. 34) (emphasis added). Therefore, the US' request for at least 12 months to respond to TDM's submission is outrageous. The US knows, as well as all other

parties in this case, that TDM's identification of 677 job/project names is not only reasonable, but was expected by the US.

### C. **The US' Bad Faith**

Special notice should be given to the instances where the US acted in bad faith. Accordingly, TDM brings these instances to the Court's attention so that they may be properly addressed. First, the US' motion criticizes TDM's January 15, 2008 submission on the ground that "TDM lists entries with no supporting documentation or testimony for its assertions that the dredged materials were treated, much less with an infringing process." (US' motion at p. 14). This statement by the US was made, allegedly, to support the US' position that TDM's submission was somehow insufficient. (*Id.*). Yet, TDM clearly provided that the basis for its statements is the testimony extracted from the US' and Donjon's witnesses -- and the issue was argued before this Court on December 13, 2007 where counsel for Donjon and the US admitted to such testimony. (Denenberg Dec., Ex. 5 at p. 92; Ex. 6 at pp. 108-109; Ex. 7 at pp. 62-63). The Discovery Order followed this hearing. (Denenberg Dec., Ex. 2). Incredibly, the US spends almost two (2) pages on this subject and then, in a footnote, states: "The government is aware that the Court only required TDM to provide the treatment method if available." (US' motion at p. 14). In light of the US' own admission, it has acted in bad faith by setting forth a basis for its motion that is meritless. Thus, the US' assertion that TDM's submission was insufficient based upon information TDM was never even required to submit is false and simply inappropriate.

Second, the US is not straightforward as to how much time it is seeking to provide the discovery requested by TDM in accordance with the Discovery Order. The US first asks for one year and towards the end of its brief, the US states "[I]t is estimated that fully responding to TDM's 677 entries would take at least twelve months." (Compare the US' motion at pp. 1, 25 and US' Ex. 2 at p. A152 ). Whether this is one year from the deadline in the Discovery Order

(February 13, 2008) is unclear. TDM believes that a request seeking another 12 months to provide discovery - - that should have been provided 15 months ago - - is not only overreaching, but outrageous. After already being given 15 months, the US now seeks what would be, at a minimum, 27 months.

The US also misrepresented its efforts to comply with RCFC 37(a) in that the US failed to include a certification that the US has in good faith conferred or attempted to confer with TDM in an effort to secure the disclosure. The US first requested an extension to respond to TDM's submission on February 4, 2008 during a telephone conversation with TDM's counsel – nine days before its response was due. (Denenberg Dec., ¶¶ 3 and 4). Interestingly, that was also the first time it brought up its allegation that TDM did not comply with the Discovery Order. (*Id.*). During that conversation, Walter Brown, counsel for the US, raised for the first time an alleged deficiency with TDM's submission because TDM had not included information on the 18 contracts the US identified in its response to interrogatory 10. (*Id.*). Michael Adler, counsel for TDM, then explained that the 18 contracts were covered in paragraph 6 of the Discovery Order and that paragraph 7.b. was for contracts where more information was sought. (*Id.*). The US also raised, for the first time, its request for an alternative method to respond. (*Id.*). TDM then sent Mr. Brown a letter reiterating its position that the exclusion of the 18 contracts in its chart was appropriate pursuant to the Discovery Order and that TDM would not entertain any proposal without seeing same in writing. (Denenberg Dec., Ex. 19).

Thereafter, Mr. Brown sent a letter to TDM outlining his request for additional time to provide the discovery required by paragraph 7.b. of the Discovery Order, but that letter omitted any assertion regarding alleged deficiencies with TDM's submission. (Denenberg Dec., Ex. 20). Of course, such an omission would apparently deem this issue resolved because it would indicate

that the US acknowledged the faulty logic underlying its position; namely, that such an exchange of information regarding the 18 New York district contracts was unnecessary and already covered by paragraph 6 of the Discovery Order. However, after TDM rejected the US' proposal, this issue was suddenly included in the US' motion. (Denenberg Dec., Ex. 21). This argument is no more reasonable now than it was then.

TDM rejected the US' proposal for two reasons.[20] First, asking for 12 more months and now, what appears to be, **at least** (i.e., more than) 12 more months was simply out of the question – a delay for another year, after 15 months of delay, is ridiculous. (Denenberg Dec., Ex. 21). Second, the US never addressed TDM's concern with the US' proposal, namely, why it would take declarants only three months to review documents and provide declarations regarding each of the contracts listed in TDM's chart, but it would take an additional nine months for the US to actually comply with the Discovery Order by referencing and producing the documents that any declarants would need to rely upon. (Denenberg Dec., Ex. 21). To date, the US has not addressed these issues with TDM or in the US' motion.

### D. The US Did Not Comply With The Discovery Order

Paragraph 7.b. of the Discovery Order states:

> b. On or before February 13, 2008, Defendant shall review the data provided by Plaintiff, and provide Plaintiff with a statement admitting or denying the accuracy of each entry on Plaintiff's list or chart. If Defendant denies the accuracy of Plaintiff's entry, it must provide what Defendant believes is the accurate data, along with the basis of its understanding and the document(s) upon which it relies. Any entry that Defendant does not deny and also provide its own entry of what it believes is more accurate, shall be deemed uncontested. It is

[20] TDM responded to the US' late proposal for an extension in a timely fashion, given the fact that the US sprung its alternative proposal on TDM's counsel only days before the Court ordered deadline.

> insufficient for Defendant simply to deny the accuracy of Plaintiff's data.

The US did not comply with the Discovery Order. On March 13, 2007, the US e-mailed (late in the day) six declarations regarding dredging contracts for only five USACE districts.[21] The declarations contained only general denials that characterize the dredging contracts for the Alaska, Buffalo, Baltimore, Rock Island and Wilmington USACE districts as not including treatment of dredged material with an additive for upland disposal. (Denenberg Dec., Ex. 22). The contracts identified therein account for less than 9% of the total estimated volume of treated dredged material in TDM's submission.

The very few declarations provided by the US fail to comply with the Discovery Order because not even a single document allegedly relied upon was identified or produced. Indeed, the declarations do not comply with paragraph 7.c. of the Discovery Order, which required:

> c. Where any disagreements exist, Defendant shall produce a knowledgeable representative for informal discussions with Plaintiff who can address any of Plaintiff's concerns and answer Plaintiff's questions. The purpose of these discussions is to reduce or eliminate areas of disagreement on matters that can be stipulated. If, after engaging in such discussions, disagreements remain, Plaintiff may request leave of Court to conduct Rule 30(b)(6) depositions limited to the areas of disagreement.

(Denenberg Dec., Ex. 2) Specifically, some of the declarations refer to office records and electronic files as the basis for "gathering information." (Denenberg Dec., Ex. 22 at declarations of Kim Kuk and Ronald S. Flodin, P.E.). Yet, the US did not fully identify or produce any of those office records or electronic files to TDM nor did the US previously advise that such information was available. (Denenberg Dec., Ex. 22). Other declarations rely upon hearsay from other USACE employees as the sole source of the information presented. (*Id.* at

[21] Notably, the US' letter came only two days before TDM's opposition to the US' motion is due and on the eve of TDM's continuing 30(b)(6) depositions.

declarations of Charles M. Franklin, Richard W. Reffner, Rhonda Johanson and Roger D. Bullock). Moreover, there is no mention in any of the declarations of a single, contract, specification, submittal, or contract amendment or other contract-related document that was reviewed by the declarants. This is exactly why TDM rejected the US' alternative proposal. (Denenberg Dec., Ex. 21). As discussed above, TDM rejected the US' proposal to provide declarations regarding the manner of treatment in districts other than New York because the US would not be able to support the declarations with documents upon which the declarants relied upon. This confirms the appropriateness of TDM's rejection.

Aside from the declarations' complete lack of substantive information, the US failed to provide the electronic files and office records referred to in the declarations. Such failure is a serious breach of its discovery obligations under RCFC 34 and paragraph 7.c. of the Discovery Order. (See generally, *Coleman Holdings, Inc. v. Morgan Stanley & Co., Inc.*, 2005 WL 679071 (Fla. Cir. March 1, 2005); *Wingnut Films, Ltd. v. Katja Motion Pictures Corp.*, 2007 WL 2758571 (C.D. Cal. September 18, 2007). By failing to provide this discovery, the US makes it impossible for TDM to respond to the US' allegations of "no treatment" because TDM is not in possession of the underlying facts the US claims to have. Therefore, the US' request for an extension of time to respond should be denied and TDM's submission deemed uncontested pursuant to paragraph 7.b. of the Discovery Order.

## IV. <u>Conclusion</u>

For all the foregoing reasons, TDM respectfully requests that the US' motion to compel TDM and the US' alternative request for an extension of time both be denied and that the Court deem TDM's submission uncontested in all respects pursuant to paragraph 7.b. of the Discovery Order.

Respectfully submitted,

DAVIDOFF MALITO & HUTCHER LLP
*Attorneys for Plaintiff*

Dated: March 17, 2008

s/David W. Denenberg
David W. Denenberg
Michael A. Adler
605 Third Avenue – 34 Floor
New York, NY 10158
Tel: (212) 557-7200
Fax: (212) 286-1884