IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TDM AMERICA, LLC, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-472 C |
| THE UNITED STATES OF AMERICA, | ) | Judge Thomas C. Wheeler |
| Defendant, | ) | |
| and | ) | |
| DONJON MARINE COMPANY, INC., | ) | |
| Third-Party Defendant. | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL PLAINTIFF'S COMPLIANCE WITH THE COURT'S DECEMBER 17, 2007 DISCOVERY ORDER, OR, IN THE ALTERNATIVE, AN EXTENSION OF TIME FOR THE GOVERNMENT TO RESPOND**

In an effort to narrow any damages issues for trial, the Court ordered the parties to attempt to agree on the volume and price paid for treated dredged material that may have used a process that allegedly infringes the claims of the patents-in-suit. See Declaration of David W. Denenberg in Support of TDM America LLC's Opposition to Defendant United States' Motion to Compel (Denenberg Declaration), Plaintiff's (Pl's) Exhibit 2 at ¶ 7 (Court's Order); Exhibit 3 at A177. In response to this Order, however, TDM America, LLC, (TDM) failed to provide any information on the eighteen contracts previously identified by the United States (government) as involving treated dredged material, or the three contracts from the Navy and Coast Guard contracts that the government has produced, see Exhibit 11 at A337, that had been the subject of TDM's previous motions to compel. Instead, TDM provided charts listing 657 jobs/projects that allegedly represent 657 new contracts that the government has had for dredging activities

throughout the United States, with scant evidence that these dredging contracts involve treatment of dredged material.[1] See Exhibit 1.

**A. The Government's Proposal to Respond to TDM's Submission**

Although the government realized that the vast majority of TDM's entries would yield no relevant information or evidence, it devised a plan to respond in the most timely and efficient fashion to the assertions that these 657 new jobs/projects dealt with treated dredge material. The government spoke to TDM on Monday, February 4, 2008, to propose a streamlined method to investigate whether any treatment of dredged material had taken place for any of the 657 jobs/projects. The government proposed that rather than producing the main contracts and modifications from each listed job/project to establish that no treatment of dredged material had been done, it would provide sworn declarations from knowledgeable personnel in each of the 32 districts identifying all the contracts by contract number implicated by TDM's entries and a statement to confirm whether any dredged material was treated during the course of those contracts. Exhibit 12 at A340.[2] If the government discovered a contract that involves treatment of dredged material, it would identify the contract as well as known information and documents

---

[1] Although TDM's submission in response to paragraph 7(a) of this Court's Order has 657 jobs/project entries, TDM mistakenly repeatedly refers to "677 contracts" in its opposing brief, see, e.g., TDM's Opposition Brief at 4.

[2] In practice, the declarations from the respective districts have also listed the sources consulted for gleaning the information concerning whether any treatment of dredged material was involved in any contract or USACE owned project. See Denenberg Dec., Pl's Exhibit 22; Exhibit 15 at A353-466; Exhibit 17 at A473-498.

regarding the volumes of treated materials, the amount paid for such treatment, and, if available, the methods of treatment for those contracts. Id.

To be thorough and comprehensive, the government also offered to go beyond what was required by this Court's Order and investigate, in addition to the 657 job/project entries, "whether any other contracted dredging activities awarded from fiscal year 1999 to present involve the treatment of dredged material and the conclusions drawn from that investigation." Exhibit 12 at A340.[3] To complete this investigation without producing irrelevant contract documents for contracts that involve no treatment of dredge material, the government estimated that it would require approximately three months. Id. The government estimated that to produce the contract documentation for all of TDM's entries to prove the irrelevancy of various contracts would take approximately twelve months. Id. at A339; Exhibit 10 at A334.

**B. TDM's Refusal to Agree to the Government's Proposal To Avoid the Production of Irrelevant Documents**

On February 11, 2008, TDM refused the government's offer stating that "TDM has no confidence that the substantive information required in paragraph 7.b. of the [Court's Order] will be provided under the guidelines of the US' proposal, especially without contract identification, data and documentation that must form the basis for any response by the US." Exhibit 14 at A347. TDM also refused to allow the government any more time to investigate and respond to the 657 new jobs/projects in its submission stating that "[i]t is unreasonable for the US to now request another three (3) months to provide considerably less than what the Court ordered to be

---

[3] Although TDM failed to list the U.S. Navy and U.S. Coast Guard contracts pursuant to ¶ 7(a) of the Court's Order, the government also agreed to produce deponents from these agencies to testify to the topics set forth in ¶ 7. Exhibit 12 at A340.

provided by February 13, 2008 in a time frame far less tha[n] the one year time frame that US has indicated is necessary to identify and review such documentation." Id. At A348.[4] Because the government could not reach an agreement with TDM to produce only those documents that relate to a contract that arguably could have used an infringing process for treating dredge material, the government filed its motion to compel, or in the alternative, for an extension of time.

### C. The Government's Continuing Investigation Shows that the Vast Majority of TDM's Entries Involve Irrelevant Contracts

The government has proceeded with investigating the 657 jobs/projects, as well as the broader question of whether any other contracted dredging activities awarded from fiscal year 1999 to present involve the treatment of dredged material. As the investigation has progressed, the government has provided to TDM declarations from knowledgeable USACE personnel with the conclusions from individual USACE districts containing such information in accordance with its proposal as summarized above. See Denenberg Dec., Pl's Exhibit 22; Exhibit 15 at A350; Exhibit 17 at A470.[5]

As the government surmised, the vast majority of the 657 entries listed by TDM to which the government had to respond are irrelevant to any issue in this suit. TDM does not dispute that the claims of the patents-in-suit relate to the *treatment* of dredged material. See Exhibit 3 at

---

[4] TDM makes the assertion that these 657 entries have been asserted numerous times, see TDM's Brief at 17-18, but previously, TDM has only asked about summary information relating to the type of disposal. See, e.g., Exhibit 18 at A500 (Hawkins' cited discussion about "upland" disposal refers, in part, to summary information set forth in exhibit 18, see Denenberg Dec., Pl's Exhibit 5 at page 90, l. 24– page 92, l. 25). TDM has never presented the government with the specific 657 entries before TDM's submission.

[5] As of the date of the filing of this brief, the government has provided sworn declarations from 22 of the 32 USACE districts implicated by TDM's submission.

A174 (TDM's counsel states "[t]he patents go to a process for *treating* dredged material.") (emphasis added)). Therefore, any dredging contract that does not involve the treatment of dredged material is irrelevant.

Rule 26(b)(1) of the Rules of the Court of Federal Claims states the following:

> [p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . . For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

RCFC 26(b)(1). The Supreme Court has construed relevancy for discovery purposes very broadly "to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978). The Court cautioned, however, that discovery does have "ultimate and necessary boundaries," which would exclude discovery of matter not "reasonably calculated to lead to the discovery of admissible evidence." Id. at 351–52.

In applying this standard in Katz v. Batavia Marine & Sporting Supplies, Inc., the Federal Circuit held that the district court did not abuse its discretion in denying requested discovery from a third party when it exceeded the narrow scope of the claimed subject matter of the patent in suit. 984 F.2d 422, 425 (Fed. Cir. 1993); see also American Std. Inc. v. Pfizer Inc., 828 F.2d 734, 742 (Fed. Cir. 1987) (denying discovery of sales information as irrelevant when plaintiff could not show some relationship between the claimed invention and the information sought).

Here, the government has shown through declarations of knowledgeable persons in the various USACE districts that the vast majority of entries TDM submitted pursuant to ¶ 7(a) of the Court's Order, in addition to any other dredging contract from 1999 until the present in all

USACE districts, indeed do not involve the treatment of dredged material. Therefore, these contracts are irrelevant, and the production of documents relating to these contracts is outside the scope of discovery contemplated by the rules of this Court. Denenberg Dec., Pl's Exhibit 22; Exhibit 15 at A350; Exhibit 17 at A470; see also Katz, 984 F.2d at 424 (stating "the potential for discovery abuse is ever-present, and the courts are authorized to limit discovery to that which is proper and warranted in the circumstances of the case") (citing Rule 26(b)(1); Micro Motion Inc. V. Kane Steel Co. Inc., 894 F.2d 1318, 1322–23 (Fed Cir. 1990)). Certainly, for the few additional contracts that have been identified as involving some type of treatment of dredged material (whether that treatment implicates the claims of the patents-in-suit), the government will provide all relevant documents to these contracts, which are not privileged, subject to the protective order that is in place in this suit.[6]

### D. The Court's Order Does Not Contemplate that the Government Should Produce Irrelevant Contract Documentation

The government has not refused to investigate TDM's submissions, and in fact has gone beyond those submissions to investigate whether any dredging contract of the USACE in any district from 1999 to present involves the treatment of dredged material. The government has not refused to produce relevant information relating to such contracts that it finds involves the treatment of dredged material, see Exhibit 15-17; it only objects to the production of

---

[6] In its opposition brief, TDM refers to 18 contracts that were omitted from its submission. In fact, there are 23 contracts that have been previously identified to TDM that arguably involve treatment of dredged material: 18 contracts from the New York district; 1 contract from the Los Angeles district; 1 contract from the Jacksonville district; and three contracts from the Navy and the Coast Guard. The remaining contracts that the government has discovered to date that involve treatment of dredged material are set forth in Exhibits 15-17.

voluminous irrelevant contract documentation to prove a negative, the lack of any treatment of dredged material.

TDM opposes the government's motion by offering a string of arguments that fail to recognize this distinction. TDM fails to recognize that the 657 entries provided to the government contemplate new jobs/projects that were not previously asserted by TDM to contemplate treated dredged material based upon scant evidence that such contracts involve treatment,[7] while ignoring the voluminous discovery that TDM has received with regard to the twenty-three contracts that the government has admitted involves some treatment of dredged material. See Exhibit 1; Exhibit 11. While TDM is certainly entitled to all documentation on contracts that contemplate some form of treatment of dredged material with an additive, it is not entitled to a wholesale production of documents that have no relation to any subject matter of this litigation and is not likely to lead to the discovery of admissible evidence.

**E. The Government Has Acted In Good Faith**

The government has acted in good faith in asking TDM to supplement its paragraph 7(a) submission by including its allegations for the 23 contracts for which it has had discovery and by attempting to work out an efficient way to investigate overly broad assertions made in TDM's submission. TDM refused these attempts. See Exhibits 11 and 14.

---

[7] For the first time, TDM asserts that Mr. Tom Witte and Donjon's counsel agree that upland disposal of dredged material requires treatment. See Opposition Brief at 10–11. What TDM failed to appreciate is that Mr. Witte's testimony, and thus his counsel's remarks relating to that testimony, is limited to Mr. Witte's experience in the New York district just as is Mr. Hawkins' testimony. Mr. Witte is not knowledgeable about the other USACE districts' dredging contracts. See Exhibit 1 (reflecting that all Donjon contracts were in the New York district). Likewise, the quotation in TDM's opposition brief referencing Mr. Wisemiller's testimony clearly references New York activities for which he is familiar. Denenberg Dec., Pl's Exhibit 11 at 58–59.

The government maintains that TDM did not properly respond to this Court's Order under paragraph 7(a) by providing an overreaching response including many jobs/projects that do not involve the treatment of dredged material. Accordingly, the government continues to seek that TDM at least supplement its response to paragraph 7(a) by producing the required information for the contracts that have previously been identified and for which TDM now has documentation.[8]

The government, in good faith, met and conferred with TDM by telephone on February 4, 2008, to attempt to get the information required under paragraph 6 of the Court's Order, but such efforts were rejected. See Exhibit 11. In TDM's letter set forth in Exhibit 11, TDM asserted that the government's response to paragraph 6 of the Court's Order and the fact that they had received contract documents for the Navy and Coast Guard contracts obviated the need for TDM to try to reach an agreement with the government as to the amount of, price paid, and treatment method used for each of the previously-identified contracts at issue as contemplated by paragraph 7. The Court's Order, however, contemplates that the parties would attempt to agree on the damages related issues as set forth in paragraph 7 to eliminate the need to try these issues. See Denenberg Dec., Pl's Exhibit 2 at 2–3. With no information provided by TDM on the twenty-three contracts for which it has discovery, no such agreement can be reached.

Also, in an effort to move the case forward, the government asks for a three-month

---

[8] The government has provided complete information under paragraph 6 of this Court's Order. TDM complains in its brief on page 2 at footnote 3 that the government failed to identify the processor for contract no DACW51-02-C002, so that TDM is unable to comply with paragraph 7(a) for that contract. The government, however, has provided Rule 30(b)(6) testimony stating that the contractor is Cruz Construction and that the processing occurred on site as opposed to a facility. Exhibit 19 at A505 at 12–13 (stating that the processing, which was less than a thousand cubic yards, occurred on site in ditches as part of construction activity).

extension of time until May 15, 2008, to complete its investigation into the remaining entries on TDM's submission and submit the remaining declarations from the USACE districts involved, and an additional three months until August 15, 2008, to produce documents relating to any contract for which an additive was used for treatment of dredged material. To date, the government has produced declarations from 22 out of 32 districts and identified eight additional contracts (including two recently issued and ongoing contracts in the New York district) that may involve some kind of treatment of dredged material. However, it is highly speculative that any treatment performed under the completed contracts remotely implicates any claimed invention of the patents-in-suit. See Exhibits 15 – 17.

The government also requests that the Court deem the declarations and production of relevant documents relating to contracts involving the treatment of dredge material to be fully responsive to paragraph 7(b) of this Court's Order. For these reasons, the government requests that its motion be granted.

Dated: March 28, 2008

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JOHN FARGO
Director

By: s/Walter W. Brown
WALTER W. BROWN
Attorney
Commercial Litigation Branch
1100 L Street, N.W.
Room 11128
Washington, D.C.
Telephone: (202) 307-0341
Facsimile: (202) 307-0345
Attorneys for the United States

Of Counsel:
JOSHUA B. BRADY