# EXHIBIT 2

PROJECT COOPERATION AGREEMENT
BETWEEN
THE DEPARTMENT OF THE ARMY
AND
THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY
FOR CONSTRUCTION OF THE
NEW YORK AND NEW JERSEY HARBOR DEEPENING PROJECT

THIS AGREEMENT is entered into this 28th day of May, 2004, by and between the Department of the Army (hereinafter the "Government"), represented by the Assistant Secretary of the Army (Civil Works), and The Port Authority of New York and New Jersey (hereinafter the "The Port Authority"), represented by the Executive Director.

WITNESSETH, THAT:

WHEREAS, construction of the New York and New Jersey Harbor Deepening Project (hereinafter the "Project", as defined in Article I.A. of this Agreement) at New York and New Jersey was authorized by Section 101(a) of the Water Resources Development Act of 2000, Public Law 106-541;

WHEREAS, the Government and The Port Authority desire to enter into a Project Cooperation Agreement (hereinafter the "Agreement") for construction of the Project;

WHEREAS, Section 101 of the Water Resources Development Act of 1986, Public Law 99-662, as amended (33 U.S.C. § 2211), specifies the cost-sharing requirements applicable to the Project;

WHEREAS, Section 221 of the Flood Control Act of 1970, Public Law 91-611, as amended, (codified as amended at 42 U.S.C. § 1962d-5b) and Section 101 of the Water Resources Development Act of 1986, Public Law 99-662, as amended (codified as amended at 33 U.S.C. § 2211), provide, *inter alia*, that the Secretary of the Army shall not commence construction of any water resources project, or separable element thereof, until each non-Federal sponsor has entered into a written agreement to furnish its required cooperation for the project or separable element;

WHEREAS, Section 902 of the Water Resources Development Act of 1986, Public Law 99-662, as amended (33 U.S.C. § 2280), establishes the maximum amount of costs for the Project and sets forth procedures for adjusting such maximum amount;

WHEREAS, the Government and The Port Authority entered into an agreement for design of the Project (hereinafter the "Design Agreement"), dated January 29, 2001, under the terms of which The Port Authority contributed a percentage of the costs for design;

WHEREAS, the Government and The Port Authority have the full authority and capability to perform as hereinafter set forth and intend to cooperate in cost-sharing and financing of the Project in accordance with the terms of this Agreement;

WHEREAS, the Government and The Port Authority, in connection with this Agreement, desire to foster a "partnering" strategy and a working relationship between the Government and The Port Authority through a mutually developed formal strategy of commitment and communication embodied herein, which creates an environment where trust and team work prevent disputes, foster a cooperative bond between the Government and The Port Authority, and facilitate the completion of a successful project;

WHEREAS, the Comprehensive Plan for Development of Port of New York enacted by the legislatures of New York and New Jersey provides at New York Unconsolidated Laws Ch. 153, § 1, and the Laws of New Jersey 1922, Chap. 9 § 1,

"That there should be urged upon the federal authorities improvements of channels so as to give access for the type of waterborne commerce adapted to the various forms of development which the respective shore fronts and adjacent lands of the port would best lend themselves to;"

WHEREAS, the Port Authority has determined that its entering into this Agreement is in furtherance of said legislative mandate and the Government's agreement to contract for the construction of the general navigation features in consultation with the Port Authority as set forth in this Agreement and the anticipated resulting contracts for the work described in the Agreement and the performance thereof are intended to constitute a material benefit to the Port Authority;

WHEREAS, the parties recognize that the Port Authority believes that there is a critical need to initiate and complete the Project and have pledged to take all steps necessary and reasonable to complete the Project as expeditiously as possible and to work together in seeking all necessary approvals and appropriations toward that goal;

WHEREAS, the Government realizes that the Port Authority will be seeking the necessary appropriations from Congress to complete the Project as expeditiously as possible and that the Port Authority will consider the Project a priority in undertaking such efforts;

WHEREAS, Section 11 of the River and Harbor Act, approved March 3, 1925 (43 Stat. 1197, 33 U.S.C. § 561) authorizes the Secretary, in his discretion, to accept and expend funds advanced by local interests for authorized river and harbor projects;

WHEREAS, Section 4 of the River and Harbor Act, approved March 4, 1915, (38 STAT 1053, 33 U.S.C. § 560), authorizes the Secretary, in his discretion, to receive and expend contributed funds for any authorized work of public improvement of rivers and harbors, whenever such work and expenditure may be considered by the Chief of Engineers as advantageous to the interests of navigation; and

WHEREAS, the parties understand that as the Project continues it may be desirable for the parties to supplement or amend this Agreement to reflect the responsibilities for the conduct of certain project work and any changes in the Project, including costs.

NOW, THEREFORE, the Government and The Port Authority agree as follows:

ARTICLE I - DEFINITIONS AND GENERAL PROVISIONS

For purposes of this Agreement:

A. The term "Project" shall mean the general navigation features; all removals accomplished in accordance with Article II of this Agreement; and all lands, easements, rights-of-way, relocations, and deep draft utility relocations that the Government, in accordance with Article III of this Agreement, determines to be necessary for the construction, operation, and maintenance of the general navigation features, but shall not include aids to navigation or the local service facilities.

B. The term "general navigation features" shall mean deepening the Ambrose Channel to 53 feet below mean low water (mlw), deepening the Anchorage Channel, Arthur Kill Channel (to Howland Hook Marine Terminal), Bay Ridge Channel, Kill Van Kull Channel, Newark Bay Channel and the Port Jersey Channel to 50 feet mlw (52 feet mlw in rock or otherwise hard material), and the associated mitigation of impacts caused from deepening (aquatic and air quality), and including possible dredged material disposal facilities, land based and aquatic, that are necessary for the disposal of dredged material required for project construction, as generally described in the Limited Reevaluation Report and Environmental Assessment on Consolidated Implementation of the New York New Jersey Harbor Deepening Project, January 2004 (hereinafter the "LRR"), and as approved by the Headquarters, U.S. Army Corps of Engineers on April 5, 2004. The term does not include any lands, easements, rights-of-way, relocations or deep draft utility relocations; removals; betterments; aids to navigation; or local service facilities.

C. The term "total cost of construction of the general navigation features" shall mean all reasonable costs incurred by The Port Authority or the Government in accordance with the terms of this Agreement directly related to construction of the general navigation features. Subject to the provisions of this Agreement, the term shall include, but is not necessarily limited to: the Government's preconstruction engineering and design costs; the value of The Port Authority's contributions under the terms of the Design Agreement; engineering and design costs during construction; The Port Authority's and the Government's costs of investigations to identify the existence and extent of hazardous substances in accordance with Article XV.A. of this Agreement; the Government's costs of historic preservation activities in accordance with Articles XVIII.A. and XVIII.D1. of this Agreement; actual construction costs (including any costs of construction of dredged or excavated material disposal facilities incurred prior to the end of the period of construction or during any subsequent period of construction and the costs of alteration, lowering, raising, or replacement and attendant demolition of existing bridges over navigable waters of the United States); supervision and administration costs; The Port Authority's and the Government's costs of participation in the Project Delivery Team in accordance with Article V of this Agreement; the Government's or The Port Authority's costs of

contract dispute settlements or awards; incidental costs of removals accomplished by The Port Authority before the end of the period of construction or during any subsequent period of construction in accordance with Article II.L. of this Agreement; direct and incidental costs of removals accomplished by the Government before the end of the period of construction or during any subsequent period of construction in accordance with Article II.K. of this Agreement; and The Port Authority's and the Government's costs of audit in accordance with Articles X.B. and X.C. of this Agreement. The term does not include the value of any lands, easements, rights-of-way, relocations, or deep draft utility relocations; any costs of removals accomplished by The Port Authority other than incidental costs; any financial obligations for operation and maintenance of the general navigation features; any costs assigned to an existing Federal or non-Federal navigation project in accordance with Article II.E. of this Agreement; any costs assigned by the Government to additional capacity in accordance with Article II.N. of this Agreement; any costs due to betterments; any costs of dispute resolution under Article VII of this Agreement; any costs of aids to navigation; or any costs of construction, operation and maintenance of the local service facilities; or any costs of additional insurance coverage requested by The.Port Authority pursuant to Article XXII of this agreement.

D. The term "financial obligation for construction" shall mean a financial obligation of the Government or The Port Authority that results or would result in a cost that is or would be included in the total cost of construction of the general navigation features.

E. The term "non-Federal proportionate share" shall mean the ratio of The Port Authority's total cash contribution required in accordance with Article II.F. of this Agreement to total financial obligations for construction, as projected by the Government.

F. The term "period of construction" shall mean the time from the date the Government first notifies The Port Authority in writing, in accordance with Article VI.B. of this Agreement, of the scheduled date for either issuance of the solicitation for the first contract for construction of the general navigation features, as defined in Article I.B. of this Agreement, or commences, using the Government's own forces, construction of the general navigation features to the date that the U.S. Army Engineer for the New York District (hereinafter the "District Engineer") notifies The Port Authority in writing of the Government's determination that construction of the general navigation features is complete, except for any construction of a dredged or excavated material disposal facility, or any expansion (including raising of dikes) of such a facility, that will contain material from maintenance, but not the construction, of the other general navigation features.

G. The term "subsequent period of construction" shall mean a period beginning with the date that the Government first notifies The Port Authority in writing of the scheduled date for either issuance of the solicitation for the contract or commencement, using the Government's own forces, of construction of a dredged or excavated material disposal facility, or any expansion (including raising of dikes) of such a facility, that will contain material from maintenance, but not the construction, of the other general navigation features and ending with the date that the District Engineer notifies The Port Authority in writing of the Government's determination that such construction or expansion is complete. There may be more than one subsequent period of

construction and a subsequent period of construction may be concurrent with the period of construction.

H. The term "highway" shall mean any highway, roadway, street, or way, including any bridge thereof, that is owned by a public entity.

I. The term "bridge over navigable waters of the United States" shall mean a lawful bridge over the navigable waters of the United States, including approaches, fenders, and appurtenances thereto, which is used and operated for the purpose of carrying railroad traffic, or both railroad and highway traffic, or if a State, county, municipality, or other political subdivision is the owner or joint owner thereof, which is used and operated for the purpose of carrying highway traffic.

J. The term "relocation" shall mean providing a functionally equivalent facility to the owner of a utility, cemetery, highway, railroad (including any bridge thereof), or public facility, excluding any bridge over navigable waters of the United States, when such action is authorized in accordance with applicable legal principles of just compensation or providing a functionally equivalent facility when such action is specifically provided for, and is identified as a relocation, in the authorizing legislation for the Project or any report referenced therein. Providing a functionally equivalent facility may take the form of alteration, lowering, raising, or replacement and attendant demolition of the affected facility or part thereof.

K. The term "deep draft utility relocation" shall mean providing a functionally equivalent facility to the owner of a utility that may take the form of alteration, lowering, raising, or replacement and attendant demolition of the utility owner's existing facility, or part thereof, that serves the general public when such action is necessary for the construction or operation and maintenance of general navigation features with an authorized depth of greater than 45 feet, excluding associated over-depth and entrance wave allowances, and not a relocation, as defined in paragraph J. of this Article.

L. The term "removal" shall mean eliminating an obstruction (other than a bridge over the navigable waters of the United States) where the Government determines, after consultation with The Port Authority, that: 1) elimination is necessary for the construction or operation and maintenance of the general navigation features, including the borrowing of material or the disposal of dredged or excavated material associated therewith; 2) The Port Authority, the State of New York, the State of New Jersey, or the Government has the legal capability to accomplish elimination of the obstruction at the expense of the owner or operator thereof; and 3) eliminating the obstruction is not part of a deep draft utility relocation as defined in paragraph K. The term also shall mean the elimination of an obstruction to the construction, operation, and maintenance of the general navigation features when such elimination is specifically provided for, and is identified as a removal, in the authorizing legislation for the Project or any report referenced therein.

M. The term "fiscal year" shall mean one fiscal year of the Government. The Government fiscal year begins on October 1 and ends on September 30.

N. The term "betterment" shall mean a difference in the engineering and design or construction of an element of the general navigation features accomplished at the request of The Port Authority that results from the application of standards that the Government determines exceed those that the Government would otherwise apply to the engineering and design or construction of that element. The term does not include features in addition to the general navigation features, nor does it include capacity provided, pursuant to Article II.N. of this Agreement, at any dredged or excavated material disposal facility for disposal of dredged or excavated material from outside the general navigation features.

O. The term "dredged or excavated material disposal facility" shall mean the improvements necessary on lands, easements, or rights-of-way to enable the disposal of dredged or excavated material associated with the construction or operation and maintenance of the other general navigation features. Such improvements may include, but are not necessarily limited to, retaining dikes, wasteweirs, bulkheads, embankments, monitoring features, stilling basins, or de-watering pumps or pipes. The term also includes modifications to a dredged or excavated material disposal facility to increase capacity beyond that created by regularly recurring operation and maintenance activities.

P. The term "depth", when used to determine the cost sharing required under this Agreement, shall mean dredged or excavated depth net of associated entrance channel wave allowances and over-depth.

Q. The term "over-depth" shall mean additional dimensions associated with a given depth that are required to accomplish advanced maintenance, if any, and to compensate for dredging inaccuracies at that depth.

R. The term "utility" shall mean that which the States of New York and New Jersey, pursuant to generally applicable state law, defines as a public utility.

S. The term "Federal program funds" shall mean funds or grants provided by a Federal agency, other than the Department of the Army, and any non-Federal matching share required therefore.

T. The term "local service facilities" shall mean those facilities that The Port Authority must construct or operate and maintain to realize the benefits of the general navigation features. The local service facilities are the berthing areas located along the Arthur Kill Channel at the Howland Hook Marine Terminal, along the Bay Ridge Channel at the South Brooklyn Marine Terminal, along the Newark Bay Channel at the Port Newark and Elizabeth Port Authority Marine Terminals and along the Port Jersey Channel at the Global Marine Terminal and the container terminal to be constructed at the former Military Ocean Terminal, Bayonne (MOTBY) site or at such other site on the Port Jersey Channel as is consistent with the requirements of the Energy and Water Development Appropriations Act, 2004, Public Law 108-137, as generally described in the Limited Reevaluation Report and Environmental Assessment on Consolidated Implementation of the New York New Jersey Harbor Deepening Project dated January, 2004 and approved by the Headquarters, U.S. Army Corps of Engineers on April 5, 2004.

ARTICLE II - OBLIGATIONS OF THE GOVERNMENT AND THE PORT AUTHORITY

A. The Government, subject to receiving funds appropriated by the Congress of the United States (hereinafter the "Congress") and using those funds and funds provided by The Port Authority, shall, in consultation with The Port Authority, expeditiously construct the general navigation features (including alteration, lowering, raising, or replacement and attendant demolition of any bridge over navigable waters of the United States), applying those procedures usually applied to Federal projects, pursuant to applicable Federal laws, regulations, and policies; provided, that the Government shall not carry out the construction of the Port Jersey Channel or afford The Port Authority credit for the construction of said channel if such construction is performed pursuant to a modification to the Project Cooperation Agreement between the Department of the Army, the State of New Jersey and The Port Authority for construction of the New York Harbor and Adjacent Channels, Port Jersey, New Jersey Project, dated July 23, 2002, until a commitment in the form of an awarded construction contract for construction of container handling facilities is obtained from The Port Authority for a second user along the Port Jersey Channel; provided further, that the Government shall not initiate construction of the Bay Ridge Channel until the South Brooklyn Marine Terminal and related cross-harbor transportation infrastructure, as described in the LRR, are under construction and scheduled to be completed concurrently with the Bay Ridge Channel.

1. The Government shall afford The Port Authority the opportunity to review and comment on the solicitations for all contracts, including relevant plans and specifications, prior to the Government's issuance of such solicitations. In the case of any disagreement regarding the aforesaid, however, the Parties will make good faith efforts to meet and attempt to resolve any differences before bids are solicited or work is done by the Government using its own forces. The Government shall afford The Port Authority the opportunity to review and comment on all proposed contract modifications, including change orders. In any instance where providing The Port Authority with notification of a contract modification prior to execution of the contract modification is not possible due to an emergency situation which might result, among other things, in personal injury, property damage or damage to the work of the Project, the Government shall provide such notification in writing at the earliest date possible. The Government also shall afford The Port Authority the opportunity to review and comment on all contract claims prior to resolution thereof. The Government shall consider in good faith the comments of The Port Authority, but the contents of solicitations, award of contracts or commencement of construction using its own forces, execution of contract modifications, resolution of contract claims, and performance of all work on the general navigation features (whether the work is performed under contract or by Government personnel), shall be exclusively within the control of the Government.

2. The Government shall not issue the solicitation for the first construction contract or commence construction using its own forces until The Port Authority has confirmed, in writing, its willingness to proceed with the Project. The Government shall not issue the solicitation for the construction contract for either the Port Jersey Channel (which, for purposes of this numbered paragraph shall also include that portion of the Anchorage Channel from its confluence with the Kill Van Kull Channel to its confluence with the Port Jersey Channel) or the Bay Ridge Channel or commence construction of either of said channels using its own forces

until The Port Authority has confirmed in writing its willingness to proceed with the channel deepening. The failure to provide such written confirmation shall not be deemed a breach of this Agreement.

3. Throughout the period of construction and during any subsequent period of construction, the District Engineer shall furnish The Port Authority with a copy of the Government's Written Notice of Acceptance of Completed Work for each contract for the general navigation features.

4. Notwithstanding paragraph A.1. of this Article, if the award of any contract for construction of the general navigation features would result in total cost of construction of the general navigation features exceeding $1,634,000,000.00, the Government and The Port Authority agree to defer award of that contract and all subsequent contracts for construction of the general navigation features until such time as the Government and The Port Authority agree to proceed with further contract awards for the general navigation features, but in no event shall the award of contracts be deferred for more than three years. Notwithstanding this general provision for deferral of contract awards, the Government, after consultation with The Port Authority, may award a contract or contracts after the Assistant Secretary of the Army (Civil Works) makes a written determination that the award of such contract or contracts must proceed in order to comply with law or to protect human life or property from imminent and substantial harm but only to the extent necessary to achieve said legal compliance or protection of human life or property.

B. The Port Authority may request the Government to design or construct betterments. Such requests shall be in writing and shall describe the betterments requested to be performed. If the Government in its sole discretion elects to perform the requested betterments or any portion thereof, it shall so notify The Port Authority in a writing that sets forth any applicable terms and conditions, which must be consistent with this Agreement. In the event of conflict between such a writing and this Agreement, this Agreement shall control. This writing shall hold and save the Government free from damages due to construction, operation, or maintenance of the betterments, except for damages due to the fault or negligence of the Government or its contractors. Both parties shall sign this writing. The Port Authority shall be solely responsible for all costs due to the requested betterments and shall pay all such costs in accordance with Article VI.C. of this Agreement.

C. In accordance with Article III of this Agreement, The Port Authority shall provide all lands, easements, and rights-of-way, including those necessary for the borrowing of material or the disposal of dredged or excavated material, that the Government determines The Port Authority must provide for construction or operation and maintenance of the general navigation features, and shall perform or ensure performance of all relocations and deep draft utility relocations that the Government determines to be necessary for construction or operation and maintenance of the general navigation features.

D. The Port Authority may request the Government to provide lands, easements, or rights-of-way or to perform relocations or deep draft utility relocations for the general navigation features on behalf of The Port Authority. Such requests shall be in writing and shall describe the

services requested to be performed. If in its sole discretion the Government elects to perform the requested services or any portion thereof, it shall so notify The Port Authority in a writing that sets forth any applicable terms and conditions, which must be consistent with this Agreement. In the event of conflict between such a writing and this Agreement, this Agreement shall control. The Port Authority shall be solely responsible for all costs of the requested services and shall pay all such costs in accordance with Article VI.C. of this Agreement. Notwithstanding the provision of lands, easements, or rights-of-way, or performance of relocations or deep draft utility relocations by the Government, The Port Authority shall be responsible, as between the Government and The Port Authority, for the costs of cleanup and response in accordance with Article XV.D. of this Agreement.

E. The Government shall assign all costs associated with the dredging or excavation of material from the dimensions, including over-depth and entrance channel wave allowances, of any existing Federal or non-Federal navigation project to the costs of operation and maintenance of the existing Federal or non-Federal navigation project. The Government, in accordance with Federal laws, regulations, and then current policies, shall assign all costs included or to be included in the total cost of construction of the general navigation features during the period of construction to one or more of the following depth increments: dredging to a depth not in excess of 20 feet plus associated over-depth and entrance channel wave allowances; dredging to a depth in excess of 20 feet but not in excess of 45 feet plus associated over-depth and entrance channel wave allowances; and dredging to a depth in excess of 45 feet plus associated over-depth and entrance channel wave allowances. Any costs of construction of the general navigation features incurred during a subsequent period of construction shall be assigned to the Project dredged depth.

F. The Port Authority shall contribute a share of the total cost of construction of the general navigation features (including any costs of dredged or excavated material disposal facilities during any subsequent period of construction) as follows: 10 percent of that portion of the total cost of construction of the general navigation features assigned to dredging to a depth not in excess of 20 feet plus associated over-depth and entrance channel wave allowances; plus 25 percent of that portion of the total cost of construction of the general navigation features assigned to dredging to a depth in excess of 20 feet but not in excess of 45 feet plus associated over-depth and entrance channel wave allowances; plus 50 percent of that portion of the total cost of construction of the general navigation features assigned to dredging to a depth in excess of 45 feet plus associated over-depth and entrance channel wave allowances. In addition, the Non-Federal Sponsor, in accordance with Article VI.C. of this Agreement, shall contribute 100 percent of the costs assigned by the Government to dredging or excavation of material from the dimensions, including over-depth and entrance channel wave allowances, of any existing non-Federal navigation project. If the construction of the Port Jersey Channel is carried out in accordance with Article II.A. of this Agreement and the construction of container handling facilities for a second user along the Port Jersey Channel is not completed by the end of the period of construction for the Port Jersey Channel and the Ambrose and Anchorage Channels, or such later date as the Government and The Port Authority may agree upon in writing, then The Port Authority shall be responsible for the total cost of constructing, operating and maintaining the Port Jersey Channel. Such responsibility for the cost of operating and maintaining the Port Jersey Channel shall continue until the Port Jersey Channel serves multiple users, at which time

The Port Authority's responsibility for such cost shall be as set forth in Article VIII of this Agreement. If the construction of the Bay Ridge Channel is carried out in accordance with Article II.A. of this Agreement and the construction of the South Brooklyn Marine Terminal and related cross-harbor transportation infrastructure, as described in the LRR, is not completed concurrently with the Bay Ridge Channel or such later date as the Government and The Port Authority may agree upon in writing, then The Port Authority shall be responsible for the total cost of constructing, operating and maintaining the Bay Ridge Channel. Such responsibility for the cost of operating and maintaining the Bay Ridge Channel shall continue until the South Brooklyn Marine Terminal and related cross-harbor transportation infrastructure have been constructed, at which time The Port Authority's responsibility for such cost shall be as set forth in Article VIII of this Agreement. In no event shall The Port Authority be responsible for constructing, operating or maintaining the container handling facilities along the Port Jersey Channel or the South Brooklyn Marine Terminal and the related cross-harbor transportation infrastructure pursuant to this Agreement.

G. If the Government projects that the value of The Port Authority's contributions under the terms of the Design Agreement and The Port Authority's contributions under paragraph L.3. of this Article, and under Articles V, X, and XV of this Agreement that are allocated by the Government to total cost of construction will be less than its share required by paragraph F. of this Article, The Port Authority shall provide additional funds, in accordance with Article VI.B. of this Agreement, in the amount necessary to meet its share required by paragraph F. of this Article.

H. The Government shall perform a final accounting in accordance with Article VI.D. of this Agreement to determine the value of The Port Authority's contributions under the terms of the Design Agreement, The Port Authority's contributions provided in accordance with paragraphs B., D., G., L.3., M. and N. of this Article before the end of the period of construction, and The Port Authority's contributions provided in accordance with Articles V, X, and XV of this Agreement before the end of the period of construction and to determine whether The Port Authority has met its obligations under paragraphs B., D., F., M., and N. of this Article for the period of construction. The final accounting also shall determine an amount equal to 10 percent of the total cost of construction of the general navigation features (hereinafter the "10 percent amount") before the end of the period of construction. In the event there is a subsequent period of construction, the Government shall amend the final accounting in accordance with Article VI.E.5. of this Agreement.

1. Before furnishing The Port Authority with the results of the final accounting, the Government shall afford credit against the 10 percent amount for the value, as determined in accordance with Article IV of this Agreement, of lands, easements, rights-of-way, relocations, or deep draft utility relocations provided before the end of the period of construction; provided, however, that such credit shall not exceed the 10 percent amount. In accordance with Article VI.E. of this Agreement, The Port Authority shall, over a period not to exceed 30 years, pay an amount equal to the 10 percent amount reduced by such credit (hereinafter the "principal amount"), with interest. In accordance with Article VI.E.4. of this Agreement, the Government also shall afford credit against the principal amount for the value, as determined in accordance with Article IV of this Agreement, of the lands, easements, rights-of-way, relocations or deep

draft utility relocations provided after the period of construction. In the event there is a subsequent period of construction and the Government amends the final accounting in accordance with Article VI.E.5. of this Agreement, The Port Authority, in accordance with Article VI.E.5. of this Agreement, shall pay any additional portion of the principal amount that is outstanding as a consequence of the amended final accounting.

2. The Government shall afford The Port Authority a credit toward the non-Federal share of the cost of the Project, as provided for in section 101(a)(2)(B)(ii) of Public Law 106-541, for design and construction work carried out by the Port Authority, as described in the LRR, prior to execution of this Agreement and determined by the Government to be integral to the Project. Such credit shall be provided in three equal installments over the first three years of the period of construction. The actual amount of such credit shall be determined following the Government's audit of records maintained by the Port Authority to document such costs.

3. If the deepening of the Port Jersey Channel to 50 feet below mlw is performed at non-Federal expense pursuant to the Project Cooperation Agreement between the Department of the Army, the State of New Jersey and the Port Authority, for construction of the New York Harbor and Adjacent Channels, Port Jersey, New Jersey Project, dated July 23, 2002, then the Government shall afford The Port Authority a credit for in-kind services or materials, as provided for in section 101(a)(2)(B)(i) of Public Law 106-541, toward the non-Federal share of the cost of the Project in an amount equal to that which would have been the Government's share of such deepening costs had the deepening been performed pursuant to this Agreement. Such credit shall be applied as described in paragraph 101 of the LRR.

I. The Government shall operate and maintain the general navigation features in accordance with Article VIII.B. of this Agreement and The Port Authority shall provide authorization for entry in accordance with Article III.A. of this Agreement.

J. The Port Authority shall not use Federal program funds to meet its obligations for the Project under this Agreement unless the Federal agency providing the Federal program funds verifies in writing that such expenditure of funds is expressly authorized by statute.

K. The Government shall accomplish all removals that neither The Port Authority nor the State of New York or the State of New Jersey, as appropriate, have the legal capability to accomplish where both The Port Authority and the State of New York or the State of New Jersey, whichever is appropriate, make a written request for the Government to accomplish such removals, and shall accomplish all removals that the Government is expressly required to accomplish in the authorizing legislation for the Project or any report referenced therein.

1. In the event a court determines that the owner of an obstruction is entitled to payment of just compensation as the result of elimination of the obstruction, such removal shall be reclassified as part of The Port Authority's responsibility to provide lands, easements, and rights-of-way, or to perform relocations, as appropriate, pursuant to Article II.C. of this Agreement.

2. All costs incurred by the Government in accomplishing removals shall be included in the total cost of construction of the general navigation features and shared in accordance with the provisions of this Agreement.

L. The Port Authority shall accomplish all removals, other than those removals specifically assigned to the Government by paragraph K. of this Article, in accordance with the provisions of this paragraph.

1. The Government in a timely manner, but in any event no later than ninety (90) days following the execution of this agreement, shall provide The Port Authority with general written descriptions, including maps as appropriate, of such removals, in detail sufficient to enable The Port Authority to fulfill its obligations under this paragraph, and shall provide The Port Authority with a written notice to proceed with accomplishing such removals. Unless the Government agrees to a later date in writing, prior to the issuance of the solicitation for each Government contract for construction, operation, and maintenance of the general navigation features, or prior to the Government incurring any financial obligation for construction, operation, and maintenance of the general navigation features that it elects to perform with its own forces, The Port Authority shall accomplish all removals set forth in such descriptions that the Government determines to be necessary for that work.

2. In the event a court determines that the owner of an obstruction is entitled to payment of just compensation as the result of elimination of the obstruction, such removal shall be reclassified as part of The Port Authority's responsibility to provide lands, easements, and rights-of-way, or to perform relocations, as appropriate, pursuant to Article II.C. of this Agreement.

3. The documented incidental costs incurred by The Port Authority in accomplishing removals shall be included in the total cost of construction of the general navigation features, subject to an audit in accordance with Article X.C. of this Agreement to determine reasonableness, allocability, and allowability of costs, and shared in accordance with the provisions of this Agreement. Incidental costs may include legal and administrative costs (such as owner or operator notification costs, public notice or hearing costs, attorney's fees, and litigation costs) incurred by The Port Authority in accomplishing removals, but shall not include any costs that The Port Authority or the State of New York or the State of New Jersey has the legal capability to require of, assign to, or recover from the owner or operator of the obstruction.

M. The Port Authority may request the Government to design, construct, or operate and maintain the local service facilities. Such requests shall be in writing and shall describe the local service facilities requested to be performed. If the Government in its sole discretion elects to perform the requested services or any portion thereof, it shall so notify The Port Authority in a writing that sets forth any applicable terms and conditions, which must be consistent with this Agreement. In the event of conflict between such a writing and this Agreement, this Agreement shall control. The Port Authority shall be solely responsible for all costs due to the requested services and shall pay all such costs in accordance with Article VI.C. of this Agreement.

N. The Port Authority may request the Government to provide additional capacity, over and above the capacity needed solely for dredged or excavated material from the other general navigation features, at a dredged or excavated material disposal facility for dredged or excavated material from outside the general navigation features. Such requests shall be in writing and shall describe the additional capacity requested to be provided. If the Government in its sole discretion elects to provide the requested additional capacity or any portion thereof, it shall so notify The Port Authority in a writing that sets forth any applicable terms and conditions, which must be consistent with this Agreement. In the event of conflict between such a writing and this Agreement, this Agreement shall control. In the event the Government elects to provide the additional capacity, the Government shall allocate the costs of engineering and design, construction, and operation and maintenance between the total cost of construction of the general navigation features and the costs of the additional capacity. The Port Authority shall be solely responsible for all costs reasonably allocated by the Government to the additional capacity and shall pay all such costs in accordance with Article VI.C. of this Agreement.

O. Subject to applicable Federal laws and regulations, The Port Authority, at no cost to the Government and in a timely manner, shall construct the local service facilities, including dredging or excavation and disposal of material therefrom, and shall be responsible for taking all actions to enable such construction. The Government shall have no responsibility under this Agreement for the construction of the local service facilities or the construction of any other facilities to be provided by The Port Authority or a third party.

P. In accordance with Article VIII. of this Agreement, The Port Authority, at no cost to the Government, shall operate and maintain, or cause to be operated and maintained, the local service facilities, including dredging or excavation and disposal of material therefrom. The Government shall have no responsibility under this Agreement for the operation and maintenance of the local service facilities or the operation and maintenance of any other facilities provided by The Port Authority or a third party.

Q. Crediting and/or reimbursement is subject to satisfactory compliance with applicable federal labor laws covering non-Federal construction, including, but not limited to, 40 U.S.C. §§ 3141-3148 and 40 U.S.C. §§ 3701-3708 (revising, codifying and enacting without substantive change the provisions of the Davis-Bacon Act (formerly 40 U.S.C. § 276a *et seq.*), the Contract Work Hours and Safety Standards Act (formerly 40 U.S.C. § 327 *et seq.*) and the Copeland Anti-Kickback Act (formerly 40 U.S.C. § 276c). Crediting and/or reimbursement may be withheld, in whole or in part, as a result of The Port Authority's failure to comply with its obligations under these laws.

R. Notwithstanding any other provision of this Agreement, neither party shall have any obligation under this Agreement with respect to provision of any dredged or excavated material disposal facility that is not part of the Project, or with respect to the provision of lands, easements, rights-of-way, relocations, or deep draft utility relocations that are required therefore.

S. The Port Authority may offer in writing to prepay a portion or all of its required cash contribution and the 10 percent amount during the period of construction or a subsequent period of construction, as applicable, to the Government for construction of the Project. This offer

shall be limited to an amount that does not exceed the most current estimate of the total of The Port Authority's required cash contribution and the 10 percent amount for the Project, as determined by the Government in coordination with The Port Authority, less any funds previously contributed by The Port Authority. Upon receipt of such offer or offers, the Government, subject to receiving such approvals and concurrences as customarily are required for contributed funds, may accept the funds or such portion thereof as the Government determines to be necessary to meet the costs of construction of the general navigation features of the Project pursuant to Section 4 of the River and Harbor Act of 1915. Any funds contributed by The Port Authority pursuant to this paragraph shall be contributed gratuitously and without any expectation of reimbursement by the Government unless specifically directed by Congress in appropriations acts. Any contributed funds, which are not expended by the Government on the Project shall be refunded to The Port Authority. If the Government elects to accept such funds, it shall notify The Port Authority of such acceptance in a writing that sets forth any applicable terms and conditions, including use of such funds by the Government, and that is consistent with this Agreement. In the event of a conflict between this Agreement and any such writing, this Agreement shall control.

T. The Port Authority may offer in writing to advance available funds to the Government for construction. Thereafter, the Government, subject to receiving such approvals and concurrences as customarily are required for advanced funds, may accept the funds, or such portion thereof as the Government determines to be necessary to meet the costs of construction, pursuant to Section 11 of the River and Harbor Act of 1925. Any funds contributed by The Port Authority pursuant to this paragraph, which are not expended by the Government on the Project shall be refunded to the Port Authority. The Government shall notify The Port Authority of such acceptance in a writing that sets forth any applicable terms and conditions, which must be consistent with this Agreement. In the event of a conflict between this Agreement and any such writing, this Agreement shall control.

U. Any funds which are contributed in accordance with Article II.S. of this Agreement, and any funds which are advanced in accordance with Article II.T. of this Agreement, shall be used by the Government to accelerate construction of the general navigation features of the Project. The parties shall confer and agree on how any such advanced funds can best be employed for that purpose.

V. As Federal appropriations are made available to pay the Federal share of construction of the Project, the Government shall afford credit for funds contributed and advanced during the period of construction in accordance with paragraphs II.S. and II.T. of this Article against the Port Authority's required cash contribution and the 10 percent amount. The Government shall credit this amount, contributed and advanced during the period of construction, toward the Port Authority's 10 percent amount and the required cash contribution for the remainder of the period of construction. If after the final accounting at the end of the period of construction, it is determined that the Port Authority has contributed and advanced funds in excess of its required cash contributions for the general navigation features constructed during the period of construction and the principal amount as determined by Article II.H.1. of this Agreement equals $0, the Government shall not reimburse the Port Authority for any such excess funds contributed and advanced during the period of construction (hereinafter the "excess contributed and

advanced funds") in accordance with paragraphs II.S. and II.T. of this Article unless specifically directed by Congress in appropriations acts. At the request of the Port Authority, the Government may apply these excess contributed and advanced funds against the non-Federal share of the costs of construction of the general navigation features during a subsequent period of construction, in accordance with paragraph W. of this Article.

W. As Federal appropriations are made available to pay the Federal share of construction of the Project, the Government shall afford credit for the aforesaid excess contributed and advanced funds or for funds contributed and advanced during a subsequent period of construction in accordance with paragraphs II.S. and II.T. of this Article against the Port Authority's required cash contribution and the 10 percent amount of the cost of a subsequent period of construction. The Government shall credit this amount toward the Port Authority's 10 percent amount and required cash contribution for the remainder of the subsequent period of construction. If after reconciling the final accounting at the end of a subsequent period of construction in accordance with Article VI.E.5. of this Agreement, it is determined that the Port Authority has contributed and advanced funds in excess of its required cash contributions for the general navigation features constructed during the subsequent period of construction and the principal amount as determined by Article II.H.1. of this Agreement equals $0, the Government shall not reimburse the Port Authority for any such excess funds contributed and advanced during the period of construction or during a subsequent period of construction in accordance with paragraphs S. and T. of this Article unless specifically directed by Congress in appropriations acts.

## ARTICLE III - LANDS, RELOCATIONS, DEEP DRAFT UTILITY RELOCATIONS, AND PUBLIC LAW 91-646 COMPLIANCE

A. The Government, after consultation with The Port Authority, shall determine the lands, easements, or rights-of-way necessary for the construction, operation, and maintenance of the general navigation features, including those lands, easements, or rights-of-way necessary for the borrowing of material, the disposal of dredged or excavated material, relocations, or deep draft utility relocations, and including those lands, easements, or rights-of-way that the Government determines to be subject to the navigation servitude. The Government at least 90 days prior to the award of the first construction contract, shall provide The Port Authority with general written descriptions, including maps as appropriate, of all the lands, easements, or rights-of-way that the Government determines The Port Authority must provide, in detail sufficient to enable The Port Authority to fulfill its obligations under this paragraph, and shall provide The Port Authority with a written notice to proceed with acquisition of such lands, easements, or rights-of-way. Unless the Government agrees to a later date in writing, prior to issuance of the solicitation for each Government contract for construction or operation and maintenance of the general navigation features, or prior to the Government incurring any financial obligation for construction or operation and maintenance of a general navigation feature it elects to perform with its own forces, The Port Authority shall acquire all lands, easements, and rights-of-way the Government determines The Port Authority must provide for that work, as set forth in such descriptions, and shall provide the Government with authorization for entry thereto.

Furthermore, prior to the end of the period of construction, or prior to the end of any subsequent period of construction, as applicable, The Port Authority shall acquire all lands, easements, and rights-of-way necessary for construction or operation and maintenance of the applicable general navigation features, as set forth in such descriptions, and shall provide the Government with authorization for entry thereto. For so long as the Project remains authorized, The Port Authority shall ensure that lands, easements, and rights-of-way that the Government determines to be required for the operation and maintenance of the general navigation features and that were provided by The Port Authority are retained in public ownership for uses compatible with the authorized purposes of the Project.

B. The Government, after consultation with The Port Authority, shall determine the relocations and deep draft utility relocations necessary for the construction or operation and maintenance of the general navigation features, including those necessary to enable the borrowing of material or the disposal of dredged or excavated material. The Government at least 90 days prior to the award of the first construction contract shall provide The Port Authority with general written descriptions, including maps as appropriate, of such relocations and deep draft utility relocations in detail sufficient to enable The Port Authority to fulfill its obligations under this paragraph, and shall provide The Port Authority with a written notice to proceed with such relocations and deep draft utility relocations. Unless the Government agrees to a later date in writing, prior to issuance of the solicitation for each Government contract for construction or operation and maintenance of the general navigation features or prior to the Government incurring any financial obligation for construction or operation and maintenance of a general navigation feature it elects to perform by its own forces, The Port Authority shall prepare or ensure the preparation of plans and specifications for, and perform or ensure the performance of, all relocations and deep draft utility relocations the Government determines to be necessary for that work. Nothing in this Agreement shall be deemed to affect any rights The Port Authority may have to seek and receive contributions from the utility owner, in accordance with Section 101(a)(4) of Public Law 99-662, for the owner's share of deep draft utility relocation costs.

C. Until the Government furnishes The Port Authority with the results of the final accounting pursuant to Article VI.D. of this Agreement, or the credit afforded pursuant to Article II.H.1. of this Agreement equals the 10 percent amount, whichever occurs later, The Port Authority in a timely manner shall provide the Government with such documents as are sufficient to enable the Government to determine the value of any contribution provided pursuant to paragraph A. or B. of this Article. Upon receipt of such documents the Government in a timely manner shall afford credit for the value of such contribution in accordance with Article II.H.1. of this Agreement.

D. The Port Authority shall comply with the applicable provisions of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, Public Law 91-646, as amended, and the Uniform Regulations contained in 49 C.F.R. Part 24, in acquiring lands, easements, or rights-of-way necessary for the construction, operation, and maintenance of the general navigation features, including those necessary for relocations, deep draft utility relocations, the borrowing of material, or the disposal of dredged or excavated material, and shall inform all affected persons of applicable benefits, policies, and procedures in connection with said Act.

ARTICLE IV - CREDIT FOR VALUE OF LANDS, RELOCATIONS, AND DEEP DRAFT UTILITY RELOCATIONS

A. The Port Authority shall receive credit in accordance with Article II.H.1. of this Agreement for the value of the lands, easements, or rights-of-way that The Port Authority must provide pursuant to Article III of this Agreement, and for the value of the relocations or deep draft utility relocations that The Port Authority must perform or for which it must ensure performance pursuant to Article III of this Agreement. However, The Port Authority shall not receive credit for the value of any lands, easements, rights-of-way, relocations, or deep draft utility relocations that have been provided previously as an item of cooperation for another Federal project. The Port Authority also shall not receive credit for the value of lands, easements, rights-of-way, relocations, or deep draft utility relocations to the extent that such items are provided or performed using Federal program funds unless the Federal agency providing the Federal program funds verifies in writing that such credit is expressly authorized by statute.

B. For the sole purpose of affording credit in accordance with this Agreement, the value of lands, easements, and rights-of-way, including those necessary for the borrowing of material, the disposal of dredged or excavated material, relocations, or deep draft utility relocations other than those the Government acquires on behalf of The Port Authority pursuant to Article II.D. of this Agreement, shall be the fair market value of the real property interests, plus certain incidental costs of acquiring those interests, as determined in accordance with the provisions of this paragraph.

1. Date of Valuation. The fair market value of lands, easements, or rights-of-way owned by The Port Authority on the effective date of this Agreement shall be the fair market value of such real property interests as of the date The Port Authority provides the Government with authorization for entry thereto. The fair market value of lands, easements, or rights-of-way acquired by The Port Authority after the effective date of this Agreement shall be the fair market value of such real property interests at the time the interests are acquired.

2. General Valuation Procedure. Except as provided in paragraph B.3. or B.4. of this Article, the fair market value of lands, easements, or rights-of-way shall be determined in accordance with paragraph B.2.a. of this Article, unless thereafter a different amount is determined to represent fair market value in accordance with paragraph B.2.b. of this Article.

a. The Port Authority shall obtain, for that real property interest, an appraisal that is prepared by a qualified appraiser who is acceptable to The Port Authority and the Government. The Port Authority shall provide the Government with the appraisal no later than 6 months after The Port Authority provides the Government with an authorization for entry for such real property interest, or, in the event an authorization for entry is not required, no later than the end of the period of construction or the end of the subsequent period of construction, as applicable. The appraisal must be prepared in accordance with the applicable rules of just compensation, as specified by the Government consistent with current Government practices and

procedures in effect at the time the appraisal is performed. The fair market value shall be the amount set forth in The Port Authority's appraisal, if such appraisal is approved by the Government. In the event the Government does not approve The Port Authority's appraisal, The Port Authority may obtain a second appraisal, and the fair market value shall be the amount set forth in The Port Authority's second appraisal, if such appraisal is approved by the Government. In the event the Government does not approve The Port Authority's second appraisal, The Port Authority chooses not to obtain a second appraisal, or The Port Authority does not provide the first appraisal as required in this paragraph, the Government shall obtain an appraisal, and the fair market value shall be the amount set forth in the Government's appraisal, if such appraisal is approved by The Port Authority. In the event The Port Authority does not approve the Government's appraisal, the Government, after consultation with The Port Authority, shall consider the Government's and The Port Authority appraisals and determine an amount based thereon, which shall be deemed to be the fair market value.

b. Where the amount paid or proposed to be paid by The Port Authority for the real property interest exceeds the amount determined pursuant to paragraph B.2.a. of this Article, the Government, at the request of The Port Authority, shall consider all factors relevant to determining fair market value and, in its sole discretion, after consultation with The Port Authority, may approve in writing an amount greater than the amount determined pursuant to paragraph B.2.a. of this Article, but not to exceed the amount actually paid or proposed to be paid. If the Government approves such an amount, the fair market value shall be the lesser of the approved amount or the amount paid by The Port Authority, but no less than the amount determined pursuant to paragraph B.2.a. of this Article.

3. Eminent Domain Valuation Procedure. For lands, easements, or rights-of-way acquired by eminent domain proceedings instituted after the effective date of this Agreement, The Port Authority shall, prior to instituting such proceedings, submit to the Government notification in writing of its intent to institute such proceedings and an appraisal of the specific real property interests to be acquired in such proceedings. The Government shall have 60 days after receipt of such a notice and appraisal within which to review the appraisal, if not previously approved by the Government in writing.

a. If the Government previously has approved the appraisal in writing, or if the Government provides written approval of, or takes no action on, the appraisal within such 60-day period, The Port Authority shall use the amount set forth in such appraisal as the estimate of just compensation for the purpose of instituting the eminent domain proceeding.

b. If the Government provides written disapproval of the appraisal, including the reasons for disapproval, within such 60-day period, the Government and The Port Authority shall consult in good faith to promptly resolve the issues or areas of disagreement that are identified in the Government's written disapproval. If, after such good faith consultation, the Government and The Port Authority agree as to an appropriate amount, then The Port Authority shall use that amount as the estimate of just compensation for the purpose of instituting the eminent domain proceeding. If, after such good faith consultation, the Government and The Port Authority cannot agree as to an appropriate amount, then The Port Authority may use the amount

set forth in its appraisal as the estimate of just compensation for the purpose of instituting the eminent domain proceeding.

c. For lands, easements, or rights-of-way acquired by eminent domain proceedings instituted in accordance with paragraph B.3. of this Article, fair market value shall be either the amount of the court award for the real property interests taken, to the extent the Government determined such interests are necessary for the construction or operation and maintenance of the general navigation features, or the amount of any stipulated settlement or portion thereof that the Government approves in writing.

4. Incidental Costs. For lands, easements, or rights-of-way acquired by The Port Authority within a five-year period preceding the effective date of this Agreement, or at any time after the effective date of this Agreement, the value of the interest shall include the documented incidental costs of acquiring the interest, as determined by the Government, consistent with current Government practices and procedures, in effect at the time the interest is acquired, subject to an audit in accordance with Article X.C. of this Agreement to determine reasonableness, allocability, and allowability of costs. In the event the Government modifies its determination made pursuant to Article III.A. of this Agreement, The Port Authority shall receive credit for the documented incidental costs associated with acquiring lands, easements, or rights-of-way identified in the original determination, subject to an audit in accordance with Article X.C. of this Agreement to determine reasonableness, allocability, and allowability of costs. Such incidental costs shall include, but not necessarily be limited to, closing and title costs, appraisal costs, survey costs, attorney's fees or cost of internal legal staff, plat maps, and mapping costs, as well as the actual amounts expended for payment of any Public Law 91-646 relocation assistance benefits provided in accordance with Article III.D. of this Agreement.

C. For the sole purpose of affording credit in accordance with this Agreement, the value of lands, easements, and rights-of-way, including those necessary for the borrowing of material, the disposal of dredged or excavated material, relocations, or deep draft utility relocations, that the Government acquires on behalf of The Port Authority pursuant to Article II.D. of this Agreement shall be the fair market value of the real property interests, plus certain incidental costs of acquiring those interests, as determined in accordance with the provisions of this paragraph.

1. The fair market value of such real property interests shall be the amount paid by the Government.

2. The value of the interest shall include the documented incidental costs of acquiring the interest. Such incidental costs shall include, but not necessarily be limited to, closing and title costs, appraisal costs, survey costs, attorney's fees, plat maps, and mapping costs, as well as the actual amounts expended for payment of any Public Law 91-646 relocation assistance benefits.

D. After consultation with The Port Authority, the Government shall determine the value of relocations and deep draft utility relocations in accordance with the provisions of this paragraph.

1. For a relocation other than a highway or a utility, the value shall be only that portion of relocation costs that the Government determines is necessary to provide a functionally equivalent facility, reduced by depreciation, as applicable, and by the salvage value of any removed items.

2. For a relocation of a highway, the value shall be only that portion of relocation costs that would be necessary to accomplish the relocation in accordance with the design standard that the State of New York or the State of New Jersey, as appropriate, would apply under similar conditions of geography and traffic load, reduced by the salvage value of any removed items.

3. For a relocation of a utility, the value shall be only that portion of relocation costs borne by The Port Authority that the Government determines is necessary to provide a functionally equivalent facility, reduced by depreciation, as applicable, and by the salvage value of any removed items.

4. Crediting for relocations and deep draft utility relocations performed within the Project boundaries is subject to satisfactory compliance with applicable Federal labor laws covering non-Federal construction, including, but not limited to, 40 U.S.C. §§ 3141-3148 and 40 U.S.C. §§ 3701-3708 (revising, codifying and enacting without substantive change the provisions of the Davis-Bacon Act (formerly 40 U.S.C. § 276a *et seq.*), the Contract Work Hours and Safety Standards Act (formerly 40 U.S.C. § 327 *et seq.*), and the Copeland Anti-Kickback Act (formerly 40 U.S.C. § 276c). Crediting may be withheld, in whole or in part, as a result of The Port Authority's failure to comply with its obligations under these laws.

5. The value of a deep draft utility relocation shall be that portion of the deep draft utility relocation costs borne by The Port Authority, but not to exceed 50 percent of the total deep draft utility relocation costs, that the Government determines are necessary to provide a functionally equivalent facility, reduced by depreciation, as applicable, and by the salvage value of any removed items.

6. Relocation costs and deep draft utility relocation costs shall include, but not necessarily be limited to, actual costs of performing the relocation or the deep draft utility relocation; planning, engineering and design costs; supervision and administration costs; and documented incidental costs associated with performance of the relocation or the deep draft utility relocation, but shall not include any costs due to betterments, as determined by the Government, nor any additional cost of using new material when suitable used material is available. Relocation costs and deep draft utility relocation costs shall be subject to an audit in accordance with Article X.C. of this Agreement to determine reasonableness, allocability, and allowability of costs.

ARTICLE V - PROJECT DELIVERY TEAM

A. To provide for consistent and effective communication, The Port Authority and the Government, not later than 30 days after the effective date of this Agreement, shall appoint named senior representatives, as each feels appropriate, to a Project Delivery Team. Thereafter, the Project Delivery Team shall meet regularly, but not less than once a month, until the end of the period of construction and during each subsequent period of construction. The Government's Project Manager and a counterpart named by The Port Authority shall co-chair the Project Delivery Team.

B. The Government's Project Manager and The Port Authority's counterpart shall keep the Project Delivery Team informed of the progress of construction, expenses, allocation of costs, engineering decisions and of significant pending issues and actions, and shall seek the views of the Project Delivery Team on matters that the Project Delivery Team generally oversees.

C. Until the end of the period of construction and during each subsequent period of construction, the Project Delivery Team shall generally oversee the Project, including but not necessarily limited to matters related to design; plans and specifications; scheduling; real property, relocation, deep draft utility relocation, and removal requirements; real property acquisition; expenses and allocation of costs; contract awards or modifications; contract costs; the application of and compliance with the Davis-Bacon Act, Contract Work Hours and Safety Standards Act and the Copeland Anti-Kickback Act for relocations and deep draft utility relocations; the Government's cost projections; final inspection of the entire Project or functional portions of the Project; preparation of the management plan for proposed dredged or excavated material disposal; anticipated requirements for operation and maintenance of the general navigation features; and other Project-related matters. The Project Delivery Team also shall generally oversee the coordination of schedules for the Project and the local service facilities. Oversight of the Project shall be consistent with a project management plan developed by the Government after consultation with the Port Authority.

D. The Project Delivery Team may make recommendations that it deems warranted to the District Engineer on Project-related matters that the Project Delivery Team generally oversees, including suggestions to avoid potential sources of dispute. The Government in good faith shall consider the recommendations of the Project Delivery Team. The Government, having the legal authority and responsibility for construction of the general navigation features, has the discretion to accept or reject, in whole or in part, the Project Delivery Team's recommendations but must act reasonably in exercising its discretion. The Government shall provide a timely written explanation for the rejection of any recommendation setting forth in detail the reasons therefore.

E. The costs of participation in the Project Delivery Team shall be included in the total cost of construction of the general navigation features and shared in accordance with the provisions of this Agreement.

## ARTICLE VI - METHOD OF PAYMENT

A. Until the Government furnishes The Port Authority with the results of the final accounting, the Government shall maintain current records of contributions provided by the parties and current projections of the total cost of construction of the general navigation features and costs due to additional work under Article II.B., II.D., II.M., or II.N. of this Agreement. At least quarterly during the period of construction and during each subsequent period of construction, if applicable, the Government shall provide The Port Authority with a report setting forth all contributions provided to date and the current projections of the total cost of construction of the general navigation features, of the portion of the total cost of construction of the general navigation features assigned to each depth increment in accordance with Article II.E. of this Agreement, of total costs due to additional work under Article II.B., II.D., II.M., or II.N. of this Agreement, of the maximum amount determined in accordance with Article XXI of this Agreement, of The Port Authority's total contributions required in accordance with Articles II.B , II.D., II.G., II.M., and II.N. of this Agreement, of the non-Federal proportionate share, of the estimated funds required from The Port Authority for the upcoming fiscal year; of the credit to be afforded in accordance with Articles II.S. and II.T. of this Agreement; of the credit to be afforded pursuant to Article II.H.1. of this Agreement for the value of lands, easements, rights-of way, relocations, or deep draft utility relocations contributed before the end of the period of construction and during any subsequent period of construction, of the 10 percent amount, of the principal amount, and of the installments to be paid in accordance with paragraph E.2. of this Article. Thereafter, until the outstanding portion of the principal amount equals $0, the Government, at least annually, shall provide The Port Authority with a report setting forth the outstanding portion of the principal amount and the current projection of the remaining installments to be paid in accordance with paragraph E.2. of this Article. On the effective date of this Agreement, the total cost of construction of the general navigation features is projected to be $1,634,000,000, and The Port Authority's contribution required under Article II.G. of this Agreement is projected to be $752,000,000. These amounts are subject to adjustment by the Government, after consultation with the Port Authority, and are not to be construed as the total financial responsibilities of the Government and the Port Authority.

B. The Port Authority shall provide the cash contribution required by the terms of this Agreement in accordance with the following provisions.

1. Not less than 60 calendar days prior to the scheduled date for the issuance of the solicitation for the first construction contract, the Government shall notify the Port Authority in writing of such scheduled date and the funds the Government determines to be required from the Port Authority to meet the Port Authority's proportionate share of financial obligations for construction incurred prior to the commencement of the period of construction. The Port Authority shall pay to the Government that amount 10 days prior to the solicitation of the first construction contract.

2. Not less than 60 calendar days prior to the scheduled date for the issuance of the solicitation for any construction contract, the Government shall notify the Port Authority, in writing, of such scheduled date and the funds the Government determines to be required from the

Port Authority for the Government to meet its anticipated legal payment obligations pursuant to this agreement and the terms of that construction contract. The Government shall notify the Port Authority of the total estimated amount of said construction contract and the amount that the Government estimates it will, upon execution of the contract, legally obligate itself to pay for the work then authorized. Not later than 10 calendar days before the solicitation of the contract the Port Authority shall provide the Government with the full amount of its proportionate share of the amount required by the Government to meet its legal obligation to pay for the authorized work. In the case of subsequently authorized work and additional obligations undertaken by the Government under any construction contract, the Government shall notify the Port Authority no later than 30 days prior to its undertaking of additional obligations of the additional amount the Government estimates it will obligate itself for and the Port Authority's proportionate share of said obligation, after consideration of the funds contributed and advanced in accordance with Articles II.P. and II.Q. of this Agreement and for which credit shall be afforded in accordance with Articles II.S. and II.T. of this Agreement. The Port Authority shall, within 20 days of receipt of such notification, and before the Government assuming the obligation, provide the Government with its proportional share.

3. The Government shall draw from the funds provided by the Port Authority such sums as the Government deems necessary to cover: (a) the non-Federal proportionate share of financial obligations for construction incurred prior to the commencement of the period of construction; (b) the non-Federal proportionate share of financial obligations for construction as they are incurred during the period of construction or during any subsequent period of construction, as applicable; and (c) additional financial obligations for construction of the Project that may be liquidated with the funds contributed and advanced in accordance with Articles II.S., II.T. and II.U. of this Agreement as they are incurred during the period of construction or during any subsequent period of construction, as applicable.

4. In the event the Government determines that pursuant to the terms hereof, the Port Authority must provide additional funds to meet its cash contribution, the Government shall notify the Port Authority in writing of the additional funds required. Within 60 calendar days thereafter, the Port Authority shall provide the Government with the full amount of the additional required funds.

5. Any funds required to be paid to the Government pursuant to this Agreement shall be paid by delivering a check payable to "FAO, USAED New York" to the District Engineer or by verifying to the satisfaction of the Government that the Port Authority has deposited the required funds in an escrow or other account satisfactory to the Government, with interest accruing to the Port Authority, or by presenting the Government with an irrevocable letter of credit acceptable to the Government for the required funds or by providing an Electronic Funds Transfer in accordance with procedures established by the Government.

C. In advance of the Government incurring any financial obligation associated with additional work under Article II.B., II.D., II.M., or II.N. of this Agreement, The Port Authority shall provide the Government with the full amount of the funds required to pay for such financial obligation through any of the payment mechanisms specified in paragraph B.5. of this Article.

The Government shall draw from the funds provided by The Port Authority such sums as the Government deems necessary to cover the Government's financial obligations for such additional work as they are incurred. In the event the Government determines that The Port Authority must provide additional funds to meet such financial obligations, the Government shall notify The Port Authority in writing of the additional funds required and provide an explanation of why additional funds are required. Within 30 calendar days thereafter, The Port Authority shall provide the Government with the full amount of the additional required funds through any of the payment mechanisms specified in paragraph B.5. of this Article.

D. Upon completion of the period of construction or termination of this Agreement before the end of the period of construction, and upon resolution of all relevant proceedings, claims, and appeals, the Government shall conduct a final accounting and furnish The Port Authority with the results of the final accounting. The Government may perform an interim accounting, if requested by The Port Authority.

1. The final accounting shall determine the total cost of construction of the general navigation features before the end of the period of construction, each party's contribution provided thereto, (including any credits afforded to The Port Authority pursuant to this Agreement) and each party's required share thereof. The final accounting also shall determine total costs due to additional work before the end of the period of construction under Article II.B., II.D., II.M., or II.N. of this Agreement and The Port Authority's contribution provided before the end of the period of construction in accordance with Article II.B., II.D., II.M., or II.N. of this Agreement.

a. In the event the final accounting shows that the total contribution provided by The Port Authority, (including any credits afforded to the Port Authority pursuant to this Agreement) before the end of the period of construction is less than its required share of the total cost of construction of the general navigation features before the end of the period of construction plus costs due to additional work before the end of the period of construction under Article II.B., II.D., II.M., or II.N. of this Agreement, The Port Authority shall, no later than 90 calendar days after receipt of written notice, make a payment to the Government of whatever sum is required to meet The Port Authority's required share of the total cost of construction of the general navigation features before the end of the period of construction plus costs due to additional work before the end of the period of construction under Article II.B., II.D., II.M., or II.N. of this Agreement by delivering a check payable to "FAO, USAED, New York" to the District Engineer or providing an Electronic Funds Transfer in accordance with procedures established by the Government.

b. In the event the final accounting shows that the total contribution provided by The Port Authority, (including any credits afforded to the Port Authority pursuant to this Agreement) before the end of the period of construction exceeds its required share of the total cost of construction of the general navigation features before the end of the period of construction plus costs due to additional work before the end of the period of construction under Article II.B., II.D., II.M., or II.N. of this Agreement, the Government shall, , refund the excess to The Port Authority no later than 90 calendar days after the final accounting is complete. To the extent that any such excess results from the Port Authority's prepayment of its required

contribution pursuant to Article II.S., hereof, or its advance of funds pursuant to Article II.T., hereof, any such refund shall be subject to the availability of funds. With respect to such prepaid or advanced funds, in the event existing funds are not available to refund the excess to The Port Authority, the Government shall seek such appropriations as are necessary to make the refund.

2. The final accounting also shall determine the 10 percent amount and the value, as determined in accordance with Article IV of this Agreement, of lands, easements, rights-of-way, relocations and deep draft utility relocations provided before the end of the period of construction.

E. The Port Authority shall pay the principal amount required by Article II.H.1. of this Agreement in accordance with the provisions of this paragraph.

1. Before furnishing The Port Authority with the results of the final accounting, the Government shall calculate the principal amount and the annual installments, which installments shall be substantially equal. At the time the Government furnishes The Port Authority with the results of the final accounting, the Government shall notify The Port Authority in writing of the principal amount and the annual installments. The Government shall recalculate the annual installments at five year intervals and shall notify The Port Authority in writing of the recalculated annual installments. In calculating or recalculating the annual installments, the Government shall amortize the principal amount over a period of 30 years (hereinafter the "payment period"), beginning on the date the Government notifies The Port Authority of the principal amount, using an interest rate determined by the Secretary of the Treasury. In the case of the initial calculation, the interest rate shall be determined by the Secretary of the Treasury taking into consideration the average market yields on outstanding marketable obligations of the United States with remaining periods to maturity comparable to the payment period during the month preceding the fiscal year in which the Government awards the first contract for construction of the general navigation features or commences construction using its own forces, plus a premium of one-eighth of one percentage point for transaction costs. In the case of recalculations, the interest rate shall be determined by the Secretary of the Treasury taking into consideration such average market yields during the month preceding the fiscal year in which the sixth installment is to be paid, and thereafter during the month preceding the fiscal year in which each fifth installment is to be paid, plus a premium of one-eighth of one percentage point for transaction costs.

2. The Port Authority shall pay the installments calculated or recalculated pursuant to paragraph E.1. of this Article each year on the anniversary of the date the Government notifies The Port Authority of the principal amount, over a period not to exceed the payment period, by delivering a check payable to "FAO, USAED, New York" to the District Engineer or providing an Electronic Funds Transfer in accordance with procedures established by the Government.

3. Notwithstanding paragraph E.2. of this Article, The Port Authority, in its sole discretion, may prepay the principal amount, in whole or in part, at any time, including any credits afforded under Articles II.S. and II.T. of this agreement and not otherwise applied to other contributions. Notwithstanding paragraph E.1. of this Article, there shall be no charges for

interest on any portion of the principal amount prepaid within 90 days after the Government notifies The Port Authority of the principal amount.

4. After the Government furnishes The Port Authority with the results of the final accounting, the Government shall afford credit against the principal amount for the value, as determined in accordance with Article IV of this Agreement, of lands, easements, rights-of-way, relocations or deep draft utility relocations provided after the period of construction; and the value of the Port Authority's credits afforded in accordance with Articles II.S. and II.T. of this Agreement and not otherwise applied against other required contributions for the general navigation features; provided, however, that the amount of credit afforded pursuant to this paragraph shall not exceed the principal amount. Credit shall be afforded against the portion of the principal amount that is outstanding at the time the credit is afforded. If the credit exceeds the portion of the principal amount outstanding at the time credit is afforded, the Government shall afford the excess credit against the portion of the principal amount that The Port Authority has paid at the time the credit is afforded, by refunding such portion to The Port Authority, subject to the availability of funds. In the event existing funds are not available to refund such portion to The Port Authority, the Government shall seek such appropriations as are necessary to make the refund.

5. In the event there is a subsequent period of construction, the Government, after completion of the construction of the applicable dredged or excavated material disposal facility or facilities, and upon resolution of all relevant proceedings, claims, and appeals, shall amend the final accounting (including recalculating the 10 percent amount), recalculate the principal amount and the principal amount outstanding, and, if the payment period has not elapsed, recalculate the annual installments by amortizing the principal amount outstanding over the remaining portion of the payment period, and shall furnish The Port Authority with the results of the amended final accounting and the aforesaid recalculations. Thereafter, if the payment period has not elapsed, The Port Authority shall pay the aforesaid recalculated installments in lieu of the previously calculated installments. If the payment period has elapsed, The Port Authority, not later than 90 days after being furnished the aforesaid results, shall pay to the Government any principal amount outstanding by delivering a check payable to "FAO, USAED, New York" to the District Engineer or providing an Electronic Funds Transfer in accordance with procedures established by the Government.

F. The Port Authority shall provide the 50 percent share required by Article VIII.A. of this Agreement in accordance with the provisions of this paragraph.

1. By August 1st of each year, the Government shall provide The Port Authority with the current projections of the Government's total financial obligations for operation and maintenance for the upcoming fiscal year, of the portion of the Government's total financial obligations for operation and maintenance in excess of the Government's financial obligations for operation and maintenance attributable to dredging to a depth not in excess of 45 feet plus associated over-depth and entrance channel wave allowances (hereinafter the "deep draft portion of financial obligations") for the upcoming fiscal year, and of the funds required from The Port Authority to cover its 50 percent share of the deep draft portion of financial obligations for the upcoming fiscal year.

2. The Government shall notify The Port Authority in writing, no later than 60 calendar days prior to the beginning of each fiscal year, of the funds the Government determines to be required from The Port Authority to cover its 50 percent share of the deep draft portion of financial obligations projected for that fiscal year. No later than 30 calendar days prior to the beginning of the fiscal year, The Port Authority shall provide the Government with the full amount of the required funds through any of the payment mechanisms specified in paragraph B.5. of this Article.

3. The Government shall draw from the funds provided by The Port Authority such sums as the Government deems necessary to cover The Port Authority's 50 percent share of the deep draft portion of financial obligations as those obligations are incurred.

4. If at any time the Government determines that additional funds will be needed from The Port Authority to cover The Port Authority's 50 percent share of the deep draft portion of financial obligations projected for the current fiscal year, the Government shall notify The Port Authority in writing of the additional funds required and provide an explanation of why additional funds are required, and The Port Authority, no later than 60 calendar days from receipt of such notice, shall make the additional required funds available through any of the payment mechanisms specified in B.5. of this Article.

5. Upon completion of each fiscal year, the Government shall conduct an accounting of the Government's financial obligations for operation and maintenance for that fiscal year (including all relevant claims and appeals resolved during that fiscal year) and furnish The Port Authority with the results of such accounting. Such accounting shall determine the Government's total financial obligation for operation and maintenance for that fiscal year, the deep draft portion of financial obligations for that fiscal year, each party's contribution provided for the deep draft portion of financial obligations for that fiscal year, and each party's required share of the deep draft portion of financial obligations for that fiscal year.

a. In the event such accounting shows that the total contribution provided by The Port Authority is less than its 50 percent share of the deep draft portion of financial obligations, The Port Authority shall, no later than 90 calendar days after receipt of written notice, make a payment to the Government of whatever sum is required to meet The Port Authority's 50 percent share of the deep draft portion of financial obligations by delivering a check payable to "FAO, USAED, New York" to the District Engineer or providing an Electronic Funds Transfer in accordance with procedures established by the Government.

b. In the event such accounting shows that the total contribution provided by The Port Authority exceeds its 50 percent share of the deep draft portion of financial obligations, the Government shall afford credit for the excess against The Port Authority's contribution for the next fiscal year, or, subject to the availability of funds, and at the request of The Port Authority, refund the excess to The Port Authority no later than 90 calendar days after such accounting is complete. In the event existing funds are not available to refund the excess as requested by The Port Authority, the Government shall seek such appropriations as are necessary to make the refund.

ARTICLE VII – DISPUTE RESOLUTION

A. As a condition precedent to a party bringing any suit for breach of this Agreement, that party must first notify the other party in writing of the nature of the purported breach and seek in good faith to resolve the dispute through negotiation. If the parties cannot resolve the dispute through negotiation, they agree to the following method of non-binding alternative dispute resolution with a qualified third party acceptable to both parties. The parties, however, reserve the right to mutually agree to another form of dispute resolution for any particular dispute.

B. Disputes between the Government and the Port Authority with respect to any purported breach of this Agreement shall be resolved by the methods hereinafter set forth. For the purposes of the following subparagraphs, a dispute is defined to mean a determination by the Government or the Port Authority, that the other party has failed to perform one or more responsibilities required of the other party under this Agreement. The existence of a dispute shall not excuse the parties from performance pursuant to this Agreement.

1. Within a period of 7 working days of written notice by either party of the existence of a dispute, the Government and the Port Authority, through the Project Coordination Team, shall meet and confer to resolve the matter.

2. If the Government and the Port Authority, acting through the Project Coordination Team, are unable to resolve the dispute, the dispute shall be referred to the Government's District Engineer and the Chief Engineer of the Port Authority for resolution.

3. Should the Government's District Engineer and the representative of the Port Authority fail to resolve the dispute within 20 working days, the Government and the Port Authority shall, within an additional 20 working days, refer the dispute to the American Arbitration Association or to another arbitration service mutually agreeable to the parties. The parties agree that time is of the essence in resolving disputes relating to this Agreement and that the Port Authority and Government shall expedite the presentation of disputes for arbitration. The Government and Port Authority shall present disputes to American Arbitration Association or the mutually agreed on arbitration service, within 15 working days of referral of the dispute for arbitration. American Arbitration Association, or the mutually agreed on arbitration service, shall decide the dispute within 20 working days after presentation. All costs incurred in presenting a dispute, including the costs of any arbitration service, shall be shared equally between the parties as such costs are incurred.

4. The Government and Port Authority agree that the form of arbitration shall be non-binding. In the event arbitration fails to resolve any dispute, the parties reserve the right to bring suit and have the matter resolved by any court of competent jurisdiction. The parties agree that participation in the arbitration process shall be a condition precedent to the filing of any such suit.

## ARTICLE VIII - OPERATION AND MAINTENANCE

A. Subject to applicable Federal laws and regulations and for so long as the Project remains authorized, and commensurate with the Government's operation and maintenance of the general navigation features, The Port Authority, at no cost to the Government, shall operate and maintain, or cause to be operated and maintained, the local service facilities in a manner compatible with the authorized purposes of the Project including dredging, excavation, and disposal of material therefrom. The Port Authority, as between the Government and The Port Authority, shall be responsible for taking all actions to enable such operation and maintenance.

B. The Government, subject to the availability of funds and as it deems necessary consistent with the authorized purposes of this project, and upon regular consultation with the Port Authority, shall operate and maintain the general navigation features and shall be responsible for all financial obligations for operation and maintenance of the general navigation features, including any financial obligations for advanced maintenance, except that the Non-Federal Sponsor shall contribute, in accordance with Article VI.F. of this Agreement, a 50 percent share of the deep draft portion of such financial obligations including any financial obligations for advanced maintenance.

C. The Non-Federal Sponsor hereby authorizes the Government to enter, at reasonable times, upon prior notification to the Port Authority and in a reasonable manner, upon property that the Non-Federal Sponsor now or hereafter owns or controls for access to the general navigation features for the purpose of inspection and, if necessary, for the purpose of operating and maintaining the general navigation features. Nothing contained herein, however, shall convey to the Government any interest in real property owned or controlled by the Non-Federal Sponsor.

## ARTICLE IX - HOLD AND SAVE

Subject to the provisions of Article XXII of this Agreement, The Port Authority shall hold and save the Government free from all damages arising from the construction, operation, and maintenance of the Project, any betterments, and the local service facilities, and the provision of capacity pursuant to Article II.N. of this Agreement, except for damages due to the fault or negligence of the Government or its contractors.

## ARTICLE X - MAINTENANCE OF RECORDS AND AUDIT

A. Not later than 60 calendar days after the effective date of this Agreement, the Government and The Port Authority shall develop procedures for keeping books, records, documents, or other evidence pertaining to costs and expenses incurred pursuant to this Agreement. These procedures shall incorporate, and apply as appropriate, the standards for financial management systems set forth in the Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments at 32 C.F.R. Section 33.20. The

Government and The Port Authority shall maintain such books, records, documents, or other evidence in accordance with these procedures and for a minimum of three years after completion of the accounting for which such books, records, documents, or other evidence were required. To the extent permitted under applicable Federal laws and regulations, the Government and The Port Authority shall each allow the other to inspect such books, records, documents, or other evidence.

B. In accordance with 32 CFR Section 33.26, The Port Authority is responsible for complying with the Single Audit Act Amendments of 1996, 31 U.S.C. Sections 7501-7507, as implemented by Office of Management and Budget (OMB) Circular No. A-133 and Department of Defense Directive 7600.10. Upon request of The Port Authority and to the extent permitted under applicable Federal laws and regulations, the Government shall provide to The Port Authority and independent auditors any information necessary to enable an audit of The Port Authority's activities under this Agreement. The costs of any non-Federal audits performed in accordance with this paragraph before the Government furnishes The Port Authority with the results of the final accounting shall be allocated in accordance with the provisions of OMB Circulars A-87 and A-133, and such costs as are allocated to the general navigation features shall be included in the total cost of construction of the general navigation features and shared in accordance with the provisions of this Agreement.

C. In accordance with 31 U.S.C. Section 7503, the Government may conduct audits in addition to any audit that The Port Authority is required to conduct under the Single Audit Act Amendments of 1996. Any such Government audits shall be conducted in accordance with Government Auditing Standards and the cost principles in OMB Circular No. A-87 and other applicable cost principles and regulations. The costs of Government audits performed in accordance with this paragraph before the Government furnishes The Port Authority with the results of the final accounting shall be included in the total cost of construction of the general navigation features and shared in accordance with the provisions of this Agreement.

## ARTICLE XI - FEDERAL AND STATE LAWS

In the exercise of their respective rights and obligations under this Agreement, The Port Authority and the Government agree to comply with all applicable Federal and State laws and regulations, including, but not necessarily limited to, Section 601 of the Civil Rights Act of 1964, Public Law 88-352 (42 U.S.C. § 2000d), as implemented by Department of Defense Directive 5500.11 and Army Regulation 600-7, entitled "Nondiscrimination on the Basis of Handicap in Programs and Activities Assisted or Conducted by the Department of the Army". The Port Authority is also required to comply with all applicable Federal labor standards requirements including, but not limited to, 40 U.S.C. §§ 3141-3148 and 40 U.S.C. §§ 3701-3708 (revising, codifying and enacting without substantive change the provisions of the Davis-Bacon Act (formerly 40 U.S.C. § 276a *et seq.*), the Contract Work Hours and Safety Standards Act (formerly 40 U.S.C. § 327 *et seq.*) and the Copeland Anti-Kickback Act (formerly 40 U.S.C. § 276c).

ARTICLE XII - RELATIONSHIP OF PARTIES

A. In the exercise of their respective rights and obligations under this Agreement, the Government and The Port Authority each act in an independent capacity, and neither is to be considered the officer, agent, or employee of the other.

B. In the exercise of its rights and obligations under this Agreement, neither party shall provide, without the consent of the other party, any contractor with a release or take any other action that waives or purports to waive any rights the other party may have to seek relief or redress against that contractor either pursuant to any cause of action that the other party may have or for violation of any law.

ARTICLE XIII - OFFICIALS NOT TO BENEFIT

No member of or delegate to the Congress, nor any resident commissioner, shall be admitted to any share or part of this Agreement, or to any benefit that may arise therefrom.

ARTICLE XIV - TERMINATION OR SUSPENSION

A. If at any time The Port Authority fails to fulfill its obligations under Articles II.B., II.D., II.G., II.M, II.N., II.O., II.P., VI or VIII. A. of this Agreement, the Assistant Secretary of the Army (Civil Works) shall terminate this Agreement or suspend future performance under this Agreement unless he determines that continuation of work on the general navigation features is in the interest of the United States or is necessary in order to satisfy agreements with any other non-Federal interests in connection with the Project.

B. If the Government fails to receive annual appropriations in amounts sufficient to meet its share of scheduled expenditures for the general navigation features for the then-current or upcoming fiscal year, the Government shall so notify The Port Authority in writing, and 60 calendar days thereafter either party may elect without penalty to terminate this Agreement or to suspend future performance under this Agreement. In the event that either party elects to suspend future performance under this Agreement pursuant to this paragraph, such suspension shall remain in effect until such time as the Government receives sufficient appropriations or until either the Government or The Port Authority elects to terminate this Agreement, whichever occurs first.

C. In the event that either party elects to terminate this Agreement pursuant to this Article or Article XV.D. of this Agreement, both parties shall conclude their activities relating to the Project and proceed to a final accounting in accordance with Article VI.D. of this Agreement, or an amended accounting in accordance with Article VI.E.5. of this Agreement, or an accounting in accordance with Article VI.F. of this Agreement, as applicable.

D. Any termination of this Agreement or suspension of future performance under this Agreement in accordance with this Article or Article XV.D. of this Agreement shall not relieve

the parties of liability for any obligation previously incurred. Any delinquent payment owed by The Port Authority shall be charged interest at a rate, to be determined by the Secretary of the Treasury, equal to 150 per centum of the average bond equivalent rate of the 13-week Treasury bills auctioned immediately prior to the date on which such payment became delinquent, or auctioned immediately prior to the beginning of each additional 3-month period if the period of delinquency exceeds 3 months.

ARTICLE XV - HAZARDOUS SUBSTANCES

A. After execution of this Agreement and upon direction by the District Engineer, The Port Authority shall perform, or cause to be performed, any investigations for hazardous substances that the Government or The Port Authority determines to be necessary to identify the existence and extent of any hazardous substances regulated under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, (hereinafter "CERCLA"), 42 U.S.C. Sections 9601-9675, that may exist in quantities which would require a response action under CERCLA, in, on, or under lands, easements, or rights-of-way that the Government determines, pursuant to Article III of this Agreement, to be necessary for the construction or operation and maintenance of the general navigation features. However, for lands, easements, and rights-of-way that the Government determines to be subject to the navigation servitude, only the Government shall perform such investigations unless the District Engineer provides The Port Authority with prior specific written direction, in which case The Port Authority shall perform such investigations in accordance with such written direction.

1. All actual costs incurred by The Port Authority or the Government before the end of the period of construction or during any subsequent period of construction for such investigations for hazardous substances shall be included in the total cost of construction of the general navigation features and shared in accordance with the provisions of this Agreement, subject to an audit in accordance with Article X.C. of this Agreement to determine reasonableness, allocability, and allowability of costs.

2. All actual costs incurred by The Port Authority after the period of construction, other than during a subsequent period of construction, for such investigations for hazardous substances shall be considered incidental costs under Article IV.B.4. of this Agreement and be credited pursuant to Article II.H.1. of this Agreement, subject to an audit in accordance with Article X.C. of this Agreement to determine reasonableness, allocability, and allowability of costs.

3. All actual costs incurred by the Government after the period of construction, other than during a subsequent period of construction, for such investigations for hazardous substances shall be considered financial obligations for operation and maintenance of the general navigation features and shared in accordance with the provisions of this Agreement.

B. The Port Authority may perform, or cause to be performed, any investigations it determines to be necessary to identify the existence and extent of any hazardous substances regulated under CERCLA that may exist in, on, or under lands, easements, or rights-of-way necessary solely for the construction, operation, and maintenance of the local service facilities.

However, for any of those lands that the Government determines to be subject to the navigation servitude, The Port Authority must obtain prior written instructions from the District Engineer regarding the method of testing and must perform such investigations only in accordance with those instructions. The costs of any investigations performed under this paragraph shall be borne entirely by The Port Authority. The Government shall have no obligation under this Agreement for the costs of any investigations performed under this paragraph. Nothing herein, however, shall exculpate or relieve the Government from any responsibility or liability it might have for having caused or contributed to the presence of any hazardous substances.

C. In the event it is discovered through any investigation for hazardous substances or other means that hazardous substances regulated under CERCLA exist in, on, or under any lands, easements, or rights-of-way that the Government determines, pursuant to Article III of this Agreement, to be necessary for the construction or operation and maintenance of the general navigation features, The Port Authority and the Government shall, in addition to providing any other notice required by applicable law, provide prompt written notice to each other, and The Port Authority shall not proceed with the acquisition of the real property interests until both parties agree that The Port Authority should proceed. In the event it is discovered through any means that hazardous substances regulated under CERCLA exist in, on, or under any lands, easements, or rights-of-way necessary for the construction or operation and maintenance of the local service facilities, The Port Authority and the Government shall, in addition to providing any other notice required by applicable law, provide prompt written notice to each other.

D. The Government and The Port Authority shall determine whether to initiate construction or operation and maintenance of the general navigation features, or, if already in construction or operation and maintenance of the general navigation features, whether to continue with construction or operation and maintenance of the general navigation features, suspend future performance under this Agreement, or terminate this Agreement for the convenience of the Government, in any case where hazardous substances regulated under CERCLA are found to exist in, on, or under any lands, easements, or rights-of-way that the Government determines, pursuant to Article III of this Agreement, to be necessary for the construction or operation and maintenance of the general navigation features. Should the Government and The Port Authority determine to initiate or continue with construction or operation and maintenance after considering any liability that may arise under CERCLA, The Port Authority shall be responsible, as between the Government and The Port Authority, for the costs of clean-up and response, to include the costs of any studies and investigations necessary to determine an appropriate response to the contamination. Such costs shall not be considered a part of the total cost of construction of the general navigation features. Nothing herein shall prevent the Port Authority from recovering the costs of clean up and response along with other damages from responsible parties. In the event The Port Authority fails to provide any funds necessary to pay for clean up and response costs or to otherwise discharge The Port Authority's responsibilities under this paragraph upon direction by the Government, the Government may, in its sole discretion, either terminate this Agreement for the convenience of the Government, suspend future performance under this Agreement, or continue work on the general navigation features. The Government shall have no obligation under this Agreement for the costs of any clean-up and response, to include the costs of any studies and investigations necessary to

determine an appropriate response to the contamination, on lands, easements, or rights-of-way necessary solely for the local service facilities.

E. The Port Authority and the Government shall consult with each other in accordance with Article V of this Agreement in an effort to ensure that responsible parties bear any necessary clean up and response costs as defined in CERCLA. Any decision made pursuant to paragraph C. or paragraph D. of this Article shall not relieve any third party from any liability that may arise under CERCLA.

F. To the maximum extent practicable, the Government and The Port Authority shall perform their responsibilities under this Agreement in a manner that will not cause liability to arise under CERCLA, or any other applicable law.

## ARTICLE XVI - NOTICES

A. Any notice, request, demand, or other communication required or permitted to be given under this Agreement shall be deemed to have been duly given if in writing and either delivered personally or by telegram or mailed by first-class, registered, or certified mail, as follows:

If to The Port Authority:

Director, Port Commerce Department
The Port Authority of New York and New Jersey
225 Park Avenue South, 11th Floor
New York, NY 10003

If to the Government:

Deputy District Engineer for Programs and Project Management
US Army Engineer District, New York
26 Federal Plaza, 21st Floor
New York, NY 10278-0090

B. A party may change the address to which such communications are to be directed by giving written notice to the other party in the manner provided in this Article.

C. Any notice, request, demand, or other communication made pursuant to this Article shall be deemed to have been received by the addressee at the earlier of such time as it is actually received or seven calendar days after it is mailed.

ARTICLE XVII - CONFIDENTIALITY

To the extent permitted by the laws governing each party, the parties agree to maintain the confidentiality of exchanged information when requested to do so by the providing party.

ARTICLE XVIII - HISTORIC PRESERVATION

A. The costs of identification, survey, and evaluation of historic properties incurred before the end of the period of construction or during a subsequent period of construction shall be included in the total cost of construction of the general navigation features and shared in accordance with the provisions of this Agreement.

B. The costs of identification, survey, and evaluation of historic properties incurred after the period of construction, other than during a subsequent period of construction, shall be considered financial obligations for operation and maintenance of the general navigation features and shared in accordance with the provisions of this Agreement.

C. The Government, as it determines necessary for the Project, shall perform any archeological data recovery activities associated with historic preservation. As specified in Section 7(a) of Public Law 86-523, as renumbered and amended by Public Law 93-291 (16 U.S.C. Section 469c(a)), the costs of archeological data recovery activities associated with historic preservation shall be borne entirely by the Government and shall not be included in the total cost of construction of the general navigation features, up to the statutory limit of one percent of the total amount authorized to be appropriated to the Government for the construction of the general navigation features.

D. The Government shall not incur costs for archeological data recovery activities that exceed the statutory one percent limit specified in paragraph C. of this Article unless and until the Assistant Secretary of the Army (Civil Works) has waived that limit (and the Secretary of the Interior has concurred in the waiver) in accordance with Section 208(3) of Public Law 96-515, as amended (16 U.S.C. Section 469c-2(3)).

1. Any costs of archeological data recovery activities that exceed the one percent limit and are determined by the Government to be attributable to construction of the general navigation features shall be included in the total cost of construction of the general navigation features and shared in accordance with the provisions of this Agreement.

2. Any costs of archeological data recovery activities that exceed the one percent limit and are determined by the Government to be attributable to operation and maintenance of the general navigation features shall be considered financial obligations for operation and maintenance of the general navigation features and shared in accordance with the provisions of this Agreement.

ARTICLE XIX - THIRD PARTY RIGHTS, BENEFITS, OR LIABILITIES

Nothing in this Agreement is intended, nor may be construed to create any rights, confer any benefits, or relieve any liability, of any kind whatsoever in any third person not party to this Agreement.

ARTICLE XX - NON-LIABILITY OF OFFICERS AND EMPLOYEES

Neither any Commissioner, officer, agent, consultant, or employee of The Port Authority, nor any officer, agent, consultant, or employee of the Government, may be charged personally with any liability, or held liable under the terms or provisions of this Agreement, or because of its execution or attempted execution, or because of any breach, attempted breach, or alleged breach thereof, except as provided in Section 912(b) of the Water Resources Development Act of 1986, Public Law 99-662, as amended (42 U.S.C. § 1962d-5b note), or other applicable law.

ARTICLE XXI - SECTION 902 PROJECT COST LIMITS

The parties have reviewed the provisions set forth in Section 902 of the Water Resources Development Act of 1986, Public Law 99-662, as amended, and understand that Section 902 establishes the maximum cost of the Project and the local service facilities. Notwithstanding any other provision of this Agreement, the Government shall not make a new Project financial obligation, make a Project expenditure, or afford credit toward total cost of construction of the general navigation features for the value of any contribution provided by The Port Authority, if such obligation, expenditure, or credit would result in the total cost of construction of the general navigation features plus the value of any contribution provided by The Port Authority in accordance with Article III of this Agreement plus the costs of the local service facilities, together with such obligations, expenditures, credits, and contributions for other elements of the Authorized Project, exceeding this maximum amount, unless otherwise authorized by law. On the effective date of this Agreement, this maximum amount is estimated to be $2,478,141,000, as calculated in accordance with ER 1105-2-100 using October 1, 2003 price levels and allowances for projected future inflation. The Government shall adjust this maximum amount in accordance with Section 902 of the Water Resources Development Act of 1986, Public Law 99-662, as amended.

ARTICLE XXII – INSURANCE REQUIREMENTS

A. The Government agrees to provide as an optional bid item in any contract entered into to construct the general navigation features of the Project that the contractor shall take out and maintain Comprehensive General Liability Insurance including but not limited to Operations and Completed Operations Coverage, Maritime Protection and Indemnity Insurance, and Chartered Legal Liability Insurance, where applicable, and Environmental Liability Insurance, which policies shall name the Port Authority as a named insured and shall contain a provision that the policy may not be canceled, terminated or modified without thirty days written advance notice to the Government and Port Authority. The Port Authority shall be responsible for all additional costs associated with this optional bid item, and such contract costs shall not be included in the

total cost of the general navigation features of the Project. Moreover, the Government's Contracting Officer may decline to include such insurance requirements in any individual contract for construction of the general navigation features of the Project where the Contracting Officer reasonably determines that the inclusion of such insurance requirements may result in a restriction in full and open competition, as defined by the Federal Acquisition Regulation, or other applicable procurement regulations. The policies required shall be for not less than the following limits:

1. Commercial General Liability Insurance in limits of not less than Five Million Dollars ($5,000,000) combined single limit per occurrence for bodily injury, death, personal injury and property damage including, but not limited to, coverage for premises-operations, products-completed operations, independent contractors, broad form property damage, property damage arising out of explosion, collapse or underground property damage hazards with a contractual liability endorsement covering the risks assumed and indemnification given by the Port Authority under this Agreement and a copy of such Agreement shall be furnished to the insurance underwriter.

2. The Commercial General Liability Policy shall not contain any provisions for exclusions from liability other than provisions for exclusion from liability forming part of the standard, basic, unamended and unendorsed commercial liability policy. Automobile Liability Insurance covering owned, non-owned, and hired autos with a limit of not less than Three Million dollars ($3,000,000) per accident.

3. Maritime Protection & Indemnity Insurance and Chartered Legal Liability Insurance, where applicable, in limits of not less than Five Million Dollars ($5,000,000) combined single limit per occurrence for bodily injury, death and property damage including coverage for Masters and members of crews.

4. Environmental Liability Insurance in limits of not less than Ten Million Dollars ($10,000,000) combined single limit per occurrence for bodily injury, death and property damage.

B. The policies described above shall include cross-liability coverage.

C. The Government further agrees that the optional bid item will require the contractor to obtain and maintain a policy of Worker's Compensation Insurance (including an all-states endorsement) in accordance with the requirements of law. The policy shall include the United States Longshoremen and Harbor Workers Compensation Act endorsement

D. The Government's insurance option clause shall also provide that, in the event the Government exercises the option provided for therein, the contractor shall furnish the Contracting Officer a certificate or statement of the above required insurance prior to the commencement of work under the contract and the Contracting Officer shall also have the right, upon written notice, to receive certified copies of such policies. The clause shall further provide that the policies evidencing the required insurance shall contain an endorsement to the effect that cancellation or any material change in the policies adversely affecting the interest of the Port

Authority in such insurance shall not be effective for such period as may be prescribed by the by the laws of the states in which the contract is being performed (and should the laws of such states provide for periods of differing length, the longer of such periods shall apply) and in no event less than thirty (30) days after written notice thereof to the Contracting Officer and the Port Authority.

E. The Government's insurance option clause shall also provide that, prior to exercise of the option provided for in this Article, the contractor will be required to submit to the Contracting Officer a certification from the contractor's insurance carrier that the amount inserted in the item entitled "Additional Cost for Optional Insurance" of the Price Schedule represents only the additional premium paid by the contractor as a direct result of the specific insurance requirements of this Article and excludes those premium costs which would have otherwise been incurred by the contractor if the insurance option had not been exercised. The clause shall also provide that the Government reserves the right to request a further elaboration with regard to this computation at any time before the exercise of the option.

F. In the event that the insurance option is exercised, the Port Authority shall reimburse the Government for the additional cost of the option at the lump sum price inserted by the contractor for such optional item in its bid.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, which shall become effective upon the date it is signed by the Assistant Secretary of the Army (Civil Works).

THE DEPARTMENT OF THE ARMY

BY: John Paul Woodley, Jr.
JOHN PAUL WOODLEY, JR.
Assistant Secretary of the Army
(Civil Works)

DATE: 28 May 2004

THE PORT AUTHORITY OF
NEW YORK AND NEW JERSEY

BY: [signature]
for JOSEPH J. SEYMOUR
Executive Director

DATE: 5/28/04

CERTIFICATE OF AUTHORITY

I, Jeffrey S. Green, do hereby certify that I am the principal legal officer of The Port Authority of New York and New Jersey, that The Port Authority of New York and New Jersey is a legally constituted public body with full authority and legal capability to perform the terms of the Agreement between the Department of the Army and The Port Authority of New York and New Jersey in connection with the New York and New Jersey Harbor Deepening Project, and to pay damages in accordance with the terms of this Agreement, if necessary, in the event of the failure to perform, as required by Section 221 of Public Law 91-611 (42 U.S.C. Section 1962d-5b), and that the persons who have executed this Agreement on behalf of The Port Authority of New York and New Jersey have acted within their statutory authority.

IN WITNESS WHEREOF, I have made and executed this certification this 28th day of May, 2004.

General Counsel
The Port Authority of New York and New Jersey

CERTIFICATION REGARDING LOBBYING

The undersigned certifies, to the best of his or her knowledge and belief that:

(1) No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

(2) If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or cooperative agreement, the undersigned shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

(3) The undersigned shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subcontracts, subgrants, and contracts under grants, loans, and cooperative agreements) and that all subrecipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by Section 1352, Title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

Arthur J. Cifelli for JJS

JOSEPH J. SEYMOUR
Executive Director

DATE: 5/28/04

# EXHIBIT 3

WEST/CRS

2006-1391, -1408

# United States Court of Appeals

*for the*

# Federal Circuit

SEVENSON ENVIRONMENTAL SERVICES, INC.,

*Plaintiff-Appellant,*

*vs.*

SHAW ENVIRONMENTAL, INC.,

*Defendant-Cross Appellant.*

*Appeals from the United States District Court for the Western District of New York in Case No. 02-CV-00527, Judge Richard J. Arcara*

## BRIEF FOR DEFENDANT-CROSS APPELLANT

FILED
U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT
AUG 21 2006
JAN HORBALY
CLERK

MARK S. GRAHAM
GEOFFREY D. KRESSIN
LUEDEKA, NEELY & GRAHAM, P.C.
P.O. Box 1871
Knoxville, Tennessee 37901-1871
(865) 546-4305

*Counsel for Defendant-Cross Appellant, Shaw Environmental, Inc.*

AUGUST 21, 2006

COUNSEL PRESS, LLC (202) 783-7288 • (888) 277-3259

The approved Work Plan specifies treatment of the Government's soil using the accused phosphoric acid process. (JA604; JA627-628; JA661). The treatment method is described in Section 5.2 of the Work Plan as follows:

> Material contaminated with lead above the characteristic hazardous waste level is treated to remove that characteristic and to achieve compliance with land disposal restrictions associated with off-site disposal at permitted landfills.... The on-site treatment system is a phosphoric acid based stabilization system. The use of phosphoric acid was selected as a result of an independent feasibility study of treatment alternatives conducted under subcontract with Kiber Environmental in 1999. The stabilization system consists of a power screener to remove oversized materials and a pugmill to mix the phosphoric acid with the soils.

(JA627-628, 650; JA661).

The most recent Work Plan approval of record dated August 22, 2003, approves the Work Plan as part of the contract "specifications" with a Code "A" unconditional approval. (JA628, 652-654). Previous versions of the approved Work Plan for the Government's Colonie site have likewise specified that the Government's soil be treated using the accused phosphoric acid process. This requirement in the approved Work Plan to use the accused phosphoric acid process has been the same under both the TERC and the PRAC contracts. (JA604; JA628; JA661).